**GIBSON, DUNN & CRUTCHER LLP**
THEODORE J. BOUTROUS, JR., SBN 132099
  tboutrous@gibsondunn.com
JILLIAN N. LONDON, SBN 319924
  jlondon@gibsondunn.com
PATRICK J. FUSTER, SBN 326879
  pfuster@gibsondunn.com
BRANTON J. NESTOR, SBN 338445
  bnestor@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile:  213.229.7520

JEFFREY B. WALL (*pro hac vice* forthcoming)
  jwall@gibsondunn.com
MORGAN L. RATNER (*pro hac vice* forthcoming)
  mratner@gibsondunn.com
1700 M Street, N.W.
Washington, DC 20036
Telephone: 202.955.8533

*Attorneys for Plaintiff Pacific Bell Telephone
Company d/b/a AT&T California*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC BELL TELEPHONE COMPANY d/b/a AT&T CALIFORNIA,<br><br>                    Plaintiff,<br><br>          v.<br><br>JOHN REYNOLDS, in his official capacity as President of the California Public Utilities Commission; DARCIE L. HOUK, KAREN DOUGLAS, MATTHEW BAKER, and CHRISTINE HARADA, in their official capacities as Commissioners of the California Public Utilities Commission; ROB BONTA, in his official capacity as Attorney General of the State of California,<br><br>                    Defendants. | Case No. **'26 CV 3148 LL   JAC**<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

Plaintiff Pacific Bell Telephone Company d/b/a AT&T California (AT&T), by and through its undersigned counsel, brings this complaint for declaratory and injunctive relief against Defendant John Reynolds in his official capacity as President of the California Public Utilities Commission (CPUC); Defendants Darcie L. Houk, Karen Douglas, Matthew Baker, and Christine Harada, in their official capacities as Commissioners of the CPUC; and Rob Bonta in his official capacity as Attorney General of the State of California. In support of the requested relief, AT&T alleges as follows:

### NATURE OF THE ACTION

1.      California requires AT&T to spend $1 billion each year to maintain a century-old telephone network that almost no one uses. The copper wires that once served *every* home now serve just three percent of households in AT&T's California territory, with consumers fleeing every day to modern broadband services that are more affordable, reliable, and energy efficient. The barely used copper network is an easy mark for criminals—California has already suffered about 2,000 outages from copper thefts this year—and drains the power grid of over 100 million kilowatt-hours each year.

2.      The Federal Communications Commission has stepped in to break the regulatory gridlock. It granted AT&T permission to stop signing up new customers for its "plain old telephone service," or POTS—a necessary step toward retiring its outdated copper network and freeing up capital to expand and improve its cutting-edge fiber and wireless services. That transition will leave no customer behind because of the range of modern wireline and wireless services offered by AT&T and its competitors. But California still refuses to let go. Its monopoly-era "Carrier of Last Resort" (COLR) rules require AT&T to continue offering POTS even after the FCC has authorized the service to be phased out. Under basic preemption principles, those COLR rules cannot stand.

3.  In 1876, Alexander Graham Bell uttered nine now-famous words: "Mr. Watson, come here; I want to see you."  Over the decades that followed, the Bell Telephone company—a predecessor to AT&T—crisscrossed the country with copper wires running down virtually every street, fueling the growth of a young nation and allowing millions of Americans to make phone calls.

4.  The telecommunications industry has come a long way since Bell's first phone call.  AT&T and its many competitors now offer a multitude of modern communications services to customers nationwide.[1]  AT&T has invested hundreds of billions of dollars to deploy fiber and 5G wireless networks, and it plans to accelerate that deployment over the next five years.  But in California, the old copper lines are still there, frozen in time by regulations that compel AT&T to maintain its antiquated "plain old telephone service."  POTS was the standard form of telephone service in the nineteenth century and much of the twentieth.  AT&T still provides it today over an aging, fragile, and expensive copper network.

5.  Although the copper wires in AT&T's legacy network are stuck in the past, consumers are not.  Nearly 80% of adults nationwide now rely solely on wireless phone service.  And of those who still have a wired home phone, almost all use a modern, Internet Protocol (IP)-based phone service provided over their broadband connection.

6.  For good reason.  The transition from POTS to modern fiber and wireless services is better for Californians and for the environment.  After all:

7.  *Copper is less reliable.*  In emergencies, wireless networks keep people connected on the go.  When disasters like wildfires strike, fiber and wireless services can be restored far faster than copper-based POTS.  And criminals target copper lines

---

[1]  As defined above, "AT&T" refers to AT&T California.  Where context indicates nationwide scope, however, "AT&T" may refer to AT&T California together with its affiliates, which generally operate nationwide under the name of AT&T Services, Inc.

for their raw-material value, leaving POTS customers without service.  All too often, criminals return to steal the replacement lines as soon as service is restored.

8.    *Copper is worse for the environment*.  Fiber delivers better performance with significantly lower energy use.  Transitioning from copper will save an estimated 300 million kilowatt-hours annually by 2030—the equivalent of eliminating emissions from 17 million gallons of gasoline.

9.    *Copper is more expensive*.  AT&T spends roughly $1 billion a year in California to maintain and repair hundreds of thousands of miles of largely obsolete copper lines, ancient "circuit" switches, and other POTS facilities.  Even finding replacement parts for decades-old equipment is a nearly insurmountable challenge.  All that spending diverts finite resources from the modern technologies that consumers actually want—fiber and wireless.

10.    Consumers and markets have moved on from copper-based POTS.  But because of the telecom industry's unique regulatory history, AT&T needs government permission before it can follow suit.  Regulations from the telephone-monopoly era require government approvals before carriers can withdraw basic services like POTS.  The federal government and virtually all States where AT&T historically offered POTS have now eliminated outdated regulatory obstacles, allowing AT&T to begin powering down its POTS network and increasing its investments in modern communication technologies.

