**GIBSON, DUNN & CRUTCHER LLP**
THEODORE J. BOUTROUS, JR., SBN 132099
  tboutrous@gibsondunn.com
JILLIAN N. LONDON, SBN 319924
  jlondon@gibsondunn.com
PATRICK J. FUSTER, SBN 326879
  pfuster@gibsondunn.com
BRANTON J. NESTOR, SBN 338445
  bnestor@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

JEFFREY B. WALL (*pro hac vice* forthcoming)
  jwall@gibsondunn.com
MORGAN L. RATNER (*pro hac vice* forthcoming)
  mratner@gibsondunn.com
1700 M Street, N.W.
Washington, DC 20036-4504
Telephone: 202.955.8533

*Attorneys for Plaintiff Pacific Bell Telephone
Company d/b/a AT&T California*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC BELL TELEPHONE COMPANY d/b/a AT&T CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>JOHN REYNOLDS, in his official capacity as President of the California Public Utilities Commission; DARCIE L. HOUK, KAREN DOUGLAS, MATTHEW BAKER, and CHRISTINE HARADA, in their official capacities as Commissioners of the California Public Utilities Commission; ROB BONTA, in his official capacity as Attorney General of the State of California,<br><br>Defendants. | Case No. 3:26-cv-03148-LL-JAC<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge:  Honorable Linda Lopez<br><br>Courtroom:  14B<br><br>Hearing Date:  July 1, 2026<br><br>**PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT** |

3:26-CV-03148-LL-JAC
MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ..........................................................................................5

I.    The Modernization Of The Telecommunications Market ...........................5

    A.    Evolving Technologies ......................................................................5

    B.    Evolving Services .............................................................................6

II.   The Federal Push Toward Network Modernization.......................................7

III.  California's Continued Insistence On Legacy Regulation.............................9

LEGAL STANDARD ...............................................................................................11

ARGUMENT .............................................................................................................11

I.    AT&T Is Likely To Succeed On The Merits Of Its Preemption Claim. .......12

    A.    Section 214(c) Expressly Preempts California's Requirements..........12

    B.    California's COLR Requirements Are Impliedly Preempted..............16

II.   AT&T Will Suffer Irreparable Harm. ..........................................................20

III.  The Equities And Public Interest Weigh Heavily In AT&T's Favor. ...........24

CONCLUSION...........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alabama Ass'n of Realtors* v. *HHS*,
594 U.S. 758 (2021) ..............................................................................................24

*All. for the Wild Rockies* v. *Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .............................................................................11

*Am. Trucking Ass'ns, Inc.* v. *City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ........................................................................24, 25

*Arizona* v. *United States*,
567 U.S. 387 (2012) ..............................................................................................19

*AT&T Corp.* v. *Iowa Util. Bd.*,
525 U.S. 366 (1999) ................................................................................................8

*Baird* v. *Bonta*,
81 F.4th 1036 (9th Cir. 2023) ..............................................................................24

*Cablevision of Texas III, L.P.* v. *Oklahoma W. Tel. Co.*,
993 F.2d 208 (10th Cir. 1993) ..............................................................................12

*California* v. *FCC*,
39 F.3d 919 (9th Cir. 1994) ..................................................................................17

*California* v. *FCC*,
75 F.3d 1350 (9th Cir. 1996) ............................................................................3, 16

*Californians for Renewable Energy* v. *CPUC*,
922 F.3d 929 (9th Cir. 2019) ................................................................................22

*Capital Cities Cable, Inc.* v. *Crisp*,
467 U.S. 691 (1984) ..............................................................................................20

*Chamber of Com. of the United States of Am.* v. *Bonta*,
62 F.4th 473 (9th Cir. 2023) ...........................................................................11, 12

*City of New York* v. *FCC*,
486 U.S. 57 (1988) ................................................................................................14

*Computer & Commc'ns Indus. Ass'n* v. *FCC*,
693 F.2d 198 (D.C. Cir. 1982) .............................................................................17

*Crosby* v. *Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) .........................................................................................12, 19

*Env't Prot. Info. Ctr.* v. *Carlson*,
968 F.3d 985 (9th Cir. 2020) ................................................................................ 11

*Herb Reed Enters., LLC* v. *Florida Ent. Mgmt., Inc.*,
736 F.3d 1239 (9th Cir. 2013) .............................................................................. 22

*Int'l Franchise Ass'n, Inc.* v. *City of Seattle*,
803 F.3d 389 (9th Cir. 2015) ................................................................................ 23

*ITT World Commc'ns, Inc.* v. *N.Y. Tel. Co.*,
381 F. Supp. 113 (S.D.N.Y. 1974) ....................................................................... 13

*Litton Sys., Inc.* v. *Am. Tel. & Tel. Co.*,
487 F. Supp. 942 (S.D.N.Y. 1980) ....................................................................... 13

*Louisiana Pub. Serv. Comm'n* v. *FCC*,
476 U.S. 355 (1986) ..................................................................... 3, 7, 16, 17

*MCI Commc'ns Corp.* v. *Am. Tel. & Tel. Co.*,
462 F. Supp. 1072 (N.D. Ill. 1978) ...................................................................... 13

*Merck Sharp & Dohme Corp.* v. *Albrecht*,
587 U.S. 299 (2019) .............................................................................................. 12

*Minnesota Pub. Utilities Comm'n.* v. *FCC*,
483 F.3d 570 (8th Cir. 2007) .......................................................................... 16, 18

*Monterey Mech. Co.* v. *Wilson*,
125 F.3d 702 (9th Cir. 1997) ................................................................................ 23

*Morales* v. *Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .............................................................................................. 20

*Nat'l Federation of Independent Business* v. *OSHA*,
595 U.S. 109 (2022) .............................................................................................. 24

*Nat'l Insts. of Health* v. *Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) .......................................................................................... 22

*NetChoice* v. *Bonta*,
790 F. Supp. 3d 798 (N.D. Cal. 2025) .................................................................. 21

*Nken* v. *Holder*,
556 U.S. 418 (2009) .............................................................................................. 24

*North Carolina Util. Comm'n* v. *FCC*,
537 F.2d 787 (4th Cir. 1976) ................................................................................ 17

*North Carolina Util. Comm'n* v. *FCC*,
552 F.2d 1036 (4th Cir. 1977) .............................................................................. 17

GIBSON, DUNN &
CRUTCHER LLP

3:26-CV-03148
MOTION FOR PRELIMINARY INJUNCTION    - iii -

*Pub. Serv. Comm'n of Md.* v. *FCC,*
  909 F.2d 1510 (D.C. Cir. 1990) ................................................................. 17

*San Francisco* v. *USCIS,*
  981 F.3d 742 (9th Cir. 2020) .................................................................... 22

*Stuhlbarg Int'l Sales Co.* v. *John D. Brush & Co.,*
  240 F.3d 832 (9th Cir. 2001) .................................................................... 22

*United States* v. *California,*
  173 F.4th 1060 (9th Cir. 2026) ................................................................. 21

*United States* v. *California,*
  921 F.3d 865 (9th Cir. 2019) .................................................................... 24

*Winter* v. *Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ..................................................................................... 11

*Wyeth* v. *Levine,*
  555 U.S. 555 (2009) ................................................................................. 12

