ROB BONTA
Attorney General of California
TODD GRABARSKY
Supervising Deputy Attorney General
SABRINA T. MCGRAW
Deputy Attorney General
VIVIANA M. HANLEY
Deputy Attorney General
CAMILLE FRAMROZE
Deputy Attorney General
State Bar No. 332075
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3916
  Fax:  (415) 703-5480
  E-mail:  Camille.Framroze@doj.ca.gov
*Attorneys for Defendants*
*John Reynolds, Darcie L. Houck, Karen*
*Douglas, Matthew Baker, Christine Harada,*
*and Rob Bonta, in their Official Capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PACIFIC BELL TELEPHONE COMPANY d/b/a AT&T CALIFORNIA,**<br><br>Plaintiff,<br><br>v.<br><br>**JOHN REYNOLDS, in his official capacity as President of the California Public Utilities Commission; DARCIE L. HOUCK, KAREN DOUGLAS, MATTHEW BAKER, and CHRISTINE HARADA, in their official capacities as Commissioners of the California Public Utilities Commission; ROB BONTA, in his official capacity as Attorney General of the State of California,**<br><br>Defendants. | No. 3:26-cv-03148-LL-JAC<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Dept:  Courtroom 14B<br>Judge:  Hon. Linda Lopez<br>Trial Date:  Not Set<br>Action Filed:  May 20, 2026<br><br>**PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT** |

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................ 1

Background ................................................................................................. 2

I. California's Telecommunications COLR Rules Ensure That Every Californian Has Access to Basic Telephone Service ............... 2

    A. CPUC Designated AT&T and Others as COLRs to Ensure All Californians Have Access to Basic Telephone Service ....... 3

    B. CPUC's Definition of "Basic Service" ..................................... 4

    C. The COLR Rules Are Technology-Neutral ............................... 4

II. AT&T Seeks to Avoid Its Obligations to Provide Basic Service ......... 7

    A. AT&T's Lawsuit Is Its Latest Attempt to Abandon Its Obligations as a COLR .............................................................. 7

    B. AT&T Does Not Intend to Offer Basic Service Through AP-A or Any Other Service If It Grandfathers POTS ................ 9

    C. POTS Can Be Grandfathered on Solely an Interstate Basis ..... 11

III. AT&T Seeks to Retire and Discontinue POTS Via FCC Petitions and the Present Lawsuit ....................................................... 12

Legal Standard ........................................................................................... 12

Argument .................................................................................................... 13

I. AT&T Is Not Likely to Succeed on the Merits of Its Preemption Claim ......................................................................................................... 13

    A. Preemption Is Not Implicated Here Because the COLR Rules Do Not Prevent AT&T from Grandfathering POTS ...... 13

    B. AT&T Cannot Overcome the Presumption Against Preemption ............................................................................... 15

    C. There Is No Express Preemption Because Congress Did Not Authorize the FCC To Preempt Regulations Like California's COLR Rules ......................................................... 16

    D. There Is No Implied Impossibility Preemption Because AT&T Can Separate the Intrastate and Interstate Components of Its POTS ........................................................ 19

    E. There Is No Implied Conflict Preemption Because the COLR Rules Do Not Prevent AT&T From Modernizing ........ 21

II. AT&T Cannot Show That It Will Suffer Irreparable Harm .............. 22

III. The Equities and Public Interest Are Squarely in Defendants' Favor ....................................................................................................... 24

Conclusion ................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page**

CASES

*ACA Connects v. Bonta*
24 F.4th 1233 (9th Cir. 2022) ............................................................................ 16

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*
559 F.3d 1046 (9th Cir. 2009) ....................................................................... 22, 23

*Bangor Gas Co., LLC v. H.Q. Energy Servs. (U.S.) Inc.*
695 F.3d 181 (1st Cir. 2012) ............................................................................. 10

*BOKF, NA v. Estes*
923 F.3d 558 (9th Cir. 2019) ............................................................................. 13

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*
489 U.S. 141 (1989) ......................................................................................... 18

*Crosby v. Nat'l Foreign Trade Council*
530 U.S. 363 (2000) ..................................................................................... 14, 21

*Diamond Sands Apartments, LLC v. Clark Cnty.*
164 F.4th 759 (9th Cir. 2026) ........................................................................... 12

*Durnford v. MusclePharm Corp.*
907 F.3d 595 (9th Cir. 2018) ............................................................................. 15

*Envtl. Democracy Project v. Green Sage Mgmt., LLC*
No. 22-CV-03970-JST, 2022 WL 4596616 (N.D. Cal. Aug. 23,
2022) ............................................................................................................... 25

*In re World Auxiliary Power Co.*
303 F.3d 1120 (9th Cir. 2002) ........................................................................... 15

*Ishikawa v. Delta Airlines, Inc.*
343 F.3d 1129 (9th Cir.) ................................................................................... 14

*ITT World Communications Inc. v. New York Telephone Co.*
381 F. Supp. 113 (S.D.N.Y. 1974) ..................................................................... 17

*Jones v. Google LLC*
73 F.4th 636 (9th Cir. 2023) ............................................................................. 16

Defendants' Opposition to Motion for Preliminary Injunction (3:26-cv-03148)

## TABLE OF AUTHORITIES
### (continued)

**Page**

*La. Pub. Serv. Comm'n v. F.C.C.*
  476 U.S. 355 (1986) ....................................................................2, 16, 19, 21

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.*
  487 F. Supp. 942 (S.D.N.Y. 1980) ................................................................ 17

*Los Angeles Unified Sch. Dist. v. S&W Atlas Iron & Metal Co.*
  506 F. Supp. 3d 1018 (C.D. Cal. 2020)......................................................... 14

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*
  462 F. Supp. 1072 (N.D. Ill. 1978)................................................................ 17

*MD/DC/DE Broadcasters Ass'n v. FCC*
  253 F.3d 732 (D.C. Cir. 2001).................................................................. 10, 16

*Minn. Pub. Utilities Comm'n v. FCC*
  483 F.3d 570 (8th Cir. 2007)........................................................................ 11

*Murphy v. Nat'l Collegiate Athletic Ass'n*
  584 U.S. 453 (2018) ..................................................................................... 13

*N. Carolina Utils. Comm'n v. FCC*
  537 F.2d 787 (4th Cir. 1976).................................................................... 20, 21

*N. Carolina Utils. Comm'n v. FCC*
  552 F.2d 1036 (4th Cir. 1977)....................................................................... 21

*Nwauzor v. GEO Grp., Inc.*
  127 F.4th 750 (9th Cir. 2025)................................................................... 15, 19

*Porretti v. Dzurenda*
  11 F.4th 1037 (9th Cir. 2021)................................................................... 13, 24

*Starbucks Corp. v. McKinney*
  602 U.S. 339 (2024) ..................................................................................... 12

*Stardock Sys., Inc. v. Reiche*
  No. C 17-07025 SBA, 2018 WL 7348858
  (N.D. Cal. Dec. 27, 2018)......................................................................... 23, 24

## TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. California*
921 F.3d 865 (9th Cir. 2019) ...................................................................... 15, 22

*Va. Uranium, Inc. v. Warren*
587 U.S. 761 (2019) ........................................................................................ 15

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008) ............................................................................... 12, 13, 24

*WWC Holding Co. v. Sopkin*
488 F.3d 1262 (10th Cir. 2007) ..................................................................... 20

*Wyeth v. Levine*
555 U.S. 555 (2009) ......................................................................... 15, 16, 17, 18

**STATUTES AND REGULATIONS**

47 U.S.C. § 151 ................................................................................................. 3

47 U.S.C. § 152 ............................................................................................. 3, 15

47 U.S.C. § 214 ......................................................................................... 2, 17, 22

47 U.S.C. § 253 ............................................................................................... 18

47 U.S.C. § 332 ............................................................................................... 18

Cal. Stat. 1904, c. 278 § 2(a) ........................................................................... 3

Cal. Public Utilities Code § 2881 ................................................................ 4, 10

**CONSTITUTIONAL PROVISIONS**

United States Constitution
Amendment X .............................................................................................. 22

iv

## INTRODUCTION

Pacific Bell Telephone Company d/b/a AT&T California's ("AT&T") motion for preliminary injunction is a transparent attempt to manufacture conflict, urgency, and harm where there is none.  It should be denied, for one simple reason: California's rules for carriers of last resort ("COLR") do not prevent AT&T from grandfathering its copper wire service, as it seeks to do in this lawsuit.  There is, therefore, no "conflicting" state provision to be preempted.  This ends the matter.

AT&T has been a designated COLR in California since 1996, which means that it is required to provide "basic service" to customers in its territory.  "Basic service" is defined by the California Public Utilities Commission ("CPUC") to include certain minimum standards that the telephone service must meet, such as free access to 911 services, and discounted rates to eligible low-income households.  However, the COLR rules are explicitly ***technology-neutral***; it does not matter whether the carrier uses copper wire, wireless, Voice over Internet Protocol, or any other type of technology, so long as it meets the standard for "basic service."  For most of the time that AT&T has been a COLR, it has chosen to provide basic service over its copper wire Plain Old Telephone Service ("POTS").[1]

Earlier this year, the Federal Communications Commission ("FCC") passed a Network Modernization Order ("NMO") that granted carriers like AT&T blanket authority to cease offering telephone services provided over copper wire to new customers—a process known as "grandfathering" the copper line services.  The crux of this dispute is straightforward:  AT&T claims that the NMO preempts the COLR rules because the COLR rules require AT&T to continue offering POTS to new customers, and the NMO allows them to stop.  But that is simply not true.  All

---

[1] The term "POTS" is nowhere defined in statute or regulation and is a term used by AT&T in its pleadings before this Court as an indivisible combination of copper wire and the COLR requirements.  As discussed at length below, *see infra* pp. 4–7, the COLR rules are technology-neutral; all that matters is whether the basic service standards are met.  Defendants use the term herein to only mean AT&T's copper-wire-based service.

1

the COLR rules require is that AT&T offer basic service to its customers; in fact, AT&T *already* offers basic service through fiber connections instead of copper connections in some locations. This lawsuit is a façade. AT&T does not really seek permission from CPUC to stop offering POTS to new customers (or to existing ones)—it already has that permission. Rather, AT&T is using its "analog versus digital" narrative as more palatable window dressing for the relief that it actually wants, namely, a release from its obligations as a COLR altogether. This attempt to manufacture a conflict between federal and state law where there isn't one cannot succeed. The Court need not go any further.

Were the Court so inclined, however, it should still deny Plaintiff's motion.

First, AT&T cannot succeed on the merits of its preemption claim. There is no language in Section 214 of the Communications Act of 1934 that expressly preempts California's COLR rules. Nor is there any implied preemption because, as described above, there is no conflict between the FCC's order authorizing carriers to grandfather services provided over copper wire, and the COLR rules, which are technology-neutral. Second, AT&T cannot show that it will suffer irreparable harm, because any such alleged harm is self-inflicted. It has for decades been and remains AT&T's choice to largely use POTS to satisfy its obligations as a COLR, even though it can choose to use other services instead. Third, there can be no doubt that the balance of equities and the public interest weigh strongly in favor of denying AT&T's motion. The Court should deny the motion so as to maintain the status quo and ensure that every Californian continues to have equal access to essential telephone services while this lawsuit is pending.

## BACKGROUND

### I.   CALIFORNIA'S TELECOMMUNICATIONS COLR RULES ENSURE THAT EVERY CALIFORNIAN HAS ACCESS TO BASIC TELEPHONE SERVICE

The Communications Act of 1934 (the "Act") established "a system of dual state and federal regulation over telephone service." *La. Pub. Serv. Comm'n v.*

2

*F.C.C.*, 476 U.S. 355, 360 (1986).  It "grants to the FCC the authority to regulate 'interstate and foreign commerce in wire and radio communication,' 47 U.S.C. § 151, while expressly denying that agency 'jurisdiction with respect to … intrastate communication service …' 47 U.S.C. § 152(b)." *Id.*  Thus, the Act accords States the separate and concurrent authority to engage in robust regulations over intrastate telecommunications—which is precisely what California has done with its COLR rules.

### A.    CPUC Designated AT&T and Others as COLRs to Ensure All Californians Have Access to Basic Telephone Service

In 1994, the California legislature mandated that CPUC "open a proceeding to examine the … definitions of universal service in telecommunications."  1994 Cal. Stat. 1904, c. 278 § 2(a).  Two years later, CPUC defined what constituted "basic service" for the first time.  Decl. of Camille Framroze ISO Opposition to Motion for Preliminary Injunction ("Framroze Decl.") Ex. A, at 18.[2]  Recognizing the importance of adopting "a uniform definition of basic service so that all residential telephone customers, no matter where they live in California, or what their level of income is, can expect a certain minimum level of service," CPUC defined "basic service" to "include those telephone service elements that consumers have come to expect." *Id.* at 7, 26.  There were 17 such "elements," including "free and unlimited access to 911/E911" and "LifeLine[3] rates and charges for eligible customers." *Id.* at 37.  As part of this framework, CPUC created the concept of a COLR—"[a] carrier who [] stands ready to provide basic service to any customer requesting such service within a specified area," and who would receive subsidies

---

[2] All exhibit citations are to exhibits attached to the Framroze Declaration unless otherwise indicated.

[3] California's "Universal LifeLine Telephone Service ["ULTS"] program" provided discounts of "up to 50% on basic telephone service to low-income consumers."  Cal. Assem. Bill. No. 3643, 1994-1995 Reg Sess. (1994).  All COLRs "providing eligible low-income customers with residential basic service" were "entitled to collect from the ULTS fund the difference between their tariffed rate for other residential customers for the corresponding service, and their ULTS rate." Ex. A at 39.

