ROB BONTA
Attorney General of California
TODD GRABARSKY
Supervising Deputy Attorney General
CAMILLE FRAMROZE
Deputy Attorney General
SABRINA T. MCGRAW
Deputy Attorney General
State Bar No. 332075
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3916
  Fax:  (415) 703-5480
  E-mail:  Camille.Framroze@doj.ca.gov
*Attorneys for Defendants*
*John Reynolds, Darcie L. Houck, Karen*
*Douglas, Matthew Baker, Christine Harada,*
*and Rob Bonta, in their Official Capacities*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PACIFIC BELL TELEPHONE COMPANY d/b/a AT&T CALIFORNIA,**<br><br>                  Plaintiffs,<br><br>        **v.**<br><br>**JOHN REYNOLDS, in his official capacity as President of the California Public Utilities Commission; DARCIE L. HOUCK, KAREN DOUGLAS, MATTHEW BAKER, and CHRISTINE HARADA, in their official capacities as Commissioners of the California Public Utilities Commission; ROB BONTA, in his official capacity as Attorney General of the State of California,**<br><br>                  Defendants. | No. 3:26-cv-03148-LL-JAC<br><br>**DECLARATION OF CAMILLE FRAMROZE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Dept:      Courtroom 14B<br>Judge:    Hon. Linda Lopez<br>Trial Date:  Not Set<br>Action Filed:  May 20, 2026 |

1

I, Camille Framroze, hereby declare and state as follows:

1. I am an attorney licensed to practice law in the State of California, admitted to the bar of this Court, and a Deputy Attorney General in the Office of the Attorney General, California Department of Justice. The Attorney General is counsel to Defendants John Reynolds, Darcie L. Houck, Karen Douglas, Matthew Baker, Christine Harada, and Rob Bonta, in their official capacities (collectively, Defendants) in this action. I make this declaration in support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction in this matter.

2. Attached as **Exhibit A** is a true and correct copy of excerpts from the California Public Utilities Commission's ("CPUC") Decision 96-10-066 in *Rulemaking on the Commission's Own Motion into Universal Service and to Comply with the Mandates of Assembly Bill 3643*, R. 95-01-020, and *Investigation on the Commission's Own Motion into Universal Service and to Comply with the Mandates of Assembly Bill 3643*, I. 95-01-021, issued on October 25, 1996.

3. Attached as **Exhibit B** is a true and correct copy of excerpts from CPUC's Decision 12-12-038 in *Order Instituting Rulemaking Regarding Revisions to the California High Cost Fund B Program*, R. 09-06-019, issued on December 24, 2012.

4. Attached as **Exhibit C** is a true and correct copy of excerpts from CPUC's Decision 08-11-033 in *Rulemaking Regarding Whether to Adopt, Amend, or Repeal Regulations Governing the Retirement by Incumbent Local Exchange Carriers of Copper Loops and Related Facilities Used to Provide Telecommunications Services*, R. 08-01-005, issued on November 13, 2008.

5. Attached as **Exhibit D** is a true and correct copy of excerpts from the Response of Frontier California Inc., *et al.*, to Administrative Law Judge's October 1, 2025 Ruling Regarding Comments on Topics Discussed at August 22, 2025 Workshop (Public Version), in *Order Instituting Rulemaking Proceeding to*

1

*Consider Changes to the Commission's Carrier of Last Resort Rules*, R. 24-06-012, filed on November 21, 2025.

6. Attached as **Exhibit E** is a true and correct copy of excerpts from the Response of Consolidated Communications of California Company, LLC to Administrative Law Judge's October 1, 2025 Ruling Regarding Comments on Topics Discussed at August 22, 2025 Workshop, in *Order Instituting Rulemaking Proceeding to Consider Changes to the Commission's Carrier of Last Resort Rules*, R. 24-06-012, filed on November 21, 2025.

7. Attached as **Exhibit F** is a true and correct copy of CPUC's Decision 24-06-024 in *Application of Pacific Bell Telephone Company d/b/a AT&T California (U1001C) for Targeted Relief from its Carrier of Last Resort Obligation and Certain Associated Tariff Obligations*, A. 23-03-003, issued on June 25, 2024.

8. Attached as **Exhibit G** is a true and correct copy of excerpts from Pacific Bell Telephone Company d/b/a AT&T California's (U1001C) Opening Comments on Administrative Law Judge's Ruling Regarding Comments on Topics Discussed at August Workshop, in *Order Instituting Rulemaking to Consider Changes to the Commission's Carrier of Last Resort Rules*, R. 24-06-012, filed on November 21, 2025.

9. Attached as **Exhibit H** is a true and correct copy of excerpts from the Federal Communications Commission's ("FCC") Report and Order in *In the Matter of Reducing Barriers to Network Improvements and Service Changes*, WC Docket No. 25-209, and *In the Matter of Accelerating Network Modernization*, WC Docket No. 25-208, dated March 26, 2026.

10. Attached as **Exhibit I** is a true and correct copy of the Section 63.71 Application of AT&T Services, Inc., on behalf of its affiliate, Pacific Bell Telephone Company d/b/a AT&T California, for Authority Pursuant to Section 214 of the Communications Act of 1934, as Amended, to Discontinue the Provision of Service, WC Docket No. 26-120, filed on May 20, 2026.

Declaration of Camille Framroze ISO Opp. to Mtn. for Preliminary Injunction (3:26-cv-03148)

11.    Attached as **Exhibit J** is a true and correct copy of the Section 63.71 Application of AT&T Services, Inc., on behalf of its affiliate, Pacific Bell Telephone Company d/b/a AT&T California, for Authority Pursuant to Section 214 of the Communications Act of 1934, as Amended, to Discontinue the Provision of Service, WC Docket No. 26-121, filed on May 20, 2026.

12.    Attached as **Exhibit K** is a true and correct copy of AT&T's Petition for Preemption and Declaratory Ruling, in *In the Matter of Petition for Preemption and Declaratory Ruling Regarding California's Carrier of Last Resort and Related Requirements*, WC Docket No. 26-125, filed on May 20, 2026.

13.    Attached as **Exhibit L** is a true and correct copy of AT&T's Petition for Forbearance under 47 U.S.C. § 160(c), in *In the Matter of Petition of AT&T for Forbearance Under 47 U.S.C. § 160(c) from Requirements Imposed on Eligible Telecommunications Carriers by 47 U.S.C. § 214(e)*, WC Docket No. 26-123, filed on May 20, 2026.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed this 17 day of June, 2026, in San Francisco, California.

_____
Camille Framroze

3

Declaration of Camille Framroze ISO Opp. to Mtn. for Preliminary Injunction (3:26-cv-03148)

## TABLE OF CONTENTS

| Exhibit No. | Description | Date | Page/Bates No. |
|---|---|---|---|
| A | California Public Utilities Commission's ("CPUC") Decision 96-10-066 in *Rulemaking on the Commission's Own Motion into Universal Service and to Comply with the Mandates of Assembly Bill 3643*, R. 95-01-020 | 10/25/1996 | 1-52 |
| B | CPUC's Decision 12-12-038 in *Order Instituting Rulemaking Regarding Revisions to the California High Cost Fund B Program*, R. 09-06-019 | 12/24/2012 | 53-83 |
| C | CPUC's Decision 08-11-033 in *Rulemaking Regarding Whether to Adopt, Amend, or Repeal Regulations Governing the Retirement by Incumbent Local Exchange Carriers of Copper Loops and Related Facilities Used to Provide Telecommunications Services*, R. 08-01-005 | 11/13/2008 | 84-98 |
| D | Response of Frontier California Inc., *et al.*, to Administrative Law Judge's October 1, 2025 Ruling Regarding Comments on Topics Discussed at August 22, 2025 Workshop (Public Version), in *Order Instituting Rulemaking Proceeding to Consider Changes to the Commission's Carrier of Last Resort Rules*, R. 24-06-012 | 11/21/2025 | 99-106 |
| E | Response of Consolidated Communications of California Company, LLC to Administrative Law Judge's October 1, 2025 Ruling Regarding Comments on Topics Discussed at August 22, 2025 Workshop, in *Order Instituting Rulemaking Proceeding to Consider Changes to the Commission's Carrier of Last Resort Rules*, R. 24-06-012 | 11/21/2025 | 107-118 |
| F | CPUC's Decision 24-06-024 in *Application of Pacific Bell Telephone Company d/b/a AT&T California (U1001C) for Targeted Relief from its Carrier of Last Resort Obligation and Certain Associated Tariff Obligations*, A. 23-03-003 | 06/25/2024 | 119-146 |
| G | Pacific Bell Telephone Company d/b/a AT&T California's (U1001C) Opening Comments on Administrative Law Judge's Ruling Regarding Comments on Topics Discussed at August Workshop, in *Order Instituting Rulemaking to Consider Changes to the Commission's Carrier of Last Resort Rules*, R. 24-06-012 | 11/21/2025 | 147-152 |

i

# TABLE OF CONTENTS
## (Continued)

| | | | |
|---|---|---|---|
| H | Federal Communications Commission ("FCC") Report and Order in *In the Matter of Reducing Barriers to Network Improvements and Service Changes*, WC Docket No. 25-209, and *In the Matter of Accelerating Network Modernization*, WC Docket No. 25-208 | 03/26/2026 | 153-159 |
| I | Section 63.71 Application of AT&T Services, Inc., on behalf of its affiliate, Pacific Bell Telephone Company d/b/a AT&T California, for Authority Pursuant to Section 214 of the Communications Act of 1934, as Amended, to Discontinue the Provision of Service, WC Docket No. 26-120 | 05/20/2026 | 160-200 |
| J | Section 63.71 Application of AT&T Services, Inc., on behalf of its affiliate, Pacific Bell Telephone Company d/b/a AT&T California, for Authority Pursuant to Section 214 of the Communications Act of 1934, as Amended, to Discontinue the Provision of Service, WC Docket No. 26-121 | 05/20/2026 | 201-244 |
| K | AT&T's Petition for Preemption and Declaratory Ruling, in *In the Matter of Petition for Preemption and Declaratory Ruling Regarding California's Carrier of Last Resort and Related Requirements*, WC Docket No. 26-125 | 05/20/2026 | 245-304 |
| L | AT&T's Petition for Forbearance under 47 U.S.C. § 160(c), in *In the Matter of Petition of AT&T for Forbearance Under 47 U.S.C. § 160(c) from Requirements Imposed on Eligible Telecommunications Carriers by 47 U.S.C. § 214(e)*, WC Docket No. 26-123 | 05/20/2026 | 305-359 |

SA2026302688
95720800.docx

ii

# EXHIBIT A

ALJ/JSW/jac *

Mailed

NOV  4 1996

Decision 96-10-066   October 25, 1996

**ORIGINAL**

BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

| | |
|---|---|
| Rulemaking on the Commission's Own Motion into Universal Service and to Comply with the Mandates of Assembly Bill 3643. | R.95-01-020 (Filed January 24, 1995) |
| Investigation on the Commission's Own Motion into Universal Service and to Comply with the Mandates of Assembly Bill 3643. | I.95-01-021 (Filed January 24, 1995) |

(See Appendix F for List of Appearances.)

- 1 -

R.95-01-020, I.95-01-021 ALJ/JSW/LJA

# I N D E X

| Subject | Page |
|---------|------|
| OPINION | |
| I. Summary | 2 |
| II. Procedural Background | 6 |
| III. Procedural Matters | 11 |
|   A. Background | 11 |
|   B. Discussion | 13 |
| IV. What Does Universal Service Mean in a Competitive Environment? | 16 |
| V. Basic Service | 19 |
|   A. The Definition of Basic Service | 19 |
|     1. Introduction | 19 |
|     2. Positions of the Parties | 21 |
|     3. Discussion | 27 |
|   B. Review of The Basic Service Definition | 32 |
|     1. Introduction | 32 |
|     2. Positions of the Parties | 32 |
|     3. Discussion | 37 |
|   C. Promoting Access To And The Deployment of Advanced Technologies | 39 |
|     1. Introduction | 39 |
|     2. Positions of the Parties | 40 |
|     3. Discussion | 45 |
|   D. 95% Goal For Universal Service | 50 |
|     1. Introduction | 50 |
|     2. Positions of the Parties | 50 |
|     3. Discussion | 53 |
|       a. General | 53 |
|       b. Unserved Territories | 54 |
|   E. Redlining | 58 |
|     1. Introduction | 57 |
|     2. Positions of the Parties | 59 |
|     3. Discussion | 62 |
|   F. Bilingual Outreach | 65 |
|     1. Introduction | 65 |
|     2. Positions of the Parties | 65 |
|     3. Discussion | 66 |

Exhibit A

3

R.95-01-020, I.95-01-021  ALJ/JSW/jac **

## I N D E X

| Subject | Page |
|---|---|
| VI. Consumer Information | 68 |
|   A. Introduction | 68 |
|   B. Positions of the Parties | 68 |
|   C. Discussion | 70 |
| VII. Benefits for Schools, Libraries, Health Care, and Community Based Organization | 72 |
|   A. Introduction | 72 |
|   B. Positions of the Parties | 75 |
|   C. Discussion | 80 |
| VIII. Funding of High Cost Areas | 92 |
|   A. Background | 92 |
|   B. Should Business Customers Be Subsidized? | 94 |
|     1. Introduction | 94 |
|     2. Positions of the Parties | 94 |
|     3. Discussion | 95 |
|   C. The Small And Mid-Size LECs | 96 |
|     1. Introduction | 96 |
|     2. Positions of the Parties | 96 |
|     3. Discussion | 99 |
|   D. The Costing Standards To Be Applied | 103 |
|     1. Introduction | 103 |
|     2. Positions of the Parties | 105 |
|     3. Discussion | 107 |
|   E. The Competing Proxy Cost Models | 108 |
|     1. Introduction | 108 |
|     2. The Size of The Fund | 109 |
|       a. Background | 109 |
|       b. Discussion | 110 |
|     3. The Two Proxy Models | 111 |
|       a. The Cost Proxy Model | 111 |
|       b. The Hatfield Proxy Model | 113 |
|       c. Discussion | 115 |
|         (1) Can The Model Estimate Costs for the Entire State on a CBG Basis? | 115 |
|         (2) Does the Model Design Accurately Reflect Costs? | 116 |
|         (3) Is the Model Open and Accessible to Changes in Inputs and Assumptions? | 119 |

Exhibit A

4

R.95-01-020, I.95-01-021   ALJ/JSW/jva

# APPENDIX

| **Subject** | **Page** |
|---|---|
| (4)   How Well Does the Model Comply With the Relevant Consensus Costing Principles? | 120 |
| (5)   Can the Model Estimate the Cost of Basic Service and Subsequent Changes to this Definition | 122 |
| (6)   Can The Inputs And Assumptions of The Model be Readily Verified? | 122 |
| d.   Summary | 124 |
| Recommended Adjustments to the CPM | 124 |
| 1.   Introduction | 124 |
| 2.   How Many Lines Should be Subsidized? | 125 |
| a.   Introduction | 125 |
| b.   Positions of the Parties | 125 |
| c.   Discussion | 127 |
| 3.   Drop Costs | 130 |
| a.   Background | 130 |
| b.   Discussion | 130 |
| 4.   Cable and Conduit Costs | 131 |
| a.   Background | 131 |
| b.   Discussion | 133 |
| 5.   Fiber Feeder Cut-off? | 135 |
| a.   Background | 135 |
| b.   Discussion | 137 |
| 6.   Fill factors | 138 |
| a.   Background | 138 |
| b.   Discussion | 140 |
| 7.   Depreciation | 140 |
| a.   Background | 140 |
| b.   Discussion | 142 |
| 8.   Reordering of Switches | 143 |
| a.   Background | 143 |
| b.   Discussion | 144 |
| 9.   Outside Plant Factors | 145 |
| a.   Background | 145 |
| b.   Discussion | 145 |
| 10.   Switching Costs | 146 |
| a.   Background | 146 |
| b.   Discussion | 147 |
| 11.   Shared and Common Costs | 148 |
| a.   Background | 148 |
| b.   Discussion | 152 |

Exhibit A

5

R.95-01-020, I.95-01-021   ALJ/JSW/jac **

            3.   Discussion ............................   211
       M.   Review of The Fund Size .................   212
            1.   Introduction .......................   212
            2.   Positions of the Parties ...........   212
            3.   Discussion .........................   213

   IX.   Universal Lifeline Telephone Service
         Program ..................................   217
         A.   Introduction .........................   217
         B.   Position of the Parties ..............   218
         C.   Discussion ...........................   225

   X.   Miscellaneous Issues .......................   238

Findings of Fact ................................   241

Conclusions of Law ..............................   261

ORDER ...........................................   279

APPENDIX A
APPENDIX B
APPENDIX C
APPENDIX D
APPENDIX E
APPENDIX F

Exhibit A
6

R.95-01-020, I.95-01-021  ALJ/JSW/jao†*A

I.  **Summary**

This decision finalizes the universal service rules that we originally proposed in Decision (D.) 95-07-050. Many of the issues raised in those proposed rules did not require any evidentiary hearings, but instead were commented upon by a number of parties in written comments in accordance with Rule 14.1 of the Commission's Rules of Practice and Procedure. (Cal. Code Regs., Title 20, Sec. 14.1.) Other issues, such as the proxy cost model for estimating the costs of basic service, required evidentiary hearings. This decision addresses both the written comments and the evidence presented during the evidentiary hearings, as well as the comments that were filed in response to the issuance of the August 5, 1996 proposed decision.

Today's decision reaffirms the Commission's commitment to universal service by ensuring that residential basic telephone service be made available throughout California, and that the rates for such service remain affordable. Our decision adopts final rules pertaining to how universal service will be carried out in California as the local exchange telephone markets are opened to competing carriers. As we enter this competitive environment, yesterday's policies supporting universal service will no longer be sustainable.

The following are some of the key universal service rules and policies that we adopt:

- o  The term "basic service" for residential customers is defined to include those telephone service elements that consumers have come to expect. (See App. B, Rule 4.)

- o  All carriers providing local exchange residential service shall, at a minimum, provide all the service elements included in the basic service definition.

- 2 -

Exhibit A

7

R.95-01-020, I.95-01-021   ALJ/JSW/jad**

o  The definition of basic service may be
   revisited to evaluate whether service
   elements should be added or deleted from the
   definition.

o  A Universal Service Working Group (USWG)
   will be formed to address ways in which
   access and deployment of advanced
   telecommunications technologies can be
   provided to all customer segments, and how
   education, health care, community, and
   government institutions can be positioned to
   take advantage of these technologies.

o  All local exchange carriers (LECs) and
   competitive local carriers (CLCs) shall be
   responsible for pursuing the objective of
   achieving a 95% subscribership rate among
   all customer groups. They shall also be
   required to include in their annual reports
   information about their subscribership
   rates.

o  All LECs and CLCs must provide a matrix of
   pricing information regarding basic service.
   Such a matrix will allow consumers to
   compare the rates charged by other carriers
   for the same type of service.

o  The Commission should take proactive steps
   to educate the public about changes and
   issues in the telecommunications market.

o  In accordance with state and federal
   directives, qualifying schools, libraries,
   municipal and county government owned and
   operated hospitals and health clinics, and
   qualifying community based organizations
   (CBOs) shall be entitled to discounted rates
   for certain services.  Funding for these
   discounts will come from the California
   Teleconnect Fund surcharge of 0.41%.

o  The five large and mid-size LECs shall be
   included in the proxy cost model calculation
   for determining universal service support.
   They, and other carriers of last resort
   (COLR), who serve high cost areas in these
   service territories will be eligible for
   subsidy support through the newly created

- 3 -

Exhibit A

8

R.95-01-020, I.95-01-021  ALJ/JSW/LWA

California High Cost Fund-B (CHCF-B). The seventeen smaller LECs shall not be subject to the rules applicable to the CHCF-B fund. Instead, the seventeen smaller LECs shall continue to be eligible for universal service support under the existing California High Cost Fund. We shall refer to the existing fund as the CHCF-A.

o  In order to avoid a windfall to the five large and mid-size LECs, any subsidy support received from the CHCF-B shall be reduced by the same amount through an equal percentage reduction for all services except for basic service rates.  The five incumbent LECs may file applications to decide what rates should be rebalanced downwards to permanently offset the explicit subsidy support.

o  The Cost Proxy Model (CPM) sponsored by Pacific Bell (Pacific) has been selected as the proxy model to estimate the cost of providing residential basic service to the five large and mid-size LECs.  The CPM estimated the statewide subsidy needed for providing universal service at $1.7 billion, of which Pacific estimated that it would receive $1.3 billion in subsidy support. The CPM model, its inputs, and its results have been examined by the parties to this proceeding.  As a result of these critiques, we have made adjustments to the model which total to $1.116 billion.  As adjusted, we believe the adjusted CPM is consistent with the consensus costing principles (CCPs) adopted in the Open Access and Network Architecture Development (OANAD) proceeding.

o  Using the adjusted CPM, a statewide average cost of $20.30 was derived.  That statewide average cost serves as the cut-off points for determining which census block groups (CBGs) are high cost.  CBGs whose costs exceed the statewide average cost of $20.30 shall be deemed high cost areas, and eligible for support from the CHCF-B.

o  The benchmark for determining COLR support shall be the statewide average cost of

- 4 -

Exhibit A

9

R.95-01-020, I.95-01-021  ALJ/JSW/jaо **

(a)($20.30,(or) the carrier's flat rate plus EUCL, whichever is higher.

o  The subsidy amounts which designated COLRs may expect to receive shall be offset with revenues that the LECs or CLCs receive from basic service, the end user common line charge (EUCL), the common carrier line charge (CCLC), and the interstate Universal Service Fund.

o  The incumbent LEC, and any other designated COLR, shall be entitled to subsidy support for those high cost CBGs in accordance with the adopted rules.

o  An all end-user surcharge (AEUS), rather than a net trans account, will be used to collect the CHCF-B subsidy amount. The estimated surcharge is 2.87%.

o  The CHCF-A and the CHCF-B may appear side by side as a single line item for purposes of collection on a customer's bill.

o  The California Teleconnect Fund shall appear as a separate line item for purposes of collection on a customer's bill.

o  The CHCF-B shall undergo a review in three years. The use of an auction mechanism in the future remains an option.

o  The Universal Lifeline Telephone Service (ULTS) program is revised to allow CLCs to compete for ULTS customers, and to receive subsidy support for providing service to this customer group.

o  In order to avoid situations where ULTS funds are being used to promote the name of a particular carrier, the marketing expenses associated with promoting the ULTS program shall no longer be recoverable from the ULTS fund in accordance with the schedule set forth in this decision. Instead, a ULTS Marketing Working Group will be formed to provide competitively neutral marketing for the program.

- 5 -

Exhibit A
10

R.95-01-020, I.95-01-021   ALJ/JSW/jac

(d) $20.30, or the carrier's flat rate plus
the EUCL, whichever is higher.

o   The subsidy amounts which designated COLRs
    may expect to receive shall be offset with
    revenues that the LECs or CLCs receive from
    basic service, the end user common line
    charge (EUCL), the common carrier line
    charge (CCLC), and the interstate Universal
    Service Fund.

o   The incumbent LEC, and any other designated
    COLR, shall be entitled to subsidy support
    for those high cost CBGs in accordance with
    the adopted rules.

o   An all end-user surcharge (AEUS), rather
    than a net trans account, will be used to
    collect the CHCF-B subsidy amount. The
    estimated surcharge is 2.87%.

o   The CHCF-A and the CHCF-B may appear side by
    side as a single line item for purposes of
    collection on a customer's bill.

o   The California Teleconnect Fund shall appear
    as a separate line item for purposes of
    collection on a customer's bill.

o   The CHCF-B shall undergo a review in three
    years. The use of an auction mechanism in
    the future remains an option.

o   The Universal Lifeline Telephone Service
    (ULTS) program is revised to allow CLCs to
    compete for ULTS customers, and to receive
    subsidy support for providing service to
    this customer group.

o   In order to avoid situations where ULTS
    funds are being used to promote the name of
    a particular carrier, the marketing expenses
    associated with promoting the ULTS program
    shall no longer be recoverable from the ULTS
    fund in accordance with the schedule set
    forth in this decision. Instead, a ULTS
    Marketing Working Group will be formed to
    provide competitively neutral marketing for
    the program.

- 5 -

Exhibit A

11

R.95-01-020, I.95-01-021  ALJ/JSW/jac

The above rules and policies are discussed in the sections which follow.

In addition to the CHCF-A, CHCF-B, and the California Teleconnect Fund, the other universal service programs include the Deaf and Disabled Telecommunications Program, and the ULTS program. As shown in Appendix B, these five universal service programs total to approximately $855 million on an annual basis.[1]

## II.   Procedural Background

In D.95-07-050, we described the backdrop leading up to the issuance of this rulemaking (OIR or R.95-01-020) and investigation (OII or I.95-01-021) into universal service.  A brief recap of some of those events, and of events subsequent to the issuance of D.95-07-050 will be of aid to those who seek an understanding of the process for today's decision.

R.95-01-020 and I.95-01-021 were opened in January of 1995 to develop rules to further the goals of universal service in a competitive telecommunications environment.  This proceeding was opened as part of this Commission's comprehensive review of how state regulatory policies need to respond to the opening of monopoly markets to competition.  In addition, the enactment of Assembly Bill (AB) 3643 (Stats. 1994, Chapter 278), which became effective January 1, 1995, provided some guidance as to the type of issues the Commission should concern itself with.

AB 3643 called for the opening of a proceeding to examine the current and future definitions of universal service, and mandated that public hearings be held so as to encourage participation from broad and diverse interests from all areas of

[1] The Deaf and Disabled Telecommunications Program is funded by the California Relay Service and Communications Devices Fund.

Exhibit A

12

R.95-01-020, I.95-01-021   ALJ/JSW/jac

the state. AB 3643 also stated that the objectives of the
proceeding were as follows:

"(1) Define the goals of universal service
given the new technologies and increasingly
competitive markets, with emphasis on the role
of basic service in education, health care, and
in the workplace.

"(2) Delineate the subsidy support needed to
maintain universal service in the new
competitive market.

"(3) Design and recommend equitable and broad
based subsidy support for universal service in
freely competitive markets.

"(4) Develop a process to periodically review
and revise the definition of universal service
to reflect new technology and markets.

"(5) Address the issues of 'carrier of last
resort' and 'franchise obligations.'"   (State
1994, Chap. 278, Sec. 2 (a).)

AB 3643 also went on to state that the recommendations
developed in this proceeding shall be consistent with Public
Utilities (PU) Code § 709,[2] and with the following principles:

"(1) Essential telecommunications services
should be provided at affordable prices to all
Californians regardless of linguistic,

_____

2   PU Code § 709 states as follows:   "The Legislature hereby
finds and declares that the policies for telecommunications in
California are as follows:   (a) To continue our universal service
commitment by assuring the continued affordability and widespread
availability of high-quality telecommunications service to all
Californians.   (b) To encourage the development and deployment of
new technologies and the equitable provision of services in a way
which efficiently meets consumer need and encourages the ubiquitous
availability of a wide choice of state-of-the-art services.   (c) To
promote economic growth, job creation, and the substantial social
benefits that will result from the rapid implementation of advanced
information and communications technologies by adequate long-term
investment in the necessary infrastructure.

- 7 -

Exhibit A

13

R.95-01-020, I.95-01-021   ALJ/JSW/jac

cultural, ethnic, physical, geographic, or income considerations.

"(2) In order to avoid an 'information rich' and 'information poor' stratification, there must be an ongoing evaluation of which services are deemed essential and therefore a part of universal service.

"(3) Any subsidy that may be required to ensure that universal service remains a viable reality must have a clearly stated purpose and scope, include a broad based and competitively neutral funding mechanism, and be imposed in a manner that clearly identifies the source of the subsidy.

"(4) Public policy should provide incentives as needed to promote deployment of advanced telecommunications technology to all customer segments.

"(5) Consumers should be able to have access to all the information needed in order for them to make timely and informed choices about telecommunications products and services, and how to best use them.

"(6) Because of their economic and social impact, education, health care, community, and government institutions must be positioned to be early recipients of the benefits of the information age.

"(7) All parties involved in providing services utilizing evolving public networks should adhere to the same guidelines regarding mutual interconnectivity and interoperability, common carriage, reliability, privacy, and security."
(Stats. 1994, Chap. 278, Sec. 2(b))

The universal service OII/OIR solicited initial comments on how to meet the above objectives and principles. Responsive comments were filed in March 1995.

As a result of those initial comments, the Commission issued D.95-07-050. That decision described and set forth a proposed set of rules pertaining to universal service

- 8 -

R.95-01-020, I.95-01-021  ALJ/JSW/LLA

cultural, ethnic, physical, geographic, or income considerations.

"(2) In order to avoid an 'information rich' and 'information poor' stratification, there must be an ongoing evaluation of which services are deemed essential and therefore a part of universal service.

"(3) Any subsidy that may be required to ensure that universal service remains a viable reality must have a clearly stated purpose and scope, include a broad based and competitively neutral funding mechanism, and be imposed in a manner that clearly identifies the source of the subsidy.

"(4) Public policy should provide incentives as needed to promote deployment of advanced telecommunications technology to all customer segments.

"(5) Consumers should be able to have access to all the information needed in order for them to make timely and informed choices about telecommunications products and services, and how to best use them.

"(6) Because of their economic and social impact, education, health care, community, and government institutions must be positioned to be early recipients of the benefits of the information age.

"(7) All parties involved in providing services utilizing evolving public networks should adhere to the same guidelines regarding mutual interconnectivity and interoperability, common carriage, reliability, privacy, and security."
(Stats. 1994, Chap. 278, Sec. 2(b).)

The universal service OIR/OII solicited initial comments on how to meet the above objectives and principles. Responsive comments were filed in March 1995.

As a result of those initial comments, the Commission issued D.95-07-050. That decision described and set forth a proposed set of rules pertaining to universal service

- 8 -

Exhibit A

15

Judge (ALJ) issued a ruling on February 21, 1996, setting forth the type of information that was to be included in the prepared testimony of the parties for the evidentiary hearings.

In ALJ rulings dated March 12, 1996, and April 3, 1996, delays in the schedule were granted to allow the parties additional time to prepare for hearings. Thirteen days of evidentiary hearings were then held in late April and May of 1996. The matter was submitted following the filing of opening and closing briefs, and the holding of oral argument before the assigned ALJ, and Commissioner Jessie J. Knight, Jr., the assigned Commissioner, on June 10, 1996.

The proposed decision of the assigned ALJ was mailed to the parties on August 5, 1996. Opening and reply comments to the proposed decision were filed on August 26, 1996, and September 3, 1996, respectively. An en banc oral argument was held on August 27, 1996.

During the time that parties were preparing for the universal service workshops, the Telecommunications Act of 1996 (Telco Act) underwent final revisions.[3] On February 8, 1996, President Clinton signed the Telco Act into law. The enactment of the Telco Act is intended to promote competition and reduce the regulation of telecommunications services. Among the provisions is the creation of a Federal-State Joint Board (Joint Board) to develop recommended changes to the procedures and regulations regarding universal service. The Joint Board's policies to preserve and advance universal service are to be based on the following principles: (1) quality services at just, reasonable, and affordable rates; (2) access to advanced telecommunications and information services to all regions; (3) access to

[3] Telecommunications Act of 1996, Public Law No. 104-104, 110 Stat. 56.

R.95-01-020, I.95-01-021  ALJ/JSW/jac

telecommunications and information services to low-income consumers, and those in rural, insular, and high cost areas; (4) equitable and nondiscriminatory contribution by all providers so as to preserve and advance universal service; (5) provide for federal and state mechanisms to preserve and advance universal service; (6) provide schools, health care providers, and libraries with access to advanced telecommunications services; and such other principles that are necessary and appropriate

With respect to the state's authority to regulate universal service, the Telco Act states:

> "(b) State Regulatory Authority.--Nothing in this section shall affect the ability of a state to impose, on a competitively neutral basis and consistent with Section 254, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers." (Telco Act, Sec. 253(b).)

## III. **Procedural Matters**

### A. **Background**

GTE California Incorporated (GTEC) was the only party who submitted transcript corrections. Since no one has objected to GTEC's proposed corrections, those corrections will be adopted and made in the Commission's copy of the reporter's transcript.

Toward Utility Rate Normalization (TURN) requested during the hearings that the model sponsors provide handbooks describing how the two different models operate. The handbook for Pacific's CPM was marked and received into evidence without objection as Exhibit 116. The handbook for the model sponsored jointly by AT&T Communications of California, Inc. (AT&T) and MCI Telecommunications Corporation (MCI) was marked for identification as Exhibit 117, and was not distributed to the parties until the last day of hearing. Since none of the other parties had an

- 11 -

Exhibit A

17

R.95-01-020, I.95-01-021  ALJ/JSW/jac\*\*\*

## A.   The Definition Of Basic Service

### 1.   Introduction

In order to effectuate a policy of universal service throughout the state, the Commission first needs to develop a list of the service elements which make up residential basic service. If the basic service definition is too narrowly drawn, some service elements that may be essential for participation in society may only be enjoyed by those who can afford it. Or, certain urban areas of the state, may enjoy some essential service elements that customers in more rural areas may not have. In balancing what service elements should be included in the definition of basic service, the Commission must also be cognizant of the extra cost. If too broad of a definition is adopted, consumers may end up paying for service elements that they do not need or want.

In D.95-07-050, proposed rule 4 included the following elements in the basic service definition.

o   Access to single party local exchange service;

o   Access to interexchange carriers;

o   Ability to place and receive calls;

o   Touch tone dialing;

o   Free access to emergency services, 911/E911;

o   Lifeline rate for eligible customers;

o   Customer choice of flat or measured rate service;

o   Access to directory assistance;

o   Access to a directory listing;

o   Access to operator services;

- 19 -

Exhibit A

18

- o Voice grade connection to public switched telephone network;
- o Access to information services and 800 services;
- o One-time free blocking for information services and one-time billing adjustment for charges incurred inadvertently, mistakenly, or that were unauthorized;
- o Access to telephone relay service as provided for in PU Code § 2881;
- o Access to public policy pay telephones;
- o Free access to customer service for information about ULTS, service activation, service termination, service repair, and bill inquiries.

Under our proposed rule, all 16 of the service elements which make up the definition of basic service would have to be

R.95-01-020, I.95-01-021  ALJ/JSW/jac

provided by all carriers in the state who provide residential service. (Proposed rule 4.A.)[6]

2. **Positions of the Parties**

Following the issuance of the proposed rules contained in D.95-07-050, interested parties were allowed an opportunity to comment. Generally speaking, the commenting parties were largely supportive of the 16 service elements proposed in the rule.

AT&T Wireless Services, Inc. (AT&T Wireless)[7] formerly known as McCaw Cellular Communications, Inc. commented that certain aspects of the proposed rules could unduly limit customer choice by creating mechanisms that disadvantage certain carriers and types of communications technologies. With regard to the definition of basic service, AT&T Wireless states that the service element of "customer choice of flat or measured service" results in a competitive disadvantage to carriers that may seek to provide forms of basic service using pricing mechanisms that are different than the traditional flat rate mechanism. AT&T Wireless believes that the unlimited flat rate calling option should only be mandatory where there is only one COLR in a geographic service area (GSA).

---

6  In proposed rule 4 of Appendix A of D.95-07-050, the service element for "access to directory assistance" mistakenly appeared twice.

7  AT&T Wireless filed its comments on behalf of its following affiliates, all of whom do business as AT&T Wireless Services: Alpine CA-3, L.P., Chico MSA Cellular, Inc., Fresno Cellular Telephone Company, Oxnard Cellular Telephone Company, McCaw Communications of Stockton, Inc., Redding Cellular Partnership, Sacramento Cellular Telephone Company, and Santa Barbara Cellular Systems Ltd.

Exhibit A
20

The California/Nevada Community Action Association
(Cal/Neva) favors expansion of the one-time free blocking and one-time billing adjustments for information services, to include unlimited free blocking and unlimited billing adjustments for unauthorized charges.

The DCA suggests that an additional service element be added to the definition of basic service. DCA proposes to add the following element, "access to a local telephone directory at no additional charge."

DCA also suggests that as more area code splits and area code overlays take place, that there will be an increase in the number of calls to directory assistance. DCA proposes that there be unlimited access to directory assistance at no additional charge, or that there be unlimited access to directory assistance at no additional charge for customers to adjoining areas that once were in the customer's own area code, or that there be a requirement that free telephone directories to all customers in areas where the split or overlay occurred be provided for both area codes.

The California Telecommunications Coalition (Coalition)[8] proposes the following modifications to some of the service elements which make up the proposed definition of basic service:

  o  **free touch tone dialing;**

  o  **free access to directory assistance for the first five calls per month;**

  o  **a free directory listing for one name in a subscriber's household;**

_____
8  At the time this proceeding began, the Coalition was made up of the following:  AT&T; California Association of Long Distance Telephone Companies; California Cable Television Association (CCTA); ICG Telecom Group, Inc., which was formally known as ICG Access Services, Inc. (ICG); MCI; MFS Intelenet, Inc.; Sprint Communications Co., L.P.; Teleport Communications Group (TCG); Time Warner AxS of California, L.P.; and TURN.

Exhibit A

21

o <u>a free white pages telephone directory and a free yellow pages telephone directory.</u>

The Coalition is opposed to Pacific's recommendation that the service element which requires LECs and CLCs to offer flat rate service, be eliminated. The Coalition points out that residential customers have had the choice of flat rate service and measured rate service, and that flat rate service is the preferred option.

Citizens Utilities Company (Citizens)[9] commented that the policy statement in proposed rule 3.A.2. should be deleted. Citizens believes that the definition of basic service should be strictly limited to include only those services provided to residential customers which are so essential to basic network usage, that no customer should be denied access on the grounds of affordability. Citizens fears that this policy statement contains the implication that as technology advances, that there will be an automatic expansion of the definition of basic service. Citizens states that in order to foster a competitive market, it is important to limit and minimize the amount of subsidy required.

The Division of Ratepayer Advocates (DRA)[10] suggested that several minor changes and clarifications be made to the basic

---

9 Citizens' comments represent the consolidated position of Citizens' five separate telecommunications entities: Citizens Telecommunications Company of California, Inc. (CTCC), an LEC; Citizens Telecommunications Company, d.b.a. Citizens Long Distance Company, an interexchange carrier (IEC); Electric Lightwave, Inc., a CLC; Citizens Telecommunications Company of Tuolumne, a small LEC, which purchased the operations and assets of Tuolumne Telephone Company (See D.95-07-037); and Citizens Telecommunications Company of the Golden State, a small LEC, which purchased the operations and assets of CP National. (See D.95-08-026).

10 Under the Commission's Vision 2000 reorganization plan, many of the functions of the DRA have been taken over by the Office of Ratepayer Advocates (ORA).

R.95-01-020, I.95-01-021   ALJ/JSW/jac **

service definition." In DRA's reply comments, DRA stated that it also supports the recommended changes of the Coalition and UCAN to the basic service definition.

GTEC commented that it did not agree with the Coalition's suggestion to add the word "free" to elements 4, 6, 10, and 18 of proposed rule 4.B." GTEC stated that all those service elements are part of basic service, but they are not provided for free. GTEC contends that the cost of those service elements should be reflected in the price paid for the basic service package.

Intel Corporation (Intel) believes that services such as Integrated Services Digital Network (ISDN) should not be included in the basic service definition at this time. Intel points out that ISDN is becoming increasingly available, but at a slow rate and at high prices.

Pacific commented that it agreed with the definition of residential basic service, but recommends that the definition should not mandate the offering of both a flat rate and measured service. Pacific proposes that usage revenues and costs be excluded from the calculation of the fund because creative calling plans are likely to be introduced which will have the effect of eliminating distinctions between local and toll calls.

Public Advocates, Inc.'s (Public Advocates)[11] comments

_____

(Footnote continued from previous page)

Rights of the San Francisco Bay Area, Motivating Adolescents to

[11] Public Advocates represents the interests of the following groups: Southern Christian Leadership Conference, National Council of La Raza, Korean Youth and Community Center, Filipinos for Affirmative Action, Filipino Civil Rights Advocates, Association of Mexican-American Educators, California Association for Asian Pacific Bilingual Education, California Association for Bilingual Education, California Rural Indian Health Board, Chicano Federation of San Diego County, Council for the Spanish Speaking, El Proyecto del Barrio, Escuela de La Raza Unida, Foundation Center for Phenomenological Research, Hermandad Mexicana Nacional, Korean Community Center of the East Bay, Lawyers' Committee for Civil Citizens. Our subsequent references to the Small LECs do not include those two subsidiaries of Citizens.

(Footnote continues on next page)

Exhibit A

23

R.95-01-020, I.95-01-021    ALJ/JSW/LYA

urge the Commission to include in the definition of basic service some access to advanced technology. Public Advocates' suggestions include the provisioning of lines with higher speed and more capacity so that transfer of voice, text, and images through the use of computers and telecommunication lines can be more easily accomplished. Another suggestion advanced by Public Advocates is to have CBOs act as the conduit by which the information superhighway is introduced to low income and immigrant communities. Under this proposal, qualified CBOs would receive a discounted rate of 50% for certain advanced telecommunications services. This issue is discussed later in this decision.

The Small LECs commented that they generally concur with the Commission's definition of basic service as set forth in the proposed rule, except for the requirement that companies offer measured rate local service.[12] The Small LECs state that many of them offer only flat rate service, and that the Commission should not require them to add a measured service offering as well. They contend that the addition of measured service will be more costly to provide than flat rate service because of the additional cost of measuring and billing the measured local usage.

The Smaller Independent LECs also generally agree with the proposed definition of basic service, but disagree that public

---

(Footnote continued from previous page)
Rights of the San Francisco Bay Area, Motivating Adolescents to Succeed, Mountain View Community Health Center, Multicultural Area Health Education Center, Spanish Speaking Citizen's Foundation, and Spanish Speaking Unity Council.

12  When this proceeding first began, the Small LECs were made up of the following entities: CP National, Evans Telephone Company, GTE West Coast Incorporated, Kerman Telephone Company, Pinnacles Telephone Company, the Siskiyou Telephone Company, Tuolumne Telephone Company, and The Volcano Telephone Company. As noted in footnote 9, the operations and assets of CP National and Tuolumne Telephone Company were subsequently sold to two subsidiaries of Citizens. Our subsequent references to the Small LECs do not include these two subsidiaries of Citizens.

(Footnote continues on next page)

Exhibit A

24

R.95-01-020, I.95-01-021   ALJ/JSW/jac\ ***

policy pay telephones should be included in the definition.[13]
They contend that the definition of basic service should encompass
the service components that should be provided in connection with
each residential and business access line.  They believe that the
availability of public pay telephones is not relevant to the scope
of basic service, and that public pay telephones should be
addressed in the local exchange competition proceeding instead.

In footnote 8 to the Coalition's September 1, 1995
comments, TURN indicated its concern that the customer's local
calling area should be at least as large as the current local
calling area.

Utility Consumers' Action Network (UCAN) suggests certain
clarifications to the proposed rule regarding the definition of
basic service.  UCAN suggests the following underlined portions be
added to the rule:

- o  free and <u>unlimited access</u> to 911/E911;

- o  <u>free</u> touch tone dialing;

- o  <u>Lifeline rate for both monthly service as
     well as installation for</u> eligible customers;

- o  <u>free access to directory assistance for
     first five calls per month;</u>

- o  <u>free access to 800 services and 800 like
     services.</u>

- o  <u>free white pages telephone directory and
     free yellow pages telephone directory;</u>

- o  free access to customer service <u>in both
     English and non-English formats.</u>

---

13   The Smaller Independent LECs refer to the following entities:
Calaveras Telephone Company, California-Oregon Telephone Company, Ducor
Telephone Company, Foresthill Telephone Co., Happy Valley Telephone
Company, Hornitos Telephone Company, The Ponderosa Telephone Co.,
Sierra Telephone Company, Inc., and Winterhaven Telephone Co.

- 26 -

R.95-01-020, I.95-01-021   ALJ/JSW/jac\***

**3.  Discussion**

We believe that it is important to adopt a uniform definition of basic service so that all residential telephone customers, no matter where they live in California, [or what their] level of income is, can expect a certain minimum level of service. This is especially important in a mobile society, where people may move across town, or from one part of the state to another. For the vast majority of telephone customers, they have come to expect and rely on the service elements that we listed in D.95-07-050.

We will adopt some of the suggested revisions to the service elements which make up basic service as suggested by the Coalition, DRA, and UCAN.[14] The suggested revisions are already incorporated as part of those particular service elements, and by adopting the suggested revisions, we are only clarifying what consumers, and our rules, regulations, and decisions, have come to expect.

Some of the revisions suggested by the Coalition and UCAN include the reference to the word "free" for certain services. GTEC points that each service element of basic service has an associated cost, and that the service elements which make up basic service are not free, since customers pay for basic service. Our use of the term in the universal service rules is intended to recognize that as part of the bundled basic service package offering, that "free" means there are no additional charges incurred by the customer when that service element is used by a customer.

_____

14  The adopted rules are attached herein as Appendix B. Any differences between the adopted rules and the proposed rules, which are attached hereto as Appendix A, for ease of reference, are highlighted in bold.

- 27 -

Exhibit A

26

R.95-01-020, I.95-01-021    ALJ/JSW/jao

One of the suggestions of the Coalition, DCA, and UCAN, is to have a free white pages directory and free yellow pages directory. Telephone customers have become accustomed to receiving a free white pages directory and yellow pages directory every year. Free directories minimize the number of calls made to directory assistance, and promotes the wide distribution of yellow pages advertising. We shall add the free white pages directory to the definition of basic service. As GTEC pointed out in its comments to the proposed decision, yellow pages directory advertising is not subject to the Commission's jurisdiction, except as provided for in subdivision (b) of Public Utilities Code § 728.2. Thus, we will not require carriers to provide free yellow pages directories as part of basic service. Although we cannot require the distribution of free yellow pages, as noted earlier, the continued free distribution of yellow pages is clearly in the best interests of the carriers, their advertisers, and the public.

In the September 5, 1996 proposed decision, and in the revised proposed decision, the assigned ALJ recommended that there be an allowance of five local directory assistance calls at no additional charge. We agree with the comments that there is a cost associated with answering these calls, and that this is an issue best left to the marketplace to decide. We will, however, require the incumbent LECs to continue to provide the same number of free

- 28 -

Exhibit A

27

R.95-01-020, I.95-01-021   ALJ/JSW/WLA

directory assistance calls that are provided for in their tariffs until otherwise ordered by the Commission. As for UCAN's suggestion that there should be free access to customer service in both English and non-English formats, our discussion of bilingual services covers that issue.

We will adopt the suggestion by the smaller independent LECs that the proposed service element regarding access to public policy pay telephones, should be deleted. The focus of the basic service definition is to define the service elements that are to be provided to all residential households. Public policy pay telephones are not provided to households. Therefore, we will

Exhibit A
28

R.95-01-020, I.95-01-021  ALJ/JSW/jao\**A

delete access to public policy pay telephones from our definition of basic service.[15]

We do not adopt the suggestions by Pacific and AT&T Wireless that flat rate service be eliminated.  At the PPHs, many consumers expressed satisfaction with having a choice of flat or measured rate service.  Depending on their circumstances, some preferred measured rate service, while others preferred flat rate service.  The flat and measured rate options preserve customer choice, and provide consumers with a method by which to comparison shop among carriers.  We believe that if wireless providers desire to compete in the local exchange market, they should be required to offer basic service in the same type of pricing formats that are offered today by wireline carriers.

For the smaller LECs in California, of which there are 17, we shall exempt them from the service element that they be required to offer customers the choice of flat or measured rate service, unless the smaller LEC currently offers that option.  If, however, a new carrier decides to offer local exchange service in the service areas of these small companies, the new carrier will be required to provide all of the service elements listed in Rule 4 of Appendix B.  Once competition arrives in these areas, the incumbent LECs that do not offer measured rate service will be forced by the

_____

15  Public policy pay telephones play a role in the universal service context because those types of phones are placed where the public safety or convenience requires it. (25 CPUC2d 281, 284) (fn. 1.)  Those type of telephones raise issues about the availability of such phones, where they should be placed, and who should have to place them there.

16  The term "smaller LECs" refers to all of the LECs included in the reference to Small LECs, the Smaller Independent LECs, Citizens Telecommunications Company of the Golden State, and Citizens Telecommunications Company of Tuolumne.

- 29 -

Exhibit A

29

R.95-01-020, I.95-01-021   ALJ/JSW/jac **

market considerations to decide whether such an option should be offered to their customers.

As for DCA's recommendations regarding unlimited directory assistance for those customers who may be subject to area code splits and overlays, we decline to adopt that suggestion. The evidence presented during the hearings clearly shows that there are costs associated with the LECs having to provide directory assistance. The number of directory assistance calls should be curtailed with our adoption of the requirement that customers be provided with a local telephone directory, and the notification process that is put into place before an area code split or overlay is adopted.

We also decline to adopt Cal/Neva's suggestion to have unlimited free blocking and unlimited billing adjustments for unauthorized information services calls. Such a change would invite an avalanche of billing adjustment complaints over whether calls were authorized or not. The end user should be responsible for deciding whether information services calls from their household should be blocked after this problem first occurs.

Citizens' recommendation to delete the policy statement in proposed rule 3.A.2 will not be adopted. Citizens' fear that the policy statement will result in the automatic expansion of the definition of basic service is unfounded. In order for the basic service definition to be expanded, the Commission will review the service in light of the criteria contained in Rule 4.C.3.

TURN raised the concern that with new entrants offering service, a customer's local calling area should be at least as large as the current local calling area. The Coalition, in footnote 13 of its reply comments, stated that CLCs who furnish residential service should be free to offer a flat rate service within a local calling area that differs from the local calling areas for the incumbent LECs. We believe that both of those

- 30 -

Exhibit A

30

R.95-01-020, I.95-01-021  ALJ/JSW/jao **

concerns are more properly addressed in the local competition proceeding rather than here.

Some of the comments made at the PPHs, and in letters to the Commission, suggested that Internet access, certain kinds of custom calling features, and advanced broadband services, such as ISDN, should be incorporated into the basic service definition. We first note that the basic service definition adopted today enables anyone who has the computer hardware and software to connect to an Internet provider. All that is needed from a telecommunications standpoint is a voice grade telephone line and touchtone dialling, both of which are included in the basic service definition. Although many have talked about access (or lack thereof) to the Internet and the information superhighway, we must point out that this Commission only has jurisdiction over the telephone companies whose wires connect the computer to the information provider.[17] To broaden the definition of universal service and basic service to include access to a computer, modem, software, and the information provider, is clearly outside this Commission's jurisdiction.

Broadening the definition of basic service to include broadband services, will also impose more costs on the incumbent LEC and the new carriers that want to enter the local exchange market. As some of the speakers mentioned at the PPHs, some customers may not want those services at all. In addition, the funding base would need to be increased as a result. We agree with

_____

[17] For example, in Public Advocates' survey of community based organizations, a survey question posed the need and demand for Internet service. 37.21% of the respondents had the service. 93.94% of the respondents who did not have the service, responded that they would use the service if it was affordable. The unaffordable portion may be the computer hardware, and the information provider's monthly fee, rather than the monthly cost of the telephone line. (See Public Advocates' Reply Comments, December 1, 1995, Survey attachment.)

Exhibit A
31

R.95-01-020, I.95-01-021  ALJ/JSW/jad

Intel's comment that to include greater bandwidth services at this time would create a new entitlement, which presently does not exist, and increase the need for additional funding. Before mandating the inclusion of a broadband pipeline into every residential telephone customer's house, as well as other calling features, we need to keep in mind that a number of households still exist within California that are without the means to afford any telephone service at all. We therefore decline at this time to include any other service elements in the definition of basic service. The service elements which we have included in the definition of basic service are contained in Rule 4.B.

To ensure that all residential telephone customers are provided with the minimum level of service that we adopt today, Rule 4.A. in Appendix B provides that all carriers that provide local exchange residential service shall provide all the service elements of basic service. Such a rule does not prevent carriers from offering more service elements than what the basic service definition requires.

**B.    Review Of The Basic Service Definition**

    **1.    Introduction**

        AB 3643 states that one of the objectives of the universal service proceeding is to develop a periodic review process to revise the definition of universal service to reflect new technologies and markets. AB 3643 also provides that in order to avoid classes of information rich and information poor customers, there must be an ongoing evaluation of which services are deemed essential, and therefore a part of universal service. Consistent with those directives, the Commission in D.95-07-050 developed proposed rules for the review of the basic service definition.

        **2.    Positions of the Parties**

        Citizens suggests that the proponent who desires to include an additional service element into the definition of basic

- 32 -

Exhibit A

32

## ADOPTED UNIVERSAL SERVICE RULES

### 1. DEFINITIONS

A. All End User Surcharge (AEUS): A funding mechanism used to collect money for Commission mandated programs. The AEUS is applicable to all telecommunications carriers, with the exception of one-way paging companies. The surcharge is a percentage of the customers' total expenditures on telecommunications services. The surcharge is visible on customers' bills as a line item charge.

B. Basic Service: A certain defined minimum level of telecommunications service which each carrier of local exchange service is required to provide to all of its residential customers who request local exchange service. Basic service is sometimes referred to as basic exchange service.

C. California High Cost Fund (CHCF or CHCF-A): An existing fund established by the Commission to ensure that customers in areas served by small and mid-size LECs have access to telephone services at reasonable rates. The Commission collects money for the fund through an AEUS and distributes it to the small and mid-size LECs based on the individual need of the companies as authorized by a Commission resolution.

D. California High Cost Fund-B (CHCF-B): the fund developed in this proceeding to subsidize high cost areas of the state. The fund includes a collection mechanism, a distribution mechanism, and a method for calculating the amount of the required subsidy.

E. California Teleconnect Fund: the fund developed in this proceeding to provide discounts for telecommunications services to qualifying schools, libraries, hospitals, health clinics, and community based organizations.

F. Carrier of Last Resort (COLR): A carrier who provides local exchange service, and stands ready to provide basic service to any customer requesting such service within a specified area. To be a COLR, the provider must meet Commission-approved qualifications.

G. Census Block Group (CBG): An area defined by the United States Census Bureau for purposes of the CHCF-B. The CBG serves as the geographic study area.

H. Common Carriage: Provision of telecommunications services available to the public on a non-discriminatory basis.

I. Competitive Local Carrier (CLC): A common carrier which has been issued a Certificate of Public Convenience and Necessity effective on or after January 1, 1996, to provide

R.95-01-020, I.95-01-021  ALJ/JSW/gab\*
APPENDIX B
Page 2

local exchange telecommunications service for a geographic
area specified by such carrier.

   J.  Competitive neutrality:  The concept that regulation of the
telecommunications industry should be structured in such a
way that it neither favors nor impedes one
telecommunications carrier or group of telecommunications
carriers, over any other carrier or group of carriers.

   K.  Geographic Study Area  (GSA):  A Commission designated
geographic area that serves as a reference point from which
cost data and high cost subsidies can be derived for the
designated carrier or carriers of last resort.

   L.  Local Exchange:  A telecommunications system providing
service within a specified area within which communications
are considered exchange messages except for those messages
between toll points.

   M.  Local Exchange Carrier (LEC):  The incumbent local exchange
carrier or carriers whose names appear on Attachment A of
these rules.

   N.  Loop:  A transmission path capable of delivering analog
voice grade signals between 300 and 3,000 Hz only, between
the network interface at a customer's premises and the main
distribution frame or any other point of interconnection to
the LEC network.  Also known as the basic level network
access channel.

   O.  Open Access Network Architecture Development (OANAD):
Order Instituting Rulemaking and Order Instituting
Investigation (R.93-04-003 and I.93-04-002) to govern access
to bottleneck services and establish a framework for network
architecture development of dominant carrier networks.

   P.  Proxy Costs:  Geographically specific costs developed using
proxy factors rather than direct measurement of costs.

   Q.  Proxy Factor:  Factor associated with costs, such as loop
length or population density, which can be used to estimate
costs when direct measurement is unavailable or impractical.

   R.  Total Service Long Run Incremental Costs (TSLRIC):  The
definition of TSLRIC that is developed in the OANAD OIR/OII.

R.95-01-020, I.95-01-021   ALJ/JSW/gab *
APPENDIX B
Page 3

(8) Universal Lifeline Telephone Service (ULTS)  The ULTS program is a statewide explicit customer subsidy that ensures low income households have access to basic telephone services at a fixed and affordable rate.  The ULTS program was created in response to the Moore Universal Telephone Service Act which became law in September, 1983.  The ULTS program is sometimes referred to as Lifeline.

(9) Universal Service  The concept that basic service should be available to virtually everyone in California at affordable rates for competitive provisioning of basic service.

2.   SCOPE OF RULES.  These rules govern universal service to California telecommunications users.  For the purposes of funding universal service, these rules apply to all California telecommunications carriers.  For the purpose of providing universal service, these rules apply to all California telecommunications carriers providing basic service.

3.   UNIVERSAL SERVICE PRINCIPLES AND OBJECTIVES

   A.   Principles:

   1.  It is the policy of the Commission to ensure that high-quality basic telecommunications services remain available and affordable to all Californians regardless of linguistic, cultural, ethnic, physical, geographic, or income considerations.

   2.  It is the policy of the Commission that in order to avoid stratification between information rich and information poor consumers, there should be a progressive expansion of the definition of basic service, as appropriate, and through the implementation of other policies, programs, and incentives to promote the deployment of advanced telecommunications technology to all customer groups.

   3.  It is the policy of the Commission to ensure that consumers have access to information needed to make timely and informed choices about basic service and ULTS.

   4.  It is the policy of the Commission to provide consumers with the ability to choose among competing basic service carriers regardless of the technologies employed by the carriers who provide basic service.

   5.  It is the policy of the Commission to ensure that basic service carriers adhere to interconnectivity, interoperability, common carriage, reliability, privacy and security guidelines.

Exhibit A
35

R.95-01-020, I.95-01-021   ALJ/JSW/gab\***
APPENDIX B
Page 4

It is the policy of the Commission to provide incentives
as needed to promote deployment of advanced
telecommunications technology to all customer segments,
and to position health care, community, and government
institutions to be early recipients of the benefits of
the information age.

7.   It is the policy of the Commission to provide a
competitively neutral universal service mechanism which
will minimize market distortions. The mechanism must
provide for competitive provisioning of basic service,
access to universal service funds, and a funding source
which is broad-based and sustainable.

**Objectives.**

It is the objective of the Commission to develop a fully
operable, competitively neutral universal service
financing source and distribution mechanism no later
than January 1, 1997.  The funding mechanism must
provide efficiency incentives to significantly reduce
the aggregate subsidy required for universal service
over time.

It is the objective of the Commission to adopt universal
service policies which allow education, health care,
community and government institutions to be in a
position that allows them to be early recipients of the
benefits of the information age.

It is the objective of the Commission to improve the
subscribership rate of basic service to all customer
groups, including low income, disabled, non-white, and
non-English speaking households, by means of the
following mechanisms:

All LECs and CLCs shall be responsible for pursuing
the objective of achieving a 95% subscribership rate
among all customer groups, including low income,
disabled, non-white, and non-English speaking
households in their service territories.

b..  LECs and CLCs shall have the flexibility to develop
innovative strategies to contribute to the
attainment of this objective.

In service territories where there is a substantial
population of non-English speakers, a carrier's
efforts to communicate with such customers in their
native languages shall be a factor that the
Commission considers in assessing each local
carrier's contribution to pursuit of universal
service targets.

R.95-01-020, I.95-01-021    ALJ/JSW/gab

APPENDIX B

Page 5

**4. BASIC SERVICE**

A. Carriers providing local exchange residential service shall, at a minimum, provide all elements of basic service, except as provided for in Rule 4.C. below.

B. Basic service includes the following service elements:

1. access to single party local exchange service;

2. access to all interexchange carriers offering service to customers in a local exchange;

3. ability to place calls or, on or before the 180th day before the review date,

4. ability to receive free unlimited incoming calls;

5. free touch tone dialing;

6. free and unlimited access to 911/E911, access to local directory assistance, and access to foreign NPAs;

8. Lifeline rates and charges for eligible customers;

9. customer choice of flat or measured rate service;

10. free provision of one directory listing per year as provided for in D.96-02-072;

11. free white pages telephone directory;

12. access to operator services;

13. voice grade connection to public switched telephone network;

14. free access to 800 or 800-like toll free services;

15. one-time free blocking for information services and one time billing adjustments for charges incurred inadvertently, mistakenly, or that were unauthorized;

16. access to telephone relay service as provided for in PU Code § 2881;

17. free access to customer service for information about ULTS, service activation, service termination, service repair and bill inquiries.

Case 3:26-cv-03148-LL-JAC    Document 31-2    Filed 06/17/26    PageID.243    Page 44 of 365

R.95-01-020, I.95-01-021   ALJ/JSW/gab \ \*
APPENDIX B
Page 6

C.  The seventeen smaller LECs shall be exempted from the basic service element that they be required to offer customers the choice of flat or measured rate service, unless the smaller LECs currently offer that option.

D.  Periodic Review of Basic Service

1.  Except as provided for in paragraph 2 below, petitioners may petition for review of the service elements which make up basic service three years after the conclusion of a review of basic service.  The adoption of final universal service rules in this proceeding (R.95-01-020 and I.95-01-021) will constitute the first review of basic service.  The petition shall be filed on or before the 180th day before the review date.

2.  Petitioners may petition the Commission to review the service elements which make up basic service at any time provided that the petitioner makes a prima facie showing that at least three of the four criteria contained in paragraph 3 below have been met.  Petitions for review will be acted upon in accordance with subdivisions (c), (e), (f), (g), and (h) of Rule 47 of the Commission's Rules of Practice and Procedure.

3.  In evaluating whether service elements should be added to or deleted from basic service the Commission will consider the following criteria:

a.  the service is essential for participation in society;

b.  a substantial majority, 65%, of residential customers subscribe to the service.  Assess the following:

(1)  availability of the service;

(2)  the degree to which the service has been promoted by the carrier;

(3)  the level of customer education which has been provided for the service;

(4)  the communities which are presently being targeted for marketing and use of the service.

the qualitative and quantitative benefits of adding the service outweigh the costs;

d.  availability of the service, or the number of subscribers would not increase without intervention.

Exhibit A

38

R.95-01-020, I.95-01-021  ALJ/JSW/gab\ **

APPENDIX B
Page 7

5. **UNIVERSAL LIFELINE TELEPHONE SERVICE (ULTS)**

A.  Carrier Responsibilities

1.  All carriers providing eligible low income customers with residential basic service, as defined in rule 4.B. shall have access to the ULTS fund.

a.  Carriers are required to inform customers of the option for ULTS service when customers first inquire about or sign up for basic exchange service, and annually thereafter.

b.  A carrier's ULTS rates shall be set in accordance with Public Utilities Code Section 874 and General Order (GO) 153, and in no event shall the carrier charge more than the statewide ULTS rate, as set by the Commission.

c.  Carriers, on a per ULTS customer basis, shall be entitled to collect from the ULTS fund the difference between their tariffed rate for other residential customers for the corresponding service, and their ULTS rate.

d.  Carriers must serve each eligible customer requesting Lifeline service within the carriers' specified serving area.

e.  Pursuant to provisions established in GO 153, Resolution T-15826, and the workshops held on April 4, and 5, 1995, carriers shall submit the required "monthly report and claim statement" for reimbursement. In addition to the information required by GO 153, Resolution T-15826, and the April 1995 workshops, the monthly report shall include the number of ULTS customers served that month. The ULTS customer categories shall indicate the number of ULTS customers with measured service, and those with flat rate service included in the CHCF-B. The seventeen smaller LECs shall be 2. Individual carriers will no longer be able to claim reimbursement for its marketing expenses associated with the ULTS program except as provided for below:

ULTS advertising campaigns, outreach activities, and related marketing expenses, that are the subject of existing contracts which call for the continued display or commercial air time of the advertising medium, or other continuing ULTS activities, after the effective date of this decision, shall continue to be reimbursed by the ULTS fund for the period called for in the contract or until three months from the effective date of this decision, whichever occurs first. It is our intent that there will be

Exhibit A
39

R.95-01-020, I.95-01-021  ALJ/JSW/gab
APPENDIX B
Page 8

> no carrier specific ULTS reimbursement for these kinds of activities after the third month from the effective date of the decision adopting this rule.

**B.  ULTS Funding Source**

1.  All telecommunications carriers are required to charge the appropriate ULTS surcharge, as set by the Commission, on all end users of telecommunications services, and to remit such monies to the ULTS program.

2.  The services excluded from the collection of the ULTS surcharge are those set forth in D.94-09-065 and D.95-02-050, specifically: ULTS billings, coin-sent paid calling, debit card messages, one-way radio paging, usage charges to COPTs, customers receiving services under existing contracts that were executed on or before September 15, 1994 and directory advertising.

**6.  THE CALIFORNIA HIGH COST FUND-B**

Identifying The Cost To Serve High Cost Areas

1.  CHCF-B subsidies will vary according to the cost of providing service within a GSA.

2.  The GSA is used for the purposes of identifying the cost of providing universal service to a particular area.  A CBG shall serve as the GSA.

3.  Costs for providing customers with basic service in individual GSAs will be determined by factors which serve as proxies for the characteristics associated with costs including, but not limited to, population density and average loop length. The methodology for determining proxy costs and the initial proxy factors will be developed in the Cost Proxy Model.

4.  The five large and mid-size LECs shall be included in the CHCF-B.  The seventeen smaller LECs shall be excluded from the CHCF-B, and instead are eligible for high cost support through the CHCF-A.  The mid-size LECs can:

a.  develop forward-looking cost studies of their own; and

b.  select the proxy costs developed by one of the large medium, or other continuing ULTS activities, after

5.  A GSA will be considered a high cost GSA if the cost of serving residential customers in that GSA is above the statewide average cost as generated by the CPM.

R.95-01-020, I.95-01-021    ALJ/JSW/gab
APPENDIX B
Page 9

(b)    Carrier Responsibilities.    Carriers shall report the following information to the Telecommunications Division on a monthly basis:

a.    The number of eligible residential basic service lines being served by the carrier in each high cost GSA. An eligible residential basic service line is a line that is used to provide service to a residential customer in a high cost GSA.

b.    The rates for residential basic service the carrier is charging in each high cost GSA.

c.    A calculation of the subsidy amount that the carrier is claiming for providing its residential customers with basic service in each high cost GSA.

d.    Such other information as may be required by the Commission.

Subsidy Applicability.

1.    The CHCF-B will apply only to residential basic service, priced at the tariffed rate, in high cost GSAs. Only one residential line per household shall be subsidized. For purposes of this rule, the term "household" shall have the same meaning as provided for in General Order 153. Carriers shall be required to obtain from their high cost area customers, a certification in a form to be prescribed by the Commission, that the household is not presently receiving residential basic service through any other telecommunications carrier.

2.    The subsidy that a designated COLR shall be entitled to will be based on the following:

(a)    The benchmark will be defined as the greater of the statewide average cost as determined by the CPM, or the incumbent's flat rate plus EUCL.

(b)    If the per line cost of serving a CBG exceeds the benchmark, the COLR will receive the difference between the benchmark and the per line CPM cost estimate for the CBG.

(c)    In areas where the incumbent's flat rate plus EUCL is less than the benchmark, the COLR will receive the difference between the benchmark and the incumbent LEC's flat rate plus EUCL, in addition to the subsidy described in subdivision (2) above.

R.95-01-020, I.95-01-021   ALJ/JSW/gab
APPENDIX B
Page 10

(d)   The COLR's draw from the CHCF-B will be offset by the COLR's revenue per subsidized line from the CCLC and the federal Universal Service Fund.   The amount of the offset will not exceed the amount of subsidy the carrier would have received without the offset.

3. The incumbent LECs shall adjust the prices of all services, other than basic service and rates covered by contracts that were executed on or before September 15, 1994, downward in an equal amount across all of those services to reflect the receipt of the explicit subsidy through the CHCF-B.  The downward adjustment shall equal the subsidy support received by the incumbent LEC from the CHCF-B.

4.  The Commission shall periodically review the subsidy in each GSA.   The initial review shall take place in three years from the date of the establishment of the fund, and every three years thereafter.

a. The review process may be in the form of an auction mechanism, with specific auction mechanism rules to be developed at a later time.

1.  All of the incumbent LECs listed in Attachment A of these rules shall be designated as the COLR in all their respective service areas at least until such time that another carrier or carriers are designated as the COLR.

2.  Other qualified CLCs may seek to become a designated COLR, or to compete in a GSA without being designated a COLR.

3.  Only designated COLRs shall have access to the CHCF-B subsidy based on the number of residential customers that it serves in high cost GSAs.

4.  Designated COLR NOI: Those CLCs seeking to be designated a COLR shall file an advice letter in compliance with GO 96-A, stating that the carrier intends to be designated a COLR. The advice letter shall become effective in 40 days from the date of filing, unless a protest to the advice letter is filed.   The advice letter shall contain a statement of the following, which the Commission will consider in deciding whether the COLR status should be granted:

a.  the facilities the carrier has in place or the arrangements that the carrier plans to enter into in order to provide basic service;

R.95-01-020, I.95-01-021  ALJ/JSW/gab\**
APPENDIX B
Page 11

the ability of the carrier to promote the goals of
universal service to all customer segments
throughout the COLR's service area.

5.   A designated COLR shall be required to serve all
customers upon request, both residential and business,
who are located within the COLR's designated service
area as specified in subsection 6 below.

A designated COLR shall be required to serve the
following:

a.   Until such time as provided for in rule 6.D.1.
above, all incumbent LECs, in order to avail
themselves of the subsidy for a high cost GSA, shall
be required to serve all the high cost GSAs that are
within the incumbent LEC's existing exchange area
boundaries.

All CLCs who are designated COLRs, in order to avail
themselves of the subsidy for a particular high cost
GSA, shall be required to serve the entire GSA(s)
that is (are) within the CLC's designated service
territory for which it has elected COLR status.

A designated COLR may opt out of its obligations in a
GSA by advice letter, unless it is the only carrier
remaining in the GSA, in which case it must file an
application to withdraw as the COLR, and continue to act
as the COLR until the application is granted or a new
COLR has been designated as a result of an auction.

E.   Competitive Bidding To Serve As The COLR

1.   If there is only one carrier in a GSA and that carrier
has filed an application to withdraw as the COLR in that
GSA, and no other provider is willing to assume the COLR
responsibility at the current subsidy level:

a.   The Commission will initiate an auction whereby
service providers shall bid on the amount of subsidy
each would require to operate as the COLR.  Such
auction will be held within 180 days from the time
the application to withdraw as the COLR is filed.

b.   The qualified bidder who places a bid representing
the lowest amount of subsidy required to offer
service in the GSA would become the subsidized COLR
for a period of three years.  Competitive entry
would be allowed, but only 1/2 the subsidy would be
available to the competitor.

R.95-01-020, I.95-01-021 ALJ/JSW/gab\*\*.\*
APPENDIX B
Page 12

A COLR who loses the bid shall have the option to sell
its facilities in the area to any interested party.

3. 180 days prior to the expiration of the three-year COLR
obligation, all carriers desiring to become a designated
COLR in the GSA shall file applications stating their
intention to become the designated COLR for that
particular service area. The Commission will then
determine whether the same designated COLR should be
retained at the current subsidy, whether multiple
carriers of last resort should be permitted and at what
subsidy amount, or if another auction should be held.

F. Funding The CHCF-B

1. The Commission will require all end users of
telecommunications services to pay the CHCF-B surcharge
except for: ULTS billings, coin-sent-paid calling,
debit card messages, one-way radio paging, usage charges
to COPTs, customers receiving services under existing
contracts that were executed on or before September 15,
1994, and directory advertising.

2. All telecommunications carriers are required to charge
the appropriate CHCF-B surcharge, as set by the
Commission, on all end users of telecommunications
services in accordance with Rule 6.F.1. above.

3. The Commission shall be the administrator of the CHCF-B
mechanism until such time the Commission may decide
otherwise.

4. The Commission will calculate each carrier's support
from the CHCF-B and distribute the appropriate amount to
the carriers.

G. Distributing The CHCF-B In A Resale Environment

1. If resale of basic exchange service or loops is allowed,
the subsidy for residential basic exchange service for
that customer shall be treated as follows:

a. If the price of the service or facility resold is
below its cost, the underlying facilities based
provider receives the subsidy for the services sold.

b. If the price of the service or facility resold is
market based or based upon actual deaveraged costs,
then the carrier who sells basic exchange service to
the end-user residential customer shall receive the
subsidy, provided that the basic residential service
is priced at the affordable (but below cost) price
set by the Commission.

Exhibit A

44

R.95-01-020, I.95-01-021   ALJ/JSW/gab\t*
APPENDIX B
Page 13

**7. UNIVERSAL SERVICE WORKING GROUP**

A.  The Commission shall form the Universal Service Working
Group (USWG).

B.  The purpose of the USWG shall be to address ways in which
access and deployment of advanced telecommunications
technologies can be provided to all customer segments, and
how education, health care, community, and government
institutions can be positioned to take advantage of these
technologies.

C.  The Steering Committee of the USWG shall be composed of 24
members.  There shall be eight representatives from the
telecommunications industry, representing a spectrum of
telecommunications carriers.  There shall be two
representatives each from the following kinds of concerns:
education, health care, community, libraries, and local
government; for a total of ten representatives.  There shall
be two representatives from the business sector, two
representatives from this Commission, one representative
from the disabled community, and one representative from
another state agency.

D.  The USWG will be funded at $250,000 per year for a period of
two years from monies in the California Teleconnect Fund.
These funds are intended to provide administrative support,
and reimbursement for a participant's reasonable expenses
related to their participation in the USWG.  Absent
Commission action, the USWG shall terminate on December 31,
1998.

4.  The Steering Committee of the USWG shall prepare an annual
report of a summary of the USWG meetings, their objectives,
the issues raised, their accomplishments, and their
recommendations.  The report shall be submitted to the
Commission, and forwarded by the Commission to the
Legislature for their information.

**8. DISCOUNTS TO CERTAIN ENTITIES**

A.  In response to the Telecommunications Act of 1996, and the
principles expressed in AB 3643, a program of rate discounts
for certain kinds of qualifying entities shall be created
and funded through the California Teleconnect Fund.  Nothing
in this rule precludes a carrier from offering a larger
discount than what is provided for in this rule.

B.  Qualifying schools and libraries shall be entitled to a
discounted rate for measured business service, switched 56,
Integrated Services Digital Network (ISDN) service, T-1
service, and DS-3, or their functional equivalents, and such
other services that the Federal Communications Commission
(FCC) may determine are appropriate.

Exhibit A

45

R.95-01-020, I.95-01-021   ALJ/JSW/gab\**
APPENDIX B
Page 14

(1) Only public or nonprofit schools providing elementary or secondary education, and which do not have endowments of more than $50 million, shall qualify for the discounted rates for schools.

(2) Only those libraries that are eligible for participation in state-based plans for funds under Title III of the Library Services and Construction Act (20 USC §335d et seq.) shall qualify for the discounted rates for libraries.

(3) All carriers offering the services listed in subdivision B above, shall provide in their tariffs that the rates for qualifying schools and libraries for such services shall be 50% below the rates charged to other businesses for those services.

(4) There is no limit on the number of subsidized lines that a school or library can have.

C. Qualifying municipal and county government-owned and operated hospitals and health clinics shall be entitled to a discounted rate for switched 56, ISDN, T-1, and DS-3, or their functional equivalents.

(1) All carriers offering the services listed in this subdivision, shall provide in their tariffs that the rates for qualifying government-owned hospitals and health clinics for such services shall be 20% below the rates charged to other businesses for those same services, or their functional equivalents.

D. Qualifying community based organizations (CBOs) shall be entitled to a discounted rate for switched 56, ISDN service, and T-1, or their functional equivalents.

(1) Only a tax exempt organization offering health care, job training, job placement, or educational instruction, shall qualify for the discounted rates for CBOs. A "tax exempt organization" shall refer to an organization described in Section 501(c)(3) or 501(d) of the Internal Revenue Code, Title 26 of the United States Code.

(2) In order to qualify for the CBO discount, the CBO must provide proof at the time of application that it is a tax exempt organization, and that it offers health care, job training, job placement, or educational instruction.

(3) All carriers offering the services listed in this subdivision, shall provide in their tariffs that the rates for qualifying CBOs for such services shall be 25% below the rates charged to other businesses for those same services, or their functional equivalents.

Exhibit A
46

R.95-01-020, I.95-01-021    ALJ/JSW/gab.***
APPENDIX B
Page 15

    (4)    The CBO shall be limited to a total number of: two switched 56 lines or their functional equivalents; two ISDN lines or their functional equivalents; one switched 56 line or its functional equivalent and one ISDN line or its functional equivalent; or one T-1 line or its functional equivalent.

    E.  Carriers who provide the above-referenced entities with those discounted services shall receive a subsidy for each qualified entity that it serves. The subsidy amount shall be: (1) the difference between the tariffed rate for businesses for such services, and the tariffed discount rate; or (2) if the rate negotiated is below the tariffed discount rate, the carrier shall be entitled to the sum that represents the percentage discount off of the negotiated rate.

    F.    These discounted rates may not be resold to, or shared with, any other non-qualifying entity or person.

    G.    Funding The California Teleconnect Fund

    1.    The Commission will require all end users of telecommunications services to contribute to the California Teleconnect Fund except for: ULTS billings, coin-sent paid calling, debit card messages, one-way radio paging, usage charges to COPTs, customers receiving services under existing contracts that were entered into on or before September 15, 1994, and directory advertising.

    2.    All telecommunications carriers are required to charge the appropriate California Teleconnect Fund surcharge, as set by the Commission, on all end users of telecommunications services in accordance with Rule 8.G.1. above.

    3.    The Commission shall be the administrator of the California Telconnect Fund until such time the Commission may decide otherwise.

    4.    Carriers supplying telecommunications services to qualifying institutions and organizations at discounted rates shall report the information required by the Commission to the Telecommunications Division on a monthly basis.

    5.    The Commission will calculate each carrier's support from the California Teleconnect Fund, and distribute the appropriate amount to the carriers.

R.95-01-020, I.95-01-021    ALJ/JSW/dab **
APPENDIX B
Page 16

9.  **CONSUMER INFORMATION RULE**

    A.  The Commission shall compile an annual report that summarizes the complaint history of each certificated carrier, and any open investigations into such carrier. Such report shall be made available to the public.

    B.  All LECs and CLCs must provide the applicable information contained in subsection C below to residential consumers (1) whenever any marketing information regarding telecommunications service offerings described in the matrix is mailed to residential customers, or (2) upon request by a consumer. The required consumer information must be on a separate sheet, and contain the following statement at the beginning: "The following information is required by the California Public Utilities Commission to allow comparisons with rates charged by other carriers for the same type of service.

    C.  The required consumer information shall consist of the following:

"The following information is required by the California Public Utilities Commission to allow comparisons with rates charged by other carriers for the same type of service.

R.95-01-020, I.95-01-021    ALJ/JSW/gab\t*

**APPENDIX B**
**Page 17**

2.   TOTAL CALL [INTRALATA/INTER [NAME OF CARRIER] ATA/LATA], or what is sometimes referred to as an intraLATA toll call, consists of any call made beyond your 1) A **LOCAL CALLS**: [Name of Carrier] local calling area consists of any calls within a ____ mile radius of the rate center for your location.

| SERVICE | DESCRIPTION OF SERVICE | INSTALLATION FEE | COST PER MONTH | COST PER MINUTE |
|---|---|---|---|---|
| Flat Rate Service | A set monthly rate for unlimited local calling in your local calling area. | $_____ | A ca $ rate beyond your local calling area, but within your LATA. | N/A Toll Call |
| Measured Rate Service | A reduced monthly rate plus per-minute charges for each local call above a minimum $____ allowance. | $_____ | $_____ | After $_____ 1st min./each addit. min. Day: ___/___ Evening: ___/___ Night/ Weekend: ___/___ |
| Universal Lifeline Telephone Service (ULTS) | Low priced service for qualifying customers on a limited income. | $10.00 Limited to one installation per year. | | |
| to Flat Rate ULTS | Unlimited local calling | | [Not to exceed $5.62] | N/A |
| to Measured Rate ULTS | 60 untimed local calls. After 60 calls, a per call charge of ____ cents. | | [Not to exceed $3.00] | After 60 calls: ____ cents |

R.95-01-020, I.95-01-021   ALJ/JSW/gab\*

APPENDIX B
Page 18

2.   **TOLL CALL/INTRALATA [TOLL] CALL:** A toll call, or what is sometimes referred to as intraLATA toll call, consists of any call made beyond your local calling area, but within your Local Access Transport Area (LATA).

| SERVICE | DESCRIPTION OF SERVICE | INSTALLATION FEE | COST PER MONTH | COST PER MINUTE |
|---|---|---|---|---|
| IntraLATA Toll Call | A call made beyond your local calling area, but within your LATA. | N/A | N/A | [carrier to describe rate structure by variables used such as time, distance, charge for first minute and each additional minute.] * |

3.   **LONG DISTANCE CALLS/INTERLATA CALLS:** A long distance call, or what is sometimes referred to as an interLATA call, consists of a call made outside your LATA.

| SERVICE | DESCRIPTION OF SERVICE | INSTALLATION FEE | COST PER MONTH | COST PER MINUTE |
|---|---|---|---|---|
| InterLATA Toll Call | Calls made outside your LATA | N/A | N/A | [carrier to describe rate structure by variables used such as time, distance, charge for first minute and each additional minute.] * |

Exhibit A
50

R.95-01-020, I.95-01-021 ALJ/JSW/gab

APPENDIX B
Page 19

4. **OTHER CHARGES:**

| CHARGE | WHEN ASSESSED | AMOUNT |
|--------|---------------|--------|
| Late Payment Charge | Payment not received by due date. | $_____ |
| Returned Check Charge | Customer's check returned to the carrier from the bank. | $_____ |
| Switching Fee | Charge for changing long distance carrier. | $_____ |
| Reconnect Charge | Charge for reconnecting service after service has been terminated for late payment. | $_____ |

*This informational brochure does not reflect the prices associated with the various kinds of discount calling plans that might be offered.

Price information current as of [month, date, and year]."

(END OF APPENDIX B)

R.95-01-020, I.95-01-021   ALJ/JSW/gab/wla

APPENDIX B
Page 20

## ATTACHMENT A

Calaveras Telephone Company
California-Oregon Telephone Company
Citizens Telecommunications Company of California Inc.
Contel of California, Inc.
CP National[1]
Ducor Telephone Company
Evans Telephone Company
Foresthill Telephone Company
GTE California Incorporated
GTE West Coast Incorporated
Happy Valley Telephone Company
Hornitos Telephone Company
Kerman Telephone Company
Pacific Bell
Pinnacles Telephone Company
The Ponderosa Telephone Company
Roseville Telephone Company
Sierra Telephone Company, Inc.
Siskiyou Telephone Company[2]
Tuolumne Telephone Company
The Volcano Telephone Company
Winterhaven Telephone Company

(END OF APPENDIX B)

---

1   Now known as Citizens Telecommunications Company of the Golden State.
2   Now known as Citizens Telecommunication Company of Tuolumne

Exhibit A
52

# EXHIBIT B

COM/MP1/gd2/lil                                    **Date of Issuance 12/24/2012**

Decision 12-12-038  December 20, 2012

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Rulemaking Regarding Revisions to the California High Cost Fund B Program. | Rulemaking 09-06-019 (Filed June 18, 2009) |

## DECISION ADOPTING BASIC TELEPHONE SERVICE REVISIONS

39603602                                        - 1 -                                        Exhibit B
                                                                                                54

R.09-06-019  COM/MP1/gd2/lil

# TABLE OF CONTENTS

**Title**                       **Page**

DECISION ADOPTING BASIC TELEPHONE SERVICE REVISIONS ................... 1

1. Introduction ............................................................................................... 2
2. Procedural Background ............................................................................. 6
3. Overview of Revisions to Basic Service Definition .............................. 10
4. Revised Basic Service Requirements ...................................................... 17
    4.1. Ability to Place and Receive Voice-grade Calls
        over all Distances Utilizing the Public Switched
        Telephone Network or Successor Network ................................. 18
    4.2. Provision of Free and Unlimited Access to Emergency Services ........... 22
    4.3. Billing Provisions ........................................................................ 24
        4.3.1. Lifeline Rates to Eligible Customers ............................... 24
        4.3.2. Provision of Unlimited Incoming Calls at No
            Additional Charge ........................................................ 26
        4.3.3. Customer Option of Fixed Rate for Unlimited
            Outgoing Local Calling ................................................ 28
            4.3.3.1. Affordability Provisions in High-Cost Areas ............ 31
    4.4. Provision of Directory Services ................................................... 32
        4.4.1. Access to Directory Assistance ...................................... 33
        4.4.2. Provision of Directory Listing ....................................... 34
        4.4.3. Provision of White Pages Directory .............................. 35
    4.5. Access to 800 or 8YY Toll-Free Services ..................................... 38
    4.6. Access to Telephone Relay Service as Provided for
        in Pub. Util. Code § 2881 ............................................................ 39
    4.7. Free Access to Customer Service for Information about
        Universal Lifeline Telephone Service, Service Activation,
        Service Termination, Service Repair and Bill Inquiries ........... 40
    4.8. One-Time Free Blocking for Information Services,
        and One-Time Billing Adjustments for Charges
        Incurred Inadvertently, Mistakenly, or Without Authorization ........... 40
    4.9. Access to Operator Service ......................................................... 41
5. Service Quality Standards ....................................................................... 41
    5.1. Importance of Service Quality Standards for Basic Service ........... 41
    5.2. Positions of Parties ...................................................................... 42

- i -

R.09-06-019  COM/MP1/gd2/lil

## TABLE OF CONTENTS

**Title**                                                                    **Page**

5.3.  Discussion ..................................................................................................... 45

6.   Assignment of Proceeding ......................................................................... 47

7.   Comments on Proposed Decision ............................................................. 47

Findings of Fact .................................................................................................. 48

Conclusions of Law ............................................................................................ 53

ORDER .................................................................................................................. 55

APPENDIX A – Revised Definition of Basic Telecommunications Service
              Elements
APPENDIX B – Cross-References of Existing to Revised Service Element
              Listings
APPENDIX C – Rules Governing Carrier of Last Resort

Exhibit B
56

R.09-06-019  COM/MP1/gd2/lil

## DECISION ADOPTING BASIC TELEPHONE SERVICE REVISIONS

### 1.    Introduction

By this decision, we adopt updated requirements for residential basic telephone service (basic service).  Appendix A contains the updated list of service elements that comprise residential basic telephone service, along with the related requirements for offering these service elements.  Although today's telecommunications marketplace offers an increasingly diverse range of products and technology options to consumers, the scope of this decision addresses only those basic telecommunications services, defined as those services essential to meet universal service needs.[1]  Although the term "basic telephone service" appeared in many Commission decisions over the years, the Commission formally defined what the term meant for the first time in Decision (D.) 96-10-066.  As stated in D.96-10-066, a uniform definition of basic service is important so that all residential telephone customers, no matter where they live in California, can expect a certain minimum level of service.  Our updated basic service definition shall apply to any telephone corporation serving as Carrier of Last Resort (COLR) and/or offering Universal Lifeline Telephone Service within California.[2]  The adopted basic service elements are designed to apply on a technology-neutral basis to all forms of communications technology that may be utilized, including wireline, wireless, and Voice over Internet Protocol (VoIP) or

---

[1] The principles underlying the California Public Utilities Commission's (CPUC or Commission) universal telephone service goals within a competitive environment are set forth in detail in D.95-07-050 (60 CPUC2d, 536, 546-547.)

[2] A "telephone corporation" is defined in Public Utilities Code Section 234 to include every corporation or person owning, controlling, operating, or managing any telephone line (with or without the use of transmission wires) for compensation within California.

Exhibit B

57

R.09-06-019  COM/MP1/gd2/lil

any other future technology that may be used in the provision of telephone service.

Under Commission rules set forth in D.96-10-066, COLR status is required to receive California High Cost Fund–B (CHCF-B or B-Fund) support.[3]  The CHCF-B program supports the Commission's universal service goal to keep basic telephone service affordable.  A COLR must offer basic service to all residential customers within its designated service territory, including those areas that are more costly or difficult to serve.  Prior to the B-Fund, a system of implicit cross-subsidies kept basic rates affordable.[4]  By replacing these implicit subsidies with an explicit subsidy fund, the CHCF-B was designed to facilitate competitive pricing for services other than basic service, while preserving the affordability of essential basic service.

The basic service obligation applies on a statewide basis to all telecommunications carriers wishing to offer basic residential telephone service.  Accordingly, the basic service obligation applies, not just in regions subject to high-cost support, but throughout California.

Another important universal service program designed to preserve the availability of basic telephone service to low-income customers at affordable

---

[3]  The rights and responsibilities of a carrier of last resort are set forth in D.96-10-066, Appendix B.6.D. attached hereto for reference purposes as Appendix C.  Pursuant to Public Utilities (Pub. Util.) Code Section (§) 739.3, the CHCF-B was established in 1996 as part of a broader policy to ensure that universal telephone service continued to be available as local markets were opened to competition.

[4]  Because the Incumbent Local Exchange Carriers (ILECs) basic rates were set based upon an average between high and low cost areas, including profitable and less-profitable areas, basic residential rates in High-Cost areas were internally subsidized by revenues from more profitable exchanges, subsidies between product lines, and from other sources of revenues.  (*See* D.95-07-050; 60 CPUC2d, 536, 546.)

- 3 -

Exhibit B
58

R.09-06-019  COM/MP1/gd2/lil

prices is Universal Lifeline Telephone Service.[5]  Any carrier that seeks Lifeline support even if they are not a COLR, must offer the basic service elements as specified in Appendix A.  Our revised definition adopted in Appendix A shall apply to Lifeline service as a starting point subject to further analysis and possible refinements that the Commission may consider in the Lifeline Rulemaking (R.) 11-03-013.  Some households that qualify for Lifeline discounts may need telephone service that differs in important respects from the basic service elements in Appendix A.  We thus find it in the public interest to provide additional flexibility in the manner in which carriers must provide basic service to qualify to receive support for discounted Lifeline services.  The Commission may add, subtract, or refine the elements a California Lifeline Service Provider is required to offer its California Lifeline subscribers in the Lifeline proceeding (R.11-03-013), depending on the record developed therein.  Our intent in this regard is to provide low-income customers with a broader range of flexibility for discounted Lifeline options, consistent with their Lifeline service needs and appropriate consumer protections.

A comprehensive definition of "basic telephone service" was last adopted in D.96-10-066.  Pursuant to Pub. Util. Code § 1708, by ruling dated May 28, 2008, parties in R.06-06-028 were served notice with opportunity to comment that basic service definitions in D.96-10-066 may be modified.[6]

---

[5]  The Lifeline program was established in 1984 (D.84-11-028) to comply with the Moore Universal Telephone Service Act, Pub. Util. Code §§ 871-884 as a means to provide affordable basic residential telephone service to low-income households.

[6]  Pub. Util. Code § 1708 states:  "The commission may at any time, upon notice to the parties, and with opportunity to be heard as provided in the case of complaints, rescind, alter, or amend any order or decision made by it.  Any order rescinding, altering, or amending a prior order or decision shall, when served upon the parties, have the same effect as an original order or decision."

- 4 -

Exhibit B

R.09-06-019  COM/MP1/gd2/lil

The definition of basic service was established in the mid-1990s, and has not been updated until now.  When the Commission last adopted a basic service definition, competition within the wireline local exchange market had not yet fully commenced.  Wireless service subscriptions were still nascent, and VoIP services were not readily available to residential consumers.  The definition adopted in D.96-10-066 was based on wireline exchange technology offered by the large ILECs,[7] the small regional Local Exchange Carriers (LECs),[8] and competitive local exchange carriers (CLECs).[9]

Today's decision updates the basic service definition, recognizing the increasing diversity of choices among communications technologies since the 1990s.  Our updated definition is designed to promote competition by technological neutrality while preserving the essential consumer protections.

The Consumer Bill of Rights, adopted in GO 168, asserts that consumers have a right to receive clear and complete information about all material terms and conditions, such as material limitations, for products and service plans they select or for which they request information.  It also provides that consumers have a right to clear and complete disclosure of material limitations on access to 911 emergency services.

We recognize that many factors may affect a customer's ability to make and receive voice connections when utilizing wireless devices, as discussed in

---

[7]  An ILEC is a local telephone corporation that was the exclusive certificated local telephone service provider in a franchise territory established before the federal Telecommunications Act of 1996 and is now regulated under the Uniform Regulatory Framework, as established in D.06-08-030.  (*See* Pub. Util. Code §§ 234 and 1001.)

[8]  The Commission regulates the small regional LECs through cost-of-service reviews as required by General Order (GO) 96-B.

[9]  The Commission regulates CLECs under rules established in R.95-04-043/I.95-04-044.

- 5 -

R.09-06-019  COM/MP1/gd2/lil

Section 4.1 below.  Other factors that may affect a customer's ability to make and receive voice connections, regardless of technology, include natural disasters such as hurricanes, floods, and fires; or security breaches of the communications or electrical infrastructure.

To ensure that customers can make fully informed choices regarding the communications services that best meet their needs, with full knowledge of the tradeoffs among the benefits and limitations of different communications technologies, we require all companies offering basic service to provide customers and potential customers with information regarding 911 reliability and accuracy, as well as clear and conspicuous disclosures of the capabilities and material limitations in service coverage, service availability, and service quality. These information disclosures must be offered in a form that is readily accessible and available to existing and prospective customers.  The disclosures must be of sufficient clarity and detail to enable customers to make an informed choice as to whether the service coverage, availability, reliability, and quality being offered is sufficient and suitable to meet the customer's expectations and needs.

To help achieve our goal of promoting informed consumer choice, we also direct the Communications Division to insure that the marketing for the California Lifeline program include information and educational materials explaining the capabilities and limitations of the communications technologies that Lifeline supports.  These materials should reference Consumer Affairs Branch complaint data wherever possible.

## 2.   Procedural Background

This rulemaking (successor to Rulemaking (R.) 06-06-028) was instituted to reform the California High Cost Fund-B program (CHCF-B or B-Fund) program. This phase of the proceeding focuses on basic telephone service revisions on a

Exhibit B

61

R.09-06-019  COM/MP1/gd2/lil

Communications Company of California.  Comments were also filed by the small regional LECs and by parties representing other carriers' interests including Sprint Nextel, Time Warner Telecom of California, L.P, the California Cable and Telecommunications Association, Cox California Telecom LLC (Cox), Omnipoint Communications, Inc. (d/b/a T-Mobile), and Cricket Wireless.

Comments representing consumers' perspectives have been filed by the Division of Ratepayer Advocates (DRA), and jointly by The Utility Reform Network (TURN), Disability Rights Advocates, and the National Consumer Law Center.

### 3.    Overview of Revisions to Basic Service Definition

Based on the comprehensive record, we hereby adopt the revised definition of residential basic telephone service set forth in Appendix A of this decision.  In revising the definition, we also consolidate the existing elements into a more concise listing.[12]  To the extent a carrier offers basic service, it must be offered on a nondiscriminatory basis to all residential households within the service provider's defined service territory.

In keeping with the essential nature of basic service, we require that all basic service providers must file and maintain tariffs or schedules with the Commission by a Tier 2 Advice Letter for its basic service offerings which must include its basic service rates, charges, terms, and conditions; and must make them publicly available.  If a carrier chooses to offer basic service in all or part of its service territory using multiple, different technologies, each type of offering

---

[12]  For ease of comparison between the service elements defined in D.96-10-066 and the revised list adopted in this decision, we provide a cross-reference of the prior and current elements by description and number in Appendix B of this decision.

- 10 -

R.09-06-019  COM/MP1/gd2/lil

must be tariffed or scheduled with the Commission.  This requirement does not extend beyond basic service.

Each basic service provider must clearly inform all potential residential subscribers who contact the provider of their option to purchase basic service prior to initiating service.  A provider must not represent to customers, or in advertising or by any other means, that any services, service elements, or service conditions, except those authorized by the Commission, constitute basic service in California.  Carriers providing basic service must offer an option with monthly rates and without contract or early termination penalties.

Although basic service offerings must include the elements set forth in Appendix A, a carrier may elect also to offer added features and/or enhanced service elements without additional charge(s) as part of a basic service offering. The basic service provider must not, however, obligate the customer to subscribe to service bundles that require subscribing to video and or data services, as a condition of receiving basic telephone service.  There is no restriction on offering customers such bundled service packages, provided that the customer is offered the option of subscribing to telecommunications services without being forced also to subscribe to bundled video or data services.

While carriers may offer basic service in conjunction with larger or enhanced service bundles, the carrier must not represent that any such additional services constitute "basic service" as defined by the Commission.  At a minimum the service elements in the following section must be offered by any telephone corporation providing basic service within California.  These revised basic service elements do not impose an obligation to provide basic service upon any carrier where no such obligation exists today.  Nor do they prohibit a carrier from electing to provide additional elements as part of its basic service offering.

- 11 -

Exhibit B

63

R.09-06-019  COM/MP1/gd2/lil

Any carrier may use any technology to satisfy any obligation to provide basic service as detailed below.

As a framework for adopting basic service revisions, we apply guiding principles and criteria designed to:

a. Consolidate and streamline existing listings of service elements.

b. Apply technology-neutral terminology and definitions.

c. Preserve standards necessary to meet essential universal service needs while not degrading existing basic service or standards.

An appropriate definition of basic telecommunications service is fundamental in supporting the Commission's goal of universal service, grounded in essential consumer protections providing:

- a minimum level of telecommunications services available to virtually everyone in the state, i.e., there is ubiquitous presence of telecommunications services throughout the state, and

- that the rates for such services remain reasonable.

Consistent with our universal service goals, we previously defined basic service as consisting of those communications needs essential for participation in modern society.  In D.95-07-050, we characterized basic service as the minimum level of service that consumers had come to expect, or services that are essential to all residential telephone customers.  A provider can always offer more than what the basic service definition provides.  (60 CPUC2d, 536, 549).

Our revised definition continues to uphold these same guiding principles, preserving essential consumer protections while also being flexible to accommodate evolving marketplace technologies and differences in how basic service may be offered.  The revised definition focuses on meeting the end-user

- 12 -

R.09-06-019  COM/MP1/gd2/lil

customer's service needs rather than the specific technology used to provide it. Setting an appropriate definition thus requires a balanced approach, as noted in D.96-10-066:

> If the service definition is too narrowly drawn, some service elements that may be essential for participation in society may only be enjoyed by those who can afford it.  Or, certain urban areas of the state may enjoy some essential service elements that customers in more rural areas may not have.  In balancing what services elements should be included in the definition of basic service, the Commission must also be cognizant of the extra cost. If too broad of a definition is adopted, consumers may end up paying for services that they do not need or want.[13]

Although communications technologies and regulatory rules have evolved since 1996, consumers are still entitled to basic service elements essential for their participation in society.  Different modes of technology may accommodate variations in how basic service is provided.  A definition designed to be technologically and competitively neutral, however, does not require that all modes of technology provide basic service in identical fashion.  The adopted definition must be broad enough to accommodate variations in service features and billing arrangements.  As technology and network architecture varies, the trade-offs of competing basic service options may also vary.  At the same time, a technology-neutral definition does not mean settling for the lowest common denominator of service standards.  Allowing such degradation in standards would undermine principles of universal service.  Essential basic needs, particularly among the most vulnerable segments of the customer base (e.g., the elderly, those with disabilities, low-income segments, etc.) must continue to be met consistent with the Commission's universal service policies.

---

[13]  68 CPUC2d; 542, 549.

Exhibit B

65

R.09-06-019  COM/MP1/gd2/lil

Various parties argue that changes in technology and consumer behavior since the mid-1990s warrant eliminating service elements previously deemed essential for participation in society.  To evaluate this argument, we consider the relevant data relating to the contemporary essential needs of consumers.  Parties representing industry interests point to increasing numbers of consumers abandoning landline in favor of other communications technology alternatives, particularly wireless.  Such parties infer that this trend toward use of wireless as a primary or sole source of communications indicates that residential consumers, in general, no longer require many currently available basic service elements.

Based on the growing use of wireless or broadband technologies, various carriers thus argue that existing basic service standards should no longer be required nor imposed.  Verizon, for example, points to the diversity of products offered by wireless service in addition to mobility, including voice mail, texting and smart phones that provide broadband connectivity allowing music, video and other valued applications.

Verizon's recitation, however, blurs relevant distinctions between basic essentials and more diverse service options.  We recognize that modern communication preferences and expectations among consumers reflect a diverse spectrum.  The growing demand for this broader diversity of communications services is separate and distinct from the continuing need for essential basic service elements upon which a significant sector of consumers rely.  The growing demand for music and video communications does not eliminate the need for basic service elements among those who rely upon them.

Likewise, the statistics showing increasing numbers of customers migrating toward wireless service does not negate the importance of existing basic service features for the majority of consumers.  The relevant data source for

- 14 -

R.09-06-019  COM/MP1/gd2/lil

identifying basic service needs is the 95% share of residential market penetration that represents the Commission's universal service goal.  By contrast, less than 50% of California consumers have chosen to discontinue wireline service.  While a growing number of consumers may be willing to give up some basic service elements in favor of current wireless offerings, this minority does not determine the preferences or needs of customers that continue to rely upon basic service.

The principles of universal service extend to all segments of the public, not just the technologically sophisticated whose calling needs may be met by wireless or other alternative technologies.  In particular, many among the elderly, disabled, economically disadvantaged, or non-English-speaking sectors may exhibit different needs compared to younger, technologically sophisticated, or more affluent sectors.  As expressed by speakers at the PPHs held during March 2011, more vulnerable sectors of the public are not prepared or equipped to forfeit current protections offered through wireline basic service.  Also, consumers in urban settings with multiple telecommunications choices face different constraints compared with those residing in rural or remote regions with fewer or only one choice of provider for basic service.

For many, the choice is not an either-or alternative between wireline versus wireless.  Most Californian consumers today own both a wireline and a wireless phone.  Wireline and wireless services may be complementary rather than complete substitutes for each other.

As noted in the Federal Communications Commission's (FCC) report on wireless markets for the first half of 2009, 22.7% of households were wireless only, up from 17.5% a year earlier, and 13.6% a year before that.  Also, as noted in the CPUC Staff Report on Affordability of Telephone Service, on a statewide basis, of the households subscribing to landline, 24% of the households are

- 15 -

R.09-06-019  COM/MP1/gd2/lil

landline only, and 76% subscribe to both landline and wireless.  In CHCF-B areas only 13% of households rely solely on landline and 87% of households subscribe to both landline and wireless services.  Similarly, statewide Lifeline subscribers rely upon landline only service more so than those in CHCF-B areas.  Of the statewide survey households subscribing to LifeLine, 49% have wireless, while 83% of the non-LifeLine customers have wireless.

These statistics signify that while a majority of the consuming public utilizes wireless communications, most wireless customers still concurrently subscribe to basic service.  Consequently, these statistics indicate that most customers still value features currently available through wireline basic service that may not otherwise be available through a current wireless service plan.  Accordingly, while these statistics indicate a growing use of wireless, current wireless service plans — without wireline at least as a back up — are still not exclusively meeting most consumers' basic service needs.  The protections offered by basic service as set forth in Appendix A thus remain essential in meeting universal service goals.

Certain parties characterize as outdated or "legacy Incumbent Local Exchange Carriers (ILEC)-centric" a definition of basic service that retains the existing elements in the definition.  The essential principle that guides any revisions in the definition does not depend on whether the service is provisioned by an ILEC or another technology.  The relevant factor is what a consumer needs today in terms of essential service features in today's competitive marketplace irrespective of network architecture or technology.  Although the essential basic service protections have traditionally been offered principally by the ILEC through wireline circuit-switched technology, the type of the network architecture used is not the determining factor in defining basic service needs.

- 16 -

Exhibit B

68

R.09-06-019  COM/MP1/gd2/lil

Even with the current limitations in participation in the B-Fund and Lifeline programs, the market is still providing customers with a growing array of communications technologies through different types of service options. Adopting the revised basic service definition set forth herein will not diminish the growing array of alternative service and technology options that are available.  Even to the extent that competitive providers choose not to meet the requirements for basic service, they retain the same competitive opportunities currently available in offering an array of consumer choices.

Certain parties argue that the basic service definition should be revised to conform to FCC universal service requirements.  We conclude that it would be inappropriate to simply adopt the FCC-jurisdictional definitions for purposes of our updated basic service definition.  The FCC definitions as presented in parties' comments lack sufficient detail or clarity to apply for our purposes here without further elaboration.  Moreover, parties' proposal relied upon FCC service element definitions that have since been revised.

Relying on the FCC's definition as presented in parties' comments would still require this Commission to fill in the details associated with what many of the FCC's components would mean for a Carrier of Last Resort (COLR).

In any event, we choose to address the merits of each service element rather than simply discarding the entire definition and replacing it with one from a federal agency that was developed under different circumstances and for different purposes.  We address each element of basic service in the following section.

### 4.   Revised Basic Service Requirements

The updated residential basic telephone service elements adopted by this decision, and as further elaborated in Appendix A, are listed below:

- 17 -

Exhibit B

69

R.09-06-019 COM/MP1/gd2/lil

1. The ability to place and receive voice-grade calls over all distances utilizing the public switched telephone network or its successor network;

2. Free Access to 911/Enhanced 911 service;

3. Billing provisions: flat rate options for unlimited incoming and outgoing calls, and California Lifeline rates and charges for eligible customers;

4. Directory services: access to directory assistance within the customer's local community; options for listed or unlisted directory listings; and options for free white pages telephone directory;

5. Access to 800 and 8YY toll-free services;

6. Access to telephone relay service as provided in Pub. Util. Code Section 2881;

7. Access to customer service information about Universal Lifeline Telephone Service, service activation, termination, and repair, and bill inquiries;

8. One-time free blocking for information services and one-time billing adjustments for charges incurred inadvertently, mistakenly, or without authorization; and

9. Access to operator services.

**4.1. Ability to Place and Receive Voice-grade Calls over all Distances Utilizing the Public Switched Telephone Network or Successor Network**

As the first revised element of basic service, we consolidate the following separate existing service elements:

-- Access to single-party local exchange service

-- Equal access to interexchange carriers

-- Ability to place calls

-- Voice-grade connection to the public switched telephone network or its successor network

-- Provision of touch-tone dialing

- 18 -

R.09-06-019  COM/MP1/gd2/lil

These elements are replaced with the following summary requirement, as further specified in Appendix A, that:

> The provider must offer customers the ability to place and receive voice-grade calls within a local exchange or an equivalent or larger-sized local calling area utilizing the public telephone network.

The existing five elements listed above, taken together, define customers' ability to send and receive voice calls both locally and by longer distance.  The revised requirement consolidates these separate existing basic service elements on a technology-neutral basis.

The restated definition replaces language requiring access to "single party local exchange" service which relates to wireline network architecture and geographically-based exchange boundaries.

The existing service elements describe wireline network technology, but do not reflect how other technologies may offer two-way voice service.  Non-wireline carriers may have different local calling boundaries or, in the case of wireless, no geographically limited calling boundaries at all.  Wireless networks are not designed for interexchange access requirements that apply to wireline networks.  Many wireless plans include nationwide long distance, encouraging customers to use the same network for local and longer distance calling.  Wireless and Voice over Internet Protocol (VoIP) carriers typically combine local and long distance.  For some customers, the benefits of such combined service from a single carrier may outweigh access to multiple carriers for only one segment (i.e. interexchange) of their telecommunications needs.

This revised element does not entail any change to the flat rate billing practices that existing wireline basic service providers currently use.  Existing basic service customers will retain their ability to make calls within their local

- 19 -

R.09-06-019  COM/MP1/gd2/lil

community as they currently do.  (We address the revised flat rate requirement in detail below.)  At the same time, wireless or other non-ILEC providers that seek to offer basic service will not be required to conform to wireline exchange-based network architecture.

The existing basic service definition also requires that customers be given access to interexchange carriers serving in the local exchange regions.  This interexchange access provides customers with the ability to make and receive calls over longer distances, even though the basic service focus is on the local community in which the customer resides.  Where basic service is offered by a wireline provider, customers will continue to be able to access interexchange carriers offering service within the local exchange.  Customers can thereby access a pre-subscribed long distance carrier.  Wireline carriers offering basic service will remain subject to applicable federal law requiring access to the customer's presubscribed long distance carrier using 1+ dialing.

The revised definition can be satisfied by wireless service providers that do not have legal obligations to provide interexchange access.  Unlike traditional wireline carriers; wireless and VoIP providers often have calling plans and network designs that do not necessarily distinguish between local, intrastate toll, or interstate toll calling; they may not have networks currently capable of providing equal access to interexchange carriers.  By making wireless and other intermodal carriers subject to the revised definition above, however, they can satisfy basic service requirements, without being subject to the requirement to provide access to presubscribed long distance carriers.

The revised definition therefore requires that the basic service carrier provide the customer with a voice-grade connection from the customer residence

- 20 -

Exhibit B

72

R.09-06-019  COM/MP1/gd2/lil

to the public switched telephone network or its successor network.  Basic service customers have come to rely on dependable voice-grade transmissions.[14]

We recognize that there are many factors that may impact a wireless customer's ability to make and receive calls, including but not limited to the building materials used to construct the customer's residence; where the customer is in the house (e.g., in the basement or attic); amount and stature of surrounding vegetation; weather; call volume within the network cell at the time the call is attempted; potential sources of interference; and the type of phone used by the customer.  These limitations, however, would not necessarily prevent a basic service customer from receiving a voice-grade connection from the customer's residence to the public switched telephone network or its successor network.

Carriers offering basic service must disclose to each customer before subscription that they are entitled to a voice-grade connection and the conditions under which the customer may terminate service without penalty if one cannot be provided.  If at any time, a basic service customer fails to receive a voice-grade connection to the residence and notifies the provider, the basic service provider is required to (1) restore the voice grade connection, or if not possible; (2) provide basic service to that customer using a different technology if offered by the provider and if the customer agrees; or (3) allow the customer to discontinue service without incurring early termination fees, if applicable.[15]

We disagree with parties' claims that customers do not require a voice-grade connection within their homes as long as they have access to the

---

[14] Current voice data quality on an Internet Protocol (IP) network may be sensitive to degradation in the form of latency, jitter, and packet loss.

[15] Nothing in these rules should be inferred as modifying the service obligations of a COLR to ensure continuity of customers' basic service.

- 21 -

Exhibit B

73

R.09-06-019  COM/MP1/gd2/lil

mobility advantage offered by wireless.  This argument ignores the essential nature of basic service as a residentially-based service.  While we recognize that wireless phones offer mobility advantages, those advantages do not negate the essential basic service need to be able to communicate within the customer's own residence.

Providing customers with the above-referenced options in the event of a loss of voice-grade connection will offer some degree of protection to customers.  We recognize, however, that additional questions must be resolved in order to protect customers' rights to maintain a voice-grade connection in the case of COLR service where the option to switch to a different basic service provider may not be available to the customer.  We shall address these additional issues in a separate proceeding to be instituted at a later date to address relevant service quality issues relating to COLR service.

We remove explicit reference to touch tone dialing, otherwise known as Dual Tone Multi Frequency signaling.  This feature is implied in the requirement to provide the ability to send and receive calls over the public telephone network.

### 4.2.    Provision of Free and Unlimited Access to Emergency Services

The basic service definition currently requires that customers be provided free and unlimited access to emergency 911/E911 services.  Access to emergency services is essential to all consumers.  Accordingly, the existing basic service standards and requirements for 911/E911 service access shall continue to apply.

Some additional clarification of the definition is necessary, however, to recognize the applicability of this service element to providers utilizing wireless or other alternative technologies.  As various parties observe, although wireless

- 22 -

Exhibit B
74

R.09-06-019  COM/MP1/gd2/lil

and other alternative technology providers are required by law to offer free access to emergency 911/E911, the technology and call routing protocols used to provide emergency access differs from those used by traditional wireline providers.

For purposes of the basic service definition, we recognize that carriers can utilize different technologies and procedures to provide emergency 911/E911 access.  We do not dictate the use of any particular technology or network design for the purpose of satisfying the basic service requirement for 911/E911 access, but recognize that a carrier must comply with applicable state and federal laws pertaining to 911/E911 access.[16]

Any carrier that is not a traditional wireline provider of basic service will be required to make a showing by filing a Tier 3 Advice Letter[17] that demonstrates its capability to provide 911/E911 that at a minimum provides location accuracy and reliability that is at least reasonably comparable but not necessarily identical to that offered by the existing COLR.  Although we are requiring the 911 and service quality filings referred to in Ordering Paragraph (OP) 5 and Appendix A and elsewhere in this Decision to initially be filed as Tier 3 Advice Letters, once the necessary rules and guidelines are established through an approved Resolution, carriers will be allowed to file Tier 2 Advice Letters for

---

[16] Public Utilities Code Section 2891 sets forth the requirements for wireless carriers to "provide access to the local emergency telephone systems described in the Warren-911-Emergency Assistance Act (Article 6 (commencing with Section 53100) of Chapter 1of Part 1 of Division 2 of Title 5 of the Government Code) . . . in accordance with all Federal Communications Commission orders." Applicable FCC orders include Wireless 911 Location Accuracy Requirements, 26 FCC Rcd 10074 (FCC 2011).

[17] If a Tier 2 advice letter has not been suspended by staff by the end of a 30-day review period, it is deemed approved.  The Commission has discretion to review further, where deemed warranted.  A Tier 3 Advice Letter is effective only after Commission approval.

- 23 -

R.09-06-019  COM/MP1/gd2/lil

technologically similar modes for delivering basic service.  The basic service provider will further be required to certify in the above mentioned Advice Letter that it is compliant with 911/E911 standards established by federal law and regulations, and will not be deemed to provide basic service if it has obtained a waiver from such federal laws and regulations.  Each basic service provider must provide its potential and existing customers information regarding its 911/E911 location accuracy and reliability standards.

### 4.3.    Billing Provisions

The basic service elements currently include the following billing affordability provisions:

-- Provision of Lifeline Rates to Eligible Customers
-- Customer Choice of flat rate or measured service for local calls
-- Provision for "free" unlimited incoming calls

We shall incorporate these elements into one consolidated requirement to provide billing affordability protections in the form of (a) Lifeline rates to eligible customers, (b) a flat rate option for unlimited outgoing calling, and (c) unlimited incoming calls at no additional per-call or per-minute charge.  We address each of these three component elements below.

### 4.3.1.    Lifeline Rates to Eligible Customers

We retain the basic service requirement to offer Universal Lifeline Telephone Service rates and charges to all eligible basic service customers pursuant to the Moore Universal Telephone Service Act (Lifeline Program).  Traditionally, the Lifeline rate is determined as a discount from the otherwise applicable stand-alone basic service rate.  The manner in which the Lifeline rate will be calculated and applied is addressed in R.11-03-013 (successor to R.06-05-028).

- 24 -

R.09-06-019  COM/MP1/gd2/lil

## APPENDIX A

### Basic Telecommunications Service Elements

At a minimum, the following service elements must be offered on a nondiscriminatory basis by any carrier providing Residential Basic Telephone Service (basic service) within California.  These revised basic service elements do not impose an obligation to provide basic service upon any carrier where no such obligation exists today.  Nor do they prohibit a carrier from electing to provide additional elements as part of its basic service offering.  Any carrier may use any technology to satisfy any obligation to provide basic service as detailed below:

### I. Basic Service Elements:

1. The provider must offer customers the ability to place and receive voice-grade calls over all distances utilizing the public switched telephone network or successor network.

   a. Carriers offering basic service must at a minimum enable calls to be sent and received within a local exchange or over an equivalent or larger-sized local calling area.

   b. A basic service provider must allow equal access to all interexchange carriers within the local calling area in accordance with state and federal law and regulation.

   c. Carriers offering basic service must provide a voice-grade connection from the customer residence to the public switched telephone network or successor network.

   d. Carriers offering basic service must disclose to each customer before subscription that they are entitled to a voice-grade connection and the conditions under which the customer may terminate service without penalty if one cannot be provided.

   e. If at any time, a basic service customer fails to receive a voice-grade connection to the residence and notifies the provider, the basic service provider is required to (1) promptly restore the voice-grade connection, or if not

- 1 -

Exhibit B

77

R.09-06-019 COM/MP1/gd2/lil

possible (2) provide basic service to that customer using a different technology if offered by the provider and if the customer agrees; or (3) allow the customer to discontinue service without incurring early termination fees, if applicable. Nothing in these rules should be inferred as modifying the service obligation of a COLR to ensure continuity of customers' basic service.

2. Free access to 911/Enhanced (E) 911 service.

   (a) A basic service provider must provide free access to 911/E911 emergency services, in compliance with current state and federal laws and regulations.

   (b) Any carrier that is not a traditional wireline provider of basic service will be required to make a showing by filing a Tier 3 Advice Letter that demonstrates its ability to provide 911/E911 location accuracy and reliability that is at a minimum at least reasonably comparable, but not necessarily identical to, that traditional wireline service offered by the existing COLR.

   (c) The basic service provider will further be required to certify in a Tier 3 Advice Letter filing that it is compliant with 911/E911 standards established by state and federal laws and regulations, and will not be deemed to provide basic service if it has obtained a waiver from such state and federal laws and regulations.

   (d) Each basic service provider must provide its potential and existing customers information regarding its 911/E911 emergency services location accuracy and reliability standards.

- 2 -

Exhibit B

78

R.09-06-019  COM/MP1/gd2/lil

3. Access to directory services.

(a) Each basic service provider must offer access to directory assistance within the customer's local community that covers an area at least equivalent to the size of the geographic area the existing COLR's directory assistance service provides.

(b) For basic service provided by other than a traditional wireline carrier, a customer's listing may be excluded from the local directory and directory assistance as a default unless the subscriber affirmatively requests to have the number listed.

(c) For basic service provided by a traditional wireline carrier, a customer's listing shall be included for free in the local directory and directory assistance as a default unless the customer affirmatively requests to have the number unlisted.

(d) A basic service provider must provide customers the option to receive a free white pages directory covering the local community in which the customer resides.  For purposes of this definition, the local community shall include a geographic region at least equivalent to the area covered by the white pages directory that the existing COLR currently provides.

(e) Because Verizon California, Inc. (Verizon) and other providers of basic service to customers residing in Verizon's service territory have been authorized to provide electronic delivery pursuant to Resolution T-17302, that authorization is compliant with the white pages directory requirement for basic service in Verizon's territory.

- 3 -

Exhibit B

79

R.09-06-019  COM/MP1/gd2/lil

(f)   The requirement to provide a free published directory can be satisfied using the procedures authorized in Resolution T-17302 in other territories upon the filing of a Tier 2 Advice Letter.  Under this authorization, the affected customers will receive delivery of the directory electronically by CD-ROM or by on-line access, unless a customer affirmatively elects to receive a traditional printed paper copy by contacting the basic service provider under the procedures authorized in Resolution T-17302.

4.  Billing Provisions

(a)   Providers of basic service must offer customers the option to receive unlimited incoming calls without incurring a per-minute or per-call charge.

(b)   Carriers offering basic service must offer a flat rate option for unlimited outgoing calls that at a minimum mirrors the local exchange or an equivalent or larger sized local calling area in which the basic service customer resides.

(c)   Basic service must be offered on a non-disriminatory basis to all residential households within the provider's service territory.  A carrier may satisfy this obligation using different technologies throughout its service territory.

(d)   Basic service providers must offer Lifeline rates on a non-discriminatory basis to any customers meeting Lifeline eligibility requirements residing within the service territory where the provider offers basic service.

(e)   Carriers providing basic service must offer an option with monthly rates and without contract or early termination penalties.

(f)   Carriers may offer added features and/or enhanced serve elements without additional charge(s) as part of a basic service offering.  For example, carriers must not obligate customers to also subscribe to service bundles that require subscription to data and/or video services as a condition of receiving basic service.

(g)   As of January 1, 2011, the Commission no longer imposes caps on basic rates.  A COLR serving in a high-cost area,

- 4 -

Exhibit B

80

R.09-06-019  COM/MP1/gd2/lil

> however, will continue to be required to certify that its basic rate in a designated high-cost area does not exceed 150% of the highest basic rate charged by a COLR in California outside of the high-cost area.

5. Access to 800 and 8YY Toll-Free Services.

   (a.) Each provider of basic service must offer at least one basic service option that allows unlimited calls to 800 and 8YY toll-free numbers with no additional usage charges for such calls.  A provider may offer alternative billing plans for basic service that may include usage charges for calls to 800 and 8YY toll-free numbers.

   (b) In any event, the carrier must provide full disclosure to the customer concerning how charges for 800 numbers would apply if the customer does not subscribe to an unlimited calling flat rate option.

6. Access to Telephone Relay Service as Provided for in Pub. Util. Code § 2881.

   Basic service providers must offer free access to California Relay Service pursuant to § 2881 for deaf or hearing-impaired persons or individuals with speech disabilities.

7. Free Access to Customer Service for Information about Universal Lifeline Telephone Service (ULTS) Service Activation, Service Termination, Service Repair and Bill Inquiries.

   The basic service provider shall provide free access to customer service for information about the above-referenced services.

8. One-Time Free Blocking for Information Services, and One-Time Billing Adjustments for Charges Incurred Inadvertently, Mistakenly, or Without Authorization.

   Basic service must include the provision of one-time free blocking for 900/976 information services and one-time free billing adjustments for changes inadvertently or mistakenly incurred, or without authorization.

9. Access to operator services

   Basic service shall include free access to operator services.

- 5 -

Exhibit B

81

R.09-06-019  COM/MP1/gd2/lil

## II. General Requirements

In addition to the basic service elements and related requirements listed above, basic service shall be provided consistent with the following requirements.

a) A basic service provider must file and maintain tariffs or schedules with the Commission by a Tier 2 Advice Letter for its basic service offerings which must include its basic service rates, charges, terms, and conditions; and must make them publicly available.  Requirements for customer notice and/or Commission filings for revisions in basic service rates, charges, terms, and/or conditions must be made in accordance with the applicable requirements for tariff filings set forth in General Order 96-B.

b) If a carrier chooses to offer basic service in all or part of its service territory using multiple, different technologies, each type of offering must be tariffed or scheduled with the Commission. This requirement does not extend beyond basic service.

c) Each basic service provider must clearly inform all potential residential subscribers who contact the provider prior to initiating service of their option to purchase basic service and to subscribe to basic service on a month-to-month basis with no termed contracts.

d) A provider must not represent to customers, or in advertising or by any other means, that any services, service elements, or service conditions, except those authorized by the Commission, constitute basic service in California.

e) Until the Commission determines the extent to which new service quality standards should be adopted for carriers, a provider that wishes to offer basic service utilizing anything other than traditional exchange-based wireline technology that cannot comply with all the requirements of General Order 133-C must file a Tier 3 advice letter.

Exhibit B

82

R.09-06-019  COM/MP1/gd2/lil

   f)  This filing must indicate what General Order 133-C service quality measurements and reporting procedures it can comply with, those it can provide functionally equivalent reporting information for and lastly what measurement and reporting requirements are not applicable to the technology it is using to provide basic service.  This filing must further indicate how the new service or new technology maintains essential basic services or standards.

**(END OF APPENDIX A)**

Exhibit B

83

# EXHIBIT C

COM/CRC/mto

**Date of Issuance 11/13/2008**

Decision 08-11-033  November 6, 2008

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Rulemaking Regarding Whether to Adopt, Amend, or Repeal Regulations Governing the Retirement by Incumbent Local Exchange Carriers of Copper Loops and Related Facilities Used to Provide Telecommunications Services. | Rulemaking 08-01-005 (Filed January 10, 2008) |

**DECISION ADOPTING PROCESS GOVERNING RETIREMENT BY INCUMBENT LOCAL EXCHANGE CARRIERS OF COPPER LOOPS AND RELATED FACILITIES USED TO PROVIDE TELECOMMUNICATIONS SERVICES**

## 1.  Summary

The Commission declines to adopt CALTEL's proposed rules requiring California's incumbent local exchange carriers to seek this Commission's permission before permanently retiring copper wire local loops from the telephone network.[1]  We find that the party requesting such rules, the California Association of Competitive Telecommunications Companies (CALTEL), has not

---

[1] For the purposes of this proceeding, we define copper retirement as the replacement of copper loops or copper subloops with fiber to the home or fiber to the curb loops, as referred to in the Federal Communications Commission's *Triennial Review Order* and in 47 C.F.R. § 51.333(b)(2).  *See also Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers; Implementation of the Local Competition Provisions of the Telecommunications Act of 1996; Development of Wireline Services Offering Advanced Telecommunications Capability,* 18 FCC Rcd 16978 (2003) (*TRO*) at ¶ 281.

360008

- 1 -

Exhibit C
85

R.08-01-005  COM/CRC/mto

demonstrated a current need for action by this Commission.  We also believe that the rules proposed by CALTEL will discourage and delay fiber systems from being built in California, contrary to clear state legislative direction to bring affordable and widespread high quality communications services to all Californians.  We therefore decline to adopt the proposed CALTEL rules at this time; however, as discussed below, we do establish a notice and negotiation process at the state level for the incumbent local exchange carriers (ILECs) to comply with when retiring copper loops.

We find that CALTEL has not demonstrated any current harm that necessitates the issuance of its proposed rules.[2]  The record of this proceeding contains no evidence showing that the installation of facilities to replace the copper network by ILECs has resulted in adverse impacts to consumers or competition.  However, we will require the ILECs to file *concurrently* with our Communications Division any notices of network changes that the carriers file with the Federal Communications Commission (FCC) for fiber to the home (FTTH) or fiber to the curb (FTTC) deployment that results in the retirement of copper plant.  Filing such notices with our Communications Division staff will allow this Commission to monitor ILEC copper retirement practices.  The FCC has found, and we concur, that such notices will ensure that incumbent and competitive carriers can work together to ensure the competitive LECs maintain

---

[2] We note that evidence of harm or absence of harm is not the standard for adopting rules in a quasi-legislative proceeding.  However, we have considered harm, in addition to other factors, including our pro-investment policies, in determining whether to adopt CALTEL's proposed rules.

Exhibit C

86

R.08-01-005  COM/CRC/mto

access to loop facilities.  We strongly encourage the carriers to coordinate in such instances to ensure that service to CLEC customers is not unduly disrupted.

Moreover, to facilitate negotiations to access the loop, we will require the ILEC to serve concurrently with its filing at the CPUC, notice of the copper retirement upon all CLECs that are interconnected with the ILEC, regardless of whether the CLEC is serving customers currently on the specific retiring copper loop.[3]  Within 20 days of the date that the notice of network change has been filed with the FCC, the CLEC must request, in writing, negotiations with the ILEC either to purchase the entire copper loop from the ILEC or to reach an agreement with the ILEC on price and terms and conditions for continued access to loop facilities.  The CLEC shall include in its request for negotiations the following information:

 a. Whether the CLEC seeks to purchase the copper loop, or whether the CLEC seeks only to have the ILEC maintain access to a loop;

 b. the number of current or planned customers on the copper loop;

 c. the services that the CLEC provides over the loop or plans to provide over the loop; and

 d. the number of UNEs that the CLEC currently purchases.

We will require the ILEC to enter into good faith negotiations with the CLEC for a period of 60 days either to sell the copper loop at issue at fair market

---

[3] Effectively, the ILEC shall serve its notice on CLECs and Commission Communications Division staff at the same time that it files it with the FCC.  By copper loop, we refer to the copper "transmission facility between a distribution frame (or its equivalent) in an incumbent LEC central office and the loop demarcation point at an

*Footnote continued on next page*

- 3 -

Exhibit C

87

R.08-01-005  COM/CRC/mto

value; or to reach a fair and equitable agreement with the CLEC on price and terms to ensure access to loop facilities.  A "fair and equitable" agreement for access to the copper loop should include all fair and reasonable costs incurred by the ILEC for maintaining access to the copper loop facility for the requesting party, vis-à-vis the retirement of the copper loop facility.  If a requesting party seeks to purchase the copper facility from the ILEC, the price shall be the fair market value of the copper facility to the ILEC, and all maintenance and operating costs of the copper facility thereafter shall be the responsibility of the purchasing party from the date of purchase.

## 2.  Background

Copper wiring has been used in telephone networks across the country for more than 100 years, but as fiber optic cable becomes more widely used, competitive local exchange carriers (CLECs) and consumer groups have raised questions about whether this Commission should impose rules to preserve the copper facilities in order to safeguard choices by consumers and protect competition by CLECs.

We therefore opened this rulemaking on CALTEL's petition (Petition (P.) 07-07-009) to examine:  (1) whether we should establish procedural rules that ILECs and others must follow when an ILEC intends to retire or permanently remove copper loop facilities, and if so, what the rules should be; (2) whether we should adopt substantive prohibitions or conditions on the removal of such facilities, and, if we require that the facilities be maintained, who shall pay for such maintenance; and (3) whether ILECs are permanently removing copper

---

end-user customer premises, including inside wire owned by the incumbent LEC."  *See TRO*, at n. 638.

- 4 -

Exhibit C
88

R.08-01-005  COM/CRC/mto

drops and, if so, what action we may take to ensure their replacement where a customer so requests.

In examining these issues, we specifically reviewed the extent to which ILECs that are installing fiber are removing the copper network, whether customers or ILEC competitors have been harmed by any such practice, and whether we should adopt rules to preserve the copper network for future generations.

In addition to the comments and data we received in response to P.07-07-009, we took comments in connection with this Rulemaking.  CALTEL, Integra Telecom of California, Inc. (Integra), the United States Department of Defense/Federal Executive Agencies (DOD/FEA), the Commission's Division of Ratepayer Advocates (DRA), and The Utility Reform Network (TURN) filed comments generally supporting CALTEL's proposed rules, while the ILECs – Pacific Bell Telephone Company dba AT&T California (AT&T), Verizon California Inc. (Verizon), SureWest Telephone (SureWest) and the small California ILECs[4] (Small LECs) – each filed comments, data request responses, or both in P.07-07-009 (with comments filed on August 13, 2007, August 23, 2007,

---

[4] Calaveras Telephone Company (U1004C), Cal-Ore Telephone Co. (U1006C), Ducor Telephone Company (U1007C), Foresthill Telephone Co. (U1009C), Global Valley Networks, Inc. (U1008C), Happy Valley Telephone Company (U1010C), Hornitos Telephone Company (U1011C), Kerman Telephone Company (U1012C), Pinnacles Telephone Co. (U1013C), The Ponderosa Telephone Co. (U1014C), Sierra Telephone Company, Inc. (U1016C), The Siskiyou Telephone Company (U1017C), Volcano Telephone Company (U1019C), Winterhaven Telephone Company (U1021C) ("Small LECs").

Exhibit C

89

R.08-01-005  COM/CRC/mto

and October 16, 2007, and data request responses[5] filed on October 4, 2007) and in this proceeding (with comments filed on March 14, 2008 and May 28, 2008).

We sought information from the ILECs as to whether they were permanently removing or retiring copper facilities in the "local loop," located between the ILECs' central offices and customers' homes and businesses, including the "drop" line that attaches underground or overhead telephone facilities to individual customer premises.[6]  Based on the record, it appears that Verizon is the only large ILEC whose new broadband-based network – called FiOS – consists entirely of fiber.  Thus, Verizon is the ILEC most likely to remove copper plant from its central office all the way to the home (FTTH), although its removal of copper loops to date and plans for future removal are somewhat limited, as we discuss below.

Verizon's actions to date consist of removal of approximately 40,000 copper drops, the short span between customers' premises and Verizon's poles

---

[5] The Administrative Law Judge (ALJ) issued a ruling on September 14, 2007 asking the ILECs to disclose the extent of their removal of copper facilities, how they defined retirement, the impact of such retirement, and related information.  The ILECs' responses are the data request responses referred to in text above.

[6] Rulemaking Regarding Whether to Adopt, Amend, or Repeal Regulations Governing the Retirement by Incumbent Local Exchange Carriers of Copper Loops and Related Facilities Used to Provide Telecommunications Carriers of Copper Loops and Related Facilities Used to Provide Telecommunications Services, Rulemaking (R.) 08-01-005, Order Granting Petition for Rulemaking and Instituting Rulemaking as to Whether to Adopt, Amend or Repeal Regulations Governing the Retirement by Incumbent Local Exchange Carriers of Copper Loops and Related Facilities Used to Provide Telecommunications Carriers of Copper Loops and Related Facilities Used to Provide Telecommunications Services (OIR), Appendix A, at 2 (R.08-01-005).

Exhibit C

90

R.08-01-005  COM/CRC/mto

or underground facilities.[7]  Because Verizon will replace these facilities upon customer request, Verizon contends that removal of copper drops does not constitute *permanent* removal of copper loops.  We agree that as long as Verizon continues to replace drops upon request, such action does not constitute permanent removal of the copper loop.

In contrast, AT&T's network, U-Verse, is a hybrid network of fiber and copper that will require AT&T to leave the copper portion of the network in its system.  AT&T's current network plan does not involve either an FTTH or FTTC approach; instead, it is placing fiber in the system between the central office and the remote terminal, but the copper loop from the remote terminal to the home remains in place.  Thus, AT&T asserts, it has no plans to remove the copper network in the foreseeable future.[8]

While SureWest is in the process of rebuilding its network to install fiber all the way to the home, it has no CLEC in its service territory that obtains unbundled network element (UNE) loops from SureWest using copper plant.  Thus, SureWest claims, removing its copper network will not deprive any CLEC of its right to lease UNEs on the SureWest network.

---

[7] P.07-07-009, Additional Comments and Information Request Responses of Verizon California, Inc, October 16, 2007, Attachment A, at A-2, Response to Question 3 and Question 4 (Verizon Additional Comments and Information); see also Initial Comments of The Utility Reform Network to Order Granting Petition for Rulemaking, R.08-01-005, filed March 14, 2008 (TURN Opening Comments) at 17; Reply Comments of Verizon California Inc. and Verizon West Coast Inc. on Order Instituting Rulemaking, R.08-01-005, filed May 28, 2008 (Verizon Reply Comments) at 19.

[8] Comments of AT&T on Order Granting Petition for Rulemaking, R.08-01-005, filed March 14, 2008 (*AT&T Opening Comments*) at 27.

Exhibit C
91

R.08-01-005  COM/CRC/mto

Finally, the Small LECs are not building fiber optic networks to replace copper facilities, and have no CLECs leasing their lines, so they too claim the facts do not support action in this proceeding.

We also asked CALTEL to identify any harm it had suffered as a result of the *status quo*.[9]  Neither CALTEL nor the other parties favoring CALTEL's proposed rules were able to identify any harm, or pattern of harm relevant to copper retirement, that convinces us to adopt prescriptive rules at this time. CALTEL could point to no customer of its members that had lost service, no customers who had complained, and no member companies that had lost their ability to serve customers as a result of ILEC removal of copper facilities to date. This Commission believes that extensive rules on this issue could discourage the significant investment of carriers in advanced fiber communications systems in our State, contrary to Pub. Util. Code § 709.[10]

### 3.    The Commission has Jurisdiction to Act

We find that we have jurisdiction to address the issues raised by the CALTEL petition and to establish the process we adopt here.  As an initial matter, we note that in its *Triennial Review Order* (TRO),[11] the FCC declined to

---

[9] Order Instituting Rulemaking, § 4.3 (Issues to be Considered) & Appendix A; P.07-07-009, *Administrative Law Judge's Requesting Additional Information and Noticing Prehearing Conference,* filed Sept. 14, 2007.

[10] Pub. Util. Code § 709 sets forth the Legislature's policies for telecommunications in California as, among other things, to encourage the development and deployment of new technologies and the equitable provision of services in a way that efficiently meets consumer need and encourages the ubiquitous availability of a wide choice of state-of-the-art services.

[11] Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers; Implementation of the Local Competition Provisions of the

*Footnote continued on next page*

- 8 -

Exhibit C

92

R.08-01-005  COM/CRC/mto

adopt any rules to prohibit the ILECs from retiring copper loops or subloops that they have replaced with FTTH loops.[12]  The FCC explicitly left open for state commissions "to evaluate whether retirement of copper loops complies with state legal or regulatory requirements":

> …[W]e stress that we are not preempting the ability of any state commission to evaluate an incumbent LEC's retirement of its copper loops to ensure such retirement complies with any applicable state legal or regulatory requirements.  We also stress that we are not establishing independent authority based on federal law for states to review incumbent LEC copper loop retirement policies.  We understand that many states have their own requirements related to discontinuance of service, and our rules do not override these requirements.[13]

We find that in this passage the FCC recognized this Commission's express authority to consider whether state law, rules or procedures exist or should exist to govern ILEC retirement of copper facilities.  Even if, as the ILECs contend, the state law had to pre-date the 2003 TRO decision by virtue of the FCC's use of the present tense in stating that "many states *have* their own requirements,"[14] at least two California statutes qualify.

Pub. Util. Code § 709, effective January 1, 2003, requires the Commission to facilitate the availability of broadband networks in California, as follows:

---

Telecommunications Act of 1996; Development of Wireline Services Offering Advanced Telecommunications Capability, 18 FCC Rcd 16978 (2003) (TRO).

[12] *Id*. at ¶ 281.

[13] *Id.* ¶ 284.

[14] We do not necessarily agree with the ILECs' interpretation of the FCC language as applying only to pre-existing state law, but assume that interpretation for purposes of argument.

- 9 -

Exhibit C
93

R.08-01-005  COM/CRC/mto

1) "continue our universal service commitment by assuring the continued affordability and widespread availability of high-quality telecommunications services to all Californians" (§ 709(a));

2) "encourage the development and deployment of new technologies and the equitable provision of services in a way that efficiently meets consumer need and encourages the ubiquitous availability of a wide choice of state-of-the-art services" (§ 709(c)); and

3) make efforts to "assist in bridging the `digital divide' by encouraging expanded access to state-of-the-art technologies for rural, inner-city, low-income and disabled Californians" (§ 709(d)).

The record of this proceeding demonstrates that the copper network is increasingly useful to facilitate advanced services in this state.  As Integra points out in material submitted with its comments,[15] digital subscriber line (DSL) is but one use of copper plant to facilitate broadband.  While ADSL started out with up to 1.5 megabits per second (Mbps) of capacity, ADSL2 can provide 25 Mbps/pair.  VDSL2 can provide up to 100 Mbps/pair on short loops of less than 1,000 feet, enough bandwidth to support services such as high definition television and video-on-demand.  Ethernet over copper is a relatively recent robust application (with speeds up to 20 Mbps) for California business, especially small business.  Thus, use of copper wiring for broadband purposes is one way of meeting our obligations to advance broadband deployment under § 709.  Thus, § 709 is a statute under which we have authority to act.

---

[15] Comments of Integra Telecom of California, Inc. on Order Instituting Rulemaking, R.08-01-005, dated March 14, 2008, Exhibit 1, at 8-9.

- 10 -

Exhibit C
94

R.08-01-005  COM/CRC/mto

Pub. Util. Code § 851, enacted in 1951, requires utilities to apply for Commission approval to sell, lease, assign, mortgage, or otherwise dispose of or encumber facilities that are necessary or useful in the performance of their duties to the public.  CALTEL argues that the retirement of copper loops is removal of plant that is necessary or useful and that the ILECs must obtain Commission approval regarding such retirement.[16]  AT&T argues on the other hand that Section 851 "by its own terms, does not apply to property that is no longer necessary or useful to the ILEC in the performance of the ILEC's duties to the public."[17]

Verizon argues that Pub. Util. Code § 851 does not apply to the "retirement" of copper loops, as it only applies to "transactions" such as the sale, lease, encumbrance or "disposition" of public utility property that is necessary or useful to its public service obligations.[18]  We disagree, and find that the term "otherwise dispose of" is broad enough to encompass copper loop retirements, as CALTEL asserts.[19]  *See Crum v. Mt. Shasta Power Corp.,* 220 Cal. 295, 308 (1934) (holding that a hydroelectric power company could not release excess water

---

[16] *Comments of CALTEL on Order Instituting Rulemaking, R.08-01-005,* dated March 14, 2008 (*CALTEL Opening Comments*), at 14-15.  CALTEL's argument is that Section 851 applies to the retirement of copper facilities because the facilities are an integrated part of the network that is used by the ILECs and CLECs.  CALTEL also asserts that the ILECs have a duty to serve the CLECs; and that copper facilities are used to provide wholesale services.

[17] Comments of AT&T on Order Granting Petition for Rulemaking, R.08-01-005, filed March 14, 2008 (AT&T Opening Comments) at 8.

[18] *Verizon Reply Comments*, at 29-30.  Verizon further asserts that absent a "transaction," Section 851 does not apply on its face to copper loop retirement.

- 11 -

Exhibit C
95

R.08-01-005  COM/CRC/mto

from a river to maintain the level of a pool without the prior approval of the Railroad Commission [this Commission's precursor] because the river water had been dedicated to a public purpose).  The common dictionary definition of "dispose" includes "to get rid of, or to deal with conclusively," and therefore includes retirement.[20]

However, for the following reasons, we believe that we should not require Section 851 approval for the retirement of individual copper loops.  The Commission has previously stated that "[o]ne of the fundamental purposes of Section 851 approval of the sale or transfer of utility assets is to permit the Commission to make a determination that the assets transfer will not impair the ability of the utility to provide adequate service to its customers following the transaction."[21]  Section 851 applies to plant that is "necessary or useful in the performance of the utility's duties to the public."  Pub. Util. Code § 851.  The FCC permitted ILECs to retire copper loops if they are replacing the loop with FTTH or FTTC loops; therefore, the FCC effectively relieved ILECs of the *duty* to provide the copper loop if the ILEC is actually retiring the copper facility.

We take a similar approach to the FCC's policy of permitting ILECs to retire copper loops under specific circumstances.  We note that there is not evidence of actual harm that has occurred in this State with ILEC copper

---

[19] *CALTEL Opening Comments*, filed Sept. 2, 2008, at 5.

[20] *Id.* at 3, citing Merriam Webster Online Dictionary, http://www.merriam-webster.com/dictionary/dispose.

[21] *See* D.07-03-008; D.05-09-008 (noting that "Our primary objective in reviewing the sale of utility property is to ensure that disposition or encumbrance of public utility property does not impair a utility's public service to customers").

- 12 -

Exhibit C
96

R.08-01-005  COM/CRC/mto

retirement.  Further, two statutes establish our policy to encourage the deployment of broadband networks.  Our State policy under Section 709 is to promote advanced services networks and to encourage the deployment of new technologies.  Moreover the Digital Infrastructure and Video Competition Act (DIVCA), at Pub. Util. Code § 5800 *et seq.*, establishes our State policy to "[p]romote the widespread access to the most technologically advanced cable and video services to all California communities in a nondiscriminatory manner."  Pursuant to DIVCA, the ILECs are deploying their fiber-based networks in part to support broadband and video services.  We have a legislative mandate to ensure that our policies do not deter network investment, and, instead, promote such investment.  The ILECs have asserted that maintaining copper networks along with new fiber networks would prevent them from fully deploying their fiber networks.[22]  A requirement that the ILECs seek approval for retirement of their individual copper loops may thus deter or prevent the ILECs from proceeding with their network plans.  For these reasons, we decline to interfere with the network investment plans of ILECs, by requiring Section 851 approvals for copper retirement.

Therefore, consistent with the FCC's policy in the *TRO*, and pursuant to our authority under Section 853(b), we find that it is not necessary in the public interest for ILECs to obtain Section 851 approval for the retirement of copper loops.  We thus exempt ILECs from seeking Commission approval pursuant to Section 851 of the retirement of copper loops, on the condition that the ILEC complies with obligations under FCC rules and with the notice and good faith

---

[22] See, e.g., AT&T Opening Comments at 25-26, Verizon Opening Comments at 33-34.

- 13 -

Exhibit C
97

R.08-01-005  COM/CRC/mto

negotiation provisions that we establish herein.  If there is evidence that the ILECs are engaging in anti-competitive behavior in this regard, we may revisit the issue.  As for the impact of the ILEC's retirement of copper loop on its retail customers, when retiring a copper loop, we require the ILEC to offer to its retail end-user customer the comparable service over fiber that the customer was previously receiving.

As discussed above, the Commission has jurisdiction with regard to the issues raised by CALTEL's petition.  However, we do not believe that there is adequate evidence in the record that the ILECs are unilaterally disrupting competitors' service over copper lines, or that consumers are being harmed.  The Commission has a strong interest in advancing policies that promote the widespread availability of broadband networks (including fiber deployment) to ensure global competitiveness and economic development in our State.  Thus, we decline to adopt a policy that is inconsistent with the FCC *TRO*.

- 14 -

Exhibit C

98

# EXHIBIT D

**FILED**

11/21/25

04:59 PM

R2406012

**BEFORE THE PUBLIC UTILITIES COMMISSION**

**OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Rulemaking Proceeding to Consider Changes to the Commission's Carrier of Last Resort Rules. | R. 24-06-012 |

**RESPONSE OF**

**FRONTIER CALIFORNIA INC. (U 1002 C) CITIZENS TELECOMMUNICATIONS COMPANY OF CALIFORNIA INC. DBA FRONTIER COMMUNICATIONS OF CALIFORNIA (U 1024 C) FRONTIER COMMUNICATIONS OF THE SOUTHWEST INC. (U 1026 C) ("FRONTIER")**

**TO ADMINISTRATIVE LAW JUDGE'S OCTOBER 1, 2025 RULING REGARDING COMMENTS ON TOPICS DISCUSSED AT AUGUST 22, 2025 WORKSHOP**

**PUBLIC VERSION**

Jack Stoddard
BRB Law LLP
492 9th Street, Suite 220
Oakland, CA 94607
Phone:  510-999-8430
Email:  jack@brblawgroup.com

Attorneys Frontier California Inc., Citizens Telecommunications Company of California Inc. dba Frontier Communications of California, and Frontier Communications of the Southwest Inc.

November 21, 2025

Exhibit D

100

## I.   INTRODUCTION.

Pursuant to the Administrative Law Judge's ("ALJ") Ruling Regarding Comments on Topics Discussed at August 22, 2025 Workshop, issued on October 1, 2025 (the "Ruling") and as permitted by the October 20, 2025 ALJ ruling granting three additional weeks to respond, Frontier California Inc. (U 1002 C), Citizens Telecommunications Company of California Inc. dba Frontier Communications of California (U 1024 C), and Frontier Communications of the Southwest Inc. (U 1026 C) (collectively, "Frontier") hereby address each of the questions posed in the Ruling and provide the information requested by the ALJ to the extent that it exists and is reasonably obtainable.  Frontier viewed the August 22, 2025 workshop through the California Public Utilities Commission's ("Commission") online webcast, but it was not an active participant in the event and is not necessarily familiar with all of the references and perspectives that the various workshop speakers advanced.  Frontier nevertheless offers its views and responsive information in connection with the issues raised during that workshop, as described herein.  Additionally, per the directive in the Ruling, this submission also includes Frontier's responses to the ALJ's questions from the May 19, 2025 Ruling regarding topics discussed at the April workshops.

## II.   RESPONSES TO QUESTIONS FOR PARTIES BASED ON WORKSHOP #3 (RULING, SECTION 3).

The Ruling asks parties to comment on various representations and topics presented during the August 22, 2025 workshop.  As a threshold matter, Frontier maintains that the scope of this proceeding should be limited to evaluating the extent to which any Carrier of Last Resort ("COLR") requirements should remain in place if and only if:  (1) an existing carrier with COLR obligations is the only carrier offering telecommunications services in a particular geographic area and (2) that sole provider affirmatively elects to withdraw from providing telecommunications service in that area.  New regulatory obligations should not be imposed based on the hypothetical and potential withdrawal of service by a carrier and COLR requirements should not be unilaterally or uniquely imposed on the Incumbent Local Exchange Carrier ("ILEC") that, in the contemporary market dynamic, services only a fraction of the voice communications lines in California.

Frontier's responses to the questions posed in the Ruling are presented with these

1

Exhibit D

101

perspectives in mind and are detailed below.  Where appropriate, Frontier's responses include its perspectives or disagreement with the framing of the questions, or the factual or legal assertions reflected therein.  Frontier reserves the right to address these questions in further detail in additional submissions in this proceeding.

**Federal Policy**

1.  **Panelist Harold Feld indicated that the Federal Communications Commission (FCC) has adopted "streamlined proceedings" for applications to discontinue service under Section 214 of the federal Telecommunications Act, in which "there is a very short period of time to raise objections…and if the FCC does not act to take the application off of fast track, the application is granted automatically." Was Mr. Feld's description of the FCC's Domestic Section 214 Discontinuance process accurate? Do parties wish to clarify any details? How does the FCC's Domestic Section 214 Discontinuance process impact COLR obligations? Given this process, should the Commission assume that a COLR granted relief from its obligation to provide basic service in a given area also is likely to receive FCC Section 214 "Fast Track" approval from the FCC to discontinue service in that same area? Should FCC approval be a precondition for applying for COLR withdrawal?**

**Response:**   Regarding Mr. Feld's characterization of the FCC section 214 "fast track" process, it is correct that there is an expedited approval path for applications meeting certain detailed criteria, but not all Section 214 requests are eligible for the "fast track" procedure.  Under the expedited process for discontinuance of service (not COLR relief), certain applications will be deemed approved after a 31-day review process.  Interested parties have an opportunity to respond and submit comments on Section 214 applications.

In addition, the COLR requirements are California state requirements governed by Commission decisions establishing service obligations applicable to only ILECs despite the fact that ILEC markets have been open to competition for more than two decades and ILECs serve a small fraction of voice lines in the state.  The "Section 214" process, by contrast, involves a request to discontinue a specific interstate or domestic service, relying on the standards in 47 U.S.C. Section 214 and FCC rules promulgated thereunder.  *See* 47 U.S.C. § 214; 47 C.F.R. § 63.71.  Section 214 relief is a distinct procedural mechanism and should not be treated as a precondition for COLR relief, nor should the Commission assume that a designation of COLR status would necessarily lead to a granting of Section 214 authority.  If an ILEC can demonstrate that it meets the criteria for withdrawing as a COLR, the COLR obligations should be eliminated.

Exhibit D

2

102

**Accessibility**

1. **To what extent is California Relay Service, or any other element of basic service, necessary to ensure accessibility of essential communications services, compatible with IP enabled advanced networks, Voice over Internet Protocol (VoIP), or wireless products?**

**Response:** Frontier does not provide California Relay Service ("CRS") to customers, but it provides *access* to CRS over its network by dialing the "711" code. Frontier's service is consistent with the definition of basic service which requires that COLRs provide "*[a]ccess* to telephone relay service." *See* D.12-12-038 at 18 (emphasis added). With respect to CRS, Frontier also notes that the Commission's authority to design, implement and enforce CRS obligations under Public Utilities Code Section 2881 is not dependent on a carrier's COLR status. Frontier is not aware of any technical incompatibility that would impede accessing CRS services over VoIP connections. Frontier defers to wireless service providers regarding the extent of alignment with wireless products.

2. **To what extent are the equipment and services, such as Teletypewriters/TTY services, and other equipment and services provided through California Connect, compatible with advanced, IP-enabled networks and Voice over Internet Protocol (VoIP) products? To what extent are these compatible with wireless networks? For responding carriers, please specify which equipment and services are not compatible with your networks.**

**Response:** Frontier does not provide teletypewriter or "TYY" services, but customers utilize such services and equipment on Frontier's network. Frontier is not aware of compatibility issues with using TYY devices over VoIP connections. Frontier defers to wireless providers on the wireless aspects of this question.

3. **What customer protections or other rules are necessary or appropriate to ensure the continuity of service for customers reliant on California Relay Service, TTY services, or other equipment and services provided by California Connect, if COLRs are granted relief from the obligation to provide basic service, or choose to no longer offer it over plain old telephone service (POTS)?**

**Response:** Frontier understands that customers can connect their TTY devices and dial 711 to regardless of the technology used (e.g., VoIP). The requirement for carriers to continue connecting 711 calls for their customers is unrelated to COLR designations and no additional protections are needed.

Exhibit D

3

103

4. **Basic service requires free access to California Relay Service. Are there any cases in which a provider has charged for access to relay service in the absence of an obligation to provide it for free? Should the Commission consider placing the requirement to offer free access to California Relay Service on other carriers if the COLR withdraws? Is access to California Relay Service possible through wireless and VoIP services.**

**Response:** As explained above, Frontier is not a CRS provider, but it provides access to CRS over its network. Frontier does not charge for such access, nor is it aware of any provider who charges for connecting CRS calls. Again, Frontier does not know of any limitations on accessing CRS through VoIP connections, and Frontier will defer to wireless carriers as to the capabilities of wireless networks. To the extent that this question assumes that COLR relief would involve a withdrawal of service, that premise is not correct. CRS access should not be an indirect or independent basis for retaining COLR obligations.

**Ancillary Services**

1. **What requirements, both legal and technical, are needed to ensure communications service continuity if an incumbent local exchange carrier (ILEC) elects to retire copper infrastructure as a result of COLR withdrawal? Parties are asked to identify any specific changes recommended for General Order 138, "Rules for the Connection of Customer Provided Equipment to Public Utility Telephone Company Systems," or General Order 152-A, "Rules Governing Private Line Alarm Service," or other rules and regulations under the Commission's jurisdiction.**

**Response:** COLR relief is not the equivalent of copper retirement under 47 C.F.R. Sections 51.325 through 51.333. *See* 47 C.F.R. §§ 51.325(a)(3) (defining copper retirement); 51.333 (explaining public notice and objection process). These provisions relate to discontinuing service using copper facilities and do not necessarily involve or suggest a carrier will discontinue providing telecommunications services to consumers in the area using fiber or other technology. G.O. 138 and G.O. 152-A do not bear on the issues in this proceeding. G.O. 138 is designed to promote the safety of telecommunications personnel by ensuring that "[c]ustomer-provided equipment" interfaces appropriately with telecommunications network equipment. *See* G.O. 138 § 1.4. Separately, G.O. 152-A contains certain reporting requirements and standards for certain types of "private line alarm systems," which Frontier does not provide. *See* G.O. 152-A § 1.2.

As other commenters have noted, the issue of whether ancillary services are interoperable with next generation technologies has already been considered extensively at the California state

Exhibit D
104

4

and federal levels.[1] These issues should be separate and distinct from the requirement to serve customers as a COLR in California. Frontier further notes that it does not provide any home security systems to customers. While certain alarm systems still rely on legacy technology for remote monitoring, consumers who use these services have many different options for home monitoring available today. To the extent that the General Orders referenced in this question require updates or clarifications, those should be addressed through a separate rulemaking proceeding.

2. **At the August 22 Workshop, panelists identified the following ancillary services that rely primarily on copper telecommunications infrastructure: highway call boxes, electronic highway signage, and alarm systems. This Ruling also inquires about emergency communications service for elevators. Are there other ancillary services that may be impacted by a COLR withdrawal? Is it reasonable to make any special provisions for alarm systems serving schools compared to alarm systems serving other customers?**

**Response:** Frontier is not aware of the full range of technical configurations that may be involved in enabling call boxes, highway signage, and alarm systems because Frontier does not provide those services; rather, it provides service connections to customers who may use those connections for those purposes. Frontier understands that such devices could be supported by a variety of telecommunications or broadband services. As such, Frontier believes there is no legal or analytical nexus between the specified communications infrastructure referenced in this question and "COLR withdrawal."

3. **What notice and engagement should a COLR be required to provide to ancillary service providers prior to being granted withdrawal? What entities should receive notice prior to withdrawal? What information should be provided in the notice? How should the notice be distributed? How far in advance should ancillary service providers be notified? What should the steps be if the service is incompatible with the change in service or technology?**

**Response:** A withdrawing COLR should provide reasonable notice to all customers. There is no need for any special notice for "ancillary service providers," as they would receive reasonable notice associated with any COLR designation ending. As Frontier has emphasized in this proceeding, any notice that is required with respect to a change in COLR status should be worded

---

[1] *See, e.g., Cal Broadband Opening Comments* (Jun. 13, 2025) at 3–4; *see also Consolidated Opening Comments* (Jun. 13, 2025) at 1–2; *see also AT&T Opening Comments* (Jun. 13, 2025) at 10.

Exhibit D
105

with precision to avoid implying that the carrier is ceasing operations or terminating service to existing customers because the elimination of a COLR obligation is separate and independent from the issue of discontinuing service.  Improperly conflating COLR withdrawal with termination of service in the customer notice would confuse and cause unnecessary concern among customers.

    **4. What impacts are possible in a transition from legacy network elements companies claim they use to satisfy the COLR obligations to modern networks if COLR obligations were eliminated? What impacts could the public or customers experience?**

**Response:**   The technological transition from copper to fiber network elements infrastructure and other network technologies has been occurring for more than a decade and is therefore already well underway.  Frontier is not aware of any limitations on its ability to satisfy basic service requirements over fiber or other network facilities.  The definition of basic service includes various unnecessary elements, including equal access requirements, white pages directory listing mandates, and other requirements that are not applicable to the expansive and growing list of competitors that are currently providing the vast majority of voice connections in California today.  These features should be removed from the definition of basic service promote fairness and competition, as discussed in Frontier's prior comments in this proceeding.[2]  Frontier can fulfill COLR obligations over copper or fiber facilities, as can other competitive service providers in California.  As such, Frontier is not aware of any adverse "impacts" to the public or customers from the ongoing transition from copper to fiber.  In fact, the impacts in transitioning from legacy copper to more modern network infrastructure relying on fiber and other technologies are overwhelmingly positive, including improved reliability, increased bandwidth and speed and expanded service options now and in the future as technologies and applications advance.

---

[2] *Frontier Opening Comments on OIR* (Sept. 30, 2024) at 5 (supporting a revision to the requirements of basic service to "to focus on the delivery of a "voice-grade" connection and E911 support").

Exhibit D 106

6

# EXHIBIT E

**FILED**

11/21/25

04:59 PM

R2406012

**BEFORE THE PUBLIC UTILITIES COMMISSION**

**OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Rulemaking Proceeding to Consider Changes to the Commission's Carrier of Last Resort Rules. | R. 24-06-012 |

**RESPONSE OF**

**CONSOLIDATED COMMUNICATIONS OF CALIFORNIA COMPANY, LLC**
**(U 1015 C)**

**TO ADMINISTRATIVE LAW JUDGE'S OCTOBER 1, 2025 RULING REGARDING COMMENTS ON TOPICS DISCUSSED AT AUGUST 22, 2025 WORKSHOP**

Patrick M. Rosvall
BRB Law LLP
492 9th Street, Suite 220
Oakland, CA 94607
Phone: (510) 955-1081
Email: patrick@brblawgroup.com

Attorneys for Consolidated Communications
of California Company, LLC

November 21, 2025

Exhibit E
108

## I.    INTRODUCTION.

Pursuant to the Administrative Law Judge's ("ALJ") Ruling Regarding Comments on Topics Discussed at August 22, 2025 Workshop, issued on October 1, 2025 (the "Ruling") and the October 20, 2025 ALJ ruling granting three additional weeks to respond, Consolidated Communications of California Company, LLC ("Consolidated") hereby addresses each of the questions posed in the Ruling and provides the information requested by the ALJ to the extent that it exists and is reasonably obtainable.  This response is accompanied by a contemporaneously-filed Motion to Seal seeking confidential treatment for specific data presented herewith that depicts the specific locations of Consolidated's subscribers.

Consolidated monitored the August 22, 2025 workshop, but it was not an active participant and is not necessarily familiar with all of the references and perspectives that the various workshop speakers advanced.  As an overall observation, Consolidated does not believe that the presentations during this "Workshop No. 3" identified material impediments to the Carrier of Last Resort ("COLR") relief that Consolidated and other Incumbent Local Exchange Carriers ("ILECs") have proposed in this proceeding.  Some of the presentations conflated the lifting of COLR obligations with copper retirement or service withdrawal under 47 U.S.C. Section 214, but Consolidated reiterates that COLR relief remains a separate consideration backed by important competitive parity concerns specific to state law and California public policy.  Consolidated also notes that the speakers at Workshop No. 3 did not devote sufficient attention to the market distortions and cost disparities that the retention of the current COLR obligations create. Furthermore, to the extent that the workshop focused on access to specific dialing codes and support for specific types of customer equipment, those are generic regulatory issues unrelated to the specific question of whether there should be a COLR in a market that is robustly competitive. The COLR concept is a relic of the rate-of-return regulatory paradigm of the 1980s and 1990s, and the Commission should move expeditiously to remove this construct in all competitive markets.

With that context noted, Consolidated addresses each of the questions posed in the Ruling. In some cases, Consolidated has noted temporal or categorical limitations on the availability of data.  Some of the requested information is not stored or retained in the format requested, and, in

Exhibit E
109

many cases, there is no business reason or regulatory requirement to retain such data. Consolidated has explained these limitations where they exist and responded to the questions to the best of its ability following a good faith search for responsive information.

**II.     RESPONSES TO QUESTIONS FOR PARTIES BASED ON WORKSHOP #3 (RULING, SECTION 3).**

The Ruling asks parties, including Consolidated, to respond to various representations and perspectives presented during the third workshop in this proceeding.  The Ruling posits that the following questions are drawn from the commentary during the third workshop, but Consolidated does not necessarily agree with the factual predicates presented in these prompts.  Nevertheless, Consolidated responds as follows to the questions posed.  Where appropriate, Consolidated has provided its perspectives on the factual propositions and legal assertions reflected in the questions. Consolidated reserves the right to address these questions in further detail in additional submissions in this proceeding.

**Federal Policy**

1. **Panelist Harold Feld indicated that the Federal Communications Commission (FCC) has adopted "streamlined proceedings" for applications to discontinue service under Section 214 of the federal Telecommunications Act, in which "there is a very short period of time to raise objections…and if the FCC does not act to take the application off of fast track, the application is granted automatically." Was Mr. Feld's description of the FCC's Domestic Section 214 Discontinuance process accurate? Do parties wish to clarify any details? How does the FCC's Domestic Section 214 Discontinuance process impact COLR obligations? Given this process, should the Commission assume that a COLR granted relief from its obligation to provide basic service in a given area also is likely to receive FCC Section 214 "Fast Track" approval from the FCC to discontinue service in that same area? Should FCC approval be a precondition for applying for COLR withdrawal?**

**Response:**  The COLR relief process and the FCC "Section 214" service discontinuation procedure are neither coextensive nor interdependent.  COLR requirements are state-level requirements governed by Commission decisions that define the scope of service obligations for Incumbent Local Exchange Carriers ("ILECs"), who are currently the only COLRs.  By contrast, the "Section 214" process involves a request to discontinue a specific interstate or domestic service, relying on the standards in 47 U.S.C. Section 214 and FCC rules implementing that code section.  *See* 47 U.S.C. § 214; 47 C.F.R. § 63.71. A lifting of COLR obligations does not equate to withdrawal from service, and a carrier may receive COLR relief but choose not to submit a

Exhibit E
110

2

Section 214 filing.  Therefore, COLR relief and Section 214 requests should not be treated as preconditions for one another, nor should the Commission assume that granting relief of COLR status would automatically lead to a granting of a Section 214 discontinuance application, or vice versa.  Regarding Mr. Feld's characterization of the 214 process, there is an expedited approval path for applications meeting certain specifications, but not all Section 214 requests fall within that "fast track" procedure.  The expedited process is structured so that certain applications will be deemed approved after a 31-day review process, which typically includes a 15-day public notice and comment timeframe.  Any party could submit comments as part of that process.

**Accessibility**

1. **To what extent is California Relay Service, or any other element of basic service, necessary to ensure accessibility of essential communications services, compatible with IP enabled advanced networks, Voice over Internet Protocol (VoIP), or wireless products?**

**Response:**   Consolidated is not a provider of California Relay Service ("CRS"), but it enables CRS calls to be made over its network by dialing the "711" code.  The definition of basic service reflects this clarification, requiring that COLRs provide "*[a]ccess* to telephone relay service."  *See* D.12-12-038 at 18 (emphasis added).  Consolidated does not object to retaining this CRS access requirement as part of basic service, and Consolidated has not proposed to remove this element of basic service in this proceeding.  Rather, Consolidated endorsed the Independent Small LECs' proposal to revise the definition of basic service, which retains CRS access.  *Consolidated Reply Comments on OIR* at 5 (supporting Independent Small LECs' revisions to basic service definition); *Independent Small LECs Opening Comments on OIR* at 9 (proposing to retain basic service elements 1, 2, 5, 6, and 7, including CRS).  However, the other aspects of basic service should be eliminated as outdated and unnecessary, including directory service, white pages delivery, operator service, free blocking, and the "billing provisions" in Element 4.  With respect to CRS, Consolidated also notes that the Commission has authority to "design and implement" the program and mandate compliance from carriers under Public Utilities Code Section 2881, regardless of COLR designations or COLR relief determinations.  Consolidated is not aware of compatibility issues in accessing CRS services over VoIP connections.  Consolidated is not a

3

Exhibit E
111

wireless provider, so it will defer to other providers on the wireless aspects of this question.

2. **To what extent are the equipment and services, such as Teletypewriters/TTY services, and other equipment and services provided through California Connect, compatible with advanced, IP-enabled networks and Voice over Internet Protocol (VoIP) products? To what extent are these compatible with wireless networks? For responding carriers, please specify which equipment and services are not compatible with your networks.**

**Response:**   Consolidated does not provide teletypewriter or "TYY" services or equipment, but customers may access such services and utilize such equipment on Consolidated's network. Consolidated is not aware of compatibility issues with using TYY devices over VoIP connections. Consolidated will defer to wireless providers on the wireless aspects of this question.

3. **What customer protections or other rules are necessary or appropriate to ensure the continuity of service for customers reliant on California Relay Service, TTY services, or other equipment and services provided by California Connect, if COLRs are granted relief from the obligation to provide basic service, or choose to no longer offer it over plain old telephone service (POTS)?**

**Response:**   Consolidated understands that customers can connect their TTY devices and dial 711 to reach the appropriate service providers regardless of the technology used to dial the call.  Other than the requirement for carriers to continue connecting 711 calls to their customers, which is unrelated to COLR designations, no protections are needed.

4. **Basic service requires free access to California Relay Service. Are there any cases in which a provider has charged for access to relay service in the absence of an obligation to provide it for free? Should the Commission consider placing the requirement to offer free access to California Relay Service on other carriers if the COLR withdraws? Is access to California Relay Service possible through wireless and VoIP services.**

**Response:**   As explained above, Consolidated does not provide CRS; it provides access to CRS. Consolidated does not charge for such access, nor is it aware of any provider who charges for connecting CRS calls.  Again, Consolidated does not know of any limitations on accessing CRS through VoIP connections, and Consolidated will defer to wireless carriers as to the capabilities of wireless networks.  To the extent that this question assumes that COLR relief would involve a withdrawal of service, that premise is not correct.  Consolidated has no intention of withdrawing from serving existing customers even if its COLR designation is lifted.  Rather, the immediate practical ramifications of COLR relief for Consolidated would be that it is no longer forced to

4

Exhibit E
112

serve new locations that may be costly or uneconomical to reach just because it is designated as a COLR in its ILEC exchange area.  As Consolidated has explained, the retention of this service obligation for Consolidated is inequitable and unnecessary given the many competitors who serve the same area who are not saddled with this same requirement.  In this context, Consolidated has no objection to continuing to provide access to CRS where it provides service, but CRS access should not be an indirect or independent basis for retaining COLR obligations.

**Ancillary Services**

1. **What requirements, both legal and technical, are needed to ensure communications service continuity if an incumbent local exchange carrier (ILEC) elects to retire copper infrastructure as a result of COLR withdrawal? Parties are asked to identify any specific changes recommended for General Order 138, "Rules for the Connection of Customer Provided Equipment to Public Utility Telephone Company Systems," or General Order 152-A, "Rules Governing Private Line Alarm Service," or other rules and regulations under the Commission's jurisdiction.**

**Response:**   COLR relief is not the equivalent of copper retirement, nor would a lifting of COLR obligations relate to the ongoing transition toward fiber-based networks.  Consolidated has not proposed to retire copper in California, and if it did, it would be a separate consideration from the issues in this proceeding and Consolidated would follow FCC procedures, including the notice requirements under 47 C.F.R. Sections 51.325 through 51.333.  *See* 47 C.F.R. §§ 51.325(a)(3) (defining copper retirement); 51.333 (explaining public notice and objection process).  Regarding G.O. 138 and G.O. 152-A, these are archaic general orders that do not have any direct relationship to the issues in this proceeding.  G.O. 138 is designed to promote the safety of telecommunications personnel by ensuring that "[c]ustomer-provided equipment" interfaces appropriately with telecommunications network equipment.  *See* G.O. 138 § 1.4.  Separately, G.O. 152-A contains reporting requirements and standards for certain types of "private line alarm systems."  *See* G.O. 152-A § 1.2.  Consolidated does not provide any services that fall within the framework governing "private line alarm systems" under G.O. 152-A.  Consolidated is not aware of any relevance of either G.O. 138 or G.O. 152-A to the issues in this proceeding.  To the extent these rules require updates or clarifications, that should be a separate exercise in a separate proceeding.

Exhibit E
113

5

2. **At the August 22 Workshop, panelists identified the following ancillary services that rely primarily on copper telecommunications infrastructure: highway call boxes, electronic highway signage, and alarm systems. This Ruling also inquires about emergency communications service for elevators. Are there other ancillary services that may be impacted by a COLR withdrawal? Is it reasonable to make any special provisions for alarm systems serving schools compared to alarm systems serving other customers?**

**Response:** Consolidated is not a provider of "call boxes" or "electronic highway signage," but customers who manage those devices can purchase services from Consolidated to support or enable the necessary equipment. Fundamentally, call boxes are wireline telephones, so they could be provisioned using traditional circuit-switched technology or VoIP, without any material functional differences. Although Consolidated is not aware of the full range of technical configurations that may be involved in enabling highway signage, Consolidated understands that such devices could be supported by a variety of telecommunications or broadband services, so there is no connection between highway signage and "COLR withdrawal." With regard to alarm systems, Consolidated does not provide security services, although it does provide basic service lines to business and institutional customers that may be used for alarm services provided by third parties. Consolidated understands that alarm systems could be supported by traditional circuit-switched connections or VoIP connections, so there is no need for any special rules in this proceeding to address alarm systems.

3. **What notice and engagement should a COLR be required to provide to ancillary service providers prior to being granted withdrawal? What entities should receive notice prior to withdrawal? What information should be provided in the notice? How should the notice be distributed? How far in advance should ancillary service providers be notified? What should the steps be if the service is incompatible with the change in service or technology?**

**Response:** A reasonable notice should be provided to all customers if a carrier's COLR designation is lifted. There is no need for any special notice for "ancillary service providers." As Consolidated has emphasized in this proceeding, any notice that is required with respect to a change in COLR status should be worded with precision to avoid implying that the carrier is ceasing operations or terminating service to existing customers. If COLR relief were equated with a withdrawal of service in a notice to customers, the notice would be misleading and risk causing alarm amongst customers.

**4. What impacts are possible in a transition from legacy network elements companies claim they use to satisfy the COLR obligations to modern networks if COLR obligations were eliminated? What impacts could the public or customers experience?**

**Response:** The technological transition from copper to fiber network elements is already well underway. Consolidated is not aware of any limitations on its ability to satisfy basic service requirements over fiber facilities. The definition of basic service includes various unnecessary elements, including equal access requirements, white pages delivery mandates, and other dictates that are not applicable to Consolidated's competitors. These features should be removed from the basic service definition to level the playing field, as discussed in Consolidated's prior comments in this proceeding. Consolidated can satisfy COLR obligations over copper and fiber facilities, so Consolidated is not aware of any "impacts" to the public or customers from the ongoing transition. The Commission should nevertheless be concerned about the regulatory disparity that its COLR rules represent, particularly as applied to a carrier like Consolidated that faces nearly ubiquitous wireline competition and 100% wireless coverage.

**<u>Miscellaneous</u>**

**1. If a COLR applies to relinquish its obligation, what are reasonable restrictions on the area covered by a single application? Should there be a maximum number of affected customers, a maximum population size, and/or a maximum geographic area? Should there be a limit on the number of applications submitted in a calendar year? Aside from broadband maps and mobile coverage maps, what data driven resources are available for providers to demonstrate the presence of other voice providers within COLR territories that can be evaluated appropriately by the Commission and affected stakeholders?**

**Response:** Consolidated has a specific, geographically-defined service territory in the greater Sacramento metropolitan area in which it is designated as the COLR. This entire area is robustly competitive, so any COLR relief should be provided in the entirety of Consolidated's footprint. Consolidated should be de-designated as a COLR in this proceeding throughout its service area, or, at a minimum, it should be provided a path for efficient COLR relief impacting all areas that it serves. There is no need to address COLR relief on a piecemeal or transitional basis as applied to Consolidated, and the mapping information already submitted is sufficient to show that Consolidated's service areas is robustly competitive. Because of its unique situation as a smaller provider besieged by extensive wireline and wireless competitors that are far larger than

Exhibit E
115

Consolidated, the Commission should consider a pilot program as part of this proceeding in which Consolidated's COLR designation is lifted, subject to reasonable reporting requirements. Consolidated has no intention of exiting the market or abandoning existing customers, but COLR relief would put Consolidated on a more even playing field with other market participants who are not compelled to serve new locations even where it is uneconomical to do so.  Using Consolidated as a "test case" for COLR relief would be a reasonable first step to determine how best to manage requests to lift COLR designations going forward.

2. **Panelist Harold Feld indicated, "Copper is extremely expensive to maintain.  The equipment which is used to support traditional copper phone networks is no longer being manufactured." Is this statement accurate? COLRs shall explain how they source necessary equipment when repairs to the legacy copper network are needed.  COLRs also shall provide information on the cost of maintaining legacy copper networks broken out by relevant cost categories (such as cost of technicians, cost of equipment, etc.) with as much detail as possible.**

**Response:**  Copper is more expensive to maintain than fiber and many supporting network elements and switches are "end-of-life" and no longer supported by the vendors.  Even the supply of refurbished or "grey" market replacements is dramatically decreasing.  Maintenance of copper facilities is being phased out by telecommunications vendors as networks shift to fiber.  This reduces the supply of copper maintenance services and increases the overall cost of repairing, maintaining, and replacing copper facilities.  Copper facilities are also more susceptible to theft, which increases the risk of maintaining a copper network.  However, fiber facilities have a long service life and are scalable by upgrading central office electronics.  Consolidated does not have a detailed breakdown of copper maintenance costs relative to fiber because such costs are not tracked on a facility-specific basis, but Consolidated agrees with the premise of this question that copper facilities are more costly to maintain than fiber.

III.    **RESPONSES TO DIRECTIVE ORDERING CARRIERS TO PROVIDE INFORMATION (RULING, SECTION 4).**

The Ruling directs carriers, including Consolidated, to provide a wide range of information regarding the customer subscription, calling patterns, and network functionalities relative to specific "ancillary" services that the Ruling identifies as potentially dependent upon COLR networks and traditional basic service platforms.  Consolidated does not have information

Exhibit E
116

8

responsive to all of these questions, but it has conducted a reasonable, good faith inquiry to obtain the data requested, and it has offered alternatives where appropriate to account for data limitations.

1. **All respondent COLRs are ordered to submit a .shp file indicating the point-level locations of all customers subscribed to basic service as of January 1, 2025.**

**Response:** Consolidated has prepared two maps depicting the locations where customers are subscribed to basic service—one showing the location of business customers and the other displaying the location of residential customers. These maps are collectively identified as **Attachment A**. Because .shp files cannot be filed as part of docketed pleadings before the Commission, these files will be uploaded to the Commission's File Transfer Portal ("FTP") site on a confidential basis. These are competitively sensitive and confidential, and they are provided subject to the motion to seal filed contemporaneously with this response.

2. **All respondent COLRs are ordered to respond to the following questions:**

   - **How many customers were subscribed to basic service as of January 1, 2025? Please provide separate totals for residential and non-residential customers, and report totals statewide and by county based on the customer's billing address.**

**Response:** Consolidated serves portions of two counties: Placer and Sacramento. The number of basic service subscriptions in each county are set forth in the table below, divided between residential and business service. To the extent that Consolidated serves institutional customers such as government agencies, those customers are included in the business category. Consolidated also notes that it has used the "service address" for this data rather than the "billing address" because the billing address could be in a county outside Consolidated's service territory, or even in another state or country. Using billing addresses would create a misleading picture of the subscribership in Consolidated's footprint, but Consolidated notes that the vast majority of customers have a billing address in the same county as their service address.

| County | Residential | Business | Total |
|---|---|---|---|
| Placer | 1,827 | 1,900 | 3,727 |
| Sacramento | 1,206 | 442 | 1,648 |
| Total | 3,033 | 2,342 | 5,375 |

Exhibit E
117

9

- **Of customers subscribed to basic service as of January 1, 2025, how many are served by copper wiring at the customer premises? How many are served by technology other than copper?**

**Response:** Currently, 4,909 of Consolidated's basic service subscribers are served over copper drops. The remaining 466 are served with fiber drops.

- **Of customers subscribed to basic service as of January 1, 2025, how many are participants in the California Connect (also known as DDTP) program?**

**Response:** Consolidated provides basic service to customers, but it does not know how many of those customers participate in the California Connect or Deaf and Disabled Telecommunications Program ("DDTP").

- **Of customers subscribed to basic service as of January 1, 2025, how many are California LifeLine participants?**

**Response:** Consolidated had 293 customers on the California LifeLine program as of January 1, 2025.

- **How many voice calls were made in 2020, 2021, 2022, 2023, and 2024? Please provide totals statewide and by county of the customer placing the call.**

**Response:** Consolidated does not track the number of total voice calls that are made over its network. While Consolidated's switches retain some historical information, it is not collected or formally tracked because there is no current business purpose or regulatory requirement to engage in such tracking. Basic service customers predominantly subscribe to flat-rate service, and VoIP services are also billed a single rate for domestic calls, without any variations in price based on the number of nature of calls made or received. Therefore, Consolidated lacks information to fully answer this question. Nevertheless, Consolidated has conducted a query using its switching equipment, and, based on a sample from a 15-day period in December 2024, Consolidated estimates that its network carries approximately 8.4 million voice calls per year. The source data for this estimate, organized by county and by call type, is provided in the document provided herewith as **Attachment B.** As these data illustrate, Consolidated has experienced a continued decline in voice calls, so the use of a sample from December 2024 likely understates the annual call volumes that would have occurred in the earlier years. Nevertheless, Consolidated used the

Exhibit E
118

# EXHIBIT F

ALJ/TJG/hma                                        **Date of Issuance: 6/25/2024**

Decision 24-06-024 June 20, 2024

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Application of Pacific Bell Telephone Company d/b/a/ AT&T California (U1001C) for Targeted Relief from its Carrier of Last Resort Obligation and Certain Associated Tariff Obligations. | Application 23-03-003 |

**DECISION DISMISSING WITH PREJUDICE THE APPLICATION OF AT&T CALIFORNIA TO WITHDRAW AS A CARRIER OF LAST RESORT**

534542934                                        - 1 -                              Exhibit F

A.23-03-003  ALJ/TJG/hma

# TABLE OF CONTENTS

**Title**                                                                                                                                  **Page**

DECISION DISMISSING WITH PREJUDICE THE APPLICATION OF AT&T
    CALIFORNIA TO WITHDRAW AS A CARRIER OF LAST RESORT...............3
Summary ........................................................................................................................3
1.  Procedural Background.............................................................................................4
2.  The Commission's COLR Rules ..............................................................................5
3.  AT&T's Amended Application ................................................................................6
4.  Issues Before the Commission.................................................................................9
5.  Cal Advocates' Motion to Dismiss ......................................................................10
6.  AT&T's Response ....................................................................................................11
7.  COLR Withdrawal Rules ........................................................................................12
8.  Standard for Granting a Motion to Dismiss .......................................................13
9.  Based on the Existing Record AT&T's Legal and Factual Analysis is Fatally
    Flawed.......................................................................................................................15
    9.1.  The Commission Must Allow Potential Replacement COLRs to Replace
       AT&T .......................................................................................................................15
      9.2.     No Potential COLR Volunteered to Replace AT&T..............................18
9.3. AT&T's Proposed Alternatives are not COLRs ...................................................18
10. Application Dismissed with Prejudice.................................................................21
11. AT&T Already is Able to Modernize its Network ............................................22
12. Summary of Public Comment ................................................................................23
13. Procedural Matters..................................................................................................24
14. Ordering Instituting Rulemaking .........................................................................24
15. Comments on Proposed Decision..........................................................................24
16. Assignment of Proceeding .....................................................................................24
Findings of Fact...............................................................................................................25
Conclusions of Law ........................................................................................................25
ORDER ..............................................................................................................................26

Exhibit F
121

A.23-03-003 ALJ/TJG/hma

## DECISION DISMISSING WITH PREJUDICE THE APPLICATION OF AT&T CALIFORNIA TO WITHDRAW AS A CARRIER OF LAST RESORT

**Summary**

This decision grants the Motion to Dismiss, filed by the California Public Utilities Commission's (Commission) Public Advocates Office on June 30, 2023. Granting this motion dismisses with prejudice the Application of Pacific Bell Telephone Company d/b/a/ AT&T California (AT&T) "for Targeted Relief from its Carrier of Last Resort (COLR) Obligation" filed and served on March 3, 2023 and amended on May 17, 2023.

The Commission's COLR withdrawal rules, adopted in Decision (D.) 96-10-066 and affirmed in D.12-12-038, require either the presence of an existing COLR in the service territory a current COLR wishes to withdraw from, or for a new COLR to volunteer to replace the COLR seeking permission to withdrawal. No other COLR serves AT&T's service territory. No potential COLR applied to replace AT&T.

Given that AT&T's Application, as amended, does not meet the requirements of the Commission's COLR withdrawal rules, and the existing undisputed facts of this case make that clear, AT&T's Application is dismissed with prejudice.

This proceeding is closed.

Finally, the Commission intends to initiate an Order Instituting Rulemaking to consider whether to revise its COLR rules.

Exhibit F
122

A.23-03-003  ALJ/TJG/hma

## 1.  Procedural Background

On March 3, 2023, Pacific Bell Telephone Company d/b/a/ AT&T California (AT&T) filed its Application "for Targeted Relief from its Carrier of Last Resort (COLR)[1] Obligation."

On May 3, 2023, the assigned Administrative Law Judge (ALJ) ordered AT&T to amend its Application, due to substantial incompleteness.[2]

On May 17, 2023, AT&T filed its Amended Application.[3]

On June 30, 2023, Cal Advocates filed its Motion to Dismiss.

A prehearing conference (PHC) was held on August 3, 2023, to address the issues of law and fact, determine the need for hearing, set the schedule for resolving the matter, and address other matters as necessary.

---

[1] The definition of a COLR is "A local exchange service provider that stands ready to provide basic service to any customer requesting such service within a specified area. To be a COLR, the provider must meet Commission-approved qualifications." A COLR is required to provide all elements of basic service, including:

- Offering customers the ability to place and receive voice-grade calls over all distances utilizing the public switched telephone network or successor network;
- Free access to 9-1-1/Enhanced (E) 9-1-1 service;
- Access to directory services;
- Billing Provisions;
- Access to 800 and 8YY Toll-Free Services;
- Access to Telephone Relay Service as provided for in Pub. Util. Code, § 2881;
- Free access to customer service for information about Universal Lifeline Telephone Service (ULTS) service activation, service termination, service repair and bill inquiries;
- One-time free blocking for information services, and one-time billing adjustments for charges incurred inadvertently, mistakenly, or without authorization; and
- Access to operator services.

Additional requirements of COLRs include participation in California LifeLine.

[2] For a number of reasons, the assigned ALJ found that AT&T's application was deficient and insufficient to scope the proceeding, including that AT&T did not identify the specific areas or communities where it sought relief. *See* Ruling at 3.

[3] Unless otherwise specified for the purposes of a citation, "Application" will refer to either AT&T's Application or its Amended Application.

- 4 -

Exhibit F

123

A.23-03-003  ALJ/TJG/hma

On November 21, 2023, the Assigned Commissioner issued a Scoping Memo and Ruling, setting forth the issues, need for hearing, schedule, category, and other matters necessary to scope this proceeding pursuant to Public Utilities Code (Pub. Util. Code) section 1701.1 and Article 7 of the Commission's Rules of Practice and Procedure.

On February 20, 2024, the assigned ALJ notified potential COLRs regarding AT&T's Application, as well as the opportunity to apply to replace AT&T as a COLR in those territories. Potential COLRs had until April 30, 2024 to inform the Commission if they wished to replace AT&T.[4,5]

No potential COLR responded to the February 20 Notice by the April 30, 2024 deadline.

## 2.    The Commission's COLR Rules

Assembly Bill (AB) 3643, enacted in 1994, directed the Commission to initiate a proceeding to ensure universal telecommunications service includes "[e]ssential telecommunications services" that is "provided at affordable prices to all Californians regardless of linguistic, cultural, ethnic, physical, geographic, or income considerations."[6]

In Decision (D.) 95-07-050, the Commission proposed that the incumbent Local Exchange Carriers (LEC) be the designated COLR in all of their service areas until such time that another carrier or carriers are designated to be a COLR. The Commission adopted its COLR rules in D.96-10-066, stressing that the COLR

---

[4] On February 28, 2024, the assigned ALJ issued a ruling, apprising the Service List in this proceeding that the notice was served.

[5] Ahead of the assigned ALJ serving the notice, parties received an opportunity to review and offer edits.

[6] Stats. 1994, Ch. 278 (Polanco and Moore)

Exhibit F

124

A.23-03-003  ALJ/TJG/hma

concept "is important to universal service policy because it ensures that customers receive service."[7] All of the incumbent LECs listed in Attachment A of D.96-10-066 were designated as the COLR in all their respective service areas (also called geographic study areas, or GSAs) at least until such time that another carrier or carriers are designated as the COLR.[8] To that end, the Commission's COLR rules required a designated COLR to retain its obligations until another carrier is designated.[9] The COLR Rules also include a procedure to replace the last remaining COLR.[10]

A designated COLR may opt out of its obligations GSA by advice letter unless it is the only COLR remaining in its service territory. If no other COLRs serve the territory in question, a COLR must file an application to withdraw as the COLR and continue to act as the COLR until the application is granted (because a new COLR has come forward) or a new COLR has been designated as a result of an auction.[11]

In adopting D.12-12-038, the Commission affirmed, among other items, the Commission's COLR withdrawal rules.

### 3.    AT&T's Amended Application

AT&T asks the Commission to relieve it of its COLR obligations in much of its service territory. Specifically, AT&T requests the following relief:

---

[7] D.96-10-066 at 109.

[8] *Id.*, at 163.

[9] *Id.,* at 109.

[10] *Id.*

[11] *Id.*

- 6 -

A.23-03-003  ALJ/TJG/hma

- In areas where "voice alternatives"[12] that offer voice service, AT&T would be relieved of its COLR obligations;

- AT&T customers would have a six-month transition period;

- Modification to AT&T's basic service tariff; and

- For areas currently without voice alternatives, the Commission would adopt an Advice Letter process for when those areas become served by voice alternatives.[13]

AT&T contends the COLR obligation made sense during an era of monopolies, but makes no sense today, given the current marketplace. AT&T asserts its COLR customers have a number of alternatives for voice services, including VoIP service from cable companies such as Comcast or Cox, and mobile voice service from providers such as Verizon, T-Mobile, and AT&T Mobility.[14] AT&T also insists its COLR responsibilities unfairly discriminate against AT&T, placing the carrier at a competitive disadvantage versus these other companies which, unburdened by COLR requirements, are able to innovate and otherwise respond to market forces.[15] AT&T also claims that the funds it spends on expenses related to its duties as a COLR "could" instead be used on other activities.[16]

---

[12] *Application of Pacific Bell Telephone Company d/b/a AT&T California (U 1001 C) for Targeted Relief from Its Carrier of Last Resort Obligation and Certain Associated Tariff Obligations* (AT&T's Application), filed March 3, 2023, at 38. "Voice alternatives" are providers of wireline VoIP and fixed and wireless voice services. Note: AT&T's "alternative voice providers" are not COLRs.

[13] AT&T's Application at 37-38.

[14] *Id.,* at 3.

[15] *Id.,* at 3-4.

[16] AT&T repeatedly uses the words "could" or "would" as part of its claims that funds spent on its COLR obligation might be used on other activities. *See* AT&T's Amended Application at 14: "With freed-up resources, AT&T California could deploy fiber broadband to additional

*Footnote continued on next page.*

- 7 -

Exhibit F

126

A.23-03-003  ALJ/TJG/hma

AT&T opines that the Commission has broad authority to grant the relief it requests, citing Pub. Util. Code §§ 1708,[17] 701,[18] 709[19] and 709.5.[20] AT&T further

---

households in rural areas across the state…" *See also* AT&T's Amended Application at Attachment A 1 (Declaration of Dr. Mark Israel): "…[the] COLR obligation ties up scarce resources that could better serve consumers elsewhere, including via reallocation to investment in the superior technologies." *See also*, AT&T's Amended Application at 13: "The COLR relief sought here would free up critical resources for similar efforts around the state." Here, AT&T is referring its work with customers who are eligible to participate in the federal Affordable Connectivity Program, as well as five Connected Learning Centers in Los Angeles. At no time does AT&T specifically commit to any activities if the Commission grants its requested relief.

[17] "The commission may at any time, upon notice to the parties, and with opportunity to be heard as provided in the case of complaints, rescind, alter, or amend any order or decision made by it."

[18] "The commission may supervise and regulate every public utility in the State and may do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction."

[19] AT&T cites, in part, to §§ 709. In full, § 709 reads as follows:

"The Legislature hereby finds and declares that the policies for telecommunications in California are as follows:

(a) To continue our universal service commitment by assuring the continued affordability and widespread availability of high-quality telecommunications services to all Californians.

(b) To focus efforts on providing educational institutions, health care institutions, community-based organizations, and governmental institutions with access to advanced telecommunications services in recognition of their economic and societal impact.

(c) To encourage the development and deployment of new technologies and the equitable provision of services in a way that efficiently meets consumer need and encourages the ubiquitous availability of a wide choice of state-of-the-art services.

(d) To assist in bridging the "digital divide" by encouraging expanded access to state-of-the-art technologies for rural, inner-city, low-income, and disabled Californians.

(e) To promote economic growth, job creation, and the substantial social benefits that will result from the rapid implementation of advanced information and communications technologies by adequate long-term investment in the necessary infrastructure.

(f) To promote lower prices, broader consumer choice, and avoidance of anticompetitive conduct.

*Footnote continued on next page.*

- 8 -

Exhibit F
127

A.23-03-003  ALJ/TJG/hma

declares that the Commission's intended policy is that once competition takes root, COLR status is voluntary, with carriers not only applying to become COLRs, but also requesting permission to withdraw.[21]

## 4.    Issues Before the Commission

The Assigned Commissioner's Scoping Memo and Ruling identified the issues to be determined or otherwise considered, including those listed below.

1. Does this application meet the Commission's Universal Service Rules and standards in D. 96-10-066, as well as the definition of universal service and obligations therein?

2. Should AT&T be relieved of its COLR obligation?

3. Are other potential COLRs interested in replacing AT&T's COLR service? Where has AT&T demonstrated there are alternative COLRs?

4. Would granting this application impact public safety, including for residents in High Fire Threat Districts and Flood Zones? If yes, what is the impact? For example, will it impact access to emergency services during an emergency?

5. Would not granting this application negatively impact AT&T's ability to offer voice or broadband service in

---

(g) To remove the barriers to open and competitive markets and promote fair product and price competition in a way that encourages greater efficiency, lower prices, and more consumer choice.

(h) To encourage fair treatment of consumers through provision of sufficient information for making informed choices, establishment of reasonable service quality standards, and establishment of processes for equitable resolution of billing and service problems."

[20] § 709.5 (a) reads as follows:  "It is the intent of the Legislature that all telecommunications markets subject to commission jurisdiction be opened to competition not later than January 1, 1997. The commission shall take steps to ensure that competition in telecommunications markets is fair and that the state's universal service policy is observed."

[21] *Application of Pacific Bell Telephone Company d/b/a AT&T California (U 1001 C) for Targeted Relief from Its Carrier of Last Resort Obligation and Certain Associated Tariff Obligations* (AT&T's Application), filed March 3, 2023, at 6.

- 9 -

A.23-03-003 ALJ/TJG/hma

California? Where would AT&T spend funds if it eliminates its COLR obligation that it would not spend otherwise?

6. Will granting the application result in a direct or reasonably foreseeable indirect physical change in the environment such that such environmental review pursuant to the California Environmental Quality Act (CEQA) is required?

7. Does the requested action have any impact on environmental and social justice communities, including the extent to which it impacts the achievement of any of the goals of the Commission's Environmental and Social Justice Action Plan? Are there other impacted individuals, such as persons with disabilities?

8. Do the potential benefits of granting this application exceed any potential negative effects on customers?

9. Should the Commission adopt Applicant's proposed Advice Letter process for communities it asserts currently do not have another voice option beyond AT&T California?

## 5. Cal Advocates' Motion to Dismiss

Cal Advocates requests the Commission dismiss the Application with prejudice, or dismiss without prejudice "and make clear that if AT&T continues its failure to comply with rulings and rules, its application will be dismissed with prejudice."[22] Cal Advocates asserts AT&T's Application does not comply with the Commission's COLR Rules, and is incompatible with California's

---

[22] *Motion of Cal Advocates to Dismiss Amended Application of Pacific Bell Telephone Company d/b/a AT&T California (U 1001 C) for Targeted Relief from Its Carrier of Last Resort Obligation and Certain Associated Tariff Obligatio*ns (Motion to Dismiss), filed June 30, 2023, at 1-2.

Exhibit F
129

A.23-03-003  ALJ/TJG/hma

commitment to universal service, espoused in AB 3643 and Pub. Util. Code § 709(a).[23]

Relying on D.18-11-028 and D.99-11-023, among other authorities, Cal Advocates argues the Commission must dismiss an application when the outcome is a forgone conclusion.[24]

## 6.    AT&T's Response

AT&T claims that Cal Advocates' argument "pushes the envelope of advocacy."[25] AT&T also opines that Rule 6.D.7 of the Commission's Universal Service Rules provides that a carrier that has applied for COLR relief must "continue to act as the COLR" only until *either* (emphasis added) "[1] the application is granted *or* (emphasis added) [2] a new COLR has been designated as a result of an auction."[26] AT&T claims the Commission may grant its COLR relief application for good cause shown, whether or not it has designated a new COLR. AT&T further contends that Cal. Pub. Util. Code §§ 1708 and 701 allow the Commission to "rescind, alter, or amend any order or decision made by it, including when market conditions underlying the decision "have undergone a material change."[27]

---

[23] "The Legislature hereby finds and declares that the policies for telecommunications in California are as follows: (a) To continue our universal service commitment by assuring the continued affordability and widespread availability of high quality telecommunications services to all Californians. . ."

[24] Motion to Dismiss at 5-6.

[25] *Pacific Bell Telephone Company D/B/A AT&T California's Response to the Motion to Dismiss of the Public Advocates Office at the California Public Utilities Commission* (AT&T's Response), filed July 14, 2023, at 2.

[26] *Id.*

[27] AT&T's Response at 3.

- 11 -

A.23-03-003  ALJ/TJG/hma

Additionally, AT&T argues that the Commission abandoned the reverse auction mechanism in D.14-06-008.

**7.     COLR Withdrawal Rules**

Under Appendix C, Section 6(c) in D.12-12-038 and Appendix B, Section C in D.96-10-066,  the Commission can grant a COLR withdrawal application in one of two ways: (a) another carrier is identified and is willing to serve as a COLR or (b) a reverse auction is held, the result of which another carrier comes forward and is willing (and able) to serve as a COLR. If no replacement COLR is identified in the application or if a replacement COLR does not come forward once the application has been filed, the Commission must hold a reverse auction. The Commission cannot grant an application to withdraw as a COLR if there is no replacement COLR.

Appendix B contains the Commission's Universal Service Rules, including 6.D.1, which designates all incumbent LECs listed in Attachment A as the COLR in all their respective service areas at least until such time that another carrier or carriers are designated as the COLR,[28] and Rule 6.D.7, which allows a designated COLR to may opt out of its obligations by advice letter, unless it is the only carrier remaining in the service territory or a new COLR has been designated as a result of an auction.[29]

Although AT&T argues that the "or" in Rule 6.D.7 indicates that the Commission could just grant its application without a new designated COLR in place, that is not only an inaccurate reading of the Commission's COLR Rules, but it would render the COLR and Universal Service Rules meaningless. The

---

[28] D. 96-10-066 at 163.

[29] *Id*.

A.23-03-003  ALJ/TJG/hma

Commission cannot ignore the other COLR Rules requiring a designated COLR, or the statute and Rule's clear intent for universal service to operate as a safety net. The accurate and more consistent reading of 6.D.7 is the last COLR must continue its obligations until the application is granted, because another carrier has entered the market and taken on COLR obligations.

## 8.    Standard for Granting a Motion to Dismiss

The Commission treats a motion to dismiss as a court of general jurisdiction would treat motions for summary judgment in civil practice.[30] While there is no Commission rule expressly for summary judgment motions, Rule 11.2 of the Commission's Rules of Practice and Procedure allows parties to file a motion to dismiss a proceeding based on the pleadings (other than a motion based upon a lack of jurisdiction) by no later than five days prior to the first day of hearing. The Commission has held that the purpose of both types of motions is to permit determination before hearing whether there are any triable issues as to any material fact.[31] The interpretation of a statute or regulation is generally seen to be a pure legal issue.[32]

A further purpose of such a motion is that it promotes and protects the administration of justice and expedites litigation by the elimination of needless

---

[30] *Westcom Long Distance, Inc. v. Pacific Bell et al.*, Decision (D.) 94-04-082, 54 CPUC2d 244, 249.

[31] *Id.*

[32] *See* Manriquez v. Gourley, 105 Cal. App. 4th 1227, 1234-35 (2003), quoting from Culligan Water Conditioning v. State Bd. of Equalization, 17 Cal.3d 86, 93 (1976).

- 13 -

Exhibit F

132

A.23-03-003  ALJ/TJG/hma

trials.[33] As such, where appropriate, the Commission regularly grants motions for summary judgment or summary adjudication.[34]

When reviewing a motion to dismiss, the Commission assumes "the facts as alleged in the application are true for the purposes of deciding whether to grant a motion to dismiss… [and]… the applicant will be able to prove everything the applicant alleged in its application…'"[35] However, the Commission does "not accept as true the ultimate facts, or conclusions, that Applicant alleges, for instance, that granting the [application] would be in the public interest."[36] Applications have been dismissed on policy grounds, to husband limited resources, to avoid conflict with statutory policy, to avoid inefficiency, "and many other reasons."[37] Additionally, the Commission has held that, "[a]fter accepting the facts as stated, the Commission then merely looks to its own law and policy. The question becomes whether the Commission and the parties would be squandering their resources by proceeding to an evidentiary hearing when the outcome is a foregone conclusion under the current law and

---

[33] Westcom Long Distance, Inc. v. Pacific Bell et al., D. 94-04-082, 54 CPUC2d 244, 249.

[34] *See* D.07-07-040 (granting Chevron judgment against Equilon "as a matter of law"); D.07-01-004 (granting Cox Telecom judgment against Global NAPs of California); D.02-04-051 (granting summary adjudication of a claim by County Sanitation District against Southern California Edison Company).

[35] *Application of GoGo Technologies, Inc. (dba GoGoGrandparent) for order declaring Applicant to be a non-regulated entity; to stay enforcement action pending resolution*, D.18-11-028 (2018 WL 6566916 at 2) (quoting *Application of Western Gas Resources-California, Inc. for a Certificate of Public Convenience and Necessity to Provide Public Utility Gas Transmission and Distribution Services*, D.99-11-023, 1999 Cal. PUC LEXIS 856, 10-11 (Cal. PUC 1999).

[36] *Id*.

[37] D.99-11-023 at 2.

Exhibit F
133

A.23-03-003  ALJ/TJG/hma

policy of the Commission."[38] While the Commission may elect to alter policy in connection with an application, it can make the choice not to do so at the outset of an application in response to a motion to dismiss.[39]

Cal Advocates filed its Motion to Dismiss on June 30, 2023 and no hearing has been held in this proceeding.

## 9. Based on the Existing Record AT&T's Legal and Factual Analysis is Fatally Flawed

The purpose of the Commission's COLR Rules is to ensure that there is a public utility which is obligated to serve all the customers that request service in its service area.[40]

There can be no misconstruing the Commission's intent, even though AT&T attempts to do that, with its argument that the Commission's COLR Rules allow the Commission to grant AT&T's application without the presence of a replacement COLR.

AT&T's Application contains additional flaws that it cannot overcome.

### 9.1. The Commission Must Allow Potential Replacement COLRs to Replace AT&T

AT&T has repeatedly misstated that, in adopting D.14-06-008, the Commission abandoned the reverse auction mechanism in D.96-10-066.[41] As noted in the Assigned Commissioner Scoping Memo and Ruling for this

---

[38] *Id.*, at 3.

[39] *Id.*

[40] D.96-10-066 at 193.

[41] In addition to making this incorrect claims in filings, AT&T representatives repeated its incorrect statement at the PHC (*See*, Reporters' Transcript, August 3, 2023, at 92:6-93:8) at an ex parte meeting with advisors for the assigned Commissioner and another Commissioner (*See*, Notice of Ex Parte Communication of AT&T California, filed February 16, 2024 at 3-4) and at another ex parte meeting with advisors for another Commissioner (*See*, Notice of Ex Parte Communication of AT&T California, filed February 29, 2024 at 2-4).

- 15 -

A.23-03-003  ALJ/TJG/hma

proceeding, D.14-06-008 concerns calculating cost support amounts, not the safety net auction to identify a COLR that would replace the COLR seeking to withdraw from a specific territory.[42] D.14-06-008 does not impact the Commission's ability to carry out a COLR auction process. A more thorough review of R.09-06-19 confirms this.

D.14-06-008 was issued in R.09-06-019, an Order Instituting Rulemaking (OIR) Regarding Revisions to the California High Cost Fund B Program. D.14-06-008 adopted provisions to implement updated methodologies to calculate cost support amounts. Amending High Cost Fund B support amount is a completely separate issue from amending the COLR requirement, including changing the requirement for a reverse auction.

The full reference in D.14-06-008 that AT&T relies on is:

"Although we initially undertook to further consider the issue of a reverse auction process in this rulemaking, the assigned Commissioner ultimately determined to first address updating basic telephone service requirements before considering <u>the merits of a reverse auction or other measures to update high cost support amounts</u>."[43] (*emphasis added*)

The Assigned Commissioner's Amended Scoping Memo and Ruling for R. 09-06-019, issued January 23, 2013, is even more explicit that the reverse auction discussed was focused on setting high-cost support amounts:

"Prior to the most recent Amended Scoping Memo, this proceeding had been considering the design of a reverse auction as a mechanism to set high-cost support amounts based on market forces. The assigned Commissioner, however, had determined to address the updating of

---

[42] *See*, Footnote 4

[43] D. 14-06-008 at 5.

- 16 -

Exhibit F

135

A.23-03-003  ALJ/TJG/hma

requirements for basic telephone service as a priority before considering whether to continue to implement a reverse auction or to pursue other measures to update high cost support amounts."[44]

Furthermore, in order to amend the reverse auction process adopted in D.96-10-066 (and reaffirmed in D.12-12-038), the Commission would have needed to scope the issue in R.09-06-019 and provide parties to R.95-01-020/I.95-01-021 (the proceedings in which D.96-10-066 was issued) with notice and an opportunity to be heard on this issue in order to comply with Pub. Util. Code § 1708.

The Commission did neither of these things. The reverse auction process to replace COLRs/allow for a COLR withdrawal as adopted in D.96-10-066, and affirmed in D.12-12-038, has never been amended. Furthermore, consistent with Pub. Util. Code § 1708, the Commission typically revises industry-wide rules issued in a rulemaking in a new industry-wide rulemaking, not in an application filed by a particular provider for specific relief.

The only way to not hold a reverse auction in the current AT&T COLR proceeding would be to give notice and opportunity to be heard to the service lists of R.95-01-020/I.95-01-021 and R.09-06-019 because the Commission would be deviating from the requirements of D.96-10-066 and D.12-12-038, which would take a significant amount of time.

It would also not make sense to address the reverse auction within the confines of AT&T's Application, as D.96-10-066 and D.12-12-038 were issued in rulemakings, and this is an industry-wide issue.

---

[44] Assigned Commissioner Amended Scoping Memo and Ruling (R. 09-06-019), issued January 29, 2013, at 2.

- 17 -

Exhibit F
136

A.23-03-003  ALJ/TJG/hma

Thus, under the COLR Rules, the Commission must conduct the reverse auction process.

### 9.2.   No Potential COLR Volunteered to Replace AT&T

AT&T has already indicated that there is not another COLR in AT&T's service territory.[45] Further, no carrier eligible to replace AT&T as a COLR volunteered to do so.

### 9.3.   AT&T's Proposed Alternatives are not COLRs

The alternatives for voice service that AT&T claims can replace its COLR service -- including VoIP service from cable companies such as Comcast or Cox, and mobile voice providers such as Verizon, T-Mobile, and AT&T Mobility[46] -- do not meet the definition of a COLR.[47] These companies did not apply to be COLRs and the Commission has not designated them as such. The voice alternatives AT&T claims can replace its COLR service are not required to offer voice service to everyone that requests it. Further, these companies may not even be able to meet that requirement.

Depending on the area in question, a cable company may need to build out its network in order to meet the requirement of offering service to any potential customers that request the service. In the case of the mobile voice providers, many comments at public participation hearings and on the Docket Card for this proceeding[48] call into question whether the companies are able to offer service to

---

[45] Amended Application at 7-8 and PHC Transcripts at 13:22-24.

[46] *Id.,* at 3.

[47] AT&T does not claim otherwise.

[48] Examples of these public comments include, but are not limited to, the ones discussed below. Public Comment of Wallace Stahl, Reporters' Transcript, Ukiah, California, February 22, 2024 at 292:9-15:

*Footnote continued on next page.*

- 18 -

A.23-03-003  ALJ/TJG/hma

every potential customer that requests it, given the gaps in these wireless

"These existing lines still go to where the signals, tower signal dependent cell towers don't reach … allowing AT&T to abandon the far flown customers who live outside or below the available microwave signals stopped by the mountains or below them in canyons like (indecipherable) and Brooktrails just a mile or two outside of Willits."

Public Comment of Neil Altimari, Reporters' Transcript, Ukiah, California, February 22, 2024 at 293: 24-295:9:

"…I live locally here in Mendocino County, Redwood Valley... we have got two cell phone carriers up there, and I have my landline through AT&T. One cell phone is through T-Mobile and it gets one bar, a lot of dropped calls; and another one is through AT&T, and it gets one bar and a lot of dropped calls… I work up here in Laytonville California (indecipherable) if you're not sure where it's at. And in that fire station -- in the fire station, I have got no cell phone service through T-Mobile and nothing on the AT&T cell phone..."

Public Comment of Victor Aparicio, Reporters' Transcript, Ukiah, California, February 22, 2024 at   299:7-300:9:

"I am a tribal member from the Manchester Point Arena Band of Pomo Indians. I am also on the Board of Trustee for Point Arena School District…

I heard … the AT&T rep, talk about Comcast and all these wonderful things and, you know, AT&T wireless and all of that. Well, anybody that lives on the South Coast in Point Arena specifically knows that that is merely impossible.

I am the water operator for my tribe. I was a former tow truck driver also, and I covered almost 100 miles of … land while I was a tow truck driver and probably had cell service maybe 30 percent of the time…

[My Aunt] can't get cell service out where she's at because of the -- because of the trees. So, there is no help for her. She's tried T-Mobile, AT&T, Verizon, US Cellular, none of them work…"

Public Comment of Liz Cooper, Browns Valley, CA, submitted on April 28, 2024:

"…I live in the Yuba County Foothills. My home is in a valley and does not receive any cell phone coverage unless I climb up a hill about 1000 yards…"

Public Comment of Armen Carlon, Forest Ranch, CA, submitted on April 28, 2024:

"The proposed map submitted by AT&T for relief from landline obligations is absolutely NOT correct for our address…. The alleged wireless coverage at this location is unreliable and cannot be depended on in an emergency, such as the Camp Fire, when wireless communications systems were rendered useless. This is a safety and hazard issue, and removing this service will put lives in danger..."

Public Comment of William Carriere, Glenn, CA, submitted on April 26, 2024:

"Our home is located along the Sacramento River in Glenn County. Cell service is spotty at best. This area is completely covered in Blue by the map, indicating that service exists.

*Footnote continued on next page.*

- 19 -

A.23-03-003  ALJ/TJG/hma

providers' coverage due to changes in terrain, dense foliage, geographic or structural obstacles and other characteristics that limit wireless signal propagation.[49]

The Commission's COLR Rules do not allow for non-COLR alternatives to replace a COLR. Further, during the 2015-2016 session, the Legislature considered legislation, AB 2395, that, if passed into law, would have changed

---

I have calls dropped all the time along the river and especially along Hwy 45 in Glenn and Colusa counties. Unfortunately T-Mobile, Verizon and others I have tried are even worse than ATT, so stuck with spotty ATT service."

[49] The Commission has made similar observations regarding wireless eligible telecommunication carriers not being able to serve everywhere in their claimed service territories. *See*, e.g., Resolution T-17437, which conditionally approved the ETC application of TAG Mobile, LLC at 15, Resolution T-17436, which conditionally approved the ETC application of Boomerang Wireless, LLC, at 15, Resolution T-17466, which conditionally approved the ETC application of Global Connection, Inc. of America, doing business as "Stand Up Wireless," at 14 and Resolution T-17448, which conditionally granted the ETC application of Air Voice Wireless, LLC at 17:

"Although wireless phone service offers great mobility for consumers, there are safety concerns related to wireless mobile phone service and E-911 and/or 911 connection limitations. Where there is a lack of coverage, poor signal strength, or atmospheric or terrain conditions that affect connections, emergency calls may not be completed. In rural areas, for example, with spotty connectivity or interference (e.g. due to geographic or structural obstacles), wireless mobile resellers of wholesale facilities service cannot guarantee full, accessible emergency connections for their own direct customers."

*See also*, Resolution T-17473, which conditionally approved the ETC application of Blue Jay Wireless, LLC at 11: "Blue Jay will require consumers to make an outbound call to activate their service." At 18:

"CD staff has safety concerns in two main areas of wireless phone service: the coverage of wireless mobile phone service and the ability of emergency first responders to find the location of the caller when using a mobile phone.

Where there is a lack of coverage, poor signal strength, or atmospheric or terrain conditions that affect connections, emergency calls may not be completed. In rural areas, for example, with spotty connectivity or interference (e.g. due to geographic or structural obstacles), wireless mobile resellers of wholesale facilities service cannot guarantee full, accessible emergency connections for their own customers. An incomplete emergency call can have devastating results."

- 20 -

A.23-03-003  ALJ/TJG/hma

existing law to allow for the relief AT&T seeks in its Application, if these purported alternatives met certain requirements.[50] That legislation did not pass. In essence, AT&T seeks to effectuate the relevant portion of AB 2395, while asking the Commission to overlook that AB 2395 never became law. The Commission's COLR Rules currently do not allow for such relief, as the alternatives AT&T suggests might replace it are not COLRs, which could lead to customers being denied voice service.

## 10.   Application Dismissed with Prejudice

The law and facts of this case are such that AT&T's Application must be dismissed with prejudice. The Commission's COLR Rules require the presence of another COLR, either one already in place or one willing to replace AT&T, for the Commission to relieve AT&T of its COLR duties. No other COLR serves AT&T's service territory and no potential COLR volunteered to replace AT&T. Thus, even if AT&T were to prove all other facts it asserts, its Application still fails to meet this standard.

It is not clear why AT&T filed this Application, under existing rules, and then attempted to convince the Commission that it should ignore its rules, based on flawed and erroneous assertions regarding the law and regulatory policy that slowed down the adjudication of this proceeding. The scope of this Application

---

[50] The bill would require the alternate service to provide, among other functions:

- Voice grade access to the public switched telephone network or its successor;

- Real-time, two-way voice communications;

- Access to 911; and

- Backup-battery capability meeting FCC standards (for household customer premise equipment). Notably missing from these requirements are critical basic service components such as access to LifeLine and relay services.

- 21 -

Exhibit F

140

A.23-03-003  ALJ/TJG/hma

is not modest, as AT&T claims.[51] If AT&T had wished to make industry-wide changes to the Commission's COLR Rules, it could have filed a Petition for Rulemaking under Rule 6.3 of the Commission's Rules of Practice and Procedure.

Given the unsuitability of this Application, the resources that another application would require, and the fact that the Commission intends to initiate a rulemaking regarding its COLR Rules, AT&T's Application is dismissed with prejudice. AT&T shall not file another application for COLR relief, nor a similar one, until one year after the issuance of a decision closing the new OIR discussed in Section 14.

## 11. AT&T Already is Able to Modernize its Network

At least publicly, AT&T has attempted to present its Application as an attempt to modernize its network. This effort includes a letter AT&T sent to customers on April 8, 2024, as well as the following statement from an AT&T representative at the public participation hearing held on February 22, 2024 in Ukiah:

> "We are simply asking the PUC to work with us in a proven, measured, thoughtful, and transparent way to ensure that our customers in California have access to the most advanced reliable technology available."[52]

AT&T's public arguments paint the picture that the Commission's COLR Rules require AT&T to retain outdated copper-based landline facilities that are expensive to maintain, or that AT&T needs Commission approval in order to be able to retire copper facilities and instead, invest in more modern technologies such as VoIP, wireless, and fiber.

---

[51] Amended Application at 4-5.

[52] Reporters' Transcript, Ukiah, California, February 22, 2024, at 127:4-7.

- 22 -

A.23-03-003  ALJ/TJG/hma

These arguments are not accurate.

The Commission does not have rules preventing AT&T from retiring copper facilities.[53] Furthermore, the Commission does not have rules preventing AT&T from investing in fiber or other facilities/technologies to improve its network. Indeed, AT&T reported that in Q2-4 2023 it invested over $150 million on fiber deployment projects in California.[54] If AT&T's arguments were accurate, this activity would be illegal.

Finally, it should be noted that the Commission defines a COLR as a local exchange carrier, the COLR Rules do not distinguish between the voice services offered (VoIP vs. POTS).

## 12.   Summary of Public Comment

Rule 1.18 of the Commission's Rules of Practice and Procedure allows any member of the public to submit written comment in any Commission proceeding using the "Public Comment" tab of the online Docket Card for that proceeding on the Commission's website. Rule 1.18(b) requires that relevant written comment submitted in a proceeding be summarized in the final decision issued in that proceeding. The Commission has received more than 5,000 public comments on the Docket Card in this proceeding, in addition to the public comments made at public participation hearings, at Commission voting

---

[53] D.08-11-033 adopted the process governing retirement of copper loops and related facilities to provide telecommunications services by ILECs such as AT&T. In that decision, the Commission declined to adopt rules for the retirement of copper facilities. The Commission did adopt notification requirements and rules regarding CLEC requests to purchase the copper facilities from the ILECs. However, these requirements and rules do not include any limitations or restrictions to the ILECs' ability to retire copper facilities.

[54] *See*, AT&T California's Revised Corrective Action Plan [Supplemental Advice Letter No.49420B of Pacific Bell Telephone Company d/b/a AT&T California (U-1001-C)], filed June 23, 2023, at 9. The actual amount is confidential.

- 23 -

A.23-03-003  ALJ/TJG/hma

meetings, and other venues. There has also been considerable interest and engagement from elected officials through letters to the Commission and local initiatives. An overwhelming majority of public comments do not support AT&T's Application.

## 13.   Procedural Matters

This decision affirms all rulings made by the Administrative Law Judge and assigned Commissioner in this proceeding. All motions not ruled on are deemed denied.

## 14.   Ordering Instituting Rulemaking

Given the age of its COLR rules, as well as changes in the marketplace, it is appropriate for the Commission to consider whether its COLR rules should be revised, and, if so, how the rules should be revised.

## 15.   Comments on Proposed Decision

The proposed decision of ALJ Thomas J. Glegola in this matter was mailed to the parties in accordance with Section 311 of the Public Utilities Code and comments were allowed under Rule 14.3 of the Commission's Rules of Practice and Procedure.

On May 30, 2024, the following parties filed opening comments:  Cal Advocates, CforAT, TURN, AT&T, RCRC, County of San Mateo, County of Santa Clara, Tahoe Energy Ratepayers Group, and Catalina Island Connect. On June 4, 2024, the following parties filed reply comments:  AT&T, TURN, Cal Advocates, and CforAT.

No revisions have been made to this decision.

## 16.   Assignment of Proceeding

John Reynolds is the assigned Commissioner and Thomas J. Glegola is the assigned Administrative Law Judge in this proceeding.

Exhibit F
143

A.23-03-003  ALJ/TJG/hma

**Findings of Fact**

1.   The definition of a COLR is a local exchange service provider that stands ready to provide basic service to any customer requesting such service within a specified area. To be a COLR, the provider must meet Commission-approved qualifications.

2.   The purpose of the COLR is to ensure that there is a public utility which is obligated to serve all the customers in its service area that request service.

3.   D.96-10-066 designated the incumbent LECs as the COLR in all of their service areas until such time that another carrier or carriers are designated to be a COLR.

4.   No hearing has been held in this proceeding.

5.   AT&T is the only COLR in its service territory.

6.   No potential COLR volunteered to replace AT&T as a COLR.

**Conclusions of Law**

1.   The Commission's Universal Service Rules, adopted in D.96-10-066 and affirmed in D.12-12-038, require the presence of another COLR or a replacement COLR to grant a COLR withdrawal application.

2.   The Commission's Universal Service Rules, adopted in D.96-10-066 and affirmed in D.12-12-038, require the Commission to offer potential COLRs the opportunity to replace AT&T as a COLR.

3.   The Commission's Universal Service Rules, adopted in D.96-10-066 and affirmed in D.12-12-038, require the presence of another COLR or a replacement COLR to grant a COLR withdrawal application.

4.   The Commission should dismiss this application.

Exhibit F

144

A.23-03-003  ALJ/TJG/hma

# O R D E R

**IT IS ORDERED** that:

1. The Application of Pacific Bell Telephone Company d/b/a/ AT&T California (U1001C) for Targeted Relief from its Carrier of Last Resort Obligation and Certain Associated Tariff Obligations is dismissed, with prejudice.

2. Pacific Bell Telephone Company d/b/a/ AT&T California (U1001C) shall not file another application for relief from its Carrier of Last Resort obligations until at least one year after the issuance of a decision closing the new Order Instituting Rulemaking discussed in Section 14.

3. Pacific Bell Telephone Company d/b/a/ AT&T California (U1001C) shall not file a similar application to the dismissed application until at least until one year after the issuance of a decision closing the new Order Instituting Rulemaking discussed in Section 14.

4. Application 23-03-003 is closed.

This order is effective upon issuance.

Dated June 20, 2024, at San Luis Obispo, California.

> ALICE REYNOLDS
> President
> DARCIE L. HOUCK
> JOHN REYNOLDS
> KAREN DOUGLAS
> Commissioners

> Commissioner Matthew Baker recused himself from this agenda item and was not part of the quorum in its consideration.

- 26 -

Exhibit F

145

A.23-03-003  ALJ/TJG/hma

- 27 -

# EXHIBIT G



**BEFORE THE PUBLIC UTILITIES COMMISSION
OF THE STATE OF CALIFORNIA**

**FILED**

11/21/25
04:59 PM
R2406012

| | |
|---|---|
| Order Instituting Rulemaking Proceeding To Consider Changes to the Commission's Carrier of Last Resort Rules. | R.24-06-012 (Filed June 20, 2024) |

**PACIFIC BELL TELEPHONE COMPANY D/B/A
AT&T CALIFORNIA'S (U 1001 C) OPENING COMMENTS ON
ADMINISTRATIVE LAW JUDGE'S RULING REGARDING
COMMENTS ON TOPICS DISCUSSED AT AUGUST WORKSHOP**

**[PUBLIC VERSION]**

Nelsonya Causby
AT&T Services, Inc.
430 Bush Street, Sixth Floor
San Francisco, CA 94108
Tel: (415) 268-9493
Email: nelsonya.causby@att.com

Meredith B. Osborn
Arnold & Porter Kaye Scholer LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Tel: (415) 471-3140
Email: meredith.osborn@arnoldporter.com

*Attorneys for AT&T California*

November 21, 2025

Exhibit G
148

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ......................................................................................................1

II.   RESPONSES TO SPECIFIC QUESTIONS........................................................5

    A.    Federal Policy ...........................................................................................5

    B.    Accessibility...............................................................................................8

        1.    Question 1 ............................................................................8

        2.    Question 2.............................................................................10

        3.    Question 3 ............................................................................12

        4.    Question 4 ............................................................................12

    C.    Ancillary Services.....................................................................................13

        1.    Question 1 ............................................................................13

        2.    Question 2 ............................................................................17

        3.    Question 3 ............................................................................20

        4.    Question 4 ............................................................................22

    D.    Miscellaneous ...........................................................................................24

        1.    Question 1 ............................................................................24

        2.    Question 2.............................................................................26

    E.    Ordering Carriers to Provide Information..............................................28

        1.    Question 1.............................................................................29

        2.    Question 2 ............................................................................29

        3.    Question 3.............................................................................34

        4.    Question 4.............................................................................36

        5.    Question 5.............................................................................37

III.  CONCLUSION...........................................................................................38

i

Exhibit G
149

and RGX.[86] In rare cases, and mostly as a last resort, AT&T will see if it can buy a part on eBay. AT&T tries to avoid eBay because most parts sold on eBay come "as is" and without a warranty, necessitating the use of a repair vendor (or a subcontractor) to check and, if necessary, repair the part before installation.[87]

Across all these efforts, AT&T spends ***BEGIN CONFIDENTIAL ███████ █████ END CONFIDENTIAL*** annually to source parts for AT&T California's legacy copper network. Nevertheless, AT&T California often cannot find the necessary parts. For example, it is extremely difficult to find a certain type of maintenance interface cards to keep Connect DX transport equipment operational. This high-capacity transport equipment, with four OC48 ports, constitutes important nodes in AT&T California's TDM network. Unfortunately, the manufacturer no longer produces new maintenance interface cards for this equipment, and AT&T California generally cannot purchase them from others. Not all of the cards that were produced are of the required type, and the manufacturer did not distinguish one type of these cards from another. As a result, AT&T California has to engage in trial and error each time it needs to replace this particular type of maintenance interface card.

### E.    Ordering Carriers to Provide Information

To respond to these requests for data, AT&T California conducted a diligent search and reasonable inquiry of those personnel most likely to have the requested information. For questions E.2.b–j, AT&T California has only located full-year data on the number of each type of voice call for 2023 and 2024 and only at the statewide level. AT&T California does not maintain these call volume data in the ordinary course of its business; does not use or rely on

---

[86] *See B-Stock Home Page*, B-Stock, https://bstock.com/ (last visited Nov. 19, 2025); *RGX Home Page*, Recycle Glob. Exch., https://www.recyclegx.com/ (last visited Nov. 19, 2025).

[87] In contrast, parts sold on B-stock and RGX typically come with one- to two-year warranties.

Exhibit G

150

them in its operations, strategies, and decision-making; and extracted these data only for purposes of this proceeding.[88]

      1.     All respondent COLRs are ordered to submit a .shp file indicating the point-level locations of all customers subscribed to basic service as of January 1, 2025.

See Attachments C (residential customers) and D (business customers).

      2.     All respondent COLRs are ordered to respond to the following questions:

      a.     How many customers were subscribed to basic service as of January 1, 2025? Please provide separate totals for residential and non-residential customers, and report totals statewide and by county based on the customer's billing address.

In the ordinary course of its business, AT&T California retains data on the number of customers subscribed to basic service as of the end of each month, so it is providing data for December 31, 2024 instead of January 1, 2025. As of December 31, 2024, AT&T California had 422,968 residential customers subscribed to basic service and 309,803 business customers subscribed to basic service. The breakdown per county of service address is attached as Attachment E.[89]

      (i)     Of customers subscribed to basic service as of January 1, 2025, how many are served by copper wiring at the customer premises? How many are served by technology other than copper?

AT&T California states that it only has data from October 2025 on the type of last-mile technology used to provide basic service to residential customers. As of October 31, 2025, AT&T California had approximately 5,600 residential basic service customers serviced over last-

---

[88] Because of these factors, AT&T California has not been able to validate the accuracy of these data.

[89] Especially, but not only, for business customers, the billing address may not be the same as the service address. Indeed, AT&T California customers have billing addresses outside of California for service inside the state.

Exhibit G

151

mile fiber connections and approximately 319,000 residential basic service customers serviced over last-mile copper connections. Based on its research to date, AT&T California has been unable to determine how many of its business basic service customers are serviced over last-mile fiber connections and how many are serviced over last-mile copper connections. AT&T California continues to pursue the requested information and will supplement its response if it identifies a way to separate its business basic service customers by last-mile connection type.

> (ii)    Of customers subscribed to basic service as of January 1, 2025, how many are participants in the California Connect (also known as DDTP) program?

California Connect is a program operated by the Commission, which "1) distributes specialized telecommunications equipment to persons with disabilities; 2) provides a dual-party relay system called California Relay Service; and 3) supplies assistance for speech generating devices"; individuals desiring such assistance apply directly to the Commission, and not through their communications provider, to receive this assistance.[90] As of October 2025,[91] AT&T California did, however, make available three custom-calling features for free (Speed Dial 8, Speed Dial 30, and Three Way Calling) to approximately 400 POTS customers for which it claims reimbursement from the California Connect program's fund. Apart from the customers receiving those features, AT&T California does not know which of its customers are enrolled in California Connect.

> (iii)    Of customers subscribed to basic service as of January 1, 2025, how many are California LifeLine participants?

---

[90] *See Deaf and Disabled Telecommunication Program*, Cal. Pub. Utils. Comm'n, https://www.cpuc.ca.gov/consumer-support/financial-assistance-savings-and-discounts/ddtp (last visited Nov. 20, 2025).

[91] After a diligent search and reasonable inquiry of those personnel most likely to have such information, AT&T California states that it only has current, but not historical, data on the number of POTS customers that receive these three custom-calling features.

30

Exhibit G

152

# EXHIBIT H

Federal Communications Commission    FCC 26-19

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Reducing Barriers to Network Improvements and Service Changes | **)** **)** | WC Docket No. 25-209 |
| | **)** | |
| Accelerating Network Modernization | **)** | WC Docket No. 25-208 |
| | **)** | |

**REPORT AND ORDER**

**Adopted:  March 26, 2026**                              **Released:  March 27, 2026**

By the Commission:  Chairman Carr and Commissioners Gomez and Trusty issuing separate statements.

**TABLE OF CONTENTS**

Heading                                                                      Paragraph #

I.    INTRODUCTION ...................................................................................................................................1
II.   BACKGROUND ....................................................................................................................................8
III.  DISCUSSION.......................................................................................................................................12
      A.  Eliminate Network Change Disclosure Filing Requirements ......................................................12
      B.  Section 214 Discontinuance.........................................................................................................22
          1.  Creating One Consolidated Technology Transitions Discontinuance Rule ...........................23
          2.  Eliminating Grandfathering Filing Requirements for Certain Services .................................60
          3.  Additional Requirements for Applications to Discontinue a Service Supporting
              Interconnection Trunks or the Exchange of Traffic ..............................................................67
          4.  Limited Section 214(a) Forbearance .....................................................................................74
          5.  The 31-day Automatic Grant Period Applies to All Discontinuance Applications ................85
          6.  Contents of Discontinuance Applications ..............................................................................90
          7.  Emergency Discontinuances ..................................................................................................92
          8.  Eliminating Outdated Discontinuance Rules..........................................................................98
      C.  State Mandates Conflicting with the FCC's Section 214 Discontinuance Authorizations
          and Authority Are Subject to Preemption.................................................................................106
IV.  PROCEDURAL MATTERS...............................................................................................................116
V.   ORDERING CLAUSES......................................................................................................................119
APPENDIX A—FINAL RULES
APPENDIX B—FINAL REGULATORY FLEXIBILITY ANALYSIS

## I.    INTRODUCTION

1.    The FCC acts today to unleash new, high-speed infrastructure builds in communities all across the country.  We do so by cutting through the red tape that has both required providers to keep aging copper lines in place and effectively prevented them from investing in the modern infrastructure that Americans want and deserve.  This action can free up billions of dollars for new builds and represents another step forward in the FCC's Build America Agenda.

2.    Today's communications marketplace offers consumers and businesses a vast array of advanced communications services far beyond the legacy voice service that first connected Americans in

Exhibit H
154

discontinuances and expanding the range of applications eligible for a 31-day streamlined review, it is not necessary to adopt additional rules restricting the Bureau's application review or creating additional time periods for objections and responses.  USTelecom does not point to specific applications that have previously been subject to unnecessary discretionary delay under the current rules.  Indeed, over the last five years, Bureau staff have removed only 11 discontinuance applications from streamlined processing, nine of which were in 2025 and were the result of a shutdown of certain agency operations due to a lapse in federal appropriations.  In all 11 instances, staff released Public Notices granting all of those applications 51 days after such removal.  And we believe that the rule changes we adopt today will make delay even less likely, because this Order broadens and clarifies the circumstances in which an alternative service is to be considered an adequate replacement for the service being discontinued.  The Commission therefore maintains the necessary flexibility to address proposed discontinuances that would otherwise result in the loss of service altogether, while the treatment of discontinuances that include an adequate replacement for customers is clarified and expedited.

### 2.    Eliminating Grandfathering Filing Requirements for Certain Services

60.    We revise our rules to grant blanket section 214(a) authority for carriers to grandfather the following services to the extent they come within the purview of section 214(a):  (1) any legacy voice service; (2) any lower-speed data telecommunications service; and (3) any interconnected VoIP service provisioned over copper wire.[212]  We define low-speed data telecommunications services as those operating at speeds below 25/3 Mbps while we consider forbearance from the incumbent LEC-specific interconnection and related obligations as proposed in the *IP Interconnection Notice*, after which we will revisit this definition.[213]  This blanket grant of authority eliminates the need for carriers to file a section 214(a) application when grandfathering these services, allowing carriers to focus their resources on the development and deployment of next-generation networks while still providing service to current customers.

61.    In the *Network and Services Modernization Notice*, we proposed to codify the relief granted in the Bureau's *March 2025 Grandfathering Order* and *May 2025 Grandfathering and Technical Appendix Order*.[214]  In the *March 2025 Grandfathering Order*, the Bureau granted section 214(a) authority for carriers to grandfather any legacy voice or telecommunications data service covered by sections 63.71(k)-(1) of the Commission's rules and waived the requirement that carriers file a section 214(a) application seeking Commission authorization in that instance.[215]  The *May 2025 Grandfathering and Technical Appendix Order* extended the relief granted in the *March 2025 Grandfathering Order* to interconnected VoIP service provisioned over copper lines.[216]  The Bureau determined in both *Orders* that granting blanket section 214(a) authority was warranted due to developments in communications technologies that allow consumers to be less dependent on these legacy services.[217]

---

[212] *See VoIP Discontinuance Order*, 24 FCC Rcd 6039, 6044-47, paras. 9-13 (2009) (*VoIP Discontinuance Order*) (exercising ancillary authority under Title I of the Act to extend section 214 discontinuance obligations to interconnected VoIP service providers).

[213] This definition is consistent with sections 63.71(k)-(l) of our current rules.  47 CFR §§ 63.71(k)-(l); *see also March 2025 Grandfathering Order*, 40 FCC Rcd at 2021, para. 6; *May 2025 Grandfathering and Technical Appendix Order*, 40 FCC Rcd at 3360, para. 9; *IP Interconnection Notice* at 3, para. 4.

[214] *Network and Services Modernization Notice*, 40 FCC Rcd at 5356, para. 69; *March 2025 Grandfathering Order*, 40 FCC Rcd at 2021 para. 6; *May 2025 Grandfathering and Technical Appendix Order*, 40 FCC Rcd at 3360, para. 9.

[215] *March 2025 Grandfathering Order*, 40 FCC Rcd at 2021, para 6.

[216] *May 2025 Grandfathering and Technical Appendix Order*, 40 FCC Rcd at 3360, para. 9.

[217] *March 2025 Grandfathering Order*, 40 FCC Rcd at 2023, para. 10; *May 2025 Grandfathering and Technical Appendix Order*, 40 FCC Rcd at 3361, para. 12.

Exhibit H

155

62.      We agree with commenters that eliminating unnecessary grandfathering requirements reduces carriers' burdens while not affecting existing subscribers, as current customers are entitled to keep the grandfathered service.[218]  A carrier still must file a discontinuance application seeking authority to permanently discontinue one of these services, and affected customers will be notified of the planned discontinuance and have the opportunity to comment.[219]  In the *March 2025 Grandfathering Order*, the Bureau noted that "carriers grandfathering these services will necessarily need to communicate to customers the grandfathering status of their service beforehand."[220]  We take the next step and require that carriers continue to notify current customers before grandfathering a service, including TDM-based transport services and services reliant on TDM-based trunk lines, 911 TDM circuits, and TDM private line circuits, which shall include (1) a "no earlier than" date, by which it intends to seek to permanently discontinue the service, and (2) a statement regarding alternative services available in the affected service area.[221]

63.      We retain a notification requirement because this relatively low burden on carriers will help ensure that customers learn as soon as possible that their service is likely to be discontinued at some point in the future, so they can make informed decisions about what services to purchase even before a discontinuance is imminent.[222]  And any customers that still subscribe to the grandfathered service when the carrier later seeks permanent discontinuance authority will have the ability to object and ask to have the application removed from streamlined processing.[223]  These requirements alleviate concerns raised in the record that eliminating the need to file grandfathering applications in the above scenarios will allow carriers to eliminate services without any notice.[224]

64.      We define "lower-speed" data telecommunications service for purposes of this blanket grant of authority consistent with our existing grandfathering rules—i.e., encompassing the data telecommunications services currently subject to sections 63.71(k) and (l) of our rules.[225]  We proposed in the *Network and Services Modernization Notice* to define lower-speed data telecommunications service as

---

[218] *See March 2025 Grandfathering Order*, 40 FCC Rcd at 2023-24, para. 11; *May 2025 Grandfathering and Technical Appendix Order*, 40 FCC Rcd at 3361, para. 13; US Chamber of Commerce Comments at 1; WTA Comments at 4; USTelecom Comments at 35-36.  *But see* Bandwidth Feb. 27, 2026 *Ex Parte* Letter, Att. (proposing that the Commission except from any grant of blanket grandfathering authority low-speed data telecommunications services subject to sections 63.500 or 63.501).

[219] *March 2025 Grandfathering Order,* 40 FCC Rcd at 2021, para. 6; *May 2025 Grandfathering and Technical Appendix Order*, 40 FCC Rcd at 3361-63, para. 13.

[220] *March 2025 Grandfathering Order,* 40 FCC Rcd at 2021, para. 6.  Indeed, to the extent that an incumbent LEC has already retired its copper facilities before grandfathering or seeking to permanently discontinue any of the services covered by our actions today, it will have already engaged with its customers.  *See, e.g.*, *2016 Technology Transitions Order*, 31 FCC Rcd at 11147, para. 45 (noting incumbent LECs' "strong incentives to work closely with their retail customers in order to retain their business given the competition they face from competitive LECs, cable providers, and wireless providers" and that "these communications must necessarily occur for the incumbent LEC to continue providing the services to which its customers subscribe").  *But see* NASUCA et al. Reply at 17-24 ("Forbearance from . . . the Section 251(c)(5) public notice rules would remove the only transparent mechanism by which consumers, local governments, and competitive carriers can track where and when network changes occur."); Public Knowledge/CWA Comments at 10-16 ("The Commission should not dilute the remaining notice requirements. Impacted customers *already* face little notice and short timelines for the opportunity to urge the Commission to remove an application from streamlined treatment.") (emphasis in original).

[221] *See infra* Appx. A, § 63.71(j).

[222] INCOMPAS Comments at 8.

[223] 47 CFR §§ 63.71(a)(5), (f).

[224] *See* Rural County Representatives of California Comments at 4.

[225] *See* 47 CFR §§ 63.71(k)-(l); *see also infra* Appx. A, § 63.71(j).

Exhibit H
156

Federal Communications Commission                                           FCC 26-19

a data telecommunications service operating at speeds below 25/3 Mbps.[226]  When the Commission adopted section 63.71(k), which allows streamlined treatment of applications to grandfather low-speed services, it defined that term as those operating at speeds below 1.544 Mbps.[227]  The Commission accounted for rising network speeds in the *Second Wireline Infrastructure Order* by extending the streamlined treatment of grandfathering applications to services operating at speeds below 25/3 Mbps if replaced with services operating at 25/3 Mbps or higher.[228]

65.    In connection with our proposed definition, we sought comment on whether we should define lower-speed service as services operating below 45 Mbps symmetrical "given the rapidly increasing bandwidths of networks today."[229]  As discussed below, we agree with commenters' concerns regarding potential unintended impacts, particularly for emergency services, if we raise the speed threshold for blanket grandfathering authority too soon.[230]  We thus find it appropriate to defer consideration of such action until after the Commission acts on the proposed forbearance from the incumbent LEC-specific interconnection and related obligations.[231]  Defining lower-speed data telecommunications service as those services operating under 25/3 Mbps strikes the appropriate balance between acknowledging the increased bandwidth capabilities of modern networks and minimizing any unintended impacts on emergency services.

66.    Finally, we decline to extend the scope of the blanket grandfathering authority we grant today to all interconnected VoIP services, regardless of transmission medium.[232]  While we agree with USTelecom that many consumers use interconnected VoIP lines provisioned over a variety of transmission mediums, we limit the blanket section 214(a) authority we grant today to interconnected VoIP services provisioned over copper lines to promote the ongoing transition from legacy and copper-based networks to IP networks.[233]  Many consumers use interconnected VoIP service as a replacement service[234] and have expectations about its availability, and we continue to find that the section 214(a) discontinuance requirements applicable to grandfathering for the majority of interconnected VoIP services is an important safeguard.[235]

### 3.    Additional Requirements for Applications to Discontinue a Service Supporting Interconnection Trunks or the Exchange of Traffic

67.    As part of the rules we adopt today, we require carriers seeking authority to discontinue a

---

[226] *Network and Services Modernization Notice,* 40 FCC Rcd at 5356, paras. 69-70.

[227] *First Wireline Infrastructure Order*, 32 FCC Rcd at 1161, para. 84.

[228] *Second Wireline Infrastructure Order*, 32 FCC Rcd at 5662-64, paras. 5, 7, 11.

[229] *Network and Services Modernization Notice,* 40 FCC Rcd at 5356, para. 70.

[230] *See* Intrado Comments at 12-13; Bandwidth Comments at 9-12; Rural County Representatives of California Comments at 4; *see also infra* Section III.B.3.

[231] *See* USTelecom Comments at 37 (stating that the definition of lower-speed data telecommunications service should be updated to speeds below 45 Mbps symmetrical).

[232] *See id.* at 35-36.

[233] *See* Intrado Comments at 1-2, 12-13 (describing the potential impact to emergency services should the Commission eliminate discontinuance requirements too quickly).

[234] Interconnected VoIP lines accounted for 79% of all retail voice service connections by June of 2024, the last time the Commission reported such data.  *See* December 2024 Voice Telephone Services Report at 3, Fig. 2.

[235] *See VoIP Discontinuance Order,* 24 FCC Rcd at 6043-49, paras. 8-17 (applying section 214(a) discontinuance requirements to interconnected VoIP service so customers have notice and to safeguard against "abrupt" changes to availability).

Exhibit H
157

## STATEMENT OF
## COMMISSIONER ANNA M. GOMEZ

Re:     *Reducing Barriers to Network Improvements and Service Changes; Accelerating Network and Service Modernization*, WC Docket Nos. 25-209 and 25-208, Report and Order (March 26, 2026).

Today the Commission takes a meaningful step in modernizing our regulatory framework for the transition away from legacy copper telephone networks to IP-based services.

Our nation's copper infrastructure is aging, costly to maintain, and increasingly vulnerable to theft and natural disaster. The future is IP-based, and our rules should facilitate, not obstruct, carriers' ability to build it.

I also want to recognize that this proceeding generated a serious and substantive record. Carriers, public safety advocates, rural providers, competitive carriers, and consumer organizations each engaged with the hard questions this transition raises. The Commission is better for that engagement, and it shows in this Order. I am pleased to support this item, and I want to thank the Chairman for his willingness to work collaboratively to strengthen the public safety, consumer, and competition safeguards in it.

The transition from legacy copper to IP-based services is not a uniform experience. Those who are most affected are often in rural, remote, tribal, and low-income communities, where alternatives are least mature and the consequences of a gap in service are most severe.

Getting the public safety, consumer protection, and competition pieces right matters enormously, and I am pleased that after working through some of our requested edits, this Order strikes the right balance between moving the transition forward, protecting our nation's 911 network, which has special considerations as the states migrate to next generation 911 services, fostering a robust and competitive market for the services that will replace legacy voice, and ensuring no one is left without a path forward when their service changes.

One concrete example of our collaboration with the Chair's office is worth highlighting. This Order now establishes a centralized docket where consumers can file objections and track concerns related to service discontinuances, and it requires carriers to include notice of that docket and how to access it when notifying customers of a planned discontinuance. It also directs the relevant bureaus to update consumer-facing pages on the Commission's website so that people know how to use the docket, how to file, and how to access the express filing process.

That is a practical, meaningful step. A consumer who receives notice that their existing phone service is going away should also receive clear information about where to go if something goes wrong. This Order now ensures that. Of course, we recognize that not all consumers have ready access to the internet or the resources to navigate these processes on their own. With our assistance, we hope that consumer advocates, community organizations, and state and local partners will help ensure that those consumers are also able to make their voices heard.

I also want to recognize the important role that states play in protecting consumers, safeguarding public safety, and combating fraud. States are often the first line of defense for consumers navigating problems with their communications services, and their authority in these areas is not diminished by today's action. The preemption framework adopted here is appropriately scoped to the discontinuance of interstate and jurisdictionally mixed services, and does not reach state consumer protection laws, state universal service obligations, or state authority over 911 service.

That is the right line to draw. The Commission has seen firsthand how powerful the federal and state partnership can be, including through our memoranda of understanding with state attorneys general

Exhibit H
158

**Federal Communications Commission**                    **FCC 26-19**

to combat illegal robocalls. That same spirit of partnership will be essential as this transition unfolds, and I look forward to continuing to build on it.

I want to thank the Chairman for the collaborative process through which we were able to work together to ensure consumers are not left behind as this transition unfolds.

And I also want to express my sincere appreciation to the Wireline Competition Bureau for their careful and thorough work on a genuinely complex rulemaking, and for their time walking me and my staff through our questions. I look forward to continuing this work together.

Exhibit H
159

# EXHIBIT I

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of<br><br>Section 63.71 Application of<br><br>AT&T Services, Inc., on behalf of its affiliate;<br>Pacific Bell Telephone Company d/b/a AT&T<br>California<br><br><br>Authority Pursuant to Section 214 of<br>The Communications Act of 1934, As Amended,<br>To Discontinue the Provision of Service | **File No.** |

### SECTION 63.71 APPLICATION OF AT&T

AT&T[1] applies for authority under section 214(a) of the Communications Act, as amended, 47 U.S.C. § 214, and section 63.71 of the Federal Communications Commission's ("Commission") rules, 47 C.F.R. § 63.71, to discontinue certain legacy TDM-based voice services in certain wire centers located in California.

### INTRODUCTION

In its recent *Network Modernization Order*, the Commission made clear its desire to accelerate the modernization of America's communications infrastructure.[2] This Application takes an important step toward that goal. The copper wires that once served *every* home now

---

[1] AT&T Services, Inc. files this Application on behalf of its affiliate Pacific Bell Telephone Company d/b/a AT&T California. The FRN associated with this filing is 0001551530.

[2] *See Reducing Barriers to Network Improvements and Serv. Changes*, Report and Order, FCC 26-19, WC Dkt. No. 25-209, ¶ 1 (Mar. 27, 2026) ("*Network Modernization Order*").

1

Exhibit I
161

serve just *three percent* of Californian households in AT&T's service territory, and that number shrinks every day as customers switch to modern broadband options that are more affordable, reliable, and energy efficient. AT&T must spend $1 billion a year to maintain a nearly-empty copper network that has become an easy mark for criminals—California has already suffered about 2,000 outages from copper thefts this year—and that is estimated to drain the power grid of over 100 million of kilowatt-hours each year.

AT&T thus seeks to discontinue AT&T Business Individual Access Line Service[3] (the "Affected Service")—a copper-wire-based legacy service often referred to as "POTS"—to approximately 15,000 customers (the "Affected Customers") in portions of 360 wire centers in California (the "Affected Service Area").[4] This Application complements actions AT&T is concurrently taking to grandfather POTS in the Affected Service Area.[5] AT&T is filing concurrently a related Application to discontinue AT&T Residential Local Service in the Affected Service Area.

The Affected Service Area is one of the most competitive areas in the country, and this Application thus presents a paradigmatic case for streamlined approval. The Affected Service Area is blanketed by three wireless networks offering both voice and broadband services. Cable companies and fiber providers have likewise deployed extensive wireline broadband networks throughout these wire centers. These providers offer the type of modern IP-based services that

---

[3] AT&T Business Individual Access Line Service may also be called Measured Rate Business Service or AT&T Business Local Exchange Line Service.

[4] This Application also includes the wholesale version of the Affected Service, which is sold to carrier customers.

[5] *See Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Invest.*, Order, 40 FCC Rcd. 2019 (2025) (waiving the requirement to file applications to grandfather legacy voice services).

Exhibit I
162

customers crave but that POTS cannot deliver, which is why the number of businesses that subscriber to the Affected Service has dramatically declined.

The National Broadband Map confirms this competitive reality. Over 99.9 percent of serviceable locations in the 360 wire centers are covered by at least three facilities-based, terrestrial fixed broadband or mobile voice providers. And this is without even counting emerging satellite-based services that are increasingly capable of serving virtually everywhere.

Critically, *every* Affected Customer has an alternative: *all* can receive the AT&T Phone for Business – Advanced ("APB-A")[6] service, which is not merely an adequate substitute for POTS, but superior to it.

And because this is the case, this Application abundantly satisfies the requirements for discontinuance as currently set forth in 47 C.F.R. §§ 63.71, 63.602.[7] The Commission has repeatedly granted AT&T discontinuance of the Affected Service on a streamlined basis for other AT&T wire centers.[8] In granting those applications, the Commission recognized each time that APB-A is an adequate replacement for business POTS under the Adequate Replacement

---

[6] AT&T recently introduced an updated and renamed version of APB-A called AT&T Business Voice ("ABV"). ABV uses the same technology and customer equipment as APB-A and has all the same features plus additional ones, including improved voicemail, call handling, and call screening functionality. The technical performance of ABV does not vary from APB-A. ABV launched on June 17, 2025, and is in the process of being introduced to different market segments. Currently, depending on the market segment, the service may be sold to customers as ABV or APB-A. For simplicity's sake, in this application references to "APB-A" include ABV as well as APB-A.

[7] AT&T files this Application under the Commission's existing rules, as the new rules adopted in the *Network Modernization Order* have not yet gone into effect (and likely will not have gone into effect if this Application is granted on a streamlined basis). However, this Application also independently satisfies the requirements of the Commission's new rules, as explained herein.

[8] *See* Section 63.71 Application of AT&T, WC Dkt. No. 25-25 (filed Apr. 1, 2025); *id.*, WC Dkt. No. 25-228 (filed July 15, 2025); *id.*, WC Dkt. No. 25-333 (filed Dec. 1, 2025).

Exhibit I

163

Test outlined in the Commission's 2016 *Tech Transitions Order*.[9] As with AT&T's previously approved discontinuance applications, discontinuing the Affected Service here will benefit the public and serve as an important step toward meeting AT&T's and the Commission's shared goal of advancing next-generation communication technologies.[10]

AT&T's request for streamlined treatment of this Application rests upon the availability of APB-A—an "Adequate Replacement" service—to all Affected Customers. However, as noted, this is only one of many alternatives available. Affected Customers are also served by one or more "facilities-based mobile wireless" providers, including Verizon, whose mobile voice service the Commission recently found to be an adequate replacement for POTS.[11] Likewise, as noted, Affected Customers will also continue to be able to obtain voice service using the broadband connections provided by cable, fiber, fixed wireless, and satellite providers.

Given that virtually all voice customers in the Affected Service Area have switched to these superior alternatives, AT&T now seeks to discontinue the Affected Service in the Affected

---

[9] *See generally Tech. Transitions*; et al., Declaratory Ruling, Second Report and Order, and Order on Reconsideration, 31 FCC Rcd. 8283 (2016) ("*Tech Transitions Order*").

[10] *See, e.g., Network Modernization Order* ¶ 1; *Reducing Barriers to Network Improvements and Service Changes*; et al., Notice of Proposed Rulemaking, 40 FCC Rcd. 5329, 5391, Statement of Chairman Brendan Carr (2025) ("We are looking to unleash the private sector to build the modern networks of the future and ensure that providers are no longer forced to invest billions of dollars in aging technology."); FCC, *Connecting America: The National Broadband Plan*, at 59 (Mar. 16, 2010), https://transition.fcc.gov/national-broadband-plan/national-broadband-plan.pdf ("requir[ing] certain carriers to maintain POTS … is not sustainable—and … can have a number of unintended consequences, including siphoning investments away from new networks and services").

[11] Section 63.71 Application (filed May 16, 2025), in *Section 63.71 Application of Qwest Corporation d/b/a CenturyLink QC*, WC Docket No. 25-177. AT&T's and T-Mobile's mobile voice services do not differ from Verizon's in any way relevant to the Adequate Replacement Test and, as a practical matter, should also be considered adequate replacements for POTS service as well. In all events, the *Network Modernization Order* has conclusively determined that facilities-based mobile wireless service is an adequate replacement service. *See Network Modernization Order* ¶ 34.

Exhibit I

164

Service Area so that it can redeploy its resources towards its next-generation fiber and wireless networks and services.

Streamlined approval of this Application will demonstrate that the Commission has succeeded in cutting the "red tape that has both required providers to keep aging copper lines in place and effectively prevented them from investing in the modern infrastructure that Americans want and deserve."[12] It will also serve as the predicate for preempting California's outdated regulatory regime that "needlessly constrain[s] the deployment of modern, next-generation IP-based networks."[13] With last-century "Carrier of Last Resort" ("COLR") rules, California requires AT&T to continue offering POTS throughout its territory. But once the Commission has authorized discontinuance, AT&T may proceed to do so without securing "any other approval."[14]

## APPLICATION

### I.    AT&T Satisfies The Adequate Replacement Test

#### A.    APB-A Satisfies the Adequate Replacement Test

When the Commission adopted the Adequate Replacement Test in 2016, it noted that "a repeat applicant for a 214 discontinuance application in the technology transition context can rely on its successful certification of compliance with all three prongs of the Adequate Replacement Test in a previously approved application involving a substantially similar service."[15] A "substantially similar service" is defined as "one offered by the same applicant

---

[12] *Network Modernization Order* ¶ 1.

[13] *Id.* ¶ 7.

[14] *Id.* ¶ 114.

[15] *Tech Transitions Order* ¶ 82. The Commission noted at the time that "[t]his approach should go a long way to addressing incumbent LEC concerns that the adoption of new requirements for section 214 discontinuances will slow technology transitions." *Id.* ¶ 83.

Exhibit I

165

relying on the same technology and utilizing a comparable network infrastructure."[16] Both prongs are met here. In this Application, AT&T relies on APB-A, which the Commission previously found to satisfy the Adequate Replacement Test, as an adequate replacement for POTS.[17] APB-A in the Affected Service Area uses "a comparable"—in fact, the same—network architecture as in the previously approved applications.

APB-A is available to all Affected Customers. As reflected in the FCC National Broadband Map – Mobile, AT&T's LTE network covers all Affected Customers.[18] APB-A uses AT&T's LTE network for connectivity; therefore, APB-A is available to all Affected Customers.[19] Because the Commission previously found APB-A to be an adequate replacement for the Affected Service, and because APB-A is available to all Affected Customers, it is an adequate replacement for the Affected Service in the Affected Service Area.[20]

**B.    Other Alternatives Are Also Widely Available and Support Discontinuance**

Although not required to approve this Application, the Affected Customers have numerous options beyond APB-A.

---

[16] *Id.* ¶ 82.

[17] *See* n.9, *supra*.

[18] *See* FCC, *FCC National Broadband Map*, https://broadbandmap.fcc.gov (last visited May 15, 2026). AT&T relied on the LTE "voice" coverage depicted on the National Broadband Map to provide the most accurate depiction of APB-A coverage given its low bandwidth and given it sits in a fixed location.

[19] APB-A can work over any kind of Internet connection, but it is capable of operating over AT&T's LTE network.

[20] In addition to AT&T's own mobile service, as noted above, Verizon's mobile wireless service also would constitute an adequate replacement service for Affected Customers, but AT&T does not rely on that service in making the showing necessary for streamlined treatment of this Application.

Exhibit I

166

*Mobile Wireless Service.* There are over 390 million mobile retail voice lines in the United States, which represent approximately 83 percent of all voice lines.[21] Californians, like most Americans, overwhelmingly rely on mobile wireless service. As of three years ago, over three quarters of California adults relied *exclusively* on their mobile phones.[22] That fraction likely has increased, given prevailing trends.

The predominance of mobile wireless substitution stems from the near-ubiquitous availability of mobile networks in the country and in California specifically. In addition to AT&T's own mobile service, Verizon and T-Mobile blanket AT&T's legacy incumbent service area with mobile service that qualifies as an "adequate replacement service."[23] Individually, AT&T's LTE mobile service reaches *all* Affected Customers, as well as approximately 99.9 percent of locations in the 360 wire centers. But virtually all of these locations also have access to Verizon or T-Mobile (or both) as well. Collectively, approximately 99.9 percent of Affected Customers and approximately 99.9 percent of serviceable locations in the 360 wire centers have access to at least two of the national mobile wireless providers.[24]

---

[21] *See* FCC, *Voice Telephone Services Report: Status as of June 30, 2025*, at 2 fig. 1 (May 2026), https://docs.fcc.gov/public/attachments/DOC-421558A1.pdf ("*Voice Telephone Services Report*").

[22] *See* Nat'l Ctr. for Health Stat., *National Health Interview Survey Early Release Program* 1 (2025), https://www.cdc.gov/nchs/data/nhis/earlyrelease/Wireless_state_202506.pdf (finding that, as of 2023, California adults relied exclusively (76.6 percent) or mostly (14.7 percent) on their wireless phones and that 3.8 percent relied equally on their wireless phones and landline (*i.e.*, POTS or broadband VoIP); only 1.7 percent of California adults were "landline-only" and only 1.9 percent were "landline-mostly").

[23] *See* n.11, *supra*.

[24] Declaration of Sandra Charneski ¶¶ 10–11 ("Charneski Decl.") (attached as Exhibit 1 to AT&T Forbearance Petition).

Exhibit I

167

***IP-Enabled Fixed Offerings.*** Customers in AT&T's California service territory also enjoy many other cost-effective options for voice service, including offerings provided over cable, fiber, and fixed wireless services. Indeed, approximately 99.7 percent of serviceable locations in the 360 wire centers have access to one or more facilities-based fixed broadband providers, and approximately 96 percent have access to two or more.[25] The Commission has recognized that facilities-based interconnected VoIP services have "brought advanced communications services to the marketplace to the benefit of consumers," ensuring robust competition for voice services wherever broadband is available.[26]

Enabled by the expansion of fixed broadband networks, interconnected VoIP has become the predominant fixed voice offering. It accounted for approximately 80 percent of all retail fixed voice service business connections as of June of 2025.[27] Interconnected VoIP services bundled with broadband are often comparably priced or cheaper than POTS.[28]

Cable providers such as Comcast, Charter, and Cox collectively have far surpassed AT&T as the leading wireline provider in California[29] and use their broadband networks to offer

---

[25] Charneski Decl. ¶ 10.

[26] *Network Modernization Order* ¶ 43 (internal quotation marks omitted) (quoting *Numbering Policies for Modern Commc'ns;* et al., Second Report and Order and Second Further Notice of Proposed Rulemaking, 38 FCC Rcd 8951, ¶ 1 (2023)).

[27] *Voice Telephone Services Report* at 3 fig. 2.

[28] *Compare Xfinity Internet Plans, Deals and Promotions*, BroadbandNow, https://broadbandnow.com/XFINITY-deals (last visited May 15, 2026) (Comcast bundled VoIP and Internet start at $40/month), *and Get Our Best Bundle*, Cox Authorized Retailer, https://www.coxbundledeals.com/ (last visited May 15, 2026) (Cox VoIP service is priced at $20/month when purchased as part of a bundle), *with Home Phone Service*, AT&T, https://www.att.com/home-phone/landline/ (last visited May 15, 2026) (AT&T traditional home phone priced at around $63/month).

[29] *See* FCC, *FCC National Broadband Map*, https://broadbandmap.fcc.gov/data-download/data-by-provider?version=jun2025&pubDataVer=jun2025 (last visited May 15, 2026) (showing

Exhibit I
168

VoIP services that directly compete with legacy POTS.[30] As a result, VoIP connections in California substantially outnumber traditional POTS connections.[31]

Mobile wireless networks also enable fixed wireless offerings capable of supporting voice service. Fixed wireless service now reaches more households nationwide than cable broadband.[32] Combined, T-Mobile and Verizon served more than 14 million fixed wireless subscribers nationwide by the end of 2025—a more than 15-fold increase from just four years ago.[33] AT&T has also begun expanding its fixed wireless offering in nearly every state and now

---

Charter, Comcast, and Cox offer wireline service at 9.3 million combined locations to AT&T's 6.5 million).

[30] *See Comcast XFINITY® Voice: Residential*, xfinity, https://www.xfinity.com/corporate/about/phonetermsofservice/comcastdigitalvoice/cdvresidential (last visited May 15, 2026); *Spectrum Voice*, Spectrum, https://www.spectrum.com/home-phone (last visited May 15, 2026); *Cox Voice Preferred Home Phone*, Cox, https://www.cox.com/residential/phone.html (last visited May 15, 2026).

[31] *See Voice Telephone Services Report* at 12 (as of June 30, 2025, there were roughly 489,000 consumer-grade switched access voice connections and 2,199,000 consumer-grade interconnected VoIP connections in California); *see also* FCC, *Voice Telephone Services Report – State Subscriptions as of June 30, 2025* (May 2026), https://www.fcc.gov/sites/default/files/VTS_State_Subscriptions_J24_to_J25.xlsx.

[32] *2024 Commc'ns Marketplace Rep.*, 39 FCC Rcd. 14116, 14125 fig. II.A.4 (2024).

[33] *See* Verizon, *Verizon Financial and Operating Information*, at 9 (Apr. 27, 2026), https://www.verizon.com/about/file/77795/download?token=fagvmEEg (reporting over 6 million fixed wireless subscribers for Q1 2026); T-Mobile, *T-Mobile Delivers Best-in-Class Customer Results in Q4, Translating into Durable and Profitable Financial Growth Driven by Widening Differentiation* (Feb. 11, 2026), https://s29.q4cdn.com/310188824/files/doc_financials/2025/q4/Q4-2025-Earnings-Release.pdf (reporting over 8.4 million 5G broadband customers); *T-Mobile US Inc. Earnings Call*, at 3 (Apr. 28, 2026), https://s29.q4cdn.com/310188824/files/doc_financials/2026/q1/TMUS-USQ_Transcript_2026-04-28.pdf (reporting adding more than 500,000 net broadband customers for Q1 2026); Monica Alleven, *T-Mobile, Verizon FWA Subs Take Center Stage in Q1 Forecasts*, Fierce Network (Apr. 15, 2022), https://www.fierce-network.com/wireless/t-mobile-verizon-fwa-takes-center-stage-q1-forecasts (Verizon ended 2021 with 228,000 fixed wireless subscribers while T-Mobile ended 2021 with 646,000 fixed wireless subscribers).

9

Exhibit I
169

has over 2.3 million subscribers.[34] Again, these networks blanket AT&T's California service territory and cover the vast majority of AT&T's California POTS customers.

*Satellite.* Finally, Affected Customers also can purchase VoIP services that run on top of satellite broadband connections. While the Commission has not yet recognized satellite as an "adequate replacement service," it has observed that satellite may be a "widely available alternative."[35] As the Commission has recognized, satellite is quickly emerging as an "innovative new [voice] service offering[]."[36] Indeed, Starlink, Amazon LEO, Globalstar, and AST SpaceMobile are deploying and swiftly expanding their fleets of satellites in low-earth orbit ("LEO") to offer voice and broadband service.[37] Satellite broadband speed and latency are

---

[34] AT&T, *Financial and Operational Schedules & Non-GAAP Reconciliations*, at 6 (Apr. 22, 2026), https://investors.att.com/~/media/Files/A/ATT-IR-V2/financial-reports/quarterly-earnings/2026/1Q-2026/1Q26_ATT_Financial_and_Operational_Schedules_and_Non_GAAP_Reconciliations.pdf.

[35] *Network Modernization Order* ¶ 39 ("Permitting third-party alternative voice service with access to 911 and substantially similar levels of network performance and availability as the service being discontinued to serve as a replacement service will enable innovative new service offerings, such as low-earth orbit satellite-based services, to qualify as replacement services without requiring the Commission to engage in additional time-consuming rulemaking proceedings … .").

[36] *Id.*

[37] *See*, *e.g.*, Starlink, *Progress Report 2024*, at 3 (2024), https://starlink.com/public-files/starlinkProgressReport_2024.pdf ("In just over five years, SpaceX designed, deployed, and activated high-quality internet, which is now available for over 2.8 billion people around the world."); Martyn Wingrove, *Second ULA Launch Doubles Amazon's Kuiper Satellite Fleet*, Riviera (July 8, 2025), https://www.rivieramm.com/news-content-hub/news-content-hub/second-ula-launch-doubles-amazon-kuiper-satellite-fleet-85363 (reporting that, in June 2025, Amazon's LEO constellation doubled to 54); *Globalstar To Enter Next Era of Mobile Satellite Connectivity with Expanded Operational Frequencies*, Globalstar (Sept. 15, 2025), https://investors.globalstar.com/news-releases/news-release-details/globalstar-enter-next-era-mobile-satellite-connectivity-expanded/ (announcing the deployment of its third-generation mobile satellite system, "which will include 48 additional satellites supported by approximately 90 new ground station antennas installed globally" and will provide service over the Big LEO frequency bands); AST Space Mobile, https://ast-science.com/spacemobile-network/ (announcing the ongoing launches of its Next-Gen Bluebird satellites, which will provide coverage for millions of daily connections such as voice and video calls, texts, and streaming and

Exhibit I
170

rapidly improving with LEO technology.[38] For example, Starlink has substantially increased its median upload and download speeds in the United States to 104.71/14.84 Mbps in 2025 and currently has the ability to deliver broadband speeds of 100/20 Mbps.[39] Recent Starlink updates have further "reduce[d] latency through laser-based inter-satellite links," and Starlink can now "deliver[] latency as low as 12 milliseconds"—which not only is sufficient for real-time voice service but also can "mak[e] real-time applications like video calls and cloud gaming viable almost anywhere on Earth."[40]

BEAD eligibility and funding for LEO mean that satellite VoIP's presence across the Affected Service Area will increase and that more locations will have access to satellite VoIP. Indeed, over 40 percent of locations that received BEAD funding in California are slated for LEO satellite deployment, with SpaceX and Amazon the two largest winners by locations

---

advertising its already-deployed satellites, which are ready to deliver broadband to billions of users worldwide). In addition, Viasat, which offers voice and broadband services, is partnering with LEO satellite operators to enhance its capabilities. *See Viasat Voice*, Viasat, https://www.viasat.com/isg/voice/ (last visited May 15, 2026); *European Space Agency (ESA) and Viasat Partner on D2D*, Viasat (Jan. 28, 2025), https://www.viasat.com/news/latest-news/corporate/2025/european-space-agency--esa--and-viasat-partner-on-d2d/.

[38] *See* Mateusz Kaczmarek, *Satellite vs. Fiber Internet: The 2025 Latency & Bandwidth Showdown*, TechStock 2 (June 4, 2025), https://ts2.tech/en/satellite-vs-fiber-internet-the-2025-latency-bandwidth-showdown/ ("Satellite internet (particularly modern LEO-based) has greatly improved and is now capable of supporting everyday activities–including streaming and video calls–that were once very challenging on satellite.").

[39] Sue Marek, *Starlink's U.S. Performance Is on the Rise, Making It a Viable Broadband Option in Some States*, Ookla (June 10, 2025), https://www.ookla.com/articles/starlink-us-performance-2025.

[40] Glanze Patrick, *Starlink Global Coverage Expands as Satellite Improves Internet Speed and Lower Latency*, Tech Times (Dec. 23, 2025), https://www.techtimes.com/articles/313567/20251223/starlink-global-coverage-expands-satellite-improves-internet-speed-lower-latency.htm.

Exhibit I

171

overall.[41] As satellite broadband continues to improve and proliferate, it will be increasingly important in the broadband ecosystem, including for voice applications, and will make POTS irrelevant even in remote areas.

## II.    Additional Information Required By 47 C.F.R. §§ 63.71, 63.602 And 63.505

As required by sections 63.71, 63.602, and 63.505 of the Commission's rules, AT&T provides the following additional information:

**Name and Address of Carrier:**

Pacific Bell Telephone Company d/b/a AT&T California.

The address for purposes of this application is:

430 Bush Street, Sixth Floor
San Francisco, CA 94108

**Date of Planned Service Discontinuance:**

Effective on or after June 1, 2027,[42] pending regulatory approval, AT&T's Affected Service will be discontinued.

**Points of Geographic Areas of Service Affected and Description of the Affected Service Area:**

AT&T plans to discontinue the Affected Service in the Affected Service Area in California. Exhibit 1 identifies the list of AT&T wire centers in California that include any service areas that fall within the Affected Service Area.

---

[41] Cal. Pub. Utils. Comm'n, *California BEAD Final Proposal – Deployment Projects*, https://www.cpuc.ca.gov/-/media/cpuc-website/divisions/communications-division/documents/broadband-implementation-for-california/bead/final-proposal/appendix-b---data-files-excel/final/fp_deployment_projects.csv (last visited May 15, 2026); Jake Neenan, *California Announces Grant Winners with BEAD Final Proposal*, BroadbandBreakfast (Dec. 3, 2025), https://broadbandbreakfast.com/california-announces-grant-winners-with-bead-final-proposal/.

[42] AT&T will of course continue to honor any term commitments in contracts with existing business POTS customers.

Exhibit I

172

**Brief Description of the Type of Service Affected:**

AT&T plans to discontinue AT&T Business Local Exchange Access Line Service in the Affected Service Area. AT&T Business Local Exchange Access Line Service provides individual business customers with telecommunications service within a specified geographical area for local calling and access to and from the telecommunications network for long-distance service.

**Brief Description of the Dates and Method of Notice to All Affected Customers:**

Customer notices were sent via U.S. Mail on May 20, 2026.[43] Copies of this Application are being sent via first class U.S. Mail to the governor, public utility commission, and federally recognized tribes (if any) in the Affected Service Area, and to the Special Assistant for Telecommunications to the Secretary of War, as required by section 63.71(a) of the Commission's rules.[44]

**Regulatory Classification of Carrier:**

AT&T offers the Affected Service pursuant to non-dominant carrier regulation.

**Public Convenience and Necessity:**

As explained in the Introduction, the public convenience and necessity will be advanced, not impaired, by the discontinuance of the Affected Service. The demand for the Affected

---

[43] Representative notices are attached as Exhibit 2. These notices also notified customers of AT&T's intent to grandfather the Affected Service in the wire centers included in this Application effective July 19, 2026. Because the Commission has waived the requirement to file applications to grandfather legacy services, this Application does not address this grandfathering action. *See* n.5, *supra*.

[44] Section 63.71(a) directs applicants to submit a copy of the application to the Secretary of Defense (now Secretary of War), Special Assistant for Telecommunications. However, due to restructuring within the Department of Defense, that position no longer exists. Commission staff has advised that a copy of the application be sent instead to the Department of Defense Chief Information Officer.

13

Exhibit I

173

Service is very low, and it is not economically rational for AT&T to continue to provide it. As the Commission's recent *Network Modernization Order* recognizes, "incumbent LECs now hold[] a minority share of the voice services market.[45] That is true in AT&T's incumbent service territory in California.

Customers of the Affected Service have many voice alternatives to choose from, including services already found to be adequate replacements for POTS, such as APB-A and Verizon's mobile wireless service. Customers also have access to other wireless services available from T-Mobile and AT&T, in particular.

**Statement Identifying the Application as a Technology Transition (47 C.F.R. § 63.602(a)(2)):**

The proposed discontinuance constitutes a "technology transition"[46] because Affected Customers will be required to replace their TDM-based voice service with a different technology or transmission medium when AT&T discontinues legacy voice service in this area, as there is no other TDM-based voice service available in the Affected Service Area.

**Information Regarding the Price of the Service for Which Discontinuance Is Sought and the Price of the Proposed Replacement Service (47 C.F.R. § 63.602(a)(3)):**

The guidebook rate for AT&T Business Local Exchange Access Line Service in the vast majority of wire centers covered by this application is approximately $2,700 per month, plus taxes, surcharges, and fees. In some areas it can be somewhat higher or lower. The price is before any applicable volume or term discounts. APB-A is offered as a service that includes the

---

[45] *Network Modernization Order* ¶ 9.

[46] See 47 C.F.R. § 63.60(i) (defining a technology transition as "any change in service that would result in the replacement of a wireline TDM-based voice service with a service using a different technology of medium for transmission to the end user, whether internet Protocol (IP), wireless, or another type").

Exhibit I
174

AT&T-owned and managed device installed at the customer's premises and is available for

$99.99 per month, plus taxes, surcharges, and fees. The price is before any applicable volume or

term discounts.

Business customers also will realize substantial cost savings from APB-A's

interoperability with legacy technologies and peripherals, which enables customers to extend the

useable lifespan of their TDM-based devices.

**Certification That the Information Submitted in This Application Is True and Accurate (47 C.F.R. § 63.602(a)(4):**

See the attached certification of authorized AT&T representative Susan Johnson at

Exhibit 3.

**Applicable Tariff Listing (47 C.F.R. § 63.505(e)):**

APB-A is not a tariffed service.

**Name of Any Other Carrier or Carriers Providing Telephone Service to the Community (47 C.F.R. § 63.505(g)):**

As set forth above, a number of competitors offer voice services to some or all of the

Affected Service Area via cable, fiber, fixed wireless, satellite, CMRS, or over-the-top services.

**Description of Any Previous Discontinuance, Reduction, or Impairment of Service to the Community Affected by the Application (47 C.F.R. § 63.605(j)):**

AT&T will grandfather the Affected Service in the Affected Service Area.[47]

**Number of Toll Messages (47 C.F.R. § 63.505(l)):**

The amount of toll traffic on AT&T's entire network has steadily decreased as its legacy

voice customers have migrated to other wireline and wireless voice service providers. Toll traffic

---

[47] *See* n.5, *supra*.

Exhibit I

175

in the Affected Service Area is likely consistent with this overall trend, although AT&T does not track the monthly number of toll messages or toll revenues in the Affected Service Area.

### III.    The Application Also Satisfies The Requirements Of New Rule 63.71(f)

AT&T has filed this Application under the Commission's existing rules. The revised rules that the Commission adopted in the *Network Modernization Order* contain new or modified information collection requirements, and they are currently subject to Office of Management and Budget (OMB) review and are not yet effective.[48] However, as the Commission generally simplified the standards for technology transition discontinuance, AT&T's Application generally satisfies the new rules the Commission has adopted.[49]

In this Application, AT&T relies on APB-A, which is a "facilities-based interconnected VoIP service" under new Rule 63.71(f)(2)(i).[50] APB-A meets all the definitional requirements of such a service under Rule 9.3.[51] Furthermore, as explained above, the Commission previously found that APB-A satisfied the Adequate Replacement Test under the 2016 *Technology Transitions Order*, as an adequate replacement for POTS.[52] APB-A in the Affected Service Area uses the same network architecture as in the prior, approved applications. As such, it is a "facilities-based interconnected VoIP service" under new Rule 63.71(f)(2)(i). Likewise, as reflected in the FCC's National Broadband Map – Mobile, AT&T's LTE network covers all

---

[48] *Network Modernization Order* ¶ 120.

[49] As explained below, however, AT&T is providing the notice to its customers required by existing Rule 63.71(a).

[50] *Network Modernization Order*, app. A.

[51] 47 C.F.R. § 9.3 (defining "Interconnected VoIP service").

[52] *See* n.9, *supra*.

16

Exhibit I

176

Affected Customers.[53] Because APB-A is capable of operating over AT&T's LTE network, APB-A is available to all Affected Customers.

Moreover, while APB-A alone constitutes an adequate replacement, customers of the Affected Service can choose from many other alternatives for voice service. These include Verizon's mobile wireless service—a service already found to be an adequate replacement for POTS—as well as other wireless services, particularly from T-Mobile and AT&T.[54] AT&T's mobile wireless service is a "facilities-based mobile wireless service" operating at the speeds of at least 5 Mbps download and 1 Mbps upload required under Rule 63.71(f)(2)(ii). Indeed, in the 360 wire centers, virtually all Affected Customers have access to at least two facilities-based mobile wireless services available.

In addition, AT&T's notice satisfies new Rule 63.71(j), which requires notice to existing customers that AT&T is grandfathering a service they currently receive.[55] As described above, AT&T has sent notices to existing customers to effectuate grandfathering in the wire centers included in this Application.

AT&T also has complied with the notice provisions of Rule 63.71(a), including the statement describing the objection process contained in existing Rule 63.71(a)(5). As described above, customer notices were sent via U.S. Mail on May 20, 2026. Copies of this Application are

---

[53] *See* n.18, *supra.*

[54] *See* n.11, *supra* ("AT&T's and T-Mobile's mobile voice services do not differ from Verizon's in any way relevant to the Adequate Replacement Test and, as a practical matter, should also be considered adequate replacements for POTS service as well. In all events, the *Network Modernization Order* has conclusively determined that facilities-based mobile wireless service is an adequate replacement service. *See Network Modernization Order* ¶ 34.").

[55] *See Network Modernization Order*, app. A ("Such notice shall include (i) an approximate date by which it intends to seek to permanently discontinue the service, and (ii) a statement regarding alternative services available in the affected service area.").

Exhibit I
177

being sent via first class U.S. Mail to the governor, public utility commission, and federally recognized tribes (if any) in the Affected Service Area, and to the Special Assistant for Telecommunications to the Secretary of War, as required by new Rule 63.71(a).[56]

*     *     *

Questions about this application may be addressed to Meredith Williams, AT&T Services, Inc., AVP – Federal Regulatory, 601 New Jersey Ave NW, Suite 650, Washington, DC, (202) 227-9725.

**CONCLUSION**

For the reasons identified above, the public convenience and necessity will not be adversely affected by the discontinuance of the Affected Service. AT&T respectfully requests the Commission approve its section 63.71 Application to discontinue services.

By: /s/ Brett Farley

BRETT FARLEY
CHRISTOPHER HEIMANN
DAVID CHORZEMPA
DAVID LAWSON
AT&T SERVICES, INC.
601 New Jersey Ave NW, Suite 650
Washington, DC 20001

May 20, 2026

---

[56] *See* n.44, *supra.*

18

Exhibit I
178

# Exhibit 1

Exhibit I
179

**List of Affected Wire Centers**

*Sections of California*: Certain areas currently served by the following wire centers:

Albany-Solano (ALBYCA11), Alhambra (ALHBCA01), Anaheim-Lemon (ANHMCA01),

Anaheim-Cypress (ANHMCA11), Anaheim-La Palma (ANHMCA12), Antioch (ANTCCA11),

Arcadia (ARCDCA11), Arcata (ARCTCA11), Aromas (ARMSCA11), Anderson (ARSNCA11),

Arlington (ARTNCA11), Arvin (ARVNCA11), Atwater (ATWRCA12), Avenal (AVNLCA12),

N Tahoe Brockway (BCWYCA11), Beale-Msvl Sterling (BEALCA11), Bell (BELLCA11),

Biggs (BGGSCA11), Bakersfield-Empire (BKFDCA11), Bakersfield-Main (BKFDCA12),

Bakersfield-Columbus (BKFDCA13), Bakersfield-Temple (BKFDCA14), Bakersfield-Mettler

(BKFDCA15), Bakersfield-West (BKFDCA17), Bakersfield-Nomad (BKFDCA19), Berkeley-

Bancroft (BKLYCA01), Benicia (BNCICA11), Ben Lomond (BNLMCA11), Buena Park

(BNPKCA11), Burbank-Palm (BRBNCA11), Bradley (BRDLCA90), Brea (BREACA12),

Burlingame (BRLNCA01), Brentwood (BRWDCA12), Brawley (BRWLCA11), Bishop Ranch

(BSRNCA70), Butte City (BTCYCA11), Bethel Island (BTISCA11), Burrel (BURLCA11),

Beverly Hills (BVHLCA01), Bear Valley (BVLYCA11), Bear Valley Springs (BVSPCA11),

Cobb Mountain (CBMTCA11), Chualar (CHLRCA11), Chula Vista-Third Avenue

(CHVSCA11), Chula Vista Apache (CHVSCA12), Chowchilla (CHWCCA11), Culver City

(CLCYCA11), Calipatria (CLPTCA11), Calistoga (CLSTCA11), Clovis (CLVSCA11), Calexico

(CLXCCA12), Compton (CMTNCA01), Concord (CNCRCA01), Colma (COLACA01),

Cordelia (CORDCA12), Corona (CORNCA11), Colton (COTNCA11), Crockett (CRCTCA02),

Corona Del Mar (CRDMCA11), Carlsbad-La Costa (CRLSCA12), Corning (CRNGCA12),

Caruthers (CRTHCA11), Costa Mesa (CSMSCA11), Crows Landing (CWLDCA12), Coyote

Wells (CYWLCA11), Danville (DAVLCA12), Tassajara (DAVLCA13), Davis (DAVSCA11),

<div align="center">1</div>

<div align="right">Exhibit I<br>180</div>

Delano (DELNCA11), Dinuba (DINBCA01), Dixon (DIXNCA11), Del Mar (DLMRCA12), Del Rey (DLRYCA11), Dunnigan (DNGNCA12), Dunsmuir (DNSMCA11), El Cajon (ELCJCA11), El Centro (ELCNCA01), Rich-Appian Way (ELSBCA11), El Segundo-Douglas (ELSGCA12), El Toro (ELTRCA11), Encinitas (ENCTCA12), Earlimart (ERLMCA11), Escalon (ESCLCA11), Escondido (ESCNCA01), Esparto (ESPRCA11), Felton (FETNCA11), Flsm-Nimbus (FLSMCA12), Flsm-El Dorado (FLSMCA13), Fontana (FNTACA11), Firebaugh (FRBHCA11), Fremont-Main (FRMTCA11), Fair Oaks (FROKCA11), Fresno-Main (FRSNCA01), Fresno-Baldwin (FRSNCA11), Fresno-Clinton (FRSNCA12), Fresno-Sierra (FRSNCA13), Fresno-West (FRSNCA14), Fresno-Woodward (FRSNCA15), Farmersville (FRVLCA11), Fortuna (FTUNCA11), Fullerton (FUTNCA01), Five Points (FVPNCA11), Frazier Park (FZPKCA11), Galt (GALTCA11), Glendale (GLDLCA11), Gonzales (GNZLCA11), Gerber (GRBRCA11), Gridley (GRDLCA11), Gardena (GRDNCA01), Grenada (GRNDCA13), Goshen (GSHNCA11), Gustine (GUSTCA11), Geyserville (GYVLCA11), Herald (HERLCA11), Highland (HGLDCA11), Hughson (HGSNCA11), Holtville (HLVLCA11), Hollywood (HLWDCA01), Hamilton City (HMCYCA11), Homewood (HMWDCA11), Hanford (HNFRCA01), Huntington Park (HNPKCA01), Hopland (HPLDCA12), Huron (HURNCA11), Hayward-Depot Ct (HYWRCA11), Ignacio (IGNCCA12), Imperial (IMPRCA11), Ione (IONECA11), Irvine-Main (IRVNCA01), Irvine-Spectrum (IRVNCA12), Ivanhoe (IVNHCA11), Jamul (JAMLCA60), Jackson (JCSNCA01), Kingsburg (KGBGCA11), Kelseyville (KLVLCA12), Knights Ferry (KNFYCA11), Kyburz (KYBRCA11), La Canada-Oak Grove (LACNCA11), La Crescenta (LACRCA11), La Jolla-Girard (LAJLCA11), La Mesa (LAMSCA01), Lamont (LAMTCA11), Laton (LATNCA11), Lockeford (LCFRCA11), Lebec-Main (LEBCCA11), Lemoore-Main (LEMRCA11), Lemoore-Wyman

Exhibit I
181

(LEMRCA12), Lafayette (LFYTCA11), Laguna Niguel (LGNGCA12), Le Grand (LGRDCA11), La Grange (LGRNCA12), Lakeport (LKPTCA02), Lincoln (LNCLCA11), Lodi (LODICA01), Loleta (LOLTCA11), Loomis (LOMSCA11), Lomita (LOMTCA11), Larkspur (LRKSCA11), Lsan-Madison 02 (LSANCA02), Lsan-Madison 03 (LSANCA03), Lsan-Pleasant (LSANCA05), Lsan-Union (LSANCA06), Lsan-Airport (LSANCA07), Lsan-Melrose (LSANCA08), Lsan-Richmond (LSANCA09), Lsan-Webster (LSANCA10), Lsan-Rampart (LSANCA11), Lsan-Normandy (LSANCA12), Lsan-Plymouth (LSANCA13), Lsan-Adams (LSANCA14), Lsan-Axminster (LSANCA15), Lsan-Capitol (LSANCA23), Lsan-Sunset (LSANCA29), Lsan-Angelus (LSANCA34), Lsan-Montebello (LSANCA35), Lsan-Republic (LSANCA38), Los Banos (LSBNCA12), Los Molinos (LSMLCA11), Live Oak (LVOKCA11), Madera-Bonadelle (MADRCA12), Marina (MARNCA11), Modesto-Main (MDSTCA02), Modesto-Kellog (MDSTCA03), Modesto-Kingswood (MDSTCA04), Modesto-Tally (MDSTCA05), Modesto-Davis (MDSTCA52), Middletown (MDTWCA11), Mokelumne Hill (MKHLCA12), Mckinleyville (MKVLCA11), Millbrae (MLBRCA11), Mendota (MNDTCA11), Mojave (MOJVCA01), Moraga (MORGCA12), Merced (MRCDCA01), Meridian (MRDNCA11), Moorpark (MRPKCA12), Mission Viejo (MSVJCAAT), Mountain Pass (MTPSCA11), Monterey (MTRYCA01), Mt Shasta (MTSHCA12), Mountain View (MTVWCA11), Marysville (MYVICA01), Nicolaus (NCLSCA12), Newhall (NHLLCA01), Nhwd-Lankershim (NHWDCA01), Nhwd-Magnolia (NHWDCA02), Nice (NICECA11), Niland Main (NILDCA11), Niland Bombay Beach (NILDCA12), Nipomo (NIPMCA11), Northridge (NORGCA11), Nscr-Wabash (NSCRCA11), Nscr-North Natomas (NSCRCA12), National City-Highland (NTCYCA11), Newcastle (NWCSCA11), Newman (NWMNCA12), Oceanside-Mission (OCSDCA11), Oakdale (OKDLCA11), Okld-45Th (OKLDCA11), Okld-Holly

3

Exhibit I

182

(OKLDCA12), Okld-Mountain (OKLDCA13), Oakley (OKLYCA11), Orange Cove (ORCVCA11), Orland (ORLDCA11), Orinda (ORNDCA11), Orange-Chapman (ORNGCA11), Orange-Olive (ORNGCA13), Orosi (ORSICA11), Orangevale (ORVACA11), Otay Mesa (OTMSCA11), Pacifica (PCFCCA11), Pedley (PDLYCA11), Palo Alto-Main (PLALCA02), Palo Alto-South (PLALCA12), Pleasant Grove (PLGVCA12), Planada (PLNDCA11), Pleasanton-Main (PLTNCA12), Pleasanton-Hacienda (PLTNCA13), Placerville-Main (PLVLCA11), Pepperwood (PPWDCA11), Paradise-Main (PRDSCA11), Parlier (PRLRCA11), Paramount (PRMTCA01), Pittsburg-Main (PSBGCA01), Pittsburg-Willow (PSBGCA11), Pismo Beach (PSBHCA11), Pixley (PXLYCA11), Rancho Bernardo (RBRNCA11), Rocklin 11 (RCKLCA11), Richmond (RCMDCA11), Richvale (RCVACA11), Redwood City (RDCYCA01), Redding-Main (RDNGCA02), Redding-Enterprise (RDNGCA11), Rio Dell (RIDECA11), RIo Linda (RILNCA12), Rialto (RILTCA11), Rancho Murieta (RNMRCA11), Rancho Penasquitos (RNPSCA11), Rancho San Diego (RNSDCA11), Rosemead (ROSMCA11), Rancho Santa Fe (RSFECA12), Rosamond (RSMDCA11), Rohnert Park (RTPKCA11), Riverdale (RVDLCA11), Riverbank (RVRBCA11), Riverside-Orange (RVSDCA01), Riverside-Woodcrest (RVSDCA11), Santee (SANTCA01), Scrm-Main (SCRMCA01), Scrm-Garden (SCRMCA03), Scrm-Gladstone (SCRMCA11), Scrm-Empire (SCRMCA12), Scrm-Fruitridge (SCRMCA13), Scotts Valley (SCVYCA01), Selma (SELMCA11), Seaside (SESDCA11), South Gate (SGATCA01), Shingle Springs (SGSPCA11), Shafter (SHFTCA11), Sherman Oaks (SHOKCA01), Stockton-Main (SKTNCA01), Stockton-Granite (SKTNCA11), Stockton-Ashley (SKTNCA12), Stockton-Redwood (SKTNCA14), Soledad (SLDDCA11), Solamint (SLMNCA11), Salinas-Main (SLNSCA01), Salinas-Hickory (SLNSCA11), Salinas-Glenview (SLNSCA12), Moro (SLNSCA14), Silverado (SLVRCA11), Santa Ana-Bristol (SNANCA11),

4

Exhibit I
183

Santa Ana-Bolsa (SNANCA12), San Carlos (SNCRCA11), Sndg-C Street (SNDGCA01), Sndg-University (SNDGCA02), Sndg-Linda Vista (SNDGCA03), Sndg-Saipan (SNDGCA05), Sndg-37Th Street (SNDGCA06), Sndg-College (SNDGCA11), Sndg-Market (SNDGCA12), Sndg-Regents (SNDGCA15), Sndg-Mira Mesa (SNDGCA16), Snfc-Mccoppin (SNFCCA04), Snfc-25Th Street (SNFCCA05), Snfc-Onondaga (SNFCCA06), Snfc-9Th Avenue (SNFCCA13), Snfc-3Rd Street (SNFCCA17), Snfc-Folsom St (SNFCCA21), Snfc-U C Med Center (SNFCCA64), San Gabriel (SNGBCA01), San Geronimo (SNGNCA11), San Jose-Main (SNJSCA02), San Jose-Chynoweth (SNJSCA13), San Jose-Foxworthy (SNJSCA14), San Jose-Junction Avenue (SNJSCA21), San Lucas (SNLCCA11), San Martin (SNMACA11), San Marcos (SNMCCA11), San Mateo (SNMTCA11), Milton (SNRACA13), San Rafael-Main (SNRFCA01), San Ramon (SNRMCA11), Space Park (SNTCCA01), Bellomy (SNTCCA11), Carroll (SNVACA01), Mathilda (SNVACA11), San Ysidro (SNYSCA12), South Pasadena-Mission (SPSDCA11), Stratford (SRFRCA11), South Tahoe-Tamarack (STAHCA12), South Tahoe-Meyers (STAHCA13), Suison City (SUISCA11), Thornton (THTNCA11), Tipton (TPTNCA11), Terra Bella (TRBLCA11), Turlock (TRLCCA11), Tulare (TULRCA11), Tustin-Main (TUSTCA11), Tustin-Redhill (TUSTCA70), Twain Harte (TWHRCA11), Union City (UNCYCA11), Vina (VINACA12), Visalia (VISLCA11), Vista (VISTCA12), Van Nuys (VNNYCA02), Ventura-Main (VNTRCA11), Valley Ford (VYFRCA11), Wasco (WASCCA01), Woodland (WDLDCA11), Woodlake (WDLKCA11), Weed (WEEDCA01), Century City (WLANCA01), Walnut Creek (WNCKCA11), Windsor (WNDSCA11), Frontier (WSCRCA11), Waterford (WTFRCA11), Yorba Linda (YRLNCA11)

Exhibit I

184

# Exhibit 2

Exhibit I

185



May 20, 2026



### Important Update About Your AT&T Business Customer Individual Access Line Service[1]

Thank you for using AT&T for your business service needs. We know that businesses today rely on high-speed, reliable connectivity, and only AT&T can bring you the best and largest network to help you connect your business. That's why we're upgrading traditional landline phone service in your area to new, enhanced solutions that are more reliable and affordable. Our records show that you currently have service in at least one of the areas impacted by these updates. You can see the addresses where your service is being upgraded below. [2]

**Upgrading your traditional phone service:**
Our customers are asking for faster and more reliable service, so we're upgrading our network in California to give you connectivity you can count on for everyday needs. California's aging copper network doesn't deliver the same level of service, quality and reliability as newer technology. Now, we have more ways to connect than ever before, with newer, faster, technology that is more reliable, energy efficient, and affordable. As we upgrade our network across the country, we're doing the same in California and delivering better technology for our customers across the state.

**As part of this transition, your traditional phone service, known as AT&T Business Customer Individual Access Line Service, will be discontinued on or after 06/01/2027.**

We know how important it is to stay connected, and we're here to make this transition easy for you. We have enhanced, more reliable options for you to better support your business needs and stay connected: AT&T Phone for Business – Advanced, AT&T Business Voice, AT&T Office@Hand, and AT&T IP Flexible Reach.

**Here's what you can expect over the next year:**
- We'll send additional information over the coming months regarding this transition and how you can upgrade your service.
- We'll no longer accept new orders, renewal of service agreements, or requests for physical changes, including moves to different service addresses, for traditional phone service in your area, effective on or after **07/19/2026**. You will continue to be able to make phone calls using your existing service until on or after **06/01/2027,** when we will stop providing service, pending FCC approval.
- You will need to contact your Account Manager to update your traditional landline phone service before **06/01/2027**. We want to help you upgrade your service, so you continue to have access to phone service and 911. Please call 855-235-0900 to understand your options for phone service from AT&T.

We look forward to continuing to serve you and providing a better and more reliable experience for your business needs.

Sincerely,

AT&T Business Services
208 S. Akard Street
Dallas, TX 75202
www.business.att.com

---

[1] In some circumstances, AT&T Business Customer Individual Access Line Service may also be referred to as Measured Rate Business Service.
[2] In the areas impacted by this notice, your traditional landline phone service is called AT&T Business Customer Individual Access Line Service and is provided by Pacific Bell Telephone Company, d/b/a AT&T California. A complete list of impacted areas is attached.

© 2026 AT&T Intellectual Property. All rights reserved. AT&T, the AT&T logo and all other AT&T marks contained herein are trademarks of AT&T Intellectual Property and/or AT&T affiliated companies.

Exhibit I

186    BAL

**We are required by the FCC to provide the following statement:**
The FCC will normally authorize this proposed discontinuance of service (or reduction or impairment) unless it is shown that customers would be unable to receive service or a reasonable substitute from another carrier or that the public convenience and necessity is otherwise adversely affected. If you wish to object, you should file your comments as soon as possible, but no later than 15 days after the Commission releases public notice of the proposed discontinuance.  You may file your comments electronically through the FCC's Electronic Comment Filing System using the docket number established in the Commission's public notice for this proceeding, or you may address them to the Federal Communications Commission, Wireline Competition Bureau, Competition Policy Division, Washington, DC 20554, and include in your comments a reference to the section 63.71 application of Pacific Bell Telephone Company, d/b/a AT&T California. Comments should include specific information about the impact of this proposed discontinuance (or reduction or impairment) upon you or your company, including any inability to acquire reasonable substitute service.

**To the extent your contract with AT&T is inconsistent with the above, these planned changes may not apply to you. Please check your contract or contact us with questions.**

**Service addresses in areas impacted by this notice:**

| SERVICE ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Exhibit I

187

BAL

| SERVICE ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| ██████████████ | ████████ | ██ | ████ |
| ███████████ | █████ | ██ | ████ |
| ███████████████████████ | █████████ | ██ | ████ |
| ████████████ | ████ | ██ | ████ |
| ██████ | ████████ | ██ | ████ |
| ██████ | ████████ | ██ | ████ |
| ████████████ | ████████ | ██ | ████ |
| ████████████ | ███████ | ██ | ████ |
| ███████████ | ██████ | ██ | ████ |
| ███████████ | ██████ | ██ | ████ |
| ██████████ | █████████ | ██ | ████ |
| ███████████ | █████████ | ██ | ████ |
| ███████████ | ██████ | ██ | ████ |
| █████████████ | █████████ | ██ | ████ |
| ██████████ | █████████ | ██ | ████ |
| ███████████ | █████████ | ██ | ████ |
| ██████████ | ███████ | ██ | ████ |
| █████████ | ███████ | ██ | ████ |
| ████████████████ | ██████ | ██ | ████ |
| ██████████ | ██████ | ██ | ████ |
| █████████ | ██████ | ██ | ████ |
| ██████████ | █████████ | ██ | ████ |
| ████████████████ | ██████ | ██ | ████ |

Exhibit I

188

3

Below is a full list of AT&T wire centers affected by this notice:

## List of Impacted Wire Centers

### California

Albany-Solano (ALBYCA11), Alhambra (ALHBCA01), Anaheim-Lemon (ANHMCA01), Anaheim-Cypress (ANHMCA11), Anaheim-La Palma (ANHMCA12), Antioch (ANTCCA11), Arcadia (ARCDCA11), Arcata (ARCTCA11), Aromas (ARMSCA11), Anderson (ARSNCA11), Arlington (ARTNCA11), Arvin (ARVNCA11), Atwater (ATWRCA12), Avenal (AVNLCA12), N Tahoe Brockway (BCWYCA11), Beale-Msvl Sterling (BEALCA11), Bell (BELLCA11), Biggs (BGGSCA11), Bakersfield-Empire (BKFDCA11), Bakersfield-Main (BKFDCA12), Bakersfield-Columbus (BKFDCA13), Bakersfield-Temple (BKFDCA14), Bakersfield-Mettler (BKFDCA15), Bakersfield-West (BKFDCA17), Bakersfield-Nomad (BKFDCA19), Berkeley-Bancroft (BKLYCA01), Benicia (BNCICA11), Ben Lomond (BNLMCA11), Buena Park (BNPKCA11), Burbank-Palm (BRBNCA11), Bradley (BRDLCA90), Brea (BREACA12), Burlingame (BRLNCA01), Brentwood (BRWDCA11), Brawley (BRWLCA11), Bishop Ranch (BSRNCA70), Butte City (BTCYCA11), Bethel Island (BTISCA11), Burrel (BURLCA11), Beverly Hills (BVHLCA01), Bear Valley (BVLYCA11), Bear Valley Springs (BVSPCA11), Cobb Mountain (CBMTCA11), Chualar (CHLRCA11), Chula Vista-Third Avenue (CHVSCA11), Chula Vista Apache (CHVSCA12), Chowchilla (CHWCCA11), Culver City (CLCYCA11), Calipatria (CLPTCA11), Calistoga (CLSTCA11), Clovis (CLVSCA11), Calexico (CLXCCA12), Compton (CMTNCA01), Concord (CNCRCA01), Colma (COLACA01), Cordelia (CORDCA11), Corona (CORNCA11), Colton (COTNCA11), Crockett (CRCTCA02), Corona Del Mar (CRDMCA11), Carlsbad-La Costa (CRLSCA12), Corning (CRNGCA12), Caruthers (CRTHCA11), Costa Mesa (CSMSCA11), Crows Landing (CWLDCA12), Coyote Wells (CYWLCA11), Danville (DAVLCA12), Tassajara (DAVLCA13), Davis (DAVSCA11), Delano (DELNCA11), Dinuba (DINBCA01), Dixon (DIXNCA11), Del Mar (DLMRCA12), Del Rey (DLRYCA11), Dunnigan (DNGNCA12), Dunsmuir (DNSMCA11), El Cajon (ELCJCA11), El Centro (ELCNCA01), Rich-Appian Way (ELSBCA11), El Segundo-Douglas (ELSGCA12), El Toro (ELTRCA11), Encinitas (ENCTCA12), Earlimart (ERLMCA11), Escalon (ESCLCA11), Escondido (ESCNCA01), Esparto (ESPRCA11), Felton (FETNCA11), Flsm-Nimbus (FLSMCA12), Flsm-El Dorado (FLSMCA13), Fontana (FNTACA11), Firebaugh (FRBHCA11), Fremont-Main (FRMTCA11), Fair Oaks (FROKCA11), Fresno-Main (FRSNCA01), Fresno-Baldwin (FRSNCA11), Fresno-Clinton (FRSNCA12), Fresno-Sierra (FRSNCA13), Fresno-West (FRSNCA14), Fresno-Woodward (FRSNCA15), Farmersville (FRVLCA11), Fortuna (FTUNCA11), Fullerton (FUTNCA01), Five Points (FVPNCA11), Frazier Park (FZPKCA11), Galt (GALTCA11), Glendale (GLDLCA11), Gonzales (GNZLCA11), Gerber (GRBRCA11), Gridley (GRDLCA11), Gardena (GRDNCA01), Grenada (GRNDCA13), Goshen (GSHNCA11), Gustine (GUSTCA11), Geyserville (GYVLCA11), Herald (HERLCA11), Highland (HGLDCA11), Hughson (HGSNCA11), Holtville (HLVLCA11), Hollywood (HLWDCA01), Hamilton City (HMCYCA11), Homewood (HMWDCA11), Hanford (HNFRCA01), Huntington Park (HNPKCA01), Hopland (HPLDCA12), Huron (HURNCA11), Hayward-Depot Ct (HYWRCA11), Ignacio (IGNCCA12), Imperial (IMPRCA11), Ione (IONECA11), Irvine-Main (IRVNCA01), Irvine-Spectrum (IRVNCA12), Ivanhoe (IVNHCA11), Jamul (JAMLCA60), Jackson (JCSNCA01), Kingsburg (KGBGCA11), Kelseyville (KLVLCA12), Knights Ferry (KNFYCA11), Kyburz (KYBRCA11), La Canada-Oak Grove (LACNCA11), La Crescenta (LACRCA11), La Jolla-Girard (LAJLCA11), La Mesa (LAMSCA01), Lamont (LAMTCA11), Laton (LATNCA11), Lockeford (LCFRCA11), Lebec-Main (LEBCCA11), Lemoore-Main (LEMRCA11), Lemoore-Wyman (LEMRCA12), Lafayette (LFYTCA11), Laguna Niguel (LGNGCA12), Le Grand (LGRDCA11), La Grange (LGRNCA12), Lakeport (LKPTCA02), Lincoln (LNCLCA11), Lodi (LODICA01), Loleta (LOLTCA11), Loomis (LOMSCA11), Lomita (LOMTCA11), Larkspur (LRKSCA11), Lsan-Madison 02 (LSANCA02), Lsan-Madison 03 (LSANCA03), Lsan-Pleasant (LSANCA05), Lsan-Union (LSANCA06), Lsan-Airport (LSANCA07), Lsan-Melrose (LSANCA08), Lsan-Richmond (LSANCA09), Lsan-Webster (LSANCA10), Lsan-Rampart (LSANCA11), Lsan-Normandy (LSANCA12), Lsan-Plymouth (LSANCA13), Lsan-Adams (LSANCA14), Lsan-Axminster (LSANCA15), Lsan-Capitol (LSANCA23), Lsan-Sunset (LSANCA29), Lsan-Angelus (LSANCA34), Lsan-Montebello (LSANCA35), Lsan-Republic (LSANCA38), Los Banos (LSBNCA12), Los Molinos (LSMLCA11), Live Oak (LVOKCA11), Madera-Bonadelle (MADRCA12), Marina (MARNCA11), Modesto-Main (MDSTCA02), Modesto-Kellog (MDSTCA03), Modesto-Kingswood (MDSTCA04), Modesto-Tally (MDSTCA05), Modesto-Davis (MDSTCA52), Middletown (MDTWCA11), Mokelumne Hill (MKHLCA12), Mckinleyville (MKVLCA11), Millbrae (MLBRCA11), Mendota (MNDTCA11), Mojave (MOJVCA01), Moraga (MORGCA12), Merced (MRCDCA01), Meridian (MRDNCA11), Moorpark (MRPKCA12), Mission Viejo (MSVJCAAT), Mountain Pass (MTPSCA11), Monterey (MTRYCA01), Mt Shasta (MTSHCA12), Mountain View (MTVWCA11), Marysville (MYVICA01), Nicolaus (NCLSCA12), Newhall (NHLLCA01), Nhwd-Lankershim (NHWDCA01), Nhwd-Magnolia (NHWDCA02), Nice (NICECA11), Niland Main (NILDCA11), Niland Bombay Beach (NILDCA12), Nipomo (NIPMCA11), Northridge (NORGCA11), Nscr-Wabash (NSCRCA11), Nscr-North Natomas (NSCRCA12), National City-Highland (NTCYCA11), Newcastle (NWCSCA11), Newman (NWMNCA12), Oceanside-Mission (OCSDCA11), Oakdale (OKDLCA11), Okld-45Th (OKLDCA11), Okld-Holly (OKLDCA12), Okld-Mountain (OKLDCA13), Oakley (OKLYCA11), Orange Cove (ORCVCA11), Orland (ORLDCA11), Orinda (ORNDCA11), Orange-Chapman (ORNGCA11), Orange-Olive (ORNGCA13), Orosi (ORSICA11), Orangevale (ORVACA11), Otay Mesa (OTMSCA11), Pacifica (PCFCCA11), Pedley (PDLYCA11), Palo Alto-Main (PLALCA01), Palo Alto-South (PLALCA12), Pleasant Grove (PLGVCA12), Planada (PLNDCA11), Pleasanton-Main (PLTNCA12), Pleasanton-Hacienda (PLTNCA13), Placerville-Main (PLVLCA11), Pepperwood (PPWDCA11), Paradise-Main (PRDSCA11), Parlier (PRLRCA11), Paramount (PRMTCA01), Pittsburg-Main (PSBGCA01), Pittsburg-Willow (PSBGCA11), Pismo Beach (PSBHCA11), Pixley (PXLYCA11), Rancho Bernardo (RBRNCA11), Rocklin 11 (RCKLCA11), Richmond (RCMDCA11), Richvale (RCVACA11), Redwood City (RDCYCA01), Redding-Main (RDNGCA02), Redding-Enterprise (RDNGCA11), Rio Dell (RIDECA11), RIo Linda (RILNCA12), Rialto (RILTCA11), Rancho Murieta (RNMRCA11), Rancho Penasquitos (RNPSCA11), Rancho San Diego (RNSDCA11), Rosemead (ROSMCA11), Rancho Santa Fe (RSFECA12), Rosamond (RSMDCA11), Rohnert Park (RTPKCA11), Riverdale (RVDLCA11), Riverbank (RVRBCA11), Riverside-Orange (RVSDCA01), Riverside-Woodcrest (RVSDCA11), Santee (SANTCA01), Scrm-Main (SCRMCA01), Scrm-Garden (SCRMCA03), Scrm-Gladstone (SCRMCA11), Scrm-Empire (SCRMCA12), Scrm-Fruitridge (SCRMCA13), Scotts Valley (SCVYCA01), Selma (SELMCA11), Seaside (SESDCA11), South Gate (SGATCA01), Shingle Springs (SGSPCA11), Shafter (SHFTCA11), Sherman Oaks (SHOKCA01), Stockton-Main (SKTNCA01), Stockton-Granite (SKTNCA11), Stockton-Ashley (SKTNCA12), Stockton-Redwood (SKTNCA14), Soledad (SLDDCA11), Solamint (SLMNCA11), Salinas-Main (SLNSCA01), Salinas-Hickory (SLNSCA11), Salinas-Glenview (SLNSCA12), Moro (SLNSCA14), Silverado (SLVRCA11), Santa Ana-Bristol (SNANCA11), Santa Ana-Bolsa (SNANCA12), San Carlos (SNCRCA11), Sndg-C Street (SNDGCA01), Sndg-University (SNDGCA02), Sndg-Linda Vista (SNDGCA03), Sndg-Saipan (SNDGCA05), Sndg-37Th Street (SNDGCA06), Sndg-College (SNDGCA11), Sndg-Market (SNDGCA12), Sndg-Regents (SNDGCA15), Sndg-Mira Mesa (SNDGCA16), Snfc-Mccoppin (SNFCCA04), Snfc-25Th Street (SNFCCA05), Snfc-Onondaga (SNFCCA06), Snfc-9Th Avenue (SNFCCA13), Snfc-3Rd Street (SNFCCA17), Snfc-Folsom St (SNFCCA21), Snfc-U C Med Center (SNFCCA64), San Gabriel (SNGBCA01), San Geronimo (SNGNCA11), San Jose-Main (SNJSCA02), San Jose-Chynoweth (SNJSCA13), San Jose-Foxworthy (SNJSCA14), San Jose-Junction Avenue (SNJSCA21), San Lucas (SNLCCA11), San Martin (SNMACA11), San Marcos (SNMCCA11), San Mateo (SNMTCA11), Milton (SNRACA13), San Rafael-Main (SNRFCA01), San Ramon (SNRMCA11), Space Park (SNTCCA01), Bellomy (SNTCCA11), Carroll (SNVACA01), Mathilda (SNVACA11), San Ysidro (SNYSCA12), South Pasadena-Mission (SPSDCA11), Stratford (SRFRCA11), South Tahoe-Tamarack (STAHCA12), South Tahoe-Meyers (STAHCA13), Suison City (SUISCA11), Thornton (THTNCA11), Tipton (TPTNCA11), Terra Bella (TRBLCA11), Turlock (TRLCCA11), Tulare (TULRCA11), Tustin-Main (TUSTCA11), Tustin-Redhill (TUSTCA70), Twain Harte (TWHRCA11), Union City (UNCYCA11), Vina (VINACA12), Visalia (VISLCA11), Vista (VISTCA12), Van Nuys (VNNYCA02), Ventura-Main (VNTRCA11), Valley Ford (VYFRCA11), Wasco (WASCCA01), Woodland (WDLDCA11), Woodlake (WDLKCA11), Weed (WEEDCA01), Century City (WLANCA01), Walnut Creek (WNCKCA11), Windsor (WNDSCA11), Frontier (WSCRCA11), Waterford (WTFRCA11), Yorba Linda (YRLNCA11)

4

Exhibit I

189

**Important Information Regarding AT&T Phone for Business – Advanced (APB-A)**

*Lack of Line Power*

AT&T Phone for Business – Advanced (APB-A) does not provide line power. However, in the event of a power outage APB-A has a built-in, rechargeable battery backup that provides up to 24 hours of power on standby.

*Backup Power*

- *Capability to Accept Backup Power.* If there is an electrical power outage that affects the electricity to your business location, your APB-A device will continue to function by using its built-in backup battery.
- *The APB-A device includes a 24-hour battery backup at no additional cost.* APB-A is offered as a service (aaS) that features AT&T-owned and managed devices installed at the customer's premises. Should the APB-A device or battery become inoperable, AT&T will replace the APB-A device for as long as the customer retains APB-A as a service.
- *Service Limitations with and without Backup Power.* The backup battery will power the APB-A service, but it will not power other customer owned equipment like medical and security-monitoring systems. To maximize battery life during a power outage, customers should minimize usage of APB-A.

*Expected Backup Power Duration*

The internal backup battery will power the APB-A service for 24 hours on standby.

*Proper Usage and Storage Conditions, Including the Impact on Duration of Failing to Adhere to Proper Usage and Storage*

Since the backup battery is integrated into the APB-A device, it should be maintained under the same conditions as the device. The APB-A device should be used inside the business location, keeping the internal temperature between 32 °F and 113 °F (0 °C and 45 °C). Storing the device at higher or lower temperatures could adversely impact the duration of backup power available from the battery.

*Subscriber Backup Power Self-Testing and -Monitoring Instructions*

The built-in backup battery is part of the APB-A device. No testing is necessary on the battery as long as the APB-A service is active.

*APB-A Device Service Assurance Details*

*The APB-A device includes a 24-hour battery backup at no additional cost.* AT&T Phone for Business – Advanced is offered as a service (aaS) that features AT&T-owned and managed devices installed at the customer's premises. Should the APB-A device or battery become inoperable, AT&T will replace the APB-A device for as long as the customer retains APB-A as a service.

*Security Responsibilities and Other Steps You May Take to Ensure Safe Use of APB-A*

As noted above, in the event of a power outage, APB-A device has a built-in battery backup that can provide power for 24 hours. However, if the device does not have electrical or battery power, APB-A service will not work, including emergency 911 service. The APB-A device should remain plugged into an electrical power source for the service to continue working and to ensure that the battery remains fully charged.

Exhibit I

5

190



May 20, 2026



██████████████████
████████████
████████████
██████████

**Important Update About Your AT&T Business Customer Individual Access Line Service[1] and AT&T Residential Local Service**

Thank you for using AT&T for your business service needs. We know that businesses today rely on high-speed, reliable connectivity, and only AT&T can bring you the best and largest network to help you connect your business. That's why we're upgrading traditional landline phone service in your area to new, enhanced solutions that are more reliable and affordable. Our records show that you currently have service in at least one of the areas impacted by these updates. You can see the addresses where your service is being upgraded below. [2]

**Upgrading your traditional phone service:**
Our customers are asking for faster and more reliable service, so we're upgrading our network in California to give you connectivity you can count on for everyday needs. California's aging copper network doesn't deliver the same level of service, quality and reliability as newer technology. Now, we have more ways to connect than ever before, with newer, faster, technology that is more reliable, energy efficient, and affordable. As we upgrade our network across the country, we're doing the same in California and delivering better technology for our customers across the state.

**As part of this transition, your traditional phone service, known as AT&T Business Customer Individual Access Line Service and AT&T Residential Local Service, will be discontinued on or after 06/01/2027.**

We know how important it is to stay connected, and we're here to make this transition easy for you. We have an enhanced, more reliable option for you to better support your business needs and stay connected: AT&T Phone for Business – Advanced.

**Here's what you can expect over the next year:**
- We'll send additional information over the coming months regarding this transition and how you can upgrade your service.
- We'll no longer accept new orders, renewal of service agreements, or requests for physical changes, including moves to different service addresses, for traditional phone service in your area, effective on or after **07/19/2026.** You will continue to be able to make phone calls using your existing service until on or after **06/01/2027,** when we will stop providing service, pending FCC approval.
- You will need to contact your Account Manager to update your traditional landline phone service before **06/01/2027.** We want to help you upgrade your service, so you continue to have access to phone service and 911. Please call 855-235-0900 to understand your options for phone service from AT&T.

We look forward to continuing to serve you and providing a better and more reliable experience for your business needs.

Sincerely,

AT&T Business Services
208 S. Akard Street
Dallas, TX 75202
**www.business.att.com**

---

[1] In some circumstances, AT&T Business Customer Individual Access Line Service may also be referred to as Measured Rate Business Service.

[2] In the areas impacted by this notice, your traditional landline phone service is called AT&T Business Customer Individual Access Line Service or AT&T Residential Local Service and is provided by Pacific Bell Telephone Company, d/b/a AT&T California. A complete list of impacted areas is attached.

© 2026 AT&T Intellectual Property. All rights reserved. AT&T, the AT&T logo and all other AT&T marks contained herein are trademarks of AT&T Intellectual Property and/or AT&T affiliated companies.

Exhibit I
191

RAL

**We are required by the FCC to provide the following statement:**
The FCC will normally authorize this proposed discontinuance of service (or reduction or impairment) unless it is shown that customers would be unable to receive service or a reasonable substitute from another carrier or that the public convenience and necessity is otherwise adversely affected. If you wish to object, you should file your comments as soon as possible, but no later than 15 days after the Commission releases public notice of the proposed discontinuance. You may file your comments electronically through the FCC's Electronic Comment Filing System using the docket number established in the Commission's public notice for this proceeding, or you may address them to the Federal Communications Commission, Wireline Competition Bureau, Competition Policy Division, Washington, DC 20554, and include in your comments a reference to the section 63.71 application of Pacific Bell Telephone Company, d/b/a AT&T California. Comments should include specific information about the impact of this proposed discontinuance (or reduction or impairment) upon you or your company, including any inability to acquire reasonable substitute service..

**To the extent your contract with AT&T is inconsistent with the above, these planned changes may not apply to you. Please check your contract or contact us with questions.**

**Service addresses in areas impacted by this notice:**

| SERVICE ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Exhibit I

192

RAL

| SERVICE ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| ███████████████ | ███████ | ███ | ██████ |
| ███████████████ | ███████ | ███ | ██████ |
| █████████████ | █████████ | ███ | ██████ |
| █████████████████ | █████████ | ███ | ██████ |
| ████████████ | █████████ | ███ | ██████ |
| ████████████ | █████████ | ███ | ██████ |
| ████████████ | █████████ | ███ | ██████ |
| ██████████████ | ███████ | ███ | ██████ |
| █████████████ | ███████ | ███ | ██████ |
| ██████████████████ | █████████████ | ███ | ██████ |
| ██████████████████ | █████████████ | ███ | ██████ |
| ████████████ | ███████ | ███ | ██████ |
| ████████████ | ███████ | ███ | ██████ |
| ████████████████ | ███████ | ███ | ██████ |
| ████████████ | ███████ | ███ | ██████ |
| █████████ | █████████ | ███ | ██████ |
| ██████████ | ███████ | ███ | ██████ |
| ███████████ | ███████ | ███ | ██████ |
| ███████████████████ | ███████ | ███ | ██████ |
| ███████████ | ███████ | ███ | ██████ |
| █████████████████ | ███████ | ███ | ██████ |
| █████████████████ | ███████ | ███ | ██████ |
| ██████████████ | ███████ | ███ | ██████ |
| ███████████████ | █████████████ | ███ | ██████ |
| ████████████████ | █████████████ | ███ | ██████ |
| █████████████ | █████████████ | ███ | ██████ |
| ████████ | █████████████ | ███ | ██████ |
| ████████████ | █████████████ | ███ | ██████ |
| ████████████████████ | █████████████ | ███ | ██████ |
| ██████████████████ | █████████████ | ███ | ██████ |
| ██████████████ | ███████████████ | ███ | ██████ |
| ██████████████████ | ███████████████ | ███ | ██████ |
| ████████████ | █████████████ | ███ | ██████ |
| ███████████████████ | █████████████ | ███ | ██████ |
| ██████████████ | █████████████ | ███ | ██████ |
| █████████████████ | █████████ | ███ | ██████ |
| █████████████████ | █████████ | ███ | ██████ |
| █████████████████ | █████████ | ███ | ██████ |
| █████████████████ | █████████ | ███ | ██████ |
| █████████████████ | █████████ | ███ | ██████ |
| ███████████ | ███████████████ | ███ | ██████ |
| █████████████ | ███████████████ | ███ | ██████ |
| █████████████ | █████████ | ███ | ██████ |
| ███████████ | █████████ | ███ | ██████ |
| ████████ | ███████████████ | ███ | ██████ |
| ████████████ | █████████ | ███ | ██████ |
| ████████████ | █████████ | ███ | ██████ |
| ███████████ | █████████████ | ███ | ██████ |
| SERVICE ADDRESS | CITY | STATE | ZIP |
| ███████████ | █████████ | ███ | ██████ |
| ████████████████ | █████████████ | ███ | |

Exhibit I

193

| SERVICE ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| ███████████████ | ██████████ | ███ | ████ |
| ██████████████████ | ██████████ | ███ | ████ |
| ██████████ | █████ | ███ | ████ |
| ███████████ | █████ | ███ | ████ |
| ████████████████ | ███████████ | ███ | ████ |
| ██████████████ | ██████████ | ███ | ████ |
| █████████████ | ██████████ | ███ | ████ |
| █████████████████ | ██████████ | ███ | ████ |
| ███████████████ | ██████████ | ███ | ████ |
| ████████████████ | ██████████ | ███ | ████ |
| ███████████████ | ██████████ | ███ | ████ |
| ██████ | ██████████ | ███ | ████ |
| ████████ | ██████████ | ███ | ████ |
| ███████ | ████████ | ███ | ████ |
| ██████████████ | ██████████ | ███ | ████ |
| ████████████ | ██████████ | ███ | ████ |
| ████████████ | █████████ | ███ | ████ |
| ███████████ | ██████████ | ███ | ████ |
| ████████████ | █████████ | ███ | ████ |
| ████████████ | █████████ | ███ | ████ |
| ████████ | █████████ | ███ | ████ |
| ████████████ | █████████ | ███ | ████ |
| ███████████ | ████████ | ███ | ████ |
| █████████ | █████████ | ███ | ████ |
| ████████████ | █████████ | ███ | ████ |
| ████████████ | █████████ | ███ | ████ |
| █████████████ | █████████ | ███ | ████ |
| █████████████ | █████████ | ███ | ████ |
| ██████████ | █████████ | ███ | ████ |
| ███████████████ | ████████ | ███ | ████ |
| ██████████████ | ████████ | ███ | ████ |

Exhibit I
194

Below is a full list of AT&T wire centers affected by this notice.

## List of Impacted Wire Centers

### California

Albany-Solano (ALBYCA11), Alhambra (ALHBCA01), Anaheim-Lemon (ANHMCA01), Anaheim-Cypress (ANHMCA11), Anaheim-La Palma (ANHMCA12), Antioch (ANTCCA11), Arcadia (ARCDCA11), Arcata (ARCTCA11), Aromas (ARMSCA11), Anderson (ARSNCA11), Arlington (ARTNCA11), Arvin (ARVNCA11), Atwater (ATWRCA12), Avenal (AVNLCA12), N Tahoe Brockway (BCWYCA11), Beale-Msvl Sterling (BEALCA11), Bell (BELLCA11), Biggs (BGGSCA11), Bakersfield-Empire (BKFDCA11), Bakersfield-Main (BKFDCA12), Bakersfield-Columbus (BKFDCA13), Bakersfield-Temple (BKFDCA14), Bakersfield-Mettler (BKFDCA15), Bakersfield-West (BKFDCA17), Bakersfield-Nomad (BKFDCA19), Berkeley-Bancroft (BKLYCA01), Benicia (BNCICA11), Ben Lomond (BNLMCA11), Buena Park (BNPKCA11), Burbank-Palm (BRBNCA11), Bradley (BRDLCA90), Brea (BREACA12), Burlingame (BRLNCA01), Brentwood (BRWDCA12), Brawley (BRWLCA11), Bishop Ranch (BSRNCA70), Butte City (BTCYCA11), Bethel Island (BTISCA11), Burrel (BURLCA11), Beverly Hills (BVHLCA01), Bear Valley (BVLYCA11), Bear Valley Springs (BVSPCA11), Cobb Mountain (CBMTCA11), Chualar (CHLRCA11), Chula Vista-Third Avenue (CHVSCA11), Chula Vista Apache (CHVSCA12), Chowchilla (CHWCCA11), Culver City (CLCYCA11), Calipatria (CLPTCA11), Calistoga (CLSTCA11), Clovis (CLVSCA11), Calexico (CLXCCA12), Compton (CMTNCA01), Concord (CNCRCA01), Colma (COLACA01), Cordelia (CORDCA11), Corona (CORNCA11), Colton (COTNCA11), Crockett (CRCTCA02), Corona Del Mar (CRDMCA11), Carlsbad-La Costa (CRLSCA12), Corning (CRNGCA12), Caruthers (CRTHCA11), Costa Mesa (CSMSCA11), Crows Landing (CWLDCA12), Coyote Wells (CYWLCA11), Danville (DAVLCA12), Tassajara (DAVLCA13), Davis (DAVSCA11), Delano (DELNCA11), Dinuba (DINBCA01), Dixon (DIXNCA11), Del Mar (DLMRCA12), Del Rey (DLRYCA11), Dunnigan (DNGNCA12), Dunsmuir (DNSMCA11), El Cajon (ELCJCA11), El Centro (ELCNCA01), Rich-Appian Way (ELSBCA11), El Segundo-Douglas (ELSGCA12), El Toro (ELTRCA11), Encinitas (ENCTCA12), Earlimart (ERLMCA11), Escalon (ESCLCA11), Escondido (ESCNCA01), Esparto (ESPRCA11), Felton (FETNCA11), Flsm-Nimbus (FLSMCA12), Flsm-El Dorado (FLSMCA13), Fontana (FNTACA11), Firebaugh (FRBHCA11), Fremont-Main (FRMTCA11), Fair Oaks (FROKCA11), Fresno-Main (FRSNCA01), Fresno-Baldwin (FRSNCA11), Fresno-Clinton (FRSNCA12), Fresno-Sierra (FRSNCA13), Fresno-West (FRSNCA14), Fresno-Woodward (FRSNCA15), Farmersville (FRVLCA11), Fortuna (FTUNCA11), Fullerton (FUTNCA01), Five Points (FVPNCA11), Frazier Park (FZPKCA11), Galt (GALTCA11), Glendale (GLDLCA11), Gonzales (GNZLCA11), Gerber (GRBRCA11), Gridley (GRDLCA11), Gardena (GRDNCA01), Grenada (GRNDCA13), Goshen (GSHNCA11), Gustine (GUSTCA11), Geyserville (GYVLCA11), Herald (HERLCA11), Highland (HGLDCA11), Hughson (HGSNCA11), Holtville (HLVLCA11), Hollywood (HLWDCA01), Hamilton City (HMCYCA11), Homewood (HMWDCA11), Hanford (HNFRCA01), Huntington Park (HNPKCA01), Hopland (HPLDCA12), Huron (HURNCA11), Hayward-Depot Ct (HYWRCA11), Ignacio (IGNCCA12), Imperial (IMPRCA11), Ione (IONECA11), Irvine-Main (IRVNCA01), Irvine-Spectrum (IRVNCA12), Ivanhoe (IVNHCA11), Jamul (JAMLCA60), Jackson (JCSNCA01), Kingsburg (KGBGCA11), Kelseyville (KLVLCA12), Knights Ferry (KNFYCA11), Kyburz (KYBRCA11), La Canada-Oak Grove (LACNCA11), La Crescenta (LACRCA11), La Jolla-Girard (LAJLCA11), La Mesa (LAMSCA01), Lamont (LAMTCA11), Laton (LATNCA11), Lockeford (LCFRCA11), Lebec-Main (LEBCCA11), Lemoore-Main (LEMRCA11), Lemoore-Wyman (LEMRCA12), Lafayette (LFYTCA11), Laguna Niguel (LGNGCA12), Le Grand (LGRDCA11), La Grange (LGRNCA12), Lakeport (LKPTCA02), Lincoln (LNCLCA11), Lodi (LODICA01), Loleta (LOLTCA11), Loomis (LOMSCA11), Lomita (LOMTCA11), Larkspur (LRKSCA11), Lsan-Madison 02 (LSANCA02), Lsan-Madison 03 (LSANCA03), Lsan-Pleasant (LSANCA05), Lsan-Union (LSANCA06), Lsan-Airport (LSANCA07), Lsan-Melrose (LSANCA08), Lsan-Richmond (LSANCA09), Lsan-Webster (LSANCA10), Lsan-Rampart (LSANCA11), Lsan-Normandy (LSANCA12), Lsan-Plymouth (LSANCA13), Lsan-Adams (LSANCA14), Lsan-Axminster (LSANCA15), Lsan-Capitol (LSANCA23), Lsan-Sunset (LSANCA29), Lsan-Angelus (LSANCA34), Lsan-Montebello (LSANCA35), Lsan-Republic (LSANCA38), Los Banos (LSBNCA12), Los Molinos (LSMLCA11), Live Oak (LVOKCA11), Madera-Bonadelle (MADRCA12), Marina (MARNCA11), Modesto-Main (MDSTCA02), Modesto-Kellog (MDSTCA03), Modesto-Kingswood (MDSTCA04), Modesto-Tally (MDSTCA05), Modesto-Davis (MDSTCA52), Middletown (MDTWCA11), Mokelumne Hill (MKHLCA12), Mckinleyville (MKVLCA11), Millbrae (MLBRCA11), Mendota (MNDTCA11), Mojave (MOJVCA01), Moraga (MORGCA12), Merced (MRCDCA01), Meridian (MRDNCA11), Moorpark (MRPKCA12), Mission Viejo (MSVJCAAT), Mountain Pass (MTPSCA11), Monterey (MTRYCA01), Mt Shasta (MTSHCA12), Mountain View (MTVWCA11), Marysville (MYVICA01), Nicolaus (NCLSCA12), Newhall (NHLLCA01), Nhwd-Lankershim (NHWDCA01), Nhwd-Magnolia (NHWDCA02), Nice (NICECA11), Niland Main (NILDCA11), Niland Bombay Beach (NILDCA12), Nipomo (NIPMCA11), Northridge (NORGCA11), Nscr-Wabash (NSCRCA11), Nscr-North Natomas (NSCRCA12), National City-Highland (NTCYCA11), Newcastle (NWCSCA11), Newman (NWMNCA12), Oceanside-Mission (OCSDCA11), Oakdale (OKDLCA11), Okld-45Th (OKLDCA11), Okld-Holly (OKLDCA12), Okld-Mountain (OKLDCA13), Oakley (OKLYCA11), Orange Cove (ORCVCA11), Orland (ORLDCA11), Orinda (ORNDCA11), Orange-Chapman (ORNGCA11), Orange-Olive (ORNGCA13), Orosi (ORSICA11), Orangevale (ORVACA11), Otay Mesa (OTMSCA11), Pacifica (PCFCCA11), Pedley (PDLYCA11), Palo Alto-Main (PLALCA02), Palo Alto-South (PLALCA12), Pleasant Grove (PLGVCA12), Planada (PLNDCA11), Pleasanton-Main (PLTNCA12), Pleasanton-Hacienda (PLTNCA13), Placerville-Main (PLVLCA11), Pepperwood (PPWDCA11), Paradise-Main (PRDSCA11), Parlier (PRLRCA11), Paramount (PRMTCA01), Pittsburg-Main (PSBGCA01), Pittsburg-Willow (PSBGCA11), Pismo Beach (PSBHCA11), Pixley (PXLYCA11), Rancho Bernardo (RBRNCA11), Rocklin 11 (RCKLCA11), Richmond (RCMDCA11), Richvale (RCVACA11), Redwood City (RDCYCA01), Redding-Main (RDNGCA02), Redding-Enterprise (RDNGCA11), Rio Dell (RIDECA11), Rio Linda (RILNCA12), Rialto (RILTCA11), Rancho Murieta (RNMRCA11), Rancho Penasquitos (RNPSCA11), Rancho San Diego (RNSDCA11), Rosemead (ROSMCA11), Rancho Santa Fe (RSFECA12), Rosamond (RSMDCA11), Rohnert Park (RTPKCA11), Riverdale (RVDLCA11), Riverbank (RVRBCA11), Riverside-Orange (RVSDCA01), Riverside-Woodcrest (RVSDCA11), Santee (SANTCA01), Scrm-Main (SCRMCA01), Scrm-Garden (SCRMCA03), Scrm-Gladstone (SCRMCA11), Scrm-Empire (SCRMCA12), Scrm-Fruitridge (SCRMCA13), Scotts Valley (SCVYCA01), Selma (SELMCA11), Seaside (SESDCA11), South Gate (SGATCA01), Shingle Springs (SGSPCA11), Shafter (SHFTCA11), Sherman Oaks (SHOKCA01), Stockton-Main (SKTNCA01), Stockton-Granite (SKTNCA11), Stockton-Ashley (SKTNCA12), Stockton-Redwood (SKTNCA14), Soledad (SLDDCA11), Solamint (SLMNCA11), Salinas-Main (SLNSCA01), Salinas-Hickory (SLNSCA11), Salinas-Glenview (SLNSCA12), Moro (SLNSCA14), Silverado (SLVRCA11), Santa Ana-Bristol (SNANCA11), Santa Ana-Bolsa (SNANCA12), San Carlos (SNCRCA11), Sndg-C Street (SNDGCA01), Sndg-University (SNDGCA02), Sndg-Linda Vista (SNDGCA03), Sndg-Saipan (SNDGCA05), Sndg-37Th Street (SNDGCA06), Sndg-College (SNDGCA11), Sndg-Market (SNDGCA12), Sndg-Regents (SNDGCA15), Sndg-Mira Mesa (SNDGCA16), Snfc-Mccoppin (SNFCCA04), Snfc-25Th Street (SNFCCA05), Snfc-Onondaga (SNFCCA06), Snfc-9Th Avenue (SNFCCA13), Snfc-3Rd Street (SNFCCA17), Snfc-Folsom St (SNFCCA21), Snfc-U C Med Center (SNFCCA64), San Gabriel (SNGBCA01), San Geronimo (SNGNCA11), San Jose-Main (SNJSCA02), San Jose-Chynoweth (SNJSCA13), San Jose-Foxworthy (SNJSCA14), San Jose-Junction Avenue (SNJSCA21), San Lucas (SNLCCA11), San Martin (SNMACA11), San Marcos (SNMCCA11), San Mateo (SNMTCA11), Milton (SNRACA13), San Rafael-Main (SNRFCA01), San Ramon (SNRMCA11), Space Park (SNTCCA01), Bellomy (SNTCCA11), Carroll (SNVACA01), Mathilda (SNVACA11), San Ysidro (SNYSCA12), South Pasadena-Mission (SPSDCA11), Stratford (SRFRCA11), South Tahoe-Tamarack (STAHCA12), South Tahoe-Meyers (STAHCA13), Suisun City (SUISCA11), Thornton (THTNCA11), Tipton (TPTNCA11), Terra Bella (TRBLCA11), Turlock (TRLCCA11), Tulare (TULRCA11), Tustin-Main (TUSTCA11), Tustin-Redhill (TUSTCA70), Twain Harte (TWHRCA11), Union City (UNCYCA11), Vina (VINACA12), Visalia (VISLCA11), Vista (VISTCA12), Van Nuys (VNNYCA02), Ventura-Main (VNTRCA11), Valley Ford (VYFRCA11), Wasco (WASCCA01), Woodland (WDLDCA11), Woodlake (WDLKCA11), Weed (WEEDCA01), Century City (WLANCA01), Walnut Creek (WNCKCA11), Windsor (WNDSCA11), Frontier (WSCRCA11), Waterford (WTFRCA11), Yorba Linda (YRLNCA11)

10

Exhibit I
195

**Important Information Regarding AT&T Phone for Business – Advanced (APB-A)**

### Lack of Line Power

AT&T Phone for Business – Advanced (APB-A) does not provide line power. However, in the event of a power outage APB-A has a built-in, rechargeable battery backup that provides up to 24 hours of power on standby.

### Backup Power

- *Capability to Accept Backup Power.*   If there is an electrical power outage that affects the electricity to your business location, your APB-A device will continue to function by using its built-in backup battery.
- *The APB-A device includes a 24-hour battery backup at no additional cost.*   APB-A is offered as a service (aaS) that features AT&T-owned and managed devices installed at the customer's premises. Should the APB-A device or battery become inoperable, AT&T will replace the APB-A device for as long as the customer retains APB-A as a service.
- *Service Limitations with and without Backup Power.*   The backup battery will power the APB-A service, but it will not power other customer owned equipment like medical and security-monitoring systems. To maximize battery life during a power outage, customers should minimize usage of APB-A.

### Expected Backup Power Duration

The internal backup battery will power the APB-A service for 24 hours on standby.

### Proper Usage and Storage Conditions, Including the Impact on Duration of Failing to Adhere to Proper Usage and Storage

Since the backup battery is integrated into the APB-A device, it should be maintained under the same conditions as the device. The APB-A device should be used inside the business location, keeping the internal temperature between 32 °F and 113 °F (0 °C and 45 °C). Storing the device at higher or lower temperatures could adversely impact the duration of backup power available from the battery.

### Subscriber Backup Power Self-Testing and -Monitoring Instructions

The built-in backup battery is part of the APB-A device. No testing is necessary on the battery as long as the APB-A service is active.

### APB-A Device Service Assurance Details

*The APB-A device includes a 24-hour battery backup at no additional cost.* AT&T Phone for Business – Advanced is offered as a service (aaS) that features AT&T-owned and managed devices installed at the customer's premises. Should the APB-A device or battery become inoperable, AT&T will replace the APB-A device for as long as the customer retains APB-A as a service.

### Security Responsibilities and Other Steps You May Take to Ensure Safe Use of APB-A

As noted above, in the event of a power outage, APB-A device has a built-in battery backup that can provide power for 24 hours. However, if the device does not have electrical or battery power, APB-A service will not work, including emergency 911 service. The APB-A device should remain plugged into an electrical power source for the service to continue working and to ensure that the battery remains fully charged.

11

Exhibit I
196

# Exhibit 3

Exhibit I
197

## Section 63.602(a)(4) Certification

I, Susan Johnson, Senior Executive Vice President - Transformation and Supply Chain, am employed by AT&T Services, Inc. I certify under penalty of perjury that, to the best of my knowledge, information, and belief, the information required by 47 C.F.R. § 63.602 that is submitted in the Section 63.71 Application of Pacific Bell Telephone Company d/b/a AT&T California, for Authority Pursuant to Section 214 of the Communications Act of 1934, As Amended, to Discontinue the Provision of Service, is true and correct.

Dated:  May 15, 2026

Susan Johnson
AT&T SERVICES, INC.
208 South Akard Street
Dallas, TX 75202

Exhibit I
198

## <u>CERTIFICATE OF SERVICE</u>

I, Martha Flaherty, certify that on May 20, 2026, will cause a copy of the foregoing

Section 63.71 Application of AT&T by U.S. Mail postage prepaid to be served on the addresses

below.


<u>/s/ Martha Flaherty</u>
Martha Flaherty

Exhibit I
199

Office of the Governor
Governor's Office
State Capitol
Sacramento, CA 95814

California Public Utilities
Commission
505 Van Ness Avenue
San Francisco, CA 94102

Department of Defense
Chief Information Officer
6000 Defense Pentagon
Washington, D.C.20301

Table Mountain Rancheria
of California
Chairman
P.O. Box 410
Friant, CA, 93626

Paskenta Band of Nomlaki
Indians of California
22580 Olivewood Avenue
Corning, California 96021

Sycuan Band of the
Kumeyaay Nation
Chairman
1 Kwaaypaay Court
El Cajon, CA, 92019

Bear River Band of the
Rohnerville Rancheria
Chairman
266 Keisner Road,
Loleta, CA, 95551

Quartz Valley Indian
Community of the
Quartz Valley Reservation
Chairman
13601 Quartz Valley Road
Fort Jones, CA, 96032

Dry Creek Rancheria
Band of Pomo Indians
Chairman
P.O. Box 607
Geyserville, CA, 95441

San Manuel Band
of Mission Indians
Chairman
26569 Community Center Dr
Highland, CA, 92346

Hopland Band
of Pomo Indians
Chairman
3000 Shanel Road,
Hopland, CA, 95449

Jamul Indian Village
Chairman
P.O. Box 612
Jamul, CA, 91935

Jackson Band
of Miwuk Indians
Chairman
P.O. Box 1090
Jackson, CA, 95642

Santa Rosa Indian
Community of the
Santa Rosa Rancheria
Chairman
P.O. Box 8
Lemoore, CA, 93245

Robinson Rancheria Band
of Pomo Indians
Chairman
P.O. Box 4015
Nice, CA, 95464

Big Valley Band of Pomo
Indians of the Big Valley
Rancheria Chairman
2726 Mission Rancheria Rd
Lakeport, CA, 95453

United Auburn Indian
Community of the Auburn
Rancheria
Chairman
10720 Indian Hill Rd
Auburn, CA, 95603

Table Bluff Rancheria
Wiyot Tribe
Chairman
1000 Wiyot Dr.
Loleta, CA 95551

Middletown Rancheria of Pomo
Indians
Chairman
P.O. Box 1035
Middletown, CA, 95461

Cher-Ae Heights Indian
Community
of the Trinidad Rancheria
Chairman
P.O. Box 630
Trinidad, CA, 95570

Enterprise Rancheria of Maidu
Indians
Chairman
2133 Montevista Ave
Oroville, CA, 95966

Lytton Rancheria
Chairman
1500 Falling Oak Way
Windsor, CA, 95492

Redding Rancheria
Chairman
2000 Redding Rancheria Rd
Redding, CA, 96001

Shingle Springs Band of Miwok
Indians,
Shingle Springs Rancheria
(Verona Tract), California
Chairman
P.O. Box 1340
Shingle Springs, CA, 95682

Exhibit I
200

# EXHIBIT J

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of<br><br>Section 63.71 Application of<br><br>AT&T Services, Inc., on behalf of its affiliate;<br>Pacific Bell Telephone Company d/b/a AT&T<br>California<br><br><br>Authority Pursuant to Section 214 of<br>The Communications Act of 1934, As Amended,<br>To Discontinue the Provision of Service | **File No.** |

## SECTION 63.71 APPLICATION OF AT&T

AT&T[1] applies for authority under section 214(a) of the Communications Act, as amended, 47 U.S.C. § 214, and section 63.71 of the Federal Communications Commission's ("Commission") rules, 47 C.F.R. § 63.71, to discontinue certain legacy TDM-based voice services in certain wire centers located in California.

### INTRODUCTION

In its recent *Network Modernization Order*, the Commission made clear its desire to accelerate the modernization of America's communications infrastructure.[2] This Application takes an important step toward that goal. The copper wires that once served *every* home now

---

[1] AT&T Services, Inc. files this Application on behalf of its affiliate Pacific Bell Telephone Company d/b/a AT&T California. The FRN associated with this filing is 0001551530.

[2] *See Reducing Barriers to Network Improvements and Serv. Changes*, Report and Order, FCC 26-19, WC Dkt. No. 25-209, ¶ 1 (Mar. 27, 2026) ("*Network Modernization Order*").

1

Exhibit J

202

serve just *three percent* of Californian households in AT&T's service territory, and that number shrinks every day as customers switch to modern broadband options that are more affordable, reliable, and energy efficient. AT&T must spend $1 billion a year to maintain a nearly empty copper network that has become an easy mark for criminals—California has already suffered about 2,000 outages from copper thefts this year—and that is estimated to drain the power grid of over 100 million of kilowatt-hours each year.

AT&T thus seeks to discontinue AT&T Residential Local Service (the "Affected Service")—a copper-wire-based legacy service often referred to as "POTS"—to approximately 184,000 residential customers (the "Affected Customers") in portions of 360 wire centers in California (the "Affected Service Area").[3] This Application complements actions AT&T is concurrently taking to grandfather POTS in the Affected Service Area.[4] AT&T is filing concurrently a related Application to discontinue AT&T Business Individual Access Line Service[5] in the Affected Service Area.

The Affected Service Area is one of the most competitive areas in the country, and this Application thus presents a paradigmatic case for streamlined approval. The Affected Service Area is blanketed by three wireless networks offering both voice and broadband services. Cable companies and fiber providers have likewise deployed extensive wireline broadband networks throughout these wire centers. These providers offer the type of modern IP-based services that

---

[3] This Application also includes the wholesale version of the Affected Service, which is sold to carrier customers.

[4] *See Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Invest.*, Order, 40 FCC Rcd. 2019 (2025) (waiving the requirement to file applications to grandfather legacy voice services).

[5] AT&T Business Individual Access Line Service may also be called Measured Rate Business Service or AT&T Business Local Exchange Line Service.

Exhibit J

203

customers crave but that POTS cannot deliver, which is why only about three percent of households in AT&T's incumbent service territory in California subscribe to POTS.[6]

The National Broadband Map confirms this competitive reality. Over 99.9 percent of serviceable locations in the 360 wire centers are covered by at least three facilities-based, terrestrial fixed broadband or mobile voice providers. And this is without even counting emerging satellite-based services that are increasingly capable of serving virtually everywhere.

Critically, *every* Affected Customer has an alternative: *all* can receive the AT&T Phone – Advanced ("AP-A") service, which is not merely an adequate substitute for POTS, but superior to it.

And because this is the case, this Application abundantly satisfies the requirements for discontinuance as currently set forth in 47 C.F.R. §§ 63.71, 63.602.[7] The Commission has repeatedly granted AT&T discontinuance of the Affected Service on a streamlined basis for other AT&T wire centers.[8] In granting those applications, the Commission recognized each time that AP-A was an adequate replacement for residential POTS under the Adequate Replacement

---

[6] AT&T calculates this figure by dividing the number of its residential POTS customers as of February 2026 by the latest U.S. Census Bureau estimate of the number of households in census block groups overlapping AT&T's California service territory. *See Household Income in the Past 12 Months (in 2024 Inflation-Adjusted Dollars)*, U.S. Census Bureau, https://data.census.gov/table/ACSDT5Y2024.B19001?q=B19001&g=040XX00US06$1500000 (last visited May 15, 2026).

[7] AT&T files this Application under the Commission's existing rules, as the new rules adopted in the *Network Modernization Order* have not yet gone into effect (and likely will not have gone into effect if this Application is granted on a streamlined basis). However, this Application also independently satisfies the requirements of the Commission's new rules, as explained herein.

[8] *See* Section 63.71 Application of AT&T, WC Dkt. No. 24-220 (filed Nov. 1, 2024); *id.*, WC Dkt. No. 25-228 (filed July 15, 2025); *id.*, WC Dkt. No. 25-333 (filed Dec. 1, 2025).

Test outlined in the Commission's 2016 *Tech Transitions Order*.[9] As with AT&T's previously approved discontinuance applications, discontinuing the Affected Service here will benefit the public and serve as an important step toward meeting AT&T's and the Commission's shared goal of advancing next-generation communication technologies.[10]

AT&T's request for streamlined treatment of this Application rests upon the availability of AP-A—an "Adequate Replacement" service—to all Affected Customers. However, as noted, this is only one of many alternatives available. Affected Customers are also served by one or more "facilities-based mobile wireless" providers, including Verizon, whose mobile voice service the Commission recently found to be an adequate replacement for POTS.[11] Likewise, as noted, Affected Customers will also continue to be able to obtain voice service using the broadband connections provided by cable, fiber, fixed wireless, and satellite providers.

---

[9] *See generally Tech. Transitions*; et al., Declaratory Ruling, Second Report and Order, and Order on Reconsideration, 31 FCC Rcd. 8283 (2016) ("*Tech Transitions Order*").

[10] *See*, *e.g.*, *Network Modernization Order* ¶ 1; *Reducing Barriers to Network Improvements and Service Changes* et al., Notice of Proposed Rulemaking, 40 FCC Rcd. 5329, 5391, Statement of Chairman Brendan Carr (2025) ("We are looking to unleash the private sector to build the modern networks of the future and ensure that providers are no longer forced to invest billions of dollars in aging technology."); FCC, *Connecting America: The National Broadband Plan*, at 59 (Mar. 16, 2010), https://transition.fcc.gov/national-broadband-plan/national-broadband-plan.pdf ("requir[ing] certain carriers to maintain POTS … is not sustainable—and … can have a number of unintended consequences, including siphoning investments away from new networks and services").

[11] Section 63.71 Application (filed May 16, 2025), in *Section 63.71 Application of Qwest Corporation d/b/a CenturyLink QC*, WC Docket. No. 25-177. AT&T's and T-Mobile's mobile voice services do not differ from Verizon's in any way relevant to the Adequate Replacement Test and, as a practical matter, should also be considered adequate replacements for POTS service as well. In all events, the *Network Modernization Orde*r has conclusively determined that facilities-based mobile wireless service is an adequate replacement service. *See Network Modernization Order* ¶ 34.

Exhibit J

205

Given that virtually all voice customers in the Affected Service Area have switched to these superior alternatives, AT&T now seeks to discontinue the Affected Service in the Affected Service Area so that it can redeploy its resources towards its next-generation fiber and wireless networks and services.

Streamlined approval of this Application will demonstrate that the Commission has succeeded in cutting the "red tape that has both required providers to keep aging copper lines in place and effectively prevented them from investing in the modern infrastructure that Americans want and deserve."[12] It will also serve as the predicate for preempting California's outdated regulatory regime that "needlessly constrain[s] the deployment of modern, next-generation IP-based networks."[13] With last-century "Carrier of Last Resort" ("COLR") rules, California requires AT&T to continue offering POTS throughout its territory. But once the Commission has authorized discontinuance, AT&T may proceed to do so without securing "any other approval."[14]

## APPLICATION

### I.    AT&T Satisfies The Adequate Replacement Test

#### A.    AP-A Satisfies the Adequate Replacement Test

When the Commission adopted the Adequate Replacement Test in 2016, it noted that "a repeat applicant for a 214 discontinuance application in the technology transition context can rely on its successful certification of compliance with all three prongs of the Adequate Replacement Test in a previously approved application involving a substantially similar

---

[12] *Network Modernization Order* ¶ 1.

[13] *Id.* ¶ 7.

[14] *Id.* ¶ 114.

service."[15] A "substantially similar service" is defined as "one offered by the same applicant relying on the same technology and utilizing a comparable network infrastructure."[16] Both prongs are met here. In this Application, AT&T relies on AP-A, which the Commission previously found to satisfy the Adequate Replacement Test, as an adequate replacement for POTS.[17] AP-A in the Affected Service Area uses "a comparable"—in fact, the same—network architecture as in the previously approved applications.

AP-A is available to all Affected Customers. As reflected in the FCC National Broadband Map – Mobile, AT&T's LTE network covers all Affected Customers.[18] AP-A uses AT&T's LTE network for connectivity; therefore, AP-A is available to all Affected Customers.[19] Because the Commission previously found AP-A to be an adequate replacement for the Affected Service, and because AP-A is available to all Affected Customers, it is an adequate replacement for the Affected Service in the Affected Service Area.[20]

---

[15] *Tech Transitions Order* ¶ 82. The Commission noted at the time that "[t]his approach should go a long way to addressing incumbent LEC concerns that the adoption of new requirements for section 214 discontinuances will slow technology transitions." *Id.* ¶ 83.

[16] *Id.* ¶ 82.

[17] *See* n.9, *supra*.

[18] *See* FCC, *FCC National Broadband Map*, https://broadbandmap.fcc.gov (last visited May 15, 2026). AT&T relied on the LTE "voice" coverage depicted on the National Broadband Map to provide the most accurate depiction of AP-A coverage given its low bandwidth and given it sits in a fixed location.

[19] AP-A can work over any kind of Internet connection, but it primarily operates over AT&T's LTE network.

[20] In addition to AT&T's own mobile service, as noted above, Verizon's mobile wireless service also would constitute an adequate replacement service for Affected Customers, but AT&T does not rely on that service in making the showing necessary for streamlined treatment of this Application.

Exhibit J

207

**B.      Other Alternatives Are Also Widely Available and Support Discontinuance**

Although not required to approve this Application, the Affected Customers have numerous options beyond AP-A.

*Mobile Wireless Service.* There are over 390 million mobile retail voice lines in the United States, which represent approximately 83 percent of all voice lines.[21] Californians, like most Americans, overwhelmingly rely on mobile wireless service. As of three years ago, over three quarters of California adults relied *exclusively* on their mobile phones.[22] That fraction likely has increased, given prevailing trends.

The predominance of mobile wireless substitution stems from the near-ubiquitous availability of mobile networks in the country and in California specifically. In addition to AT&T's own mobile service, Verizon and T-Mobile blanket AT&T's legacy incumbent service area with mobile service that qualifies as an "adequate replacement service."[23] Individually, AT&T's LTE mobile service reaches *all* Affected Customers, as well as approximately 99.9 percent of locations in the 360 wire centers. But virtually all of these locations also have access to Verizon or T-Mobile (or both) as well. Collectively, approximately 99.9 percent of Affected

---

[21] *See* FCC, *Voice Telephone Services Report: Status as of June 30, 2025*, at 2 fig. 1 (May 2026), https://docs.fcc.gov/public/attachments/DOC-421558A1.pdf ("*Voice Telephone Services Report*").

[22] *See* Nat'l Ctr. for Health Stat., *National Health Interview Survey Early Release Program* 1 (2025), https://www.cdc.gov/nchs/data/nhis/earlyrelease/Wireless_state_202506.pdf (finding that, as of 2023, California adults relied exclusively (76.6 percent) or mostly (14.7 percent) on their wireless phones and that 3.8 percent relied equally on their wireless phones and landline (*i.e.*, POTS or broadband VoIP); only 1.7 percent of California adults were "landline-only" and only 1.9 percent were "landline-mostly").

[23] *See* n.11, *supra*.

Exhibit J

208

Customers and approximately 99.9 percent of serviceable locations in the 360 wire centers have access to at least two of the national mobile wireless providers.[24]

   *IP-Enabled Fixed Offerings.* Customers in AT&T's California service territory also enjoy many other cost-effective options for voice service, including offerings provided over cable, fiber, and fixed wireless services. Indeed, approximately 99.7 percent of serviceable locations in the 360 wire centers have access to one or more facilities-based fixed broadband providers, and approximately 96 percent have access to two or more.[25] The Commission has recognized that facilities-based interconnected VoIP services have "brought advanced communications services to the marketplace to the benefit of consumers," ensuring robust competition for voice services wherever broadband is available.[26]

   Enabled by the expansion of fixed broadband networks, interconnected VoIP has become the predominant fixed voice offering. It accounted for approximately 80 percent of all retail fixed voice service connections as of June of 2025.[27] Interconnected VoIP services bundled with broadband are often comparably priced or cheaper than POTS.[28]

---

[24] Declaration of Sandra Charneski ¶¶ 10–11 ("Charneski Decl.") (attached as Exhibit 1 to AT&T Forbearance Petition).

[25] Charneski Decl. ¶ 10.

[26] *Network Modernization Order* ¶ 43 (internal quotation marks omitted) (quoting *Numbering Policies for Modern Commc'ns*; et al., Second Report and Order and Second Further Notice of Proposed Rulemaking, 38 FCC Rcd 8951, ¶ 1 (2023)).

[27] *Voice Telephone Services Report* at 3 fig. 2.

[28] *Compare Xfinity Internet Plans, Deals and Promotions*, BroadbandNow, https://broadbandnow.com/XFINITY-deals (last visited May 15, 2026) (Comcast bundled VoIP and Internet start at $40/month), *and Get Our Best Bundle*, Cox Authorized Retailer, https://www.coxbundledeals.com/ (last visited May 15, 2026) (Cox VoIP service is priced at $20/month when purchased as part of a bundle), *with Home Phone Service*, AT&T, https://www.att.com/home-phone/landline/ (last visited May 15, 2026) (AT&T traditional home phone priced at around $63/month).

Cable providers such as Comcast, Charter, and Cox collectively have far surpassed AT&T as the leading wireline provider in California[29] and use their broadband networks to offer VoIP services that directly compete with legacy POTS.[30] As a result, VoIP connections in California substantially outnumber traditional POTS connections.[31]

Mobile wireless networks also enable fixed wireless offerings capable of supporting voice service. Fixed wireless service now reaches more households nationwide than cable broadband.[32] Combined, T-Mobile and Verizon served more than 14 million fixed wireless subscribers nationwide by the end of 2025—a more than 15-fold increase from just four years ago.[33] AT&T has also begun expanding its fixed wireless offering in nearly every state and now

---

[29] *See* FCC, *FCC National Broadband Map*, https://broadbandmap.fcc.gov/data-download/data-by-provider?version=jun2025&pubDataVer=jun2025 (last visited May 15, 2026) (showing Charter, Comcast, and Cox offer wireline service at 9.3 million combined locations to AT&T's 6.5 million).

[30] *See Comcast XFINITY® Voice: Residential*, xfinity, https://www.xfinity.com/corporate/about/phonetermsofservice/comcastdigitalvoice/cdvresidential (last visited May 15, 2026); *Spectrum Voice*, Spectrum, https://www.spectrum.com/home-phone (last visited May 15, 2026); *Cox Voice Preferred Home Phone*, Cox, https://www.cox.com/residential/phone.html (last visited May 15, 2026).

[31] *See Voice Telephone Services Report* at 12 (as of June 30, 2025, there were roughly 489,000 consumer-grade switched access voice connections and 2,199,000 consumer-grade interconnected VoIP connections in California); *see also* FCC, *Voice Telephone Services Report – State Subscriptions as of June 30, 2025* (May 2026), https://www.fcc.gov/sites/default/files/VTS_State_Subscriptions_J24_to_J25.xlsx.

[32] *2024 Commc'ns Marketplace Rep.*, 39 FCC Rcd. 14116, 14125 fig. II.A.4 (2024).

[33] *See* Verizon, *Verizon Financial and Operating Information*, at 9 (Apr. 27, 2026), https://www.verizon.com/about/investors/quarterly-reports/1q-2026-earnings-conference-call-webcast (reporting over 6 million fixed wireless subscribers for Q1 2026); T-Mobile, *T-Mobile Delivers Best-in-Class Customer Results in Q4, Translating into Durable and Profitable Financial Growth Driven by Widening Differentiation* (Feb. 11, 2026), https://s29.q4cdn.com/310188824/files/doc_financials/2025/q4/Q4-2025-Earnings-Release.pdf (reporting over 8.4 million 5G broadband customers); *T-Mobile US Inc. Earnings Call*, at 3 (Apr. 28, 2026), https://s29.q4cdn.com/310188824/files/doc_financials/2026/q1/TMUS-USQ_Transcript_2026-04-28.pdf (reporting adding more than 500,000 net broadband customers

9

has over 2.3 million subscribers.[34] Again, these networks blanket AT&T's California service territory and cover the vast majority of AT&T's California POTS customers.

*Satellite.* Finally, Affected Customers also can purchase VoIP services that run on top of satellite broadband connections. While the Commission has not yet recognized satellite as an "adequate replacement service," it has observed that satellite may be a "widely available alternative."[35] As the Commission has recognized, satellite is quickly emerging as an "innovative new [voice] service offering[]."[36] Indeed, Starlink, Amazon LEO, Globalstar, and AST SpaceMobile are deploying and swiftly expanding their fleets of satellites in low-earth orbit ("LEO") to offer voice and broadband service.[37] Satellite broadband speed and latency are

---

for Q1 2026); Monica Alleven, *T-Mobile, Verizon FWA Subs Take Center Stage in Q1 Forecasts*, Fierce Network (Apr. 15, 2022), https://www.fierce-network.com/wireless/t-mobile-verizon-fwa-takes-center-stage-q1-forecasts (Verizon ended 2021 with 228,000 fixed wireless subscribers while T-Mobile ended 2021 with 646,000 fixed wireless subscribers).

[34] AT&T, *Financial and Operational Schedules & Non-GAAP Reconciliations*, at 6 (Apr. 22, 2026), https://investors.att.com/~/media/Files/A/ATT-IR-V2/financial-reports/quarterly-earnings/2026/1Q-2026/1Q26_ATT_Financial_and_Operational_Schedules_and_Non_GAAP_Reconciliations.pdf.

[35] *Network Modernization Order* ¶ 39 ("Permitting third-party alternative voice service with access to 911 and substantially similar levels of network performance and availability as the service being discontinued to serve as a replacement service will enable innovative new service offerings, such as low-earth orbit satellite-based services, to qualify as replacement services without requiring the Commission to engage in additional time-consuming rulemaking proceedings … .").

[36] *Id.*

[37] *See*, *e.g.*, Starlink, *Progress Report 2024*, at 3 (2024), https://starlink.com/public-files/starlinkProgressReport_2024.pdf ("In just over five years, SpaceX designed, deployed, and activated high-quality internet, which is now available for over 2.8 billion people around the world."); Martyn Wingrove, *Second ULA Launch Doubles Amazon's Kuiper Satellite Fleet*, Riviera (July 8, 2025), https://www.rivieramm.com/news-content-hub/news-content-hub/second-ula-launch-doubles-amazon-kuiper-satellite-fleet-85363 (reporting that, in June 2025, Amazon's LEO constellation doubled to 54); *Globalstar To Enter Next Era of Mobile Satellite Connectivity with Expanded Operational Frequencies*, Globalstar (Sept. 15, 2025), https://investors.globalstar.com/news-releases/news-release-details/globalstar-enter-next-era-

10

Exhibit J

211

rapidly improving with LEO technology.[38] For example, Starlink has substantially increased its median upload and download speeds in the United States to 104.71/14.84 Mbps in 2025 and currently has the ability to deliver broadband speeds of 100/20 Mbps.[39] Recent Starlink updates have further "reduce[d] latency through laser-based inter-satellite links," and Starlink can now "deliver[] latency as low as 12 milliseconds"—which not only is sufficient for real-time voice service but also can "mak[e] real-time applications like video calls and cloud gaming viable almost anywhere on Earth."[40]

BEAD eligibility and funding for LEO mean that satellite VoIP's presence across the Affected Service Area will increase and that more locations will have access to satellite VoIP.

---

mobile-satellite-connectivity-expanded/ (announcing the deployment of its third-generation mobile satellite system, "which will include 48 additional satellites supported by approximately 90 new ground station antennas installed globally" and will provide service over the Big LEO frequency bands); AST Space Mobile, https://ast-science.com/spacemobile-network/ (announcing the ongoing launches of its Next-Gen Bluebird satellites, which will provide coverage for millions of daily connections such as voice and video calls, texts, and streaming and advertising its already-deployed satellites, which are ready to deliver broadband to billions of users worldwide). In addition, Viasat, which offers voice and broadband services, is partnering with LEO satellite operators to enhance its capabilities. *See Viasat Voice*, Viasat, https://www.viasat.com/isg/voice/ (last visited May 15, 2026); *European Space Agency (ESA) and Viasat Partner on D2D*, Viasat (Jan. 28, 2025), https://www.viasat.com/news/latest-news/corporate/2025/european-space-agency--esa--and-viasat-partner-on-d2d/.

[38] *See* Mateusz Kaczmarek, *Satellite vs. Fiber Internet: The 2025 Latency & Bandwidth Showdown*, TechStock 2 (June 4, 2025), https://ts2.tech/en/satellite-vs-fiber-internet-the-2025-latency-bandwidth-showdown/ ("Satellite internet (particularly modern LEO-based) has greatly improved and is now capable of supporting everyday activities–including streaming and video calls–that were once very challenging on satellite.").

[39] Sue Marek, *Starlink's U.S. Performance Is on the Rise, Making It a Viable Broadband Option in Some States*, Ookla (June 10, 2025), https://www.ookla.com/articles/starlink-us-performance-2025.

[40] Glanze Patrick, *Starlink Global Coverage Expands as Satellite Improves Internet Speed and Lower Latency*, Tech Times (Dec. 23, 2025), https://www.techtimes.com/articles/313567/20251223/starlink-global-coverage-expands-satellite-improves-internet-speed-lower-latency.htm.

Exhibit J

212

Indeed, over 40 percent of locations that received BEAD funding in California are slated for LEO satellite deployment, with SpaceX and Amazon the two largest winners by locations overall.[41] As satellite broadband continues to improve and proliferate, it will be increasingly important in the broadband ecosystem, including for voice applications, and will make POTS irrelevant even in remote areas.

## II.        Additional Information Required By 47 C.F.R. §§ 63.71, 63.602 And 63.505

As required by sections 63.71, 63.602, and 63.505 of the Commission's rules, AT&T provides the following additional information:

**Name and Address of Carrier:**

Pacific Bell Telephone Company d/b/a AT&T California.

The address for purposes of this application is:

430 Bush Street, Sixth Floor
San Francisco, CA 94108

**Date of Planned Service Discontinuance:**

Effective on or after June 1, 2027, pending regulatory approval, AT&T's Affected Service will be discontinued.

---

[41] Cal. Pub. Utils. Comm'n, *California BEAD Final Proposal – Deployment Projects*, https://www.cpuc.ca.gov/-/media/cpuc-website/divisions/communications-division/documents/broadband-implementation-for-california/bead/final-proposal/appendix-b---data-files-excel/final/fp_deployment_projects.csv (last visited May 15, 2026); Jake Neenan, *California Announces Grant Winners with BEAD Final Proposal*, BroadbandBreakfast (Dec. 3, 2025), https://broadbandbreakfast.com/california-announces-grant-winners-with-bead-final-proposal/.

Exhibit J

213

**Points of Geographic Areas of Service Affected and Description of the Affected Service Area:**

AT&T plans to discontinue the Affected Service in the Affected Service Area in California. Exhibit 1 identifies the list of AT&T wire centers in California that include any service areas that fall within the Affected Service Area.

**Brief Description of the Type of Service Affected:**

AT&T plans to discontinue AT&T Residential Local Service in the Affected Service Area. AT&T Residential Local Service is a TDM-based exchange access line service. It includes the serving central office line equipment and all outside plant facilities needed to connect that office with the network interface at the demarcation point of the customer premises. The service includes optional custom calling features and the End User Common Line service, which allows the line to facilitate local exchange, intrastate interexchange, and interstate voice calling.

**Brief Description of the Dates and Method of Notice to All Affected Customers:**

Customer notices were sent via U.S. Mail on May 20, 2026.[42] Copies of this Application are being sent via first class U.S. Mail to the governor, public utility commission, and federally recognized tribes (if any) in the Affected Service Area, and to the Special Assistant for Telecommunications to the Secretary of War, as required by section 63.71(a) of the Commission's rules.[43]

---

[42] A representative template notice to residential customers is attached at Exhibit 2. Also attached at Exhibit 2 is a representative notice letter to wholesale customers of the Affected Service. *See* n.3, *supra*. These notices also notified customers of AT&T's intent to grandfather the Affected Service in the wire centers included in this Application effective July 19, 2026. Because the Commission has waived the requirement to file applications to grandfather legacy services, this Application does not address this grandfathering action. *See* n.4, *supra*.

[43] Section 63.71(a) directs applicants to submit a copy of the application to the Secretary of Defense (now Secretary of War), Special Assistant for Telecommunications. However, due to restructuring within the Department of Defense, that position no longer exists. Commission staff

13

Exhibit J

214

**Regulatory Classification of Carrier:**

AT&T offers the Affected Service pursuant to non-dominant carrier regulation.

**Public Convenience and Necessity:**

As explained in the Introduction, the public convenience and necessity will be advanced, not impaired, by the discontinuance of the Affected Service. The demand for the Affected Service is very low, and it is not economically rational for AT&T to continue to provide it. As the Commission's recent *Network Modernization Order* recognizes, "incumbent LECs now hold[] a minority share of the voice services market.[44] That is true in AT&T's incumbent service territory in California, where only about three percent of households continue to subscribe to AT&T's POTS.

Today, only a small fraction of Californians rely exclusively on landline service, while the overwhelming majority rely at least as much on mobile wireless phones.[45] Moreover, customers of the Affected Service have many voice alternatives to choose from, including services already found to be adequate replacements for POTS, such as AP-A and Verizon's mobile wireless service. Customers also have access to other wireless services available from T-Mobile and AT&T, in particular.

---

has advised that a copy of the application be sent instead to the Department of Defense Chief Information Officer.

[44] *Network Modernization Order* ¶ 9.

[45] *See* n.22, *supra.*

14

Exhibit J

215

**Statement Identifying the Application as a Technology Transition (47 C.F.R. § 63.602(a)(2)):**

The proposed discontinuance constitutes a "technology transition"[46] because Affected Customers will be required to replace their TDM-based voice service with a different technology or transmission medium when AT&T discontinues legacy voice service in this area, as there is no other TDM-based voice service available in the Affected Service Area.

**Information Regarding the Price of the Service for Which Discontinuance Is Sought and the Price of the Proposed Replacement Service (47 C.F.R. § 63.602(a)(3)):**

The price of AT&T Residential Local Service in California is $50 per month, plus taxes, surcharges, and fees. AP-A for consumers is available for $45 per month, plus taxes, surcharges, and fees.

Customers also will realize substantial cost savings from AP-A's interoperability with legacy technologies and peripherals, which enables customers to extend the useable lifespan of their TDM-based devices.

**Certification That the Information Submitted in This Application Is True and Accurate (47 C.F.R. § 63.602(a)(4):**

See the attached certification of authorized AT&T representative Susan Johnson at Exhibit 3.

**Applicable Tariff Listing (47 C.F.R. § 63.505(e)):**

AP-A is not a tariffed service.

---

[46] *See* 47 C.F.R. § 63.60(i) (defining a technology transition as "any change in service that would result in the replacement of a wireline TDM-based voice service with a service using a different technology of medium for transmission to the end user, whether internet Protocol (IP), wireless, or another type").

Exhibit J

216

**Name of Any Other Carrier or Carriers Providing Telephone Service to the Community (47 C.F.R. § 63.505(g)):**

As set forth above, a number of competitors offer voice services to some or all of the Affected Service Area via cable, fiber, fixed wireless, satellite, CMRS, or over-the-top services.

**Description of Any Previous Discontinuance, Reduction, or Impairment of Service to the Community Affected by the Application (47 C.F.R. § 63.605(j)):**

AT&T will grandfather the Affected Service in the Affected Service Area.[47]

**Number of Toll Messages (47 C.F.R. § 63.505(l)):**

The amount of toll traffic on AT&T's entire network has steadily decreased as its legacy voice customers have migrated to other wireline and wireless voice service providers. Toll traffic in the Affected Service Area is likely consistent with this overall trend, although AT&T does not track the monthly number of toll messages or toll revenues in the Affected Service Area.

**III.    The Application Also Satisfies The Requirements Of New Rule 63.71(f)**

AT&T has filed this Application under the Commission's existing rules. The revised rules that the Commission adopted in the *Network Modernization Order* contain new or modified information collection requirements, and they are currently subject to Office of Management and Budget (OMB) review and are not yet effective.[48] However, as the Commission generally simplified the standards for technology transition discontinuance, AT&T's Application generally satisfies the new rules the Commission has adopted.[49]

---

[47] *See* n.4, *supra*.

[48] *Network Modernization Order* ¶ 120.

[49] As explained below, however, AT&T is providing the notice to its customers required by existing Rule 63.71(a).

Exhibit J

217

In this Application, AT&T relies on AP-A, which is a "facilities-based interconnected VoIP service" under new Rule 63.71(f)(2)(i).[50] AP-A meets all the definitional requirements of such a service under Rule 9.3.[51] Furthermore, as explained above, the Commission previously found that AP-A satisfied the Adequate Replacement Test under the 2016 *Technology Transitions Order*, as an adequate replacement for POTS.[52] AP-A in the Affected Service Area uses the same network architecture as in the prior, approved applications. As such, it is a "facilities-based interconnected VoIP service" under new Rule 63.71(f)(2)(i). Likewise, as reflected in the FCC's National Broadband Map – Mobile, AT&T's LTE network covers all Affected Customers.[53] Because AP-A primarily operates over AT&T's LTE network, AP-A is available to all Affected Customers.

Moreover, while AP-A alone constitutes an adequate replacement, customers of the Affected Service can choose from many other alternatives for voice service. These include Verizon's mobile wireless service—a service already found to be an adequate replacement for POTS—as well as other wireless services, particularly from T-Mobile and AT&T.[54] AT&T's mobile wireless service is a "facilities-based mobile wireless service" operating at the speeds of at least 5 Mbps download and 1 Mbps upload required under Rule 63.71(f)(2)(ii). Indeed, in the

---

[50] *Network Modernization Order*, app. A.

[51] 47 C.F.R. § 9.3 (defining "Interconnected VoIP service").

[52] *See* n.9, *supra*.

[53] *See* n.18, *supra*.

[54] *See* n. 11, *supra* ("AT&T's and T-Mobile's mobile voice services do not differ from Verizon's in any way relevant to the Adequate Replacement Test and, as a practical matter, should also be considered adequate replacements for POTS service as well. In all events, the *Network Modernization Order* has conclusively determined that facilities-based mobile wireless service is an adequate replacement service. *See Network Modernization Order* ¶ 34.").

17

Exhibit J

218

360 wire centers, virtually all Affected Customers have access to at least two facilities-based mobile wireless services available.

In addition, AT&T's notice satisfies new Rule 63.71(j), which requires notice to existing customers that AT&T is grandfathering a service they currently receive.[55] As described above, AT&T has sent notices to existing customers to effectuate grandfathering in the wire centers included in this Application.

AT&T also has complied with the notice provisions of Rule 63.71(a), including the statement describing the objection process contained in existing Rule 63.71(a)(5). As described above, customer notices were sent via U.S. Mail on May 20, 2026. Copies of this Application are being sent via first class U.S. Mail to the governor, public utility commission, and federally recognized tribes (if any) in the Affected Service Area, and to the Special Assistant for Telecommunications to the Secretary of War, as required by new Rule 63.71(a).[56]

<p style="text-align:center">*    *    *</p>

Questions about this application may be addressed to Meredith Williams, AT&T Services, Inc., AVP – Federal Regulatory, 601 New Jersey Ave NW, Suite 650, Washington, DC, (202) 227-9725.

---

[55] *See Network Modernization Order*, app. A ("Such notice shall include (i) an approximate date by which it intends to seek to permanently discontinue the service, and (ii) a statement regarding alternative services available in the affected service area.").

[56] *See* n.43, *supra*.

Exhibit J

219

**CONCLUSION**

For the reasons identified above, the public convenience and necessity will not be adversely affected by the discontinuance of the Affected Service. AT&T respectfully requests the Commission approve its section 63.71 Application to discontinue services.

By:  /s/ Brett Farley

BRETT FARLEY
CHRISTOPHER HEIMANN
DAVID CHORZEMPA
DAVID LAWSON
AT&T SERVICES, INC.
601 New Jersey Ave NW, Suite 650
Washington, DC 20001

May 20, 2026

19

Exhibit J

220

# Exhibit 1

**List of Affected Wire Centers**

*Sections of California*: Certain areas currently served by the following wire centers:

Albany-Solano (ALBYCA11), Alhambra (ALHBCA01), Anaheim-Lemon (ANHMCA01), Anaheim-Cypress (ANHMCA11), Anaheim-La Palma (ANHMCA12), Antioch (ANTCCA11), Arcadia (ARCDCA11), Arcata (ARCTCA11), Aromas (ARMSCA11), Anderson (ARSNCA11), Arlington (ARTNCA11), Arvin (ARVNCA11), Atwater (ATWRCA12), Avenal (AVNLCA12), N Tahoe Brockway (BCWYCA11), Beale-Msvl Sterling (BEALCA11), Bell (BELLCA11), Biggs (BGGSCA11), Bakersfield-Empire (BKFDCA11), Bakersfield-Main (BKFDCA12), Bakersfield-Columbus (BKFDCA13), Bakersfield-Temple (BKFDCA14), Bakersfield-Mettler (BKFDCA15), Bakersfield-West (BKFDCA17), Bakersfield-Nomad (BKFDCA19), Berkeley-Bancroft (BKLYCA01), Benicia (BNCICA11), Ben Lomond (BNLMCA11), Buena Park (BNPKCA11), Burbank-Palm (BRBNCA11), Bradley (BRDLCA90), Brea (BREACA12), Burlingame (BRLNCA01), Brentwood (BRWDCA12), Brawley (BRWLCA11), Bishop Ranch (BSRNCA70), Butte City (BTCYCA11), Bethel Island (BTISCA11), Burrel (BURLCA11), Beverly Hills (BVHLCA01), Bear Valley (BVLYCA11), Bear Valley Springs (BVSPCA11), Cobb Mountain (CBMTCA11), Chualar (CHLRCA11), Chula Vista-Third Avenue (CHVSCA11), Chula Vista Apache (CHVSCA12), Chowchilla (CHWCCA11), Culver City (CLCYCA11), Calipatria (CLPTCA11), Calistoga (CLSTCA11), Clovis (CLVSCA11), Calexico (CLXCCA12), Compton (CMTNCA01), Concord (CNCRCA01), Colma (COLACA01), Cordelia (CORDCA12), Corona (CORNCA11), Colton (COTNCA11), Crockett (CRCTCA02), Corona Del Mar (CRDMCA11), Carlsbad-La Costa (CRLSCA12), Corning (CRNGCA12), Caruthers (CRTHCA11), Costa Mesa (CSMSCA11), Crows Landing (CWLDCA12), Coyote Wells (CYWLCA11), Danville (DAVLCA12), Tassajara (DAVLCA13), Davis (DAVSCA11),

1

Delano (DELNCA11), Dinuba (DINBCA01), Dixon (DIXNCA11), Del Mar (DLMRCA12), Del Rey (DLRYCA11), Dunnigan (DNGNCA12), Dunsmuir (DNSMCA11), El Cajon (ELCJCA11), El Centro (ELCNCA01), Rich-Appian Way (ELSBCA11), El Segundo-Douglas (ELSGCA12), El Toro (ELTRCA11), Encinitas (ENCTCA12), Earlimart (ERLMCA11), Escalon (ESCLCA11), Escondido (ESCNCA01), Esparto (ESPRCA11), Felton (FETNCA11), Flsm-Nimbus (FLSMCA12), Flsm-El Dorado (FLSMCA13), Fontana (FNTACA11), Firebaugh (FRBHCA11), Fremont-Main (FRMTCA11), Fair Oaks (FROKCA11), Fresno-Main (FRSNCA01), Fresno-Baldwin (FRSNCA11), Fresno-Clinton (FRSNCA12), Fresno-Sierra (FRSNCA13), Fresno-West (FRSNCA14), Fresno-Woodward (FRSNCA15), Farmersville (FRVLCA11), Fortuna (FTUNCA11), Fullerton (FUTNCA01), Five Points (FVPNCA11), Frazier Park (FZPKCA11), Galt (GALTCA11), Glendale (GLDLCA11), Gonzales (GNZLCA11), Gerber (GRBRCA11), Gridley (GRDLCA11), Gardena (GRDNCA01), Grenada (GRNDCA13), Goshen (GSHNCA11), Gustine (GUSTCA11), Geyserville (GYVLCA11), Herald (HERLCA11), Highland (HGLDCA11), Hughson (HGSNCA11), Holtville (HLVLCA11), Hollywood (HLWDCA01), Hamilton City (HMCYCA11), Homewood (HMWDCA11), Hanford (HNFRCA01), Huntington Park (HNPKCA01), Hopland (HPLDCA12), Huron (HURNCA11), Hayward-Depot Ct (HYWRCA11), Ignacio (IGNCCA12), Imperial (IMPRCA11), Ione (IONECA11), Irvine-Main (IRVNCA01), Irvine-Spectrum (IRVNCA12), Ivanhoe (IVNHCA11), Jamul (JAMLCA60), Jackson (JCSNCA01), Kingsburg (KGBGCA11), Kelseyville (KLVLCA12), Knights Ferry (KNFYCA11), Kyburz (KYBRCA11), La Canada-Oak Grove (LACNCA11), La Crescenta (LACRCA11), La Jolla-Girard (LAJLCA11), La Mesa (LAMSCA01), Lamont (LAMTCA11), Laton (LATNCA11), Lockeford (LCFRCA11), Lebec-Main (LEBCCA11), Lemoore-Main (LEMRCA11), Lemoore-Wyman

2

Exhibit J

223

(LEMRCA12), Lafayette (LFYTCA11), Laguna Niguel (LGNGCA12), Le Grand (LGRDCA11), La Grange (LGRNCA12), Lakeport (LKPTCA02), Lincoln (LNCLCA11), Lodi (LODICA01), Loleta (LOLTCA11), Loomis (LOMSCA11), Lomita (LOMTCA11), Larkspur (LRKSCA11), Lsan-Madison 02 (LSANCA02), Lsan-Madison 03 (LSANCA03), Lsan-Pleasant (LSANCA05), Lsan-Union (LSANCA06), Lsan-Airport (LSANCA07), Lsan-Melrose (LSANCA08), Lsan-Richmond (LSANCA09), Lsan-Webster (LSANCA10), Lsan-Rampart (LSANCA11), Lsan-Normandy (LSANCA12), Lsan-Plymouth (LSANCA13), Lsan-Adams (LSANCA14), Lsan-Axminster (LSANCA15), Lsan-Capitol (LSANCA23), Lsan-Sunset (LSANCA29), Lsan-Angelus (LSANCA34), Lsan-Montebello (LSANCA35), Lsan-Republic (LSANCA38), Los Banos (LSBNCA12), Los Molinos (LSMLCA11), Live Oak (LVOKCA11), Madera-Bonadelle (MADRCA12), Marina (MARNCA11), Modesto-Main (MDSTCA02), Modesto-Kellog (MDSTCA03), Modesto-Kingswood (MDSTCA04), Modesto-Tally (MDSTCA05), Modesto-Davis (MDSTCA52), Middletown (MDTWCA11), Mokelumne Hill (MKHLCA12), Mckinleyville (MKVLCA11), Millbrae (MLBRCA11), Mendota (MNDTCA11), Mojave (MOJVCA01), Moraga (MORGCA12), Merced (MRCDCA01), Meridian (MRDNCA11), Moorpark (MRPKCA12), Mission Viejo (MSVJCAAT), Mountain Pass (MTPSCA11), Monterey (MTRYCA01), Mt Shasta (MTSHCA12), Mountain View (MTVWCA11), Marysville (MYVICA01), Nicolaus (NCLSCA12), Newhall (NHLLCA01), Nhwd-Lankershim (NHWDCA01), Nhwd-Magnolia (NHWDCA02), Nice (NICECA11), Niland Main (NILDCA11), Niland Bombay Beach (NILDCA12), Nipomo (NIPMCA11), Northridge (NORGCA11), Nscr-Wabash (NSCRCA11), Nscr-North Natomas (NSCRCA12), National City-Highland (NTCYCA11), Newcastle (NWCSCA11), Newman (NWMNCA12), Oceanside-Mission (OCSDCA11), Oakdale (OKDLCA11), Okld-45Th (OKLDCA11), Okld-Holly

3

(OKLDCA12), Okld-Mountain (OKLDCA13), Oakley (OKLYCA11), Orange Cove (ORCVCA11), Orland (ORLDCA11), Orinda (ORNDCA11), Orange-Chapman (ORNGCA11), Orange-Olive (ORNGCA13), Orosi (ORSICA11), Orangevale (ORVACA11), Otay Mesa (OTMSCA11), Pacifica (PCFCCA11), Pedley (PDLYCA11), Palo Alto-Main (PLALCA02), Palo Alto-South (PLALCA12), Pleasant Grove (PLGVCA12), Planada (PLNDCA11), Pleasanton-Main (PLTNCA12), Pleasanton-Hacienda (PLTNCA13), Placerville-Main (PLVLCA11), Pepperwood (PPWDCA11), Paradise-Main (PRDSCA11), Parlier (PRLRCA11), Paramount (PRMTCA01), Pittsburg-Main (PSBGCA01), Pittsburg-Willow (PSBGCA11), Pismo Beach (PSBHCA11), Pixley (PXLYCA11), Rancho Bernardo (RBRNCA11), Rocklin 11 (RCKLCA11), Richmond (RCMDCA11), Richvale (RCVACA11), Redwood City (RDCYCA01), Redding-Main (RDNGCA02), Redding-Enterprise (RDNGCA11), Rio Dell (RIDECA11), RIo Linda (RILNCA12), Rialto (RILTCA11), Rancho Murieta (RNMRCA11), Rancho Penasquitos (RNPSCA11), Rancho San Diego (RNSDCA11), Rosemead (ROSMCA11), Rancho Santa Fe (RSFECA12), Rosamond (RSMDCA11), Rohnert Park (RTPKCA11), Riverdale (RVDLCA11), Riverbank (RVRBCA11), Riverside-Orange (RVSDCA01), Riverside-Woodcrest (RVSDCA11), Santee (SANTCA01), Scrm-Main (SCRMCA01), Scrm-Garden (SCRMCA03), Scrm-Gladstone (SCRMCA11), Scrm-Empire (SCRMCA12), Scrm-Fruitridge (SCRMCA13), Scotts Valley (SCVYCA01), Selma (SELMCA11), Seaside (SESDCA11), South Gate (SGATCA01), Shingle Springs (SGSPCA11), Shafter (SHFTCA11), Sherman Oaks (SHOKCA01), Stockton-Main (SKTNCA01), Stockton-Granite (SKTNCA11), Stockton-Ashley (SKTNCA12), Stockton-Redwood (SKTNCA14), Soledad (SLDDCA11), Solamint (SLMNCA11), Salinas-Main (SLNSCA01), Salinas-Hickory (SLNSCA11), Salinas-Glenview (SLNSCA12), Moro (SLNSCA14), Silverado (SLVRCA11), Santa Ana-Bristol (SNANCA11),

4

Exhibit J

225

Santa Ana-Bolsa (SNANCA12), San Carlos (SNCRCA11), Sndg-C Street (SNDGCA01), Sndg-University (SNDGCA02), Sndg-Linda Vista (SNDGCA03), Sndg-Saipan (SNDGCA05), Sndg-37Th Street (SNDGCA06), Sndg-College (SNDGCA11), Sndg-Market (SNDGCA12), Sndg-Regents (SNDGCA15), Sndg-Mira Mesa (SNDGCA16), Snfc-Mccoppin (SNFCCA04), Snfc-25Th Street (SNFCCA05), Snfc-Onondaga (SNFCCA06), Snfc-9Th Avenue (SNFCCA13), Snfc-3Rd Street (SNFCCA17), Snfc-Folsom St (SNFCCA21), Snfc-U C Med Center (SNFCCA64), San Gabriel (SNGBCA01), San Geronimo (SNGNCA11), San Jose-Main (SNJSCA02), San Jose-Chynoweth (SNJSCA13), San Jose-Foxworthy (SNJSCA14), San Jose-Junction Avenue (SNJSCA21), San Lucas (SNLCCA11), San Martin (SNMACA11), San Marcos (SNMCCA11), San Mateo (SNMTCA11), Milton (SNRACA13), San Rafael-Main (SNRFCA01), San Ramon (SNRMCA11), Space Park (SNTCCA01), Bellomy (SNTCCA11), Carroll (SNVACA01), Mathilda (SNVACA11), San Ysidro (SNYSCA12), South Pasadena-Mission (SPSDCA11), Stratford (SRFRCA11), South Tahoe-Tamarack (STAHCA12), South Tahoe-Meyers (STAHCA13), Suison City (SUISCA11), Thornton (THTNCA11), Tipton (TPTNCA11), Terra Bella (TRBLCA11), Turlock (TRLCCA11), Tulare (TULRCA11), Tustin-Main (TUSTCA11), Tustin-Redhill (TUSTCA70), Twain Harte (TWHRCA11), Union City (UNCYCA11), Vina (VINACA12), Visalia (VISLCA11), Vista (VISTCA12), Van Nuys (VNNYCA02), Ventura-Main (VNTRCA11), Valley Ford (VYFRCA11), Wasco (WASCCA01), Woodland (WDLDCA11), Woodlake (WDLKCA11), Weed (WEEDCA01), Century City (WLANCA01), Walnut Creek (WNCKCA11), Windsor (WNDSCA11), Frontier (WSCRCA11), Waterford (WTFRCA11), Yorba Linda (YRLNCA11)

Exhibit J

226

# Exhibit 2

**AT&T**

May 20, 2026

<FIRSTNAME><LASTNAME>
<ADDRESS>
<CITY>,<STATE> <ZIP>-<PLUS4>

# Important Update About Your AT&T Home Phone Service

**Hi <First Name> or Hello, (if no first name available or UV_22=Y)**

At AT&T, we are always working to bring you the best connectivity in the industry. That's why we're upgrading home phone service in your area to a new, enhanced solution that's more reliable and affordable.

**Upgrading your home phone service:**
Our customers are asking for faster and more reliable service, so we're upgrading our network in California to give you connectivity you can count on for everyday needs. California's aging copper network doesn't deliver the same level of service, quality and reliability as newer technology. Now, we have more ways to connect than ever before with newer, faster technology that is more reliable, energy efficient, and affordable. As we upgrade our network across the country, we're doing the same in California and delivering better technology for our customers across the state.

**As part of this transition, the home phone service[1] you're currently using will be discontinued on or after June 1, 2027**. We know how important it is to keep your phone number and stay connected, and we're here to make this transition as easy as possible for you.

We want to work with you to upgrade your home phone service to **AT&T Phone – Advanced**, which is designed to better support your essential needs and help keep your calling experience seamless. Visit **www.att.com/home-phone/phone-advanced** to learn more. Key benefits include:
- Keep your current home number
- Works with most existing home phones
- Comparable or in some cases less expensive than traditional home phone service
- Unlimited nationwide calling at no extra cost
- 911 location detection for added peace of mind
- Better reliability during power outages with 24-hour battery back up
- AT&T Call Protect, a service that helps block unwanted calls, including spam and fraud

[1] In the areas impacted by this notice, your home phone service is called AT&T Residential Local Service and is provided by Pacific Bell Telephone Company, d/b/a AT&T California.  A complete list of impacted areas is attached.

©2026 AT&T Intellectual Property. AT&T, and globe logo are registered trademarks of AT&T Intellectual Property and/or AT&T affiliated companies. All other marks are the property of their respective owners.

AT&T, 208 S. Akard St., Dallas, TX 75201

A7353729 | A000000010

Exhibit J[Over]

228

**Here's what you can expect over the next year:**
- We'll send additional information over the coming months regarding this transition and how you can upgrade to AT&T Phone – Advanced or AT&T Wireless.
- We'll no longer accept new orders for traditional home phone service in your area, effective on or after **July 19, 2026**. This means you won't be able to make changes to your existing service, including moving it to a different address.
- You will continue to be able to make phone calls using your existing service until on or after **June 1, 2027**, when we will stop providing service, pending FCC approval.

**What are my next steps?**
We're ready to help you upgrade your AT&T service at any time before **June 1, 2027**, so you continue to have access to home phone service and 911. Please call **855.845.1472** Monday through Friday, 6:00 AM – 6:00 PM PST, and Saturday, 7:00 AM – 5:00 PM PST to understand your options for phone service from AT&T -- often for less than you pay today. For more information and answers to frequently asked questions, please visit **www.att.com/connectca**.

Thank you for being a loyal AT&T customer. We look forward to continuing to serve you and providing a better and more reliable experience for your home phone service.

**Your AT&T Team**
AT&T
2260 E Imperial Highway
Flr. 212b
El Segundo, CA 90245-3501
**www.att.com**

2

Exhibit J
229

**We're required by the FCC to provide the following statement:**

The FCC will normally authorize this proposed discontinuance of service (or reduction or impairment) unless it is shown that customers would be unable to receive service or a reasonable substitute from another carrier or that the public convenience and necessity is otherwise adversely affected. If you wish to object, you should file your comments as soon as possible, but no later than 15 days after the Commission releases public notice of the proposed discontinuance. You may file your comments electronically through the FCC's Electronic Comment Filing System using the docket number established in the Commission's public notice for this proceeding, or you may address them to the Federal Communications Commission, Wireline Competition Bureau, Competition Policy Division, Washington, DC 20554, and include in your comments a reference to the section 63.71 application of Pacific Bell Telephone Company, d/b/a AT&T California. Comments should include specific information about the impact of this proposed discontinuance (or reduction or impairment) upon you or your company, including any inability to acquire reasonable substitute service.

**Your language. Delivered. Plus 200 more. Call 855.845.1472**

致電 855.845.1472獲取中文資訊.

でこの情報を得るには 855.845.1472にお電話ください。.

이 정보를 한국어로 원하시면 855.845.1472로 전화하시기 바랍니다.

Tumawag sa 855.845.1472 upang makuha itong impormasyon sa Tagalog.

Gọi số 855.845.1472 để có được thông tin này bằng tiếng Việt.

позвоните по телефону: 855.845.1472 чтобы получить эту информацию на русском языке.

zadzwoń pod numer 855.845.1472, aby uzyskać te informacje w języku polskim.

Por favor, llame al 855.845.1472 para obtener esta información en español.

**AT&T's National Center for Customers with Disabilities (NCCD)**

- 📞 Voice: 8662416568
- 📞 TTY: 8662416567
- 🕐 Hours:
    - o  Mon–Fri: 11 a.m. – 9 p.m. PST
    - o  Sat: 11 a.m. – 8 p.m. PST

3

Exhibit J

230

**California:**

Albany-Solano (ALBYCA11), Alhambra (ALHBCA01), Anaheim-Lemon (ANHMCA01), Anaheim-Cypress (ANHMCA11), Anaheim-La Palma (ANHMCA12), Antioch (ANTCCA11), Arcadia (ARCDCA11), Arcata (ARCTCA11), Aromas (ARMSCA11), Anderson (ARSNCA11), Arlington (ARTNCA11), Arvin (ARVNCA11), Atwater (ATWRCA12), Avenal (AVNLCA12), N Tahoe Brockway (BCWYCA11), Beale-Msvl Sterling (BEALCA11), Bell (BELLCA11), Biggs (BGGSCA11), Bakersfield-Empire (BKFDCA11), Bakersfield-Main (BKFDCA12), Bakersfield-Columbus (BKFDCA13), Bakersfield-Temple (BKFDCA14), Bakersfield-Mettler (BKFDCA15), Bakersfield-West (BKFDCA17), Bakersfield-Nomad (BKFDCA19), Berkeley-Bancroft (BKLYCA01), Benicia (BNCICA11), Ben Lomond (BNLMCA11), Buena Park (BNPKCA11), Burbank-Palm (BRBNCA11), Bradley (BRDLCA90), Brea (BREACA12), Burlingame (BRLNCA01), Brentwood (BRWDCA12), Brawley (BRWLCA11), Bishop Ranch (BSRNCA70), Butte City (BTCYCA11), Bethel Island (BTISCA11), Burrel (BURLCA11), Beverly Hills (BVHLCA01), Bear Valley (BVLYCA11), Bear Valley Springs (BVSPCA11), Cobb Mountain (CBMTCA11), Chualar (CHLRCA11), Chula Vista-Third A (CHVSCA11), Chula Vista Apache (CHVSCA12), Chowchilla (CHWCCA11), Culver City (CLCYCA11), Calipatria (CLPTCA11), Calistoga (CLSTCA11), Clovis (CLVSCA11), Calexico (CLXCCA12), Compton (CMTNCA01), Concord (CNCRCA01), Colma (COLACA01), Cordelia (CORDCA12), Corona (CORNCA11), Colton (COTNCA11), Crockett (CRCTCA02), Corona Del Mar (CRDMCA11), Carlsbad-La Costa (CRLSCA12), Corning (CRNGCA12), Caruthers (CRTHCA11), Costa Mesa (CSMSCA11), Crows Landing (CWLDCA12), Coyote Wells (CYWLCA11), Danville (DAVLCA12), Tassajara (DAVLCA13), Davis (DAVSCA11), Delano (DELNCA11), Dinuba (DINBCA01), Dixon (DIXNCA11), Del Mar (DLMRCA12), Del Rey (DLRYCA11), Dunnigan (DNGNCA12), Dunsmuir (DNSMCA11), El Cajon (ELCJCA11), El Centro (ELCNCA01), Rich-Appian Way (ELSBCA11), El Segundo-Douglas (ELSGCA12), El Toro (ELTRCA11), Encinitas (ENCTCA12), Earlimart (ERLMCA11), Escalon (ESCLCA11), Escondido (ESCNCA01), Esparto (ESPRCA11), Felton (FETNCA11), Flsm-Nimbus (FLSMCA12), Flsm-El Dorado (FLSMCA13), Fontana (FNTACA11), Firebaugh (FRBHCA11), Fremont-Main (FRMTCA11), Fair Oaks (FROKCA11), Fresno-Main (FRSNCA01), Fresno-Baldwin (FRSNCA11), Fresno-Clinton (FRSNCA12), Fresno-Sierra (FRSNCA13), Fresno-West (FRSNCA14), Fresno-Woodward (FRSNCA15), Farmersville (FRVLCA11), Fortuna (FTUNCA11), Fullerton (FUTNCA01), Five Points (FVPNCA11), Frazier Park (FZPKCA11), Galt (GALTCA11), Glendale (GLDLCA11), Gonzales (GNZLCA11), Gerber (GRBRCA11), Gridley (GRDLCA11), Gardena (GRDNCA01), Grenada (GRNDCA13), Goshen (GSHNCA11), Gustine (GUSTCA11), Geyserville (GYVLCA11), Herald (HERLCA11), Highland (HGLDCA11), Hughson (HGSNCA11), Holtville (HLVLCA11), Hollywood (HLWDCA01), Hamilton City (HMCYCA11), Homewood (HMWDCA11), Hanford (HNFRCA01), Huntington Park (HNPKCA01), Hopland (HPLDCA12), Huron (HURNCA11), Hayward-Depot Ct (HYWRCA11), Ignacio (IGNCCA12), Imperial (IMPRCA11), Ione (IONECA11), Irvine-Main (IRVNCA01), Irvine-Spectrum (IRVNCA12), Ivanhoe (IVNHCA11), Jamul (JAMLCA60), Jackson (JCSNCA01), Kingsburg (KGBGCA11), Kelseyville (KLVLCA12),

Exhibit J
231

4

Knights Ferry (KNFYCA11), Kyburz (KYBRCA11), La Canada-Oak Grove (LACNCA11), La Crescenta (LACRCA11), La Jolla-Girard (LAJLCA11), La Mesa (LAMSCA01), Lamont (LAMTCA11), Laton (LATNCA11), Lockeford (LCFRCA11), Lebec-Main (LEBCCA11), Lemoore-Main (LEMRCA11), Lemoore-Wyman (LEMRCA12), Lafayette (LFYTCA11), Laguna Niguel (LGNGCA12), Le Grand (LGRDCA11), La Grange (LGRNCA12), Lakeport (LKPTCA02), Lincoln (LNCLCA11), Lodi (LODICA01), Loleta (LOLTCA11), Loomis (LOMSCA11), Lomita (LOMTCA11), Larkspur (LRKSCA11), Lsan-Madison 02 (LSANCA02), Lsan-Madison 03 (LSANCA03), Lsan-Pleasant (LSANCA05), Lsan-Union (LSANCA06), Lsan-Airport (LSANCA07), Lsan-Melrose (LSANCA08), Lsan-Richmond (LSANCA09), Lsan-Webster (LSANCA10), Lsan-Rampart (LSANCA11), Lsan-Normandy (LSANCA12), Lsan-Plymouth (LSANCA13), Lsan-Adams (LSANCA14), Lsan-Axminster (LSANCA15), Lsan-Capitol (LSANCA23), Lsan-Sunset (LSANCA29), Lsan-Angelus (LSANCA34), Lsan-Montebello (LSANCA35), Lsan-Republic (LSANCA38), Los Banos (LSBNCA12), Los Molinos (LSMLCA11), Live Oak (LVOKCA11), Madera-Bonadelle (MADRCA12), Marina (MARNCA11), Modesto-Main (MDSTCA02), Modesto-Kellog (MDSTCA03), Modesto-Kingswood (MDSTCA04), Modesto-Tally (MDSTCA05), Modesto-Davis (MDSTCA52), Middletown (MDTWCA11), Mokelumne Hill (MKHLCA12), Mckinleyville (MKVLCA11), Millbrae (MLBRCA11), Mendota (MNDTCA11), Mojave (MOJVCA01), Moraga (MORGCA12), Merced (MRCDCA01), Meridian (MRDNCA11), Moorpark (MRPKCA12), Mission Viejo (MSVJCAAT), Mountain Pass (MTPSCA11), Monterey (MTRYCA01), Mt Shasta (MTSHCA12), Mountain View (MTVWCA11), Marysville (MYVICA01), Nicolaus (NCLSCA12), Newhall (NHLLCA01), Nhwd-Lankershim (NHWDCA01), Nhwd-Magnolia (NHWDCA02), Nice (NICECA11), Niland Main (NILDCA11), Niland Bombay Beach (NILDCA12), Nipomo (NIPMCA11), Northridge (NORGCA11), Nscr-Wabash (NSCRCA11), Nscr-North Natomas (NSCRCA12), National City-Highl (NTCYCA11), Newcastle (NWCSCA11), Newman (NWMNCA12), Oceanside-Mission (OCSDCA11), Oakdale (OKDLCA11), Okld-45Th (OKLDCA11), Okld-Holly (OKLDCA12), Okld-Mountain (OKLDCA13), Oakley (OKLYCA11), Orange Cove (ORCVCA11), Orland (ORLDCA11), Orinda (ORNDCA11), Orange-Chapman (ORNGCA11), Orange-Olive (ORNGCA13), Orosi (ORSICA11), Orangevale (ORVACA11), Otay Mesa (OTMSCA11), Pacifica (PCFCCA11), Pedley (PDLYCA11), Palo Alto-Main (PLALCA02), Palo Alto-South (PLALCA12), Pleasant Grove (PLGVCA12), Planada (PLNDCA11), Pleasanton-Main (PLTNCA12), Pleasanton-Hacienda (PLTNCA13), Placerville-Main (PLVLCA11), Pepperwood (PPWDCA11), Paradise-Main (PRDSCA11), Parlier (PRLRCA11), Paramount (PRMTCA01), Pittsburg-Main (PSBGCA01), Pittsburg-Willow (PSBGCA11), Pismo Beach (PSBHCA11), Pixley (PXLYCA11), Rancho Bernardo (RBRNCA11), Rocklin 11 (RCKLCA11), Richmond (RCMDCA11), Richvale (RCVACA11), Redwood City (RDCYCA01), Redding-Main (RDNGCA02), Redding-Enterprise (RDNGCA11), Rio Dell (RIDECA11), RIo Linda (RILNCA12), Rialto (RILTCA11), Rancho Murieta (RNMRCA11), Rancho Penasquitos (RNPSCA11), Rancho San Diego (RNSDCA11), Rosemead (ROSMCA11), Rancho Santa Fe (RSFECA12), Rosamond (RSMDCA11), Rohnert Park (RTPKCA11), Riverdale (RVDLCA11),

Exhibit J

5

232

Riverbank (RVRBCA11), Riverside-Orange (RVSDCA01), Riverside-Woodcrest (RVSDCA11), Santee (SANTCA01), Scrm-Main (SCRMCA01), Scrm-Garden (SCRMCA03), Scrm-Gladstone (SCRMCA11), Scrm-Empire (SCRMCA12), Scrm-Fruitridge (SCRMCA13), Scotts Valley (SCVYCA01), Selma (SELMCA11), Seaside (SESDCA11), South Gate (SGATCA01), Shingle Springs (SGSPCA11), Shafter (SHFTCA11), Sherman Oaks (SHOKCA01), Stockton-Main (SKTNCA01), Stockton-Granite (SKTNCA11), Stockton-Ashley (SKTNCA12), Stockton-Redwood (SKTNCA14), Soledad (SLDDCA11), Solamint (SLMNCA11), Salinas-Main (SLNSCA01), Salinas-Hickory (SLNSCA11), Salinas-Glenview (SLNSCA12), Moro (SLNSCA14), Silverado (SLVRCA11), Santa Ana-Bristol (SNANCA11), Santa Ana-Bolsa (SNANCA12), San Carlos (SNCRCA11), Sndg-C Street (SNDGCA01), Sndg-University (SNDGCA02), Sndg-Linda Vista (SNDGCA03), Sndg-Saipan (SNDGCA05), Sndg-37Th Street (SNDGCA06), Sndg-College (SNDGCA11), Sndg-Market (SNDGCA12), Sndg-Regents (SNDGCA15), Sndg-Mira Mesa (SNDGCA16), Snfc-Mccoppin (SNFCCA04), Snfc-25Th Street (SNFCCA05), Snfc-Onondaga (SNFCCA06), Snfc-9Th Avenue (SNFCCA13), Snfc-3Rd Street (SNFCCA17), Snfc-Folsom St (SNFCCA21), Snfc-U C Med Center (SNFCCA64), San Gabriel (SNGBCA01), San Geronimo (SNGNCA11), San Jose-Main (SNJSCA02), San Jose-Chynoweth (SNJSCA13), San Jose-Foxworthy (SNJSCA14), San Jose-Junction A (SNJSCA21), San Lucas (SNLCCA11), San Martin (SNMACA11), San Marcos (SNMCCA11), San Mateo (SNMTCA11), Milton (SNRACA13), San Rafael-Main (SNRFCA01), San Ramon (SNRMCA11), Space Park (SNTCCA01), Bellomy (SNTCCA11), Carroll (SNVACA01), Mathilda (SNVACA11), San Ysidro (SNYSCA12), South Pasadena-Miss (SPSDCA11), Stratford (SRFRCA11), South Tahoe-Tamarack (STAHCA12), South Tahoe-Meyers (STAHCA13), Suison City (SUISCA11), Thornton (THTNCA11), Tipton (TPTNCA11), Terra Bella (TRBLCA11), Turlock (TRLCCA11), Tulare (TULRCA11), Tustin-Main (TUSTCA11), Tustin-Redhill (TUSTCA70), Twain Harte (TWHRCA11), Union City (UNCYCA11), Vina (VINACA12), Visalia (VISLCA11), Vista (VISTCA12), Van Nuys (VNNYCA02), Ventura-Main (VNTRCA11), Valley Ford (VYFRCA11), Wasco (WASCCA01), Woodland (WDLDCA11), Woodlake (WDLKCA11), Weed (WEEDCA01), Century City (WLANCA01), Walnut Creek (WNCKCA11), Windsor (WNDSCA11), Frontier (WSCRCA11), Waterford (WTFRCA11), Yorba Linda (YRLNCA11)

Exhibit J
233

**Important Information About AT&T Phone – Advanced (AP-A) and Battery Backup**

### AT&T Phone – Advanced includes Backup Power

- *Capability to Accept Backup Power.*  If there is an electrical power outage that affects the electricity in your home, your AP-A device will continue to function by using its built-in back-up battery.
- *Backup Battery Duration and Line Power.*  The built-in, rechargeable back-up battery provides up to 24 hours of power on standby. AT&T Phone – Advanced works over our wireless network or any broadband connection. It does not provide line power but with its built-in battery back-up, AP-A will keep you connected if electricity goes out.
- *Purchase and Replacement Information.*  The back-up battery is included at no additional cost.  If you would like to purchase an additional battery, you may do so through AT&T for $89 before sales tax.
- *Self-Testing and Self-Monitoring Instructions.*  The built-in backup battery is part of the AP-A device.  No testing is necessary on the battery as long as the AP-A service is active.
- *Service Limitations with and without Backup Power.*  The backup battery will power the AP-A device, but it will not power other equipment like medical and security-monitoring systems.  During a power outage, customers should use the AP-A device sparingly to preserve battery life.
- *Warranty Details.*  The AP-A device carries a one-year warranty, which also covers the built-in backup battery.
- *Proper Usage and Storage Conditions, Including the Impact on Duration of Failing to Adhere to Proper Usage and Storage.*  Since the backup battery is integrated into the AP-A device, it should be maintained under the same conditions as the device.  The AP-A device should be used inside the home, keeping the internal temperature between 32 °F and 113 °F (0 °C and 45 °C).  Storing the device at higher or lower temperatures could adversely impact the duration of backup power available from the battery.
- *Security Responsibilities and Other Steps You May Take to Ensure Safe Use of AP-A.*  As noted, AP-A has a built-in battery backup device that can provide power for up to 24 hours.  However, if the device does not have electrical or battery power, then the AP-A service will not work, including emergency 911 service.  The AP-A device should remain plugged in to an electrical power source for the service to continue working and to ensure that the battery remains fully charged.

Exhibit J

234



May 20, 2026



**Important Update About Your AT&T Business Customer Individual Access Line Service[1] and AT&T Residential Local Service**

Thank you for using AT&T for your business service needs. We know that businesses today rely on high-speed, reliable connectivity, and only AT&T can bring you the best and largest network to help you connect your business. That's why we're upgrading traditional landline phone service in your area to new, enhanced solutions that are more reliable and affordable. Our records show that you currently have service in at least one of the areas impacted by these updates. You can see the addresses where your service is being upgraded below. [2]

**Upgrading your traditional phone service:**
Our customers are asking for faster and more reliable service, so we're upgrading our network in California to give you connectivity you can count on for everyday needs. California's aging copper network doesn't deliver the same level of service, quality and reliability as newer technology. Now, we have more ways to connect than ever before, with newer, faster, technology that is more reliable, energy efficient, and affordable. As we upgrade our network across the country, we're doing the same in California and delivering better technology for our customers across the state.

**As part of this transition, your traditional phone service, known as AT&T Business Customer Individual Access Line Service and AT&T Residential Local Service, will be discontinued on or after 06/01/2027.**

We know how important it is to stay connected, and we're here to make this transition easy for you. We have an enhanced, more reliable option for you to better support your business needs and stay connected: AT&T Phone for Business – Advanced.

**Here's what you can expect over the next year:**
- We'll send additional information over the coming months regarding this transition and how you can upgrade your service.
- We'll no longer accept new orders, renewal of service agreements, or requests for physical changes, including moves to different service addresses, for traditional phone service in your area, effective on or after **07/19/2026.** You will continue to be able to make phone calls using your existing service until on or after **06/01/2027,** when we will stop providing service, pending FCC approval.
- You will need to contact your Account Manager to update your traditional landline phone service before **06/01/2027.** We want to help you upgrade your service, so you continue to have access to phone service and 911. Please call 855-235-0900 to understand your options for phone service from AT&T.

We look forward to continuing to serve you and providing a better and more reliable experience for your business needs.

Sincerely,

AT&T Business Services
208 S. Akard Street
Dallas, TX 75202
**www.business.att.com**

---

[1] In some circumstances, AT&T Business Customer Individual Access Line Service may also be referred to as Measured Rate Business Service.
[2] In the areas impacted by this notice, your traditional landline phone service is called AT&T Business Customer Individual Access Line Service or AT&T Residential Local Service and is provided by Pacific Bell Telephone Company, d/b/a AT&T California. A complete list of impacted areas is attached.

© 2026 AT&T Intellectual Property. All rights reserved. AT&T, the AT&T logo and all other AT&T marks contained herein are trademarks of AT&T Intellectual Property and/or AT&T affiliated companies.

Exhibit J

235    RAL

We are required by the FCC to provide the following statement:
The FCC will normally authorize this proposed discontinuance of service (or reduction or impairment) unless it is shown that customers would be unable to receive service or a reasonable substitute from another carrier or that the public convenience and necessity is otherwise adversely affected. If you wish to object, you should file your comments as soon as possible, but no later than 15 days after the Commission releases public notice of the proposed discontinuance. You may file your comments electronically through the FCC's Electronic Comment Filing System using the docket number established in the Commission's public notice for this proceeding, or you may address them to the Federal Communications Commission, Wireline Competition Bureau, Competition Policy Division, Washington, DC 20554, and include in your comments a reference to the section 63.71 application of Pacific Bell Telephone Company, d/b/a AT&T California. Comments should include specific information about the impact of this proposed discontinuance (or reduction or impairment) upon you or your company, including any inability to acquire reasonable substitute service..

**To the extent your contract with AT&T is inconsistent with the above, these planned changes may not apply to you. Please check your contract or contact us with questions.**

**Service addresses in areas impacted by this notice:**

| SERVICE ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Exhibit J

236

RAL

| SERVICE ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| ███████████████ | ████████ | ███ | ██████ |
| ███████████████ | ████████ | ███ | ██████ |
| █████████████ | ██████████ | ███ | ██████ |
| █████████████████ | ████████ | ███ | ██████ |
| █████████████ | ████████ | ███ | ██████ |
| ████████████ | ████████ | ███ | ██████ |
| █████████████ | ████████ | ███ | ██████ |
| ██████████████ | ███████ | ███ | ██████ |
| █████████████ | ███████ | ███ | ██████ |
| ████████████████ | ███████████ | ███ | ██████ |
| ██████████████████ | ██████████ | ███ | ██████ |
| ████████████ | ███████ | ███ | ██████ |
| ████████████ | ███████ | ███ | ██████ |
| █████████████████ | ███████ | ███ | ██████ |
| ████████████ | ███████ | ███ | ██████ |
| ██████████ | ██████████ | ███ | ██████ |
| ███████████ | ███████ | ███ | ██████ |
| ████████████ | ███████ | ███ | ██████ |
| ████████████████████ | ███████ | ███ | ██████ |
| ████████████ | ███████ | ███ | ██████ |
| █████████████████ | ███████ | ███ | ██████ |
| █████████████████ | ███████ | ███ | ██████ |
| ███████████████ | ███████ | ███ | ██████ |
| ███████████████ | ██████████ | ███ | ██████ |
| ████████████████ | ██████████ | ███ | ██████ |
| ████████████ | ██████████ | ███ | ██████ |
| ███████ | ██████████ | ███ | ██████ |
| █████████████ | ██████████ | ███ | ██████ |
| █████████████████████ | ██████████ | ███ | ██████ |
| ███████████████████ | ██████████ | ███ | ██████ |
| ████████████████ | ████████████ | ███ | ██████ |
| ███████████████████ | ████████████ | ███ | ██████ |
| █████████████ | ██████████ | ███ | ██████ |
| ████████████████████ | ██████████ | ███ | ██████ |
| ██████████████ | ██████████ | ███ | ██████ |
| █████████████████ | ██████████ | ███ | ██████ |
| █████████████████ | ██████████ | ███ | ██████ |
| ██████████████████ | ██████████ | ███ | ██████ |
| █████████████████ | ██████████ | ███ | ██████ |
| █████████████████ | ██████████ | ███ | ██████ |
| ████████████ | ████████████ | ███ | ██████ |
| ███████████████ | ████████████ | ███ | ██████ |
| ████████████████ | ██████████ | ███ | ██████ |
| ████████████ | ██████████ | ███ | ██████ |
| ███████ | ████████████ | ███ | ██████ |
| █████████████ | ██████████ | ███ | ██████ |
| ████████████ | ██████████ | ███ | ██████ |
| █████████████ | ███████████ | ███ | ██████ |
| SERVICE ADDRESS | CITY | STATE | ZIP |
| ████████████ | ████████ | ███ | |
| █████████████████ | ███████████ | ███ | Exhibit J |

| SERVICE ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| ███████████████████ | ██████████ | ██ | ██████ |
| █████████████████████████ | ██████████ | ██ | █████ |
| ███████████ | ████ | ██ | █████ |
| ███████████████ | ████ | ██ | █████ |
| ███████████████████ | ███████████ | ██ | █████ |
| ██████████████████ | ███████████ | ██ | █████ |
| ████████████████ | ██████████ | ██ | █████ |
| ██████████████████████ | ███████████ | ██ | █████ |
| ████████████████████ | ███████████ | ██ | █████ |
| █████████████████████ | ███████████ | ██ | █████ |
| █████████████████████ | ███████████ | ██ | █████ |
| ████████ | ███████████ | ██ | █████ |
| ██████████ | ███████████ | ██ | █████ |
| ████████ | █████████ | ██ | █████ |
| ██████████████████ | ███████████ | ██ | █████ |
| ██████████████ | ██████████ | ██ | █████ |
| ███████████████ | █████████ | ██ | █████ |
| ██████████████ | ███████████ | ██ | █████ |
| ███████████████ | ███████████ | ██ | █████ |
| ███████████████ | ██████████ | ██ | █████ |
| ██████████ | ██████████ | ██ | █████ |
| ████████████████ | ██████████ | ██ | █████ |
| █████████████ | █████████ | ██ | █████ |
| ██████████ | █████████ | ██ | █████ |
| ██████████████ | ██████████ | ██ | █████ |
| ██████████████ | ██████████ | ██ | █████ |
| ████████████████ | ██████████ | ██ | █████ |
| ███████████████ | ██████████ | ██ | █████ |
| ████████████ | █████████ | ██ | █████ |
| ████████████████████ | █████████ | ██ | █████ |
| ████████████████████ | █████████ | ██ | █████ |

Exhibit J

238

Below is a full list of AT&T wire centers affected by this notice

## List of Impacted Wire Centers

### California

Albany-Solano (ALBYCA11), Alhambra (ALHBCA01), Anaheim-Lemon (ANHMCA01), Anaheim-Cypress (ANHMCA11), Anaheim-La Palma (ANHMCA12), Antioch (ANTCCA11), Arcadia (ARCDCA11), Arcata (ARCTCA11), Aromas (ARMSCA11), Anderson (ARSNCA11), Arlington (ARTNCA11), Arvin (ARVNCA11), Atwater (ATWRCA12), Avenal (AVNLCA12), N Tahoe Brockway (BCWYCA11), Beale-Msvl Sterling (BEALCA11), Bell (BELLCA11), Biggs (BGGSCA11), Bakersfield-Empire (BKFDCA11), Bakersfield-Main (BKFDCA12), Bakersfield-Columbus (BKFDCA13), Bakersfield-Temple (BKFDCA14), Bakersfield-Mettler (BKFDCA15), Bakersfield-West (BKFDCA17), Bakersfield-Nomad (BKFDCA19), Berkeley-Bancroft (BKLYCA01), Benicia (BNCICA11), Ben Lomond (BNLMCA11), Buena Park (BNPKCA11), Burbank-Palm (BRBNCA11), Bradley (BRDLCA90), Brea (BREACA12), Burlingame (BRLNCA01), Brentwood (BRWDCA12), Brawley (BRWLCA11), Bishop Ranch (BSRNCA70), Butte City (BTCYCA11), Bethel Island (BTISCA11), Burrel (BURLCA11), Beverly Hills (BVHLCA01), Bear Valley (BVLYCA11), Bear Valley Springs (BVSPCA11), Cobb Mountain (CBMTCA11), Chualar (CHLRCA11), Chula Vista-Third Avenue (CHVSCA11), Chula Vista Apache (CHVSCA12), Chowchilla (CHWCCA11), Culver City (CLCYCA11), Calipatria (CLPTCA11), Calistoga (CLSTCA11), Clovis (CLVSCA11), Calexico (CLXCCA12), Compton (CMTNCA01), Concord (CNCRCA01), Colma (COLACA01), Cordelia (CORDCA12), Corona (CORNCA11), Colton (COTNCA11), Crockett (CRCTCA02), Corona Del Mar (CRDMCA11), Carlsbad-La Costa (CRLSCA12), Corning (CRNGCA12), Caruthers (CRTHCA11), Costa Mesa (CSMSCA11), Crows Landing (CWLDCA12), Coyote Wells (CYWLCA11), Danville (DAVLCA12), Tassajara (DAVLCA13), Davis (DAVSCA11), Delano (DELNCA11), Dinuba (DINBCA01), Dixon (DIXNCA11), Del Mar (DLMRCA12), Del Rey (DLRYCA11), Dunnigan (DNGNCA12), Dunsmuir (DNSMCA11), El Cajon (ELCJCA11), El Centro (ELCNCA01), Rich-Appian Way (ELSBCA11), El Segundo-Douglas (ELSGCA12), El Toro (ELTRCA11), Encinitas (ENCTCA12), Earlimart (ERLMCA11), Escalon (ESCLCA11), Escondido (ESCNCA01), Esparto (ESPRCA11), Felton (FETNCA11), Flsm-Nimbus (FLSMCA12), Flsm-El Dorado (FLSMCA13), Fontana (FNTACA11), Firebaugh (FRBHCA11), Fremont-Main (FRMTCA11), Fair Oaks (FROKCA11), Fresno-Main (FRSNCA01), Fresno-Baldwin (FRSNCA11), Fresno-Clinton (FRSNCA12), Fresno-Sierra (FRSNCA13), Fresno-West (FRSNCA14), Fresno-Woodward (FRSNCA15), Farmersville (FRVLCA11), Fortuna (FTUNCA11), Fullerton (FUTNCA01), Five Points (FVPNCA11), Frazier Park (FZPKCA11), Galt (GALTCA11), Glendale (GLDLCA11), Gonzales (GNZLCA11), Gerber (GRBRCA11), Gridley (GRDLCA11), Gardena (GRDNCA01), Grenada (GRNDCA13), Goshen (GSHNCA11), Gustine (GUSTCA11), Geyserville (GYVLCA11), Herald (HERLCA11), Highland (HGLDCA11), Hughson (HGSNCA11), Holtville (HLVLCA11), Hollywood (HLWDCA01), Hamilton City (HMCYCA11), Homewood (HMWDCA11), Hanford (HNFRCA01), Huntington Park (HNPKCA01), Hopland (HPLDCA12), Huron (HURNCA11), Hayward-Depot Ct (HYWRCA11), Ignacio (IGNCCA12), Imperial (IMPRCA11), Ione (IONECA11), Irvine-Main (IRVNCA01), Irvine-Spectrum (IRVNCA12), Ivanhoe (IVNHCA11), Jamul (JAMLCA60), Jackson (JCSNCA01), Kingsburg (KGBGCA11), Kelseyville (KLVLCA12), Knights Ferry (KNFYCA11), Kyburz (KYBRCA11), La Canada-Oak Grove (LACNCA11), La Crescenta (LACRCA11), La Jolla-Girard (LAJLCA11), La Mesa (LAMSCA01), Lamont (LAMTCA11), Laton (LATNCA11), Lockeford (LCFRCA11), Lebec-Main (LEBCCA11), Lemoore-Main (LEMRCA11), Lemoore-Wyman (LEMRCA12), Lafayette (LFYTCA11), Laguna Niguel (LGNGCA12), Le Grand (LGRDCA11), La Grange (LGRNCA12), Lakeport (LKPTCA02), Lincoln (LNCLCA11), Lodi (LODICA01), Loleta (LOLTCA11), Loomis (LOMSCA11), Lomita (LOMTCA11), Larkspur (LRKSCA11), Lsan-Madison 02 (LSANCA02), Lsan-Madison 03 (LSANCA03), Lsan-Pleasant (LSANCA05), Lsan-Union (LSANCA06), Lsan-Airport (LSANCA07), Lsan-Melrose (LSANCA08), Lsan-Richmond (LSANCA09), Lsan-Webster (LSANCA10), Lsan-Rampart (LSANCA11), Lsan-Normandy (LSANCA12), Lsan-Plymouth (LSANCA13), Lsan-Adams (LSANCA14), Lsan-Axminster (LSANCA15), Lsan-Capitol (LSANCA23), Lsan-Sunset (LSANCA29), Lsan-Angelus (LSANCA34), Lsan-Montebello (LSANCA35), Lsan-Republic (LSANCA38), Los Banos (LSBNCA12), Los Molinos (LSMLCA11), Live Oak (LVOKCA11), Madera-Bonadelle (MADRCA12), Marina (MARNCA11), Modesto-Main (MDSTCA02), Modesto-Kellog (MDSTCA03), Modesto-Kingswood (MDSTCA04), Modesto-Tally (MDSTCA05), Modesto-Davis (MDSTCA52), Middletown (MDTWCA11), Mokelumne Hill (MKHLCA12), Mckinleyville (MKVLCA11), Millbrae (MLBRCA11), Mendota (MNDTCA11), Mojave (MOJVCA01), Moraga (MORGCA12), Merced (MRCDCA01), Meridian (MRDNCA11), Moorpark (MRPKCA12), Mission Viejo (MSVJCAAT), Mountain Pass (MTPSCA11), Monterey (MTRYCA01), Mt Shasta (MTSHCA12), Mountain View (MTVWCA11), Marysville (MYVICA01), Nicolaus (NCLSCA12), Newhall (NHLLCA01), Nhwd-Lankershim (NHWDCA01), Nhwd-Magnolia (NHWDCA02), Nice (NICECA11), Niland Main (NILDCA11), Niland Bombay Beach (NILDCA12), Nipomo (NIPMCA11), Northridge (NORGCA11), Nscr-Wabash (NSCRCA11), Nscr-North Natomas (NSCRCA12), National City-Highland (NTCYCA11), Newcastle (NWCSCA11), Newman (NWMNCA12), Oceanside-Mission (OCSDCA11), Oakdale (OKDLCA11), Okld-45Th (OKLDCA11), Okld-Holly (OKLDCA12), Okld-Mountain (OKLDCA13), Oakley (OKLYCA11), Orange Cove (ORCVCA11), Orland (ORLDCA11), Orinda (ORNDCA11), Orange-Chapman (ORNGCA11), Orange-Olive (ORNGCA13), Orosi (ORSICA11), Orangevale (ORVACA11), Otay Mesa (OTMSCA11), Pacifica (PCFCCA11), Pedley (PDLYCA11), Palo Alto-Main (PLALCA02), Palo Alto-South (PLALCA12), Pleasant Grove (PLGVCA12), Planada (PLNDCA11), Pleasanton-Main (PLTNCA12), Pleasanton-Hacienda (PLTNCA13), Placerville-Main (PLVLCA11), Pepperwood (PPWDCA11), Paradise-Main (PRDSCA11), Parlier (PRLRCA11), Paramount (PRMTCA01), Pittsburg-Main (PSBGCA01), Pittsburg-Willow (PSBGCA11), Pismo Beach (PSBHCA11), Pixley (PXLYCA11), Rancho Bernardo (RBRNCA11), Rocklin 11 (RCKLCA11), Richmond (RCMDCA11), Richvale (RCVACA11), Redwood City (RDCYCA01), Redding-Main (RDNGCA02), Redding-Enterprise (RDNGCA11), Rio Dell (RIDECA11), Rio Linda (RILNCA12), Rialto (RILTCA11), Rancho Murieta (RNMRCA11), Rancho Penasquitos (RNPSCA11), Rancho San Diego (RNSDCA11), Rosemead (ROSMCA11), Rancho Santa Fe (RSFECA12), Rosamond (RSMDCA11), Rohnert Park (RTPKCA11), Riverdale (RVDLCA11), Riverbank (RVRBCA11), Riverside-Orange (RVSDCA01), Riverside-Woodcrest (RVSDCA11), Santee (SANTCA01), Scrm-Main (SCRMCA01), Scrm-Garden (SCRMCA03), Scrm-Gladstone (SCRMCA11), Scrm-Empire (SCRMCA12), Scrm-Fruitridge (SCRMCA13), Scotts Valley (SCVYCA01), Selma (SELMCA11), Seaside (SESDCA11), South Gate (SGATCA01), Shingle Springs (SGSPCA11), Shafter (SHFTCA11), Sherman Oaks (SHOKCA01), Stockton-Main (SKTNCA01), Stockton-Granite (SKTNCA11), Stockton-Ashley (SKTNCA12), Stockton-Redwood (SKTNCA14), Soledad (SLDDCA11), Solamint (SLMNCA11), Salinas-Main (SLNSCA01), Salinas-Hickory (SLNSCA11), Salinas-Glenview (SLNSCA12), Moro (SLNSCA14), Silverado (SLVRCA11), Santa Ana-Bristol (SNANCA11), Santa Ana-Bolsa (SNANCA12), San Carlos (SNCRCA11), Sndg-C Street (SNDGCA01), Sndg-University (SNDGCA02), Sndg-Linda Vista (SNDGCA03), Sndg-Saipan (SNDGCA05), Sndg-37Th Street (SNDGCA06), Sndg-College (SNDGCA11), Sndg-Market (SNDGCA12), Sndg-Regents (SNDGCA15), Sndg-Mira Mesa (SNDGCA16), Snfc-Mccoppin (SNFCCA04), Snfc-25Th Street (SNFCCA05), Snfc-Onondaga (SNFCCA06), Snfc-9Th Avenue (SNFCCA13), Snfc-3Rd Street (SNFCCA17), Snfc-Folsom St (SNFCCA21), Snfc-U C Med Center (SNFCCA64), San Gabriel (SNGBCA01), San Geronimo (SNGNCA11), San Jose-Main (SNJSCA02), San Jose-Chynoweth (SNJSCA13), San Jose-Foxworthy (SNJSCA14), San Jose-Junction Avenue (SNJSCA21), San Lucas (SNLCCA11), San Martin (SNMACA11), San Marcos (SNMCCA11), San Mateo (SNMTCA11), Milton (SNRACA13), San Rafael-Main (SNRFCA01), San Ramon (SNRMCA11), Space Park (SNTCCA01), Bellomy (SNTCCA11), Carroll (SNVACA01), Mathilda (SNVACA11), San Ysidro (SNYSCA12), South Pasadena-Mission (SPSDCA11), Stratford (SRFRCA11), South Tahoe-Tamarack (STAHCA12), South Tahoe-Meyers (STAHCA13), Suisun City (SUISCA11), Thornton (THTNCA11), Tipton (TPTNCA11), Terra Bella (TRBLCA11), Turlock (TRLCCA11), Tulare (TULRCA11), Tustin-Main (TUSTCA11), Tustin-Redhill (TUSTCA70), Twain Harte (TWHRCA11), Union City (UNCYCA11), Vina (VINACA12), Visalia (VISLCA11), Vista (VISTCA12), Van Nuys (VNNYCA02), Ventura-Main (VNTRCA11), Valley Ford (VYFRCA11), Wasco (WASCCA01), Woodland (WDLDCA11), Woodlake (WDLKCA11), Weed (WEEDCA01), Century City (WLANCA01), Walnut Creek (WNCKCA11), Windsor (WNDSCA11), Frontier (WSCRCA11), Waterford (WTFRCA11), Yorba Linda (YRLNCA11)

Exhibit J

239

**Important Information Regarding AT&T Phone for Business – Advanced (APB-A)**

### Lack of Line Power

AT&T Phone for Business – Advanced (APB-A) does not provide line power. However, in the event of a power outage APB-A has a built-in, rechargeable battery backup that provides up to 24 hours of power on standby.

### Backup Power

- *Capability to Accept Backup Power.*   If there is an electrical power outage that affects the electricity to your business location, your APB-A device will continue to function by using its built-in backup battery.
- *The APB-A device includes a 24-hour battery backup at no additional cost.*   APB-A is offered as a service (aaS) that features AT&T-owned and managed devices installed at the customer's premises. Should the APB-A device or battery become inoperable, AT&T will replace the APB-A device for as long as the customer retains APB-A as a service.
- *Service Limitations with and without Backup Power.*   The backup battery will power the APB-A service, but it will not power other customer owned equipment like medical and security-monitoring systems. To maximize battery life during a power outage, customers should minimize usage of APB-A.

### Expected Backup Power Duration

The internal backup battery will power the APB-A service for 24 hours on standby.

### Proper Usage and Storage Conditions, Including the Impact on Duration of Failing to Adhere to Proper Usage and Storage

Since the backup battery is integrated into the APB-A device, it should be maintained under the same conditions as the device. The APB-A device should be used inside the business location, keeping the internal temperature between 32 °F and 113 °F (0 °C and 45 °C). Storing the device at higher or lower temperatures could adversely impact the duration of backup power available from the battery.

### Subscriber Backup Power Self-Testing and -Monitoring Instructions

The built-in backup battery is part of the APB-A device. No testing is necessary on the battery as long as the APB-A service is active.

### APB-A Device Service Assurance Details

*The APB-A device includes a 24-hour battery backup at no additional cost.* AT&T Phone for Business – Advanced is offered as a service (aaS) that features AT&T-owned and managed devices installed at the customer's premises. Should the APB-A device or battery become inoperable, AT&T will replace the APB-A device for as long as the customer retains APB-A as a service.

### Security Responsibilities and Other Steps You May Take to Ensure Safe Use of APB-A

As noted above, in the event of a power outage, APB-A device has a built-in battery backup that can provide power for 24 hours. However, if the device does not have electrical or battery power, APB-A service will not work, including emergency 911 service. The APB-A device should remain plugged into an electrical power source for the service to continue working and to ensure that the battery remains fully charged.

Exhibit J
240

241

# Exhibit 3

## Section 63.602(a)(4) Certification

I, Susan Johnson, Senior Executive Vice President - Transformation and Supply Chain, am employed by AT&T Services, Inc. I certify under penalty of perjury that, to the best of my knowledge, information, and belief, the information required by 47 C.F.R. § 63.602 that is submitted in the Section 63.71 Application of Pacific Bell Telephone Company d/b/a AT&T California, for Authority Pursuant to Section 214 of the Communications Act of 1934, As Amended, to Discontinue the Provision of Service, is true and correct.

Dated: May 15, 2026

Susan Johnson
AT&T SERVICES, INC.
208 South Akard Street
Dallas, TX 75202

Exhibit J

242

## <u>CERTIFICATE OF SERVICE</u>

I, Martha Flaherty, certify that on May 20, 2026, I will cause a copy of the foregoing Section 63.71 Application of AT&T by U.S. Mail postage prepaid to be served on the addresses below.

<u>/s/ Martha Flaherty</u>
Martha Flaherty

Exhibit J

243

Office of the Governor
Governor's Office
State Capitol
Sacramento, CA 95814

California Public Utilities
Commission
505 Van Ness Avenue
San Francisco, CA 94102

Department of Defense
Chief Information Officer
6000 Defense Pentagon
Washington, D.C.20301

Table Mountain Rancheria
of California
Chairman
P.O. Box 410
Friant, CA, 93626

Paskenta Band of Nomlaki
Indians of California
22580 Olivewood Avenue
Corning, California 96021

Sycuan Band of the
Kumeyaay Nation
Chairman
1 Kwaaypaay Court
El Cajon, CA, 92019

Bear River Band of the
Rohnerville Rancheria
Chairman
266 Keisner Road,
Loleta, CA, 95551

Quartz Valley Indian
Community of the
Quartz Valley Reservation
Chairman
13601 Quartz Valley Road
Fort Jones, CA, 96032

Dry Creek Rancheria
Band of Pomo Indians
Chairman
P.O. Box 607
Geyserville, CA, 95441

San Manuel Band
of Mission Indians

Chairman
26569 Community Center Dr
Highland, CA, 92346

Hopland Band
of Pomo Indians
Chairman
3000 Shanel Road,
Hopland, CA, 95449

Jamul Indian Village
Chairman
P.O. Box 612
Jamul, CA, 91935

Jackson Band
of Miwuk Indians
Chairman
P.O. Box 1090
Jackson, CA, 95642

Santa Rosa Indian
Community of the
Santa Rosa Rancheria
Chairman
P.O. Box 8
Lemoore, CA, 93245

Robinson Rancheria Band
of Pomo Indians
Chairman
P.O. Box 4015
Nice, CA, 95464

Big Valley Band of Pomo
Indians of the Big Valley
Rancheria Chairman
2726 Mission Rancheria Rd
Lakeport, CA, 95453

United Auburn Indian
Community of the Auburn
Rancheria
Chairman
10720 Indian Hill Rd
Auburn, CA, 95603

Table Bluff Rancheria
Wiyot Tribe
Chairman
1000 Wiyot Dr.
Loleta, CA 95551
Middletown Rancheria of Pomo
Indians
Chairman

P.O. Box 1035
Middletown, CA, 95461

Cher-Ae Heights Indian
Community
of the Trinidad Rancheria
Chairman
P.O. Box 630
Trinidad, CA, 95570

Enterprise Rancheria of Maidu
Indians
Chairman
2133 Montevista Ave
Oroville, CA, 95966

Lytton Rancheria
Chairman
1500 Falling Oak Way
Windsor, CA, 95492

Redding Rancheria
Chairman
2000 Redding Rancheria Rd
Redding, CA, 96001

Shingle Springs Band of Miwok
Indians,
Shingle Springs Rancheria
(Verona Tract), California
Chairman
P.O. Box 1340
Shingle Springs, CA, 95682

Exhibit J

244

# EXHIBIT K

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of )<br><br>Petition of AT&T for Preemption and )<br>Declaratory Ruling Regarding )<br>California's Carrier of Last Resort )<br>and Related Requirements )<br>) | Docket No. _____ |

## **PETITION FOR PREEMPTION AND DECLARATORY RULING**

BRETT FARLEY
CHRISTOPHER HEIMANN
DAVID CHORZEMPA
DAVID LAWSON
AT&T SERVICES, INC.
601 New Jersey Ave. N.W., Ste. 650
Washington, DC 20001-3051

C. FREDERICK BECKNER III
MAUREEN R. JEFFREYS
WILLIAM C. PERDUE
ARNOLD PORTER KAYE SCHOLER LLP
601 Massachusetts Ave. N.W.
Washington, DC 20001-3743


*Counsel for AT&T Services, Inc.*

May 20, 2026

Exhibit K
246

**TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY ................................................................................ 1

BACKGROUND ......................................................................................................... 9

   A.  California's Outdated "Universal Service" Regulatory Regime ..................... 10

     1.  California COLR Obligations Effectively Require POTS............................ 11

     2.  California Imposes Additional Hurdles to Discontinuance ......................... 13

   B.  California Has Steadfastly Maintained Its COLR Regime Notwithstanding Widespread Competition.................................................................................. 15

   C.  The Commission's Efforts To Encourage Network Modernization ............... 19

ARGUMENT ............................................................................................................ 23

   A.  Federal Law Preempts State Requirements That Require Additional Authorizations Before Implementing Commission-Approved Discontinuance ........................ 24

   B.  POTS Is A Jurisdictionally Mixed Service With An Inseverable Interstate Component . 28

   C.  California's COLR Rules Conflict With Federal Law ..................................... 34

     1.  California's COLR Regime Impedes AT&T's Ability To Discontinue ...................... 36

     2.  The CPUC's Requirements Are Preempted Because the CPUC Seeks To Regulate Interstate Services Contrary to Federal Policy .............................................. 40

     3.  The COLR Requirements Compelling Business Service Are also Preempted............. 43

   D.  California's Tariffing And Other Regulatory Requirements Independently Impede AT&T From Discontinuing POTS ...................................................................... 44

CONCLUSION............................................................................................................ 48

**INTRODUCTION AND SUMMARY**

Building the communications infrastructure necessary to meet the demands of America's future requires policies that encourage investment and embrace modern technologies. Unfortunately, in the case of California, outdated regulations don't reflect today's communications landscape but rather require AT&T to power, repair, and sell "Plain Old Telephone Service" (POTS) on a century-old telephone network that almost no one uses. The copper wires that once served *every* home now serve just *three percent* of Californian households in AT&T's service territory, and that number shrinks every day as customers switch to modern broadband options that are more affordable, reliable, and energy efficient. Yet California's outdated regulations persist, requiring AT&T to spend $1 billion a year to maintain a nearly-empty copper network that has become an easy mark for criminals—California has already suffered about 2,000 outages from copper thefts this year—and that is estimated to drain the power grid of over 100 million kilowatt-hours each year.

In its *Network Modernization Order*,[1] the Commission stepped in to break such a self-defeating cycle of regulatory gridlock. Among other things, the Commission took decisive and necessary steps to cut "red tape that has both required providers to keep aging copper lines in place and effectively prevented them from investing in the modern infrastructure that Americans want and deserve."[2] It also made clear that, when the Commission applies its streamlined procedures and grants a discontinuance, "federal law *preempts* state and local requirements" that "needlessly constrain the deployment of modern, next-generation IP-based networks."[3] Indeed,

---

[1] *Reducing Barriers to Network Improvements and Service Changes*, WC Dkt. No. 25-209, Report and Order, FCC 26-19, (Mar. 27, 2026) ("*Network Modernization Order*").

[2] *Id.* ¶ 1.

[3] *Id.* ¶ 7 (emphasis added).

1

after Commission authorization, a carrier may act "without securing [any other] approval,"[4] and the Commission invited carriers "to seek a determination from the Commission that [a] state requirement is preempted" if the state requirement impedes the modernization efforts the Commission has authorized and encouraged.[5]

In this filing, AT&T accepts the Commission's invitation. Under the Communications Act, Commission authorization is all that is required for AT&T to discontinue POTS in California, but unlike other states, California clings to last-century "Carrier of Last Resort" (COLR) rules that requires AT&T to continue offering POTS throughout the state even after the Commission has authorized the service to be phased out. Under federal law, those COLR rules can no longer stand. The Commission should declare California's COLR regime preempted, clearing the way for AT&T to bring more consumers the communication technologies of today rather than those of the late 1800s, all while leaving no customer behind.

* * *

In 1876, Alexander Graham Bell uttered nine now-famous words: "Mr. Watson, come here; I want to see you." Over the decades that followed, AT&T's predecessor, the Bell Telephone company, crisscrossed the country with copper wires running down virtually every street, fueling the growth of a young nation and allowing millions of Americans to make phone calls. The telecommunications industry has come a long way since Bell's first phone call, and copper wires have been replaced by a multitude of modern communications services available to customers nationwide. AT&T has invested hundreds of billions to deploy fiber and 5G wireless networks, and it plans to accelerate that deployment over the next five years. But in California,

---

[4] 47 U.S.C. § 214(c); *see Network Modernization Order* ¶ 114.

[5] *Network Modernization Order* ¶ 115.

Exhibit K
249

the aging, fragile, and expensive copper lines are still there, frozen in time by California regulations enacted by prior generations for the benefit of prior generations.

Although the copper wires in AT&T's legacy network are stuck in the past, customers are not. The vast majority of consumers now rely solely on wireless phone service, and of those who still have a wired home phone, almost all use a modern, IP-based phone service provided over their broadband connection.[6] It's no wonder. After all:

*Copper is less reliable*. In emergencies, wireless networks keep people connected on the go. When disasters like wildfires strike, fiber and wireless services can be restored far faster than copper-based POTS. And criminals also target copper lines for their raw-material value, leaving POTS customers without service. All too often, the criminals return to steal the replacement lines as soon as service is restored.

*Copper is worse for the environment*. Fiber delivers gigabit-plus speeds with significantly lower energy use. Transitioning from copper will save an estimated 300 million kilowatt-hours annually by 2030—the equivalent to eliminating emissions from 17 million gallons of gasoline.

*Copper is more expensive*. AT&T spends roughly $1 billion a year in California to operate, maintain, and repair hundreds of thousands of miles of largely obsolete copper lines, ancient "circuit" switches, and other POTS facilities. Even finding replacement parts for decades-old equipment is a near insurmountable challenge. All that spending diverts finite resources from the modern technologies that could be used to provide consumers what they actually want—fiber and wireless.

As a result, consumers and markets have moved on from copper-based POTS. The goal of robust, full-scale intermodal competition has been reached just as Congress intended when it

---

[6] *Id.* ¶ 34.

3

Exhibit K

250

passed the Telecommunications Act of 1996. Virtually all states in AT&T's footprint have recognized this, eliminating outdated COLR barriers to new investment, and this Commission has now acted decisively to eliminate red tape. But in California, outdated regulations remain, seemingly frozen in time with no rational application to today's marketplace of superior and ever-improving products.

Unlike its peer states, California maintains procedural and substantive roadblocks that require AT&T to continue providing POTS regardless of the available alternatives. In particular, California's enduring COLR regime prevents AT&T from discontinuing service unless it receives permission from the California Public Utilities Commission (CPUC).[7] The process of seeking and receiving approval is onerous. It is also fruitless: California has made clear that it will not allow AT&T to relinquish its COLR obligations unless another carrier first agrees to become a COLR.[8] Unsurprisingly, no other carrier is willing to assume AT&T's outdated obligations.

Even setting aside these basic substantive barriers, the CPUC's protracted processes independently prevent any meaningful transition. To discontinue POTS, AT&T must navigate years-long proceedings, obtain multiple layers of approval, and satisfy extensive notice and customer-migration requirements. The CPUC would also require AT&T to tariff a replacement "basic service"—subject to full regulatory review—even though the only service that currently satisfies that definition is the very POTS that AT&T seeks to retire. Past experience underscores

---

[7] *See Rulemaking on the Comm'n's Own Motion into Universal Serv. & To Comply with the Mandates of Assembly Bill 3643*, D.96-10-066, 1996 Cal. PUC LEXIS 1046, app. B at *468–70 (Universal Service Rule 6.D) (Oct. 25, 1996) ("*1996 CPUC COLR Decision*").

[8] *See Decision Dismissing with Prejudice the Application of AT&T Cal. To Withdraw as a Carrier of Last Resort*, D.24-06-024, 2024 Cal. PUC LEXIS 331, at *12–19 (June 25, 2024) ("*CPUC COLR Dismissal Order*").

4

Exhibit K

251

the futility of this process: when AT&T previously sought targeted relief, the CPUC subjected the request to lengthy proceedings, ultimately rejecting it on procedural grounds, and directed AT&T not to ask again for at least a year.[9] In practice, these byzantine requirements ensure that any effort to modernize will be delayed indefinitely, underscoring the need for federal preemption to allow investments to shift from maintaining a nearly-empty POTS network to deploying next-generation technologies that will allow consumers and businesses alike to participate in the coming generation of AI and other digital applications.

<div align="center">* * *</div>

Importantly, no customer will be left behind in AT&T's transition to modern technologies. Even for any customers who are still wary of parting with the familiar functionality of POTS, AT&T has a complete modern solution: AT&T Phone Advanced (AP-A). AP-A preserves the same look and feel of POTS, while delivering improved reliability and efficiency by connecting to AT&T's wireless network (or *any* broadband connection). The service lets customers use their traditional landline phones but submits calls in an IP, internet-friendly format. It even works with fax machines, elevators, medical monitors, and accessibility devices for people with hearing or speech difficulties. And in emergencies, it has a 24-hour back-up battery and can take advantage of wireless and wired internet in the event of a service disruption. In short, AP-A is better than POTS—and usually cheaper too. After rigorous testing and review, the Commission has already declared it an adequate replacement for POTS and allowed AT&T to discontinue POTS across much of its footprint.

---

[9] *Id.* at *18.

Exhibit K

252

In contemporaneous filings, AT&T seeks to discontinue POTS in areas of California where superior, alternative AP-A service is available.[10] These applications would allow AT&T to focus investment on its modern, IP-based networks and should be approved on a streamlined basis, as they are predicated on an established "adequate replacement" service that is available for all existing AT&T POTS customers in the areas for which relief is sought. If the Commission grants those applications—as it should—AT&T will be stuck with conflicting rules. The Commission will have authorized AT&T to discontinue POTS so that it may retire the underlying copper network and free up resources to construct modern networks that consumers overwhelmingly prefer, but California regulations on the books will still require AT&T to continue offering POTS throughout its service territory. These contradictory regimes cannot be reconciled; one must go.

Fortunately, Congress anticipated just such a clash and, in the Communications Act, decided that the Commission wins. With respect to services with an interstate component, Congress directed the Commission to authorize any "discontinuance, reduction, or impairment of service" to a community.[11] Before granting authorization, the Commission must determine that "neither the present nor future public convenience and necessity will be adversely affected" by the change.[12] Then the Commission's determination controls. Once the Commission authorizes a

---

[10] AT&T has concurrently filed separate applications for residential and business POTS, including resold POTS service. These are collectively referred to as the AT&T Discontinuance Applications. Although separate applications, the underlying support for discontinuance is largely the same. To avoid unnecessary duplication, AT&T herein cites to the Residential Discontinuance Application rather than both applications.

[11] 47 U.S.C. § 214(a), (c); *see id.* § 152(a).

[12] *Id.* § 214(a).

6

Exhibit K

253

reduction or discontinuance in service, a carrier can act "*without securing approval other than such certificate*" from the Commission.[13]

The Communications Act preempts California's COLR and related requirements as applied to AT&T's discontinuance of POTS in California under any of three well-established strands of preemption doctrine recognized in the *Network Modernization Order*.

*First*, express preemption. Section 214 of the Communications Act expressly preempts state requirements that impinge on modifications to interstate or jurisdictionally mixed services where the Commission has authorized "discontinuance, reduction, or impairment of service."[14] Congress provided that, after the Commission has authorized a discontinuance, reduction, or impairment, a carrier may perform the authorized activity "without securing [other] approval."[15] The Commission has "grant[ed] blanket section 214(a) authority for carriers to grandfather legacy voice services."[16] In direct contravention of section 214(c), California requires AT&T to seek additional regulatory "approval[s]" before discontinuing POTS. That should be the end of the matter.

*Second*, impossibility preemption. California and the CPUC cannot separate and regulate any nominally intrastate component of POTS.[17] In section 2 of the Communications Act, Congress attempted "to divide the world of domestic telephone service neatly into two hemispheres—one comprised of interstate service, over which the FCC would have plenary authority, and the other made up of intrastate service, over which the States would retain

---

[13] *Id.* § 214(c) (emphasis added).

[14] *Id.*

[15] *Id.*

[16] *Network Modernization Order* ¶ 6; *see id.* ¶¶ 60–66.

[17] *Id.* ¶ 113.

Exhibit K
254

exclusive jurisdiction."[18] However, "the realities of technology and economics belie such a clean parceling of responsibility."[19] Courts have thus recognized an "impossibility exception" to the division of authority in section 2, under which an intrastate regulation is preempted if "(1) it is not possible to separate the interstate and intrastate aspects of the service, and (2) federal regulation is necessary to further a valid federal regulatory objective, i.e., state regulation would conflict with federal regulatory policies."[20]

Both criteria are met here. Modern voice services are provided over integrated, all-distance networks, and the concept of "local" telephone service has faded into irrelevance. When it comes to the physical maintenance of a POTS system, interstate and intrastate telephone services are inseparable: the facilities and wires used to provide each service are the same, making it impossible to retire the interstate network while maintaining the intrastate one.

*Third*, conflict preemption. CPUC rules blocking AT&T from discontinuing POTS cannot stand because they would effectively force AT&T to continue service after the Commission has said otherwise, nullifying the Commission's exclusive section 214 authority. Those rules would also undermine the Commission's explicit objective of "spur[ring] network modernization."[21] And they would allow California to assume a different role than the one section 214 specifically prescribes for states.

Under any one of these three preemption theories, California cannot apply its COLR and related requirements to force AT&T to continue to offer POTS once the Commission grants the

---

[18] *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 360 (1986); *see* 47 U.S.C. § 152.

[19] *La. Pub. Serv. Comm'n*, 476 U.S. at 360.

[20] *Minn. Pub. Utils. Comm'n v. FCC*, 483 F.3d 570, 578 (8th Cir. 2007); *see California v. FCC*, 75 F.3d 1350, 1359 (9th Cir. 1996) (impossibility preemption applies where it is "not possible to separate the interstate and intrastate components of the asserted FCC regulation").

[21] *Network Modernization Order* ¶ 2.

Exhibit K

255

discontinuance applications. As the Commission explained in the *Network Modernization Order*, where "state and local requirements prevent a provider from discontinuing the interstate portion of a legacy voice service for which the Commission has already granted discontinuance authorization pursuant to section 214, then the requirements negate a valid federal regulatory objective" and are thus "subject to preemption."[22] That is precisely how California law operates here.

AT&T[23] thus seeks a declaration that any California law or regulation that interferes with or otherwise conditions AT&T's ability to discontinue POTS as authorized by the Commission is preempted.

## BACKGROUND

As explained in AT&T's Discontinuance Applications, customers in California have many alternatives to POTS. AT&T faces competition from a host of providers that have deployed wireless and wireline, mobile and fixed, terrestrial and satellite, facilities-based and over-the-top VoIP service. And for customers who want a more traditional phone experience, AT&T developed AP-A, which provides the functionality of landline POTS using existing phone equipment.[24] AP-A can be used anywhere covered by AT&T's wireless or fiber networks, as

---

[22] *Id.* ¶ 114.

[23] AT&T Services, Inc., files this Petition, pursuant to 47 C.F.R § 1.2, on behalf of its affiliate Pacific Bell Telephone Company d/b/a AT&T California. "AT&T" refers to AT&T affiliated entities collectively or AT&T California specifically depending on context.

[24] An over-the-top service, AP-A can use AT&T's LTE network for connectivity (although it is compatible with most broadband connections). *See* AT&T Residential Discontinuance Application at 6–7 & n.19. AT&T offers AP-A for both residential and business customers. *See* AT&T Residential Discontinuance Application at 3; AT&T Business Discontinuance Application at 3. Although marketed under different names, for convenience these services are referred to here as "AP-A." The Commission has already found AP-A to be an "adequate replacement" service for POTS and has approved section 214 discontinuance on the basis of this service. AT&T Residential Discontinuance Application at 3–5. Indeed, based on AP-A, the

Exhibit K

256

well as on broadband connections from other providers. As a result of these superior alternatives, AT&T now provides POTS to approximately three percent of households in its California service territory.[25]

Nearly all locations in the 360 wire centers covered by its Discontinuance Applications can receive broadband service from multiple providers. Of the over five million serviceable locations in those 360 wire centers, more than 99.9 percent have access to at least two of the national mobile voice providers and three or more facilities-based, terrestrial fixed broadband or mobile voice providers.[26] And most relevantly here, *all* of AT&T's existing POTS customers ("Affected Customers") in the areas covered by the Discontinuance Application ("Affected Service Area") have an alternative provider of high-quality voice service, and 99.9 percent have access to at least two others beyond AT&T.[27] Accordingly, POTS is no longer necessary to provide Affected Customers with voice service.

### A.    California's Outdated "Universal Service" Regulatory Regime

Despite these developments, the CPUC still maintains the legacy COLR regime enacted before local competition was unleashed. Key here, California law imposes both substantive and procedural barriers to AT&T's discontinuance of POTS. Substantively, the CPUC requires

---

Commission has approved AT&T discontinuance applications covering 18 states. *See id.* at 4 n.8 (citing prior approved applications).

[25] AT&T calculates this figure by dividing the number of its residential POTS customers as of February 2026 by the latest U.S. Census Bureau estimate of the number of households in census block groups overlapping AT&T's California service territory. *See Household Income in the Past 12 Months (in 2024 Inflation-Adjusted Dollars)*, U.S. Census Bureau, https://data.census.gov/table/ACSDT5Y2024.B19001?q=B19001&g=040XX00US06$1500000 (last visited May 15, 2026).

[26] *See* Declaration of Sandra Charneski ¶¶ 10–11 ("Charneski Decl.") (attached as Exhibit 1 to AT&T's concurrently filed Forbearance Petition).

[27] *See* AT&T Residential Discontinuance Application at 7–8.

AT&T—but not its cable and wireless rivals—to offer an anachronistic "basic service" to residential customers that includes features and functions that consumers do not want and its competitors do not offer, and to do so pursuant to rates, terms, and conditions contained in a tariff that the CPUC must approve, and that cannot be altered without CPUC approval. This basic service must include *interstate* service, which the CPUC purports to regulate. Procedurally, the CPUC requires AT&T to secure its formal permission to discontinue POTS and to approve a replacement "basic service." The CPUC also approves customer notice and "migration" plans necessary under California law for discontinuance of POTS. The CPUC also independently compels AT&T to provide voice service to all businesses in its territory.

### 1.    California COLR Obligations Effectively Require POTS

As a California COLR, AT&T must provide "basic service" to "all residential households within [its] defined service territory."[28] The CPUC has prescribed numerous "elements" of residential "basic service,"[29] as well as additional "general requirements" that a COLR must satisfy when providing basic service.[30] Although ostensibly "technologically and competitively

---

[28] *Ord. Instituting Rulemaking Regarding Revisions to the Cal. High Cost Fund B Program*, D.12-12-038, 2012 Cal. PUC LEXIS 597, at *16 (Dec. 24, 2012) ("*2012 CPUC COLR Order*"). The AT&T POTS that satisfies California's basic service obligation in California is tariffed as *Network and Exchange Services Tariff of AT&T California*, Sched. C.P.U.C. No. A5 (Oct. 10, 2018), https://cpr.att.com/pdf/ca/a005.pdf.

[29] *See 2012 CPUC COLR Order*, 2012 Cal. PUC LEXIS 597, app. A, pt. I, at *88–95; *Admin. L. Judge's Ruling Issuing Staff Proposal for Comment*, R.24-06-012, attach. A at 12–13 (C.P.U.C. Dec. 15, 2025), https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M591/K255/591255757.PDF ("Staff COLR Proposal").

[30] *See 2012 CPUC COLR Order*, 2012 Cal. PUC LEXIS 597, app. A, pt. II, at *95–97. As long as AT&T has an obligation to offer basic service, it also must participate in the California LifeLine program, regardless of the technology it uses. *See* Cal. Pub. Util. Code § 876; *2012 CPUC COLR Order*, 2012 Cal. PUC LEXIS 597, app. A, pt. I.4(d), at *93; Cal. Pub. Utils. Comm'n, *General Order 153-A* § 3.2, https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M588/K780/588780806.PDF ("*General*

Exhibit K

258

neutral,"[31] these requirements effectively dictate that AT&T can satisfy its COLR obligation only by offering POTS.

In particular, a number of the basic-service "elements" required by the CPUC are POTS-specific features rooted to the past. They are not included in modern services because customers simply do not value them. For example, the CPUC requires AT&T to provide "[d]irectory services," such as "access to directory assistance within the customer's local community," directory listings, and the "option to receive a free white pages directory."[32] The CPUC similarly mandates that AT&T provide "free access to operator services."[33] AT&T offers none of these elements as part of its nationwide mobile wireless or VoIP services; they simply make no sense for nationwide networks.

The CPUC also rejects other Commission-approved alternatives to POTS that could otherwise satisfy the basic-service requirements. In particular, it requires any COLR "that wishes to offer basic service utilizing anything other than traditional exchange-based wireline technology" to obtain special approval from the CPUC unless and until the CPUC adopts service-quality standards for the proposed technology.[34] The CPUC has yet to adopt such standards for mobile wireless service.[35] Thus, AT&T's mobile wireless services cannot meet the

---

*Order 153-A*"); *see also id.* § 1.3 ("Participation in California LifeLine by Non-Traditional Providers (wireless, VoIP, Internet Service Providers, etc.) is optional.").

[31] *2012 CPUC COLR Order*, 2012 Cal. PUC LEXIS 597, at *20; *see also id.* at *2, *8, *18, *20–21, *29, *75, *82, *83.

[32] *Id.* app. A, pt. I.3, at *91–92. In the ongoing COLR rulemaking the CPUC staff has proposed eliminating some of these elements, but some parties have opposed this proposal, and the Commission has yet to adopt it. *See* Staff COLR Proposal at 54–56.

[33] *2012 CPUC COLR Order*, 2012 Cal. PUC LEXIS 597, app. A, pt. I.9, at *95.

[34] *Id.* at *36–37 & n.17, app. A, pt. II, at *96–97.

[35] The CPUC recently commenced a proceeding to consider service-quality standards for mobile wireless. *See Ord. Instituting Rulemaking To Consider Serv. Quality Rules for Wireless Carriers*,

Exhibit K

259

CPUC's requirements without CPUC approval, even though the Commission has concluded that mobile service is an adequate replacement for POTS.[36]

In addition, although POTS provided to businesses is not itself a "basic service," the CPUC nonetheless compels COLRs to provide voice service to business customers territory wide as well. The CPUC's rules specify: "A designated COLR shall be required to serve all customers upon request, both residential *and business*, who are located within the COLR's designated service area."[37]

### 2.      California Imposes Additional Hurdles to Discontinuance

These core COLR obligations are not the only aspect of a regulatory regime developed for monopoly utilities rather than the highly competitive modern communications marketplace. The CPUC also requires that a COLR must "maintain tariffs or schedules with the [CPUC] . . . for its basic service offerings[,] which must include its basic service rates, charges, terms, and conditions; and must make them publicly available."[38] This CPUC mandate implements California's statutory requirement that basic service must be tariffed.[39] To make any changes to its residential basic service, a COLR thus must provide the CPUC with advance notice of a tariff

---

R.26-02-017, 2026 Cal. PUC LEXIS 102 (Feb. 26, 2026) (wireless); *see also Decision Adopting Gen. Ord. 133-E*, D.25-09-031, 2025 Cal. PUC LEXIS 455 (Sept. 18, 2025) (fixed VoIP). CPUC rulemaking proceedings can last years, and this proceeding has only recently commenced. *See generally R2602017 – Proceeding*, Cal. Pub. Utils. Comm'n, https://apps.cpuc.ca.gov/apex/f?p=401:56::::RP,57,RIR:P5_PROCEEDING_SELECT:R2602017 (last visited May 15, 2026).

[36] *See Network Modernization Order* ¶¶ 34–36. It is also not clear whether the CPUC would permit AT&T to use AP-A to satisfy its basic service obligation without additional scrutiny given that service is typically delivered to customers over AT&T's mobile network.

[37] *2012 CPUC COLR Order*, 2012 Cal. PUC LEXIS 597, app. C at *99 (emphasis added).

[38] *Id.* at *16.

[39] *See* Cal. Pub. Util. Code § 495.7(b).

Exhibit K
260

change, and the CPUC has authority to reject the revised tariff if it finds the "rates, charges, terms, and conditions" unsatisfactory.[40] A tariff change requiring CPUC approval would be necessary for AT&T to discontinue POTS or to provide basic service through an IP-based service. And in order to withdraw a "basic service" tariff, the CPUC's rules require a formal proceeding,[41] leaving no way to avoid seeking and gaining this approval.

This tariffing requirement also means that, to the extent AT&T seeks to satisfy its COLR obligations with a service other than POTS, the CPUC applies substantive standards to rate-regulate an interstate service—and those substantive standards may depart from the Commission's own. As noted, the CPUC tariffing regime gives it direct authority over the "rates, charges, terms, and conditions" of the tariffed service. Critically, any eligible "basic service" must provide "the ability to place and receive voice-grade calls over all distances"[42]—*i.e.*, including interstate calling. AT&T's traditional POTS provides interstate calling by offering federally regulated long-distance service; indeed, California requires basic-service POTS to include "equal access" to a presubscribed long-distance carrier, a quintessentially interstate service.[43] However, like other market offerings, AT&T's VoIP and mobile wireless offerings do not include separate local and long-distance components; each is a jurisdictionally mixed "all-distance" service provided over common, inseparable facilities. But section 2 of the Communications Act grants the Commission exclusive authority over interstate services.[44]

---

[40] *Id.* §§ 454, 489, 491, 495.

[41] Cal. Pub. Utils. Comm'n, *General Order 96-B*, https://docs.cpuc.ca.gov/word_pdf/GENERAL_ORDER/100177.pdf ("*General Order 96-B*") (Telecommunication Industry Rules 7.4 & 8.5).

[42] *2012 CPUC COLR Order*, 2012 Cal. PUC LEXIS 597, app. A, pt. I.1, at *89.

[43] *Id.* app. A, pt. I.1, at *89.

[44] *See Network Modernization Order* ¶ 114.

14

Nevertheless, in order to use either VoIP or wireless service to satisfy its COLR obligation, AT&T—but not its rivals—would have to tariff that jurisdictionally mixed service and subject it to the CPUC's regulatory authority, in violation of section 2.

In addition, to discontinue residential POTS, AT&T would need to comply with CPUC-mandated notice requirements, including CPUC approval of its proposed notices,[45] even though the *Network Modernization Order* already prescribes requirements for such discontinuation notices.[46] AT&T also would have to obtain CPUC approval for an "exit plan" under the CPUC's Mass Migration Guidelines, even though AT&T would not in fact exit the voice market but would continue to offer existing and new customers service via a modern IP-based service.[47] Accordingly, even apart from California's COLR rules and tariffing requirements, AT&T still would have to navigate multiple, sequential CPUC approval processes to discontinue its POTS service.

### B.    California Has Steadfastly Maintained Its COLR Regime Notwithstanding Widespread Competition

The CPUC adopted its COLR rules shortly after Congress opened local markets to competition in the Telecommunications Act of 1996, but before that competition took root. The CPUC designated AT&T and other incumbent telephone companies—and only these entities—as

---

[45] *See General Order 96-B* (Telecommunication Industry Rules 3, 3.2, 5 & 7.4).

[46] *See Network Modernization Order* ¶ 46.

[47] *General Order 96-B* (Telecommunication Industry Rule 8.5); Cal. Pub. Utils. Comm'n, *Mass Migration Guidelines* (2010), https://docs.cpuc.ca.gov/word_pdf/FINAL_DECISION/121590.pdf.

Exhibit K
262

COLRs[48] and implemented a subsidy fund to support service to high-cost areas.[49] At the time, the CPUC recognized that its COLR regime should only be temporary, explaining that as the marketplace "moves from a monopoly provider to multiple providers, the universal service program needs to be readjusted to meet the challenges of increasing competition."[50] Today, nearly 30 years later, California has largely eliminated its high-cost subsidy for COLRs,[51] and Californians have more voice offerings to choose from than ever before. Yet, while other states in AT&T's service territory have eliminated their COLR regimes,[52] the promised COLR "readjust[ment]" has yet to occur in California.

As the local marketplace became increasingly competitive, AT&T has sought relief from the COLR rules that require AT&T, but not its many rivals, to provide the CPUC's defined basic service. None of these state-level efforts has succeeded. For example, in 2016, AT&T supported a California bill that would have allowed companies to discontinue POTS in areas with an

---

[48] *1996 CPUC COLR Decision*, 1996 Cal. PUC LEXIS 1046, at *300–308 (Findings of Fact ¶¶ 165, 169); *id.* app. B at *468–70 (Universal Service Rule 6.D).

[49] *California High Cost Fund-B*, Cal. Pub. Utils. Comm'n, https://www.cpuc.ca.gov/industries-and-topics/internet-and-phone/california-high-cost-fund-b (last visited May 15, 2026).

[50] *1996 CPUC COLR Decision*, 1996 Cal. PUC LEXIS 1046, at *369 (Findings of Fact ¶ 16).

[51] *See Ord. Instituting Rulemaking Proceeding To Consider Changes to the Comm'n's Carrier of Last Resort Rules*, R.24-06-012, 2024 Cal. PUC LEXIS 359, at *6 n.13 (June 28, 2024) ("*CPUC COLR OIR*") ("The available CHCF-B support for residential basic service in California has decreased since 1996, when it totaled $352 million per year for all carriers to $22 million in 2020–21.").

[52] *See Appl. of Pac. Bell Tel. Co. d/b/a AT&T Cal. (U 1001 C) for Targeted Relief from Its Carrier of Last Resort Obligations & Certain Associated Tariff Obligations* 5, attach. B (C.P.U.C. filed Mar. 3, 2023), https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M502/K977/502977267.PDF ("AT&T COLR Application").

Exhibit K

263

alternative voice service available, after compliance with certain procedures.[53] That effort stalled out in committee.[54]

Eight years later, AT&T tried again, this time in a March 2023 application with the CPUC to relinquish the COLR designation and associated tariff obligations. AT&T presented evidence that over 99 percent of the population in AT&T's service territory had access to at least three facilities-based alternatives to POTS.[55] AT&T's POTS subscribership had plummeted,[56] yet AT&T was incurring costs of approximately $1 billion a year for its California TDM network and related services.[57] Even so, AT&T sought to relinquish its COLR obligations only where a voice alternative existed.[58] And to ensure an orderly transition for consumers, AT&T agreed to serve existing customers in relinquishment areas under its then-current tariffs for at least six months following approval of its application.[59]

Nevertheless, after over a year of contested regulatory proceedings,[60] the CPUC

---

[53] *See* A.B. 2395, 2015–2016 Leg., Reg. Sess., sec. 2 § 711 (Cal. 2016).

[54] *See, e.g.*, Steve Blum, *AT&T's Attempt To Rewrite California Law Shredded by a Higher Power*, Tellus Venture Assocs. (May 28, 2016), https://www.tellusventure.com/atts-attempt-rewrite-california-law-shredded-higher-power/.

[55] *See* AT&T COLR Application at 3.

[56] *See id.*

[57] *See id.* at 31.

[58] *See id.* at 7–8, 37–39.

[59] *See id.*

[60] In support of its detailed application, AT&T was required to file numerous pleadings, respond to massive discovery requests, attend live hearings, provide notices to customers and governments of its application, and participate in public participation hearings across the state. *See generally AT&T Applications Regarding Carrier of Last Resort and Eligible Telecommunications Carrier Designation*, Cal. Pub. Utils. Comm'n, https://www.cpuc.ca.gov/industries-and-topics/internet-and-phone/att-colr-etc-proceedings (last visited May 15, 2026) (Under "Quick Links, AT&T's Carrier of Last Resort (COLR) Proceeding)," click "Proceeding documents"). Overall, there are more than 130 entries in the docket prior to the CPUC's decision. *Id.*

Exhibit K
264

dismissed AT&T's application on the basis of a motion filed at the outset of the proceeding.[61] The CPUC insisted that its rules barred AT&T from withdrawing as a COLR unless another COLR took its place—but, of course, none has done so,[62] and no rational entity would do so. The CPUC then opened a rulemaking proceeding to consider whether to modify its existing COLR rules "[g]iven the age of its COLR rules, as well as changes in the marketplace."[63] But the CPUC effectively punished AT&T for applying for COLR relief, forbidding AT&T from filing "another application for COLR relief" for at least one year after the conclusion of the COLR rulemaking.[64]

That CPUC rulemaking has now been ongoing for nearly two years,[65] but no reforms have been enacted, nor are meaningful reforms likely. The CPUC staff has proposed a scheme that would erect significant barriers to COLR relinquishment while *adding* to the obligations imposed on existing COLRs.[66] Although the CPUC staff proposes two "paths" to relinquishment, neither would provide significant relief, leaving AT&T as the COLR for large

---

[61] *See generally CPUC COLR Dismissal Order*, 2024 Cal. PUC LEXIS 331, at *12–18.

[62] *See id.* at *15–17.

[63] *Id.* at *20.

[64] *Id.* at *18.

[65] *See CPUC COLR OIR*, 2024 Cal. PUC LEXIS 359.

[66] *See generally* Staff COLR Proposal; *see also Pac. Bell Tel. Co. d/b/a AT&T Cal.'s (U 1001 C) Opening Comments on the Admin. L. Judge's Ruling Issuing Staff Proposal for Comment*, R.24-06-012, at 1–31 (C.P.U.C. filed Jan. 30, 2026), https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M598/K101/598101785.PDF ("AT&T Comments on Staff Proposal"); *Pac. Bell Tel. Co. d/b/a AT&T Cal.'s (U 1001 C) Reply Comments on the Admin. L. Judge's Ruling Issuing Staff Proposal for Comment*, R. 24-06-012, at 4–6, 11–14 (C.P.U.C. filed Feb. 13, 2026), https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M599/K152/599152770.PDF ("AT&T Reply Comments on Staff Proposal").

Exhibit K

265

swaths of its territory—still without a realistic way to discontinue POTS.[67] And, even where all of the other proposed criteria for relinquishment were met, AT&T would have to offer wireline broadband service—even though COLR is a voice obligation (and no funding mechanism is contemplated for the required broadband service).[68] Simply put, no state-level solution to California's outdated POTS system is forthcoming.

### C.    The Commission's Efforts To Encourage Network Modernization

The Commission has taken a far different approach to network modernization. For well over a decade, and on a bipartisan basis, the Commission has recognized that requiring carriers to maintain POTS can "siphon[] investments away from new networks and services."[69] For that reason, the Commission in 2014 found that it would be in the public interest to release AT&T and other incumbent carriers from the high-cost requirement under section 214(e) for eligible telecommunications carriers (ETCs) to offer voice telephony service throughout their service territories.[70] The Commission explained that "carriers can reallocate their resources towards making upgrades to their networks to meet the broadband needs of their existing or new customers" instead of "spend[ing] their resources on maintaining existing voice telephony services or deploying new infrastructure to offer voice telephony service in newly constructed

---

[67] *See* AT&T Comments on Staff Proposal at 6–14, 31–64; AT&T Reply Comments on Staff Proposal at 5–6, 19–39.

[68] *See* Staff COLR Proposal at 20–22 (making COLR relinquishment pathway available only in areas where the COLR offers broadband); *id.* at 80 (specifying COLR must provide "wireline" broadband to relinquish); *see also* AT&T Comments on Staff Proposal at 7, 9–10; AT&T Reply Comments on Staff Proposal at 9, 19.

[69] FCC, *Connecting America: The National Broadband Plan* 59 (2010), https://transition.fcc.gov/national-broadband-plan/national-broadband-plan.pdf.

[70] *See Connect America Fund*, Report and Order, 29 FCC Rcd. 15644, ¶ 65 (2014).

Exhibit K

266

homes where there are already reasonable substitutes."[71] The Commission again lifted legacy universal service obligations with respect to Lifeline in 2016, reasoning that doing so was "likely to free up service provider funds for broadband investment."[72] And more recently, the Commission has furthered network modernization by approving several applications by AT&T to discontinue POTS service where AP-A is available as an alternative.[73]

Most recently, in its *Network Modernization Order*, the Commission on a unanimous, bipartisan basis recognized that further reform of federal section 214 discontinuance regulation was necessary.[74] But it also recognized that state service mandates may impede network modernization—and it explained that Congress had preempted many of them. As the Commission explained, "the record shows that certain state and local requirements have been unduly prolonging the use of legacy networks and actually preventing providers from building modern ones by limiting the types of services that may qualify as adequate replacements," which was inconsistent with the Commission's determination to encourage such modernization.[75]

Declaring that section 214 "creates an exclusively federal discontinuance regime for interstate or jurisdictionally mixed telecommunications services,"[76] the Commission set forth the controlling federal framework.[77] The Commission found that "the expansion of . . . modern

---

[71] *Id.*

[72] *Lifeline and Link Up Reform and Modernization*, Third Report and Order, Further Report and Order, and Order on Reconsideration, 31 FCC Rcd. 3962, ¶ 337 (2016).

[73] *See* AT&T Residential Discontinuance Application at 3 n.8.

[74] *See Network Modernization Order* ¶ 1; *see also id.* ¶ 10 (discussing section 214 reforms adopted in 2016).

[75] *Id.* ¶ 4.

[76] *Id.* ¶ 108.

[77] *See generally id.*

20

Exhibit K

267

networks, and benefits they afford, have been hindered by the need for carriers to divert important resources to the maintenance of aging and deteriorating legacy networks that deliver outdated services to an ever-decreasing number of subscribers."[78] The Commission thus adopted a set of "common sense reforms" to eliminate "red tape that has both required providers to keep aging copper lines in place and effectively prevented them from investing in the modern infrastructure that Americans want and deserve."[79]

To start, the Commission codified a prior grant of blanket section 214(a) authority, permitting carriers to grandfather legacy voice service (and certain other lower-speed services) without filing a section 214(a) discontinuance application.[80] The Commission also streamlined the discontinuance process.[81] In particular, the Commission adopted a "consolidated rule" that identified "explicit categories of adequate replacement services" that would support discontinuance.[82] These include facilities-based VoIP, mobile wireless service, and voice services supported by the Commission's modernized high-cost programs.[83]

Having cut its own bureaucratic "red tape," the Commission then determined "that federal law preempts state and local requirements to the extent they needlessly constrain the deployment of modern, next-generation IP-based networks by impeding providers' ability to discontinue providing … legacy services and to retire outdated and deteriorating legacy

---

[78] *Id.* ¶ 2.

[79] *Id.* ¶¶ 1, 4.

[80] *See id.* ¶¶ 6, 60–66.

[81] *See id.* ¶¶ 22, 25, 30, 46–47, 54–55, 58–59.

[82] *Id.* ¶¶ 6, 22, 23–25, 29.

[83] *See id.* ¶¶ 26–40.

21

networks."[84] The Commission emphasized that "states lack authority to regulate interstate services"[85] and that once the Commission has "exercised its section 214 authority to allow discontinuance of a service within its regulatory sphere, section 214(c) expressly provides that carriers do not require any other 'approval' to discontinue the covered service."[86]

The Commission confirmed that federal law thus preempts any state requirement that, on its face or in effect, requires a carrier to continue providing legacy voice service after the Commission has authorized discontinuance, or that discourages carriers from seeking such authorization.[87] Also preempted are state requirements obligating carriers to provide grandfathered legacy services to new customers, as such state requirements are incompatible with the Commission's blanket grandfathering authority and federal discontinuance regime.[88]

Finally, the Commission made clear that states cannot avoid preemption by claiming they are regulating purely "intrastate" services.[89] Section 214 makes the Commission's authority to permit discontinuance exclusive, and even purportedly intrastate requirements can contravene or interfere with that exclusive authority. Under the "impossibility exception" to state jurisdiction under section 2 of the Communications Act, the Commission's orders "preempt state law when (1) it is impossible or impracticable to regulate the intrastate aspects of a service without

---

[84] *Id.* ¶ 7.

[85] *Id.* ¶ 114.

[86] *Id.*

[87] *See id.* ¶¶ 7, 106, 115.

[88] *See id.* ¶¶ 6–7, 114 & n.415.

[89] *Id.* ¶¶ 112–115.

22

Exhibit K

269

affecting interstate communications and (2) the Commission determines that such regulation would interfere with federal regulatory objectives."[90]

The Commission recognized that, for legacy copper networks, even where nominally "local" and "long distance" services are being provided, "these services are provisioned over the same network using the same technology."[91] Thus, where joint facilities are used to provide intra- and interstate service, state requirements may "prevent a provider from discontinuing the interstate portion of a legacy voice service for which the Commission has already granted discontinuance authorization pursuant to section 214."[92] Such state requirements "negate a valid federal regulatory objective because the interstate impacts of the state or local requirements cannot be unbundled from the intrastate aspects of those requirements" and are therefore preempted.[93]

## ARGUMENT

The Commission should declare that California's anachronistic COLR rules and all other regulatory barriers to network modernization are preempted. As the Commission correctly recognized in the *Network Modernization Order*, "where the Commission has lawfully exercised its section 214 authority to allow discontinuance of a service within its regulatory sphere, section 214(c) expressly provides that carriers do not require any other 'approval' to discontinue the covered service."[94] Here, AT&T's residential POTS is clearly "within [the Commission's]

---

[90] *Id.* ¶ 113 (quoting *Minn. Pub. Utils. Comm'n*, 483 F.3d at 578).

[91] *Id.* ¶ 107.

[92] *Id.* ¶ 114.

[93] *Id.*

[94] *Id.* ¶ 114; *id.* ¶ 7 (explaining that, under section 214(c), "after a carrier obtains Commission authorization to discontinue a service, it need *not obtain any additional authorizations* before implementing that discontinuance of service" (emphasis added)); *id.* ¶ 110 ("After issuance of such certificate, . . . the carrier may, *without securing approval other than such certificate,*

Exhibit K
270

regulatory sphere." It is a jurisdictionally mixed service—not only technologically, but also operationally and economically—providing customers the ability to make or receive local and interstate long-distance calls over common facilities. Once the Commission allows AT&T to discontinue POTS, no other "approval" is required before AT&T may lawfully do so.

California, however, imposes two additional sets of requirements, each of which forces AT&T to obtain additional state "approvals" before discontinuing POTS and retiring the underlying legacy facilities. First and foremost, California's COLR rules require AT&T to offer "basic service" to all customers in its service territory, and AT&T can satisfy that state-law obligation only by continuing to provide POTS. Second, California's tariffing and other associated regulatory requirements independently prevent AT&T California from discontinuing POTS upon Commission approval. Both sets of state requirements must yield to federal law.

A.     **Federal Law Preempts State Requirements That Require Additional Authorizations Before Implementing Commission-Approved Discontinuance**

As the Commission correctly recognized, Congress in section 214 "create[d] an exclusively federal discontinuance regime for interstate or jurisdictionally mixed telecommunications services."[95] Section 214(a) provides that "[n]o carrier shall discontinue . . . service to a community, or part of a community, unless and until there shall first have been obtained from the Commission a certificate that neither the present nor future public convenience and necessity will be adversely affected thereby."[96] States play a consultative role in the Commission's discontinuance determinations: under section 214(b), the Commission must

---

comply with the terms and conditions" and "proceed with the . . . discontinuance." (emphasis added) (cleaned up)).

[95] *Id.* ¶ 108.

[96] 47 U.S.C. § 214(a).

provide "notice" to "the Governor of each State . . . in which such discontinuance . . . of service is proposed, with the right to those notified to be heard."[97] "This provision allows states to object to any federal discontinuance application prior to any Commission authorization."[98] But Congress did not grant states any decision-making authority over the discontinuance of interstate or jurisdictionally mixed services.

To the contrary, under section 214(c), the Commission alone "shall have power" to grant discontinuance and to "attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require."[99] Critically, section 214(c) expressly preempts inconsistent state requirements: "After issuance of such certificate, . . . the carrier may, *without securing approval other than such certificate*, comply with the terms and conditions" and "proceed with the . . . discontinuance."[100] Thus, "it is the Commission that has sole jurisdiction to decide whether a carrier's proposed discontinuance adversely affects the public convenience and necessity and whether it should be approved or rejected."[101]

Reinforcing the point, section 214(c) provides that a "court of competent jurisdiction" "may enjoin any discontinuance of service that occurs '*contrary to* the provisions of' section 214."[102] By negative inference, therefore, courts may *not* enjoin a discontinuance that is

---

[97] *Id.* § 214(b).

[98] *Network Modernization Order* ¶ 110.

[99] 47 U.S.C. § 214(c).

[100] *Id.* (emphasis added); *see Cablevision of Tex. III, L.P. v. Okla. W. Tel. Co.*, 993 F.2d 208, 210 (10th Cir. 1993).

[101] *Network Modernization Order* ¶ 110.

[102] *Id.* (quoting 47 U.S.C. § 214(c) (emphasis added)). And, even where a state obtains an injunction against a carrier from discontinuing service contrary to section 214, the basis for the injunction "evaporate[s]" once the carrier obtains proper approval from the Commission. *Cablevision of Tex.*, 993 F.2d at 210; *see Network Modernization Order* ¶ 110 n.397.

Exhibit K

272

*consistent* with section 214—*i.e.*, a discontinuance approved by the Commission under section 214(a).[103]

The statute thus "leaves exclusively within the jurisdiction of the Commission the determination of whether to grant a certificate of convenience and necessity" to "discontinue a service."[104] These "powers . . . over . . . the discontinuance of service over existing facilities" are "central to [the Commission's] mission."[105] "[N]either section 214(b) nor section 214(c) provides states with the power to decide whether a carrier may discontinue interstate or jurisdictionally mixed service, or empowers states to impose requirements that frustrate or add extra conditions to Commission decisions allowing discontinuance."[106] By the plain terms of the statute, therefore, state law that obstructs the Commission's exercise of its discontinuance authority over interstate and jurisdictionally mixed services is preempted and must yield.

Section 2(b) is not to the contrary. As the Commission correctly recognized in the *Network Modernization Order*, section 2(b)'s general division of authority does not displace the more specific and "express[]" terms of section 214(c), which provides that a carrier may proceed with a Commission-approved discontinuance without any "other" approval—including any approval required by state law.[107] Section 2(b) likewise does not displace general principles of conflict preemption, under which, "[e]ven where Congress has not entirely displaced state regulation in a specific area, state law is pre-empted to the extent that it actually conflicts with

---

[103] *See Network Modernization Order* ¶ 110.

[104] *ITT World Commc'ns, Inc. v. N.Y. Tel. Co.*, 381 F. Supp. 113, 120 (S.D.N.Y. 1974).

[105] *Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 487 F. Supp. 942, 948 (S.D.N.Y. 1980); *see MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 462 F. Supp. 1072, 1080 (N.D. Ill. 1978) (similar).

[106] *Network Modernization Order* ¶ 110.

[107] *Id.* ¶ 114.

Exhibit K
273

federal law."[108] Consistent with those principles, "[i]t is well established that, under the 'impossibility exception' to state jurisdiction, the Commission may preempt state law when (1) it is impossible or impracticable to regulate the intrastate aspects of a service without affecting interstate communications and (2) the Commission determines that such regulation would interfere with federal regulatory objectives."[109] Similarly, state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" is preempted.[110]

Faithfully applying these principles, the Commission determined in the *Network Modernization Order* that, "where the Commission has exercised its section 214 discontinuance authority over interstate and/or jurisdictionally mixed services to allow a carrier to discontinue legacy voice service, state requirements that operate to require the carrier to continue providing those services conflict with federal law."[111] For starters, section 214(c) "expressly provides that carriers do not require any other 'approval' to discontinue the covered service."[112] As to the first prong of the impossibility exception test, these state requirements "effectively 'negate the Commission's exercise of its lawful authority because regulation of the interstate aspects of the

---

[108] *Exxon Corp. v. Eagerton*, 462 U.S. 176, 182 (1983).

[109] *Network Modernization Order* ¶ 113 (quoting *Minn. Pub. Utils. Comm'n*, 483 F.3d at 578); *see also, e.g., N.C. Utils. Comm'n v. FCC*, 552 F.2d 1036 (4th Cir. 1977) ("*North Carolina II*"); *Comput. & Commc'ns Indus. Ass'n v. FCC*, 693 F.2d 198 (D.C. Cir. 1982); *State Corp. Comm'n v. FCC*, 787 F.2d 1421 (10th Cir. 1986); *Nat'l Ass'n of Regul. Comm'rs v. FCC*, 880 F.2d 422 (D.C. Cir. 1989); *Pub. Serv. Comm'n of Md. v. FCC*, 909 F.2d 1510 (D.C. Cir. 1990); *California v. FCC*, 905 F.2d 1217 (9th Cir. 1990).

[110] *Network Modernization Order* ¶ 113 (quoting *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 347 (D.C. Cir. 2018)).

[111] *Id.* ¶ 114.

[112] *Id.*

27

Exhibit K

274

matter cannot be severed from regulation of the intrastate aspects.' "[113] And, as to the second prong, these state requirements "negate" the Commission's "critical" federal regulatory objective: encouraging "the transition to next-generation networks and services."[114] At the very least, such state requirements conflict with the clear congressional choice to allow states to participate in the Commission's discontinuance process rather than to regulate on top of it. Consequently, "any such state requirements, to the degree they regulate services shown to be jurisdictionally mixed, are subject to preemption pursuant to both the impossibility exception and general principles of conflict preemption"—as well as express preemption.[115]

### B. POTS Is A Jurisdictionally Mixed Service With An Inseverable Interstate Component

As the Commission noted in the *Network Modernization Order*, legacy voice services transmit voice communications "using circuit-switched [TDM] technology," "usually over copper wires."[116] While this service "generally includes what is sometimes colloquially described as 'local telephone service,' . . . that term does not accurately reflect the jurisdictional nature of the service as a practical matter in today's networks."[117] In fact, "[f]ew, if any, networks today operate on a purely local or even intrastate level"; rather, "[t]he vast majority of consumers use the same provider for both their local and long distance service," and "these services are provisioned over the same network using the same technology."[118]

---

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] *Id.* ¶ 107.

[117] *Id.*

[118] *Id.*

Exhibit K

275

Although the Commission declined in the *Network Modernization Order* to decide whether any particular POTS service is jurisdictionally mixed, it stated that it "will consider on a case-by-case basis whether certain legacy voice services are interstate or jurisdictionally mixed."[119] The Commission should find now, for two reasons, that AT&T's POTS is a "jurisdictionally mixed" service.

*First*, as set forth in more detail in the attached declaration of Dr. Hany Fahmy, it is impossible for AT&T to discontinue the interstate aspects of POTS and retire the associated legacy infrastructure without also discontinuing the intrastate aspects of POTS.[120] The wires and switches that AT&T's POTS customers in California use to make or receive local or intrastate calls are the same wires and switches they use to make or receive long-distance calls.[121] Indeed, this network architecture is inherent to the CPUC's definition of "basic service," which requires AT&T to use its local network to provide exchange access, enabling subscribers to make and receive interstate, long-distance calls.[122] Whether a customer places a call to a destination across the street or across the country, the same copper wires transmit the signal to the same switches in the same local AT&T wire center to be routed appropriately.[123] In short, "these services," inter- and intrastate, "are provisioned over the same network using the same technology."[124]

---

[119] *Id.* ¶ 107 n.383.

[120] Declaration of Dr. Hany Fahmy ¶¶ 10–12 ("Fahmy Decl.") (attached at Exhibit 1).

[121] *See id.* ¶ 9; *see also* USTelecom Ex Parte Letter, WC Dkt. No. 25-208, at 7–9 (Feb. 6, 2026).

[122] *See supra* Part I.A.2; *2012 California COLR Order*, 2012 Cal. PUC LEXIS 597, app A, pt. I.1, at *89 (stating that a COLR "must offer customers the ability to place and receive voice-grade calls over all distances utilizing the public switched telephone network or successor network" and that "[a] basic service provider must allow equal access to all interexchange carriers within the local calling area in accordance with state and federal law and regulation").

[123] *See* Fahmy Decl. ¶ 9.

[124] *Network Modernization Order* ¶ 107.

29

Exhibit K

276

Critically, the discontinuance contemplated by the *Network Modernization Order* (and simultaneously requested in the AT&T Discontinuance Applications) is intended to allow carriers like AT&T not just to cease providing legacy voice services, but also "to retire outdated and deteriorating legacy networks."[125] Whatever ability there may be to separate intra- and interstate components of POTS for purposes of rate regulation, there is no such ability for discontinuance and facilities retirement. The Commission declared its goal of "cutting through the red tape that has . . . required providers to keep aging copper lines in place."[126] But, if AT&T were to retire the copper lines and associated infrastructure that support the *inter*state aspects of POTS, it necessarily would have to retire the infrastructure that supports the *intra*state aspects as well. It is all the same infrastructure.[127] California, however, precludes AT&T from discontinuing intrastate service, which effectively precludes AT&T from discontinuing the interstate service and achieving the Commission's policy goal of retiring outdated POTS network facilities.[128] As courts have made clear, the requirements of the impossibility exception are met in these circumstances.[129]

In section 214, Congress has confirmed the Commission's authority over jurisdictionally mixed infrastructure. Section 214(a) provides that a carrier need not obtain Commission approval to construct, acquire, or operate a "line within a single state *unless such line constitutes part of an interstate line.*"[130] It follows that Commission approval *is* required to construct, acquire, or

---

[125] *Id.* ¶ 7; *see id.* ¶ 114 (similar).

[126] *Id.* ¶ 1.

[127] *See* Fahmy Decl. ¶ 12.

[128] *See id.*

[129] *See, e.g.*, *N.C. Utils. Comm'n v. FCC*, 537 F.2d 787 (4th Cir. 1976) ("*North Carolina I*"); *North Carolina II*, 552 F.2d 1036; *Comput. & Commc'ns Indus. Ass'n*, 693 F.2d at 215.

[130] 47 U.S.C. § 214(a) (emphasis added).

Exhibit K

277

operate an intrastate line that is part of an interstate line. The Commission thus necessarily possesses jurisdiction—and its discontinuance decisions thus preempt state law—with respect to the intrastate portion of interstate lines. Here, to the extent POTS is an intrastate service, it is provided over intrastate lines that are part of interstate lines.

*Second*, even if the infrastructure supporting the inter- and intrastate aspects of POTS were physically separable, discontinuing the interstate aspects of POTS while continuing the intrastate aspects still would be "impracticable."[131] The Commission and courts alike have repeatedly recognized that Commission actions preempt state law not only where it is physically impossible to separate intra- and interstate service, but also where doing so is infeasible "as a practical matter" and "on a practical level."[132] Even if physical separation is "possible technologically," the Commission may appropriately determine "that such separation [i]s not practical"[133] based on "economic and operational factors."[134]

Courts have upheld such determinations, for example, where "the economic burden of identifying" a jurisdictional dividing line was substantial[135] or where the Commission has found that consumers "generally wish[ed] to purchase both interstate and intrastate" services, and enforcing jurisdictional separation would be "detrimental to the consumer and the interstate communications system."[136] And "[s]ervice providers are not required to develop a mechanism

---

[131] *Network Modernization Order* ¶ 113 (quoting *Minn. Pub. Utils. Comm'n*, 483 F.3d at 578).

[132] *Id.* ¶ 107.

[133] *Pub. Serv. Comm'n of Md.*, 909 F.2d at 1516.

[134] *California*, 39 F.3d at 932; *see* Peter W. Huber, Michael K. Kellogg & John Thorne, *Federal Telecommunications Law* § 3:7 (3d ed. 2026) (discussing same).

[135] *Minn. Pub. Utils. Comm'n*, 483 F.3d at 578.

[136] *Comput. & Commc'ns Indus. Ass'n*, 693 F.2d at 215.

31

Exhibit K

278

for distinguishing between interstate and intrastate communications merely to provide state commissions with an intrastate communication they can regulate."[137]

The Fourth Circuit's *North Carolina Utilities Commission* decisions,[138] cited with approval by the Supreme Court in *Louisiana Public Service Commission v. FCC*,[139] are instructive. There, the court upheld the Commission's preemption of state regulations barring the use of customer-provided telephone equipment in intrastate communications, which conflicted with the Commission's regulations permitting such equipment for interstate use.[140] The court acknowledged that it was physically possible to reconcile the differing state and federal regulations because customers theoretically could maintain separate equipment for intrastate and interstate use.[141] But the court upheld the Commission's determination that such a separation was "a practical and economic impossibility."[142]

Here, too, retiring legacy interstate POTS while retaining purely intrastate basic service would be operationally and economically impracticable. As an initial matter, the CPUC itself has made clear that subscribers generally require the ability to receive and make interstate, long-distance calls and has made "the ability to place and receive voice-grade calls over all distances" a core COLR requirement.[143] Thus, AT&T has no option but to offer interstate service. Even apart from that, AT&T's POTS customers use its legacy facilities interchangeably for local and

---

[137] *Minn. Pub. Utils. Comm'n*, 483 F.3d at 578.

[138] *North Carolina I*, 537 F.2d 787; *North Carolina II*, 552 F.2d 1036.

[139] 476 U.S. at 385 n.4.

[140] *See North Carolina II*, 552 F.2d at 1043.

[141] *See North Carolina I*, 537 F.2d at 791–92.

[142] *North Carolina II*, 552 F.2d at 1043.

[143] *2012 CPUC COLR Order*, 2012 Cal. PUC LEXIS 597, app. A, I.1, at *89.

Exhibit K
279

long-distance calls, showing that they "generally wish to purchase both interstate and intrastate" services over shared infrastructure.[144] As it stands today, AT&T's POTS is a jurisdictionally mixed service, and AT&T is not required to develop a new, purely intrastate version of POTS "merely to provide [the CPUC] with an intrastate communication [it] can regulate."[145]

In any event, providing purely intrastate POTS would be uneconomical and thus unsustainable. Because AT&T uses the same infrastructure for intra- and interstate calling, offering a purely intrastate service would still require AT&T to continue maintaining substantially the same legacy network. As noted, the costs of maintaining and operating AT&T's TDM network and legacy services in California are enormous, about $1 billion annually.[146] This network consumes a vast amount of power and requires ceaseless maintenance.[147] Replacement parts are often not commercially available—indeed, in some cases, AT&T is forced to turn to eBay to replace important equipment such as line cards for circuit switches.[148] Ongoing copper theft issues have only exacerbated these challenges.[149] At the same time, the customer base available to fund AT&T's POTS network in California is already small and declining—only

---

[144] *Minn. Pub. Utils. Comm'n*, 483 F.3d at 578.

[145] *Id.*

[146] *See supra* Part I.B; *see also Network Modernization Order* ¶ 9 n.19; Fahmy Decl. ¶ 12.

[147] *See Network Modernization Order* ¶ 9.

[148] *See Comments of USTelecom – The Broadband Ass'n on ALJ Ruling Regarding Comments on Topics Discussed at the Aug. 22, 2025, Workshop*, R.24-06-012, at 27–28 (C.P.U.C. filed Nov. 21, 2025), https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M588/K915/588915231.PDF.

[149] *See Network Modernization Order* ¶ 9; Susan Santana, *Teaming Up to Tackle Copper Theft*, AT&T Connects (July 16, 2025), https://www.attconnects.com/teaming-up-to-tackle-copper-theft/.

Exhibit K

280

three percent of households in AT&T's service territory subscribe to the current, jurisdictionally mixed version of POTS.[150]

As noted, the CPUC has made clear that the ability to place and receive interstate, long-distance calls is an essential part of the voice service consumers expect and require.[151] If, in the *North Carolina Utilities Commission* decisions, requiring customers merely to maintain separate telephones for local and long-distance calls was "a practical and economic impossibility,"[152] then requiring AT&T to maintain an entire legacy copper network for a purely intrastate service serving a tiny or non-existent customer base is *a fortiori* impracticable—and would directly frustrate the Commission's objective of freeing up resources for investment in modern network technologies.

### C.    California's COLR Rules Conflict With Federal Law

The only remaining question is whether the California state requirements "interfere with federal regulatory objectives."[153] They do. California's COLR rules fit those identified in the *Network Modernization Order* to a tee: they "have the effect of preventing carriers from seeking to retire deteriorating legacy networks and discontinuing outdated TDM-based services taken by ever-fewer customers for undetermined periods of time, leaving these providers unable to

---

[150] *See Pac. Bell Tel. Co. d/b/a AT&T Cal.'s (U 1001 C) Opening Comments on the Proposed Decision Dismissing with Prejudice the Appl. of AT&T Cal. To Withdraw as a Carrier of Last Resort*, A.23-03-003, at 7 (C.P.U.C. filed May 30, 2024), docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M532/K621/532621192.PDF ("AT&T California Comments on COLR PD").

[151] *See 2012 CPUC COLR Order*, 2012 Cal. PUC LEXIS 597, app. A, I.1, at *89.

[152] *North Carolina II*, 552 F.2d at 1043.

[153] *Network Modernization Order* ¶ 113 (quoting *Minn. Pub. Utils. Comm'n*, 483 F.3d at 578).

Exhibit K

281

redirect time and resources away from the development and deployment of next-generation networks and technologies."[154]

Because AT&T is the only COLR within its service territory, the only way for AT&T to escape its state-law obligation to provide "basic service" is for some other carrier to take AT&T's place. As the CPUC has explained, its "current rules require that there be a COLR for every Californian and no telecommunications service provider may stop being a COLR unless another telecommunications service provider stands ready to assume the legal obligation to offer basic service in the designated COLR territory."[155] Over 200 carriers recently were offered the opportunity to assume AT&T's COLR obligations; unsurprisingly, none accepted the invitation to be bound by outdated and onerous regulations.[156]

Notwithstanding the POTS-focused requirements of "basic service," the CPUC has argued that its COLR regime does not prevent AT&T from discontinuing POTS because the COLR rules are "technology neutral" and thus allow AT&T to retire its copper network while continuing to provide the required "basic service" over an IP-based network.[157] But that

---

[154] *Id.* ¶ 114 & n.411.

[155] *Carrier of Last Resort Rulemaking*, Cal. Pub. Utils. Comm'n, https://www.cpuc.ca.gov/industries-and-topics/internet-and-phone/carrier-of-last-resort-rulemaking (last visited May 17, 2026).

[156] *See* AT&T California Comments on COLR PD at 9; *CPUC COLR Dismissal Order*, 2024 Cal. PUC LEXIS 331, at *15 ("[N]o carrier eligible to replace AT&T as a COLR volunteered to do so.").

[157] CPUC Reply Comments, WC Dkt. No. 25-208, at 2–4 & nn.2, 7 (Nov. 18, 2025). The CPUC also cannot justify COLR on universal service grounds. *See 1996 CPUC COLR Decision*, 1996 Cal. PUC LEXIS 1046, at *1. Any universal service justification COLR may have had in 1996 no longer exists. Moreover, section 254(f) provides that a state "may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State *only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards.*" 47 U.S.C. § 254(f) (emphasis added). The Commission has emphasized that section 254 imposes a "competitive neutrality" principle and that "universal service support mechanisms and rules [must] neither unfairly advantage nor

35                                                    Exhibit K

justification fails for two fundamental reasons: First, the Commission has made clear that the "practical effect" of a state's COLR regime controls—not the labels a state assigns to it. Second, and independently, the CPUC's supposedly "technologically neutral" approach represents an attempt to leverage its limited authority over intrastate services to control interstate services, which federal law forbids.

### 1. California's COLR Regime Impedes AT&T's Ability To Discontinue

The CPUC's COLR regime directly impedes AT&T from discontinuing residential POTS as permitted by the Commission. The basic services a COLR must provide include "free access to operator services" or "[d]irectory services," such as "access to directory assistance within the customer's local community," directory listings, and the "option to receive a free white pages telephone directory."[158] These features are foreign to any service other than POTS. To AT&T's knowledge, no wireless, VoIP, mobile, or cable carrier includes them in its modern nationwide offerings. And forcing AT&T—but not its rivals—to develop and add these vestigial POTS features to its nationwide IP-based services would impede AT&T's ability to discontinue POTS. It would require AT&T to bear the costs of reconfiguring its IP-based services, all in order to

---

disadvantage one provider over another." *Federal-State Joint Board on Universal Service*, Report and Order, 12 FCC Rcd. 8776, ¶¶ 46–47 (1997). Yet that is precisely what California's COLR rules do. They impose a compulsory service obligation on AT&T, and AT&T alone, within its legacy service territory. And they do so based on AT&T's historical status as an incumbent telephone provider in 1996, even though the marketplace is now fiercely competitive, and AT&T has numerous competitors with larger customer bases. Whatever the CPUC's universal service authority, it cannot impose an almost entirely unfunded mandate on AT&T alone, nor require AT&T to use POTS to meet a universal service obligation after the Commission has authorized discontinuance of POTS based on a finding that modern services are, *in fact*, available to POTS customers.

[158] *2012 CPUC COLR Order*, 2012 Cal. PUC LEXIS 597, app. A, pt. I.1, at *89; *see supra* Part I.A.1. *But see* Staff COLR Proposal at 54–56 (proposing to eliminate the operator-services and directory-services elements).

Exhibit K
283

provide features that consumers do not want. It would severely slow down discontinuance approvals, and perhaps make them economically unviable altogether.

Even if the CPUC were to eliminate the POTS-focused elements of its basic-service definition, that would not create a "technology neutral" regime. While AT&T has aggressively deployed fiber, AT&T as a practical matter would have to use its mobile wireless network to provide "basic service" to the substantial majority of its service territory.[159] But it is demonstrably implausible that the CPUC would ultimately allow AT&T to use its mobile network to fulfill its "basic service" obligation. The CPUC views mobile as a second-class service. In its recent proposal for COLR "reform," for example, the CPUC staff would only allow COLRs to obtain relief where they provide "wireline" broadband service.[160] That is because it does "not consider mobile service as a full substitute for a COLR."[161] CPUC staff also cast doubt on the accuracy of wireless maps that would be critical to establish the availability of any wireless service in a practical way, asserting that these "maps cannot be considered reliable determinants for COLR substitution."[162] These views stand in stark contrast to those of the Commission, which has found that mobile service and interconnected wireless VoIP service are adequate replacements for POTS and that coverage of these services can be established by the National Broadband Maps.[163]

---

[159] While not itself a mobile service, as noted, AT&T's AP-A offering is typically delivered to customers over AT&T's mobile network.

[160] Staff COLR Proposal at 80.

[161] *Id.* at 22.

[162] *Id.* at 25.

[163] *See supra* Part I.C; *see also* AT&T Residential Discontinuance Application at 7–10.

Exhibit K
284

The CPUC likewise demonstrated its belief that mobile wireless service is not an adequate alternative to wireline service like POTS in denying AT&T's application to relinquish its designation as an ETC.[164] There, even though the statute commands that the CPUC "shall permit" relinquishment "in any area served by more than one" ETC,[165] the CPUC determined categorically that AT&T may not relinquish based on any mobile wireless alternative ETC.[166] In this regard, the CPUC also determined that AT&T cannot rely on wireless coverage maps.[167] Instead, the CPUC determined that AT&T must prove "indoor[]" signal strength "at the individual customer level" for hundreds of thousands of residential customers—a standard no ETC could practically meet.[168] That evidentiary standard, if applied to the COLR context, would likewise make it practically impossible for COLRs to retire POTS in favor of mobile wireless.

Just as problematically, even if the CPUC somehow ultimately allowed AT&T to provide non-POTS "basic service," AT&T would still have to play "mother-may-I" in order to discontinue POTS in favor of superior alternatives, like mobile wireless or AP-A. As described above, AT&T would need to create new state tariffs for these services and have the CPUC sign off on (and thus regulate) the terms, conditions, and rates of those services.[169] To be able to use mobile service in particular, AT&T also would need to convince the CPUC that it can use mobile

---

[164] *See Decision Denying in Part Pac. Bell Tel. Co. d/b/a AT&T Cal.'s Application To Relinquish Eligible Telecomms. Carrier Designation*, D.25-12-004, 2025 Cal. PUC LEXIS 579, at *32, *64–65 (Dec. 5, 2025) ("*CPUC ETC Denial*"). AT&T discusses the errors pervading the CPUC's ETC denial in greater detail in its Forbearance Petition.

[165] 47 U.S.C. § 214(e)(4).

[166] *See CPUC ETC Denial*, 2025 Cal. PUC LEXIS 579, at *31, *50–54, *64–72.

[167] *See id.* at *40–48, *59–67.

[168] *Id.* at *2, *22, *61 (citation omitted).

[169] *See supra* Part I.A.2.

Exhibit K

285

service to provide basic service notwithstanding that the CPUC has not issued service-quality regulations for mobile service.[170]

Again, federal law does not permit the CPUC to delay discontinuance or add its own substantive requirements for doing so. Under section 214(c), once the Commission grants discontinuance, AT&T "may, without securing approval other than [federal discontinuance], . . . proceed with the . . . discontinuance." By its plain terms, that language means that, with the Commission's approval, AT&T may discontinue POTS without securing CPUC approval.[171] The Commission's grant of discontinuance authorizes AT&T to discontinue upon satisfying the Commission's conditions—and no others. As the Supreme Court has explained, California "may not enforce . . . requirements . . . which impose upon the performance of activity sanctioned by federal [law] additional conditions not contemplated by Congress."[172] So if the Commission's approval "is unqualified, then, by virtue of the Supremacy Clause, [California] may not deny to those failing to meet its own qualifications the right to perform the functions within the scope of the federal authority."[173] Yet in allowing AT&T to discontinue POTS only on the condition that AT&T offers a state-approved substitute service, that is precisely what California is doing.

Experience shows that the need to secure the CPUC's affirmative "approval" here is highly problematic. Given the CPUC's history, obtaining the necessary approvals would, at a minimum, be costly and burdensome. AT&T would need to endure contested regulatory

---

[170] *See supra* note 35. It is thus also unclear whether the CPUC would view AP-A as having established service quality metrics or new metrics would need to be developed given its reliance on AT&T's mobile network. *See supra* note 24.

[171] *See Cablevision of Tex.*, 993 F.2d at 210 ("[T]he statute clearly provides that the carrier may proceed in compliance with the [discontinuance] certificate once it is issued.").

[172] *Sperry v. Florida*, 373 U.S. 379, 385 (1963) (citation omitted).

[173] *Id.*; *see Haywood v. Drown*, 556 U.S. 729, 737 (2009) (explaining that states may not place conditions on federal rights).

Exhibit K
286

proceedings to relitigate what the Commission will have already concluded: that adequate replacement services exist for AT&T's existing POTS customers in the Affected Service Area. At best, this would take years, with no certainty that the CPUC would ultimately allow AT&T to discontinue POTS or what conditions would be attached.

By mandating that basic service include POTS-specific elements, requiring AT&T to obtain CPUC approval before providing basic service over modern networks, and signaling an unwillingness to allow AT&T to provide basic service over wireless, California has made clear that its COLR regime places additional conditions on AT&T's ability to discontinue POTS over and above approval from the Commission under section 214(a). Under section 214(c) and basic preemption principles, that is unlawful.

<div align="center">

**2.      The CPUC's Requirements Are Preempted Because the CPUC Seeks To Regulate Interstate Services Contrary to Federal Policy**

</div>

The Commission also should find that the CPUC's supposedly "technologically neutral" COLR regime is independently preempted because it attempts to bootstrap the CPUC's limited authority over purely intrastate service into sweeping authority to regulate the core terms and rates of interstate services. Unlike POTS, modern services like wireless and VoIP are not offered with a segregable intrastate component that could be subject to state jurisdiction. They are jurisdictionally mixed offerings that draw no technological or economic distinction between communications where the participants are in the same state or different states. Indeed, as noted, the CPUC expressly requires COLRs to provide the ability of customers to make calls of "all distances."[174] AT&T thus cannot fulfill its COLR obligations through a service other than POTS without subjecting an interstate service to state regulatory authority.

---

[174] *2012 CPUC COLR Order*, 2012 Cal. PUC LEXIS 597, app. A, I.1, at *89.

<div align="center">

40

</div>

<div align="right">

Exhibit K

287

</div>

In the *Network Modernization Order*, however, the Commission "stress[ed] that states lack authority to regulate interstate services."[175] California cannot leverage its historical authority to regulate the then-separable, intrastate aspects of POTS into authority—which federal law denies it—over all-distance IP-based services. Nor can it mandate that AT&T spend to develop a new service that includes a separate intrastate-only component "merely to provide [the CPUC] with an intrastate communication [it] can regulate."[176] This problem is particularly acute for mobile wireless services—section 332(c)(3) of the Communications Act expressly strips the CPUC of "any authority to regulate the entry of or the rates charged" by mobile wireless carriers, including through tariffs.[177]

The Commission should expressly confirm and declare that state "basic service" regulation of jurisdictionally mixed, all-distance wireless and VoIP service is itself preempted. Having "emphasize[d] that states lack authority to regulate interstate services," the Commission should confirm that that principle precludes California from conditioning a COLR's discontinuance of POTS on the COLR's agreement to subject replacement interstate services to the CPUC's regulatory authority.[178] Indeed, Congress has occupied the field of interstate communications for more than a century.[179] But even if California somehow had authority to

---

[175] *Network Modernization Order* ¶ 114.

[176] *Minn. Pub. Utils. Comm'n*, 483 F.3d at 578.

[177] 47 U.S.C. § 332(c)(3).

[178] *See Network Modernization Order* ¶ 114.

[179] Congress first occupied the field of interstate communications in 1910, when it brought "under federal control the interstate business of telegraph companies" and thereby "excluded state action"—including a state effort to enact a telegraph neutrality statute. *Postal Tel.-Cable Co. v. Warren-Godwin Lumber Co.*, 251 U.S. 27, 31 (1919); *see W. Union Tel. Co. v. Boegli*, 251 U.S. 315, 316–17 (1920) (explaining that the 1910 Act prohibited "the continuance of state power" over that interstate service). The Communications Act carried forward that "intent . . . to occupy the field to the exclusion of state law." *Ivy Broad. Co. v. Am. Tel. & Tel. Co.*, 391 F.2d 486, 490–91 (2d Cir. 1968); *see O'Brien v. W. Union Tel. Co.*, 113 F.2d 539, 541 (1st Cir. 1940)

Exhibit K

288

regulate interstate services in the absence of a conflict with federal regulation, the Commission should expressly declare that the CPUC's supposedly "technologically neutral" approach "prevent[s] or frustrate[s] the accomplishment of a federal objective" and is preempted for that reason as well.[180]

The conflict is particularly stark in the context of tariffing. As noted, the CPUC would require a COLR to tariff replacement interstate wireless and VoIP residential services and subject them to state public utility regulation.[181] But the Commission has imposed mandatory detariffing of competitive interstate services precisely to avoid such regulation[182]—and has preempted "tariffing" requirements as "directly conflict[ing] with our pro-competitive deregulatory rules and policies."[183] The Commission has found:

> a regime without nondominant interexchange carrier tariffs for interstate, domestic, interexchange services is the most pro-competitive, deregulatory

---

(same). Congress's intent to occupy the field is reflected in 47 U.S.C. § 152, which in subsection (a) grants the Commission "comprehensive authority" to "regulate all aspects of interstate communication by wire or radio." *Cap. Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 700 (1984); *see La. Pub. Serv. Comm'n*, 476 U.S. at 360 (describing § 152(a) as giving the FCC "plenary authority" over interstate service).

[180] *Network Modernization Order* ¶ 114.

[181] *See supra* Part I.A.2.

[182] *See, e.g.*, *Policy and Rules Concerning the Interstate, Interexchange Marketplace, Implementation of Section 254(g) of the Communications Act of 1934, as Amended*, Second Report and Order, 11 FCC Rcd. 20730, ¶ 3 (1996) ("*Interexchange Detariffing Order*") ("order[ing] all nondominant interexchange carriers to cancel their tariffs for interstate, domestic, interexchange services"); *Implementation of Sections 3(n) and 332 of the Communications Act Regulatory Treatment of Mobile Services*, Second Report and Order, 9 FCC Rcd. 1411, ¶ 16 (1994) (forbearing "from imposing any tariff filing obligations upon CMRS providers"); *see also Vonage Holdings Co. Petition for Declaratory Ruling Concerning an Order of the Minnesota Public Utilities Commission*, Memorandum Opinion and Order, 19 FCC Rcd. 22404, ¶ 20 (2004) (explaining that Vonage's VoIP service, if classified as a telecommunications service, "would be considered a nondominant, competitive telecommunications provider for which the Commission has eliminated entry and tariff filing requirements") ("*Vonage Preemption Order*"), *aff'd*, *Minn. Pub. Utils. Comm'n*, 483 F.3d 570.

[183] *Vonage Preemption Order* ¶ 20 (preempting state tariffing requirements for VoIP service).

Exhibit K

289

system. Specifically, we find that not permitting nondominant interexchange carriers to file tariffs . . . will enhance competition among providers of such services, promote competitive market conditions, and achieve other objectives that are in the public interest, including . . . establishing market conditions that most closely resemble an unregulated environment.[184]

In this regard, the Commission emphasized that "tariff filings by nondominant interexchange carriers for interstate, domestic, interexchange services may facilitate, rather than deter, price coordination, because under a tariffing regime, all rate and service information is collected in one, central location."[185] In addition, the Commission found that tariffing "(1) remov[es] incentives for competitive price discounting; (2) reduc[es] or tak[es] away carriers' ability to make rapid, efficient responses to changes in demand and cost; (3) impos[es] costs on carriers that attempt to make new offerings; and (4) prevent[s] consumers from seeking out or obtaining service arrangements specifically tailored to their needs."[186] Indeed, the Commission's detariffing mandate creates a direct instance of impossibility preemption[187]—it is impossible for AT&T to satisfy its state-law obligation to provide tariffed basic service while still complying with federal law prohibiting tariffing.

### 3.   The COLR Requirements Compelling Business Service Are also Preempted

The CPUC's COLR regime would also negate a Commission decision approving discontinuance of AT&T's POTS with respect to business customers. To obtain discontinuance

---

[184] *Interexchange Detariffing Order* ¶ 52.

[185] *Id.* ¶ 23; *see id.* ¶¶ 37, 42, 53, 61.

[186] *Id.* ¶ 53; *see id.* ¶¶ 54–55, 60.

[187] *See Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 486–87 (2013) ("When federal law forbids an action required by state law, the state law is without effect." (cleaned up)); *Cap. Cities Cable*, 467 U.S. at 706 (holding state law preempted where it "compels conduct that federal law forbids").

Exhibit K
290

approval, AT&T need only show that its *existing* business customers can receive AP-A service, and once discontinuance is granted, AT&T would be free to cease offering POTS.

But the CPUC would impose additional conditions on that grant. As noted, the CPUC's COLR rules require AT&T to provide voice service to *any* business customer in its territory, including in the Affected Service Area.[188] And, as such, it would effectively require AT&T to maintain its POTS network in many wire centers where it is not able to use AP-A to serve *every location* in the wire center, as the COLR rule requires. This requirement clearly imposes an additional condition—indeed, an enormously burdensome one—on the Commission's conclusive grant of discontinuance.

Further, even as to those wire centers where it has complete AP-A coverage, there is still a barrier. As discussed above, given the CPUC's hostility to wireless service, it is highly unlikely that the CPUC would agree that AT&T could satisfy its COLR obligation to serve all locations using AP-A. AT&T accordingly would need to maintain its POTS network to satisfy the CPUC that it can "serve all customers upon request."[189]

### D.    California's Tariffing And Other Regulatory Requirements Independently Impede AT&T From Discontinuing POTS

In addition to its COLR rules, the CPUC also enforces additional tariffing and other regulatory requirements that would independently prevent AT&T California from discontinuing POTS on the terms set by the Commission. Those state requirements, too, are preempted.

*First*, California law precludes detariffing of basic service. As noted, COLRs are required to tariff their basic service, and AT&T has done so.[190] Eliminating any basic-service element in

---

[188] *See 2012 CPUC COLR Order*, 2012 Cal. PUC LEXIS 597, app. C at *99.

[189] *Id.*

[190] *See supra* Part I.A.2.

AT&T's tariff would require prior CPUC approval.[191] Although the CPUC otherwise has authority to exempt competitive offerings from tariff regulation, the relevant California statute expressly excludes basic exchange services from the class of services the CPUC may detariff.[192] Under state law, therefore, AT&T would not only be required to "secur[e] approval" from the CPUC despite the Commission's permission to discontinue POTS—in direct contravention of section 214(c) and the Commission's approval of AT&T's Discontinuance Applications—but also would have no possibility of actually securing that approval.[193]

*Second*, even apart from tariffing, California law requires CPUC approval to discontinue basic service under its "*General Order*" industry rules.[194] Obtaining this approval would necessitate a formal CPUC proceeding, along with separate notice obligations beyond those required by the Commission's rules governing service changes and customer transitions.[195] Again, such proceedings are lengthy and contested. The CPUC would have no obligation to decide AT&T's application on a timely basis—while the CPUC is nominally subject to an 18-

---

[191] *See* Cal. Pub. Util. Code §§ 489, 491, 495.7.

[192] *See id.* § 495.7(b) (allowing the CPUC "partially or completely" to "exempt certain telecommunications services, *except basic exchange service offered by telephone or telegraph corporations*, from the tariffing requirements of Sections 454, 489, 491, and 495" if a statutory condition is met (emphasis added)); *Decision Establishing Regul. Framework for Tel. Corps. Providing Interconnected Voice over Internet Protocol Serv.*, D.24-11-003, 2024 Cal. PUC LEXIS 623, *102–106 (Nov. 7, 2024)(discussing tariffing requirements of Public Utility Code).

[193] And so long as AT&T retains an obligation to offer basic service, it also has an obligation to participate in the California LifeLine program. *See* Cal. Pub. Util. Code § 876; *2012 CPUC COLR Order*, 2012 Cal. PUC LEXIS 597 app. A, pt. I.4(d), at *93; Cal. Pub. Utils. Comm'n, *General Order 153-A* § 3.2; *see also id.* § 1.3 ("Participation in California LifeLine by Non-Traditional Providers (wireless, VoIP, Internet Service Providers, etc.) is optional.").

[194] *General Order 96-B* (Telecommunications Industry Rules 3.3 & 7.4). The CPUC would also require formal proceedings in order for AT&T to withdraw its wholesale POTS tariff. *Id.*

[195] *Id.* (Telecommunications Industry Rules 3, 3.2, 5, 7.4 & 8.5).

Exhibit K

292

month deadline to decide applications, it routinely extends that deadline.[196] And ultimately, the CPUC could simply deny relief. AT&T's experience confirms that these concerns are not hypothetical: the CPUC took nearly 15 months to adjudicate AT&T's COLR and tariff relinquishment application—only to grant a motion to dismiss that had been filed shortly after the application was filed.[197]

Finally, even though it would continue to offer AP-A, AT&T would have to comply with the CPUC's Mass Migration Guidelines, which impose yet further CPUC application and customer-notice requirements when discontinuing service.[198] These "guidelines" require that, to withdraw from providing local voice service (like POTS) to customers, a provider must file a formal application and submit a 19-point "Exit Plan"—and must continue to offer existing service until the CPUC approves these submissions.[199]

The cumulative effect of these requirements is to give the CPUC a practical veto over AT&T's discontinuance of POTS. To discontinue service in the Affected Service Area, California law requires AT&T to navigate a gauntlet of sequential state proceedings, each with its own timeline, each requiring separate CPUC approval, and none of which the CPUC is obligated to resolve promptly, favorably, or even on the merits. All of these barriers constitute "additional conditions on the Commission's authorization of discontinuance" that the *Network*

---

[196] *See* Cal. Pub. Util. Code § 1701.5 (setting the deadline and permitting extensions).

[197] *See supra* note 60.

[198] *See General Order 96-B* (Telecommunications Industry Rule 8.5).

[199] Cal. Pub. Utils. Comm'n, *Mass Migration Guidelines* (2010), https://docs.cpuc.ca.gov/word_pdf/FINAL_DECISION/121590.pdf. Further, as these guidelines contemplate discontinuance by "competitive local exchange carriers," it is possible the CPUC would require different and more burdensome requirements for discontinuance of POTS by AT&T as an incumbent local exchange carrier.

46

Exhibit K

293

*Modernization Order* recognizes are inconsistent with section 214.[200] Accordingly, the Commission should declare these and any other requirements preempted to the extent they condition, delay, or otherwise impede AT&T's ability to proceed with discontinuance upon receipt of the Commission's approval.

* * *

There is no justifiable basis for California to retain its COLR rules and other regulatory barriers to network modernization. They force AT&T to keep in place a largely empty copper network that is less reliable, less energy-efficient, and more expensive than modern networks. None of AT&T's many rivals in California must shoulder this burden. Compelling AT&T alone to offer POTS not only tilts the competitive playing field, but is no longer necessary to ensure that Californians have universal access to voice service. Consumers have overwhelmingly abandoned legacy voice services in favor of reliable, cost-effective, superior alternatives provided over modern IP-based networks. Californians can now choose from among numerous carriers providing competitive voice offerings over cable, fiber, fixed wireless, and satellite technologies.[201] None of AT&T's existing POTS customers will be left behind as a result of granting this Petition, as every Affected Customer in the Affected Service Area has access to an adequate replacement for POTS. On the other side of the ledger, granting this Petition will fulfill the promise the Commission made in the *Network Modernization Order* to cut through the "red tape" that prevents "invest[ment] in the modern infrastructure that Americans want and deserve."[202]

---

[200] *Network Modernization Order* ¶ 112.

[201] *See id.* ¶ 9.

[202] *Id.* ¶ 1.

47

Exhibit K

294

## CONCLUSION

For the foregoing reasons, the Commission should declare that its approval of AT&T's Discontinuance Applications preempts the CPUC's COLR rules, tariffing requirements, General Orders, Mass Migration Guidelines, LifeLine participation rules, and any other state requirements to the extent they impede AT&T from fully discontinuing POTS to existing customers in the Affected Service Area, such that AT&T may proceed with discontinuance without securing *any* additional state authorization.


Respectfully Submitted,


|  | /s/ C. Frederick Beckner III |
|---|---|
| BRETT FARLEY | C. FREDERICK BECKNER III |
| CHRISTOPHER HEIMANN | MAUREEN R. JEFFREYS |
| DAVID CHORZEMPA | WILLIAM C. PERDUE |
| DAVID LAWSON | ARNOLD PORTER KAYE SCHOLER LLP |
| AT&T SERVICES, INC. | 601 Massachusetts Ave. N.W. |
| 601 New Jersey Ave. N.W., Ste. 650 | Washington, DC 20001-3743 |
| Washington, DC 20001-3051 |  |

*Counsel for AT&T Services, Inc.*

May 20, 2026

48

Exhibit K

295

# Exhibit 1

## DECLARATION OF DR. HANY FAHMY

I, Hany Fahmy, declare as follows:

## I.      QUALIFICATIONS AND BACKGROUND

1.      I am an Assistant Vice President of AT&T Services, Inc. in the areas of Technology Policy and Regulatory. I have worked for AT&T since 1998, including 17 years in AT&T Bell Labs. I have extensive technical experience in wireless and wireline telecommunications and data networks, including all aspects of service, technology, and regulatory development. Prior to joining AT&T, I was a Research Staff Member with Racal DataComm USA, a manufacturer of modems, data communications, and networking equipment. I hold a Ph.D. in Electric and Computer Engineering from the University of Miami and an M.B.A. in Data Analytics from Georgia State University.

## II.     PURPOSE AND SUMMARY

2.      The purpose of this declaration is to describe the architecture of the converged network platform that AT&T California uses to provides plain old telephone service ("POTS") and show that the facilities and elements in the network that AT&T California uses to provide FCC-regulated voice service are the same facilities and elements that AT&T California uses to provide state-regulated voice service.[1] The declaration demonstrates that AT&T California cannot decommission the FCC-regulated facilities on its POTS network without also ending its provision of state-regulated service. As such, unless AT&T California can discontinue fully its POTS network, AT&T California will not free up resources that can be used to support innovation and

---

[1] Pacific Bell Telephone Company d/b/a AT&T California owns and operates AT&T's POTS network in California.

1

Exhibit K
297

investment in modern, IP-based broadband networks that support the services that consumers now demand.

### III.    POTS NETWORK ARCHITECTURE

3.    The network that AT&T California uses to provide POTS today is similar to the one its predecessors used in the days of Alexander Graham Bell. A pair of copper wires runs from the customer's premises to a switch – this connection is sometimes called the "local loop," as the pair of copper wires form a loop (also known as a "circuit") between the customer's premises and the switch. The customer speaks into the telephone, which converts the customer's voice into an analog electrical current, which mirrors the frequency and amplitude of the customer's voice. One of the copper wires transmits that analog electric current from the customer's premises to the switch, and the other copper wire transmits the analog electric current from the switch to the customer's premises. To provide service, the customer's line is always powered. When the customer wants to make a telephone call, the switch creates a connection between the customer's pair of copper wires and the pair of copper wires of the person that the customer is calling. The result is a continuous circuit between the two parties to the telephone call.

4.    To be sure, there have been some notable updates to the POTS network over the last century and a half. For example, switching was originally done manually, with a switchboard operator connecting calls with a pair of phone plugs. Today, by contrast, switching is done automatically. Most significantly, however, is the ability to make calls between customers on different switches, and the use of a network architecture with multiple switches to accommodate this.

5.    In today's POTS network, the first switch after a customer's premises is a "Class-5 switch" or a "local circuit switch." If the customer and the person the customer is calling are on

Exhibit K
298

the same Class-5 switch, then the Class-5 switch connects the two. If not, the Class-5 switch sends the call over lines called "trunks" to a "Class-4 switch" or the "Tandem switch." If the call is going to a nearby Class-5 switch (more specifically, if the call stays within a "Local Access and Transport Area" or "LATA"), the Class-4 switch will route the call there. If the call is going farther afield (more specifically, outside the LATA), the Class-4 switch will hand the call over to the switch of the long distance telephone company at the long distance telephone company's "point-of-presence" or "POP," which is typically located adjacent to or near the Class-4 switch.[2] The long distance telephone company carries the call from its POP at the Class-4 switch of the person calling to its POP at the Class-4 switch of the person being called. The local telephone company of the person being called then carries the call from the Class-4 switch to the Class-5 switch and from the Class-5 switch on to the person's premises over the local loop.

## IV.    THE LEGACY SERVICES PROVIDED OVER THE POTS NETWORK

6.    AT&T California provides both "exchange access" and "telephone exchange service." The same POTS facilities (i.e., the local loop, the Class-4 and Class-5 switches, the trunks that connect the switches, and the supporting systems) are jointly used to provide both services. There are not separate POTS facilities for exchange access and telephone exchange service.

7.    Exchange access provides customers with the ability to make and receive long distance (interLATA) calls, which are frequently interstate. Exchange access is the connection between the customer's premises and the long distance telephone company's POP over the local loop via the Class-5 switch and the Class-4 switch. Without this connection, the customer would have no ability to place or receive long distance telephone calls, as long distance telephone

---

[2] While historically the long distance and local telephone companies may have been separate, as noted below, the marketplace has shifted to "all distance" service offered by a single company.

3

companies do not have networks that run all the way to customers' premises. When the customer places a long distance call, AT&T California carries the call from the customer's premises to the Class-5 switch over the local loop, then on to the Class-4 switch, where AT&T California hands over the call to the long distance carrier's switch at the long distance carrier's POP. The same is true in reverse when a customer of AT&T California receives a long distance call – AT&T California picks up the call at the long distance carrier's switch at the long-distance carrier's POP, where it goes to the Class-4 switch, then the Class-5 switch, and on to the customer's premises via the local loop. When a long distance call crosses state lines, the exchange access that provides the connection between the long distance carrier's POP and the customer's premises is treated as an interstate service subject to FCC regulation.[3]

8.      Telephone exchange service is a local voice service within an exchange or connected system of exchanges (intraLATA) and typically wholly intrastate. The customer places a call, which travels over the local loop to the Class-5 switch. If the called party is on the same Class-5 switch, the call is routed directly by the same Class-5 switch to the called party. If not, the call goes to the Class-4 switch, which then sends the call to the Class-5 switch of the called party, and then on from there over the local loop to the called party. These facilities and elements that provide telephone exchange service are the same facilities and elements that provide exchange access. Historically, telephone exchange service has been considered an intrastate service subject to state regulation, unlike exchange access, which is subject to FCC regulation when the associated long distance call is interstate.[4]

---

[3] The foregoing describes the historical paradigm. AT&T's voice competitors today offer "all-distance" services using IP-based networks that merge the functions of historically distinct interstate and intrastate services/networks.

[4] I understand that the California Public Utilities Commission requires AT&T California to offer "Residential Basic Telephone Service," which is also called "basic service." I also understand that telephone exchange service is one of the elements of basic service.

4

9.      While AT&T California's POTS network provides two services that may have been distinct for cost recovery and ratemaking purposes (exchange access and telephone exchange service), the facilities and elements are the same (the local loop, the switches, the connecting trunks, and the supporting systems). There are not separate local loops, separate switches, separate connecting trunks, or separate supporting systems for exchange access and telephone exchange service. The same POTS facilities are used for both exchange access and telephone exchange service, regardless of whether someone is calling the person next door or a person across the country or even around the world.

## V.      INSEPARABILITY OF JURISDICTIONALLY-MIXED POTS SERVICES FOR NETWORK RETIREMENT

10.      The POTS network provides a "jurisdictionally mixed service." In other words, some of the services that the POTS network provides (e.g., interstate exchange access) are subject to federal regulation, and some of the services that the POTS network provides (e.g., local, and typically intrastate, telephone exchange services) are generally subject to state regulation. I understand that there are complicated rules about how much of the costs can be recovered from the different services. Similarly, I understand that the FCC has regulatory authority over interstate exchange access, while state commissions have regulatory authority over some aspects of telephone exchange service to the extent the end points of a call are in the same state.

11.      While the federal government and the state governments historically shared jurisdiction over the POTS network for certain purposes such as some types of retail rate regulation, this is not possible for purposes of network retirement. That shared jurisdiction for rate regulation could be achieved with accounting and other economic conventions, but those types of conceptual approaches do not apply to actual operation of loops, switches, connecting trunks, and supporting systems that are jointly used for all types of calls. Of course, most states and the

5

Exhibit K

301

Commission have abandoned rate regulation in most circumstances, given the competitive marketplace.

12.     Either the POTS network remains up and running, or it does not. AT&T California cannot retire a portion of the local loop, or a portion of a switch, or a portion of a connecting trunk, or a portion of the supporting systems. AT&T California cannot cease offering long distance service and decommission its facilities provisioning long distance service without also decommissioning its facilities that provide intrastate service – these facilities are one and the same. Thus, either AT&T California continues to spend around $1 billion a year keeping its POTS network in California running or AT&T California does not. There is no option for a partial retirement of just the interstate long-distance part of the POTS network. And if AT&T California cannot retire its loops, switches, connecting trunks, and supporting systems, AT&T California will not be able to achieve savings that can be used for the modern, IP-based broadband networks and services that consumers prefer.

13.     In this regard, as noted, AT&T California's competitors typically offer "all distance" services. Consumers value these services because they allow the consumer to make domestic calls of any distance without incurring additional charges. Thus, even if AT&T California sought to cease providing only the interstate component of its POTS while leaving in place telephone exchange service, consumers would view the resulting "intrastate-only" version of POTS as an even more inferior service than it is today. Unlike subscribers to all of the available voice services using modern networks, POTS subscribers in California would have no ability to make or receive calls that cross the state's border. This would only exacerbate the economic impact of having to maintain the POTS network.

Exhibit K
302

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 18, 2026.

_____
Hany Fahmy

Exhibit K

303

## <u>CERTIFICATE OF SERVICE</u>

I, Martha Flaherty, certify that on May 20, 2026, will cause a copy of the foregoing

Petition by U.S. Mail postage prepaid to be served on the addresses below.

<div align="right">

/s/ Martha Flaherty
Martha Flaherty

</div>

:

President John Reynolds

Commissioner Darcie L. Houck
Commissioner Karen Douglas
Commissioner Matthew Baker
Commissioner Christine Harada

Christine Jun Hammond
General Counsel – Legal Division

Christofer C. Nolan
Assistant General Counsel, Federal Advisory
Section – Legal Division

California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102

Rob Bonta
Attorney General
Office of the Attorney General
State of California Department of Justice
1300 "I" Street
Sacramento, CA 95814-2919

<div align="right">

Exhibit K
304

</div>

# EXHIBIT L

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| Petition of AT&T for ) | Docket No. _____ |
| Forbearance Under 47 U.S.C. § 160(c) ) | |
| from Requirements Imposed on ) | |
| Eligible Telecommunications Carriers ) | |
| by 47 U.S.C. § 214(e) ) | |
| ) | |

## PETITION OF AT&T
## FOR FORBEARANCE UNDER 47 U.S.C. § 160(c)

BRETT FARLEY                     C. FREDERICK BECKNER III
CHRISTOPHER HEIMANN              MAUREEN R. JEFFREYS
DAVID CHORZEMPA                  WILLIAM C. PERDUE
DAVID LAWSON                     ARNOLD PORTER KAYE SCHOLER LLP
AT&T SERVICES, INC.              601 Massachusetts Ave. N.W.
601 New Jersey Ave. N.W., Ste. 650   Washington, DC 20001-3743
Washington, DC 20001-3051

                                 *Counsel for AT&T Services, Inc.*

May 20, 2026

Exhibit L

306

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................... 1

II.     BACKGROUND ................................................................................................ 7

   A.   Statutory Framework Governing ETCs ........................................................... 7

   B.   The FCC's USF Reforms And Section 214(e) Forbearance Orders................. 10

   C.   AT&T's ETC Designation In California ......................................................... 16

   D.   The *Network Modernization Order* And AT&T's Related Filings ................. 20

III.    CONSUMERS HAVE NUMEROUS ALTERNATIVES TO POTS IN AT&T'S
        CALIFORNIA SERVICE TERRITORY ........................................................... 23

IV.     THE PETITION SATISFIES THE STANDARD FOR FORBEARANCE.................... 26

   A.   Forbearance From AT&T's General Voice Obligation Is Warranted .............. 27

       1.   Census Blocks That Already Qualify Under the *2014 CAF Order* ............. 27

       2.   Census Blocks with No Serviceable Locations ........................................... 29

       3.   Other Census Blocks with Near-Ubiquitous Fixed and Mobile Broadband Service.... 30

   B.   Forbearance From AT&T's Lifeline Voice Obligation Is Warranted .............. 34

       1.   Sierra and Trinity Counties........................................................................ 34

       2.   Existing Customers ..................................................................................... 38

       3.   Permanent Forbearance............................................................................... 40

V.      CONCLUSION.................................................................................................. 43

Exhibit L
307

## I.    INTRODUCTION

This Petition complements other contemporaneous filings AT&T[1] is making to realize the Commission's vision of accelerating the nation's transition from legacy copper networks to modern IP-based infrastructure. As contemplated in the recent *Network Modernization Order*,[2] AT&T is filing two applications under 47 U.S.C. § 214(a) to discontinue, respectively, residential and business "plain old telephone service" ("POTS") in certain wire centers in California where consumers have access to superior alternative service. AT&T also is filing a petition to determine that the Commission's grant of discontinuance preempts certain California rules and procedural requirements that would impede AT&T's ability to discontinue POTS and retire the associated infrastructure. In this Petition, AT&T seeks forbearance under 47 U.S.C. § 160 from its remaining obligations as an eligible telecommunications carrier ("ETC") under 47 U.S.C. § 214(e), which likewise threaten to impede AT&T from modernizing its network in California. As explained below, AT&T amply satisfies the statutory forbearance criteria, as it seeks relief based on a modest extension of prior Commission forbearance from section 214(e).

ETC is a regulatory status established in the Telecommunications Act of 1996 as part of an effort to spur local competition while promoting universal service. Recognizing that competition would undermine prior universal service regimes, which relied on monopolists' ability to cross-subsidize service in high-cost areas, Congress required federal and state universal service policies to be explicit and competitively neutral. As relevant here, Congress directed the Commission to maintain a universal service fund, from which ETCs could receive support in

---

[1] AT&T Services, Inc., files this Petition, pursuant to 47 C.F.R. § 1.2, on behalf of its affiliate Pacific Bell Telephone Company d/b/a AT&T California.

[2] *Reducing Barriers to Network Improvements and Service Changes*, WC Dkt. No. 25-209, Report and Order, FCC 26-19 (Mar. 27, 2026) ("*Network Modernization Order*").

Exhibit L
308

exchange for offering and advertising supported services throughout their designated areas. Under this regime, ETC designation is generally voluntary. Carriers are entitled to be designated as ETCs if they demonstrate the requisite capability and commitment to provide service, and are entitled to relinquish their designations if another ETC has been designated to serve their areas. Although the standards for ETC designation are spelled out in federal law and overseen by the Commission, the statute delegates authority over ETC designations and relinquishments thereof to state public utilities commissions.

Following the 1996 Act, incumbent local exchange carriers ("ILECs") like AT&T were designated as ETCs. As such, ILECs were obligated to offer voice telephony service throughout their service territories and, in return, were eligible to receive federal "high-cost" support. ILECs also were obligated to offer Lifeline voice service to eligible low-income households throughout their service territories and, in return, received reimbursement for that Lifeline benefit.

As local competition developed and demand for broadband grew, however, the Commission reformed these ETC obligations. In the *2011 ICC/USF Transformation Order*, the Commission overhauled the high-cost program to transition support from voice service to broadband.[3] The Commission then issued two significant forbearance orders reflecting this reform and the competitive marketplace. *First*, in its *2014 CAF Order*, the Commission granted forbearance from the general voice telephony obligation in census blocks that either are low-cost or have certain alternatives available.[4] The Commission reasoned that this forbearance would relieve carriers from having "to spend their resources on maintaining existing voice telephony

---

[3] *Connect America Fund*, Report and Order and FNPRM, 26 FCC Rcd. 17663, ¶¶ 17–25 (2011) ("*2011 ICC/USF Transformation Order*").

[4] *Connect America Fund*, Report and Order, 29 FCC Rcd. 15644, ¶ 51 (2014) ("*2014 CAF Order*").

Exhibit L
309

services . . . where there are already reasonable substitutes," enabling them to "reallocate their resources towards making upgrades to their networks to meet the broadband needs of their existing or new customers."[5] *Second*, in its *2016 Lifeline Order*, the Commission granted conditional forbearance from the obligation to offer Lifeline voice service to new customers in counties meeting certain competitive criteria.[6] The Commission again reasoned that this forbearance would "create additional incentives for providers to promote the deployment and availability of broadband networks and services."[7]

Most recently, in the *Network Modernization Order*, the Commission implemented needed reforms to cut "red tape that has both required providers to keep aging copper lines in place and effectively prevented them from investing in the modern infrastructure that Americans want and deserve."[8] The Commission streamlined its rules to accelerate "technology transitions discontinuance applications" and "grant[ed] blanket section 214(a) authority for carriers to grandfather legacy voice services."[9] The Commission also invited carriers "to seek a determination from the Commission that [a] state requirement is preempted" if the Commission "has authorized a carrier to discontinue legacy voice service and any state requirement conflicts with that authorization."[10] At the same time, the Commission recognized that ETC designations

---

[5] *Id.* ¶ 65.

[6] *Lifeline and Link Up Reform and Modernization*, Third Report and Order, Further Report and Order, and Order on Reconsideration, 31 FCC Rcd. 3962, ¶¶ 34–35 (2016) ("*2016 Lifeline Order*").

[7] *Id.* ¶ 336.

[8] *Network Modernization Order* ¶ 1.

[9] *Id.* ¶ 6.

[10] *Id.* ¶ 115.

Exhibit L
310

could impede the goals of the Commission's discontinuance and preemption determinations by requiring a carrier to offer services the Commission authorized it to discontinue.[11]

AT&T attempted to forestall any conflict between its residual ETC obligations and its network modernization efforts in 2023 by filing an application with the California Public Utilities Commission ("CPUC") to relinquish AT&T's ETC designation throughout its California service territory.[12] Granting AT&T's application should have been straightforward, as it has been in many other states where AT&T entities have successfully relinquished their ETC designations. AT&T has not received any high-cost support in California since 2021, and AT&T demonstrated that there was at least one alternative ETC (and typically multiple alternative ETCs) designated to serve every wire center and census block in its California service territory.[13] AT&T's application thus amply satisfied the statute, which provides that the CPUC "shall permit [AT&T] to relinquish its designation as [an ETC] in any area served by more than one [ETC]."[14] Reinforcing that language, the Commission has admonished that state commissions may not erect "additional hurdles" or "exit barriers" for carriers seeking to shed their ETC designations.[15]

---

[11] *See id.* ¶ 99.

[12] *See Application of Pac. Bell Tel. Co. d/b/a AT&T Cal. (U 1001 C) To Relinquish Its Eligible Telecomms. Carrier Designation*, A.23-03-002, at 1–3 (C.P.U.C. filed Mar. 3, 2023), https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M502/K987/502987683.PDF ("AT&T ETC Application").

[13] *See id.* at 5–7 & attach. A.

[14] 47 U.S.C. § 214(e)(4).

[15] *Network Modernization Order* ¶ 104; *Federal-State Joint Board on Universal Service*, Report and Order, 12 FCC Rcd. 8776, ¶ 143 (1997) ("*1997 USF Order*").

Exhibit L
311

Yet that is precisely what the CPUC did. After lengthy, contested proceedings, the CPUC issued a decision effectively denying AT&T's application in full.[16] The CPUC did not dispute AT&T's showing that alternative ETCs have been designated throughout its service territory. Instead, the CPUC announced novel legal and evidentiary requirements that transform AT&T's ETC status in California from a largely voluntary federal funding condition into a compulsory mandate, untethered from the receipt of federal support or the availability of voice alternatives.

In adjudicating this Petition, the Commission need not directly review the CPUC's deeply flawed decision. Instead, AT&T seeks a modest extension of the forbearance the Commission already granted, which will give AT&T full forbearance from any residual ETC obligations within its California service territory. This relief will facilitate AT&T's discontinuance of POTS and retirement of the associated legacy copper infrastructure, notwithstanding the CPUC's erroneous denial of AT&T's relinquishment application.

The forbearance AT&T seeks falls easily within the Commission's authority. Under section 10(a) of the Communications Act, the Commission "shall forbear from applying" certain provisions, including section 214(e), if it determines that doing so is (1) not necessary to ensure that rates are just, reasonable, and nondiscriminatory; (2) not necessary to protect consumers; and (3) in the public interest.[17] AT&T seeks an extension of the previously granted forbearance as to AT&T's general voice and Lifeline voice obligations, which satisfy all three conditions.

As to the *general voice* obligation, it simply makes no sense to impose a general voice obligation on AT&T when it receives no high-cost support. And the Commission has already

---

[16] *Decision Denying in Part Pac. Bell Tel. Co. d/b/a AT&T Cal.'s Application To Relinquish Eligible Telecomms. Carrier Designation*, D.25-12-004, 2025 Cal. PUC LEXIS 579 (Dec. 5, 2025) ("*CPUC ETC Denial*").

[17] 47 U.S.C. § 160(a).

Exhibit L
312

granted forbearance substantially aligning that obligation with funding by eliminating it in approximately 94 percent of the census blocks within AT&T's California service territory.[18] But the existing forbearance is tied to *fixed* alternative service, even though consumers now overwhelmingly prefer mobile voice service and the Commission has recognized mobile wireless as an adequate replacement for POTS. Within the six percent of census blocks that do not already have forbearance, nearly all serviceable locations have access to at least one alternative provider of facilities-based fixed broadband or mobile voice service, and often several. Extending the existing forbearance to these census blocks will not create competitive problems or harm consumers, and it will serve the public interest by placing AT&T on equal regulatory footing with other carriers and allowing it to reallocate resources toward modernizing its network.

As to the *Lifeline* voice obligation, the Commission has already granted conditional forbearance with respect to new consumers in almost all of AT&T's service territory—all except Sierra and Trinity Counties. AT&T accordingly seeks to extend the existing forbearance to those counties, apply it to existing customers, and make it permanent rather than conditional. These extensions, too, meet the forbearance criteria. Most serviceable locations in Sierra and Trinity Counties have wireless coverage from AT&T, Verizon, and/or T-Mobile, and thus are served by the numerous ETCs that rely on those carriers' networks. Similarly, virtually all existing AT&T Lifeline customers in AT&T's full service territory have wireless coverage from AT&T, Verizon, and/or T-Mobile. And the Commission's discontinuance process serves as an additional

---

[18] *Price Cap Resources*, FCC, https://www.fcc.gov/general/price-cap-resources (last visited May 17, 2026). This Petition uses 2010 census blocks, as the Commission did when it last identified the census blocks not subject to forbearance. *See* FCC, *List of Census Blocks Subject to Federal High-Cost Voice Obligations (as of 1/13/23)*, https://www.fcc.gov/sites/default/files/pc_etc_voice_oblig_1_13_23.xlsx.

6                                                                    Exhibit L
                                                                          313

"backstop" against any customer losing service. These widespread alternatives reflect structural trends; there is no reasonable prospect that all alternative ETCs will exit the market.

The relief AT&T seeks in this Petition is incremental but necessary. In denying AT&T's relinquishment application, the CPUC not only flouted the clear terms of section 214(e)(4), but also threatened AT&T's ability to discontinue POTS. As an ETC, AT&T has a federal obligation to continue (1) to offer voice service in scattered areas representing six percent of census blocks in its service territory, (2) to offer Lifeline voice service to new customers in Sierra and Trinity Counties, and (3) to offer Lifeline voice service to existing Lifeline customers throughout its service territory. AT&T meets those obligations with POTS. And because AT&T operationalizes discontinuance of POTS on a wire-center basis, these residual ETC obligations restrict AT&T's ability to complete its network modernization in California. Full, permanent ETC forbearance thus is necessary to ensure the full realization of the Commission's network modernization goals.

## II.    BACKGROUND

### A.    Statutory Framework Governing ETCs

Congress enacted section 214(e) as part of the 1996 Act,[19] which sought to open local telephone markets to competition while preserving universal service.[20] Before 1996, universal service was promoted through a system of implicit cross-subsidies—ILECs operated as regulated monopolies, charging above-cost rates to low-cost (generally urban) customers and below-cost rates to high-cost (generally rural) customers.[21] But Congress recognized that competition would undermine this system by allowing new entrants to undercut the above-cost rates charged to low-

---

[19] Telecommunications Act of 1996, Pub. L. No. 104-104, § 102, 110 Stat. 56, 80–81.

[20] *See* 47 U.S.C. §§ 251–54.

[21] *See 1997 USF Order* ¶¶ 9–12.

Exhibit L
314

cost customers. Congress accordingly sought to decouple federal and state universal service subsidies from the monopoly market structure and make them explicit and competitively neutral.[22] To facilitate this goal, it created the federal Universal Service Fund ("USF"), which was intended to provide explicit support for universal service where market competition alone would not sustain it.[23]

Section 214(e) defines the class of carriers eligible to receive support from the USF—known as "eligible telecommunications carriers," or ETCs—and sets forth the obligations that accompany that status. In exchange for support, an ETC must "offer the services that are supported by Federal universal service support mechanisms" and "advertise the availability of such services" throughout its designated service area.[24] The Commission determines which services qualify and bears primary responsibility for administering the USF and section 214(e).[25] State commissions play a largely ministerial role with respect to ETCs subject to their jurisdiction: they define service areas, designate ETCs, and permit relinquishment, applying mandatory federal criteria established by Congress and implemented by the Commission.[26]

Section 214(e) establishes straightforward standards governing designation as an ETC and relinquishment of that designation. On the front end, a carrier may request ETC designation from a state commission, and the commission "shall" designate the carrier upon a showing of the

---

[22] *See* 47 U.S.C. § 254(d)–(f).

[23] *See id.* § 254(e).

[24] *Id.* § 214(e)(1)(A)–(B).

[25] *See id.* § 254(a), (c).

[26] *See id.* § 214(e)(2)–(5); *see also id.* § 214(e)(6) (assigning these responsibilities to the Commission as to carriers that, unlike AT&T in California, are not subject to the jurisdiction of a state commission).

Exhibit L
315

requisite capability and commitment to serve.[27] Multiple ETCs may be designated in a given area.[28] Designation is involuntary in only one narrow circumstance not at issue here: where "no common carrier will provide" supported services in a given area.[29]

On the back end, a state commission "shall permit [an ETC] to relinquish its designation . . . in any area served by more than one [ETC]," provided the ETC gives "advance notice."[30] A relinquishing ETC thus does not need to show anything beyond the designation of at least one other ETC in the area. As the Commission has explained, a relinquishing ETC "need only show in its advance notice . . . that the affected service area is 'served by more than one [ETC].' "[31] The statute separately directs the state commission to "require the remaining [ETCs] to ensure that all customers served by the relinquishing carrier will continue to be served" and gives those ETCs up to "one year" to construct or acquire any necessary facilities.[32] But that duty falls on the state commission and the remaining ETCs, not the relinquishing ETC.[33] The Commission has confirmed—and recently reiterated—that state commissions may not erect "additional hurdles" or "exit barriers" for relinquishing ETCs beyond what section 214(e) requires.[34]

The statute thus reflects Congress's recognition that ETC status is a generally voluntary bargain: carriers accept service conditions in exchange for federal support. They are free to enter

---

[27] *Id.* § 214(e)(2); *see Federal-State Joint Board on Universal Service*, Report and Order, 20 FCC Rcd. 6371, ¶ 20 (2005).

[28] 47 U.S.C. § 214(e)(2).

[29] *Id.* § 214(e)(3).

[30] *Id.* § 214(e)(4).

[31] *Network Modernization Order* ¶ 99.

[32] 47 U.S.C. § 214(e)(4).

[33] *See id.*

[34] *Network Modernization Order* ¶ 104; *1997 USF Order* ¶ 143.

Exhibit L
316

ETC status when it serves their interests and exit when it does not, so long as another ETC has been designated. Congress thus ensured that, as local competition eroded the monopoly-era assumptions underlying universal service mandates, ILECs and other carriers alike would have a clear pathway to shed ETC designations the market has rendered unnecessary.

### B.    The FCC's USF Reforms And Section 214(e) Forbearance Orders

Following the 1996 Act, state commissions designated ILECs as ETCs for their entire service territories.[35] ILECs thus received high-cost support to provide voice telephony service throughout their service territories, as well as reimbursement to provide Lifeline voice service to eligible low-income households.[36] But as alternative voice services became ubiquitous and technological advancements rendered incumbents' legacy copper networks increasingly obsolete, the Commission reformed these ETC obligations to promote broadband deployment.

Thus, in the *2011 ICC/USF Transformation Order*, the Commission overhauled the high-cost USF program, phasing out voice-focused support in favor of a new framework, under which ETCs could receive USF support to deploy broadband in unserved areas.[37] But the Commission quickly recognized that additional reforms were necessary. In light of the elimination of traditional high-cost voice support and the acceleration of local competition, legacy section 214(e) requirements no longer served their intended purpose. Accordingly, in two separate orders discussed immediately below, the Commission granted substantial, albeit incomplete, relief from section 214(e) in order to allow ILECs like AT&T to free up resources for broadband.

---

[35] *See 2016 Lifeline Order* ¶ 34.

[36] *See id*. The high-cost support discussed in this Petition is *federal* high-cost support, not any state-provided high-cost support.

[37] *See 2011 ICC/USF Transformation Order* ¶¶ 17–25.

10

Exhibit L

317

The **2014 CAF Order.** In 2014, USTelecom sought forbearance from ILECs' general voice telephony obligation under section 214(e) in areas where they were no longer receiving high-cost support.[38] USTelecom and other commenters supporting forbearance explained that voice service mandates were increasingly unnecessary in light of local competition.[39] They also emphasized that the scope of any section 214(e) obligations should align with the reduced scope of USF support resulting from the *2011 ICC/USF Transformation Order*.[40]

Granting forbearance, on the other hand, would promote competitive neutrality by placing these ILECs on equal regulatory footing with cable, wireless, and VoIP competitors that faced no equivalent voice service mandate.[41] Commenters further explained that the voice obligation drained resources from broadband investment by forcing ILECs to maintain "rapidly obsolescing facilities and services" rather than deploying next-generation networks.[42]

In its *2014 CAF Order*, the Commission granted substantial forbearance from the general telephony obligation. Specifically, the Commission granted forbearance in (1) low-cost census blocks, (2) census blocks served by an unsubsidized competitor offering voice and 10/1 Mbps

---

[38] *2014 CAF Order* ¶ 50 & n.111.

[39] *See, e.g.*, USTelecom Ex Parte Letter, WC Dkt. No. 10-90, attach. at 2–3, 15–17 (Mar. 14, 2014); Verizon Comments, WC Dkt. No. 10-90, at 2, 9–12 (Jan. 18, 2012); AT&T Comments, WC Dkt. No. 10-90, at 2–4, 25–26 (Aug. 8, 2014).

[40] *See, e.g.*, AT&T Comments, WC Dkt. No. 10-90, at 13 (Aug. 8, 2014) ("Now that the Commission has transformed the USF program and created the CAF to target funding to specific areas of need and to a single carrier willing to take on the obligations, it must also 'transform' its ETC rules to match the new vision."); *see also* Verizon Comments, WC Dkt. No. 10-90, at 3–7 (Jan. 18, 2012); Frontier Comments, WC Dkt. No. 10-90, at 9 (Jan. 18, 2012); Alaska Communications Systems Group Reply Comments, WC Dkt. No. 10-90, at 8–9 (Feb. 17, 2012); Windstream Comments, WC Dkt. No. 10-90, at 32–35 (Jan. 18, 2012).

[41] *2014 CAF Order* ¶ 66; *see also, e.g.*, Verizon Comments, WC Dkt. No. 10-90, at 5 (Jan. 18, 2012); Windstream Comments, WC Dkt. No. 10-90, at 34 (Jan. 18, 2012).

[42] Verizon Comments, WC Dkt. No. 10-90, at 2–3 (Jan. 18, 2012); *see also, e.g.*, USTelecom Ex Parte Letter, WC Dkt. No. 10-90, attach. at 3 (Mar. 14, 2014).

11

Exhibit L

318

broadband to all eligible locations, and (3) census blocks where another ETC is receiving high-cost support to deploy a modern network.[43] Notably, however, these forbearance conditions included only alternative providers of *fixed* services—not mobile.[44]

In granting forbearance, the Commission recognized that "ETC service obligations and funding should be appropriately matched."[45] It further recognized that the voice obligation forced ILECs to devote resources to maintaining legacy infrastructure that otherwise could be invested in broadband.[46] With forbearance, however, ILECs would "no longer be required to spend their resources on maintaining existing voice telephony services or deploying new infrastructure to offer voice telephony service in newly constructed homes where there are already reasonable substitutes."[47] Rather, they could "reallocate their resources towards making upgrades to their networks to meet the broadband needs of their existing or new customers."[48]

The Commission rejected arguments from consumer advocates who claimed that carriers had not sufficiently quantified the costs of maintaining voice service.[49] The Commission found that even a partial reallocation of funds from voice to broadband would benefit consumers. "If a price cap carrier that is relieved of a federal ETC obligation to offer voice service in some areas spends even a portion of the funds that it otherwise would have used to provide voice in those

---

[43] *2014 CAF Order* ¶ 51.

[44] The third prong does so explicitly, referencing other ETCs that "offer voice and broadband to *fixed* locations." *Id.* (emphasis added). The second prong does so implicitly, referencing "an 'unsubsidized' competitor, as defined in our rules." *Id.* (citing 47 C.F.R. § 54.5). Section 54.5 defines "unsubsidized competitor" as a provider of "fixed" services. 47 C.F.R. § 54.5.

[45] *2014 CAF Order* ¶ 50.

[46] *See id.* ¶ 65.

[47] *Id.*

[48] *Id.*

[49] *See id.* ¶ 66 & n.146.

12

Exhibit L
319

areas to upgrade its broadband networks or deploy broadband to new customers, that would help advance our goal of ensuring that all Americans have access to advanced networks."[50]

The Commission also noted the lack of any possible consumer harm. Other voice alternatives were broadly available, and section 214(e) was not necessary to ensure consumers had access to at least one voice provider.[51] The Commission emphasized that forbearance from the ETC voice obligation did "not mean that price cap carriers c[ould] immediately cease providing voice telephony service," since they would still be required to provide notice to customers and obtain discontinuance authority from the Commission.[52] And the Commission would "not authorize a proposed discontinuance of service if customers or other end users would be unable to receive service or a reasonable alternative."[53]

According to the Commission's most recent list, approximately 94 percent of census blocks in AT&T's California service territory have forbearance.[54] But it has been three years since the Commission updated that list, which does not reflect the substantial expansion of wireline and fixed wireless broadband networks from subsidized and unsubsidized carriers in the interim. As discussed below, applying the *2014 CAF Order*'s test based on the latest version of the National Broadband Map, AT&T estimates that about 98 percent of census blocks in its California service territory would qualify for forbearance.[55] If the Commission takes into

---

[50] *Id.* ¶ 66 n.146.

[51] *See id.* ¶¶ 60–63.

[52] *Id.* ¶ 61.

[53] *Id.* ¶ 60.

[54] *See* FCC, *List of Census Blocks Subject to Federal High-Cost Voice Obligations (as of 1/13/23)*, https://www.fcc.gov/sites/default/files/pc_etc_voice_oblig_1_13_23.xlsx.

[55] *See* Declaration of Sandra Charneski ¶ 13 ("Charneski Decl.") (attached as Exhibit 1).

13

Exhibit L
320

account mobile wireless services, virtually all serviceable locations in the remaining census blocks have an alternative provider.[56]

The *2016 Lifeline Order.* Two years later, the Commission turned to the Lifeline voice obligation.[57] As the Commission recognized, ILECs' ETC designations generally required them to provide Lifeline voice service throughout their entire service territories, including in areas where they received no high-cost support.[58] That Lifeline obligation raised a policy concern mirroring that identified in the *2014 CAF Order*: ETC obligations continued to require carriers like AT&T to maintain legacy voice infrastructure to serve a small and declining segment of subscribers, often in areas where they did not receive high-cost support or have an obligation to deploy broadband.[59] As a result, a number of carriers that historically had provided Lifeline voice service "no longer wish[ed] to do so, at least not to the full extent they did so in the past."[60]

The Commission therefore granted conditional forbearance from the Lifeline voice obligation with respect to new Lifeline customers for ETCs designated to receive both high-cost and Lifeline support.[61] The Commission granted this forbearance on a county basis where the following conditions were met: (a) at least 51 percent of Lifeline subscribers have broadband; (b) at least three other providers of Lifeline broadband internet access service ("BIAS") each serve at least five percent of Lifeline broadband subscribers; and (c) the ETC does not receive

---

[56] *See id.* ¶ 15.

[57] *See 2016 Lifeline Order* ¶ 324.

[58] *See id.* ¶ 16.

[59] *See id.* ¶ 341.

[60] *Id.* ¶ 336.

[61] *See id.*

14

Exhibit L

321

federal high-cost support.[62] But even where these conditions were met, the Commission required ETCs to continue serving existing Lifeline voice customers, subject to the Commission's discontinuance authority under section 214(a).[63] And because the grant of forbearance was "conditional," the Commission stated that it would update the list of counties with forbearance on an annual basis.[64]

Again, the Commission's forbearance analysis was driven by concern that ETC obligations deterred broadband investment. "[O]n net," the Commission concluded, conditional forbearance "str[uck] the right balance between creating additional incentives for providers to promote the deployment and availability of broadband networks and services while adequately protecting the interests of low-income voice service users."[65] Absent forbearance, ETCs "would need to retain much, if not all, of their infrastructure used to serve Lifeline voice subscribers just to potentially serve that narrower segment of overall Lifeline subscribers, not knowing if or when such subscribers might seek service."[66] As a result, these ETCs "would continue incurring costs that they otherwise could direct to broadband investment."[67] And the Commission made clear that Lifeline "infrastructure" encompasses "not only physical network infrastructure, but also other infrastructure like that required for billing and other administrative functions associated with providing Lifeline voice service."[68] Thus, the mere existence of the Lifeline

---

[62] *See id.* ¶ 354.

[63] *See id.* ¶ 340.

[64] *Id.* ¶ 360.

[65] *Id.* ¶ 336.

[66] *Id.* ¶ 341.

[67] *Id.*

[68] *Id.* ¶ 341 n.856.

Exhibit L

322

voice obligation—regardless of the size of the subscriber base—imposed significant costs that diverted resources away from broadband deployment. And forbearance would "at least incrementally" be "likely to free up service provider funds for broadband investment."[69]

The Commission also again emphasized the lack of consumer harm. Forbearance did "not preclude carriers from electing to provide the supported Lifeline voice service and from receiving universal service support for doing so"; it "simply eliminate[d] that mandatory obligation."[70] The Commission also reiterated that forbearance is not discontinuance and that the Commission's section 214(a) rules provide a "backstop" ensuring that customers would not be left without a voice alternative.[71]

Today, the forbearance granted by the *2016 Lifeline Order* covers most of AT&T's California service territory. According to the Commission's most recent annual list, of the 56 counties that overlap with AT&T's California service territory, only two relatively low-population counties—Sierra and Trinity—do not qualify for this forbearance.[72]

### C.    AT&T's ETC Designation In California

Since 1997, AT&T has been designated as an ETC throughout its California incumbent service territory.[73] Initially, AT&T received federal high-cost support in California, but as a

---

[69] *Id.* ¶ 337.

[70] *Id.* ¶ 342.

[71] *Id.* & n.857.

[72] *See Wireline Competition Bureau Announces Counties Where Conditional Forbearance from the Lifeline Voice Obligation Applies*, Public Notice, 40 FCC Rcd. 5759 (2025).

[73] Cal. Pub. Utils. Comm'n, *Resolution T-16105* (Dec. 16, 1997), https://files.cpuc.ca.gov/gopher-data/telecom/T16105.doc.

Exhibit L

323

result of the reforms enacted in the *2011 ICC/USF Transformation Order*, AT&T has not received any high-cost support in California since the end of 2021.[74]

While AT&T continues to receive federal reimbursement to provide the Lifeline voice benefit to eligible households over its POTS network, AT&T's Lifeline subscribership has plummeted as customers migrate to wireless. Today, AT&T has about 40,000 Lifeline subscribers in California. Similarly, over 96 percent of subscribers to California's parallel state "LifeLine" program have chosen a wireless provider, and AT&T serves fewer than three percent of the state's LifeLine customers.[75] Eight other ETCs individually serve more LifeLine customers than AT&T.[76]

In 2023, AT&T filed an application with the CPUC to relinquish its ETC designation throughout its California service territory. After a fully litigated proceeding, which included expert testimony, evidentiary hearings, and post-hearing briefing, the CPUC issued a decision on December 5, 2025, which formally denied the application in substantial part and effectively denied it in full.[77] AT&T filed a timely application for rehearing, which remains pending.[78]

---

[74] *See* AT&T ETC Application at 2 & n.5.

[75] *See California LifeLine Related Forms and Notices for Carriers*, Cal. Pub. Utils. Comm'n, https://www.cpuc.ca.gov/consumer-support/financial-assistance-savings-and-discounts/lifeline/lifeline-related-forms-and-notices-for-service-providers (last visited May 17, 2026) (choose "2026" under "THIRD PARTY ADMINISTRATOR LIFELINE CUSTOMER COUNTS") (showing 1.82 million total Lifeline subscribers in March 2026, with wireless ETCs having 1.75 million). The CPUC's data includes subscribers that potentially qualify only for California's parallel state "LifeLine" support but not federal Lifeline support. While the CPUC's data thus overstates the number of AT&T California's federal Lifeline customers, it provides a reasonable approximation of the extent to which Lifeline subscribers use wireless service.

[76] *See id.*

[77] *See CPUC ETC Denial*, 2025 Cal. PUC LEXIS 579, at *1–2, *4–6.

[78] *Pac. Bell Tel. Co. d/b/a AT&T Cal. (U 1001 C) Appl. for Reh'g of Decision 25-12-004*, A.23-03-002 (C.P.U.C. filed Jan. 5, 2026),

Exhibit L

324

In its relinquishment application, AT&T presented unrebutted evidence satisfying the one-alternative-ETC standard under section 214(e)(4). Specifically, AT&T showed that at least one alternative ETC is designated in every wire center and census block in its service territory, and no party introduced evidence to the contrary.[79] Indeed, AT&T demonstrated that the available alternatives far exceeded section 214(e)(4)'s standard. For example, 99.6 percent of AT&T's then-current Lifeline customers could choose among at least five alternative ETCs.[80] Wire centers with 99.8 percent of the population had twelve or more alternative ETCs, and census blocks with 99.9 percent of the population had at least five.[81] The CPUC accordingly had a mandatory statutory duty that it "shall permit [AT&T] to relinquish its designation."[82]

In denying AT&T's relinquishment application, the CPUC adopted a novel interpretation of section 214(e)(4) that conflated the statute's distinct provisions and imposed prerequisites the statute does not authorize.[83] The CPUC's decision reflects three basic errors.

*First*, the CPUC ruled that it was not sufficient for AT&T to demonstrate that alternative ETCs have been designated throughout its service territory (the actual statutory requirement), and that AT&T also had to prove that alternative ETCs have the "practical ability" to serve "all"

---

https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M593/K230/593230773.PDF ("AT&T California Application for Rehearing").

[79] *See Pac. Bell Tel. Co. d/b/a AT&T Cal.'s (U 1001 C) Post-Hr'g Br.*, A.23-03-002, at 1 (C.P.U.C. filed Sept. 6, 2024), https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M539/K998/539998939.PDF ("AT&T California Post-Hearing Brief").

[80] *See id.*; *Rebuttal Testimony of Mark A. Israel on Behalf of AT&T*, A.23-03-002, ¶ 15 (C.P.U.C. filed Jan. 19, 2024), https://docs.cpuc.ca.gov/PublishedDocs/SupDoc/A2303002/6991/523725016.pdf ("Israel Rebuttal Testimony").

[81] *See* AT&T California Post-Hearing Brief at 12; Israel Rebuttal Testimony ¶¶ 40, 72.

[82] 47 U.S.C. § 214(e)(4).

[83] *See* AT&T California Application for Rehearing at 2.

18

Exhibit L

325

customers in AT&T's service territory.[84] By definition, however, designated alternative ETCs have a statutory duty to "offer" and "advertise" supported services "throughout the service area for which the designation is received."[85] And while the statute requires that "all customers served by the relinquishing carrier will continue to be served," it is the CPUC and remaining ETCs—not AT&T—who must ensure that that requirement is met.[86] Moreover, the CPUC made no attempt to reconcile its newly minted "all customers" standard with the forbearance the Commission had already granted AT&T from the obligation to provide voice telephony service, as well as the Lifeline voice benefit to new customers, in most of its California service territory.

*Second*, the CPUC also ruled that AT&T cannot rely on *wireless* ETCs. The CPUC reasoned that its state-law jurisdiction over wireless ETCs is preempted by 47 U.S.C. § 332(c)(3),[87] even though, in designating wireless ETCs under section 214(e), the CPUC was exercising delegated *federal* authority. The CPUC also reasoned that AT&T cannot rely on the CPUC's own wireless coverage maps to show the availability of alternative service, citing decade-old "reservations" about wireless coverage.[88] The CPUC thus required AT&T to prove that remaining ETCs will serve all of AT&T's residential customers "indoors."[89] This standard has never been applied to another ETC, and the CPUC did not explain how AT&T could feasibly measure wireless signal strength inside hundreds of thousands of customer locations.[90]

---

[84] *CPUC ETC Denial*, 2025 Cal. PUC LEXIS 579, at *1–2, *33.

[85] 47 U.S.C. § 214(e)(1).

[86] *Id.* § 214(e)(4).

[87] *See CPUC ETC Denial*, 2025 Cal. PUC LEXIS 579, at *32, *65, *105.

[88] *Id.* at *53, *67–68, *104.

[89] *Id.* at *1; *see* AT&T California Application for Rehearing at 24–25.

[90] *See CPUC ETC Denial*, 2025 Cal. PUC LEXIS 579, at *23.

Exhibit L
326

*Third*, the CPUC ruled that AT&T, as an ETC designated to receive both high-cost and Lifeline support, cannot rely on any alternative ETC that receives only Lifeline support.[91] But the CPUC identified no basis for this requirement in the statute, which does not distinguish between different types of ETCs. In any event, as a result of the overhaul of the high-cost program in the *2011 ICC/USF Transformation Order*, AT&T has not actually received any high-cost support in years, and in light of the forbearance granted from the high-cost obligation in the *2014 CAF Order*, AT&T "effectively became a Lifeline-only ETC" in almost all of its service territory.[92]

### D.    The *Network Modernization Order* And AT&T's Related Filings

In its recent *Network Modernization Order*, the Commission took "decisive and necessary steps" to cut "red tape that has both required providers to keep aging copper lines in place and effectively prevented them from investing in the modern infrastructure that Americans want and deserve."[93] The Commission found that "the expansion of . . . modern networks, and benefits they afford, have been hindered by the need for carriers to divert important resources to the maintenance of aging and deteriorating legacy networks that deliver outdated services to an ever-decreasing number of subscribers."[94] To address this problem, the Commission streamlined its rules to accelerate "technology transitions discontinuance applications" and "grant[ed] blanket section 214(a) authority for carriers to grandfather legacy voice services."[95] With these reforms,

---

[91] *See id.* at *24–29.

[92] *2014 CAF Order* ¶ 70. And even then, as noted, as a result of the *2016 Lifeline Order*, AT&T only had an obligation as to its dwindling number of existing Lifeline subscribers.

[93] *Network Modernization Order* ¶ 1.

[94] *Id.* ¶ 2.

[95] *Id.* ¶ 6.

Exhibit L

327

the Commission sought to "free up billions of dollars for new builds," representing "another step forward in the FCC's Build America Agenda."[96]

As part of these reforms, the Commission adopted a single "consolidated rule" that identified "explicit categories of adequate replacement services" that will support discontinuance.[97] These categories include facilities-based VoIP, mobile wireless service, and voice services supported by the Commission's modernized high-cost programs.[98] Notably, as to mobile wireless service, the Commission emphasized that the majority of consumers are mobile-only and expressly found that facilities-based mobile wireless service operating at speeds reflected on the National Broadband Map is an adequate replacement for POTS for purposes of streamlined processing.[99] The Commission further declined to adopt additional verification requirements beyond the data reflected in the National Broadband Map, finding "sufficient safeguards in place to account for discrepancies, including in rural areas, without the need to adopt more stringent, mobile-specific verification requirements at this time."[100]

In addition to federal barriers to network modernization, the Commission addressed state barriers as well. The Commission recognized that "certain state and local requirements have been unduly prolonging the use of legacy networks and actually preventing providers from building modern ones by limiting the types of services that may qualify as adequate replacements."[101] Recognizing that section 214(a) "creates an exclusively federal discontinuance regime for

---

[96] *Id.* ¶ 1.

[97] *Id.* ¶¶ 6, 22, 23–25, 29.

[98] *See id.* ¶¶ 26–40.

[99] *See id.* ¶¶ 34–35.

[100] *Id.* ¶ 35.

[101] *Id.* ¶ 4.

Exhibit L

328

interstate or jurisdictionally mixed telecommunications services,"[102] the Commission found "that federal law preempts state and local requirements to the extent they needlessly constrain the deployment of modern, next-generation IP-based networks by impeding providers' ability to discontinue providing legacy services and to retire outdated and deteriorating legacy networks."[103] The Commission invited carriers "to seek a determination from the Commission that [a] state requirement is preempted" if "the Commission has authorized a carrier to discontinue legacy voice service and any state requirement conflicts with that authorization."[104]

As contemplated in the *Network Modernization Order*, AT&T is contemporaneously filing two section 214(a) discontinuance applications ("Discontinuance Applications") and a preemption petition ("Preemption Petition"). In its Discontinuance Applications, AT&T seeks Commission authorization to discontinue residential and business POTS for 360 wire centers within its California service territory.[105] As explained in the Discontinuance Applications, discontinuing POTS in these wire centers will not strand any of AT&T's existing customers, who have access to many voice alternatives. AT&T faces competition from a host of providers, and for customers who want a more traditional phone experience, AT&T has developed AT&T Phone – Advanced and AT&T Phone for Business – Advanced (collectively, "AP-A"), which provide the functionality of POTS using wireless or another broadband connection.[106] As reflected in the National Broadband Map, AT&T's LTE network covers all of AT&T's existing

---

[102] *Id.* ¶ 108.

[103] *Id.* ¶ 7.

[104] *Id.* ¶ 105.

[105] AT&T has filed separate residential and business Discontinuance Applications, but to avoid unnecessary duplication, AT&T herein cites only to the Residential Discontinuance Application rather than both applications.

[106] *See* AT&T Residential Discontinuance Application at 3.

22                                          Exhibit L
                                              329

POTS customers where AT&T seeks discontinuance, and thus AP-A is available to all of those customers.[107] And AT&T has announced an offer of discounted AP-A for existing Lifeline customers in the areas where AT&T is seeking discontinuance. In its Preemption Petition, AT&T seeks a determination that the Commission's approval of the Discontinuance Applications preempts California's carrier of last resort regime, as well as related state-law requirements that would require AT&T to secure numerous other "approvals" before discontinuing POTS.[108]

This Forbearance Petition complements the Discontinuance Applications and the Preemption Petition. And while granting forbearance will facilitate AT&T's network modernization, it does not call into question AT&T's commitment to continue to offer AP-A and its wireless services to most serviceable locations in its California territory. AT&T is not walking away from California; it is simply focused on offering consumers there the type of modern services they demand.

### III.    CONSUMERS HAVE NUMEROUS ALTERNATIVES TO POTS IN AT&T'S CALIFORNIA SERVICE TERRITORY

As the Commission has recognized, "[c]ompetition in the communications marketplace has flourished, with incumbent LECs now holding a minority share of the voice services market."[109] Consumers nationally and in California now have numerous alternatives to POTS.

Starting with mobile wireless, consumers continue to abandon POTS. There are over 390 million mobile retail voice lines in the United States, representing approximately 83 percent of

---

[107] *See id.* at 6–7.

[108] *See* AT&T Preemption Petition at 1–2.

[109] *Network Modernization Order* ¶ 9.

Exhibit L
330

all voice lines.[110] As of three years ago, over three quarters of California adults relied *exclusively* on their mobile phones,[111] and that fraction has only increased in the interim. These trends have resulted from the near ubiquitous deployment of mobile wireless networks. In addition to AT&T's own mobile service, Verizon and T-Mobile blanket California with mobile service that the Commission has found qualifies as an "adequate replacement service" for POTS.[112]

Facilities-based interconnected VoIP services have likewise "brought advanced communications services to the marketplace to the benefit of consumers," ensuring robust competition for voice services wherever broadband is available.[113] Enabled by the expansion of fixed broadband networks, interconnected VoIP has become the predominant fixed-voice offering.[114] As the Commission recently recognized, "th[e] disparity between legacy voice service and interconnected VoIP connections will only increase as fiber deployments around the country continue."[115] And wireless networks also support fixed broadband capable of supporting voice service. Indeed, fixed wireless now reaches more households than cable broadband.[116]

California is not immune to these trends. Cable providers such as Comcast, Charter, and Cox collectively have far surpassed AT&T as the leading wireline provider and use their

---

[110] *See* FCC, *Voice Telephone Service: Status as of June 30, 2025*, at 2 fig. 1 (May 2026), https://docs.fcc.gov/public/attachments/DOC-421558A1.pdf ("*Voice Telephone Services Report*").

[111] *See* Nat'l Ctr. for Health Stat., *National Health Interview Survey Early Release Program* 1 (2025), https://www.cdc.gov/nchs/data/nhis/earlyrelease/Wireless_state_202506.pdf.

[112] *See* AT&T Residential Discontinuance Application at 8.

[113] *Network Modernization Order* ¶ 43 (quotation marks omitted).

[114] *See Voice Telephone Services Report* at 2 fig. 1.

[115] *Network Modernization Order* ¶ 28.

[116] *See* AT&T Residential Discontinuance Application at 10.

Exhibit L

331

broadband networks to offer VoIP services that directly compete with legacy POTS.[117] As a result, VoIP connections in California substantially outnumber traditional POTS connections.[118]

Finally, consumers also can purchase VoIP services that run on top of satellite broadband connections. While the Commission has not yet recognized satellite as an "adequate replacement service," it is an "innovative new service offering" that is establishing itself as a "widely available alternative."[119] As detailed in AT&T's Discontinuance Applications, Starlink, Amazon LEO, Globalstar, and AST SpaceMobile are expanding their fleets of satellites in low-earth orbit ("LEO") to offer voice and broadband service and are improving the quality of their services.[120] Eligibility and funding for LEO under the Broadband Equity, Access, and Deployment Program mean that satellite VoIP's presence will expand even further.[121]

As a result, voice options abound in AT&T's California service territory. Based on the National Broadband Map, approximately 99.9 percent of serviceable locations have two or more facilities-based fixed broadband or mobile voice providers, and about 99.7 percent have three or more.[122] The same story is true for AT&T's dwindling Lifeline customer base. *All* existing Lifeline customers subject to the pending Discontinuance Applications are served by AT&T's mobile wireless network and, therefore, the Lifeline ETCs that resell AT&T's mobile wireless service. And approximately 99.99 percent of these Lifeline customers are also covered by the

---

[117] *See id.* at 9.

[118] *See id.* at 9 & n.31.

[119] *Network Modernization Order* ¶ 29.

[120] *See* AT&T Residential Discontinuance Application at 11–12.

[121] *See id.* at 12.

[122] *See* Charneski Decl. ¶ 9.

Exhibit L
332

mobile wireless networks of Verizon, T-Mobile, or both.[123] Verizon subsidiary TracFone and T-Mobile subsidiary Assurance Wireless both are Lifeline ETCs in California, and numerous other Lifeline ETCs provide service over Verizon's and T-Mobile's mobile wireless networks.[124] Footprint-wide, virtually all of AT&T's existing Lifeline subscribers (99.8 percent) are covered by at least one of the major mobile wireless networks and thus have access to multiple Lifeline ETCs.[125]

## IV.    THE PETITION SATISFIES THE STANDARD FOR FORBEARANCE

As noted, section 10(a) of the Communications Act allows the Commission to "forbear from applying . . . any provision" of the Communications Act "to a telecommunications carrier . . . in any or some of its or their geographic markets." Here, AT&T seeks full forbearance from section 214(e) for the entirety of its California incumbent service territory. In particular, AT&T seeks an extension of the forbearance the Commission previously granted with respect to AT&T's general voice obligation and its Lifeline obligation.

As to general voice, the Commission's *2014 CAF Order* already grants forbearance in approximately 94 percent of the census blocks in AT&T's California service territory. AT&T accordingly seeks to extend that forbearance to the remaining relatively small number of census blocks that are not already covered by the existing grant of forbearance. As to Lifeline, the Commission's *2016 Lifeline Order* granted AT&T conditional forbearance with respect to new customers in all but two counties that overlap AT&T's California service territory—Sierra and

---

[123] *See id.* ¶ 19.

[124] *See infra* notes 162–163.

[125] *See* Charneski Decl. ¶ 18.

Exhibit L
333

Trinity. AT&T accordingly seeks to extend that forbearance to Sierra and Trinity Counties, apply it to new and existing customers, and make it permanent rather than conditional.

These extensions of the Commission's existing grants of forbearance easily satisfy the statutory criteria under section 10(a) and are necessary to realize the Commission's network modernization goals. Under section 214(e)(4), AT&T is entitled to relinquish its ETC designation so long as just *one* alternative ETC is designated to serve the relevant area, and here, customers throughout AT&T's California service territory have numerous high-quality alternatives. There is simply no need to compel AT&T to provide voice service, and freeing AT&T from that obligation will enable it to accelerate the transition from copper to modern IP-based networks.

### A.    Forbearance From AT&T's General Voice Obligation Is Warranted

AT&T seeks full forbearance from the general voice obligation under section 214(e) throughout AT&T's California service territory. That relief involves extending the Commission's existing grant of forbearance under the *2014 CAF Order* to three categories of additional census blocks: (1) census blocks that already qualify for forbearance under the *2014 CAF Order* once the Commission updates its data; (2) census blocks where there are no serviceable locations; and (3) census blocks where alternative broadband service is ubiquitous. Each category of census block easily satisfies the criteria for forbearance in section 10(a).

### 1.    Census Blocks That Already Qualify Under the *2014 CAF Order*

The vast majority of census blocks in AT&T's California service territory already have forbearance from the general voice obligation under the *2014 CAF Order*. There, the Commission granted forbearance in three categories of census blocks: (1) census blocks that are low-cost; (2) census blocks served by an "unsubsidized competitor" offering voice and broadband at speeds of 10/1 Mbps to all eligible locations; and (3) census blocks where another

<div align="center">27</div>

Exhibit L

334

ETC is receiving support to offer voice and broadband to fixed locations.[126] Based on its most recent (January 2023) list of census blocks still subject to the general voice obligation, the Commission has recognized that approximately 94 percent of the about 469,000 census blocks in AT&T's California service territory satisfy these criteria.[127] Only about six percent, or approximately 29,000 census blocks, are not currently recognized as qualifying for forbearance under the *2014 CAF Order* ("Remaining Census Blocks").[128]

Because the Commission's list was last updated as of January 2023, however, it does not reflect the significant fixed broadband deployment that has occurred since then—including the explosive growth of fixed wireless services. Based on current data, AT&T estimates that about 19,000 of the Remaining Census Blocks satisfy the forbearance criteria under the *2014 CAF Order*.[129] AT&T accordingly requests that the Commission update its list of census blocks and extend forbearance to all census blocks that qualify. Because the Commission has already determined that its 2014 criteria suffice to satisfy the forbearance standard under section 10(a), no further showing is necessary—only an updated analysis based on current data. With this update, AT&T estimates that about 98 percent of the census blocks in its California service territory would qualify for forbearance.[130]

---

[126] *See 2014 CAF Order* ¶ 51.

[127] *See* FCC, *List of Census Blocks Subject to Federal High-Cost Voice Obligations (as of 1/13/23)*, https://www.fcc.gov/sites/default/files/pc_etc_voice_oblig_1_13_23.xlsx.

[128] *See* Charneski Decl. ¶ 12.

[129] *See id.* ¶ 13.

[130] *See id.*

28

Exhibit L
335

### 2.    Census Blocks with No Serviceable Locations

Of the around 10,000 Remaining Census Blocks that do not already qualify for forbearance under the *2014 CAF Order*, an additional approximately 4,500 census blocks have no serviceable locations according to the National Broadband Map.[131] The *2014 CAF Order* did not address these census blocks, which is unsurprising. The National Broadband Map did not yet exist, and the Commission had no precise way to identify areas lacking serviceable locations.[132]

Now that such data exists, the case for forbearance in these census blocks is straightforward. Where there are no serviceable locations, the section 10(a) criteria are satisfied almost by definition. Enforcing the ETC general voice obligation is not necessary to ensure just and reasonable rates or to protect consumers because there are no rates to charge and no consumers to protect. And forbearance in these census blocks plainly serves the public interest because it relieves AT&T of the burden of maintaining service capabilities in areas where there is no demand, freeing resources for investment in areas where consumers actually reside.

The Commission reached precisely this conclusion when granting a closely related form of forbearance in the *2018 Tech Transition Order*.[133] There, the Commission granted full forbearance from the obligation to seek discontinuance under section 214(a) for services with no customers, reasoning that, "when a service has no customers, it necessarily follows that the section 214 discontinuance processes are not necessary."[134] If the more protective discontinuance

---

[131] *See id.* ¶ 14.

[132] *See Broadband Data Task Force Releases Pre-Production Draft of the National Broadband Map*, Public Notice, 37 FCC Rcd. 13348 (BDTF/WTB/WCB/OEA/CGB 2022).

[133] *See Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, Order, 33 FCC Rcd. 5660 (2018).

[134] *Id.* ¶¶ 15–21.

Exhibit L

336

obligation under section 214(a) is unnecessary in areas with no demand, then *a fortiori* the ETC general voice obligation under section 214(e) is unnecessary as well.

### 3. Other Census Blocks with Near-Ubiquitous Fixed and Mobile Broadband Service

After accounting for the Remaining Census Blocks that would qualify for forbearance under the *2014 CAF Order* and those with no serviceable locations, AT&T estimates that only about 5,500 census blocks remain.[135] Although these blocks were not captured by the *2014 CAF Order*'s fixed-broadband framework (which considered only *fixed* services providing 10/1 Mbps speeds),[136] forbearance is now warranted when the analysis properly accounts for mobile wireless alternatives.

Accounting for mobile wireless follows naturally from the determination the Commission has already made that mobile wireless is an adequate replacement for POTS. As the Commission has recognized, the marketplace has irreversibly shifted toward mobile. As of December 2024, there were approximately 395 million mobile voice subscriptions in the United States.[137] And as of three years ago, over 76 percent of adults were living in wireless-only households—with adults in younger age groups even more likely to do so.[138] The Commission has recognized this transformation, observing in the *Network Modernization Order* that "the market has . . . spoken": "consumers continue to rely more heavily on mobile wireless services, and . . . these services have thus become an essential part of everyday life."[139] On that basis, the Commission

---

[135] *See* Charneski Decl. ¶ 15.

[136] *See supra* note 44.

[137] *See Voice Telephone Services Report* at 2 fig. 1.

[138] *See Network Modernization Order* ¶ 34.

[139] *Id.*

Exhibit L
337

concluded that mobile is an "adequate alternative" to POTS for purposes of technology transition discontinuance applications under section 214(a).[140]

The Commission's discontinuance reasoning regarding mobile wireless in the *Network Modernization Order* applies with equal force to the forbearance analysis here. Discontinuance is the point at which customers actually lose access to their existing service. If mobile wireless service is an adequate alternative at that point, it necessarily follows that it is sufficient for purposes of forbearance, where the question is merely whether, in light of the alternatives available, the ETC general voice obligation is no longer necessary.[141]

Once the Commission accounts for mobile wireless, the case for forbearance is overwhelming. As noted, after accounting for census blocks that already qualify for forbearance with updated data and census blocks with no serviceable locations, AT&T estimates that only about 5,500 census blocks remain.[142] For virtually all of the serviceable locations within those census blocks—about 75,000 out of the about 77,000—the National Broadband Map shows that

---

[140] *Id.* ¶¶ 34–35. Before the *Network Modernization Order*, the Commission also found that Verizon's mobile wireless service met the Commission's prior "Adequate Replacement Test." *See Section 63.71 Application of Qwest Corp. d/b/a CenturyLink QC*, WC Dkt. No. 25-177 (May 16, 2025).

[141] The *2014 CAF Order* also required that a competitor offer broadband at speeds of 10/1 Mbps for a census block to qualify for forbearance. But this Petition seeks forbearance from AT&T's *voice* obligation, and AT&T does not receive section 254(e) support for broadband. There is no reason to condition relief from a voice obligation on the *broadband* speeds offered by alternative providers. The Commission included the 10/1 Mbps requirement in 2014 to help "avoid consumer disruption in access to communications services," *2014 CAF Order* ¶ 50 (quoting *2011 ICC/USF Transformation Order* ¶ 1089), but that concern is fully addressed here: mobile providers offer voice service that is superior to POTS and generally offer high-quality broadband as well, *see Communications Marketplace Report*, 39 FCC Rcd. 14116, ¶ 94 (2024). Accordingly, in determining alternatives available for the remaining approximately 5,500 census blocks, AT&T's analysis looked at coverage for any terrestrial fixed broadband service at any speed and for mobile voice service.

[142] *See* Charneski Decl. ¶ 15.

31

Exhibit L

338

there is broadband service from a fixed broadband provider or voice service from the mobile wireless networks of AT&T, Verizon, or T-Mobile.[143] Indeed, in the vast majority of these census blocks, *every* serviceable location has access to fixed broadband or mobile wireless service from AT&T, Verizon, or T-Mobile.[144] And these figures actually understate the availability of voice service, as they do not account for satellite-based providers that are capable of reaching virtually any location.

Given these competitive conditions, forbearance in these remaining census blocks satisfies each of the section 10(a) criteria. Enforcing the ETC voice obligation in these census blocks is not necessary to ensure just and reasonable rates; competition for voice services is robust, and AT&T will continue to offer AP-A, a superior replacement.[145] Even if granting forbearance led to the elimination of AT&T's legacy POTS in these census blocks, that service is not a competitively significant offering.[146] As the Commission has recognized, "[t]he 19th century technology of copper-based networks . . . has been rendered obsolete by more advanced networks."[147] And over the longer run, forbearance will free resources that AT&T can devote to competitively relevant services, which will *increase* competition rather than diminish it.[148]

As to the protection of consumers, forbearance is not discontinuance. The Commission emphasized in the *2014 CAF Order* that relieving AT&T of its general voice obligation "does

---

[143] *See id.*

[144] *See id.*

[145] *See* AT&T Residential Discontinuance Application at 2–5.

[146] *See 2014 CAF Order* ¶ 56; *Network Modernization Order* ¶ 9.

[147] *Network Modernization Order* ¶ 9.

[148] *See id.* ¶ 2.

Exhibit L

339

not mean that price cap carriers can immediately cease providing voice telephony service."[149] And the Commission explained in the *Network Modernization Order* that, "while a carrier's ETC status determines whether that carrier may receive universal service support . . . , the question of whether a carrier may discontinue a specific interstate service is wholly governed by Section 214(a) through (c)."[150] AT&T thus may cease service only if the Commission authorizes discontinuance under section 214(a), and the Commission will do so only upon finding that adequate replacement services are available.[151] That process provides a robust backstop: if any customer in these census blocks would be left without service, then the Commission "will not authorize" discontinuance.[152] Forbearance simply removes a regulatory obligation that is unnecessary in light of these additional protections and the overwhelming availability of alternatives.

Finally, forbearance in these remaining census blocks will serve the public interest. It will allow AT&T to "reallocate resources towards making upgrades to [its] network[] to meet the broadband needs of [its] existing or new customers."[153] Given that AT&T receives no high-cost funding, forbearance also will ensure that "ETC service obligations and funding should be appropriately matched."[154] And it will further the principle that universal service policies should

---

[149] *2014 CAF Order* ¶ 60.

[150] *Network Modernization Order* ¶ 99.

[151] *See 2014 CAF Order* ¶ 61; *Network Modernization Order* ¶¶ 22–47.

[152] *2014 CAF Order* ¶ 61.

[153] *Id.*

[154] *Id.* ¶ 50; *see also* 47 U.S.C. § 254.

33

Exhibit L

340

be equitable and nondiscriminatory, enabling AT&T to compete on equal regulatory footing with providers that face no equivalent voice mandate.[155]

Retaining AT&T's general voice obligation in these census blocks, by contrast, would threaten to tether AT&T to legacy copper infrastructure in scattered census blocks throughout its California service territory, preventing it from operationalizing discontinuance on a wire-center basis and diverting resources from the broadband investment the Commission has sought to encourage.[156] That is precisely the kind of regulatory impediment the *Network Modernization Order* was designed to eliminate.

### B.    Forbearance From AT&T's Lifeline Voice Obligation Is Warranted

AT&T seeks a modest expansion of the Lifeline voice forbearance granted in the *2016 Lifeline Order* along three dimensions. AT&T seeks: (1) to extend the geographic scope of forbearance to Sierra and Trinity Counties; (2) to extend the substantive scope of forbearance to encompass existing Lifeline customers, not just new ones; and (3) to make forbearance permanent rather than conditional. Extending the Commission's existing grant of forbearance along each of these dimensions satisfies the criteria for forbearance under section 10(a).

### 1.    Sierra and Trinity Counties

As noted, the *2016 Lifeline Order* granted conditional forbearance from ETCs' obligation to provide Lifeline voice service to new customers in counties meeting a three-part test.[157] In the

---

[155] *See 2014 CAF Order* ¶ 66.

[156] *See id.* ¶ 46; *Network Modernization Order* ¶ 1.

[157] *See 2016 Lifeline Order* ¶ 354.

Exhibit L

341

Commission's most recent update, 54 of the 56 counties overlapping with AT&T's California service territory satisfy these conditions.[158] Only two counties do not: Sierra and Trinity.[159]

Extending this forbearance to Sierra and Trinity Counties satisfies the section 10(a) forbearance criteria. AT&T's Lifeline voice obligation in these two counties is not necessary to ensure just and reasonable rates because alternative voice providers abound in both counties. Although these counties do not meet the *2016 Lifeline Order*'s test, those criteria are highly conservative in that they require the presence of multiple Lifeline BIAS providers. But the *Network Modernization Order* finds that a *single* mobile wireless provider is an adequate replacement for POTS for purposes of discontinuance under section 214(a), and section 214(e)(4) provides that an ETC is entitled to relinquish its designation if a single alternative ETC has been designated to serve the relevant area. Further, the BIAS penetration limitation is unnecessary given that many wireless ETCs offer broadband in addition to voice service.[160]

Based on coverage data from the National Broadband Map that was not available to the Commission in 2016, it is now clear that the mobile wireless networks of AT&T, Verizon, and T-Mobile broadly cover both counties. According to the Commission's data, the substantial

---

[158] *See Wireline Competition Bureau Announces Counties Where Conditional Forbearance from the Lifeline Voice Obligation Applies*, Public Notice, 40 FCC Rcd. 5759 (2025).

[159] *See id.*

[160] *See*, *e.g.*, *Lifeline Program*, Tracfone Wireless, Inc., https://www.tracfonewirelessinc.com/en/lifeline (last visited May 17, 2026); *Lifeline Questions*, SafeLink Wireless, https://support.safelinkwireless.com/en/brands/General/SLaccounthelp/faq/3101183/ (last visited May 17, 2026); *California Lifeline*, Assurance Wireless, https://www.assurancewireless.com/lifeline-services/states/california-lifeline-free-government-phone-service (last visited May 17, 2026); *Lifeline Program*, Boomerang Wireless (enTouch Wireless), https://entouchwireless.com/lifeline/ (last visited May 17, 2026).

Exhibit L
342

majority of the 2,800 total serviceable locations in the two counties have mobile voice service.[161]

And even that figure does not account for satellite.

This extensive wireless coverage in Sierra and Trinity Counties facilitates Lifeline service from numerous designated ETCs. For example, Air Voice Wireless, Boomerang Wireless, IM Telecom, and Telrite Corporation provide Lifeline service over AT&T's mobile network,[162] and TracFone Wireless, Assurance Wireless, TruConnect Communications, TAG Mobile, and others provide Lifeline service over Verizon's or T-Mobile's networks.[163] As noted, these providers collectively serve far more Lifeline customers than AT&T, whose Lifeline subscriber base has been in steady decline.[164] Nearly all consumers in these two counties thus have *multiple* Lifeline voice alternatives. For Lifeline customers in those counties served by a

---

[161] *See* Charneski Decl. ¶ 16 (about 2300 of the 2800 serviceable locations have coverage).

[162] *See* Cal. Pub. Utils. Comm'n, *Resolution T-17481* (July 23, 2015), https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M152/K878/152878009.PDF (Air Voice Wireless); Cal. Pub. Utils. Comm'n, *Resolution T-17436* (May 15, 2014), https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M088/K410/88410241.PDF (Boomerang Wireless); Cal. Pub. Utils. Comm'n, *Resolution T-17729* (June 3, 2021), https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M386/K113/386113149.pdf (IM Telecom); Cal. Pub. Utils. Comm'n, *Resolution T-17462* (Nov. 20, 2014), https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M124/K582/124582478., PDF (Telrite Corporation).

[163] *See*, *e.g.*, Cal. Pub. Utils. Comm'n, *Resolution T-17467* (Aug. 13, 2015), https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M153/K271/153271605.PDF (TracFone Wireless); Cal. Pub. Utils. Comm'n, *Resolution T-17284* (May 5, 2011), https://docs.cpuc.ca.gov/PUBLISHED/FINAL_RESOLUTION/135062.htm (Assurance Wireless); Cal. Pub. Utils. Comm'n, *Resolution T-17339* (Oct. 6, 2011), https://docs.cpuc.ca.gov/PUBLISHED/COMMENT_RESOLUTION/142659.htm (TruConnect Communications); Cal. Pub. Utils. Comm'n, *Resolution T-17587* (Mar. 5, 2018), https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M211/K788/211788688.pdf (same); Cal. Pub. Utils. Comm'n, *Resolution T-17437* (May 20, 2014), https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M089/K938/89938993.PDF (TAG Mobile).

[164] *See supra* Parts II.C, III.

36                                                         Exhibit L
                                                              343

provider other than AT&T, grant of forbearance to AT&T will have no practical effect; they will continue to receive service from their chosen alternative provider without interruption.

Nor is federal Lifeline the only program supporting low-income consumers. California operates its own state LifeLine program, which provides substantially greater voice support than federal Lifeline and does not require providers to be designated as an ETC.[165] California has also recently expanded support for broadband service.[166] Separately, AT&T provides discounted fixed broadband service for eligible consumers through "Access from AT&T."[167] Other broadband providers do so as well.[168]

Modestly extending forbearance to Sierra and Trinity Counties is consistent with the public interest. As the *2016 Lifeline Order* recognized, absent forbearance, carriers must "retain much, if not all, of their infrastructure used to serve Lifeline voice subscribers just to potentially serve that narrower segment of overall Lifeline subscribers."[169] The result is that AT&T would continue "incurring costs that [it] otherwise could direct to broadband investment."[170] Retaining

---

[165] *See* Cal. Pub. Utils. Comm'n, *California Lifeline Factsheet, Fiscal Year 2024–2025* (2025), https://www.cpuc.ca.gov/-/media/cpuc-website/divisions/communications-division/documents/lifeline/fact-sheets/ca-lifeline-fact-sheet-fy-24-25.pdf.

[166] *See CPUC Launches Pilot To Improve Broadband for Low-Income Households Through California LifeLine*, Cal. Pub. Utils. Comm'n, https://www.cpuc.ca.gov/news-and-updates/all-news/cpuc-launches-pilot-to-improve-broadband-for-low-income-households-through-california-lifeline (last visited May 17, 2026).

[167] *See Internet Access*, AT&T, https://www.att.com/internet/access/ (last visited May 17, 2026). AT&T self-funds the Access from AT&T program, which is not supported by federal Lifeline.

[168] *See, e.g.*, *Spectrum Internet for Low-Income Households*, Charter (Spectrum), https://www.spectrum.com/internet/spectrum-internet-assist (last visited May 17, 2026); *Affordable Internet*, Cox, https://www.cox.com/residential/internet/low-cost-internet-plans.html (last visited May 17, 2026); *Internet Essentials*, Comcast (Xfinity), https://www.xfinity.com/learn/internet-service/internet-essentials (last visited May 17, 2026).

[169] *2016 Lifeline Order* ¶ 341.

[170] *Id.*

the Lifeline voice obligation for a dwindling number of customers in these two sparsely populated counties would divert resources from broadband investment with no corresponding benefit to consumers—all while forbearance applies to every other county in AT&T's California service territory.[171] And because AT&T operationalizes network transitions on a wire-center basis, retaining residual Lifeline voice obligations in Sierra and Trinity Counties would potentially prevent AT&T from retiring copper not just in those two counties, but also in entire wire centers that encompass them in part—delaying the deployment of modern infrastructure that would benefit consumers across those wire centers.

### 2. Existing Customers

The *2016 Lifeline Order* requires ETCs to continue serving existing Lifeline voice customers even in counties where forbearance was granted.[172] Extending forbearance to these customers satisfies section 10(a) because, as discussed above, AT&T's Lifeline service has become competitively irrelevant.[173]

AT&T's existing Lifeline customers have a wealth of alternatives. Every existing AT&T Lifeline customer covered by the Discontinuance Applications has multiple alternative ETCs.[174] All can receive mobile service from AT&T, which, as noted, enables them to receive Lifeline services from multiple ETCs.[175] Virtually all (99.99 percent) are also covered by the wireless networks of Verizon or T-Mobile—which support Lifeline services from additional ETCs.[176]

---

[171] *See id.* & n.856.

[172] *See id.* ¶ 340.

[173] *See supra* Parts II.C, III.

[174] *See id.*

[175] *See supra* Part III.

[176] *See* Charneski Decl. ¶ 19.

Exhibit L

345

Overall, more than 99.8 percent of AT&T's approximately 40,000 existing Lifeline customers in California are covered by at least one mobile wireless network and over 99.5 percent are covered by at least two.[177] As such, virtually all have access to Lifeline services offered by multiple other ETCs. Further, AT&T's Lifeline voice subscribers continue to drop POTS in favor of other modern services. For existing AT&T Lifeline customers *not* covered by the pending residential Discontinuance Application, a future discontinuance process still would remain as a backstop ensuring voice service. And, as noted, there are also other available programs to support low-income subscribers.

To eliminate any possible concern, however, AT&T commits, in California, to continue participating in the federal Lifeline program for existing Lifeline subscribers, providing the federal Lifeline discount and receiving reimbursement, until AT&T obtains Commission authorization for discontinuance of residential POTS as to that Lifeline subscriber.[178] This commitment will allow existing Lifeline subscribers to continue obtaining federal Lifeline-supported service from AT&T until voice alternatives become available and AT&T obtains discontinuance authority, while ensuring that ETC obligations do not stand as an obstacle to network modernization when AT&T satisfies the standards for discontinuance.[179]

---

[177] *See id.* ¶ 18.

[178] This commitment mirrors what AT&T does today: while AT&T has forbearance from the federal Lifeline obligation for most of its service territory, it continues to participate in the federal Lifeline program even where it has forbearance, providing the federal Lifeline discount and receiving federal support when it does. In the *2016 Lifeline Order*, the Commission made clear that "forbearance from the Lifeline voice service obligation . . . does not preclude carriers from electing to provide the supported Lifeline voice service and from receiving universal service support for doing so," but rather "simply eliminates that mandatory obligation for them to do so." *2016 Lifeline Order* ¶ 342.

[179] As noted above, AT&T also is offering discounted AP-A to existing Lifeline customers in areas where AT&T is seeking discontinuance.

Exhibit L

346

### 3.    Permanent Forbearance

Finally, the forbearance granted in the *2016 Lifeline Order* was conditional.[180] That approach reflected appropriate caution at the time, when the competitive landscape for Lifeline broadband was still developing. But the conditions that justified forbearance in 2016 have only solidified in the decade since, and there is no realistic prospect that they will reverse.

The coverage of the three national mobile wireless networks will not shrink; to the contrary, the wireless industry continues to invest heavily to expand and enhance mobile service. AT&T itself has committed $250 billion over the next five years to expand its broadband networks, including its mobile wireless network.[181] As noted, there are numerous wireless ETCs providing Lifeline service in AT&T's California service territory.[182] And the two largest mobile wireless Lifeline providers in California are bound by merger commitments that ensure their continued participation: T-Mobile's affiliate Assurance Wireless has committed to offer Lifeline in California indefinitely, while Verizon's affiliate TracFone has committed to offer California LifeLine service for 20 years following its 2021 acquisition.[183]

---

[180] *See id.* ¶¶ 354, 360.

[181] *See AT&T Announces $250 Billion Commitment To Advance U.S. Connectivity*, AT&T (Mar. 10, 2026), https://about.att.com/story/2026/att-announces-250-billion-commitment.html.

[182] *See supra* notes 162–163.

[183] *See Joint Application of Sprint Commc'ns Co. L.P. (U5112) & T-Mobile USA, Inc., a Del. Corp., for Approval of Transfer of Control of Sprint Commc'ns Co. L.P. Pursuant to Cal. Pub. Util. Code Section 854(a)*, D.20-04-008, 2020 Cal. PUC LEXIS 529, at *26, *104, *117 (Apr. 16, 2020); *Joint Application of TracFone Wireless, Inc. (U4321C), América Móvil, S.A.B. de C.V. & Verizon Commc'ns, Inc. for Approval of Transfer of Control over TracFone Wireless, Inc.*, D.21-11-030, 2021 Cal. PUC LEXIS 564, at *1, *52 (Nov. 18, 2021); *see also Application of Verizon Communications Inc. and América Móvil, S.A.B. de C.V. for Consent To Transfer Control of International Section 214 Authorization*, 36 FCC Rcd. 16994, ¶¶ 131–35 (2021) (seven-year federal Lifeline commitment).

Exhibit L
347

Keeping forbearance conditional accordingly is no longer necessary. And granting AT&T permanent forbearance will provide it with the regulatory certainty necessary to plan for long-term copper retirement—precisely the kind of investment the *Network Modernization Order* was designed to encourage.[184] Making forbearance permanent satisfies section 10(a) for the same reasons the Commission found in 2016: enforcement of the Lifeline voice obligation is not necessary to ensure just and reasonable rates or to protect consumers given the abundance of alternatives, and permanent forbearance will serve the public interest by enabling AT&T to commit resources to network modernization rather than legacy infrastructure maintenance.[185]

<div align="center">*   *   *</div>

The modest, incremental relief sought in this Petition would not be necessary if not for the CPUC's erroneous denial of AT&T's ETC relinquishment application, which failed to heed the Commission's prior forbearance orders. In light of the CPUC's effort to transform AT&T's residual ETC obligations from a voluntary funding condition into a largely unfunded mandate to guarantee universal service, the Commission should take two steps to ensure that the CPUC does not undermine any further forbearance the Commission grants.

*First*, the Commission should confirm that, upon obtaining discontinuance authorization from the Commission under section 214(a), no other approval is necessary for AT&T to discontinue POTS, including CPUC approval to formally "relinquish" its ETC designation.[186] In its *2014 CAF Order*, the Commission observed that, while it was granting forbearance from the general voice obligation, "any incumbent price cap carrier must still comply with the

---

[184] *See Network Modernization Order* ¶¶ 1–2.

[185] *See 2016 Lifeline Order* ¶¶ 249–50, 353.

[186] *Network Modernization Order* ¶¶ 109, 114.

<div align="center">41</div>

<div align="right">Exhibit L

348</div>

requirements of section 214(e)(4) of the Act regarding relinquishment of ETC designation."[187]

That statement made sense at the time, when the Commission had not yet conditionally forborne in certain counties from the ETC obligation to provide Lifeline voice service. When the Commission later did so in its *2016 Lifeline Order*, it did not indicate that ETCs would continue to have *any* ETC obligation in areas where both forms of forbearance apply.[188] Here, if the Commission grants this Petition, it will have forborne from the entirety of AT&T's obligations as an ETC, obviating any need for AT&T to seek relinquishment. Nevertheless, for the avoidance of doubt, the Commission should clarify that, notwithstanding AT&T's nominal status as an "ETC," that status poses no barrier to discontinuance.

*Second*, in granting the Petition, the Commission also should confirm that the CPUC is prohibited from contradicting the Commission's forbearance decisions. Under section 10(e), "[a] State commission may not continue to apply or enforce any provision . . . that the Commission has determined to forbear from applying."[189] Accordingly, the Commission should make clear that its grant of forbearance bars the CPUC from imposing or enforcing any obligation against AT&T based on its nominal status as an ETC.

---

[187] *2014 CAF Order* ¶ 68. Notably, in making this observation, the Commission characterized as "speculative" the concern that seeking ETC relinquishment would be burdensome. *Id.* n.155. As shown above, AT&T's experience in California shows this concern is no longer "speculative."

[188] *See 2016 Lifeline Order* ¶ 355.

[189] 47 U.S.C. § 160(e); *see N.Y. State Telecomms. Ass'n v. James*, 101 F.4th 135, 155 (2d Cir. 2024) ("If the FCC decides to forbear from imposing a common carrier obligation, the states are prohibited from imposing that same obligation on the telecommunications service.").

Exhibit L

349

**V.      CONCLUSION**

For the foregoing reasons, the Commission should grant forbearance from any obligation imposed on AT&T by virtue of its designation as an ETC under section 214(e) throughout its California incumbent service territory.

Respectfully Submitted,

/s/ C. Frederick Beckner III

| | |
|---|---|
| BRETT FARLEY | C. FREDERICK BECKNER III |
| CHRISTOPHER HEIMANN | MAUREEN R. JEFFREYS |
| DAVID CHORZEMPA | WILLIAM C. PERDUE |
| DAVID LAWSON | ARNOLD PORTER KAYE SCHOLER LLP |
| AT&T SERVICES, INC. | 601 Massachusetts Ave. N.W. |
| 601 New Jersey Ave. N.W., Ste. 650 | Washington, DC 20001-3743 |
| Washington, DC 20001-3051 | |

*Counsel for AT&T Services, Inc.*

May 20, 2026

43

Exhibit L

350

351

# Exhibit 1

Exhibit L
351

**DECLARATION OF SANDRA CHARNESKI**

I, Sandra Charneski, declare as follows:

## I.    QUALIFICATIONS AND PURPOSE

1.    I am an Assistant Vice President of AT&T Services, Inc. in the areas of Public Policy and Data Analytics. I have worked for AT&T since 1984, and I have extensive experience in mapping and analyzing the coverage of fixed and mobile broadband and voice providers. I lead the team with a key role in providing AT&T's coverage data as part of the Commission's Broadband Data Collections for the National Broadband Map and am familiar with how carrier coverage data underlie that map. I also am familiar with how AT&T developed the coverage and related data it presents in its petition for forbearance ("the Petition") and the filings it is making in connection with seeking discontinuance for 360 wire centers in California (the "Discontinuance Applications").

2.    The purpose of this declaration is to explain how AT&T used the Commission's National Broadband Map and other information sources to develop the coverage and related data it presents in the Petition.

## II.    AT&T'S DATA ANALYSES

3.    AT&T's data analyses began with shapefiles of the boundaries of AT&T's 613 wire centers in California.[1] AT&T overlaid those wire center shapefiles with the boundaries of the census blocks from the 2010 U.S. census,[2] which also define county boundaries because

---

[1] "A shapefile is a simple, nontopological format for storing the geometric location and attribute information of geographic features. Geographic features in a shapefile can be represented by points, lines, or polygons (areas)." *What Is a Shapefile?*, ArcMap, https://desktop.arcgis.com/en/arcmap/latest/manage-data/shapefiles/what-is-a-shapefile.htm (last visited May 15, 2026).

[2] The U.S. Census Bureau changed census block boundaries between the 2010 and 2020 censuses. For purposes of its analysis, AT&T uses the 2010 census block boundaries as the Commission did when it most recently identified the census blocks that are not subject to

Exhibit L
352

census blocks are entirely contained within counties. AT&T then overlaid version 7 of CostQuest's Broadband Data Collection location fabric to identify each broadband serviceable location in the 613 wire centers using the latitude and longitude, and capturing address, unit count, and building type code for each. A broadband serviceable location is "a business or residential location in the United States at which mass-market fixed broadband Internet access service is, or can be, installed."[3]

4.     AT&T also overlaid data for each of its active POTS residential and business service locations (as of February 28, 2026) and, for residential service, whether the customer receives the Lifeline discount for POTS service at that location. The service location data also identify the wire center serving each location.

5.     AT&T also overlaid coverage data from the "Data Download" tab of the National Broadband Map website, using the data as of June 30, 2025 (the latest data available). For mobile coverage, the data for each provider comprise a set of shapefiles depicting the areas the provider covers. For fixed coverage, the data for each provider comprise the specific locations where the provider offers service. Specifically, AT&T overlaid mobile voice coverage data from AT&T, T-Mobile, and Verizon and fixed broadband coverage data by speed from every fixed broadband provider in California that offers service using cable, copper wire, fiber to the premises, licensed-by-rule terrestrial fixed wireless, licensed terrestrial fixed wireless, and unlicensed terrestrial fixed wireless (*i.e.*, every terrestrial fixed broadband technology but "other"

---

forbearance. *See* FCC, *List of Census Blocks Subject to Federal High-Cost Voice Obligations (as of 1/13/23)*, https://www.fcc.gov/sites/default/files/pc_etc_voice_oblig_1_13_23.xlsx, *available at Price Cap Resources*, FCC, https://www.fcc.gov/general/price-cap-resources (last visited May 15, 2026). Using 2010 census block boundaries allows an apples-to-apples comparison.

[3] *About the Fabric: What a Broadband Serviceable Location (BSL) Is and Is Not*, FCC (July 31, 2025), https://help.bdc.fcc.gov/hc/en-us/articles/16842264428059-About-the-Fabric-What-a-Broadband-Serviceable-Location-BSL-Is-and-Is-Not.

Exhibit L
353

technologies).[4] AT&T similarly determined satellite-based coverage from the National Broadband Map data.

6.    In addition, AT&T identified whether the Commission had forborne from enforcing the "federal high-cost requirement that price cap carriers offer voice telephony service throughout their service areas pursuant to section 214(e)(1)(A)" for each of the 2010 census blocks overlapping any of the 613 wire centers ("2014 Forbearance").[5] For the 56 counties overlapping any of the 613 wire centers, AT&T also identified whether the Commission had forborne from the requirement that eligible telecommunications carriers ("ETCs") with designations enabling them to receive both federal high-cost and Lifeline support provide Lifeline voice service ("2016 Forbearance").[6]

7.    Together, these overlaid sets of data allowed AT&T to:

- determine the mobile voice and fixed broadband providers that can serve each broadband serviceable location in the 613 wire centers;

- determine the mobile voice providers that can serve each of AT&T's POTS customer locations;

- determine whether mobile wireless ETCs can serve AT&T's Lifeline customers based on wireless coverage of the customer;[7]

---

[4] AT&T excluded fixed broadband coverage using its own copper wires from this analysis.

[5] *Connect Am. Fund*, Report and Order, 29 FCC Rcd. 15644, ¶ 51 (2014); *see* FCC, *List of Census Blocks Subject to Federal High-Cost Voice Obligations (as of 1/13/23)*, https://www.fcc.gov/sites/default/files/pc_etc_voice_oblig_1_13_23.xlsx, *available at Price Cap Resources*, FCC, https://www.fcc.gov/general/price-cap-resources (last visited May 15, 2026). To account for imprecisions in mapping data, AT&T excludes *de minimis* overlaps of less than or equal to 0.1 percent of the census block's area.

[6] *See Lifeline & Link Up Reform & Modernization*, Third Report and Order, Further Report and Order, and Order on Reconsideration, 31 FCC Rcd. 3962, ¶¶ 335, 360 (2016); *Wireline Competition Bureau Announces Counties Where Conditional Forbearance from the Lifeline Voice Obligation Applies*, Public Notice, 40 FCC Rcd. 5759 (WCB 2025).

[7] I understand that, when the California Public Utilities Commission ("CPUC") designates a provider as an ETC, the CPUC specifies the geographic area for which it designates the provider

Exhibit L
354

- aggregate these coverage determinations by census block and wire center;

- identify how these coverage determinations interact with the Commission's 2014 Forbearance and 2016 Forbearance determinations; and

- estimate which additional census blocks would qualify for 2014 Forbearance based on the most recent National Broadband Map coverage data.

## III.    THE RESULTS OF AT&T'S DATA ANALYSES

8.      AT&T determined the scope of competitive alternatives generally in its service territory, as well as specifically with respect to the wire centers where it is seeking discontinuance, the 2014 and 2016 forbearance orders, and Lifeline customers.

9.      **AT&T's Service Territory.** Across all of AT&T's 613 California wire centers, approximately 99.9 percent of broadband serviceable locations have two or more facilities-based fixed broadband or mobile voice providers and about 99.7 percent have three or more providers.

10.      **Wire Centers Where AT&T Is Seeking Discontinuance.** Of the over five million broadband serviceable locations in the 360 wire centers where AT&T is seeking to discontinue service, AT&T's LTE mobile voice service reaches more than 99.9 percent. Virtually all of these broadband serviceable locations also have access to multiple alternatives. Over 99.9 percent of these broadband serviceable locations have access to at least two of the national mobile voice providers and three or more facilities-based, terrestrial fixed broadband or mobile voice providers. Even considering just fixed broadband providers, approximately 99.7 percent of broadband serviceable locations have access to one or more facilities-based fixed broadband providers, and approximately 96 percent have access to two or more.

11.      AT&T serves approximately 184,000 residential and approximately 15,000 business POTS customers in those 360 wire centers. AT&T's LTE mobile voice service reaches

---

and, in the case of resellers, the underlying facilities-based providers. I further understand that there are multiple mobile ETCs reselling AT&T, Verizon, and T-Mobile wireless service.

<div align="center">4</div>

<div align="right">Exhibit L<br>355</div>

each of those locations, and approximately 99.9 percent of those locations have access to at least two of the national mobile wireless providers.

12.     **2014 Forbearance.** There are about 469,000 census blocks in AT&T's service territory in California. The Commission has forborne from the general voice obligation for most these census blocks: Only about six percent, or about 29,000 census blocks, are on the Commission's most recent list of census blocks without 2014 Forbearance ("Remaining Census Blocks").[8] However, as I now explain, the Commission's data show that nearly all broadband serviceable locations in those Remaining Census Blocks have access to at least one alternative provider of facilities-based fixed broadband or mobile voice service, and often several.

13.     The Commission's list of census blocks without 2014 Forbearance is over three years old and does not reflect substantial expansions of fixed broadband network coverage in recent years. Applying the National Broadband Map data as of June 30, 2025 to the test for 2014 Forbearance,[9] AT&T estimates that about 19,000 of the Remaining Census Blocks would qualify for 2014 Forbearance. With this update, AT&T estimates that about 98 percent of the census blocks in its California service territory would qualify for 2014 Forbearance.

14.     Of the roughly 10,000 Remaining Census Blocks that AT&T estimates would not qualify for 2014 Forbearance, an additional approximately 4,500 census blocks have no broadband serviceable locations according to the National Broadband Map.

---

[8] *See* FCC, *List of Census Blocks Subject to Federal High-Cost Voice Obligations (as of 1/13/23)*, https://www.fcc.gov/sites/default/files/pc_etc_voice_oblig_1_13_23.xlsx, *available at Price Cap Resources*, FCC, https://www.fcc.gov/general/price-cap-resources (last visited May 15, 2026). The Commission's list attributes a small number of census blocks exclusively to other incumbent local exchange carriers even though they overlap AT&T's 613 California wire centers. For completeness, AT&T includes those census blocks in its analysis.

[9] The Commission's test is set forth in Paragraph 51 of its 2014 Order. *See Connect Am. Fund*, Report and Order, 29 FCC Rcd. 15644, ¶ 51 (2014).

5

Exhibit L

356

15.     After accounting for census blocks that AT&T estimates would qualify for 2014 Forbearance with updated data and for census blocks with no broadband serviceable locations, only about 5,500 census blocks remain. For virtually all of the broadband serviceable locations within those census blocks—about 75,000 out of about 77,000—the National Broadband Map shows that there is broadband service from a fixed broadband provider or voice service from the mobile wireless network of AT&T, Verizon, or T-Mobile. Indeed, in all but about 400 of these census blocks, every broadband serviceable location has access to service from a fixed broadband provider or from the mobile wireless network of AT&T, Verizon, or T-Mobile. And all broadband serviceable locations in the last roughly 400 census blocks are covered if satellite-based service is included.

16.     **2016 Forbearance.** The Commission has granted forbearance from serving new Lifeline customers in every county within AT&T's service territory except two, Sierra and Trinity Counties.[10] Based on the National Broadband Map, of the approximately 2,800 total broadband serviceable locations in these two counties combined, only about 500 lack mobile wireless voice service.

17.     That figure does not account for satellite. All of those locations are shown as being covered by satellite-based service.

18.     **Existing Lifeline Customers.** As noted, mobile wireless ETCs resell mobile voice service throughout AT&T's California incumbent local exchange carrier service territory. Across all of AT&T's 613 California wire centers, over 99.8 percent of AT&T's approximately

---

[10] *See Lifeline & Link Up Reform & Modernization*, Third Report and Order, Further Report and Order, and Order on Reconsideration, 31 FCC Rcd. 3962, ¶¶ 335, 360 (2016); *Wireline Competition Bureau Announces Counties Where Conditional Forbearance from the Lifeline Voice Obligation Applies*, Public Notice, 40 FCC Rcd. 5759, 5763–5764 (WCB 2025).

Exhibit L

357

40,000 existing Lifeline customers in California are covered by at least one mobile wireless network, and over 99.5 percent are covered by at least two. Each of these covered Lifeline customers thus has access to multiple alternative ETCs.

19.    With regard to the 360 wire centers covered by AT&T's Discontinuance Applications, AT&T's LTE mobile voice network reaches all of AT&T's existing Lifeline customers. Therefore, all of AT&T's existing Lifeline customers in these 360 wire centers have access to multiple alternative ETCs. Further, approximately 99.99 percent are also covered by the mobile wireless networks of Verizon, T-Mobile, or both, providing them access to additional alternative ETCs (Verizon and T-Mobile affiliates as well as resellers).

7

Exhibit L

358

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 18, 2026.

Sandra Charneski

Exhibit L
359