UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE LINDA LOPEZ

UNITED STATES DISTRICT JUDGE

| | |
|---|---|
| PACIFIC BELL TELEPHONE COMPANY d/b/a AT&T CALIFORNIA, | ) |
| Plaintiff, | ) Case No.26-cv-03148-LL-JAC |
| v. | ) Thursday, July 16, 2026 |
| JOHN REYNOLDS, in his official capacity as President of the California Public Utilities Commission; DARCIE L. HOUK, KAREN DOUGLAS, MATTHEW BAKER, and CHRISTINE HARADA, in their official capacities as Commissioners of the California Public Utilities Commission; ROB BONTA, in his official capacity as Attorney General of the State of California, | ) CERTIFIED TRANSCRIPT |
| Defendants. | ) |

REPORTER'S TRANSCRIPT OF MOTION HEARING

PAGES 1 THROUGH 25

(Appearances of Counsel on Following Page)

Reported By: Jessica Borynack, RPR, CSR No. 14779
District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California 92101-3806
(Reported stenographically; transcribed via computer)

APPEARANCES:

For Plaintiff: GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
WASHINGTON, DC 20036-4504
BY: MORGAN L. RATNER, ESQ.

GIBSON, DUNN & CRUTCHER LLP
2000 Avenue of the Stars, Suite 1200N
Los Angeles, CA 90067-4700
BY: JILLIAN NICOLE LONDON, ESQ.

For Defendants: CALIFORNIA DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
BY: CAMILLE FRAMROZE, ESQ.

OFFICE OF THE ATTORNEY GENERAL
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
BY: SABRINA T. MCGRAW, ESQ.

Attorneys for
Amicus Curiae: BEST BEST & KRIEGER LLP
1800 K Street NW, Suite 725
Washington, DC 20006
BY: CHERYL ANN LEANZA, ESQ.

BEST BEST & KRIEGER LLP
300 South Grand Avenue, 25th Floor
Los Angeles, CA 90071
BY: GAIL A. KARISH, ESQ.

.

Also Present: Joseph P. Tocco, In-House Counsel for AT&T.

Todd Grabarsky, Deputy Attorney General for California Department of Justice.

**SAN DIEGO, CALIFORNIA: THURSDAY, JULY 16, 2026; 11:00 A.M.**

*** * * ***

**(All parties appearing via Zoom.)**

**(Call to order.)**

***THE CLERK:*** Matter 1: 26-cv-3148, Pacific Bell Telephone Company v. Reynolds, et al. for a Motion Hearing.

***THE COURT:*** All right. Counsel, if you can make your appearances.

***MS. RATNER:*** Good morning, Your Honor. Morgan Ratner for AT&T. I'm here with my colleague, Jillian London, and we have with us Joe Tocco from AT&T.

***THE COURT:*** All right. Thank you.

For the defense?

***MS. FRAMROZE:*** Good morning, Your Honor. Camille Framroze for the defendants. And I'm joined by my colleagues Todd Grabarsky and Sabrina McGraw.

***THE COURT:*** All right. Thank you.

Appreciate all of you making time to be here this morning and I appreciate all of the briefings that have been submitted so far.

So we're here this morning for Plaintiff AT&T's motion for preliminary injunction. The matter is fully briefed, and I've granted with two motions for leave to file briefs, the amicus briefs, so those have been granted.

So on March 26, 2026, the FCC issued a report and order on

network modernization that provided authorization for carriers, such as AT&T, to stop offering new customers its legacy telephone service over copper wires, a process called "grandfathering." AT&T refers to the legacy copper wire service as "plain old telephone service" or "POTS" for short.

AT&T claims that it cannot begin grandfathering its copper wire service in California because AT&T is a Carrier of Last Resort and subject to requirements that come with that designation. So AT&T seeks a preliminary injunction to stop California officials from applying the State's Carrier of Last Resort rules and tariff regime when AT&T begins grandfathering its legacy telephone service over copper wires on July 19th of 2026.

AT&T claims that a federal statute in the Communications Act of 1934 as amended by the Telecommunications Act of 1996 -- specifically, Section 214 of Title 47 of the United States Code -- preempts California's Carrier of Last Resort requirements.

On the other hand, California opposes arguing that the Carrier of Last Resort rules do not conflict with the network modernization order and the Communications Act, because although the State requires -- the State rules require that AT&T offer basic service to its customers, they do not require that AT&T use copper wire to do so.

