**GIBSON, DUNN & CRUTCHER LLP**
THEODORE J. BOUTROUS, JR., SBN 132099
tboutrous@gibsondunn.com
JILLIAN N. LONDON, SBN 319924
jlondon@gibsondunn.com
MARISSA MULLIGAN, SBN 319734
mmulligan@gibsondunn.com
PATRICK J. FUSTER, SBN 326879
pfuster@gibsondunn.com
BRANTON J. NESTOR, SBN 338445
bnestor@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

JEFFREY B. WALL (*pro hac vice*)
jwall@gibsondunn.com
MORGAN L. RATNER (*pro hac vice*)
mratner@gibsondunn.com
1700 M Street, N.W.
Washington, DC 20036-4504
Telephone: 202.955.8533

*Attorneys for Plaintiff Pacific Bell Telephone Company d/b/a AT&T California*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

PACIFIC BELL TELEPHONE COMPANY d/b/a AT&T CALIFORNIA,

Plaintiff,

v.

JOHN REYNOLDS, in his official capacity as President of the California Public Utilities Commission; DARCIE L. HOUCK, KAREN DOUGLAS, MATTHEW BAKER, and CHRISTINE HARADA, in their official capacities as Commissioners of the California Public Utilities Commission; ROB BONTA, in his official capacity as Attorney General of the State of California,

Defendants.

Case No. 3:26-cv-03148-LL-JAC

**OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Judge: Honorable Linda Lopez

Courtroom: 14B

Hearing Date: November 5, 2026

**PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT**

# TABLE OF CONTENTS


Page

INTRODUCTION ........ 1

BACKGROUND ........ 3

A. Consumers Shift From POTS To Modern Networks. ........ 3

B. The FCC Authorizes Grandfathering And Discontinuance. ........ 4

C. California Imposes Its Own Service Rules. ........ 5

LEGAL STANDARD ........ 6

ARGUMENT ........ 7

I. The Court Has Jurisdiction. ........ 7

A. AT&T Has Standing. ........ 7

B. This Case Is Ripe. ........ 10

II. AT&T Has Stated A Plausible Preemption Claim. ........ 11

A. Section 214(c) Expressly Preempts California's Requirements. ........ 12

B. Federal Law Impliedly Preempts California's Requirements. ........ 19

CONCLUSION ........ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Encore* v. *Fontes*,
152 F.4th 1097 (9th Cir. 2025) ........ 9

*Am. Trucking Ass'ns, Inc.* v. *City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ........ 8

*Arizona* v. *Yellen*,
34 F.4th 841 (9th Cir. 2022) ........ 10

*AT&T Corp.* v. *Iowa Utils. Bd.*,
525 U.S. 366 (1999) ........ 20

*Bantam Books, Inc.* v. *Sullivan*,
372 U.S. 58 (1963) ........ 10

*Bell Atlantic Corp.* v. *Twombly*,
550 U.S. 544 (2007) ........ 6

*Block* v. *Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) ........ 20

*Cablevision of Texas III, L.P.* v. *Oklahoma W. Tel. Co.*,
993 F.2d 208 (10th Cir. 1993) ........ 13

*Cal. Rest. Ass'n* v. *City of Berkeley*,
89 F.4th 1094 (9th Cir. 2024) ........ 15

*Cal. Trucking Ass'n* v. *Bonta*,
996 F.3d 644 (9th Cir. 2021) ........ 8, 10

*California* v. *FCC*,
39 F.3d 919 (9th Cir. 1994) ........ 24, 25

*California* v. *FCC*,
75 F.3d 1350 (9th Cir. 1996) ........ 23

*Chamber of Com. of the United States* v. *Bonta*,
62 F.4th 473 (9th Cir. 2023) ........ 11

*Chicago & North W. Transp. Co.* v. *Kalo Brick & Tile Co.*,
450 U.S. 311 (1981) ........ 14, 17, 21

*China Unicom (Americas) Ops. Ltd.* v. *FCC*,
124 F.4th 1128 (9th Cir. 2024) ........ 14

*City & Cnty. of San Francisco* v. *Trump*,
897 F.3d 1225 (9th Cir. 2018) ........ 10, 11

*Colorado* v. *United States*,
271 U.S. 153 (1926) .......... 14

*Crosby* v. *Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) .......... 11

*Diamond Alternative Energy, LLC* v. *EPA*,
606 U.S. 100 (2025) .......... 8

*Fed. Election Comm'n* v. *Ted Cruz for Senate*,
596 U.S. 289 (2022) .......... 9

*Gade* v. *Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992) (Kennedy, J., concurring in part and concurring in the judgment) .......... 15

*Geier* v. *Am. Honda Motor Co.*,
529 U.S. 861 (2000) .......... 19

*Haw. Tel. Co.* v. *Pub. Utils. Comm'n of Hawaii*,
827 F.2d 1264 (9th Cir. 1987) .......... 21

*ITT World Commc'ns, Inc.* v. *N.Y. Tel. Co.*,
381 F. Supp. 113 (S.D.N.Y. 1974) .......... 13

*KalshiEX, LLC* v. *Assad*,
— F.4th —, 2026 WL 2543846 (9th Cir. Aug. 28, 2026) .......... 15, 16

*Lomax* v. *Ortiz-Marquez*,
590 U.S. 595 (2020) .......... 13

*Louisiana Pub. Serv. Comm'n* v. *FCC*,
476 U.S. 355 (1986) .......... 23, 25

*Lujan* v. *Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 7, 8, 10

*Maya* v. *Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011) .......... 9

*Midgett* v. *Tri-County Metro. Transp. Dist. of Or.*,
254 F.3d 846 (9th Cir. 2001) .......... 9

*Minn. Pub. Utils. Comm'n* v. *FCC*,
483 F.3d 570 (8th Cir. 2007) .......... 23, 25

*Morales* v. *Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .......... 11, 14

*Nat'l Rifle Ass'n of Am.* v. *Vullo*,
602 U.S. 175 (2024) .......... 6, 10

*North Carolina Utils. Comm'n* v. *FCC*,
537 F.2d 787 (4th Cir. 1976) .......... 25

*Peace Ranch, LLC* v. *Bonta*,
93 F.4th 482 (9th Cir. 2024) .......... 11

*Pub. Serv. Comm'n of Md.* v. *FCC*,
909 F.2d 1510 (D.C. Cir. 1990) .......... 24

*Puerto Rico* v. *Franklin Cal. Tax-Free Trust*,
579 U.S. 115 (2016) .......... 15

*Qwest Corp.* v. *Arizona Corp. Comm'n*,
567 F.3d 1109 (9th Cir. 2009) .......... 20

*Rates for Interstate Inmate Calling Services*,
Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd. 9519 (2021) .......... 24

*Seattle Pac. Univ.* v. *Ferguson*,
104 F.4th 50 (9th Cir. 2024) .......... 8, 10

*In re Section 63.71 Application of AT&T*,
Public Notice, 37 FCC Rcd. 14050 (2022) .......... 22

*Spokane Indian Tribe* v. *United States*,
972 F.2d 1090 (9th Cir. 1992) .......... 10

*Sprietsma* v. *Mercury Marine*,
537 U.S. 51 (2002) .......... 19

*Susan B. Anthony List* v. *Driehaus*,
573 U.S. 149 (2014) .......... 7, 10

*Ting* v. *AT&T*,
319 F.3d 1126 (9th Cir. 2003) .......... 19, 20

*Trump* v. *Cook*,
609 U.S. 528 (2026) .......... 14

*Verizon New England, Inc.* v. *Maine Pub. Utils. Comm'n*,
509 F.3d 1 (1st Cir. 2007) .......... 14