11.    California stands alone in resisting this progress.  Unlike its peer States, California maintains procedural and substantive roadblocks that require AT&T to continue providing POTS to both existing and new customers regardless of available alternatives.  In particular, California's enduring COLR regime prevents AT&T from reducing service unless it receives permission from the California Public Utilities Commission (CPUC).  CPUC Decision 96-10-066, Appx. B at 11.  The process of seeking and receiving approval is onerous.  It is also fruitless:  California has made clear that it will not allow AT&T to relinquish its COLR obligations unless another

carrier first agrees to take AT&T's place. *See*, *e.g.*, CPUC Decision 24-06-024 at 21-25; CPUC Gen. Order No. 96-B, Telecommunications Industry Rule 7.4(1); CPUC Decision 12-12-038 at 56, Appx. A at 6. Unsurprisingly, no other carrier is willing to assume AT&T's unique, antiquated obligations.

12. AT&T is now stuck with conflicting rules about what it can do with its outdated copper lines and the POTS it provides over them—and a state agency that will not budge. The FCC has made a blanket determination that AT&T and other carriers may stop accepting new customers for POTS (a reduction in service the FCC calls "grandfathering"). This is an essential step toward eventually discontinuing service and retiring the underlying copper network, freeing up resources to construct modern networks that consumers overwhelmingly prefer. But California regulations on the books still require AT&T to continue offering POTS throughout its service territory. These contradictory regimes cannot be reconciled; one must go.

13. Fortunately, Congress anticipated just such a clash and, in the Communications Act of 1934, decided that the FCC wins. With respect to services like POTS with an interstate component, Congress directed the FCC to authorize any "discontinuance, reduction, or impairment of service" to a community. 47 U.S.C. § 214(a), (c); *see id.* § 152(a). Before granting authorization, the FCC must determine that "neither the present nor future public convenience and necessity will be adversely affected" by the change. *Id.* § 214(a). The FCC's determination then controls. Once the FCC authorizes a reduction or discontinuance in service, a carrier can act "*without securing approval other than such certificate*" from the FCC. *Id.* § 214(c) (emphasis added).

14. In March, the FCC adopted the Network Modernization Order (NMO) and expressly addressed its preemptive effect. Report and Order, WC Docket No. 25-209 (Mar. 26, 2026); *see* Order, WC Docket No. 17-84 (Mar. 20, 2025) (Waiver Order). In doing so, the FCC took decisive steps to "cut[] through the red tape that has both required providers to keep aging copper wires in place and effectively

prevented them from investing in the modern infrastructure that Americans want and deserve." NMO ¶ 1. The NMO aims to free up resources to facilitate "the transition to next-generation networks and services," NMO ¶ 114; to "allow providers to invest more resources toward modernizing their networks," NMO ¶ 23; and to clear away "state and local requirements" that "needlessly constrain the deployment of modern, next-generation IP-based networks," NMO ¶ 7. To achieve those goals, the FCC granted all carriers, including AT&T, "blanket section 214(a) authority" to "grandfather" legacy voice services like POTS without the need for further filings or regulatory approval. NMO ¶ 6.

15. Under the Communications Act, the FCC's authorization is all AT&T needs to grandfather POTS in California. But California's conflicting state laws still stand in the way, and California has shown no signs of backing down. So judicial intervention is required to declare that AT&T may exercise the grandfathering authority granted by the FCC, and to stop state officials from punishing AT&T for acting on that authority.

16. The Communications Act preempts California's COLR requirements, as applied to AT&T's grandfathering of POTS in California, under any of three established strands of preemption doctrine.

17. *First*, express preemption. Section 214 of the Communications Act expressly preempts state requirements that impinge on modifications to interstate or jurisdictionally mixed services where the FCC has authorized "discontinuance, reduction, or impairment of service." 47 U.S.C. § 214(c). Congress provided that, after the FCC has authorized a discontinuance, reduction, or impairment, a carrier may perform the authorized activity "without securing [other] approval." *Ibid.* The FCC has "grant[ed] blanket section 214(a) authority for carriers to grandfather legacy voice services." NMO ¶ 6; *see id.* ¶¶ 60-66. In direct contravention of Section 214(c), California requires AT&T to seek additional regulatory "approval[s]" before grandfathering POTS. That should be the end of the matter.

18.   *Second*, impossibility preemption.  California and the CPUC cannot separate and regulate any nominally intrastate component of POTS.  In Section 2 of the Communications Act, Congress attempted "to divide the world of domestic telephone service neatly into two hemispheres—one comprised of interstate service, over which the FCC would have plenary authority, and the other made up of intrastate service, over which the States would retain exclusive jurisdiction."  *Louisiana Pub. Serv. Comm'n* v. *FCC*, 476 U.S. 355, 360 (1986); *see* 47 U.S.C. § 152.  However, "the realities of technology and economics belie such a clean parceling of responsibility."  *Louisiana*, 476 U.S. at 360.  Courts have thus recognized an "impossibility exception" to the division of authority in Section 2, under which an intrastate regulation is preempted if "(1) it is not possible to separate the interstate and intrastate aspects of the service, and (2) federal regulation is necessary to further a valid federal regulatory objective, i.e., state regulation would conflict with federal regulatory policies."  *Minnesota Pub. Utilities Comm'n* v. *FCC*, 483 F.3d 570, 578 (8th Cir. 2007); *see California* v. *FCC*, 75 F.3d 1350, 1359 (9th Cir. 1996) (Impossibility preemption applies where it is "not possible to separate the interstate and intrastate components of the asserted FCC regulation.").

19.   Both criteria are met here.  Modern voice services are provided over integrated, all-distance networks, and the concept of "local" telephone service has faded into irrelevance.  When it comes to the physical maintenance of a copper-wire POTS system, interstate and intrastate telephone services are inseparable:  the facilities and wires used to provide each service are the same, making it impossible to retire the interstate network while maintaining the intrastate one.  Requiring either one would impede the FCC's regulatory objective of shifting investment dollars to modern services.