**Constitutional Provisions:**

U.S. Const. Art. VI, cl. 2 ............................................................... 1, 23, 24

**Statutes:**

47 U.S.C. § 151 ................................................................................ 7, 13, 20

47 U.S.C. § 152 ................................................................................. 3, 7, 16

47 U.S.C. § 157(a) ..................................................................................... 20

47 U.S.C. § 214 ........................................................................................... 3

47 U.S.C. § 214(a) ......................................................... 4, 8, 12, 14, 19, 25

47 U.S.C. § 214(b) ............................................................................. 8, 13, 19

47 U.S.C. § 214(c) .......................................................... 3, 8, 12, 13, 19, 25

47 U.S.C. § 1302(a) ................................................................................... 20

**Regulations:**

*Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment,* Order, WC Docket No. 17-84, 40 FCC Rcd. 2019 (Mar. 20, 2025) ............................................................... 14

CPUC Decision 12-12-038 ............................................................... 9, 10, 15

CPUC Decision 24-06-024 ........................................................................................... 10

CPUC Decision 96-10-066 ............................................................................................. 9

CPUC Gen. Order No. 133-D ........................................................................................ 9

CPUC Gen. Order No. 133-E ........................................................................................ 9

*Reducing Barriers to Network Improvements and Service Changes*,
    Report and Order, WC Docket Nos. 25-208, 25-209
    (Mar. 26, 2026) .................................................................................................... 2, 14

**Other Authorities:**

*AT&T Moves to Withdraw Copper Landlines, Sues California*, Politico
    (May 20, 2026) ........................................................................................................ 10

Stephen J. Blumberg & Julian V. Luke, *Wireless Substitution: Early
    Release of Estimates from the National Health Interview Survey,
    July-December 2023*, Nat'l Ctr. for Health Statistics (June 2025) ....................... 7

FCC, *Voice Telephone Services: Status as of June 30, 2025*
    (Feb. 2026) ............................................................................................................... 5

11A Wright, et al., Fed. Practice & Proc. (1995) ...................................................... 23

GIBSON, DUNN &
CRUTCHER LLP

3:26-CV-03148
MOTION FOR PRELIMINARY INJUNCTION        - v -

**PRELIMINARY STATEMENT**

Congress vested the Federal Communications Commission (FCC) with exclusive authority to say when telecommunications carriers may reduce or discontinue certain services.  The FCC recently exercised that authority, granting AT&T permission to stop enrolling new customers in its copper-wire-based "plain old telephone service," called POTS.  That bipartisan FCC decision was a critical step toward long-planned network modernization nationwide.  Everywhere else, the decision means what it says—but not in California.  Here, the California Public Utilities Commission (CPUC) continues to enforce century-old "Carrier of Last Resort" regulations that compel AT&T to offer POTS to a shrinking pool of new customers.  The result is a direct collision between federal authorization and state bureaucracy.  The Supremacy Clause resolves that clash, but AT&T faces irreparable harm in the meantime:  these preempted California regulations cost it tens of millions of dollars each year in unrecoverable operational costs, while undercutting AT&T's ability to compete for and retain customers.

In recent decades, the telephone industry has experienced remarkable growth and change, spurred by the development of the internet and the demand for more and faster connectivity.  The physical systems have changed:  companies like AT&T are replacing slower, more expensive, and less reliable copper wires with fiberoptic internet cables and high-speed wireless networks.  The services have changed, too:  a system once marked by a division between local and long-distance calls has all but disappeared, replaced by an all-distance service that everyone expects.  Consumers want speed and universality; modern networks can give them that.

But regulatory gridlock threatens to slow the march toward modernization.  In California, AT&T continues to provide POTS to just 3% of households in its territory.  It provides that service on an antiquated copper-wire network, which requires enormous expense to maintain, is subject to widespread theft for raw materials, and is extremely challenging to repair because of its obsolete systems and ancient parts.

3:26-CV-03148
MOTION FOR PRELIMINARY INJUNCTION          - 1 -

AT&T continues to offer POTS in California not because it is good business but because legacy regulations from the telephone-monopoly era give federal and state regulators the power to review and reject any reduction or discontinuance of certain phone services.

At the federal level, AT&T now has the regulatory approval that it needs to stop offering POTS to new customers.  The bipartisan FCC has taken decisive steps to "cut[] through the red tape that has both required providers to keep aging copper lines in place and effectively prevented them from investing in the modern infrastructure that Americans want and deserve." *Reducing Barriers to Network Improvements and Service Changes*, Report and Order, WC Docket Nos. 25-208, 25-209, ¶ 1 (Mar. 26, 2026) (NMO).  As part of that mission, the FCC recently and unanimously issued a blanket authorization for carriers to "grandfather," or stop offering to new customers, legacy voice services like POTS.  NMO ¶¶ 6, 60-66.  The FCC recognized the national imperative to free up resources to facilitate the "transition to next-generation networks and services," and emphasized that its decision would foreclose any "state and local requirements" that "needlessly constrain the deployment of modern, next-generation IP-based networks."  NMO ¶¶ 7, 114.

California disagrees.  The CPUC holds fast to regulatory roadblocks that prevent AT&T from grandfathering POTS unless California, too, gives its blessing.  These roadblocks come in the form of Carrier of Last Resort (COLR) obligations and a related tariff regime.  They prevent AT&T from winding down POTS—including by restricting it to existing customers—unless the CPUC approves.  And when AT&T last requested approval, the CPUC said no.  In fact, it said that AT&T should not bother even *asking* unless another company agrees to take on its unique COLR obligations, which of course no other company will do.

The net result is that customers want AT&T to move on from POTS, AT&T wants to move on from POTS, and the FCC wants AT&T to move on from POTS— but California stands in the way.  Congress was ready for just such a situation.  In the

Communications Act of 1934, Congress gave the FCC exclusive authority to decide whether to allow the "discontinuance, reduction, or impairment" of any service with an interstate or foreign component—including California POTS.  47 U.S.C. §§ 152, 214.  AT&T thus filed this preemption suit, and now seeks a preliminary injunction to stop California officials from applying the State's COLR requirements and tariff-ing regime to prevent AT&T from grandfathering POTS.

All four preliminary-injunction requirements are amply satisfied here.  *First*, AT&T is likely to prevail on the merits because the Communications Act expressly preempts California law.  Congress gave the FCC exclusive decision-making power and made clear that a carrier may act "without securing approval other than [a] cer-tificate" from the FCC.  47 U.S.C. § 214(c).  The FCC has unambiguously authorized AT&T to grandfather POTS.  NMO ¶¶ 6, 60-66.  And California POTS is a jurisdic-tionally mixed service, meaning that its interstate nature is inextricable from any in-trastate piece.  Fahmy Decl. ¶¶ 10-11.  That is enough for express preemption.

Impossibility-preemption principles also foreclose California's overreach.  In the Communications Act, Congress attempted "to divide the world of domestic tele-phone service neatly into two hemispheres—one comprised of interstate service, over which the FCC would have plenary authority, and the other made up of intrastate service, over which the States would retain exclusive jurisdiction." *Louisiana Pub. Serv. Comm'n* v. *FCC*, 476 U.S. 355, 360 (1986); *see* 47 U.S.C. § 152.  But "the realities of technology and economics belie such a clean parceling of responsibility." *Louisiana*, 476 U.S. at 360.  Courts have thus recognized an "impossibility excep-tion" where (1) it is "not possible to separate the interstate and intrastate components of the asserted FCC regulation" and (2) state regulation would conflict with a federal regulatory objective.  *California* v. *FCC*, 75 F.3d 1350, 1359 (9th Cir. 1996).  Both are true here.  There is a single network of copper lines; those lines cannot be wound down for federal purposes yet maintained for state ones.