3

for their services. *Id.* at 33, 39–43. AT&T—then Pacific Bell—was one such carrier that was designated a COLR. *Id.* at 52.

### B. CPUC's Definition of "Basic Service"

In 2012, CPUC updated the basic service definition, such that it would "continue to uphold [CPUC's] same guiding principles, preserving essential consumer protections while also being flexible to accommodate evolving marketplace technologies and differences in how basic service may be offered." Ex. B at 64. The elements that still constitute basic service today are as follows:

1. The ability to place and receive voice-grade calls over all distances utilizing the public switched telephone network or its successor network;

2. Free Access to 911/Enhanced 911 service;

3. Billing provisions: flat rate options for unlimited incoming and outgoing calls, and California LifeLine rates and charges for eligible customers;

4. Directory services: access to directory assistance within the customer's local community; options for listed or unlisted directory listings; and options for free white pages telephone directory;

5. Access to 800 and 8YY toll-free services;

6. Access to telephone relay service as provided in Pub. Util. Code Section 2881;

7. Access to customer service information about Universal LifeLine Telephone Service, service activation, termination, and repair, and bill inquiries;

8. One-time free blocking for information services and one-time billing adjustments for charges incurred inadvertently, mistakenly, or without authorization; and

9. Access to operator services.

*Id.* at 69–70.

### C. The COLR Rules Are Technology-Neutral

Contrary to AT&T's representations in this lawsuit, California's COLR rules do not require AT&T to provide copper-line POTS to Californian customers. *Contra, e.g.*, Compl. (ECF No. 1) ¶ 12 ("But California regulations on the books

4

still require AT&T to continue offering POTS throughout its service territory"); ¶ 26 ("… CPUC's COLR requirements, which require AT&T to offer POTS to all new customers…");  *see also* ¶¶ 2, 11, 46, 86; Plaintiffs' Motion for Preliminary Injunction (ECF No. 10-1) ("Mot.") at 4, 10–11.)  As is plain from CPUC's decisions, the definition of basic service is expressly ***technology-neutral***.

In 1996, the definition of basic service was "based on [existing] wireline exchange technology."  Ex. B at 60.  However, when revising the definition in 2012, CPUC "focuse[d] on meeting the end-user customer's service needs rather than the specific technology used to provide it."  *Id.* at 64–65.  The "relevant factor" was "what a consumer needs [] in terms of essential service features in today's competitive marketplace irrespective of network architecture or technology."  *Id.* at 68.  CPUC accordingly deliberately crafted a definition that was and still is "broad enough to accommodate variations in service features and billing arrangements."  *Id.* at 65.  As a result, the revised "basic service elements are designed to apply on a technology-neutral basis to all forms of communications technology that may be utilized, including wireline, wireless, and [] [Voice over Internet Protocol ("VoIP")] or any other future technology that may be used in the provision of telephone service."  *Id.* at 57–58.

As is plain from the text, each element of the basic service definition is deliberately phrased to be technology-neutral.  For instance, the first element mandates the "ability to place and receive voice-grade calls over all distances utilizing the public switched telephone network or its successor network."  *Id.* at 70.  The revised definition replaced prior language that was tied to the specifics of "wireline network architecture" and did "not reflect how ***other technologies*** may offer two-way voice service."  *Id.* at 71 (emphasis added).  The revisions allow "wireless and other intermodal carriers" to "satisfy basic service requirements" without being subject to requirements applicable only to traditional wireline carriers.  *Id.* at 72.  Similarly, the second element necessitates access to emergency

5

services. *Id.* at 70. CPUC noted that "carriers can utilize different technologies and procedures to provide emergency 911/E911 access" and clarified that it "[does] not dictate the use of any particular technology or network design." *Id.* at 75.

In this way, CPUC preserved the ethos of "basic service," while ensuring that it can adapt to new technology. As CPUC observed, "a technology-neutral definition does not mean settling for the lowest common denominator of service standards." *Id.* at 65. "[M]any among the elderly, disabled, economically disadvantaged, or non-English-speaking sectors may exhibit different needs compared to younger, technologically sophisticated, or more affluent sectors." *Id.* at 67. "The growing demand for this broader diversity of communications services is separate and distinct from the continuing need for essential basic service elements upon which a significant sector of consumers rely." *Id.* at 66.

Consistent with this approach, nearly twenty years ago, CPUC declined to adopt rules that would have restricted carriers from retiring copper loops in favor of fiber. *See* Ex. C. CPUC found that the proposed rules would have "discourage[d] and delay[ed] fiber systems from being built in California" and so "exempt[ed] [the carriers] from seeking [CPUC] approval … of the retirement of copper loops" as long as the carrier "offer[ed] to its retail end-user customer the comparable service over fiber that the customer was previously receiving." *Id.* at 57, 65–66.

Further, in June 2024, CPUC initiated a process to review and possibly update the COLR rules, including as to the definition of "basic service" in a changing technological landscape—a process in which AT&T has been a willing participant. Decl. of Robert B. Osborn ISO Defendants' Opposition to Motion for Preliminary Injunction ("Osborn Decl.") ¶ 14. As it has had throughout, California "has a strong interest in advancing policies that promote the widespread availability of broadband networks (including fiber deployment) to ensure global competitiveness and economic development in our State." Ex. C at 98.

6

California does not mandate POTS; it mandates that the service provided by a COLR meets the standards of basic service, as set forth above, *supra* p. 4.  Other COLRs, including Frontier California Inc. and Consolidated Communications of California Company, LLC ("Consolidated Communications") have reached precisely the same understanding of their obligations.  (*See*, *e.g.*, Ex. D at 106 ("Frontier is not aware of any limitations on its ability to satisfy basic service requirements over fiber or other network facilities."); *id.* Ex. E at 115 (same, as to Consolidated Communications).[4]  As of January 2025, Consolidated Communications provides 466 of its customers with basic service "via fiber drops" instead of "copper drops."  *Id.* Ex. E at 118.  Similarly, although AT&T tries to equate "POTS" with "basic service" in this briefing, *see*, *e.g.*, Compl. ¶ 45 ("The CPUC steadfastly maintains its COLR regime, which mandates that AT&T provide 'basic' voice service (*i.e.*, POTS) to 'all residential telephone customers'"), it, too, admits that it can stop offering POTS if it "***swap[s] in*** a different 'basic service.'" Mot. at 9 (emphasis added).  In fact, as of October 31, 2025, AT&T had approximately 5,600 residential basic service customers who were serviced over last-mile fiber connections, as opposed to copper connections.  Ex. G at 151–52.

## II.  AT&T SEEKS TO AVOID ITS OBLIGATIONS TO PROVIDE BASIC SERVICE

### A.  AT&T's Lawsuit Is Its Latest Attempt to Abandon Its Obligations as a COLR

This lawsuit is a Trojan horse.  AT&T does not want to stop offering POTS so that it can offer basic service using different technology instead.  AT&T wants to shed its obligation to meet basic service standards under the COLR rules altogether.