California contends that there is no conflict and thus no

preemption, that AT&T cannot show irreparable harm because any such harm is self-inflicted and that the public interest in California -- that the public interest in California favors.

I'm going to start with some questions first for the plaintiff.

For the plaintiff: What telephone services can AT&T provide that complies with the Carrier of Last Resort rules by offering basic services to California customers without the use of copper wire?

***MS. RATNER:*** Well, the answer, Your Honor, is as currently construed with this set of basic service requirements that are geared toward a traditional POTS network, we cannot provide -- or we do not provide an alternative that has some things like operator services and white pages.

We do provide alternate coverage everywhere, and that, I think, is really critical. The question is just, is California going to accept an alternate that the FCC has -- says is an adequate replacement? But that doesn't comply with some of these more minor and outdated provisions of the basic service requirement.

So I think it's really critical everyone has an adequate alternative coverage -- that's the Ray Declaration 13 -- but it's not coverage that we think California is going to say that ticks every last little outdated box.

***THE COURT:*** All right. So for example, if AT&T

replaced with phone advance or AP-A or fiber wire service, are you saying that if AT&T switched to either of those two systems, your position is that California would say that the phone service that's being provided by using one of those two methods -- for lack of better choices -- would still not provide the customers exactly what California believes the customers are entitled to?

***MS. RATNER:*** That is my understanding, Your Honor. And I just want to be very clear, if the Court were to issue, for example, a preliminary injunction that said AT&T has to provide coverage everywhere in this territory that is sufficient to satisfy what the FCC has said is an adequate recess placement for POTS -- and that would include AP-A -- we would be perfectly happy with a preliminary injunction that says we have to comply with that.

I think the problem is, again, that California says either we're not going to accept those things as alternatives, or we need to send you down a rabbit hole of months and months of procedure in order to make a decision on that question. And both of those reasons are a problem for preemption.

***THE COURT:*** And so the next question that I have that is according to California, AT&T is able to use fiber to provide basic services, because you all are already doing it for approximately 5,600 people. So my question is: Those 5,600 people that are getting service -- I have a few questions

with respect to that; Number 1, are they getting service that, as far as you know, California is satisfied with; Number 2, how did that happen; and Number 3, did you have to apply to receive permission for California to approve those 5600 customers?

***MS. RATNER:*** Yeah. So, Your Honor, let me say two things on fiber. I think the first is I want to be really clear here, this is not fiber as we might think of as the internet fiber, the voice over internet protocol fiber. This is actually portions of the traditional POTS network, the traditional circuit-based switching network, where we have had, for whatever reason, some of that copper wire destroyed and have put in fiber instead.

So yes, that has been accepted. It's part of the traditional POTS system. It's not the new fiber internet-based fiber that we're usually thinking of when we're talking about as fiber.

***THE COURT:*** So why --

***MS. RATNER:*** Yeah, you --

***THE COURT:*** I'm going to interrupt you. Counsel, I'm going to interrupt you. So then, I understand what AT&T wants. But if what we're focusing on right now is how can we eliminate the copper, and for 5600 people, California approved removing copper with a form of fiber that is not what we currently in 2026 consider fiber, but nonetheless, it is a means by which to remove copper and comply with what California believes AT&T --

AT&T is required to be providing as a Carrier of Last Resort.

So, you know, how -- why wouldn't that be the best alternative?

***MS. RATNER:*** So understand, Your Honor, two things on that: The first is it is not feasible -- and we say this in the reply declaration and I think California knows this -- there is no world where we can install modern fiber to serve everyone in our territory. It's not even close to economically viable. So we are going to have to serve some people in our territory by wireless or by reliance on alternative carriers. Fiber cannot carry the whole day for everyone.

The second point is, I just want to be really clear here, this is fiber still within the old circuit-based POTS network that we want to replace. And yes, we -- we usually use as shorthand "copper POTS," because it's traditionally been copper and it's almost entirely copper. But it's still part of that old, outdated network that we want to move on from anyway.

So the answer is, sort of, this is not a different thing, and even if it were, there is no world where this can be the substitute. We're going to have to talk about some FCC-approved substitutes including wireless to have a realistic coverage for everyone.

***THE COURT:*** With respect to -- for those 5600 people, did you have to apply to get that approved? And if so, how did that process go? Because I know AT&T mentions in their

briefings that you are seeking a preliminary injunction and not going through this application process, because, in your opinion, it's going to just fall in some black hole somewhere and never get approved or get decided.