*Virginia* v. *Am. Booksellers Ass'n, Inc.*,
484 U.S. 383 (1988) .......... 8

*W. Union Tel. Co.* v. *State*,
63 S.E.2d 878 (Ga. 1951) .......... 14

*WWC Holding Co.* v. *Sopkin*,
488 F.3d 1262 (10th Cir. 2007) .......... 16, 25

**Statutes**

47 U.S.C. § 152 .......... 15, 16, 23

47 U.S.C. § 214 .......... 2, 4, 12, 13, 14, 27, 21

47 U.S.C. § 253 ........ 15, 16

47 U.S.C. §332 ........ 15, 16

Cal. Pub. Util. Code §§ 489-491, 454, 494, 495.7(b) ........ 6, 18, 23

Communications Act of 1934, ch. 652, § 214(c), 48 Stat. 1064, 1075 ........ 14

Transportation Act of 1920, ch. 91, § 402, 41 Stat. 456, 478 ........ 14

### Other Authorities

*Network Modernization Order* (NMO), WC Docket Nos. 25-208, 25-209, ¶ 112 (Mar. 26, 2026) ........ 2

*Vonage Holdings Corp. Petition for Declaratory Ruling Concerning an Ord. of the Minn. Pub. Utils. Comm'n, Memorandum Opinion and Order*, 19 FCC Rcd. 22404 (2004), *aff'd*, *Minn. Pub. Utils. Comm'n* v. *FCC*, 483 F.3d 570 (8th Cir. 2007) ........ 23

### Rules

General Rule 7.3.4(2) ........ 18

General Rule 7.4.1 ........ 17, 18

### Regulations

CPUC Decision 12-12-038 ........ 6, 17, 18

Gen. Order No. 96-B ........ 17

# INTRODUCTION

AT&T wants to retire an outmoded network that almost all of its California customers have abandoned, that thieves strip for scrap, and that costs $1 billion a year to keep running. In the last six months, the Federal Communications Commission (FCC) has twice authorized key steps to do so. The FCC granted AT&T (1) permission to stop enrolling new customers in its copper-wire-based "plain old telephone service," called POTS; and (2) permission to discontinue POTS altogether after a notice period. AT&T is taking those steps in only 360 of its 613 California wire centers, carefully chosen because AT&T has pervasive wireless coverage that satisfies FCC standards and because other carriers offer plenty of modern options, too.

Congress gave the FCC the exclusive authority to authorize these service changes. So under the Supremacy Clause, California cannot undo or add to AT&T's federal approvals. California disclaims doing so. It insists that its rules are "technology neutral" and that AT&T is free to stop offering POTS to new customers (what the FCC calls "grandfathering") and ultimately to discontinue POTS. As a result, California says, there is no conflicting state regulation for federal law to preempt and accordingly nothing for this Court to decide.

But California's insistence that AT&T may wind down POTS is paired with a series of punishing caveats. AT&T may retire POTS *so long as* it gets several state permissions first—permissions that California insists are merely ministerial but are anything but. AT&T may retire POTS *so long as* it offers an alternative under California standards that are more onerous than the federal standards. AT&T may retire POTS *so long as* it substitutes a different service with features that the CPUC concedes are obsolete, and that AT&T's modern services do not offer. AT&T may retire POTS *so long as* it tariffs the replacement, which federal law forbids. Scratch the surface, and none of these conditions is truly neutral. Together, they are a mandate to keep providing a service that the FCC has authorized AT&T to stop.

This Court has jurisdiction over AT&T's preemption claim. Although

California repackages its merits arguments as a challenge to AT&T's standing, the standing inquiry assumes that AT&T prevails on the merits. On that assumption, this case falls within Article III for straightforward reasons: California law inflicts harm on AT&T, which must choose between (i) forgoing FCC-approved service reductions and (ii) seeking additional CPUC approvals and developing new CPUC-blessed alternatives to POTS. And this case is ripe because California has credibly threatened to enforce its regulations against AT&T unless AT&T complies with the litany of "*so long as*" qualifications to its federal approvals.

On the merits, California's rules are preempted for two independent reasons. First, the Communications Act expressly preempts the extra conditions that California seeks to impose. Once the FCC acts, AT&T may proceed "without securing approval other than [the FCC's] certificate." 47 U.S.C. § 214(c). California's rules are an "other" "approval" under both plain meaning and precedent. Second, the rules conflict with the Communications Act scheme, with the FCC's grandfathering and discontinuance authorizations, and with federal rules governing interstate services. California cannot escape that conflict by telling AT&T to offer POTS only for intrastate calls. AT&T has plausibly alleged that interstate and intrastate calls run over a single, integrated POTS network, and California's own rules require AT&T to offer interstate access.

The FCC has already made the policy judgments here. It even anticipated California's maneuver and rejected it in advance: state "conditions that purport to be technology neutral"—like California's—are preempted if they "have the practical effect of requiring the carrier to continue providing an interstate or jurisdictionally mixed telecommunications service." *Network Modernization Order* (NMO), WC Docket Nos. 25-208, 25-209, ¶ 112 (Mar. 26, 2026). This Court should say the same. California may not throw up roadblocks to FCC-approved service changes and then hide from preemption by labeling such roadblocks "technology neutral." This Court should deny the motion to dismiss.

## BACKGROUND

### A. Consumers Shift From POTS To Modern Networks.

POTS is the wire-and-circuit-based telephone service that AT&T and other carriers have offered for generations. First Amended Complaint (FAC) ¶¶ 3-4, 32, Dkt. 56. It runs primarily over an aging, fragile, and expensive copper network. *Id.* ¶ 4. Copper wires are an easy and growing target for thieves: copper thefts have caused more than 3,200 outages in California over the first eight months of this year. *Id.* ¶ 1. For that reason and many others, POTS is a shrinking service, now used by less than 3% of households in AT&T's California territory (and shrinking). *Id.* ¶¶ 1, 32. AT&T added fewer than 500 POTS lines last year while subscribers canceled tens of thousands of lines. Dkt. 10-3 ¶ 5. That minuscule demand stands in sharp contrast to the roughly $1 billion a year AT&T spends to keep the network running. FAC ¶¶ 1, 36.[1]

Customers have moved on to faster, more reliable networks. Nearly 80% of adults nationwide now rely solely on wireless service. FAC ¶ 5. IP-based networks like wireless and fiber move hundreds of thousands of times faster than the legacy copper-based network. *Id.* ¶ 37. They are also more reliable, and can be restored faster when disasters like wildfires strike. *Id.* ¶ 7. AT&T has responded to consumer demand by investing hundreds of billions of dollars in fiber and 5G wireless, and it plans to accelerate that deployment over the next five years. *Id.* ¶¶ 4, 41. Those modern alternatives are widely available in the 360 wire centers at issue here: of the more than five million serviceable locations in those wire centers, more than 99.9% can obtain service from two or more facilities-based fixed broadband or mobile voice providers. *Id.* ¶ 42. The options include AT&T Phone – Advanced, or AP-A, an IP-based service that the FCC has thoroughly vetted and repeatedly found, on a bipartisan basis, to be an adequate replacement for POTS. AP-A is available to every

[1] California argues that the term POTS "is not a statutory or regulatory term." Mot. 1 n.1. The FCC uses the term in its orders, *e.g.*, NMO ¶¶ 30 n.104, 49, 100, as does the CPUC to sort service offerings by technology, *e.g.*, RJN, Dkt. 60-2, Ex. F at 8.

existing POTS customer in these wire centers, at comparable or lower costs.