20.   *Third*, conflict preemption.  CPUC rules blocking AT&T from grandfathering POTS cannot stand because they would effectively force AT&T to extend a service to new customers after the FCC has said otherwise, nullifying the

FCC's exclusive Section 214 authority. Those rules would also undermine the FCC's explicit objective of "spur[ring] network modernization." NMO ¶ 2. And they would allow California to assume a different role than the one Section 214 specifically prescribes for States.

21. Under any one of these three preemption theories, California cannot apply its COLR and related regulations to force AT&T to continue to offer copper-based POTS to new customers. As the FCC explained in the NMO, "where the [FCC] has exercised its section 214(a) authority over interstate and/or jurisdictionally mixed service to allow a carrier to grandfather legacy voice service . . . federal law preempts state requirements that operate to require the carrier to continue offering that interstate or jurisdictionally mixed grandfathered service to new customers." NMO ¶ 114 n.415. That is precisely how California law operates here.

22. AT&T thus seeks (i) a declaration that any California law or regulation that interferes with AT&T's ability to grandfather POTS, as authorized by the FCC in the NMO, is unlawful; and (ii) injunctive relief to preclude California officials from applying those laws or regulations to prevent or slow AT&T from grandfathering POTS.

### PARTIES

23. Plaintiff Pacific Bell Telephone Company d/b/a AT&T California is a California corporation with a principal address of 430 Bush Street, San Francisco, California 94108. AT&T has offices throughout California, including a corporate office in San Diego, California. AT&T provides customers across the State with a variety of telecommunications services, including POTS. Thousands of customers who subscribe to POTS live in the Southern District of California and will receive grandfathering notices.

24. Defendant John Reynolds is the President of the CPUC. Defendants Darcie L. Houk, Karen Douglas, Matthew Baker, and Christine Harada are commissioners of the CPUC. The President and Commissioners of the CPUC are

GIBSON, DUNN &
CRUTCHER LLP

- 7 -

COMPLAINT

the officials charged with enforcement of California's COLR requirements. The President and Commissioners' offices are located at 505 Van Ness Avenue, San Francisco, California 94102.

25.    Defendant Rob Bonta is the Attorney General of the State of California. The Attorney General—and the state and local entities acting under him or in concert with him (including district attorneys)—are also charged with enforcement of California's COLR requirements.    The Attorney General maintains offices throughout the State—including 1300 I Street, Sacramento, California 95814, and 600 West Broadway Street, Suite 1800, San Diego, California 92101.

## JURISDICTION AND VENUE

26.    This action arises under the Communications Act of 1934, as amended by the Telecommunications Act of 1996; the FCC's implementing Waiver Order and NMO; and the Supremacy Clause of the United States Constitution.  AT&T seeks declaratory and injunctive relief against the CPUC's COLR requirements, which require AT&T to offer POTS to all new customers, because the Communications Act preempts those requirements.  "A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, . . . presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Shaw* v. *Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983).  This Court accordingly has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

27.    This Court has personal jurisdiction over defendants, who are state officers, because they are citizens of California, maintain their principal offices in California, and threaten the challenged actions in California.

28.    Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2).  A substantial part of the events giving rise to this action—including the grandfathering of POTS for a substantial number of District residents—has occurred and will occur in this District.

GIBSON, DUNN & CRUTCHER LLP

- 8 -

COMPLAINT

**FACTS**

29.    For over a century, POTS served as the standard form of telephone service for many Americans.  But as technology has evolved, rising costs and falling demand have reshaped the market.  Today, the vast majority of AT&T's California customers have abandoned POTS in favor of wireless and VoIP services.  Just 3% of households in AT&T's California territory subscribe to POTS, and those numbers continue to drop.  Even as customers migrate to better and faster services, AT&T continues to spend huge sums to maintain the sprawling copper-wire network necessary to serve the dwindling number of POTS subscribers.

30.    The FCC has recognized the importance of facilitating carriers' transition to modern technologies, which will allow more homes across the country—including in California—to access state-of-the-art, high-speed communications.  The FCC understands that every dollar spent on maintenance of an outdated network is a dollar that cannot be used on innovation and driving America forward.

31.    The CPUC stands alone among the States in AT&T's 21-State footprint by erecting barriers to this technological transition.  The CPUC's regulatory barriers have made it impossible for AT&T to take advantage of the FCC's decision to allow carriers to grandfather POTS in order to expedite the rollout of newer technology in its place.

**A.    Evolution Of The Telecommunications Market**

32.    The POTS network dates to the advent of the Bell System.  It consists of over a million miles of metallic cables and thousands of time-division-multiplexing (TDM) circuit switches, which allow multiple simultaneous calls to occur along the same piece of copper by slicing up each call and assigning it a repeating interval of time—fractions of every second—during which it may occupy the line.  AT&T's POTS network was sized to serve virtually every one of the millions of homes and businesses in its footprint.

33.   While once state-of-the-art, the legacy POTS network is now a dinosaur. It consumes a vast amount of power, is increasingly expensive to maintain, and cannot support broadband data transport.  The cost of maintaining POTS networks has skyrocketed in recent years.  AT&T spends approximately $1 billion each year in California alone to maintain the legacy copper network, due in part to rising costs of raw materials such as copper and in part to the expertise required to repair and maintain copper phone lines.  Given the rising raw-material costs, AT&T must also battle increasing thefts of copper cables, which cause significant service outages.  On top of that, replacement parts are increasingly difficult to procure because manufacturers have discontinued obsolete TDM equipment.

34.   IP-based networks are far more reliable and efficient, and they support the ever-increasing broadband speeds—hundreds of thousands of times faster than copper networks—that modern consumers demand.

35.   As a result, the rising costs of POTS are spread among fewer and fewer consumers each year.  POTS is incapable of delivering the speed, convenience, and efficiency that consumers expect from modern networks.  So as digital phone options have proliferated, customer demand for POTS has fallen.  Today, wireless services account for roughly 83% of voice phone lines nationwide, with Voice over Internet Protocol, or VoIP, provided over modern broadband networks capturing most of the remainder. *Internet Access Services: Status as of June 30, 2025*, Fed. Commc'ns Comm'n, Office of Econ. & Analytics, at 2 fig. 1 (May 8, 2026), https://docs.fcc.gov/public/attachments/DOC-421558A1.pdf.   Consumers have made their preferences clear:  they have rapidly abandoned POTS in favor of all-distance services provided over fiber and wireless networks.