If any doubt remained, general principles of conflict preemption confirm that

States cannot nullify the federal process in Section 214 by requiring additional approvals. The Communications Act gives States a specific role in the approval process, designed to inform and effectuate the *FCC's* approval decision, not to make their own. California cannot wield a veto outside that process.

*Second*, AT&T needs immediate relief because any further application of California's preempted laws and regulations will cause irreparable harm. California requires AT&T to pour resources into maintaining an obsolete system and to continue offering a service that it plans to discontinue in short order. Delaying FCC-approved grandfathering would impose unrecoverable operational costs of tens of millions of dollars each year—primarily to maintain and electrify equipment that nobody is using but theoretically *might* in the future. Delaying grandfathering would also harm AT&T's reputation, including by linking it to outdated systems and disrupting an orderly customer transition. And delaying grandfathering would create stark competitive disadvantages, as AT&T's competitors do not have the same obligation to maintain outdated systems or spend commercially unjustifiable resources on a product that customers do not want. Only a preliminary injunction can shield AT&T from the unenviable choice between exposing itself to punishment under California's unconstitutional regulations or shouldering these irreparable costs to avoid legal risk.

*Finally*, the third and fourth factors—the balance of hardships and the public interest—also favor interim relief. When the FCC issued a blanket authorization for grandfathering legacy voice services like POTS, it concluded that such grandfathering was consistent with "the present [and] future public convenience and necessity." 47 U.S.C. § 214(a). Consumers have abandoned POTS in droves, and those who have kept it—likely out of inertia—will be able to keep the status quo for now. Nobody will lose connectivity. All that a preliminary injunction will do is allow AT&T to stop taking on new customers, and thus to begin a long-overdue transition process. California has no good reason for maintaining unconstitutional rules that lock old systems in place and discourage innovation.

3:26-CV-03148
MOTION FOR PRELIMINARY INJUNCTION        - 4 -

## STATEMENT OF FACTS

**I.    The Modernization Of The Telecommunications Market**

**A.    Evolving Technologies**

For over a century, copper wires connected Americans across the country.  The national copper-based network consists of over a million miles of metallic cables and thousands of time-division-multiplexing (TDM) circuit switches, which allow multiple simultaneous calls to occur along the same piece of copper by slicing up each call and assigning it a repeating interval of time—fractions of every second—during which it may occupy the line.  Compl. ¶ 32.

A century and a half of technological advancement has rendered the legacy copper network a dinosaur.  The copper lines used to provide POTS consume a vast amount of power, are increasingly expensive to maintain, and cannot support broadband data transport.  Compl. ¶ 33.  AT&T spends approximately $1 billion each year to operate its legacy network in California.  Ray Decl. ¶ 16; Fahmy Decl. ¶ 14.  The copper lines must remain powered at all times, burning through hundreds of millions of kilowatt-hours of electricity each year.  Ray Decl. ¶ 17.  Modern alternatives, such as wireless and broadband, are more reliable and more efficient.  *Id.* ¶ 6; Compl. ¶ 34.

Consumers have noticed.  They have rapidly abandoned POTS in favor of services provided over fiber and wireless networks.  Nationwide, wireless services now account for approximately 83.4% of voice lines, with interconnected VoIP service accounting for approximately 13.4%.  *See* FCC, *Voice Telephone Services: Status as of June 30, 2025*, at 2, Fig. 1 (Feb. 2026), https://tinyurl.com/4xkwwcap.

Against this backdrop of technological and market change, AT&T is modernizing its networks and transitioning away from POTS across the country.  AT&T owns the Nation's largest fiber network and has built the largest mobile broadband network in the United States.  Ray Decl. ¶ 7.  In recent years, it has extended 5G to over 320 million people across 27,700 cities and towns.  *Id*.  This investment is a

competitive imperative. Rival carriers have deployed various modern communications technologies, especially in California. In areas where AT&T is seeking to grandfather POTS, all of its existing POTS customers have alternative voice-service options, and 99.9% have options from multiple broadband or mobile voice providers. *Id*. ¶ 13.

But AT&T cannot optimize its network while continuing to devote huge sums of money to maintaining outdated infrastructure. Compl. ¶ 40; Ray Decl. ¶¶ 23-26, 28, 38-41; Fahmy Decl. ¶¶ 3, 14. AT&T has thus sought to transition customers to IP-based services across its nationwide footprint and promptly decommission outdated networks. Ray Decl. ¶¶ 7, 27. That transition has benefited the environment, too. Since beginning its copper-reclamation efforts in 2024, AT&T has recycled more than 100 million pounds of copper—the equivalent of five Eiffel Towers. Ray Decl. ¶ 27.

As a critical part of that transition, AT&T is grandfathering POTS nationwide. Grandfathering enables AT&T to limit POTS to existing customers, while encouraging new customers to select from technologically superior services throughout AT&T's territory. Compl. ¶ 41. Grandfathering is also a necessary step toward eventually discontinuing the service, which will free up billions of dollars in capital expenditures and maintenance costs to put toward other, more modern systems. Ray Decl. ¶¶ 16, 20-21. Grandfathering allows AT&T and its customers to make a gradual, orderly transition to those modern alternatives.

## B.     Evolving Services

As telecommunications technology has evolved, so too has the structure of the market—particularly the historic distinction between local and long-distance service. For much of the twentieth century, customers generally used different companies for local phone service and long-distance service. Local carriers provided local service and access to interexchange (*i.e.*, long-distance) carriers, charging access fees for originating or terminating long-distance calls, while long-distance carriers separately

billed customers for the actual long-distance services. Against this backdrop, regulators at both the federal and state levels historically imposed "basic service" obligations to ensure universal access to telephone service. For such basic services, the FCC regulated interstate exchange access and long-distance service, while States regulated purely intrastate local calls. Importantly, both services relied on the same underlying infrastructure of exchanges and copper wires.

Carriers were historically able to parcel out the charges associated with customer access to each type of service. But this model effectively disappeared, as legacy local carriers and their competitors gained the ability to offer long-distance service and shifted to offering integrated "all-distance" service. Today, nearly every domestic telecommunications carrier offers all-distance service, and few customers maintain separate subscriptions for local and long-distance service. In fact, nearly 80% of adults nationwide rely solely on wireless phone service, which by its nature is not tied to a particular State. Stephen J. Blumberg & Julian V. Luke, *Wireless Substitution: Early Release of Estimates from the National Health Interview Survey, July–December 2023*, Nat'l Ctr. for Health Statistics (June 2025), https://tinyurl.com/5yvmmd72. Like POTS itself, purely local telecommunications service is a thing of the past.