---

[4] These statements contradict the argument that Frontier and Consolidated Communications must maintain their "legacy copper networks" in order to comply with the COLR rules, as asserted in the amicus brief that USTelecom – the Broadband Association seeks leave to file.  Brief of Amicus Curiae USTelecom – The Broadband Association as Amicus Curiae in Support of Plaintiff (ECF No. 17-1) ("USTelecom Br.") at 3.

Defendants' Opposition to Motion for Preliminary Injunction (3:26-cv-03148)

AT&T admits that this is not the first time that it has tried to abandon its responsibilities as a COLR. Mot. at 10. In March 2023, AT&T filed an application "for Targeted Relief from its [COLR] Obligation." Ex. F at 123. AT&T suggests that was a request to "wind[] down POTS." Mot. at 2. Not so. AT&T sought relief from its COLR obligations as a whole in certain areas, as well as modifications to its basic service tariff. Ex. F at 126. And AT&T argued that CPUC should grant its application even "without a new designated COLR in place." *Id.* at 131, 137. CPUC denied the application, in the absence of a viable replacement, noting that the purpose of the COLR rules "is to ensure that there is a public utility which is obligated to serve all customers that request service in its service area." *Id.* at 134; *see id.* at 137–40. In so doing, CPUC noted AT&T's tactic—the same one that is employed here—of "paint[ing] the picture that [CPUC]'s COLR [r]ules require AT&T to retain outdated copper-based landline facilities that are expensive to maintain, or that AT&T needs [CPUC] approval in order to be able to retire copper facilities and instead[] invest in more modern technologies." *Id.* at 141. And CPUC clarified, again, that the COLR rules "do not distinguish between the voice services offered (VoIP vs. POTS)," and that CPUC "does not have rules preventing AT&T from retiring copper facilities" or "investing in [] other facilities/technologies to improve its network." *Id.* at 142. Indeed, in 2023, AT&T invested over $150 million in its fiber deployment projects in California. *Id.*

This lawsuit is AT&T's latest attempt to shed its COLR status. This is plain from the relief sought in its Complaint. AT&T does not ask for permission to grandfather POTS ***and offer basic service through another means instead***. AT&T asks the Court to find the so-called "COLR requirements" preempted to the extent they "purport to impede AT&T's ability to grandfather POTS," without ever representing what kind of service it will offer instead. Compl. Prayer for Relief. Many of these "requirements" have nothing to do with copper wire. For instance, General Order 153 establishes the procedures and rules for the LifeLine Program,

8

which is "intended to provide low-income households with access to affordable basic residential telephone service."  Cal. Pub. Utils. Comm'n, General Order No. 153, § 1.1.  That AT&T seeks relief from these provisions showcases its true intent. What does AT&T achieve if the Court finds that the COLR regulations are preempted by the NMO, in the absence of a commitment by AT&T to offer basic service through another means?  It achieves a release from its COLR obligations.

### B.   AT&T Does Not Intend to Offer Basic Service Through AP-A or Any Other Service If It Grandfathers POTS

AT&T claims that the COLR rules prevent it from retiring POTS because AT&T can only stop offering POTS if:  (i) another company takes on its COLR obligations, (ii) CPUC releases AT&T from its COLR status, or (iii) CPUC allows AT&T to "swap in a different 'basic service.'"  Mot. at 9.  As to (i), AT&T represents that its efforts have been unsuccessful.  *Id.*  That may be, but it has nothing to do with whether the COLR rules are preempted by the NMO.  The specious suggestion in (ii) is of no moment.  As CPUC found the last time AT&T sought this relief, "[t]he purpose of the [] COLR [r]ules is to ensure that there is a public utility which is obligated to serve all customers that request service in its service area."  Ex. F at 134.  Releasing AT&T without a substitute would put Californians' access to telecommunications in immediate jeopardy.

Recognizing as much, AT&T spends most of its Motion on (iii), alleging that it could substitute POTS with "mobile wireless or AT&T – Phone Advanced" ("AP-A"), but that AT&T would reject such a proposed substitution. (Mot. at 10. That is incorrect.  AT&T has ***never*** formally sought to substitute POTS with AP-A. Osborn Decl. ¶ 10.  Any COLR seeking to offer basic service using a technology that CPUC has not previously approved can file a "Tier 2 Advice Letter" describing its basic service offering.  *Id.* ¶ 6.  CPUC General Order 96-B sets out the process for these advice letter filings.  The proceedings do not require adjudication before an Administrative Law Judge and must be conducted within strictly defined time

9

frames. *Id.* ¶ 8. AT&T has never made use of this process for AP-A and its allegation that CPUC would reject its application is meritless.[5] *Id.* ¶ 10.

Moreover, AT&T's failure to do so is telling. It does not want to meet its COLR obligations through AP-A; it seeks relief from meeting them at all. That is why AT&T does not claim in this lawsuit, either, that it will offer **basic service** through AP-A (or any other service) instead. Nowhere does AT&T represent, for instance, that AP-A includes the following elements of basic service: (i) "flat rate options for unlimited incoming and outgoing calls"; (ii) "California LifeLine rates and charges for eligible customers"; (iii) "access to customer service information about Universal LifeLine Telephone Service"; (iv) "one-time billing adjustments for charges incurred inadvertently, mistakenly, or without authorization"; and (v) "access to telephone relay service as provided in Pub. Util. Code Section 2881." Ex. B at 69–70. Nor has it provided this information to CPUC directly. Osborn Decl. ¶ 11. A service with non-LifeLine pricing is not functionally equivalent for a low-income customer merely because a commercial alternative exists within the census block. These gaps are all the more pertinent here, because AP-A could have a higher monthly cost than POTS and in any event requires the purchase of additional equipment. *Id.* ¶ 12. Section 2881 of the Public Utility Code mandates the provision of free specialized equipment and services to residents with disabilities. Pub. Util. Code Section 2881. Without telephone relay service, Californians with hearing or speech disabilities will struggle. Osborn Decl. ¶ 13. Without these and other basic service commitments (that plainly have nothing to do with copper wiring), A&T's proposed substitution would not be in keeping with

---

[5] In support of its claim, AT&T cites to a CPUC Staff Proposal. Mot. at 10. This is irrelevant. Like all administrative agencies, CPUC speaks through its orders, not through staff proposals. *See, e.g.*, *Bangor Gas Co., LLC v. H.Q. Energy Servs. (U.S.) Inc.*, 695 F.3d 181, 190 (1st Cir. 2012) ("Parties cannot rely on non-binding opinions from FERC staff because the Commission speaks through its orders.") (cleaned up); *MD/DC/DE Broadcasters Ass'n v. FCC*, 253 F.3d 732, 735 (D.C. Cir. 2001) ("The Federal Communications Commission is a collegial body [that] speaks through its orders, not through counsel's filings.").