So how did it happen for these 5600 people?

***MS. RATNER:*** Your Honor, I do not know the details. But because we weren't changing the service, again, we were not changing it from the POTS service to a internet fiber service, we were just replacing a piece of the cable. I think that it was not a particularly complicated switch because we didn't change the underlying service.

For changing from POTS service to different services, like wireless services, that's the real concern that we talk about needing an application to substitute POTS -- that's what California says we would have to do -- and having any sort of process there, the process is the problem. We're going to have to go through state approval processes to be allowed to do something that the federal government has said we get to do right now.

***THE COURT:*** So it sounds like -- I don't want to put words in your mouth -- but it sounds like really the bigger issue here is not whether you want to replace copper and what would be feasible to do with copper. This -- what seems to me from some of the positions raised in the briefing, and based on your current response, is really what AT&T is seeking to do is

to just change the type of service that these individuals are currently receiving.

Would that be a fair statement?

***MS. RATNER:*** I think that is a fair statement. AT&T has made commitments that no customer is left behind. In 100 percent of this territory, there are alternate options; 99.9 percent at least two carriers; 99.7 percent at least three carriers.

But the problem is procedural that if we want to make that switch, we have to go down the California rabbit hole after we have been told by the federal government that we're done with getting approvals. And the problem is substantive which is that California does not share the same view of wireless, the most critical substitute, that the federal government has.

And so those are the two obstacles for us relying on these clear alternative services.

***THE COURT:*** It seem that California -- and I don't want to put words in their mouth -- but it seems that California's position is not so much that they'd be opposed to a change, they just want a change that -- and I think they affirmatively say that -- they want a change that would continue to provide for these individuals, particularly in rural neighborhoods, elderly people, people with disabilities. They would like -- they believe that according to the state regulations, they'd still be permitted to require that AT&T,

under the last resort -- be required to provide those services.

And so AT&T -- I mean, California's position is, you know, if AT&T can continue providing those services, using any other means, then we're not opposed. But we believe that those services are essential and they're critical. And quite honestly, I think they make a good argument for that because there are a lot of services --

***MS. RATNER:*** So, Your Honor --

***THE COURT:*** Go ahead. I'm sorry.

***MS. RATNER:*** No, I'm sorry. I -- we agree that we are not trying to take service from anyone. The thing that California is asking for though is to run that additional analysis of whether it thinks these things are substitutes when the federal government has already told us two things: One, we're done with the analysis, go ahead start now; and two, that it does think that these things are substitutes.

And so California is asking, Well, we're not sure we want to do our own process first. And that's why I keep going back to the process is the preemptive problem because you have the federal government saying, "You can act now"; and you have California saying, "Well, we're not so sure yet. We need to decide whether you can act now." And that's, I think, the source of the conflict.

But I do want to be perfectly clear, we -- we are asking for 360 wire centers that we have care -- carefully chosen

because we don't think that any person will lose access, because we think we can provide people with the same or better services in those areas.

And if you think of this as, sort of, a Venn diagram, we're talking only about grandfathering. For any person to be harmed here, you would need someone in the middle of a Venn diagram where one side is a person who does not have existing service but wants to add POTS, and other side is that person does not have an equal or better alternative. We don't think there's single person in the middle of that Venn diagram. Almost nobody is coming to POTS new -- which is what this PI is about, grandfathering only -- and almost everybody has better options.

And so I don't think at the end of the day there's really a public interest to your concern with this request, or anybody in the middle of that Venn diagram who could be harmed. And I haven't seen California or the amici identify any specific person who might fall in the middle here. We've done the work to make sure there won't be anyone.

***THE COURT:*** All right. And has that -- have your studies and work that you've done and your inclination to create 360, you know, wire centers, has that information all been provided to California and is -- and I guess it'll tie into another question -- or is your position "We have not because we don't believe we need to," based on the recent

ruling from the FCC?

***MS. RATNER:*** Well, Your Honor, our position is that we don't think we need to, but yes, we have provided it to California. And what I mean by that is we fought this out in front of the FCC, right? California was there and has done filings. AT&T was there and has done filings.

So all of this information about adequacy of AP-A about coverage options, all of that is stuff that was presented to the federal government, and the federal government has made determinations on that front. And look, the FCC has already taken a look and has said some of these concerns about wireless, about rural customers, we think -- and this is quote from page -- from paragraph 49 of the NMO, "Are well-intentioned but misplaced."