### B. The FCC Authorizes Grandfathering And Discontinuance.

The Communications Act of 1934 established an "exclusively federal discontinuance regime for interstate or jurisdictionally mixed telecommunications services." NMO ¶ 108. Section 214(a) of the Act requires an FCC certificate before a carrier may "discontinue, reduce, or impair service to a community, or part of a community." 47 U.S.C. § 214(a). States have a right to notice and an opportunity to be heard before the FCC acts. *Id.* § 214(b). But once a federal certificate issues, the "carrier may, without securing approval other than such certificate, . . . proceed with the . . . discontinuance, reduction, or impairment of service." *Id.* § 214(c). POTS falls within the FCC's jurisdiction as a jurisdictionally mixed service: the same loops, switches, and trunks carry both interstate and intrastate calls, and AT&T "has no purely intrastate system." FAC ¶¶ 39-40, 91, 102-103.

For the past decade, the FCC has worked to clear regulatory barriers to modern IP-based networks so that "all consumers can access more advanced communications services." NMO ¶ 2. That effort culminated in the FCC's bipartisan, unanimous NMO, which took effect in large part on May 20, 2026. FAC ¶ 72. In the NMO, the FCC found that the transition to modern networks had been "hindered by the need for carriers to divert important resources to the maintenance of aging and deteriorating legacy networks" like POTS. NMO ¶ 2. The NMO streamlined the retirement of POTS in two ways. First, to "ease burdens associated with outdated services," the FCC granted "blanket section 214(a) authority for carriers to grandfather legacy voice services, lower-speed data telecommunications services, and interconnected Voice over IP (VoIP) service provisioned over copper wire," conditioned only on notice to existing customers. *Id.* ¶ 6. Second, to "bring [its rules] in line with the realities of today's communications marketplace," the FCC adopted streamlined rules for evaluating discontinuance applications. *Id.* ¶ 22.

The NMO addressed preemption, too. Nothing in Section 214, the FCC

explained, "empowers states to impose requirements that frustrate or add extra conditions to Commission decisions allowing discontinuance." NMO ¶ 110. So when the FCC authorizes grandfathering, "federal law preempts state requirements that operate to require the carrier to continue offering that interstate or jurisdictionally mixed grandfathered service to new customers." *Id.* ¶ 114 n.415. The FCC further explained that States may not "needlessly constrain the deployment of modern, next-generation IP-based networks by impeding providers' ability to discontinue providing interstate and jurisdictionally mixed legacy services and to retire outdated and deteriorating legacy networks." *Id.* ¶ 7. The agency specifically added that federal law preempts even "*conditions that purport to be technology neutral*" if they "have the practical effect of requiring the carrier to continue providing an interstate or jurisdictionally mixed telecommunications service." *Id.* ¶ 112 (emphasis added).

After the NMO, AT&T filed Section 214 applications to discontinue POTS in the 360 California wire centers where AT&T could demonstrate that its wireless coverage permitted a smooth transition from POTS to AP-A. FAC ¶¶ 2, 47. That same day, AT&T notified customers that it would grandfather POTS in those areas beginning in July 2026 and would discontinue the service no earlier than June 2027. *Id.* ¶ 51. The CPUC vigorously contested both applications, arguing that AP-A and other wireless services are not adequate replacements for POTS and that the FCC's coverage benchmarks, including the National Broadband Map, cannot reliably establish wireless coverage. *Id.* ¶ 58. The FCC granted the applications over the CPUC's opposition. *Id.* ¶ 48.

**C. California Imposes Its Own Service Rules.**

California adheres to uniquely onerous carrier-of-last-resort (COLR) rules that obstruct AT&T's federally authorized transition from POTS. California's COLR regime requires AT&T to furnish "basic service" to every customer in its legacy service territory. FAC ¶ 54. Basic service is defined by nine enumerated elements, which have remained POTS-centric since their adoption in the 1990s. *Id.* ¶ 55. Several

require antiquated features associated with traditional wireline service, including directory services and operator assistance. *Id.* ¶ 57. Modern voice services—to which more than 97% of California households in AT&T's territory subscribe—rarely include those features, and consumers have largely stopped using them. *Id.* ¶¶ 57, 95.

California's COLR regime also imposes conditions on changing the basic service that a carrier provides. For example, a carrier may not simply stop offering POTS and offer a different service instead. Before doing so, carriers must file an advice letter and obtain the CPUC's approval. *Id.* ¶ 60. Under a 2012 CPUC decision "adopt[ing] updated requirements for residential basic telephone service," a carrier that "is not a traditional wireline provider of basic service," or that "wishe[s] to offer basic service utilizing anything other than traditional exchange-based wireline technology," must file an even more demanding Tier 3 advice letter, which requires Commission approval. RJN Ex. B at 57, 78, 111 [CPUC Decision 12-12-038 at 2, 23 & n.17, 56]; *see* RJN Ex. N at 477 [CPUC Opening Comments at 16, WC Docket No. 26-125 (July 7, 2026)]. California further requires that a carrier's basic-service offering be memorialized in a tariff filed with the CPUC and thereby subjects that service to additional regulatory oversight. Cal. Pub. Util. Code §§ 489-491; RJN Ex. B at 65, 119 [CPUC Decision 12-12-038 § 3 & Appx. A]; *see* FAC ¶¶ 54-55.

Shortly after the NMO authorized it to grandfather POTS, AT&T filed this suit, alleging that the FCC approval preempts parts of California's COLR regime. AT&T amended its complaint after the FCC's further discontinuance authorization.

## LEGAL STANDARD

A complaint need plead only "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). At the pleading stage, unlike at the preliminary-injunction stage, the Court must accept AT&T's allegations as true and draw all "reasonable inferences" in AT&T's favor. *Nat'l Rifle Ass'n of Am.* v. *Vullo*, 602 U.S. 175, 195 (2024).

## ARGUMENT

California's motion raises both jurisdictional and merits defenses, but they collapse into one basic thesis: there is no conflict, California says, because it does not stop AT&T from retiring copper-based POTS. AT&T has plausibly pleaded otherwise. California does not have a single rule that expressly says "AT&T must provide POTS," but it has a tangle of other rules that amount to the same thing, or at least impede the transition from POTS. For example, several procedural rules require state approval to switch to a new basic service. And the basic-service requirements themselves are outmoded and slanted in favor of POTS and against modern substitutes, such as wireless. Indeed, while it claims to have an open mind, the CPUC has repeatedly made clear that it views wireless generally and AP-A specifically as a second-class service that cannot replace POTS as-is. California's refusal to let AT&T act on its clear federal authorization—without additional requirements—gives AT&T a real injury, a ripe risk of enforcement, and a viable preemption claim.

### I. The Court Has Jurisdiction.

California raises threshold questions about standing and ripeness, but those requirements are easily satisfied here. This Court has jurisdiction over AT&T's suit because the FCC authorized AT&T to grandfather and discontinue POTS, while California impedes AT&T from acting on that federal authorization. Those state hurdles harm AT&T's constitutional and business interests. This dispute is also ripe because California continues to brandish the threat of enforcement. California's contrary arguments assume away pleaded conflicts and conflate jurisdiction with the merits.

#### A. AT&T Has Standing.

To establish standing "at the pleading stage," AT&T need offer only "general factual allegations" that satisfy the "irreducible constitutional minimum" of the "case or controversy" requirement. *Lujan* v. *Defs. of Wildlife*, 504 U.S. 555, 560-561 (1992). Here, AT&T's allegations are more than "sufficient for Article III," *Susan B. Anthony List* v. *Driehaus*, 573 U.S. 149, 168 (2014), because AT&T has plausibly

alleged "injury," "causation," and "redress[ability]," *Seattle Pac. Univ.* v. *Ferguson*, 104 F.4th 50, 57 (9th Cir. 2024).