36.   In POTS's heyday, customers generally used different providers for local phone service and long-distance service.  The local carrier would provide local phone service and access to an interexchange (*i.e.*, long-distance) carrier.  The local carrier would charge interexchange-access charges for originating or terminating

- 10 -

long-distance calls.  The long-distance carrier would also charge the customer for long-distance service.  The FCC regulated exchange access and interstate long-distance service, while States regulated purely in-state local calls.  Importantly, both services relied on the same infrastructure of copper wires and exchanges.  But through subscriber agreements and other arrangements, local and long-distance carriers could parcel out the charges associated with customer access to each service.

37.    This model effectively disappeared when legacy local carriers and their competitors gained the ability to offer long-distance calls and shifted to offering "all-distance" service.  Today, nearly every domestic telecommunications carrier offers all-distance service, and the vast majority of customers do not maintain separate subscriptions to a local carrier and a long-distance carrier.  Purely local telecom service is a relic of the past, just like POTS itself.

## B.    AT&T's Investment In The Future

38.    AT&T is transitioning from legacy copper to modern IP-based networks nationwide.  AT&T has already invested heavily to deploy the largest fiber network in the country—and plans to expand its fiber footprint to 60 million locations by 2030.  AT&T has also built the nation's largest mobile broadband network.  AT&T's 5G network now covers over 320 million people in over 27,700 cities and towns using low-band spectrum, while its faster mid-band "5G+" service covers over 300 million people.  To mark the 150th anniversary of the first telephone call, AT&T has committed to invest a further $250 billion in telecommunications infrastructure over the next five years.  This investment will accelerate the deployment of fiber, mobile, and home internet service across the country.

39.    This investment is a competitive imperative.  AT&T faces competition from a host of providers that have deployed modern communications technologies: wireless and wireline, mobile and fixed, terrestrial and satellite, facilities-based and over-the-top VoIP.  This is especially true in California, where nearly all locations in AT&T's California service territory can receive broadband service from multiple

providers.  Of the over seven million locations, approximately 99.9% of broadband-serviceable locations have two or more facilities-based fixed broadband or mobile voice providers, and about 99.7% have three or more providers.

40.  AT&T cannot invest its full resources to modernize its network while continuing to devote huge sums of money to keeping POTS alive.  Because it makes no sense to maintain a ubiquitous, costly legacy network that consumers have largely abandoned, AT&T has sought to transition customers to IP-based services across its nationwide footprint.

41.  As a critical part of that long-planned and ongoing transition, AT&T has grandfathered or is grandfathering POTS throughout its territory nationwide. Grandfathering allows it to reduce the resources allocated to an outmoded service by eliminating its obligation to offer that service to new customers.  Grandfathering is also a necessary step to eventual discontinuance of the service.  In particular, it improves the customer experience by minimizing disruption:  AT&T can avoid taking on new POTS subscribers shortly before discontinuing the service.

42.  Grandfathering does not affect existing POTS customers, all of whom will continue to receive their existing services for now.[2]  Grandfathering simply allows AT&T to restrict POTS to its existing customers.  New customers can then select from the available service offerings throughout AT&T's territory.  Those include AT&T Phone – Advanced, a VoIP service that the FCC has repeatedly found to be an adequate replacement for POTS.  AT&T Phone – Advanced lets customers use their traditional landline phones but submits calls in an internet-friendly format. Customers also have access to AT&T's mobile wireless service, as well as mobile and broadband offerings from a variety of AT&T's competitors.

---

[2]  AT&T has initiated separate proceedings with the FCC to seek permission to discontinue POTS service following at least a one-year notice period.  *See* AT&T Section 214 Application for Discontinuance of Residential Service (May 20, 2026); AT&T Section 214 Application for Discontinuance of Business Service (May 20, 2026).  If the FCC approves AT&T's plan for discontinuance, AT&T will begin to transition existing POTS customers to an approved alternative service.

43.     When a carrier grandfathers a service, it notifies affected individuals—those in the carrier's service territory who currently receive the service—that it will no longer offer that service to new customers.  Under the NMO, this notification must also include "(1) a 'no earlier than' date, by which it intends to seek to permanently discontinue the service, and (2) a statement regarding alternative services available in the affected service area."  NMO ¶ 62.

## C.     California's Impediments To Change

44.     State and federal restrictions on reducing or discontinuing POTS have long deterred carriers from transitioning to cheaper and more reliable wireless or fiber-based networks.  As the FCC has observed, the transition to modern networks has "been hindered by the need for carriers to divert precious resources to the maintenance of aging and deteriorating legacy networks that deliver outdated services to an ever-decreasing number of subscribers."  NMO ¶ 2; *see id.* ¶ 13 ("Excessive regulatory burdens prevent carriers from investing in and deploying next-generation networks that are needed to support modern communication services.").

45.     Over the last decade, the FCC and various States have sought to reduce the regulatory barriers preventing network modernization.  At the state level, most States have abandoned COLR regulations that compelled AT&T to provide POTS to customers, recognizing that these legacy requirements were no longer necessary.  At the federal level, AT&T has successfully filed for Section 214 discontinuance in areas across its incumbent footprint, covering existing POTS customers who have access to better modern alternatives.  The FCC has approved AT&T discontinuance applications covering 18 States based on such alternative services.

46.     California, however, remains an outlier.  The CPUC steadfastly maintains its COLR regime, which mandates that AT&T provide "basic" voice service (*i.e.*, POTS) to "all residential telephone customers" in its territory, "no matter where they live."  CPUC Decision 12-12-038 at 2, 56, Appx. C ¶ 5.  It also requires

that this service be memorialized in a public tariff that requires CPUC approval to modify. *See* Cal. Pub. Util. Code §§ 489, 495, 495.7(b); CPUC Decision 96-10-066 Appx. A. And it further requires AT&T to serve all business customers within its COLR territory. *See* CPUC Decision 12-12-038, Appx. C ¶ 5.