## II.     The Federal Push Toward Network Modernization

The Communications Act of 1934, as amended by the Telecommunications Act of 1996, establishes the framework governing the Nation's communications networks. *See* 47 U.S.C. § 151 *et seq.* The Act grants the FCC broad authority over interstate and foreign communications by wire and radio. *See id.* § 152(a). At the same time, the Act historically preserved state authority over purely intrastate communications matters, creating a system of dual federal and state regulation. *See Louisiana*, 476 U.S. at 360-361. The Telecommunications Act of 1996 substantially expanded the FCC's authority over modern telecommunications networks and local telecommunications competition. In *AT&T Corp.* v. *Iowa Utilities Board*, the Supreme

Court explained that the 1996 Act "clearly 'appl[ies]' to intrastate service" and confirmed that the FCC possesses broad authority to implement its mandate, notwithstanding the traditional intrastate/interstate divide.  525 U.S. 366, 378-385 (1999).

Among other powers, Congress granted the FCC the authority over the discontinuance or modification of communications services subject to the agency's jurisdiction.  Section 214(a) requires FCC approval before a carrier may "discontinue, reduce, or impair service to a community, or part of a community."  47 U.S.C. § 214(a).  The FCC must notify affected States and provide them an opportunity to be heard as to whether the FCC should grant authorization.  *Id.* § 214(b).  But if the FCC determines that a discontinuance or modification serves "the present or future public convenience and necessity," it "shall have power to issue such certificate."  *Id.* § 214(c).  Once the FCC grants that authorization, "the carrier may, *without securing approval other than such certificate*, . . . proceed with the . . . discontinuance, reduction, or impairment of service covered thereby."  *Ibid.* (emphasis added).  Section 214 thus contemplates a role for States *within* the FCC's process, but not *outside* it.  The net result is "an exclusively federal discontinuance regime for interstate or jurisdictionally mixed telecommunications services."  NMO ¶ 108.

Under that statutory scheme, the FCC has taken steps to facilitate the transition from legacy networks to modern, IP-based infrastructure.  These efforts culminated in the March NMO, which was adopted unanimously on a bipartisan basis and became effective on May 20, 2026.  The NMO revises the FCC's rules to "ease burdens associated with outdated services by granting blanket section 214(a) authority for carriers to grandfather legacy voice services."  NMO ¶ 6.  Specifically, the NMO "grant[s] blanket section 214(a) authority for carriers to grandfather the following services to the extent they come within the purview of section 214(a):  (1) any legacy voice service; (2) any lower-speed data telecommunications service; and (3) any interconnected VoIP service provisioned over copper wire."  NMO ¶ 60.

That authorization allows carriers like AT&T to stop offering outdated

services like POTS to new customers. The agency understood the importance of that step, alongside other regulatory reforms. It observed that modernization has "been hindered by the need for carriers to divert important resources to the maintenance of aging and deteriorating legacy networks that deliver outdated services to an ever-decreasing number of subscribers." NMO ¶ 2. And it reasoned that because the NMO would hasten the winding down of copper-based networks, it would "free up billions of dollars for new builds" and allow providers to "invest more resources toward modernizing their networks so all consumers can access more advanced communications services." NMO ¶¶ 1-2.

### III.   California's Continued Insistence On Legacy Regulation

Although the FCC and various States have reduced regulatory barriers to modernization, California has not. It continues to maintain a regulatory regime that locks in place outdated and unwanted technology. In particular, the CPUC's COLR regime imposes both procedural and substantive barriers to discontinuing POTS.

The CPUC designated AT&T a COLR decades ago in the telephone-monopoly era—before broadband and other modern technologies were widely available—to ensure universal access to basic phone service. *See* CPUC Decision 96-10-066, Appx. B at 9-10, Attachment A to Appx. B. The proliferation of wireless, VoIP, and broadband services has rendered the concerns that precipitated the COLR requirements largely obsolete. Nevertheless, AT&T's legacy COLR designation requires it to offer "basic service" to customers in California pursuant to rates, terms, and conditions contained in a tariff subject to CPUC approval. CPUC Decision 12-12-038 at 56, Appx. A. The CPUC threatens substantial penalties for outages in those basic services. CPUC Gen. Order No. 133-E, § 2.2(f); CPUC Gen. Order No. 133-D, § 9. AT&T's approved "basic service" is POTS. If AT&T wants to stop offering POTS, it must either (1) persuade another company to shoulder its COLR obligations, or (2) persuade the CPUC to let AT&T escape its COLR designation or swap in a different "basic service." CPUC Decision 12-12-038 at 56, Appx. A.

Neither option is real. The first option—find a substitute carrier to voluntarily assume COLR obligations—is no option at all. AT&T has tried, and those efforts have failed. When AT&T last applied to withdraw as a COLR in light of significant technological and market changes, the CPUC rejected that application—after 15 months of burdensome and contested proceedings—because no other carrier would assume AT&T's obligations. Compl. ¶ 50; CPUC Decision 24-06-024 at 21. It is no surprise that no competitor has volunteered to assume outdated and expensive regulatory obligations unique to AT&T.

The alternative—receive CPUC permission to discontinue POTS as its basic service—is not viable either. The procedural obstacles are formidable enough: the CPUC requires AT&T to secure the agency's formal permission to discontinue POTS by demonstrating to the CPUC's satisfaction that an alternative AT&T service satisfies the "basic service" requirements. That requires navigating a gauntlet of state proceedings—none of which the CPUC must resolve promptly—which alone causes substantial delay and confusion. Indeed, California Assembly Communications Chair Tasha Boerner recently criticized "the CPUC's multi-year delay and gamesmanship to avoid taking decisive action." *AT&T Moves to Withdraw Copper Landlines, Sues California*, Politico (May 20, 2026), https://tinyurl.com/pksk5hhp.

Substantively, the CPUC has made clear that it will not permit AT&T to substitute a feasible, superior alternative like mobile wireless or AT&T Phone – Advanced, a service that relies on AT&T's mobile wireless network but allows customers to use existing, analog phones. The CPUC views wireless-based services, including those that replicate traditional POTS functionalities, as second-class offerings that cannot be "a full substitute for a COLR." CPUC Communications Division, Staff Proposal, 24-06-012, at 22; CPUC Decision 12-12-038 at 18-19, Appx. A at 3-5. So even if AT&T could navigate the byzantine and cumbersome CPUC procedures to get a decision, it would not be a favorable one.

All told, California's regulatory regime continues to require AT&T to devote

substantial resources to maintaining a legacy network that serves a shrinking group of customers.  *See* Ray Decl. ¶ 16 (AT&T spends roughly $1 billion on legacy services); *see also, e.g.*, Compl. ¶ 5.  Although competing providers—who are unburdened by comparable monopoly-era obligations—are able to focus their resources on deploying advanced services, AT&T must continue to maintain its outdated legacy copper network.  Just as the FCC warned against, California forces AT&T to "divert important resources to the maintenance of aging and deteriorating legacy networks that deliver outdated services to an ever-decreasing number of subscribers."  NMO ¶ 2.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must show that (1) it is likely to succeed on the merits; (2) it will suffer irreparable harm absent relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.  *Chamber of Com. of the United States of Am.* v. *Bonta*, 62 F.4th 473, 481 (9th Cir. 2023); *Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Under the "sliding scale" approach, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction."  *All. for the Wild Rockies* v. *Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011).  The "[l]ikelihood of success on the merits" is the "most important factor."  *Env't Prot. Info. Ctr.* v. *Carlson*, 968 F.3d 985, 989 (9th Cir. 2020).