CPUC's goal of ensuring that "[e]ssential telecommunications services … be provided at affordable prices to all Californians regardless of linguistic, cultural, ethnic, physical, geographic, or income considerations." Ex. A at 13–14.[6]

### C.    POTS Can Be Grandfathered on Solely an Interstate Basis

It is possible for AT&T to continue operating POTS on an intrastate basis while winding down interstate service. When an AT&T customer makes a telephone call on POTS, an analog electrical current runs from their premises in a "local loop" to what is known as a "Class-5 switch." Decl. of Dr. Hany Famhy (ECF. No. 10-2) ("Fahmy Decl.") ¶¶ 1, 4, 6. If the call is within the same Local Access Transport Area ("LATA"), which is generally "intrastate," it is routed directly by the same Class-5 switch, or via another "Class-4 switch," to the called party. *Id.* ¶ 9. This service is called "telephone exchange service," and it "has been "[h]istorically" "considered an intrastate service subject to state regulation." *Id.*

If, however, the call is to someone outside the LATA, which is generally "interstate," the Class-4 switch "will hand the call over to a long-distance telephone company's switch at the long-distance telephone company's 'point-of-presence' or 'POP.'" *Id.* ¶¶ 6, 8. This service, also provided by AT&T, is called "exchange access," and it exists because "long-distance telephone companies do not have networks that run all the way to customers' premises." *Id.* ¶ 8. It is "treated as an interstate service subject to FCC regulation." *Id.* Thus, there is a clear cut-off point for whether service is intrastate or interstate: a call is either handed over to a long-distance carrier's switch at the long-distance carrier's POP, or it is not. *Id.* ¶¶ 4, 6, 8, 9. This is also how the separation has long been viewed by courts. *See, e.g., Minn. Pub. Utilities Comm'n v. FCC*, 483 F.3d 570, 574 (8th Cir. 2007) ("The end-

---

[6] Wireless services may also have gaps in connectivity, resulting in an inability, especially in rural areas, to complete emergency calls. Ex. F at 137–39; *see* Ex. H at 158 ("The transition from legacy copper to [Internet Protocol]-based services is not a uniform experience. Those who are most affected are often in rural, remote, tribal, and low-income communities, where alternatives are least mature and the consequences of a gap in service are most severe.").

11

Defendants' Opposition to Motion for Preliminary Injunction (3:26-cv-03148)

to-end geographic locations of traditional landline-to-landline telephone communications are readily known, so it is easy to determine whether a particular phone call is intrastate or interstate in nature.").

## III. AT&T SEEKS TO RETIRE AND DISCONTINUE POTS VIA FCC PETITIONS AND THE PRESENT LAWSUIT

Through this lawsuit, AT&T escalates its attempts to avoid its COLR obligations, this time by hiding behind the FCC's NMO. On March 26, 2026, the FCC issued a grant that allows "carriers to grandfather" "to the extent [it] come[s] within the purview of section 214(a)" "any legacy voice service" that is "provisioned over copper wire." Ex. H ¶ 60. On May 20, 2026, AT&T filed two applications before the FCC seeking to discontinue its provision of POTS to residential and business customers in California. Exs. I, J. It also filed two FCC petitions (i) seeking a declaratory ruling that an order granting the discontinuance applications preempts any contrary California laws, Ex. K, and (ii) seeking forbearance from certain federal requirements imposed on so-called "eligible telecommunications carriers" like itself. Ex. L. On the same day, AT&T notified Californian residential customers of its intent to grandfather POTS in certain areas, effective July 19, 2026. Ex. J at 228–34. Finally, also on that same day, AT&T filed the present lawsuit. Compl.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy that is never awarded as of right." *Diamond Sands Apartments, LLC v. Clark Cnty.*, 164 F.4th 759, 761 (9th Cir. 2026) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). To obtain this relief, a plaintiff bears the burden of clearly establishing that (1) it is "likely to succeed on the merits"; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) the "balance of equities tips in [its] favor"; and (4) an "injunction is in the public interest". *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quoting *Winter*, 555 U.S. at 20, 22). "The third and fourth factors

of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry when the government opposes a preliminary injunction." *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). A court may deny preliminary relief based solely on a plaintiff's failure to establish a likelihood of success on the merits, *see id.*, but the "likelihood of success on the merits is not, on its own, sufficient basis for the grant of a preliminary injunction." *BOKF, NA v. Estes*, 923 F.3d 558, 565 (9th Cir. 2019); *see Winter*, 555 U.S. at 32–33 (vacating injunction based on the equities and public interest without considering the merits).

## ARGUMENT

### I. AT&T IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS PREEMPTION CLAIM

#### A. Preemption Is Not Implicated Here Because the COLR Rules Do Not Prevent AT&T from Grandfathering POTS

AT&T's lawsuit fails at the threshold because there is no conflict between the federal NMO and California's COLR rules in the first place.

Preemption, of whatever type, arises in the following situation: "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018). There is no such state law to preempt here. The FCC granted permission for carriers to grandfather services "***provisioned over copper wire***." Ex. H ¶ 60 (emphasis added). Contrary to AT&T's representations in the Motion, the COLR rules do not "conflict" with the NMO, because they do not require AT&T to continue offering copper-line POTS to new customers. *See, e.g.*, Mot. at 3–4, 9–11. As explained above, the COLR rules are explicitly technology-neutral. *See supra* pp. 4–7. AT&T even ***admits*** that it can stop offering POTS if it "swap[s] in a different 'basic service.'" Mot. at 9. But it has never made any attempt to "swap" POTS with AP-A. Osborn Decl. ¶ 10. The only rationale it gives for that failure is that "the procedural

13

obstacles are formidable" and that it must "navigat[e] a gauntlet of state proceedings—none of which [] CPUC must resolve promptly." Mot. at 10. Even if that were true (it is not, *see* Osborn Decl. ¶¶ 6–8) such mainstream bureaucracy is hardly an "obstacle" that can give rise to conflict preemption. *See Crosby*, 530 U.S. at 372–73. AT&T has always been and continues to be free to offer basic service through another technology—as it already does, for instance, with the 5,600 customers receiving basic service via fiber cable as of October 2025. Ex. G at 151.

Ultimately, AT&T does not and cannot point to a single provision in the COLR rules that actually prevents it from grandfathering POTS. The COLR rules—which AT&T treats as an impenetrable monolith—are simply a set of regulations that define minimal standards for the telephone service that Californians can expect to receive. AT&T groups them together and seeks a declaratory ruling that they are ***all*** preempted because the present "digital versus analog" lawsuit is a more compelling way to package the relief it really wants, *i.e.*, relief from being a COLR altogether. If AT&T genuinely wanted to grandfather POTS in favor of more modern technology, it would commit to offering basic service through AP-A or another service instead. It has not and does not. Regardless, AT&T's motives do not take away from its obligation to point out what portions of the COLR rules, specifically, are "inconsistent" with the NMO. *Cf. Ishikawa v. Delta Airlines, Inc.*, 343 F.3d 1129, 1132 (9th Cir.), *opinion amended on denial of reh'g,* 350 F.3d 915 (9th Cir. 2003). When analyzing claims of conflict preemption, the Ninth Circuit "analyze[s] the specific sections of the law to see if any actual conflict exist[s]." *Los Angeles Unified Sch. Dist. v. S&W Atlas Iron & Metal Co.*, 506 F. Supp. 3d 1018, 1029–30 (C.D. Cal. 2020). Failure to "engage[] at this specific level and … show[] a specific conflict" precludes AT&T's claim. *Id.*

As the NMO and COLR rules can co-exist without any conflict, the question of the former preempting the latter does not apply. *Cf. Ishikawa*, 343 F.3d at 1132 ("If state law is not inconsistent, it cannot be impossible to comply with, and it

14

cannot obstruct implementation of federal law"); *see In re World Auxiliary Power Co.*, 303 F.3d 1120, 1131 (9th Cir. 2002) ("There is no conflict between the statutory provisions: the Copyright Act doesn't speak to security interests in unregistered copyrights, the U.C.C. does.").