So it's run the analysis and we're just arguing at this point. We get to operate with the approvals that we have and to say, "Well, we just need a little more bureaucracy," is not consistent with the immediate action item that we have from the FCC.

***THE COURT:*** Last question I have for the plaintiff is: So AT&T announced that it would stop offering copper wire service to new customers beginning July 19th of this year. Where did that date come from? Because while I -- while I appreciate that this needs to be resolved, I personally don't -- or the Court doesn't personally see this urgency of

July 19th or something really terrible is going to happen because, you know, the bigger concern for me is, you know, we go with this arbitrary date of July 19th, and your 360 wire centers are not up and running and someone in a rural area, you know, notices a fire start and they try to use their phone and they can't connect, and we lose a, you know, portion of our population; small as it may be or large as it may be. And that's more concerning to me than a July 19th deadline for financial reasons.

***MS. RATNER:*** So, Your Honor, I will answer the July 19th. But if I could just make two very quick factual corrections. I want to be clear, the 360 wire centers that I was referring to, that's the portion of our California service territory for which we have asked the FCC to discontinue and for which we are grandfathering right now.

***THE COURT:*** Okay.

***MS. RATNER:*** My point on that was, we're not just willy-nilly pulling back everywhere, we actually carefully considered where there were alternates and are acting only on those areas of the territory.

With just one more tiny factual point, if we're talking about fires or people losing service, I want to be crystal clear: The preliminary injunction is just for new customers. There is discontinuance in the pipeline, that is not anything that we have provided notice for until June of 2027. And so

the July 19th date is solely -- this is the date on which we're going to stop adding new accounts.

Now where did that date come from -- just to get back to Your Honor's question -- we had permission to do that -- clear permission from the NMO when it was finalized in May. The NMO and the FCC generally requires the notice to customers. So acting on our federal rights, we then issued notice to customers consistent with what the FCC had said. We gave the 60-day notice period -- which is, sort of, the 30 or 60 days is standard for grandfathering -- and that 60-day notice period runs up on July 19th.

So that's where we ended up, but it is acting based on when our federal authorization occurred and when the FCC said, "Look, we don't have to be waiting on further state approvals."

***THE COURT:*** All right. Thank you.

So a couple questions for the defense: So what alternative, non-copper wire service can AT&T provide that would satisfy the CPUC basic services?

***MS. FRAMROZE:*** Your Honor, that is -- as the California COLR rules are drafted, they are entirely technology neutral. So there are no restrictions on what technology AT&T can use to satisfy those requirements.

The definition was first laid out in a Commission Decision No. 12-12-038. And that decision explicitly contemplates how different kinds of technology could meet the elements;

including wireless that is referenced dozens, if not hundreds, of times in that decision.

So the question it's -- the -- the question itself makes an assumption that I don't think it is warranted in terms of how the COLR rules actually operate. AT&T and any provider -- not just AT&T -- is free to use any technology it wants to satisfy the COLR rules so long as it is meeting the definition of basic service.

***THE COURT:*** So do you agree then with the amicus brief filed by Rural County Representatives of California and others where they state that any wireless service, including AT&T Phone Advanced, are not functionally reliable and thus cannot satisfy the basic services rule?

***MS. FRAMROZE:*** We do not, Your Honor. We do not agree that as a matter of fact a wireless provider could never satisfy the COLR rules. And again, I say that because the ability of a wireless -- the basic service definition was first arrived at in 1996 in a very different technological context. The reason it was updated in 2012 was to take account of new technologies in the market and how the definition should be adapted and crafted such that wireless providers could meet it.

So far from agreeing that it could never, it's explicitly contemplated that they can and should.

***THE COURT:*** If AT&T filed an application today to substitute something else for copper wire services, how long

would that process take for them to obtain an answer? Is it truly a black hole like I just very briefly or generally described? What does that process look like?

***MS. FRAMROZE:*** Your Honor, I'm so glad you asked, because there is no application.

***THE COURT:*** Correct. But if they --

***MS. FRAMROZE:*** There is no --

***THE COURT:*** -- if they applied -- if they applied today, how long does a process like that take?

***MS. FRAMROZE:*** Your Honor, what I mean by that is -- and sorry, I'll -- I'll be clear about how that could work if they decided to ask for sign off -- but I just want to be clear that there is baked into AT&T's briefing and perhaps some of the answers, this idea that AT&T has to secure approval before it conducts this replacement or substitution, and that there's an application process that it has to go to -- go through.