The standing allegations are straightforward. AT&T has a "concrete plan" to act on its federal approvals. *Cal. Trucking Ass'n* v. *Bonta*, 996 F.3d 644, 653 (9th Cir. 2021). It has sent grandfathering and discontinuance notices, no longer offers POTS to new customers, and plans to discontinue POTS for existing customers. FAC ¶¶ 41-51. AT&T also has plausibly alleged that California law "arguably proscribe[s]" its current grandfathering and planned discontinuance. *Seattle Pac. Univ.*, 104 F.4th at 60. California maintains that AT&T must take additional steps before carrying out that transition, including to satisfy substantive and procedural requirements governing any replacement basic service. FAC ¶¶ 29, 52-67.

If AT&T holds off on discontinuing POTS until it has California's blessing, then AT&T will suffer severe business and constitutional injuries that far exceed Article III's minimal pleading-stage screen. *Defs. of Wildlife*, 504 U.S. at 560. Prohibiting AT&T from discontinuing POTS will cost AT&T millions (if not billions) by requiring it to continue operating expensive POTS systems. FAC ¶¶ 36, 110. Such "monetary costs are 'of course an injury.'" *Diamond Alternative Energy, LLC* v. *EPA*, 606 U.S. 100, 114 (2025) (citation omitted). If AT&T instead complies with California's challenged requirements, AT&T will incur costs undergoing the advice-letter process, adding outdated features to craft a substitute "basic service," and trying to tariff an interstate service that it cannot. FAC ¶¶ 94-95. That course of action also inflicts a constitutional injury by requiring AT&T to comply, on pain of enforcement, with preempted state regulations. *Am. Trucking Ass'ns, Inc.* v. *City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009). Either way, the costs are traceable to California's continued insistence that AT&T clear additional state hurdles. Dkt. 56-1 at 2-3. And a decision that federal law preempts those state hurdles would redress the harm from "significant and costly compliance measures." *Virginia* v. *Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988).

California argues (at 9-13) that the CPUC's rules are "technology neutral" and that it is "speculative" that the CPUC would reject "wireless service" as a POTS "substitute." California improperly mixes jurisdiction (whether AT&T has pleaded an Article III harm) with the merits (whether California's rules in fact impose preempted obstacles). Standing "is distinct from the merits of [a] claim." *Am. Encore* v. *Fontes*, 152 F.4th 1097, 1110 (9th Cir. 2025) (alteration in original); *see Maya* v. *Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (collecting cases). AT&T's "legal clai[m]" must be "accept[ed] as valid" for "standing purposes." *Fed. Election Comm'n* v. *Ted Cruz for Senate*, 596 U.S. 289, 298 (2022). That claim is simple: the FCC has authorized grandfathering and discontinuance of POTS, without regard to state approvals, but California law imposes an impermissible state approval.

California also argues (at 14-15) that AT&T's "economic losses do not confer standing" because they are "self-inflicted." Suffice it to say, AT&T would not voluntarily choose to pay millions (or billions) to keep POTS running, and the complaint plausibly alleges that California is inflicting the harm. If AT&T forgoes discontinuing POTS to comply with California law, AT&T suffers the harm of maintaining an outdated wire system for an unwanted service. FAC ¶¶ 36, 42-43, 110. If AT&T instead seeks the state approvals necessary to transition from POTS, AT&T incurs the costs of California's advice-letter, replacement-service, and tariffing requirements. *Id.* ¶¶ 94-95. Either way, the alleged injury results from California's requirements, not AT&T's voluntary choices.

California wrongly relies (at 14-15) on this Court's preliminary view that, if AT&T does not transition away from POTS, then the "harm [would be] self-inflicted" and not irreparable. Dkt. 47 at 22:23-23:17. But at the preliminary-injunction stage, this Court addressed irreparable harm, which is a more demanding requirement than Article III injury in fact. *Midgett* v. *Tri-County Metro. Transp. Dist. of Or.*, 254 F.3d 846, 850-851 (9th Cir. 2001). The complaint also now alleges post-hearing developments and more fully explains how California's requirements injure

AT&T whichever course it takes. FAC ¶¶ 29, 60, 66, 94-95, 110. Those allegations must be accepted as true here. *Defs. of Wildlife*, 504 U.S. at 561. On top of that, California has retreated from its representations at the preliminary-injunction hearing that its approval process is fully optional. *See infra*, at 17.

**B. This Case Is Ripe.**

AT&T's conflict with California is ripe for review. To establish ripeness at this stage, AT&T need plausibly allege only that (1) it has an "intention to engage" in the FCC-approved service changes, (2) such conduct is "proscribed by a statute," and (3) there is a "credible threat of prosecution" against AT&T. *Arizona* v. *Yellen*, 34 F.4th 841, 849 (9th Cir. 2022) (citing *Susan B. Anthony List*, 573 U.S. at 159); *see, e.g.*, *City & Cnty. of San Francisco* v. *Trump*, 897 F.3d 1225, 1236 (9th Cir. 2018). As explained, AT&T has engaged and plans to further engage in conduct proscribed by California law. And AT&T has plausibly alleged a "credible threat" of enforcement. *Seattle Pac. Univ.*, 104 F.4th at 59; *see Yellen*, 34 F.4th at 850.

California has repeatedly refused to disavow enforcement here. FAC ¶¶ 29, 62-67. That refusal to "disavow enforcement," combined with the potential for sweeping penalties, alone establishes ripeness. *Seattle Pac. Univ.*, 104 F.4th at 60; *see, e.g.*, *Cal. Trucking Ass'n*, 996 F.3d at 653. And since this litigation began, California's conduct has confirmed that AT&T has a "real and reasonable apprehension" that California may act. *Spokane Indian Tribe* v. *United States*, 972 F.2d 1090, 1092 (9th Cir. 1992). For example, California sent a letter on August 7 demanding that AT&T "explain how" its decision to grandfather POTS without CPUC approval "complies" with various "CPUC rules and regulations." Dkt. 56-1 at 3. California insists (at 13) that "[t]he letter merely '*asks* AT&T to explain how its proposed conduct complies with'" California law. But as the Supreme Court observed about letters requesting "cooperation," "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around." *Bantam Books, Inc.* v. *Sullivan*, 372 U.S. 58, 68 (1963); *see Vullo*, 602 U.S.

at 193 (explaining that a "threat" of civil enforcement "'need not be explicit'"); *Peace Ranch, LLC* v. *Bonta*, 93 F.4th 482, 490 (9th Cir. 2024) (upholding jurisdiction where the State's "briefing diligently avoid[ed] taking a stance" on enforcement).

California argues (at 8) that AT&T has not alleged that it will "violate the COLR rules" or "prompt enforcement action." But that is exactly what it alleges. AT&T has *already* grandfathered POTS without providing a CPUC-compliant substitute, and California has never agreed to let AT&T rely on its current AP-A offerings. Although California says (at 14-15) that AT&T is free to discontinue and grandfather POTS, it always includes a caveat—*so long as* AT&T complies with California's (preempted) requirements and approvals. That condition puts AT&T to the "Hobson's choice" of "continually violat[ing]" California law and risking enforcement consequences, or "suffer[ing] the injury of obeying the law" and forgoing federally approved actions. *Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). California's refusal to disavow enforcement confirms that "this controversy is ripe for adjudication." *Trump*, 897 F.3d at 1238.