47. California's basic-service obligation is almost unrecognizable in the modern marketplace. For example, it includes vestigial components like free "White Pages" telephone directories and free operator services. *See* CPUC Decision 12-12-038, Appx. A at 3-5. Basic service is a relic of an era in which "[a]ll that [was] needed from a telecommunications standpoint [was] a voice grade telephone line and touchtone dialing." CPUC Decision 96-10-066 at 31.

48. AT&T has sought to work with the CPUC to mitigate the burdens that its COLR regime imposes on nationwide networks like AT&T's, to no avail. Recent efforts have made clear that California will not promptly reduce regulatory obstacles to rolling out modern, high-speed communications technology.

49. In particular, in 2023 AT&T filed an application with the CPUC for targeted regulatory relief from the COLR regime enacted in 1996. AT&T demonstrated that, as in the other States in its footprint, consumers had overwhelmingly abandoned basic service. California POTS subscribers have abandoned the service in droves because multiple facilities-based providers—including Comcast, Charter, Cox, T-Mobile, Verizon, and AT&T Mobility—have deployed modern networks covering the vast majority of AT&T's California service territory. Thus, whatever its initial merits, California's COLR regime is no longer necessary to ensure that customers have an option for high-quality voice service.

50. The CPUC's response to AT&T's 2023 application was revealing. After 15 months of burdensome, contested proceedings, the CPUC ruled that AT&T had no right even to *seek* such relief, regardless of marketplace changes. CPUC Decision 24-06-024 at 21. According to the CPUC, its hands were tied: AT&T could

GIBSON, DUNN &
CRUTCHER LLP

- 14 -

COMPLAINT

cease to be a COLR only if another provider wanted to assume that obligation. Unsurprisingly, no other provider volunteered.

51.    The CPUC appears committed to trapping AT&T and its customers in its outdated COLR regime.  In response to AT&T's 2023 application, the CPUC promised a rulemaking to consider COLR reform.  But more than two years later, the CPUC has failed to adopt any COLR reform, and the CPUC staff's working proposals would not grant any COLR relief for AT&T throughout most of its California service territory.

52.    In short, California's still-unreformed COLR regime forces AT&T to continue to spend massive resources on a legacy network that is largely unused— resources that AT&T could use to expand and enhance its modern networks.  This in turn reduces the competitive pressure AT&T otherwise could place on its many rivals that do not share its unique COLR burden, which also reduces their incentives to deploy broadband.  There are no apparent winners here, except for bureaucracy.

**D.    The Communications Act And Network Modernization Order**

53.    Over the last decade, the FCC has sought to eliminate regulatory barriers preventing the deployment of modern IP-based networks.

54.    The Communications Act of 1934, as amended by the Telecommunications Act of 1996, governs the federal communications ecosystem. *See* 47 U.S.C. § 151 *et seq.*  The Act applies to all interstate and foreign communication by wire or radio.  *See id.* § 152(a).  Section 214 requires FCC approval before a carrier may "discontinue, reduce, or impair service to a community, or part of a community."  *Id.* § 214(a).  If the FCC determines that discontinuance, reduction, or impairment is in the public interest, it "shall have power to issue such certificate."  *Id.* § 214(c).

55.    Where the FCC has authorized discontinuance, reduction, or impairment, "the carrier may, without securing approval other than such certificate,

. . . proceed with the . . . discontinuance, reduction, or impairment of service covered thereby." 47 U.S.C. § 214(c). No other authorization is required.

56. Section 214 provides a role for States in two relevant places. First, under Section 214(b), when the FCC receives a Section 214 application, it "shall cause notice thereof to be given to, and shall cause a copy of such application to be filed with, . . . the Governor of each State . . . in which such discontinuance, reduction, or impairment of service is proposed, with the right to those notified to be heard." 47 U.S.C. § 214(b). Second, under Section 214(c), "[a]ny . . . discontinuance, reduction, or impairment of service contrary to the provisions of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, the State commission, any State affected, or any party in interest." *Id.* § 214(c).

57. The FCC's latest policies regarding preemption and the grandfathering of legacy voice services are set forth in the NMO, which was unanimously adopted on a bipartisan basis on March 26, 2026. The NMO became effective on May 20, 2026.[3]

58. In the NMO, the FCC revised its rules to "ease burdens associated with outdated services by granting blanket section 214(a) authority for carriers to grandfather legacy voice services." NMO ¶ 6. It adopted these rules pursuant to the FCC's statutory authority under Section 214, which "creates an exclusively federal discontinuance regime for interstate or jurisdictionally mixed telecommunications services." NMO ¶ 108.

59. Specifically, the NMO revises the FCC's "rules to grant blanket section 214(a) authority for carriers to grandfather the following services to the extent they

---

[3] Although most of the NMO's provisions are effective, certain provisions remain subject to confirmation by the Office of Management and Budget as part of the Paperwork Reduction Act and are thus not yet effective. The difference is irrelevant here because the NMO codifies existing FCC policy on grandfathering legacy voice services, previously enacted on a temporary basis in the Waiver Order. This complaint generally refers to the NMO for convenience, but the same authorization appears in both.

come within the purview of section 214(a):  (1) any legacy voice service; (2) any lower-speed data telecommunications service; and (3) any interconnected VoIP service provisioned over copper wire." NMO ¶ 60.  This authorization allows AT&T to stop providing legacy voice services like POTS to new customers.

60.     With these reforms, the FCC seeks to "free up billions of dollars for new builds."  NMO ¶ 1.  By eliminating regulatory burdens that "divert important resources to the maintenance of aging and deteriorating legacy networks that deliver outdated services to an ever-decreasing number of subscribers," the NMO "allow[s] providers to invest more resources toward modernizing their networks so all consumers can access more advanced communications services."  NMO ¶ 2.