## ARGUMENT

The preliminary-injunction factors are easily satisfied here.  Most importantly, AT&T is likely to succeed on the merits.  Whether under express, impossibility, or general conflict preemption, the federal Communications Act preempts any California laws or regulations that prevent AT&T from effectuating the grandfathering of POTS that the FCC has already authorized.  The remaining factors—irreparable harm, the balance of the equities, and the public interest—decisively cut in favor of enjoining California from enforcing state regulations that violate federal law,

frustrate the national interest in modernizing telecommunication networks, threaten AT&T with serious and unrecoverable economic and constitutional harms, and provide no real-world benefits to California consumers.

## I.    AT&T Is Likely To Succeed On The Merits Of Its Preemption Claim.

Federal law can preempt state law in several ways. First, a "federal statute may expressly preempt state law by enacting a clear statement to that effect." *Chamber of Com. of the United States of Am.* v. *Bonta*, 62 F.4th 473, 482 (9th Cir. 2023). Alternatively, state laws can be impliedly preempted, including "to the extent of any conflict with a federal statute." *Ibid.* (quoting *Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)). Such conflict preemption can occur in situations where it is "impossible for a private party to comply with both state and federal requirements," *ibid.* (quoting *Merck Sharp & Dohme Corp.* v. *Albrecht*, 587 U.S. 299, 303 (2019)), or where the state law at issue "creates an unacceptable obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *ibid.* (quoting *Wyeth* v. *Levine*, 555 U.S. 555, 563-564 (2009)). California's COLR and related requirements, as applied to block AT&T from grandfathering POTS, fail every applicable preemption test.

### A.    Section 214(c) Expressly Preempts California's Requirements.

Congress spoke expressly here. For telecommunications lines subject to the FCC's jurisdiction, Section 214(c) explicitly forecloses any state requirements that prevent a carrier from acting on the FCC's authorization. The statute provides that where the FCC has certified that a carrier may "discontinue, reduce, or impair service to a community, or part of a community," "the carrier may, *without securing approval other than such certificate*, . . . proceed with the . . . discontinuance, reduction, or impairment of service covered thereby." 47 U.S.C. § 214(a), (c) (emphasis added). Section 214(c) "clearly provides that the carrier may proceed in compliance with the certificate once it is issued." *Cablevision of Texas III, L.P.* v. *Oklahoma W. Tel. Co.*, 993 F.2d 208, 210 (10th Cir. 1993). So the FCC "has sole jurisdiction to decide

whether a carrier's proposed discontinuance adversely affects the public convenience and necessity and whether it should be approved or rejected." NMO ¶ 110.

States may participate in the Section 214 process, but only in a supporting capacity. Section 214(b) requires the FCC to provide "notice" to affected states and affords them "the right . . . to be heard." 47 U.S.C. § 214(b). "This provision allows states to object to any federal discontinuance application prior to any Commission authorization." NMO ¶ 110. States' views may *inform* the FCC's decision. But the statute does not give States any authority to approve, deny, or condition discontinuances of interstate or jurisdictionally mixed services.

States may also *enforce* the FCC's decisions by suing to enjoin those discontinuances that occur "contrary to the provisions of" Section 214 itself. 47 U.S.C. § 214(c); NMO ¶ 110. The negative inference is clear: courts may *not* enjoin a discontinuance that complies with an FCC-issued certificate. Nor may States do so indirectly by imposing their own approval requirements.

Consistent with the statutory text, courts have recognized that Section 214 "leaves exclusively within the jurisdiction of the Commission the determination of whether to grant a certificate of convenience and necessity" to "discontinue a service." *ITT World Commc'ns, Inc.* v. *N.Y. Tel. Co.*, 381 F. Supp. 113, 120 (S.D.N.Y. 1974); NMO ¶ 110. Congress centralized that determination because decisions concerning "the construction of new telephone lines and facilities and the discontinuance of service over existing facilities" are "central to [the FCC's] mission." *Litton Sys., Inc.* v. *Am. Tel. & Tel. Co.*, 487 F. Supp. 942, 948 (S.D.N.Y. 1980). That mission includes making telecommunications service available "to all the people of the United States"—an objective achieved by "centralizing authority" in the Commission over certain regulatory decisions. 47 U.S.C. § 151; *see MCI Commc'ns Corp.* v. *Am. Tel. & Tel. Co.*, 462 F. Supp. 1072, 1080 (N.D. Ill. 1978) ("Congress concentrated on vesting the FCC with sufficient powers to insure that AT&T provided telephone users . . . rapid and uniform services."). As the FCC has explained, Section 214(b)

and (c) do not empower States "to decide whether a carrier may discontinue interstate or jurisdictionally mixed service, or . . . to impose requirements that frustrate or add extra conditions to Commission decisions allowing discontinuance." NMO ¶ 110.

The next question under Section 214 is whether the FCC has authorized AT&T to grandfather POTS in California. It has. The FCC previously granted carriers the authority to grandfather legacy voice services without filing a Section 214(a) application. *Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, Order, WC Docket No. 17-84, 40 FCC Rcd. 2019, ¶ 6 (Mar. 20, 2025) (Waiver Order). The 2026 NMO confirmed and expanded that authorization, providing "blanket section 214(a) authority for carriers to grandfather legacy voice services . . . provisioned over copper wire." NMO ¶ 6; *see id.* ¶¶ 60-66. In so doing, the FCC acted over California's objection. CPUC, Network Modernization Reply Comments (Nov. 18, 2025, WC Docket Nos. 25-208, 25-209). This exercise of the FCC's legislatively granted Section 214 authority has preemptive effect. *See City of New York* v. *FCC*, 486 U.S. 57, 64 (1988) (explaining that federal agency action taken pursuant to delegated authority may preempt conflicting state regulation).

The final question under Section 214 is whether California POTS is a jurisdictionally mixed service subject to the FCC's jurisdiction. It is. As the FCC explained in the NMO, most legacy voice services operate "using circuit-switched [TDM] technology," typically "over copper wires." NMO ¶ 107. Although often described as "local telephone service," that label "does not accurately reflect the jurisdictional nature of the service as a practical matter in today's networks." *Ibid*. Modern networks are rarely divided into discrete intrastate and interstate systems. Instead, consumers typically obtain both local and long-distance service from the same provider, "provisioned over the same network using the same technology." *Ibid.* Two features of AT&T's California POTS—its practical operation and modern commercial demands—make clear that it is a jurisdictionally mixed service.

*First*, the interstate and intrastate components of POTS are practically inseparable. Fahmy Decl. ¶¶ 10-11. The network that supports POTS was built to handle both intrastate and interstate calls over a single, inseverable network. AT&T uses the same copper loops, switches, connecting trunks, and supporting systems to carry both local and long-distance calls. *Id.* ¶ 10. A call across the street and a call across the county traverse the same facilities before being routed to their destinations. *Ibid.* This architecture is not incidental. It is why POTS satisfies California's COLR obligations to begin with: the CPUC's definition of "basic service" requires that consumers be able "to place and receive voice-grade calls over all distances." CPUC Decision 12-12-038, Appx. A at 1. Because the same infrastructure simultaneously supports interstate and intrastate communications, AT&T cannot discontinue one without discontinuing the other.