**B.    AT&T Cannot Overcome the Presumption Against Preemption**

In any event, should the Court reach the preemption analysis, AT&T is still unlikely to succeed.

AT&T invokes express preemption and conflict preemption.[7]  Mot. at 12. Under either preemption analysis, "[i]nvoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law; a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (lead opinion of Gorsuch, J.) (cleaned up).

The Court must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (cleaned up).  "[I]t is a state's historic police power—not preemption—that [courts] must assume, unless clearly superseded by federal statute." *United States v. California*, 921 F.3d 865, 887 (9th Cir. 2019) (citation omitted), *cert. denied*, 590 U.S. 1015 (2020).  "Once triggered, the presumption against preemption applies 'even if the law "touch[es] on" an area of significant federal presence.'" *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 768 (9th Cir. 2025) (citation omitted).

Here, the COLR rules are a classic exercise of state police power to protect consumers. *See Durnford v. MusclePharm Corp.*, 907 F.3d 595, 601 (9th Cir. 2018) ("[c]onsumer protection falls well within" the States' "traditional state police power," such that the "presumption against preemption applies").  AT&T has failed

---

[7] AT&T does not contend that Congress has preempted the "field" of telephone communication.  Nor could it, as the Communications Act expressly preserves the role of States in this field.  47 U.S.C. § 152(b).

to overcome this presumption and establish that the "clear and manifest purpose of Congress" was to prevent California from enacting regulations that protect Californians' access to basic service. *Wyeth*, 555 U.S. at 565 (citation omitted).

### C. There Is No Express Preemption Because Congress Did Not Authorize the FCC To Preempt Regulations Like California's COLR Rules

Simply put, nowhere does the Act state that the FCC has the exclusive power to impose regulations on whether or when a carrier can discontinue or impair or reduce telephone service—particularly intrastate telephone service. And the FCC cannot confer that power unto itself. *ACA Connects v. Bonta*, 24 F.4th 1233, 1242 (9th Cir. 2022) ("Without the power to act, a federal agency can not [sic] preempt."); *La. Pub. Serv. Comm'n*, 476 U.S. at 374 ("[A] federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority."). This ends the express preemption inquiry.

AT&T argues that the COLR rules have been expressly preempted by broadly construed language in Section 214(c), which provides that a carrier that obtains a certificate under subsection (a) may act "without securing approval other than such certificate." Mot. at 12–13. AT&T reads this to mean that no *State* approval is required. However, "[e]xpress preemption is a question of statutory construction, requiring a court to look to the plain wording of the statute and surrounding statutory framework to determine whether Congress intended to preempt state law." *Jones v. Google LLC*, 73 F.4th 636, 641 (9th Cir. 2023). Here, the plain wording does not support AT&T's expansive interpretation; Section 214(c) makes no mention of State regulatory authority at all. Rather, in the context of a provision covering the scope of the FCC's authority to grant certificates, the provision clearly means that no additional *FCC* or *federal* action is required.

None of the out-of-circuit cases that AT&T cites support its express preemption theory. *See* Mot. at 12–13. To the contrary: they illustrate how the phrase "without securing approval other than such certificate" has been interpreted

16

to address further *federal* authorization.  In *Cablevision of Texas III, L.P. v. Oklahoma Western Telephone Co.*, the Tenth Circuit held that Section 214(c) prevented a court from keeping in place a permanent injunction where the FCC had issued a certificate allowing it.  993 F.2d 208, 210 (10th Cir. 1993).  The Court interpreted that language to mean that a carrier could comply with the certificate "regardless of any appeal that might be pending" regarding the FCC's action.  *Id.*  The decision had nothing to do with a State's authority to create and enforce its own regulations.  Similarly, *ITT World Communications Inc. v. New York Telephone Co.* does not discuss the preemption of a State's regulations, but instead explains how Section 214 gives the FCC "primary jurisdiction" over *a federal district court* in determining whether a certificate should be granted under Section 214.  381 F. Supp. 113, 120–21 (S.D.N.Y. 1974) (holding that the FCC must decide in the first instance whether a telephone company that imposed a "tariff" that may have impaired carrier service was required to seek a certificate from the FCC).  The same is true of all the cases AT&T cites in support of its express preemption argument; *none* deal with the preemption of State regulations.[8]  Mot. at 12–13.

AT&T's attempts to divine "express" preemption out of "negative inference" by pointing to other aspects of State participation in Section 214 likewise fail.  Mot. at 13.  It is true that States must be given an opportunity to be heard on FCC certification decisions, and it is true that States can sue to enjoin any actions taken that are contrary to the provisions of Section 214.  *Id.*; *see* 47 U.S.C. § 214(b)–(c).  But nothing in Section 214 *requires* States to act only in a "supporting capacity" with respect to the impairment or reduction of a telephone service.  *Id.*  Such conjecture goes against the requirement that Congress provide a "clear and manifest purpose" in statutes that preempt state law.  *Wyeth*, 555 U.S. at 565.

---

[8] *See Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 487 F. Supp. 942, 948 (S.D.N.Y. 1980) (holding that telephone carriers regulated by the FCC and state regulation were not impliedly immune from antitrust laws); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 462 F. Supp. 1072, 1080 (N.D. Ill. 1978) (same).

17

Indeed, had Congress intended Section 214 to be interpreted as AT&T does, it could have made that explicit, as it has done elsewhere. For instance, Section 253 of the Act states that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). Subsection (d) explicitly states: "If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b), *the Commission shall preempt* the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency." *Id.* § 253(d) (emphasis added). In circumstances such as these,[9] "where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them," "[t]he case for federal pre-emption is particularly weak." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166–67 (1989). When the Act was first passed ninety years ago, it contained express preemption provisions in some sections, but not in Section 214(c). When it was amended thirty years ago, Congress added express preemption provisions to certain sections, but it again chose to leave Section 214(c) alone. That silence "is powerful evidence that Congress did not intend [FCC] oversight to be the exclusive means" of regulating the impairment or reduction of telephone service. *Wyeth*, 555 U.S. at 574–75 (holding that similar legislative history in the context of the Federal Food, Drug, and Cosmetic Act meant that the Food and Drug Administration did not have "exclusive oversight" of "drug safety

---

[9] There are more examples of this in the Act and in sections of the Telecommunications Act of 1996 that amended parts of the Act. *See, e.g.*, 47 U.S.C. § 332(c)(3) (prohibiting "State or local government" authority to "regulate the entry of or the rates charged by any commercial mobile service or any private mobile service"); *id.* § 152(a) ("Preemption.—A provider of direct-to-home satellite service shall be exempt from the collection or remittance, or both, of any tax or fee imposed by any local taxing jurisdiction on direct-to-home satellite service.").

and effectiveness"). Congress evidently had no intention of providing the FCC with the authority to preempt State regulations regarding the reduction or impairment of telephone services—especially intrastate telephone services.