The only point that I want to clarify is that if AT&T now, today, tomorrow, months from now wants to start grandfathering its copper-wire network and offering service to new customers through another technological means, it can do that without having to go through any procedural -- bureaucracy or not, any procedural at all.

So the advice letter process, which was in our briefing, is optional if a carrier wants sign off before it undertakes -- the advice letter process exists for a variety of changes, Your

Honor, not just a change in technology. More commonly, it's used for changes in tariffs --

**(Court Reporter interruption.)**

***MS. FRAMROZE:*** But it's a voluntary --

***THE CLERK:*** Ma'am, can you please slow down? Speak more clearly and slowly, please.

***MS. FRAMROZE:*** I apologize.

***THE CLERK:*** Thank you.

***MS. FRAMROZE:*** I apologize. Please stop me if I'm going too fast again.

The advice letter process is voluntary, and it allows AT&T to say that it wants to do X, Y, Z, and would the commission approve if it did. But it isn't a required process for substituting the technology.

***THE COURT:*** So -- so if I'm -- and honestly, coming into this hearing, what both lawyers have represented is pretty similar to what I assessed from the briefings. It seems like AT&T's position is because it's the right thing to do, and based on the FCC's recent ruling, we believe that we can replace copper wiring with modern technology that could still provide these basic services that they're required to provide under Carrier of Last Resort. And California's saying we don't disagree, you can do this and it doesn't have to be copper wire, you can replace it with whatever type of technology so long as these basic services that are provided under the

Carrier of Last Resort break down -- as long as those services are provided, then we don't -- it doesn't matter to us what type of technology is used.

And so when I -- putting aside the amicus brief, when I hear those two sides of arguments, it doesn't seem to me that we necessarily have a conflict that necessitates a ruling from the Court.

But that said, I do want to take a brief recess and if we can meet back up in about 15 minutes.

***THE COURT:*** All right. Thank you.

***MS. FRAMROZE:*** Thank you, Your Honor.

**(Recess taken from 11:25 a.m. to 11:42 a.m.)**

***THE CLERK:*** Remain seated. This District Court is once again in session.

***THE COURT:*** All right. Once again, thank you very much for your briefings and your argument here this morning.

So my basic takeaway after hearing from everyone and reviewing the briefings is that we have -- we have significant amount of agreement between the parties here. I think everyone is seeking, to an extent, to accomplish the same goal. AT&T is aware of their requirement to offer basic services as the Carrier of Last Resort; and State of California is concerned about whether new technology could potentially provide all of the services that are deemed to be essential or necessary.

And I -- one of the things that I, you know, wonder is I

know in one of the briefings there was a mention that in 2024, California was going to take another look at these services that are included in the basic services that must be provided and potentially rework those according to changes in technology and modernization.

I don't have -- no one brought before me the studies of that, whether it even happened, of that review of list because I -- you know, I do think that perhaps the parties meeting and conferring to determine which of those basic services California is concerned would not be able to be provided with AT&T's modernization whether they are, in fact, still necessary, viable, supported in this current technology time that we live in.

So I do think that with respect to coming up with potentially an ability for the parties to meet and going over your list -- I don't recall if it was 16 or 17 items that are considered basic services -- it's possible that this issue can be resolved and that AT&T can begin their modernization process while providing the services according to the Carrier of Last Resort, providing services that are consistent with where we currently are at today.

With that said, considering the pending motion in order to obtain a preliminary injunction, a plaintiff must show it is: One, likely to succeed on the merits; two, that will suffer irreparable harm absent relief; three, that the balance of

equities tips in its favor; and four, an injunction is in the public interest. These are sometimes called the "*Winter*" factors from *Winter v. National Resources Defense Council Inc.*, 555 U.S. 7 at page 20. The last two factors merge into one when the government opposes a preliminary injunction, as is the case here.

In the Ninth Circuit, a court may apply a sliding scale test in which serious questions going to the merits and a balance of hardships that tips sharply toward the moving party can support the issuance of a preliminary injunction as long as there is also a showing of a likelihood of irreparable injury and that the injunction is in the public interest. And that is from *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 at page 1135, decided by the Ninth Circuit in 2011.

The Supreme Court describes preemption occurring when Congress enacts a law that imposes restrictions or confers rights on private actors, as state law confers right or imposes restrictions that conflict with the federal law; and therefore, the federal law takes precedent and the state law is preempted. *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453, at page 477.