## II. AT&T Has Stated A Plausible Preemption Claim.

A "federal statute may expressly preempt state law by enacting a clear statement to that effect." *Chamber of Com. of the United States* v. *Bonta*, 62 F.4th 473, 482 (9th Cir. 2023). Alternatively, state laws can be impliedly preempted, including "to the extent of any conflict with a federal statute." *Ibid.* (quoting *Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)). California runs afoul of both types of preemption. It contravenes Section 214(c)'s express preemption clause by requiring AT&T to secure California's approval—through the advice-letter, service-tariffing, and other state-administrative processes—before acting on the FCC's authorization. And it conflicts with the statutory scheme and the NMO because California's rules effectively require POTS or, at the very least, impose onerous conditions that impede AT&T's ability to retire it.

### A. Section 214(c) Expressly Preempts California's Requirements.

Express preemption alone is sufficient to reject California's motion. Section 214(c) explicitly forecloses additional state conditions layered on top of an FCC-approved service change. The statute provides that, when the FCC has authorized a carrier to "discontinue, reduce, or impair service to a community," "the carrier may, *without securing approval other than such certificate*, . . . proceed with the . . . discontinuance, reduction, or impairment of service." 47 U.S.C. § 214(a), (c) (emphasis added). California does not dispute that the FCC properly exercised its Section 214 authority here, or that AT&T received FCC approval to grandfather and discontinue POTS. It contends instead (at 16-19) that Section 214(c) does not address state regulation at all, and (at 19-20) that California does not impose additional "approvals" anyway. Those arguments misconstrue the preemptive force of Section 214(c), disregard AT&T's allegations, and mischaracterize California law.

#### 1. AT&T Received FCC Approval Under Section 214.

The complaint alleges both that POTS is subject to the FCC's Section 214 authority and that AT&T received federal authorization to grandfather and discontinue it. California appears to accept both premises.

California accepts (at 16) that POTS is a jurisdictionally mixed service subject to the FCC's jurisdiction. FAC ¶ 91; *cf.* Mot. 23-24 (arguing only that AT&T hypothetically could offer POTS on an intrastate-only basis). The complaint certainly pleads as much. AT&T's POTS network "consists of over a million miles of metallic cables and thousands of time-division-multiplexing (TDM) circuit switches." FAC ¶ 35. AT&T "employs the same copper wireline network for both interstate and intrastate calls," and "has no purely intrastate system." *Id.* ¶¶ 102-103. As a result, the copper wires, loops, and other equipment are "part of an interstate line" allowing communication with people outside California. 47 U.S.C. § 214(a); *see* NMO ¶ 107.

California also acknowledges (at 5) that the FCC has granted AT&T authorization to grandfather and discontinue POTS. The NMO confirmed the FCC's

"blanket section 214(a) authority for carriers to grandfather legacy voice services . . . provisioned over copper wire." NMO ¶ 6. The FCC has since granted AT&T's applications to discontinue POTS in 360 California wire centers. FAC ¶ 82.

**2. Section 214(c) Expressly Preempts State-Law Approvals.**

California argues (at 16-19) that Section 214(c) does not preempt additional state-law approvals governing how carriers implement the FCC's approval to reduce a covered service. California's federal/state dichotomy has no basis in Section 214, which states that "the carrier may, *without securing approval other than such certificate*," "proceed with" a discontinuance or reduction. 47 U.S.C. § 214(c) (emphasis added). Section 214 thus "leaves exclusively within the jurisdiction of the Commission the determination of whether to" allow a carrier to "discontinue a service." *ITT World Commc'ns, Inc.* v. *N.Y. Tel. Co.*, 381 F. Supp. 113, 120 (S.D.N.Y. 1974). Carriers may modify services immediately once a certificate is in hand. *Cablevision of Texas III, L.P.* v. *Oklahoma W. Tel. Co.*, 993 F.2d 208, 210 (10th Cir. 1993). As a matter of text, context, history, and precedent, States may not say otherwise.

a. Section 214(c)'s text is plain. Although California would add the word "federal" before "approval," courts "may not narrow a provision's reach by inserting words Congress chose to omit." *Lomax* v. *Ortiz-Marquez*, 590 U.S. 595, 600 (2020). No "approval other than such certificate" means no approval—federal or state.

Statutory context confirms that States may not impose additional requirements on service changes. Section 214 allows States to *consult* in FCC proceedings and to *enforce* the FCC's decision, but not to veto or impede the FCC's decision with additional requirements. To facilitate state consultation, Section 214(b) requires the FCC to provide "notice" to affected States and "the right . . . to be heard." 47 U.S.C. § 214(b). "This provision allows states to object to any federal discontinuance application prior to any Commission authorization." NMO ¶ 110. That is exactly what California did here: it unsuccessfully objected to AT&T's discontinuance applications. FAC ¶ 48. States may also enforce the FCC's decisions by suing to enjoin any

discontinuances "contrary to the provisions of" Section 214 itself. 47 U.S.C. § 214(c); NMO ¶ 110. The negative inference is clear: States may not *countermand* the certificate by imposing their own approval requirements after the FCC acts. *See Verizon New England, Inc.* v. *Maine Pub. Utils. Comm'n*, 509 F.3d 1, 7 (1st Cir. 2007) (interpreting analogous provisions to commit decision "exclusively to the FCC" after state consultation). If States could impose their own approval requirements, "no purpose would be served" by spelling out the more limited rights to consult with the FCC and to enforce its decisions. *Morales*, 504 U.S. at 385-386.

History reinforces that Section 214(c) preempts additional state-law requirements. Congress borrowed the key language—"without securing approval other than such certificate"—from the Transportation Act of 1920, ch. 91, § 402, 41 Stat. 456, 478. *See China Unicom (Americas) Ops. Ltd.* v. *FCC*, 124 F.4th 1128, 1149 (9th Cir. 2024). By the time that Congress enacted that language in the Communications Act of 1934, ch. 652, § 214(c), 48 Stat. 1064, 1075, the Supreme Court had held that the Transportation Act barred state regulation of service changes. *Colorado* v. *United States*, 271 U.S. 153, 164-166 (1926). Congress "presumptively [was] aware" of *Colorado* when enacting Section 214(c). *Trump* v. *Cook*, 609 U.S. 528, 554 (2026).

Precedent confirms the same point. The Supreme Court has held that the parallel transportation scheme preempts efforts to impose "sanctions upon a regulated carrier for doing" what the certificate authorizes, even if a State uses "artful" language to block the reduction by another name. *Chicago & North W. Transp. Co.* v. *Kalo Brick & Tile Co.*, 450 U.S. 311, 324, 326 (1981). Applying Section 214(c) itself, the Georgia Supreme Court likewise invalidated a penalty that a state public service commission had imposed for a telegraph carrier's change in service to an FCC-approved alternative. It reasoned that the phrase "without securing approval other than such certificate" reflects "a clear intent on the part of Congress that, where the services of the carrier involve both interstate and intrastate communications, consent to reduce the same need not be obtained from any other regulatory body." *W.*

*Union Tel. Co.* v. *State*, 63 S.E.2d 878, 883-885 (Ga. 1951).

b. California offers (at 16-19) four theories for its novel position that Section 214(c) precludes only additional federal approvals for service reductions. None overcomes Section 214(c)'s text, context, history, or precedent.

*First*, California invokes (at 17) the presumption against preemption. But that presumption does not apply. When, as here, "the statute 'contains an express pre-emption clause,'" courts "do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause.'" *Puerto Rico* v. *Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125 (2016) (citation omitted). California thus cannot put a "presumptive thumb on the scale" against preemption. *KalshiEX, LLC* v. *Assad*, — F.4th —, 2026 WL 2543846, at *7 (9th Cir. Aug. 28, 2026) (quoting *Cal. Rest. Ass'n* v. *City of Berkeley*, 89 F.4th 1094, 1101 (9th Cir. 2024)).