61.     The NMO emphasizes the Communications Act's instruction that where the FCC has authorized discontinuance, reduction, or impairment (including grandfathering), the carrier may, "without securing approval other than such certificate, . . . proceed with the . . . discontinuance . . . of service covered."  NMO ¶ 110 (quoting 47 U.S.C. § 214(c)).

62.     The NMO makes clear that its overarching aim is to reduce regulatory burdens to network modernization, including those like the California COLR requirements.  The FCC intends to reduce "red tape that has both required providers to keep aging copper lines in place and effectively prevented them from investing in the modern infrastructure that Americans want and deserve."  NMO ¶ 1.  Yet, as the FCC explains, "certain state and local requirements have been unduly prolonging the use of legacy networks and actually preventing providers from building modern ones by limiting the types of services that may qualify as adequate replacement services," requiring federal action to remove those barriers.  NMO ¶ 4.

63.     The NMO confirms that such conflicting state requirements must yield to the federal discontinuance framework.  It notes that "federal law preempts state and local requirements to the extent they needlessly constrain the deployment of modern, next-generation IP-based networks by impeding providers' ability to

GIBSON, DUNN &
CRUTCHER LLP

- 17 -

COMPLAINT

discontinue providing legacy services and to retire outdated and deteriorating legacy networks." NMO ¶ 7.

64. The NMO similarly notes that the FCC's blanket grandfathering authorization preempts state requirements. NMO ¶ 114 n.415. Thus, "where the Commission has exercised its section 214(a) authority over interstate and/or jurisdictionally mixed service to allow a carrier to *grandfather* legacy voice service, . . . federal law preempts state requirements that operate to require the carrier to continue offering that interstate or jurisdictionally mixed grandfathered service to new customers." *Ibid.*

65. Although the FCC did not address particular state laws, it is clear that California is among the culprits. The FCC expressly recognized that "conditions that purport to be technology neutral"—such as the California COLR requirements—are nonetheless preempted where they "have the practical effect of requiring the carrier to continue providing an interstate or jurisdictionally mixed telecommunications service." NMO ¶ 112. The FCC even cited commenters' discussion of the practical impact of the CPUC's requirements. *See* NMO ¶ 112 n.403. The FCC also specifically rejected the CPUC's contrary arguments on this point. *See* NMO ¶ 113 n.407.

## COUNT I

### (*Ex parte Young* Claim For Injunctive Relief Based On
### Preemption Under 47 U.S.C. §§ 152, 214)

66. AT&T repeats and realleges the preceding paragraphs as if fully set forth herein.

67. The Supremacy Clause of the United States Constitution makes federal law "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. "[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, 'any state law, however clearly within a State's acknowledged power, which interferes with or is

contrary to federal law, must yield.'" *Gade* v. *National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (quoting *Felder* v. *Casey*, 487 U.S. 131, 138 (1988)).

68. Preemption may be express or implied. With express preemption, Congress "define[s] explicitly the extent to which its enactments pre-empt state law." *English* v. *General Elec. Co.*, 496 U.S. 72, 78 (1990). Meanwhile, implied preemption—including its "conflict preemption" form—preempts state law "to the extent that it actually conflicts with federal law." *Id.* at 79.

69. *Ex parte Young*, 209 U.S. 123 (1908), provides an equitable cause of action that allows courts to issue injunctions preventing state officials from enforcing preempted state laws against regulated parties. *See Armstrong* v. *Exceptional Child Center Inc.*, 575 U.S. 320, 326 (2015); *Osborn* v. *Bank of United States*, 22 U.S. (9 Wheat.) 738, 838-839 (1824).

**A.    Section 214(c) Expressly Preempts California's Requirements.**

70. The Communications Act of 1934, as amended by the Telecommunications Act of 1996, 47 U.S.C. § 151 *et seq.*, governs the federal communications ecosystem. The Act states that it "shall apply to all interstate and foreign communication by wire or radio." *Id.* § 152(a). Section 214 requires FCC approval before a carrier may "discontinue, reduce, or impair service to a community, or part of a community." *Id.* § 214(a). If the FCC determines that discontinuance, reduction, or impairment is in the public interest, it "shall have power to issue such certificate as applied for." *Id.* § 214(c). Where the FCC has authorized discontinuance, reduction, or impairment, "the carrier may, *without securing approval other than such certificate*, . . . proceed with the . . . discontinuance, reduction, or impairment of service covered thereby." *Ibid.* (emphasis added).

71. Although Section 2 already places sole responsibility for interstate communications in the hands of the FCC, Section 214 makes the division of regulatory powers even more express: when the FCC has authorized a discontinuance, reduction, or impairment, a carrier needs no "other" approval—

including from California—before acting. Section 214 thus expressly preempts any state requirement that prevents a carrier from acting on the FCC's authorization for any service within the FCC's authority. *See* NMO ¶ 114.

72.    As discussed, Section 214 instead allows States to participate in the federal process in two ways. First, Section 214(b) requires the FCC to notify the States affected by the petition, so that they have a chance to submit their views. *See* 47 U.S.C. § 214(b). Second, Section 214(c) permits any State or state commission to sue to enjoin any discontinuance, reduction, or impairment that is contrary to Section 214's requirements. *Id.* § 214(c).

73.    These two provisions carve out a limited role for state authority. States may participate in the Section 214 process and can sue to enjoin violations of the FCC's determinations under Section 214, but States cannot prevent an *FCC-authorized* Section 214 discontinuance, reduction, or impairment. As the NMO emphasizes, "neither Section 214(b) nor Section 214(c) provides states with the power to decide whether a carrier may discontinue interstate or jurisdictionally mixed service, or empowers states to impose requirements that frustrate or add extra conditions to Commission decisions allowing discontinuance." NMO ¶ 110. In short, "Section 214 . . . creates an exclusively federal discontinuance regime for interstate or jurisdictionally mixed telecommunications services." NMO ¶ 108.