That reality also aligns with the NMO's rationale. The FCC's goal was not merely to allow carriers to stop offering certain interstate voice services, but to enable them "to retire outdated and deteriorating legacy networks." NMO ¶ 7; *see id.* ¶ 114. The FCC declared its goal of "cutting through the red tape that has . . . required providers to keep aging copper lines in place." NMO ¶ 1. But there is no way to retire the copper network for interstate traffic while preserving it for intrastate use because "these services . . . are provisioned over the same network using the same technology." NMO ¶ 107; *see* Fahmy Decl. ¶ 10. Grandfathering or discontinuing the interstate portion would do nothing but cause confusion.

*Second*, as a commercial matter, there is no real market for "local-only" POTS service. Nowadays, customers demand integrated "all-distance" services that offer both intrastate and interstate coverage, rather than separate local and long-distance alternatives. Fahmy Decl. ¶¶ 10-11. AT&T and its competitors have all but abandoned the twentieth-century model of separate local and long-distance service. So to offer a purely intrastate version of POTS, AT&T would need to sell a fundamentally different service than it and its competitors offer today, and that no consumers

GIBSON, DUNN & CRUTCHER LLP

3:26-CV-03148
MOTION FOR PRELIMINARY INJUNCTION    - 15 -

actually want. AT&T is not obligated to create such a service "merely to provide [the CPUC] with an intrastate communication [it] can regulate." *Minnesota Pub. Utilities Comm'n.* v. *FCC*, 483 F.3d 570, 578 (8th Cir. 2007).

In short, AT&T's California POTS is a single, integrated service that includes both interstate and intrastate communications. It is therefore jurisdictionally mixed and subject to the FCC's exclusive authority over discontinuance or modification. The FCC exercised that authority in the NMO, and California's contrary COLR regulations are expressly preempted.

### B.     California's COLR Requirements Are Impliedly Preempted.

Even if California's COLR requirements did not fall within the scope of Section 214(c)'s express-preemption provision, the requirements are still impliedly preempted. Under longstanding principles of conflict preemption, a state law must yield to federal law "where compliance with both federal and state law is in effect physically impossible" or "when there is outright or actual conflict between federal and state law." *Louisiana,* 476 U.S. at 357. Both are true here.

***Impossibility Preemption.*** In the Communications Act, Congress attempted "to divide the world of domestic telephone service neatly into two hemispheres—one comprised of interstate service, over which the FCC would have plenary authority, and the other made up of intrastate service, over which the States would retain exclusive jurisdiction." *Louisiana*, 476 U.S. at 360; *see* 47 U.S.C. § 152. But "the realities of technology and economics belie such a clean parceling of responsibility." *Louisiana*, 476 U.S. at 360. Impossibility preemption—sometimes characterized as the "impossibility exception" to the presumptive division of federal and state authority in Section 152—allows the FCC to "preempt a state regulation where it is 'not possible to separate the interstate and intrastate components of the asserted FCC regulation'" and the state regulation would undermine valid FCC regulatory goals. *California*, 75 F.3d at 1359 (quoting *Louisiana*, 476 U.S. at 375 n.4).

Even where separating interstate and intrastate service is "possible

technologically," the impossibility exception applies if "such a separation [i]s not practical." *Pub. Serv. Comm'n of Md.* v. *FCC*, 909 F.2d 1510, 1516 (D.C. Cir. 1990). Whether such separation is practical turns on "economic and operational factors." *California* v. *FCC*, 39 F.3d 919, 932 (9th Cir. 1994). Services are practically inseparable where consumers "generally wish to purchase both interstate and intrastate . . . services" together and where enforcing a jurisdictional separation would be "detrimental to both the consumer and the interstate communication system." *Computer & Commc'ns Indus. Ass'n* v. *FCC*, 693 F.2d 198, 215 (D.C. Cir. 1982).

The Supreme Court's decision in *Louisiana* illustrates the distinction between services that can be separated into interstate and intrastate components, and those that cannot. There, the Court held that the FCC could not preempt state depreciation practices for intrastate ratemaking because the Communications Act's "jurisdictional separations" process made it possible to allocate costs between interstate and intrastate uses of the same facilities. 476 U.S. at 375-376. It was, after all, simply a matter of allocating dollars and cents. But the Court expressly distinguished cases in which "it was not possible to separate the interstate and intrastate components" of the regulated service. *Id.* at 376 n.4. The Court cited as an example a pair of Fourth Circuit decisions finding preempted a state regulation that would have negated federal policy governing interconnected telephone equipment used for both interstate and intrastate communications. *Ibid.* (citing *North Carolina Util. Comm'n* v. *FCC*, 537 F.2d 787 (4th Cir. 1976); *North Carolina Util. Comm'n* v. *FCC*, 552 F.2d 1036 (4th Cir. 1977)). In those cases, the same network facilities and terminal equipment were used "in common and indivisibly" for both interstate and intrastate communications, making jurisdictional separation impracticable. *North Carolina*, 537 F.2d at 791-792. State restrictions therefore could not coexist with federal authorization because the state rules would effectively negate the federal regime. *Id.* at 793-794.

The Eighth Circuit applied the same principle to modern integrated telecommunications networks in *Minnesota*. The court found preempted a state regulation

of interconnected VoIP services because it was "impractical or impossible to separate the service into its interstate and intrastate components."  483 F.3d at 578-580.  In doing so, the court rejected the counterargument that a provider could theoretically operate a purely intrastate service.  It reasoned that providers need not construct separate systems or develop costly mechanisms "merely to provide state commissions with an intrastate communication they can then regulate."  *Id.* at 578.  And it emphasized that the impossibility inquiry turns not only on technological capability, but also on practical and economic realities.  *Id*. at 578-579.

This case falls squarely on the *North Carolina* and *Minnesota* side of the line.  This is not a matter of allocating costs between intrastate and interstate services; it is an all-or-nothing decision on whether to maintain a copper-wire network to support POTS.  AT&T's California POTS operates over a single integrated network whose interstate and intrastate components cannot practically be separated.  As discussed, *see supra* Part I.A, AT&T does not maintain separate sets of infrastructure for interstate calls and intrastate calls:  the same copper loops, switches, trunks, and operational systems support both. Fahmy Decl. ¶¶ 10-11.  AT&T cannot retire the network for interstate purposes while maintaining it for intrastate purposes, nor can AT&T meaningfully grandfather only the interstate component of POTS while continuing to offer a separate "intrastate-only" version of the service.  *Id.* ¶¶ 10, 14.  If AT&T wants to retire interstate POTS to recoup savings to invest in other infrastructure, then it needs to retire the copper lines.  If AT&T must provide intrastate POTS, then it needs to maintain the copper lines.  There is no way to wind down one system and keep the other operational.  *Id*. ¶¶ 13-14.

Because it is impossible for AT&T to both proceed expeditiously in accordance with the NMO and to adhere to the CPUC's COLR requirements, those requirements would be preempted under the doctrine of impossibility preemption even if Section 214 did not expressly preempt them.