Further, even if the Court were to interpret the language of Section 214 as AT&T suggests, this still would not implicate the COLR rules because, as discussed below, POTS is not a jurisdictionally-mixed service. *See* Mot. at 14. Because it is possible for AT&T to grandfather its interstate POTS while still continuing to offer its intrastate POTS, *see infra* pp. 11–12, even AT&T's characterization of the Act's statutory language would not result in the express preemption of California's COLR rules.

Finally, to the extent there is any ambiguity as to the meaning of the provision in Section 214(c), the dispute must be resolved in favor of protecting California's traditional police powers over consumer protection. *Nwauzor*, 127 F.4th at 768.

**D.    There Is No Implied Impossibility Preemption Because AT&T Can Separate the Intrastate and Interstate Components of Its POTS**

In the alternative, even if the Court finds that California's technology-neutral COLR rules **do** prevent AT&T from grandfathering POTS, the COLR rules are still not impliedly preempted. AT&T may grandfather the interstate component of its POTS and continue to offer the intrastate component of its POTS to new customers.

Congress set up the "system of dual state and federal regulation over telephone service" in the Act by depriving the FCC of any jurisdiction over "services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier[.]" *La. Pub. Service Comm'n*, 476 U.S. at 360. As such, the Supreme Court has made clear that impossibility preemption applies only where it is "not possible to separate the interstate and intrastate components of the asserted FCC regulation." *Id.* at 357. That is not the case here because AT&T's intrastate and interstate telephone services through POTS are distinct and separable.

As discussed above, there is a clear delineation for whether AT&T is providing intrastate or interstate telephone service: a call transmitted on a copper line is either handed over by a Class 4-switch to a long-distance carrier's switch at the long-distance carrier's POP, or it is not. *See supra* pp. 11–12. As a result, it does not matter that AT&T chose to provide its interstate and intrastate services to its customers using the same facilities. Mot. at 15. Simply because a carrier chose to "bundle[]" its services does not mean that the Act "expressly preempts a state from exercising the [] authority to regulate carriers providing intrastate services." *WWC Holding Co. v. Sopkin*, 488 F.3d 1262, 1271 (10th Cir. 2007). That holds true even if the regulatory conditions being imposed "would affect some phone calls that originate and terminate in different states." *Id.*

In *Minnesota Public Utilities Commission*—on which AT&T relies, Mot. at 17–18—the telecommunications at issue were "VoIP-to-landline or landline-to-VoIP communications, known as 'interconnected VoIP service,'" for which "the geographic location of the VoIP part of the call could be anywhere in the universe the VoIP customer obtains broadband access to the Internet." 483 F.3d at 574–75. The Eighth Circuit therefore upheld the FCC's determination that "it was impractical or impossible to separate the intrastate components of VoIP service from its interstate components." *Id.* at 579. But none of that rationale applies to the landline telephones at issue here, as to which the Court in fact held: "[t]he end-to-end geographic locations of traditional landline-to-landline telephone communications are readily known, so it is easy to determine whether a particular phone call is intrastate or interstate in nature." *Id.* at 578.

AT&T also places great weight on a pair of distinguishable Fourth Circuit cases from 50 years ago. Mot. at 17–18. These cases dealt with regulations regarding the ***physical*** equipment, specifically, the "interconnection of customer-provided equipment to the customer's individual subscriber station and line." *N. Carolina Utils. Comm'n v. FCC*, 537 F.2d 787, 790 (4th Cir. 1976) ("*NCUC I*")

20

(sustaining the FCC's declaratory ruling that it had authority over the terms and conditions); *N. Carolina Utils. Comm'n v. FCC*, 552 F.2d 1036 (4th Cir. 1977) ("*NCUC II*") (same). As a result, whether it was "feasible" "to limit the use of such equipment to either interstate or intrastate transmissions" mattered, because it was impossible to physically comply with both of the conflicting regulations. *NCUC I*, 537 F.2d at 791. Here, the issue is whether AT&T's intrastate and interstate *services* are separable. Whether AT&T's "single network of copper lines" can be "wound down for federal purposes yet maintained for state ones" is irrelevant. Mot. at 3, 15. AT&T can provide intrastate service compliant with the COLR rules (whether by copper wires or other technology) while not permitting such service to extend to interstate communications.

If this Court were to hold that California's COLR rules are subject to impossibility preemption, this would collapse the distinction between interstate and intrastate telephone service altogether. Nothing would constitute "intrastate telephone service" anymore. This would fly in the face of the dual regulatory system that Congress chose to create when it first enacted the Communications Act, and cannot be its intended result. *La. Pub. Serv. Comm'n*, 476 U.S. at 360.

### E. There Is No Implied Conflict Preemption Because the COLR Rules Do Not Prevent AT&T From Modernizing

The COLR rules do not pose an obstacle to the "accomplishment and execution of the full purposes and objectives of Congress," for the following reasons. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

First, nothing in the COLR rules frustrates Congress's "system of dual state and federal regulation over telephone service"—in fact, the regulations *reinforce* it. *La. Pub. Serv. Comm'n*, 476 U.S. at 360. AT&T argues that Section 214 was intended to give the FCC "exclusive authority" regarding the winding down of communication services and to allow States to only be "contributors to and enforcers of a uniform federal decision." Mot. at 19. However, nothing in Section

21

214 actually gives the FCC such "exclusive authority." *See supra* pp. 16–19. In contending that "Congress did not authorize States to impose independent approval requirements or substantive conditions separate from the FCC's," AT&T gets it backwards. Mot. at 19. It is not the role of Congress to provide what States **can do** with their own powers. States maintain their police powers unless and until Congress unambiguously preempts that space. *California*, 921 F.3d at 887; *see also* U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."). The specific role that Congress created for States in Section 214 is just an additional grant of power for States to participate in how the FCC administers its powers. 47 U.S.C. § 214(b)–(c) (permitting States to comment on proposed FCC certificate decisions and to enforce FCC decisions).

Second, in any event—and as discussed extensively above, *see supra* pp. 13–16—the COLR rules do not conflict with the NMO. The FCC granted permission for AT&T to grandfather POTS. California's technology-neutral COLR rules do not "require[e] AT&T to continue offering POTS to new customers." Mot. at 20. There is no conflict.