I find two factors are dispositive here: Irreparable injury and the public interest.

First, the Court does not find an injunction allowing AT&T to immediately stop offering copper wire service to new

customers would be in the public interest. AT&T states that it does not dispute that the public interest is advanced by sustaining universal service as another court held in *Assurance Wireless USA, L.P. v. Reynolds*, found at 2023 Westlaw 2780365, on page 1.

Logically then, removing the copper wire option then meets the basic services requirements and replacing it with an alternative that may not satisfy basic services, as they stand today, will reduce universal service. If, for instance, the alternative is too expensive or does not provide access to telephone relay service for people with hearing or speech disabilities, this reduces universal service.

Similarly, interrupting the provision of the basic services instead of sustaining it would not serve the public interest.

AT&T argues that only few dozen customers a month order copper wire services. Rural counties' amicus brief suggest that people request copper wire service due to financial or geographical necessity. Removing the only viable phone service option for some people, even if it's not too many people, as opposed to maintaining the status quo does not advance public interest.

Second, the Court agrees with those courts that find no irreparable harm when that harm is self-inflicted such as *Stardock Systems, Inc. v. Reiche*, 218 Westlaw 7348858, at page

11.

AT&T claims that without an injunction, it will suffer millions of dollars in unrecoverable damages by being forced to maintain the allegedly, quote, "outdated, slower, and less reliable," end quote, copper-wire network; as well as harm to its customer goodwill and competitive standing.

However, since 2012 when the CPUC updated the requirements for residential basic telephone service so that it was technology neutral instead of being based on wireline technology, AT&T was free to provide basic services with something other than copper wire. The 2012 revisions state that the adopted basic service elements are designed to apply on a technology-neutral basis to all forms of communications technology, that may be utilized including wireline, wireless, and voice over internet protocol or any other future technology that may be used in the provision of tele -- in the provision of telephone services.

Because the Court does not find that AT&T has shown that it will suffer irreparable harm without an injunction and that an injunction would serve public interest, the Court denies AT&T's motion for preliminary injunction.

With that ruling in mind, I will come back to how I started before I issued the ruling. It seems that what California is conceding in their 2012 changes to the CPUC which is that it is technology neutral may somehow potentially --

these are just thoughts, not a ruling -- be in conflict with the current list of basic necessities.

So on the one hand, California is saying you can use whichever technology so long as you provide basic services, but of these specific list of basic services which was to be renewed -- or reviewed in 2024 and contains certain aspects of it that make it impossible for anything other than copper wire or some form of actual wire to be provided, then there seems to be some inconsistency there. Which is why I urge the parties to meet and confer after this ruling and come up with whether the list of basic services can actually be modified to accomplish what AT&T is attempting to accomplish pursuant to the FCC ruling, and with what California is attempting to accomplish by indicating that they have no opposition to a technology-neutral system. I don't think that this can all coexist together. And so and it's a suggestion that you all try to see if you can come up with a solution for this.

That's going to -- that's my ruling for today. I know that I previously issued an order extending the deadlines to reply to complaints.

I am available if you all want to attempt to have any type of mediation session with the magistrate judge assigned to this case to see if you can attempt to revamp what that list of basic requirements or basic services are. I encourage you to do so. It could be very, very beneficial for everyone and I

think that we can get on track to where AT&T's trying to go and to where it seems State of California realizes it's inevitably going to go at some point. So rather than spending a ton of time in litigation, I think you all can resolve this.

So in the event you choose to take up my recommendation and reach out to your magistrate judge, feel free to let them know that we had this hearing, what my ruling was, and ask to see if you can meet with them at the earliest possible opportunity.

All right. That's all for today. Thank you.

***MS. RATNER:*** Thank you, Your Honor.

***MS. FRAMROZE:*** Thank you, Your Honor.

***THE COURT:*** Thank you.

**(Proceedings adjourned at 11:53 a.m.)**

* * * *

C E R T I F I C A T E

I, Jessica Borynack, certify that I am a duly qualified and acting Official Court Reporter for the United States District Court; that the foregoing is a true and accurate transcript of the proceedings as taken by me in the above-entitled matter on July 16, 2026; and that the format used complies with the rules and requirements of the United States Judicial Conference.

Dated: July 17, 2026.

Jessica Borynack, RPR, CSR No. 14779
U.S. Official Court Reporter