*Second*, California argues (at 18) that Section 214(c) is not an express preemption provision because Congress did not explicitly refer to state-law approvals or use a variant of the word "preemption," as it did in other provisions of the federal communications law. *See, e.g.*, 47 U.S.C. §§ 152 note, 253(d), 332(c)(3). But neither the Supreme Court nor the Ninth Circuit has "required any particular magic words in [its] express pre-emption cases." *Gade* v. *Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 112 (1992) (Kennedy, J., concurring in part and concurring in the judgment). Indeed, the Ninth Circuit rejected a nearly identical argument just two months ago. It held that a provision granting the Commodity Futures Trading Commission "'exclusive jurisdiction'" over certain financial transactions excluded not only other federal agencies but also "all others." *KalshiEX*, 2026 WL 2543846, at *7. The Ninth Circuit rejected a proposed carveout for state regulators, explaining that "there are no magic words that a statute must employ to preempt state law." *Ibid.*

California contends (at 18) that the existence of other, differently labeled preemption provisions in federal communications law "strongly suggests" that Section 214(c) is not an express preemption provision. But *KalshiEX* just rejected that

argument, too. There, as here, related provisions used even "more explicit language for preemption," but those other formulations did not strip the operative provision of preemptive effect. 2026 WL 2543846, at *7. That result makes even more sense here, where the different preemption provisions in the Communications Act were enacted over many decades. Congress enacted Section 214(c) almost a century ago, modeled on a provision that the Supreme Court had already interpreted to exclude state law. *See supra*, at 16. Later-enacted provisions exempting direct-to-home satellite service from local taxation (§ 152 note), protecting carriers' ability to provide telecommunications services (§ 253), and forbidding state rate-setting for mobile service (§ 332(c)(3)) did not narrow Section 214(c)'s well-established reach.

*Third*, California suggests (at 18) that Section 152(b) permits States to impose additional requirements on service reductions. That provision states a general rule that the FCC lacks jurisdiction over "intrastate communication service." 47 U.S.C. § 152(b). But Section 152(b) is irrelevant here because California does not dispute that POTS is a jurisdictionally mixed service subject to the FCC's jurisdiction. *See supra*, at 12. At any rate, "in discerning the limits of a state's regulatory authority," courts "look past a mere rule of thumb demarcating jurisdiction over interstate or intrastate communications, and instead look to the [statute] itself"—here, Section 214(c). *WWC Holding Co.* v. *Sopkin*, 488 F.3d 1262, 1271 (10th Cir. 2007).

*Fourth*, California protests (at 17-18) that giving effect to Section 214(c)'s plain text would lead to absurd consequences, like carriers disregarding state permitting requirements or contractual obligations. But Section 214(c) preempts only state requirements that operate as a state "approval" of, or precondition to, the "terms and conditions" of the FCC-authorized service change. A generally applicable law unrelated to telecommunications service, such as the physical construction of facilities or the performance of a private contract, will thus not trigger Section 214(c) at all. Here, by contrast, California's COLR rules require AT&T to secure the State's permission before carrying out the service reductions the FCC authorized. California may not

target the service change itself and thus impose "sanctions upon a regulated carrier for doing" what a federal certificate permits. *Kalo Brick*, 450 U.S. at 324, 326.

**3. The COLR Rules Are Forbidden State-Law Approvals.**

Alternatively, California argues (at 19-20) that its COLR rules do not operate as "approvals" for service changes. AT&T has alleged that they do in at least three ways. California (1) requires CPUC approval before substituting a replacement service, (2) subjects any substitute to the CPUC's tariffing jurisdiction, and (3) demands that AT&T offer a replacement service beyond what federal law requires. Those requirements are precisely the kind of "approval other than such certificate" that Section 214(c) preempts.

*First*, as California now acknowledges (at 20), the COLR rules require AT&T to receive formal CPUC approval via the advice-letter process before switching from POTS to a different basic service. California previously told this Court that the advice-letter process was "optional." FAC ¶ 60; *see* Dkt. 53-1 at 5 ("CPUC maintains an optional process (the 'advice letter' process) for utilities to request relief from a particular basic service requirement, or to secure advanced authorization to satisfy the requirement in a new way."). It has now backtracked, acknowledging that the process is required but characterizing it as merely "ministerial." Mot. 20; RJN Ex. O at 491-492 [CPUC Reply Comments at 4-5, WC Docket No. 26-125 (July 22, 2026)]. That concession is fatal. Ministerial or not, the advice-letter process is an additional "approval" that Section 214 does not allow. 47 U.S.C. § 214(c).

In any event, California's own exhibits demonstrate that this approval is anything but ministerial. AT&T must submit a Tier 3 advice letter, which requires full CPUC approval in often-lengthy proceedings, to switch to a non-wireline basic service. RJN Ex. B at 78 [CPUC Decision 12-12-038 at 23 & n.17]. Even if the supposedly less onerous Tier 2 process applies, as the CPUC has suggested, it is no rubber stamp. "Any person" may protest a Tier 2 advice letter and request an evidentiary hearing, Gen. Order No. 96-B, Gen. R. 7.4.1, and CPUC staff can suspend the

effectiveness of the letter, *id.* Gen. R. 7.5.1-.2. A protested or suspended letter takes effect only after written staff approval or a Commission resolution. *Id.*, Gen. R. 7.3.4(2); *see* Dkt. 32-2, Exs. 9-11 (illustrating Tier 2 approval that took two years and three filings). Either procedure would let the CPUC relitigate what the FCC has already decided. FAC ¶ 58.

*Second*, California requires AT&T to submit any replacement basic service to the CPUC's tariffing jurisdiction. FAC ¶¶ 54-55, 59. California law requires a carrier offering basic service to file a tariff memorializing that service with the CPUC. Cal. Pub. Util. Code §§ 489(a), 495, 495.7(b) (excluding basic exchange service from tariff exemptions). Carriers also must secure CPUC approval for tariff modifications. *Id.* §§ 454(a), 494, 495.7(b); RJN Ex. B at 119 [CPUC Decision 12-12-038, Appx. A at 6]. And once the service is tariffed, its rates, terms, and conditions are subject to the CPUC's ongoing oversight. FAC ¶ 59. The tariffing requirement acts as a veto here. POTS's modern replacements—AP-A, VoIP, and mobile wireless—are all-distance services that federal law bars AT&T from tariffing. *Ibid.*; *see infra*, at 23.

*Third*, as California admits (at 20-21), state law requires replacement services beyond what the FCC requires. The FCC granted carriers blanket authority to grandfather legacy voice services without requiring them to identify (let alone provide) *any* replacement service. NMO ¶ 60. The only condition is notice to existing customers—a requirement imposed to "ensure that customers learn as soon as possible that their service is likely to be discontinued at some point in the future." *Id.* ¶¶ 62-63. The federal scheme contemplates that any potential customers, who by definition do not rely on AT&T's POTS, already have a different service or can choose among the many modern services available in their area. FAC ¶¶ 42, 45. Yet California law permits grandfathering only "so long as AT&T offers a replacement service that meets [state] regulatory requirements." Dkt. 56-1 at 2; *see* FAC ¶¶ 54-55, 60.