74.    California POTS is a jurisdictionally mixed service that falls within the FCC's Section 214 authority over interstate services. The concept of "local" telephone service has all but vanished: customers do not wish to purchase a service that will allow them to make only local, intrastate voice calls, and that requires a separate subscription for long-distance calls. Modern phone service is almost always "all-distance." Indeed, California's "basic service" elements *require* that AT&T offer customers "the ability to place and receive voice-grade calls over all distances." CPUC Decision 12-12-038, Appx. A at 1. And even if intrastate and interstate services could be disentangled and sold separately, the infrastructure that powers

them cannot be. Carriers use a single, unified network to provide telephone service to customers in a particular area, regardless of whether a specific call is long-distance or local. Because both interstate and intrastate calls "are provisioned over the same network using the same technology," NMO ¶ 107, and are otherwise commercially inseparable, they are jurisdictionally mixed and subject to the FCC's authority.

75. AT&T has obtained FCC authorization to grandfather California POTS via the blanket authority granted in the NMO. *See* NMO ¶ 6 (granting "blanket section 214(a) authority for carriers to grandfather legacy voice services, lower-speed data telecommunications services, and interconnected Voice over IP (VoIP) service provisioned over copper wire").

76. Even though Congress and the FCC have authorized AT&T to grandfather after it receives FCC approval, California law imposes several additional—and preempted—procedural and substantive hurdles before AT&T can act on the FCC's authorization.

77. First, California requires AT&T to seek permission from a state regulator—the CPUC—instead of relying solely on FCC's federal authorization. *See* CPUC Decision 12-12-038 at 56, Appx. A at 6. AT&T must demonstrate to the CPUC's satisfaction that it should be released from California's COLR regime or that an alternative service satisfies the CPUC's "basic service" requirements. AT&T has tried, and those efforts have failed. Most notably, in 2023 AT&T applied to withdraw as a COLR in light of significant technological and market changes. CPUC Decision 24-06-024 at 8-10. But after 15 months of burdensome and contested proceedings, the CPUC rejected that application because no other carrier would assume AT&T's obligations. The CPUC ruled that AT&T had no right even to *seek* such relief, and barred it from trying again for at least a year. CPUC Decision 24-06-024 at 21-22. This byzantine approval process creates significant procedural obstacles and delay.

78.    Second, the CPUC has made clear that it is not willing to permit AT&T to substitute for POTS a superior service like mobile wireless or AT&T Phone – Advanced, which relies on AT&T's wireless network.  The CPUC views services that rely on wireless as a second-class offering that cannot be "a full substitute for a COLR."  CPUC Communications Division, Staff Proposal, 24-06-012, at 22; *see id.* at 23 (explaining that the CPUC "identified critical limitations to mobile service which may make it only a partial substitute to the essential communication service guaranteed by a COLR").  In addition, the CPUC requires any substitute service to have anachronistic elements that modern POTS replacements lack, including access to dedicated long-distance carriers, outmoded components, and free access to operator services.  *See* CPUC Decision 12-12-038 at 18-19, Appx. A. at 3-5; *see also, e.g.*, *id.* at 26, 42 ("basic services" must fall under CPUC jurisdiction, and "wireless carriers" do not).  So even if AT&T could navigate the cumbersome CPUC procedures to get a decision, CPUC's existing rules prohibit AT&T from grandfathering POTS.

79.    California's COLR and tariffing requirements erect impermissible procedural barriers and substantively prohibit AT&T from grandfathering POTS, a jurisdictionally mixed service.  Under Section 214(c), these requirements are thus expressly preempted.

**B.    California's Requirements Are Preempted Under The Impossibility Exception To Section 2.**

80.    Even if POTS were not jurisdictionally mixed and instead consisted of meaningful intrastate and interstate components, California's COLR requirements would still be preempted under longstanding impossibility-preemption principles applicable to the telecommunications industry.

81.    Section 2 of the Communications Act bifurcates communications into two theoretical spheres:  (1) interstate communications and (2) intrastate communications.  Federal regulation applies to "all interstate and foreign" radio and

wire communications services. 47 U.S.C. § 152(a). The Act leaves jurisdiction to the States over only "intrastate communication service by wire or radio." *Id.* § 152(b).

82. Despite this division of authority, the Supreme Court has explained that "the realities of technology and economics belie such a clean parceling of responsibility." *Louisiana*, 476 U.S. at 360. Where neat division is impracticable, preemption of state regulation nominally of intrastate services turns on a strand of conflict-preemption analysis called the "impossibility exception."

83. Under the "'impossibility exception' of 47 U.S.C. § 152(b)," state regulation of a service is preempted "if (1) it is not possible to separate the interstate and intrastate aspects of the service, and (2) federal regulation is necessary to further a valid federal regulatory objective, i.e., state regulation would conflict with federal regulatory policies." *Minnesota*, 483 F.3d at 578; *see California*, 75 F.3d at 1359 (recognizing the impossibility exception).

84. Even if separating interstate and intrastate service is "possible technologically," the impossibility exception applies where "such a separation [i]s not practical." *Public Serv. Comm'n of Md.* v. *FCC*, 909 F.2d 1510, 1516 (D.C. Cir. 1990). Whether such separation is practical turns on "economic and operational factors." *California* v. *FCC*, 39 F.3d 919, 932 (9th Cir. 1994). Services are practically inseparable where consumers "generally wish to purchase both interstate and intrastate . . . services" and where enforcing a jurisdictional separation would be "detrimental to both the consumer and the interstate communication system." *Computer & Commc'ns Indus. Ass'n* v. *FCC*, 693 F.2d 198, 215 (D.C. Cir. 1982); *see North Carolina Utils. Comm'n* v. *FCC*, 552 F.2d 1036, 1046-1047 (4th Cir. 1977) ("FCC regulations must preempt any contrary state regulations where the efficiency or safety of the national communications network is at stake," so there is "no statutory basis for the argument that FCC regulations serving other important

GIBSON, DUNN &
CRUTCHER LLP

- 23 -                                                                              COMPLAINT

interests of national communications policy are subject to approval by state utility commissions").