***General Conflict Preemption***.  Conflict preemption also exists where state law

"stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" or otherwise interferes with the methods by which Congress chose to implement federal law. *Crosby*, 530 U.S. at 372-373. The inquiry turns on the statutory scheme and what it reveals about Congress's objectives. *See Arizona* v. *United States*, 567 U.S. 387, 399 (2012). California's requirements conflict with the Communications Act's text and the FCC's regulatory framework in several ways.

*First*, California's regime conflicts with Congress's decision to vest the FCC with exclusive authority to determine whether discontinuing or winding down jurisdictionally mixed communications services serves "the present or future public convenience and necessity." 47 U.S.C. § 214(a), (c). Congress recognized that communications networks operate across state lines and therefore assigned the FCC—not 50 separate States—the responsibility for determining when service modifications are consistent with the broader public interest. That is why Section 214(c) provides that a carrier need only secure the FCC's authorization, and then can act "without securing approval other than such certificate." *Id.* § 214(c). California's imposition of additional state-law hurdles conflicts with Congress's decision to centralize decision-making authority in the FCC.

*Second*, California's regime conflicts with Congress's careful prescription of States' roles within the Section 214 process. Congress treated States as contributors to and enforcers of a uniform federal decision: States may present their views to the FCC before the agency acts, *see* 47 U.S.C. § 214(b), and they may seek judicial enforcement if a carrier violates an FCC order, *see id.* § 214(c). But Congress did not authorize States to impose independent approval requirements or substantive conditions separate from the FCC's. California's COLR requirements effectively transform the State from a participant in the federal process into a veto-holder over FCC-authorized discontinuances. That second-guessing contravenes the Communications Act's careful allocation of authority.

*Third*, California's regime conflicts with the FCC's specific modernization

policy embodied in the NMO. Congress directed the FCC to promote "a rapid, efficient, Nation-wide, and world-wide" communications system, 47 U.S.C. § 151, to "encourage the provision of new technologies and services to the public," *id.* § 157(a), and to "remove barriers to infrastructure investment" in order to accelerate deployment of advanced telecommunications capability, *id.* § 1302(a). Executing those directives, the FCC expressly determined that legacy copper networks impede modernization by forcing providers to "divert important resources to the maintenance of aging and deteriorating legacy networks." NMO ¶ 2. The FCC therefore granted blanket Section 214 authority to grandfather legacy services, allowing carriers to "focus their resources on the development and deployment of next-generation networks." NMO ¶ 60. California's COLR requirements undermine those federal objectives. By effectively requiring AT&T to continue offering POTS to new customers rather than winding it down, the CPUC blocks the infrastructure modernization that the FCC deemed necessary to advance Congress's goals. The CPUC's regulations thus "conflict[] with the accomplishment and execution of the full purposes of federal law." *Capital Cities Cable, Inc.* v. *Crisp*, 467 U.S. 691, 716 (1984).

Because the CPUC's COLR requirements conflict with Congress's allocation of authority, the Communications Act's decision-making structure, and the FCC's specific modernization directives, those requirements are preempted under "general principles of conflict preemption." NMO ¶ 114.

## II.     AT&T Will Suffer Irreparable Harm.

Without a preliminary injunction, AT&T will suffer irreparable harm to both its business interests and its constitutional rights. AT&T faces a "Hobson's choice" between "continually violat[ing]" the law and risking enforcement consequences, or "suffer[ing] the injury of obeying the law during the pendency of the proceedings and any further review." *Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). Complying with California's preempted COLR requirements would inflict tens of millions of dollars in "unrecoverable costs" on AT&T, while damaging its

customer goodwill and competitive standing. *NetChoice* v. *Bonta*, 790 F. Supp. 3d 798, 810 (N.D. Cal. 2025). Those business harms are sufficient to warrant relief. And they are compounded by the ongoing violation of AT&T's constitutional rights, which independently and "necessarily" constitutes irreparable injury. *United States* v. *California*, 173 F.4th 1060, 1069 (9th Cir. 2026).

***Operational Harms.*** AT&T will suffer immediate and irreparable harm to its business if California's preempted COLR requirements remain in force. Continued provision of POTS requires extensive maintenance of aging copper infrastructure, including scarce replacement parts and specialized servicing. In California alone, the costs to maintain AT&T's copper networks run about $1 billion annually. Ray Decl. ¶ 16. Because the CPUC prevents AT&T from grandfathering POTS, AT&T cannot begin winding down the copper network even in areas where it is dormant—that is, where there are no *current* customers. Instead, AT&T must continue maintaining the broader copper-network infrastructure needed to support the (shrinking) possibility of *future* POTS orders in any corner of its territory. *Id.* ¶ 21. As a result, AT&T must continue operating, monitoring, repairing, and maintaining infrastructure that serves minimal or no customer demand. *Ibid.* Grandfathering would save AT&T millions annually by allowing it to power down and retire unused infrastructure— and together with discontinuance, would save it billions in the long term. *Id.* ¶ 23.

Most significantly, AT&T currently maintains thousands of remote terminals—which house equipment outside of the main service centers that extend the network—in areas of California with little or declining POTS usage, solely because AT&T must accept potential new POTS orders in those areas. Ray Decl. ¶ 22. Such remote terminals may have no active customers, but must remain powered, operational, monitored, and available for service. *Id.* ¶¶ 23-26. AT&T must also continue maintaining portions of its legacy copper infrastructure in a service-ready condition, including keeping certain copper cables energized and pressurized to prevent water intrusion and service degradation. *Ibid.* By analogy, picture a mostly vacant office

building, where the owner is required to keep the lights on and the air conditioning blasting on empty floors, just in case someone moves in.

If AT&T were permitted to grandfather POTS and stop accepting new POTS orders in areas where there are no existing customers, AT&T would see immediate financial gains. AT&T could save more than $1.7 million annually by eliminating power, maintenance, and other operational costs associated with certain remote terminals and unused network facilities, including expenses related to energizing facilities, air-pressurizing lines, and proactive maintenance. Ray Decl. ¶ 24. AT&T could also reduce its copper-theft avoidance efforts and repairs in areas with no customers. *Id*. ¶ 25 ($20 million/year). On top of that, AT&T could immediately recover substantial value from reclaimed parts, and accelerate its reclamation of copper from old systems—an asset that it values at around $800 million. *Id*. ¶¶ 25-26. All told, waiting even one year to resolve this suit would likely cost AT&T tens of millions of dollars. And because the CPUC is immune from damages, AT&T cannot recover those funds if it prevails. *See Californians for Renewable Energy* v. *CPUC*, 922 F.3d 929, 941 (9th Cir. 2019). Such nonrecoverable costs are classically irreparable. *See, e.g.*, *Nat'l Insts. of Health* v. *Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025); *San Francisco* v. *USCIS*, 981 F.3d 742, 762 (9th Cir. 2020).

***Reputational Harms.*** California's regulations will also harm AT&T's customer goodwill and prospective business opportunities—another irreparable harm. *E.g.*, *Herb Reed Enters., LLC* v. *Florida Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *Stuhlbarg Int'l Sales Co.* v. *John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001). Forcing AT&T to continue offering an outdated, slower, and less reliable copper-based POTS service—one increasingly prone to outages from theft and natural disasters—inevitably harms AT&T's reputation in the marketplace. Ray Decl. ¶¶ 30-34. Customers using POTS often attribute the problems to AT&T, damaging AT&T's reputation and driving customers elsewhere when they eventually switch to a modern alternative. *Id*. ¶ 32. Every day that AT&T must accept new POTS

GIBSON, DUNN & CRUTCHER LLP

3:26-CV-03148
MOTION FOR PRELIMINARY INJUNCTION    - 22 -

customers is another day its competitors are advantaged. *Id*. ¶ 41.