## II.    AT&T CANNOT SHOW THAT IT WILL SUFFER IRREPARABLE HARM

Even if the Court finds that AT&T is likely to succeed on the merits, it should still deny the Motion. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009) (even a party likely to succeed on the merits cannot succeed unless it can also show the likelihood of irreparable harm). AT&T cannot show that it will suffer irreparable harm because any such harm is self-inflicted.

When the COLR regime was first adopted, "[w]ireless service subscriptions were still nascent, and VoIP services were not readily available to residential customers." Ex. B at 60. As early as 2012, however, "recognizing the increasing diversity of choices among the communications technologies," CPUC revised its definition of basic service to "promote competition by technological neutrality." *Id.*

22

As discussed above, AT&T has been free, ever since, to provide basic service through more modern means than its POTS. *See supra* pp. 4–7. And consistent with that understanding, AT&T has made attempts to do so. For instance, AT&T reported that, in 2023, it invested over $150 million in its fiber deployment projects in California. Ex. F at 142. Evidently, AT&T is not struggling to find "dollar[s] [] to invest in modernization, innovation, and customer acquisition." Mot. at 23. Regardless, the relevant inquiry is not whether *CPUC* is mandating that AT&T continue to provide POTS (it does not); it is whether *AT&T* meets the longstanding COLR rules for basic service, whatever the technology. The COLR rules require only a "certain minimum level of service" to "all residential telephone customers, no matter where they live"—including "the most vulnerable segments of the customer base." Ex. B at 57, 65. AT&T's choice not to even attempt an application to substitute POTS with AP-A, *see supra* pp. 9–10, and any consequent alleged harm, *see* Mot. at 21–24, is on AT&T, not CPUC.[10]

"If the harm complained of is self-inflicted, it does not qualify as irreparable." *Stardock Sys., Inc. v. Reiche*, No. C 17-07025 SBA, 2018 WL 7348858, at *11 (N.D. Cal. Dec. 27, 2018) (citation omitted). In *Adtrader, Inc. v. Google LLC*, for instance, defendant Google LLC sent out communications stating that any advertiser that continued to use a particular advertising platform would be automatically deemed to have consented to certain modified terms in its operating agreement. No. 17-CV-07082-BLF, 2018 WL 1876950, at *1 (N.D. Cal. Apr. 19, 2018). The plaintiffs sought a temporary restraining order to enjoin Google from suspending the accounts of advertisers who declined to accept the terms. *Id.* at *3. The Court denied the request, holding that the "purported injury that would result from the deactivation of their accounts [was] based on their voluntary choice to decline the new terms." *Id.* at *4. It further noted that the plaintiffs had done so on

---

[10] For the same reasons, the harms allegedly suffered by USTelecom's members are not caused by the COLR rules, either. USTelecom Br. at 5.

23

an "*incorrect premise*," believing they would be subjected to an arbitration provision that they were actually free to decline. *Id.* at *4–5 (emphasis added). The same is true here: AT&T's faulty premise is that the COLR rules require it to maintain POTS. As is made clear above, they do not; AT&T made that decision for itself. Any alleged harm that AT&T has suffered or will suffer "stemming from such a decision is self-inflicted and does not constitute irreparable harm." *Id.* at *5.

Further, AT&T does not explain what urgency has suddenly necessitated a preliminary injunction in a situation that has otherwise persisted for years. The answer is clear: AT&T decided of its own volition to issue notices to customers advising them of its intent to grandfather POTS as of July 19, 2026. *See supra* p. 12. Nothing prevented AT&T from allowing this litigation to simply run its course instead. Again, any harm resulting from this artificial deadline is of AT&T's own making and cannot form the basis for any injunctive relief. *Stardock Sys., Inc.*, 2018 WL 7348858, at *11.

### III. THE EQUITIES AND PUBLIC INTEREST ARE SQUARELY IN DEFENDANTS' FAVOR

Because the government opposes this preliminary injunction, the balance of equities and public interest *Winter* factors "merge into one inquiry." *Poretti*, 11 F.4th at 1050. Here, there can be absolutely no doubt that it is in the public's interest for AT&T's Motion to be denied.

Simply put, if the Motion is granted, AT&T will immediately stop offering POTS to new customers. Because it has nowhere represented that it will continue to offer basic service through another means instead—AP-A or otherwise—that means that AT&T can stop offering basic service to Californians **altogether**. *See generally* Compl., Mot. Depending on the financial circumstances and location of those new customers, this could result in disruption to their 911 access; emergency communications; continuity of service during power outages and natural disasters; medical monitoring; contact with caregivers, family members, and social service

Defendants' Opposition to Motion for Preliminary Injunction (3:26-cv-03148)

providers; and perhaps for some, such as those dependent on LifeLine rates, exclusion from the telecommunications market altogether. *See supra* pp. 10–11. This is not a situation that necessitates a complex analysis because denying the Motion is squarely in the public's interest. And this is especially so where, as here, any harm that AT&T claims it will suffer is of its own making. *Envtl. Democracy Project v. Green Sage Mgmt., LLC*, No. 22-CV-03970-JST, 2022 WL 4596616, at *4 (N.D. Cal. Aug. 23, 2022) ("Regardless of [the] magnitude [of the asserted harm], however, the Court would still find the balance of equities favors Plaintiff because Defendant's alleged harms are self-inflicted.").

*Assurance Wireless USA, L.P. v. Reynolds* is instructive. There, wireless carriers challenged on preemption grounds a CPUC rule that changed how California funded programs that "expand[ed] public access to communications services." No. 23-CV-00483-LB, 2023 WL 2780365, at *1 (N.D. Cal. Mar. 31, 2023), *aff'd*, 100 F.4th 1024 (9th Cir. 2024). In denying the carriers' motion for preliminary injunction, the Court held that "the public interest is advanced by sustaining universal service, as the [C]PUC's rulemaking process established." *Id.* The same result follows here: the Court should sustain AT&T's provision of basic service rather than risking an interruption to it.

Finally, as discussed above, AT&T is already free to direct funds towards offering basic service through a modernized alternative to POTS. Mot. at 25. The COLR rules do not inhibit or delay that process, because they are technology-neutral. *See supra* pp. 4–7. As a result, AT&T's desire to modernize does not change this Court's calculus of what is in the public's interest—namely, simply preserving their access to a "minimum level of service." Ex. B at 57.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court deny AT&T's motion for preliminary injunction.

Dated:  June 17, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
TODD GRABARSKY
Supervising Deputy Attorney General
SABRINA MCGRAW
Deputy Attorney General
VIVIANA M. HANLEY
Deputy Attorney General


*/s/Camille Framroze*
_____
CAMILLE FRAMROZE
Deputy Attorney General
*Attorneys for Defendants
John Reynolds, Darcie L. Houck,
Karen Douglas, Matthew Baker,
Christine Harada, and Rob Bonta, in
their Official Capacities*

Defendants' Opposition to Motion for Preliminary Injunction (3:26-cv-03148)