Discontinuance standards differ, too. Federal law permits a carrier to discontinue a legacy voice service so long as there is at least one adequate replacement

service—offered by *anyone*, not just the applicant, and judged according to federal standards—throughout the affected area. NMO ¶¶ 23, 25, 38. The FCC applied that standard when granting AT&T's applications here. FAC ¶¶ 47-48. Conversely, California demands that *AT&T* offer a tariffed service satisfying all nine basic-service elements, including elements (like operator assistance and directory services) that AT&T's replacement does not offer. *Id.* ¶¶ 54-55; *see* Mot. 21. California may not pile on its own conditions to the service reduction that the FCC already approved, over California's objection, on less onerous terms.

### B. Federal Law Impliedly Preempts California's Requirements.

Even if California were right that the challenged rules survive express preemption, they would still be impliedly preempted. At every turn, California's requirements are written around POTS and penalize, disincentivize, or even make impossible a switch to obvious alternatives like wireless. That heavy preference for the status quo impedes the FCC's grandfathering and discontinuance authorizations nearly as much as a flat-out POTS requirement. And California cannot evade these conflicts by commanding that AT&T offer POTS on an intrastate-only basis.

#### 1. Conflict-Preemption Principles Apply.

California first tries to wave away any conflict-preemption analysis. It suggests (at 17, 19) that Section 214(c)'s express-preemption provision limits any implied-preemption analysis. But "Congress' inclusion of an express pre-emption clause 'does *not* bar the ordinary working of conflict pre-emption principles.'" *Sprietsma* v. *Mercury Marine*, 537 U.S. 51, 65 (2002) (quoting *Geier* v. *Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000)). In any event, California's lead argument (at 16-19) is that Section 214(c) is not an express preemption provision—which, if true, would mean that California has no basis to argue that Congress expressed a view that preemption should be limited to the terms of Section 214(c).

California also is wrong to invoke (at 21-22) the presumption against preemption. That "presumption does not apply" where the "State regulates in an area where

there has been a history of significant federal presence." *Ting* v. *AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003) (holding presumption inapplicable to "long-distance telecommunications"); *see Qwest Corp.* v. *Arizona Corp. Comm'n*, 567 F.3d 1109, 1118 (9th Cir. 2009) (same). This case implicates a "long history of federal presence" in regulating service reductions for jurisdictionally mixed services. *Ting*, 319 F.3d at 1136. That history traces back to 1934, when Congress vested the FCC with exclusive jurisdiction under Section 214. *See supra*, at 13-14. In all events, any presumption would be "just that—a presumption." *Block* v. *Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984). Congress overcame any such presumption here by "tak[ing] the regulation" of reductions or discontinuances "away from the States," as it has done for other telecommunications issues. *AT&T Corp.* v. *Iowa Utils. Bd.*, 525 U.S. 366, 378 n.6 (1999).

**2. California Law Conflicts With Federal Law.**

California's primary defense to conflict preemption is again that its COLR regulations are "technology neutral." But the FCC was clear: even laws that "purport to be technology neutral" are preempted if they "have the practical effect of requiring the carrier to continue providing" POTS. NMO ¶ 112. Here, California's regulatory scheme is obstructing and delaying the FCC's decision to wind down "aging and deteriorating legacy networks" and expedite the transition to "next-generation networks." *Id.* ¶¶ 2, 13. California's outmoded regime does so because it: (1) mandates that AT&T secure additional state approvals, (2) imposes basic-service requirements that obstruct the transition from POTS to modern alternatives, (3) blocks the only economically viable, territory-wide substitute for POTS, and (4) requires tariffing prohibited by federal law. These additional requirements—individually and collectively—entrench last century's technology.

***Additional Approvals.*** If California were right that Section 214(c) does not expressly preempt California's additional approval requirements, those requirements would still conflict with the federal scheme. Congress chose to centralize decision-

making authority in the FCC, and to give the FCC the last word. It folded States *into* that federal process, rather than allowing them to run their own separate process. 47 U.S.C. § 214(b)-(c). More broadly, when it comes to interstate or jurisdictionally mixed services like POTS, the Communications Act "evince[s] a congressional intent" that the FCC "control the state regulatory bodies," because a "nationwide telecommunications system" requires one set of approval procedures—and necessarily "preempt[s] any independent" procedures demanded by individual States. *Haw. Tel. Co.* v. *Pub. Utils. Comm'n of Hawaii*, 827 F.2d 1264, 1276 (9th Cir. 1987). Congress gave the FCC the "exclusive discretion" over grandfathering and discontinuance, with "no further role" for California. *Kalo Brick*, 450 U.S. at 326. California therefore cannot impose "sanctions upon [AT&T] for doing" what the FCC authorized, and it certainly cannot use "artful" framing to contradict the FCC's authorization. *Id.* at 324-326.

***Outmoded Rules.*** Despite California's "technology neutral" slogan, California's basic-service definition effectively requires POTS and forecloses modern alternatives like AP-A. California may not "accomplish by subterfuge what it could not, by its own admission, do directly." *Haw. Tel.*, 827 F.2d at 1277-1278. California's regulations obstruct AT&T from winding down POTS because they impose "outdated" requirements—like directory assistance and operator assistance—that are relics of the traditional wireline era and not offered by AT&T's replacement service. FAC ¶¶ 54-55, 57, 60. Insisting on these outmoded requirements thus locks POTS in place and impedes the FCC's attempt to wind down "aging and deteriorating legacy networks." NMO ¶ 2. This Court observed as much at the preliminary-injunction hearing, noting that at least some CPUC rules "make it impossible for anything other than copper wire" to satisfy California law. Dkt. 47 at 24:3-9. California responds (at 9-10) that AT&T *could* change its modern offerings to include these outdated features. But that is an obvious burden on discontinuance: a company may discontinue POTS only if it changes its existing alternative services to add features

that do not make sense, customers do not want, and its rivals do not need to offer.[2]

***Wireless Rejection.*** The FCC made clear that POTS is out—and wireless is in. Although AT&T has deployed fiber in places, wireless is the only realistic alternative in some areas of its territory and is a necessary solution to retiring POTS. FAC ¶ 58. For that reason, the FCC (1) authorized grandfathering and discontinuance of POTS, *id.* ¶¶ 75, 92; and (2) confirmed that wireless services (including AP-A) are adequate substitutes for POTS, *id.* ¶¶ 39-40, 102; NMO ¶ 34. California may not practically negate the former determination by disputing the latter one.

California now suggests (at 23-24) that AT&T could replace POTS with a wireless service like AP-A. But that late-breaking (and tentative) statement appears in this Court and nowhere else. California was not so generous in its August 7 letter to AT&T. *See* Dkt. 56-1 at 2-3. And the CPUC has recently told the FCC the opposite: it challenged the FCC's determination that AP-A is an adequate alternative in California. *See, e.g.*, Dkt. 60-2 at 454-457. The CPUC has elsewhere taken the similar position that "current wireless service plans—without wireline at least as a backup—are still not exclusively meeting most consumers' basic service needs." Dkt. 32-3 at 19; *see* Dkt. 32-6 at 92 ("[W]ireless service" is not "an adequate replacement for a wireline service" without additional proof of coverage beyond what the FCC has accepted). It has also rejected federal benchmarks for establishing wireless coverage, NMO ¶ 35, including the National Broadband Map relied upon by the FCC. *See, e.g.*, CPUC Opposition at 9, WC Docket Nos. 26-120 & 26-121 (June 15, 2026); *see also* FAC ¶ 58. In short, the complaint plausibly alleges that the CPUC has rejected the FCC's conclusion that AP-A is sufficient, both generally and in these 360 wire centers. That negates AT&T's ability to retire POTS using the obvious alternative that the FCC has blessed.