85. Here, the interstate and intrastate aspects of POTS are practically inseparable. As discussed above, carriers do not maintain one set of lines for intrastate services and another for interstate ones. Offering one while retiring the other would be economically and operationally infeasible. The market has long since moved beyond the twentieth-century model of separate local and long-distance service; modern voice offerings are uniformly "all-distance" services carried over integrated interstate networks.

86. AT&T employs the same copper wireline network for both interstate and intrastate calls. The FCC has authorized AT&T to grandfather this service for interstate calls. But the CPUC requires AT&T to maintain this network for intrastate calls. If AT&T is required to maintain its POTS network for intrastate calls, it cannot transition away from the network at all, given that it employs the same network for both interstate and intrastate service. It must continue maintaining the entire network so that the few remaining POTS customers can make (at least) intrastate calls. Any intrastate and interstate services are thus functionally inseparable.

87. The practical effect of the CPUC's COLR requirements is to frustrate the federal goal of network modernization. Those requirements functionally prohibit AT&T from transitioning away from outdated legacy voice services like POTS. And no matter the substantive content of those requirements, the mere imposition of state regulatory hurdles slows a process that the FCC has tried to hasten. These effects directly undermine the federal objectives articulated in the NMO: encouraging "the transition to next-generation networks and services." NMO ¶ 114.

88. Because these state requirements functionally prevent AT&T from grandfathering POTS to help transition to a modern communications network, in direct contravention of federal regulatory decision, the requirements are preempted under impossibility-preemption principles.

GIBSON, DUNN &
CRUTCHER LLP

- 24 -

COMPLAINT

**C.      California's Requirements Are Preempted Under Ordinary Principles Of Conflict Preemption.**

89.     At a minimum, the CPUC's requirements are preempted under ordinary principles of conflict preemption.  Conflict preemption exists where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" or otherwise interferes with the methods by which Congress chose to implement federal law.  *Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363, 372-373 (2000) (quoting *Hines* v. *Davidowitz*, 312 U.S. 52, 67 (1941)).  The inquiry turns on the statutory scheme and what it reveals about Congress's objectives.  *See Arizona* v. *United States*, 567 U.S. 387, 399 (2012).  Here, California's COLR requirements conflict with the Communications Act's text and the FCC's regulatory framework.  Section 214 lays out a careful scheme, in which States play only a participatory role.  It sets out a specific standard of public interest for the FCC to apply.  When the FCC determines that an action meets that standard, States cannot block the action outside the prescribed Section 214 process—whether formally or in practical effect.

90.     The conflict here is particularly stark.  The FCC's explicit goal in the NMO is to "cut[] through the red tape that has . . . required providers to keep aging copper lines in place," allowing carriers to "transition from legacy TDM-based networks" to "competitive all IP-based networks."  NMO ¶¶ 1, 3.  In providing a blanket grandfathering authorization, the FCC "allow[ed] carriers to focus their resources on the development and deployment of next-generation networks."  NMO ¶ 60. But the CPUC's COLR requirements functionally negate the FCC's decision.

91.     As discussed, modern carriers provide service to their customers through a single, unified network.  The FCC recognized this reality, observing that both local and long-distance services "are provisioned over the same network using the same technology."  NMO ¶ 107.  The FCC authorized AT&T to grandfather POTS as an initial step in winding down its expansive and costly copper wireline

network.  The CPUC's requirements both slow the process and ultimately prevent AT&T from doing so.  The CPUC's requirements thus functionally negate the FCC's grandfathering authorization.

92.    Because the CPUC's requirements conflict with Congress's Section 214 scheme and with the FCC's grandfathering authorization, they are preempted under "general principles of conflict preemption."  NMO ¶ 114.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Pacific Bell Telephone Company d/b/a AT&T California, respectfully requests this Court:

i.    Enter judgment for AT&T declaring that California's COLR requirements are preempted as applied to AT&T's grandfathering of POTS, including the following provisions of the Public Utilities Code, CPUC rules, and CPUC decisions and orders, to the extent that they purport to impede AT&T's ability to grandfather POTS immediately and without further regulatory approval:

(a)    Cal. Pub. Util. Code §§ 489, 490, 491, 495, 495.7, and 701;

(b)    CPUC Gen. Order No. 153;

(c)    CPUC Gen. Order No. 96-B, Telecommunications Industry Rules 3, 3.2, 5, 7.4, 7.1(9) and 8.5;

(d)    CPUC Decision 96-10-066;

(e)    CPUC Decision 12-12-038;

(f)    CPUC Decision 14-01-036; and

(g)    CPUC Decision 24-06-024.

ii.    Enjoin defendants, their agents, and all persons acting in concert with them from commencing any enforcement action against AT&T based on AT&T's grandfathering of POTS or from taking any action that interferes with, either directly or indirectly, AT&T's grandfathering of POTS; and

GIBSON, DUNN & CRUTCHER LLP

- 26 -

COMPLAINT

iii.    Grant AT&T any other relief as the Court may deem just and proper.

Dated: May 20, 2026

**GIBSON, DUNN & CRUTCHER LLP**

By: /s/ Theodore J. Boutrous, Jr.
Theodore J. Boutrous, Jr.
*Attorney for Plaintiff Pacific Bell
Telephone Company d/b/a AT&T
California*

THEODORE J. BOUTROUS, JR.,
SBN 132099
  tboutrous@gibsondunn.com
JILLIAN N. LONDON, SBN 319924
  jlondon@gibsondunn.com
PATRICK J. FUSTER, SBN 326879
  pfuster@gibsondunn.com
BRANTON J. NESTOR, SBN 338445
  bnestor@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile:  213.229.7520

JEFFREY B. WALL (*pro hac vice*
forthcoming)
  jwall@gibsondunn.com
MORGAN L. RATNER (*pro hac vice*
forthcoming)
  mratner@gibsondunn.com
1700 M Street, N.W.
Washington, DC 20036
Telephone:  202.955.8533

*Attorneys for Plaintiff Pacific Bell
Telephone Company d/b/a AT&T
California*

GIBSON, DUNN &
CRUTCHER LLP

- 27 -

COMPLAINT