Barring grandfathering makes things worse. Grandfathering is a transitional step designed to smooth the path to eventual discontinuance, and delaying grandfathering generates unnecessary friction. New customers may sign up for POTS—only to promptly receive a notice that their service will be discontinued. Ray Decl. ¶ 33. That whiplash will generate confusion and frustration. *Ibid*. And without grandfathering, existing customers may be confused about the future of their POTS service, or frustrated by a rapid discontinuance rather than a smooth transition. *Id*. ¶¶ 33-34. Grandfathering is a way to provide certainty to AT&T's customer base.

***Competitive Harms.*** The financial and reputational harms cut deeper because *only AT&T* suffers them. California's requirements impose a unique competitive disadvantage on a single provider. POTS is an outdated service that consumers are rapidly abandoning in favor of faster, more reliable IP-based alternatives. Ray Decl. ¶¶ 4-6, 19. Yet only AT&T must continue investing heavily in maintaining that declining service, even as its competitors invest exclusively in next-generation offerings. *Id*. ¶¶ 20, 41. Only AT&T must mitigate customer whiplash from regulatory delays. Every dollar AT&T is forced to spend sustaining POTS is a dollar it cannot invest in modernization, innovation, and customer acquisition. Fahmy Decl. ¶ 13. And unlike AT&T, its competitors are free to capture those customers now and need not offer an outdated service. Ray Decl. ¶ 41. This asymmetry places AT&T at a sustained "competitive disadvantage," which "constitutes irreparable harm." *Int'l Franchise Ass'n, Inc.* v. *City of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015).

***Constitutional Harms.*** These operational, reputational, and competitive injuries are particularly concerning because they stem from preempted state laws and regulations—which, under the Supremacy Clause, violate AT&T's constitutional rights. "'[A]n alleged constitutional infringement will often alone constitute irreparable harm.'" *Monterey Mech. Co.* v. *Wilson*, 125 F.3d 702, 715 (9th Cir. 1997); *see* 11A Wright, et al., Fed. Practice & Proc. § 2948.1 (1995). "[W]hen a plaintiff alleges

a constitutional violation and injury" a showing of likelihood of success on the merits "usually" also suffices to show irreparable harm. *Baird* v. *Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). That includes violations of the Supremacy Clause that force a party to choose between complying with a preempted law or risking penalties. *See Am. Trucking Ass'ns, Inc.* v. *City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) (a "constitutional violation alone, coupled with the damages incurred, can suffice to show irreparable harm"). As explained, AT&T is likely to succeed on the merits of its claim for "constitutional violation and injury." *Baird*, 81 F.4th at 1040. That constitutional harm amplifies the need for interim relief.

Each of these harms alone establishes irreparable injury; together, they leave no doubt that preliminary relief is warranted. Without a preliminary injunction, AT&T will be locked into continued compliance with a tangle of preempted California regulations that delay it from modernizing its network, force it to spend vast sums that it will never get back, and leave it to compete with its telecommunications rivals with one hand behind its back.

### III.    The Equities And Public Interest Weigh Heavily In AT&T's Favor.

When the government is the opposing party, the public interest and balance of equities often merge. *Nken* v. *Holder*, 556 U.S. 418, 435 (2009). Here, the public interest and balance of the equities decisively favor interim relief, which would preserve existing services while facilitating future network modernization.

For starters, because the CPUC's regulations violate federal law, the CPUC has no legitimate interest in continuing to enforce those regulations. The CPUC may not "act unlawfully even in pursuit of desirable ends"—and certainly not to frustrate national telecommunications development. *Alabama Ass'n of Realtors* v. *HHS*, 594 U.S. 758, 766 (2021); *see Nat'l Federation of Independent Business* v. *OSHA*, 595 U.S. 109, 120 (2022). The public interest instead favors promptly stopping violations of the Supremacy Clause. As the Ninth Circuit has explained, "preventing a violation of the Supremacy Clause serves the public interest." *United States* v. *California*, 921

GIBSON, DUNN &
CRUTCHER LLP

3:26-CV-03148
MOTION FOR PRELIMINARY INJUNCTION    - 24 -

F.3d 865, 893 (9th Cir. 2019); *accord Am. Trucking*, 559 F.3d at 1059-1060.

The practical equities and public interest also favor an injunction. First, the FCC has already evaluated the "public convenience and necessity," 47 U.S.C. § 214(a), (c), and determined that facilitating grandfathering serves the public interest. The FCC concluded that legacy-service requirements "divert important resources to the maintenance of aging and deteriorating legacy networks that deliver outdated services to an ever-decreasing number of subscribers." NMO ¶ 2. Thus, there has already been government oversight and a considered regulatory determination (at the end of an extensive administrative process in which California participated) that enabling the transition away from legacy networks benefits consumers.

Second, this case concerns grandfathering—not immediate discontinuance. Grandfathering simply initiates the transition to modern systems; it does not terminate service to existing customers or otherwise alter the status quo for them. No existing customer will lose service as a result of an injunction permitting AT&T to begin that transition process. Ray Decl. ¶ 8. So the equities do not involve any tradeoff between modernization and even arguable concerns about service continuity.

Third, jumpstarting that transition advances the public interest. Grandfathering will enable AT&T to more quickly direct resources away from maintaining obsolete copper infrastructure and toward modern, IP-based networks that consumers prefer because they are faster, more reliable, and more resilient. Ray Decl. ¶¶ 30-31. By contrast, California's COLR regime delays that transition, forcing continued investment in outdated systems and slowing the deployment of advanced services.

In short, an injunction would preserve existing services while accelerating the transition to better ones. Nobody will lose service in the interim. The balance of the equities and the public interest therefore strongly favor interim relief.

## CONCLUSION

For the foregoing reasons, AT&T respectfully asks this Court to grant its motion for a preliminary injunction.

Dated: May 27, 2026

**GIBSON, DUNN & CRUTCHER LLP**

By: /s/ Theodore J. Boutrous, Jr.
Theodore J. Boutrous, Jr.
*Attorney for Plaintiff Pacific Bell Telephone Company d/b/a AT&T California*

THEODORE J. BOUTROUS, JR., SBN 132099
  tboutrous@gibsondunn.com
JILLIAN N. LONDON, SBN 319924
  jlondon@gibsondunn.com
PATRICK J. FUSTER, SBN 326879
  pfuster@gibsondunn.com
BRANTON J. NESTOR, SBN 338445
  bnestor@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000

JEFFREY B. WALL (*pro hac vice* forthcoming)
  jwall@gibsondunn.com
MORGAN L. RATNER (*pro hac vice* forthcoming)
  mratner@gibsondunn.com
1700 M Street, N.W.
Washington, DC 20036-4504
Telephone:  202.955.8533

*Attorneys for Plaintiff Pacific Bell Telephone Company d/b/a AT&T California*

3:26-CV-03148
MOTION FOR PRELIMINARY INJUNCTION