---

[2] California argues (at 10 n.5) that AT&T used to have a VoIP product that offered "operator and directory assistance" services. But AT&T discontinued those services precisely because consumers did not want them, and it has never offered those features with AP-A. *In re Section 63.71 Application of AT&T*, Public Notice, 37 FCC Rcd. 14050, 14053 (2022) (discontinuance effective January 2023); *see* FAC ¶ 57.

***Tariffing.*** As noted above, the CPUC maintains rules that require AT&T to tariff replacement "basic services." Cal. Pub. Util. Code § 495.7(b). That sets up a conflict that rises to true impossibility: as California never disputes, the FCC has *prohibited* state tariffing of interstate services like AP-A. *See, e.g.*, *Vonage Holdings Corp. Petition for Declaratory Ruling Concerning an Ord. of the Minn. Pub. Utils. Comm'n, Memorandum Opinion and Order*, 19 FCC Rcd. 22404, ¶ 20 (2004), *aff'd*, *Minn. Pub. Utils. Comm'n* v. *FCC*, 483 F.3d 570 (8th Cir. 2007); *see also, e.g.*, FAC ¶ 59. AT&T cannot satisfy California's demand that AT&T tariff all-distance AP-A as a replacement basic service while complying with federal law prohibiting tariffing. Again, taking off the table the only commercially viable POTS alternative (and an FCC-approved alternative, at that) sets up an insurmountable obstacle to discontinuing POTS as the federal government has authorized.

**3. An Intrastate POTS Carve-Out Would Be Impossible.**

California argues (at 23-25) as a last resort that, even if the COLR rules conflict with federal law as applied to California POTS, the State may require AT&T to engineer an intrastate-only version of POTS for California to regulate. That attempt to avoid preemption runs headlong into the Supreme Court's impossibility doctrine.

In Section 2 of the Communications Act, Congress attempted to "divide the world of domestic telephone service neatly into two hemispheres—one comprised of interstate service, over which the FCC would have plenary authority, and the other made up of intrastate service, over which the States would retain exclusive jurisdiction." *Louisiana Pub. Serv. Comm'n* v. *FCC*, 476 U.S. 355, 360 (1986); *see* 47 U.S.C. § 152. But "the realities of technology and economics belie such a clean parceling of responsibility." *Louisiana*, 476 U.S. at 360. Courts have thus recognized an "impossibility exception" to the division of authority in Section 2, whereby federal law preempts intrastate regulation when (1) it is "not possible to separate the interstate and intrastate components of the asserted FCC regulation" and (2) the state regulation would undermine valid FCC regulatory goals. *California* v. *FCC*, 75 F.3d

1350, 1359 (9th Cir. 1996) (internal quotations omitted). Both are met here.

*First*, AT&T has alleged that separating the interstate and intrastate components of POTS is physically impossible, commercially impractical, and legally prohibited. Physically, "[c]arriers use a single, unified network to provide telephone service to customers in a particular area, regardless of whether a specific call is long-distance or local," and both interstate and intrastate calls "are provisioned over the same network using the same technology." FAC ¶ 91. In addition, there has been no "reasonable or reliable" way "for many years" to determine the location of called parties based on area codes. *Rates for Interstate Inmate Calling Services*, Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, 36 FCC Rcd. 9519, ¶ 246 (2021). Commercially, "such a separation [i]s not practical," *Pub. Serv. Comm'n of Md.* v. *FCC*, 909 F.2d 1510, 1516 (D.C. Cir. 1990), taking into account "economic and operational factors," *California* v. *FCC*, 39 F.3d 919, 932 (9th Cir. 1994). Modern voice offerings are uniformly "all-distance" services carried over integrated interstate networks. FAC ¶ 102. In the vanishingly rare instances where separate local and long-distance products *are* still available, every local service offers the interstate exchange services necessary to connect with another long-distance carrier. *Ibid.* Nobody would buy a voice service that cannot (even in combination with another carrier) make calls to or receive calls from a different area code. That is why California's own basic-service definition *requires* the ability to place and receive voice-grade calls "'over all distances.'" FAC ¶ 91.

*Second*, California's attempt to require AT&T to offer POTS on an intrastate-only basis "functionally prohibit[s] AT&T from transitioning away from outdated legacy voice services like POTS." FAC ¶ 104. The FCC's explicit goal in the NMO is to "cut[] through the red tape that has . . . required providers to keep aging copper lines in place," allowing carriers to "transition from legacy TDM-based networks" to "competitive all IP-based networks." NMO ¶¶ 1-3. To recoup savings to invest in such modern telecommunications services, AT&T must retire the facilities of that

indivisible network. FAC ¶ 103. AT&T thus faces an all-or-nothing decision on whether to maintain a copper-wire network to support POTS. Because there is no practical way to wind down interstate POTS while keeping intrastate POTS operational, California's COLR regulations "would effectively negate" the FCC's certificates authorizing AT&T to grandfather and discontinue POTS. *California*, 39 F.3d at 933 (citation omitted); *see North Carolina Utils. Comm'n* v. *FCC*, 537 F.2d 787, 791-792 (4th Cir. 1976) (jurisdictional separation impracticable when carrier used same facilities and equipment "in common and indivisibly" for both interstate and intrastate communications); *Louisiana*, 476 U.S. at 375 n.4 (citing *North Carolina* to illustrate impossibility). Thus, the CPUC proposes the worst of all possible worlds, saddling AT&T with the costs of maintaining most of the POTS network, but solely to provide a service that no one would want.

In response to all that, California cites (at 24) *WWC Holding*. But *WWC Holding* addressed a different question. There, a state commission conditioned an eligibility designation on "state-specific consumer protection and operational standards." 488 F.3d at 1268-1269. The Tenth Circuit held that the carrier could not escape those conditions merely because it offered "interstate and intrastate services in 'bundles' to individual consumers." *Id.* at 1271. But AT&T's argument here does not depend on mere marketing of two disaggregable services. AT&T carries interstate and intrastate calls over a single, indivisible copper network that it cannot retire for one purpose while maintaining it for the other. FAC ¶¶ 102-103. In addition, the statute in *WWC Holding*, unlike Section 214, expressly preserved state authority. *See* 488 F.3d at 1271. *WWC Holding* thus provides no support for California's argument that California may force AT&T to offer POTS on an intrastate-only basis. AT&T is not obligated to create such a service "merely to provide [the CPUC] with an intrastate communication [it] can then regulate." *Minn. Pub. Utils. Comm'n*, 483 F.3d at 578.

## CONCLUSION

This Court should deny California's motion to dismiss.

Dated: October 15, 2026

**GIBSON, DUNN & CRUTCHER LLP**

By: /s/ Theodore J. Boutrous, Jr.
Theodore J. Boutrous, Jr.
*Attorney for Plaintiff Pacific Bell Telephone Company d/b/a AT&T California*

THEODORE J. BOUTROUS, JR., SBN 132099
tboutrous@gibsondunn.com
JILLIAN N. LONDON, SBN 319924
jlondon@gibsondunn.com
MARISSA MULLIGAN, SBN 319734
mmulligan@gibsondunn.com
PATRICK J. FUSTER, SBN 326879
pfuster@gibsondunn.com
BRANTON J. NESTOR, SBN 338445
bnestor@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000

JEFFREY B. WALL (*pro hac vice*)
jwall@gibsondunn.com
MORGAN L. RATNER (*pro hac vice*)
mratner@gibsondunn.com
1700 M Street, N.W.
Washington, DC 20036-4504
Telephone: 202.955.8533

*Attorneys for Plaintiff Pacific Bell Telephone Company d/b/a AT&T California*